## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| OPERATIVE PLASTERERS AND CEMENT MASONS INTERNATIONAL ASSOCIATION LOCAL 262 ANNUITY FUND, Individually And On Behalf of All Others Similarly Situated, | ) ) ) ) ) | **CIVIL ACTION NO. 08-CV-5523(LAK)** |
| Plaintiff, | ) ) ) | JURY TRIAL DEMANDED |
| vs. | ) ) | |
| LEHMAN BROTHERS HOLDINGS, INC., RICHARD S. FULD, JR., CHRISTOPHER M. O'MEARA, JOSEPH M. GREGORY, and ERIN CALLAN, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Operative Plasterers and Cement Masons International Association Local 262 Annuity Fund ("Plaintiff") makes the following allegations, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, based upon the investigation conducted by Plaintiff's counsel, which included, among other things, a review and analysis of Lehman Brothers Holdings, Inc.'s ("Lehman Brothers" or the "Company") filings with the United States Securities and Exchange Commission (the "SEC"), news articles and other media reports, press releases and other matters of public record. Except as alleged herein, information concerning Defendants' actions and the particulars thereof is not available to the public and lies within the possession and control of Defendants.

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of itself and all others who purchased or otherwise acquired the common stock of Lehman Brothers between September 13, 2006 and June 6, 2008, inclusive ("Class Period") seeking to recover damages caused by Defendants' violations of the federal securities laws.

2.      Lehman Brothers is the fourth-largest securities firm in the United States. The Company provides various financial services to corporations, governments and municipalities, institutions and high-net-worth individuals worldwide. The array of services Lehman Brothers provides includes equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.

3.      During the Class Period, Lehman Brothers was heavily invested in collateralized debt obligations ("CDOs") and sub-prime mortgage backed derivatives and was an aggressive participant in the mortgage backed securities origination sector. CDOs are a type of asset-backed security and structured credit product constructed from a portfolio of fixed-income

1

assets. When the mortgage and credit markets began to deteriorate, many of the large securities firms reported massive losses and write-downs as a result of investments in CDOs and similar derivative instruments.

4.      Despite this tumultuous financial climate, Lehman Brothers made repeated false and misleading statements touting the Company's sophisticated and conservative risk management policies and assuring investors that it was highly unlikely that the Company would suffer significantly as a result of the mortgage and credit market meltdown.

5.      For instance, on July 18, 2007, in response to speculation that the Company would face substantial additional losses from sub-prime mortgages than those previously disclosed to the investing public, Lehman Brothers denied the speculation, stating that "the rumors related to subprime exposure are unfounded."

6.      Similarly, in a March 18, 2008 conference call regarding Lehman Brothers' financial results for the first quarter of 2008 in which the Company reported a profit of $489 million, Lehman Brothers' Chief Financial Officer Erin Callan touted the Company's superior risk management discipline and long-term capital outlook in declaring that the Company was well-positioned to weather the financial storm. These financial results and statements reassured investors still concerned about the impact of roiling credit markets on the nation's financial institutions, particularly in the wake of the collapse of Bear Stearns just days earlier.

7.      On June 2, 2008, Standard & Poor's lowered its credit rating for Lehman Brothers citing questions about the Company's financing of its operations. The Company's shares fell nearly $3, or 8%, in response to that downgrade. Lehman Brothers faced continuing concerns about its liquidity the following day, as it was forced to deny rumors that it had resorted to borrowing from the Federal Reserve's "discount window." But a report that day in *The Wall*

*Street Journal* that Lehman intended to raise an additional $4 billion in capital – following upon other significant fund raising earlier in 2008, including a $4 billion bond offering in January and the sale of $1.9 billion in preferred shares in February – heightened concerns about the Company's ability to access the capital it needed.  Lehman Brothers shares fell another $3 per share on June 3, 2008 in response to those concerns.

8.      Finally, on June 9, 2008, the extent of Lehman Brothers' exposure to the mortgage and credit market meltdown was finally exposed.  On this day, the Company issued a press release announcing second quarter results a week ahead of schedule, and disclosed a loss of $2.87 billion – nearly ten times the loss analysts had anticipated – following write-downs of $3.7 billion to mortgage-backed assets.  The Company also revealed that it raised $6 billion in capital – 50% more than previously reported – through the sale of common and preferred stock, thus diluting the position of current shareholders.  Following that disclosure, Moody's lowered its rating of Lehman to "negative" from "stable."  In response, the price of Lehman shares fell roughly 12%, dropping from $32.29 to close at $28.47.

9.      Defendants' statements and omissions throughout the Class Period were materially false and misleading when made because Defendants failed to disclose or indicate the following: (1) the extent and nature of the Company's exposure to the sub-prime mortgage market deterioration and the losses that the Company would incur as a result of such derivatives; (2) the Company's failure to timely write-down its positions on CDOs and mortgage-backed security originations, and the losses incurred as a result of its exposure to these securities; (3) the overstated value of the Company's mortgage-backed assets; (4) the Company's improper deferred recognition of losses to later periods in order to report continued profits in earlier periods; (5) the inadequate reserves for the Company's exposure to the mortgage and credit

crisis; (6) the Company violated Generally Accepted Accounting Principles ("GAAP") in preparing and disseminating false and misleading financial statements; and (7) the Company lacked adequate internal and financial controls.

10.     Defendants' knowing or reckless statements and inadequate disclosure artificially inflated the price of Lehman Brothers common stock throughout the Class Period.  When the truth about Lehman Brothers' financial condition finally reached the market, culminating with the Company's stunning disclosure on June 9, 2008 reporting nearly $3 billion in losses and write-downs of $3.7 billion on complex investments tied to mortgage-backed securities, the price of Lehman Brothers' stock sank to $28.47 per share – a stunning drop from the Class Period high of $86.18.  Defendants' wrongful course of conduct wiped out tens of billions of dollars in shareholder value and caused substantial damage to Plaintiff and the Class.

## JURISDICTION AND VENUE

11.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District and Lehman Brothers maintains its corporate headquarters in this District at 745 Seventh Avenue, New York, NY 10019.

14.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.    Plaintiff, as set forth in the accompanying certification incorporated herein by reference, purchased Lehman Brothers' common stock during the Class Period at artificially inflated prices and has been damaged thereby.

16.    Defendant Lehman Brothers is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 745 Seventh Avenue, New York, NY 10019.

17.    Defendant Richard S. Fuld, Jr. ("Fuld") was, at all relevant times, the Company's Chief Executive Officer and Chairman of the Board of Directors.

18.    Defendant Christopher M. O'Meara ("O'Meara") served as the Company's Chief Financial Officer, Controller and Executive Vice President during the Class Period until December 1, 2007.   Since December 1, 2007, O'Meara has served as the head of Risk Management, Worldwide.

19.    Defendant Joseph M. Gregory ("Gregory") was, at all relevant times, the Company's President and Chief Operating Officer.

20.    Defendant Erin Callan ("Callan") became the Company's Chief Financial Officer and Executive Vice President since December 2007.   Callan joined Lehman Brothers in 1995 and has served in various capacities at the Company, including head of the Investment Banking Global Hedge Fund Coverage group, the Global Finance Solutions Group and Global Finance Analytics group.

21.     Defendants Fuld, O'Meara, Gregory and Callan are referred to collectively as the "Individual Defendants."  The Individual Defendants, because of their positions with Lehman Brothers, were controlling persons of the Company and possessed the power and authority to control the contents of Lehman Brothers' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were aware of the Company's actual and projected financial figures, and closely monitored the Company's operations.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Each exercised their power and influence to cause Lehman Brothers to engage in the fraudulent practices complained of herein.

22.     Because of their positions and access to material non-public information regarding the Company, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public and that the positive representations which were being made to investors were then materially false and misleading.  Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Lehman Brothers common stock, by disseminating materially false and misleading statements and/or concealing material adverse facts.

## SUBSTANTIVE ALLEGATIONS

### The Rise and Fall of Sub-prime Mortgage Lending

23.     The term " sub-prime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened

credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."[1]

24.    Between 2003 and 2005, the prevalence of sub-prime loans among all mortgage originations more than doubled.[2]

25.    Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the sub-prime lending market to several factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.[3]

26.    In order to take advantage of this new market, some lenders began weakening their underwriting standards, including reducing the minimum credit score borrowers need to qualify for certain loans and allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load (e.g., "no money down").[4]

27.    In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers. Examples of typical sub-prime mortgages are: interest-only mortgages, which allow borrowers to pay only interest for a period of time (typically 5–10

---

[1]    *See Sub-prime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services,* 110th Cong. (2007) (Statement of Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd.).

[2]    Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Sub-prime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount,* Wall St. J., Dec. 5, 2006.

[3]    *See Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee,* 110th Cong. (2007) (Statement of, Sandra L. Thompson, FDIC Dir., Div. of Supervision and Consumer Prot.).

[4]    *See* Ruth Simon*, Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules,* Wall St. J., July 26, 2005, at D1; *See also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down,* USA Today, Jan. 17, 2006.

years); "pick a payment" loans, for which borrowers choose their monthly payment (full payment, interest only, or a minimum payment which may be lower than the payment required to reduce the balance of the loan); and initial fixed rate mortgages that quickly convert to variable rates.[5] These novel terms combined with the lowered lending standards contributed to the likelihood that many borrowers would default.

28.    As a result of these various incentives for sub-prime mortgages, sub-prime mortgage originations grew from $120 billion in 2001 to $625 billion in 2005.[6]

29.    Then housing troubles emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes which caused the interest rates on variable rate loans, including mortgage loans, to rise.

30.    In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, issued new guidelines for mortgage lenders.[7] The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of sub-prime lenders.[8]

31.    However, most sub-prime lenders failed to heed these and other warnings. "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards.  Many lenders kept

---

[5]      *See* Liz Moyer, *Beware the Interest-Only Mortgage,* Forbes, July 6, 2005; *See also* Ruth Simon, *New Type of Mortgage Surges in Popularity*, Wall St. J., April 19, 2006, at D1 *and* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* September 29. 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

[6]      *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Sub-prime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[7]      *Id*.; *See also Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee,* 110th Cong. (2007) (Statement of, Sandra L. Thompson, FDIC Dir., Div. of Supervision and Consumer Prot.).

[8]      *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* September 29. 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

introductory 'teaser' rates low even after short-term interest rates began rising in June 2005."[9] Sub-prime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate expired.  However, because housing prices were falling, borrowers could not readily re-sell the property for a profit when they could not pay their increased monthly payments, causing mortgage defaults to increase significantly.

32.     In 2006, sub-prime mortgage exposure grew even riskier as lenders originated a large number of "liar loans" (no-documentation and low-documentation loans).  This practice constituted as much as 40% of sub-prime mortgages issued in 2006, up from 25% in 2001.[10] Mortgage industry research reported in April 2006 revealed that 90% of borrowers had overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of the cases.[11]

### Background of Lehman Brothers

33.     Lehman Brothers, through its subsidiaries, provides various financial services to corporations, governments and municipalities, institutions, and high-net-worth individuals worldwide.  The Company operates in three segments: Capital Markets, Investment Banking, and Investment Management.  The Capital Markets segment represents institutional customer flow activities, including secondary trading, financing, mortgage origination and securitization, prime brokerage, and research activities in fixed income and equity products.  These products include a range of cash, derivative, secured financing, and structured instruments and investments. It also offers equity and fixed income products, including U.S., European, and Asian equities; government and agency securities; money market products; corporate high grade

---

[9]      *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Sub-prime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.
[10]     Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007.
[11]     *Id.*

securities; high yield and emerging market securities; mortgage- and asset-backed securities; preferred stock; municipal securities; bank loans; foreign exchange; and financing and derivative products. In addition, this segment invests in real estate, private equity, and other long-term investments.

34.    The Company's Investment Banking segment provides advice to corporate, institutional, and government clients on mergers, acquisitions, and other financial matters. This segment also raises capital for clients by underwriting public and private offerings of debt and equity instruments. The Investment Management segment consists of private investment management, which provides investment, wealth advisory, and capital markets execution services to high net worth and middle market institutional clients; and asset management that provide customized investment management services for high net worth clients, mutual funds, and other small and middle market institutional investors. Lehman Brothers was founded in 1850 and is headquartered in New York, New York with regional headquarters in London, the United Kingdom and Tokyo, Japan.

### Lehman Brothers and the Sub-Prime Mortgage Market

35.    Leading up to and during the Class Period, Lehman Brothers increased its investments in CDOs and sub-prime mortgage backed derivatives and was an aggressive participant in the mortgage-backed security origination sector.

36.    CDOs are essentially mutual funds that buy securities backed by things like mortgages, auto loans and corporate bonds. Specifically, after a loan is originated, it is often packaged up into an asset-backed security. These are then sliced into different tranches and sold to institutional investors such as hedge funds and insurers. CDOs became very popular among

fixed-income investors looking for higher yields in a low-yield world. In 1995, there were hardly any. In 2006, CDOs worth more than $500 billion were issued.

37.    CDOs are usually constructed from a portfolio of fixed-income assets and are used to spread the risk of the underlying assets. These assets are divided into different tranches: senior tranches, mezzanine tranches, and equity tranches. Losses are applied in reverse order of seniority so junior tranches offer higher coupons (interest rates) to compensate for the added default risk. But the system only works if the underlying asset backed securities held by the CDO are uncorrelated -- that is, if they are unlikely to go bad all at once.

38.    To the contrary, CDOs holding only sub-prime related investments (e.g., notes, bonds, and other instruments dependent on mortgages for their value) were highly correlated because they held only sub-prime securities and were therefore vulnerable to a rise in defaults on sub-prime mortgage loans. Nonetheless, because of the high yields associated with sub-prime mortgages, these mortgages became very attractive for investment banks securitizing CDOs.[12]

39.    During the Class Period, Lehman Brothers actively carried financial positions linked to CDOs and similar derivative instruments on its balance sheet and reported the "value" of these positions to the Company's investors. The Company touted the quality of its portfolio and repeatedly downplayed the risks associated with owning these CDOs and related securities. In so doing, Lehman Brothers concealed the true extent of the Company's exposure to sub-prime related assets and financial positions and materially misled the investing public.

**False and Misleading Statements During the Class Period**

40.    The Class Period begins on September 13, 2006, when Lehman Brothers issued a press release announcing the Company's financial results for the third quarter of 2006. In the

---

[12]    *See* FDIC Outlook, *A New Plateau for the U.S. Securitization Market, available at* http://www.fdic.gov/bank/analytical/regional/ro20063q/na/2006_fall01.html.

press release, the Company reported net income of $916 million and net revenues of $4.2 billion.

The press release stated in pertinent part as follows:

> NEW YORK, September 13, 2006 — Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $916 million for the third quarter ended August 31, 2006, or $1.57 per common share (diluted), representing increases of 4% and 7%, respectively, from net income of $879 million, or $1.47 per common share (diluted), reported for the third quarter of fiscal 2005. Second quarter fiscal 2006 net income was $1.0 billion, or $1.69 per common share (diluted).
>
> For the first nine months of fiscal 2006, the Firm reported record net income of $3.0 billion, or $5.09 per common share (diluted), up 23% and 26%, respectively, from the first nine months of fiscal 2005.
>
> **Third Quarter Business Highlights**
>
> - Reported record quarterly net revenues in Investment Management and Europe
> - Posted record net revenues in the nine-month period across all segments and regions
> - Felix G. Rohatyn joined Lehman Brothers as senior advisor to the Chairman and as Chairman of the International Advisory Committees
>
> * * *
>
> Net revenues (total revenues less interest expense) for the third quarter of fiscal 2006 increased to $4.2 billion, up 8% from $3.9 billion in the third quarter of fiscal 2005, and down 5% from $4.4 billion in the second quarter of fiscal 2006. Net revenues for the first nine months of fiscal 2006 increased 19%, to a record $13.1 billion, from $10.9 billion for the first nine months of fiscal 2005.
>
> Investment Banking revenues decreased 11% to $726 million in the third quarter of fiscal 2006, from $815 million in the third quarter of fiscal 2005, reflecting a decrease in completed M&A transactions and equity origination volumes. At August 31, 2006, the Investment Banking fee pipeline was at a record level. Capital Markets net revenues in the third quarter of fiscal 2006 rose 13% to $2.8 billion, compared to $2.5 billion for the same period in fiscal 2005, representing the third highest quarter ever for the segment. Equities Capital Markets reported strong net revenues of $837 million, up 31% from $637 million in the third quarter of 2005, driven by solid customer flow activity in the cash and prime brokerage businesses. Fixed Income Capital Markets net revenues increased 6% to $2.0 billion in the third quarter of fiscal 2006 from $1.9 billion in the third quarter of 2005, reflecting record results in real estate and strong results in foreign exchange products, partially offset by lower performances within mortgages, high

yield and interest rate products. Record Investment Management net revenues, which increased 18% to $605 million in the third quarter of fiscal 2006 compared to $511 million a year ago, were attributable to record Private Investment Management revenues, which increased 7% to $256 million from $239 million a year ago, and higher Asset Management revenues. Asset Management reported its second highest revenues ever of $349 million, an increase of 28% from $272 million a year ago. Assets under management grew to a record $207 billion.

* * *

41.     Commenting on the financial results, Defendant Fuld stated the following:

Market conditions during the third quarter were clearly more challenging than during the first half of the year. However, despite the market environment and the typically slower activity of the summer months, these results are our best third quarter results ever. These results also contributed to our best nine months ever, which were driven by record performances across all segments and regions. This performance demonstrates the Firm's ability to partner with our clients across cycles and to continue to deliver consistent returns to our shareholders.

42.     On October 10, 2006, the Company filed its quarterly report on Form 10-Q for the third quarter of 2006 with the SEC ("Third Quarter 2006 Form 10-Q"). The Third Quarter 2006 Form 10-Q was signed by Defendant O'Meara and reaffirmed the Company's financial results previously announced on September 13, 2006.

43.     In addition, the 2006 Third Quarter Form 10-Q contained Sarbanes-Oxley certifications signed by Defendants Fuld and O'Meara, which certified the following:

1.     I have reviewed this quarterly report on Form 10-Q of Lehman Brothers Holdings Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect

the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), I, [Richard S. Fuld, Jr., / Christopher M. O'Meara] certify that:

1.     The Quarterly Report on Form 10-Q for the quarter ended August 31, 2006 (the "Report") of Lehman Brothers Holdings Inc. (the "Company") as filed with the Securities and Exchange Commission as of the date hereof, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

44.     On December 14, 2006, Lehman Brothers issued a press release announcing the Company's financial results for the fourth quarter of 2006 and for the fiscal year 2006. The press release stated in pertinent part as follows:

NEW YORK– December 14, 2006 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $1.0 billion, or $1.72 per common share (diluted), for the fourth quarter ended November 30, 2006, representing increases of 22% and 25%, respectively, from net income of $823 million, or $1.38 per common share (diluted), reported for the fourth quarter of fiscal 2005. Third quarter fiscal 2006 net income was $916 million, or $1.57 per common share (diluted).

For the 2006 full fiscal year, net income and earnings per common share (diluted) increased 23% and 25%, respectively, to a record $4.0 billion and $6.81, respectively, compared to $3.3 billion and $5.43, respectively, in fiscal 2005.

**Full Year Business Highlights**

- Reported record net revenues, net income and earnings per share (diluted) for the third consecutive year

- Achieved record net revenues across all business segments and regions for the year

- Reported record annual pre-tax margin of 33.6%

- Ranked #1 in both Equity and Fixed Income Research by *Institutional Investor*'s "All-America Research" polls for the fourth consecutive year; ranked #1 in Equity Sales by *Institutional Investor*'s 2006 "All-America Sales" poll

- Ranked #1 dealer on the London Stock Exchange for 16 consecutive months; ranked #2 on Xetra and #2 on Euronext by trading volume

- Ranked #1 in *Barron's* 500, the publication's annual survey of the corporate performance of the 500 largest U.S. and Canadian companies

- Grew assets under management to a record $225 billion

\* \* \*

Net revenues (total revenues less interest expense) for the fourth quarter of fiscal 2006 were $4.5 billion, an increase of 23% from $3.7 billion reported in the fourth quarter of fiscal 2005 and an increase of 8% from the $4.2 billion reported in the third quarter of fiscal 2006. Investment Banking revenues were a record for the quarter, increasing 5% to $858 million from $817 million in the fourth quarter of fiscal 2005. These revenues were driven by strong performances in debt and equity origination, which increased 14% and 7%, respectively, from the prior year's period, and solid merger and acquisition advisory revenue, which decreased 7% from the record results in the fourth quarter of fiscal 2005. Capital Markets net revenues increased 28% to $3.0 billion in the fourth quarter of fiscal 2006 from $2.4 billion in the prior year's fourth quarter on strong performances from both Fixed Income and Equities Capital Markets. Fixed Income Capital Markets reported its second highest revenue quarter, an increase of 31% from the fourth quarter of fiscal 2005, reflecting strong levels of client activity, as well as improved results in credit products. Equities Capital Markets also reported its second highest revenue quarter, an increase of 22% compared to the fourth quarter of fiscal 2005, driven by solid customer flow activities, improved market conditions and continued growth in the prime brokerage businesses. The Firm also reported its highest revenue quarter in Investment Management, with net revenues increasing 26% to $640 million in the fourth quarter of fiscal 2006, from $509 million in the fourth quarter of fiscal 2005. This performance was driven by

record revenues in Private Investment Management and record-matching revenues in Asset Management. Assets under management grew to a record $225 billion.

For the full 2006 fiscal year, net revenues increased 20% to a record $17.6 billion, from $14.6 billion for fiscal 2005, with record net revenues in each business segment and in each region. For fiscal 2006, non-U.S. revenues grew 21% to a record $6.5 billion, representing 37% of Firmwide net revenues.

45.     Commenting on the financial results, Defendant Fuld stated the following:

Once again, we have achieved outstanding results across all our business segments and geographic regions this year. Our record performance is the result of our client-focused strategy and our continued investment in strategic areas that enable us to deliver the best capabilities, intellectual capital and solutions to our clients. As always, our success is a tribute to how well our people continue to work together across the Firm to deliver superior value to our clients and shareholders.

46.     On February 13, 2007, the Company filed its annual report for fiscal year 2006 on Form 10-K with the SEC ("2006 Form 10-K"). The Company's 2006 Form 10-K was signed by Defendants Fuld and O'Meara and reaffirmed the financial results previously announced on December 14, 2006. In addition, the 2006 Form 10-K also contained Sarbanes-Oxley certifications signed by Defendants Fuld and O'Meara which are substantially similar to the certifications contained in ¶ 43.

47.     On March 14, 2007, Lehman Brothers issued a press release announcing the financial results for the first quarter 2007. The press release stated in pertinent part as follows:

NEW YORK– March 14, 2007 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported record net income of $1.15 billion, or $1.96 per common share (diluted), for the first quarter ended February 28, 2007, representing increases of 6% and 7%, respectively, from net income of $1.09 billion, or $1.83 per common share (diluted), reported for the first quarter of fiscal 2006. Fourth quarter fiscal 2006 net income was $1.00 billion, or $1.72 per common share (diluted). The 2006 first quarter results include an after-tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.

17

**First Quarter Business Highlights**

- Reported record net revenues in the Capital Markets and Investment Management segments
- Reported record net revenues in both Europe and Asia
- Announced the acquisition of Grange Securities Limited, marking the Firm's entrance into Australia
- Named the #1 "Most Admired Company" in the securities industry by *Fortune* magazine in its annual ranking of "America's Most Admired Companies"

\* \* \*

Net revenues (total revenues less interest expense) for the first quarter of fiscal 2007 were a record $5.0 billion, an increase of 13% from $4.5 billion reported in the first quarter of fiscal 2006 and an increase of 11% from the $4.5 billion reported in the fourth quarter of fiscal 2006. Capital Markets reported record net revenues of $3.5 billion in the first quarter of fiscal 2007, an increase of 15% from $3.0 billion in the first quarter of fiscal 2006, driven by strong performances in both Fixed Income and Equities Capital Markets. Fixed Income Capital Markets reported net revenues of $2.2 billion, its second highest revenue quarter and an increase of 3% from $2.1 billion in the first quarter of fiscal 2006, reflecting record results in credit products as well as a strong performance in real estate, partially offset by declines in securitized products due to weakness in the U.S. residential mortgage sector and in interest rate products. Equities Capital Markets reported record net revenues of $1.3 billion, an increase of 42% from $944 million in the first quarter of fiscal 2006, driven by continued growth in execution services and prime brokerage activities, as well as solid customer flow activities and strong equity markets. Investment Banking reported its second highest revenue quarter, increasing 2% to $850 million from $835 million in the first quarter of fiscal 2006. These revenues were driven by record debt origination, which increased 4% to $428 million from $410 million in the first quarter of fiscal 2006, and strong merger and acquisition advisory revenues, which increased 9% to $247 million from $226 million in the first quarter of fiscal 2006, partially offset by lower revenues in equity origination as compared to the first quarter of fiscal 2006. Investment Management reported record net revenues of $695 million, an increase of 20% from $580 million in the first quarter of fiscal 2006. This performance was driven by record revenues in both Asset Management, which increased 13% to $416 million from $368 million in the first quarter of fiscal 2006, and Private Investment Management, which increased 32% to $279 million from $212 million in the first quarter of fiscal 2006. Assets under management grew to a record $236 billion.

48.    Commenting on the financial results, Defendant Fuld stated the following:

By expanding our global footprint, building our capabilities and partnering with our clients, we have again posted record net revenues, net income and earnings per share. Our results clearly demonstrate that we are better positioned than ever to create value for our clients and our shareholders.

49.    On April 9, 2007, the Company filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2007 ("First Quarter 2007 Form 10-Q"). The First Quarter 2007 Form 10-Q was signed by Defendant O'Meara and reaffirmed the Company's financial results previously announced on March 14, 2007. In addition, the First Quarter 2007 Form 10-Q contained Sarbanes-Oxley certifications signed by Defendants Fuld and O'Meara which are substantially similar to the certifications contained in ¶ 43.

50.    On June 12, 2007, Lehman Brothers issued a press release announcing the financial results for the second quarter of 2007. The press release stated in pertinent part as follows:

NEW YORK– June 12, 2007 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported record net income of $1.3 billion, or $2.21 per common share (diluted), for the second quarter ended May 31, 2007, representing increases of 27% and 31%, respectively, from net income of $1.0 billion, or $1.69 per common share (diluted), reported for the second quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 increased 11% and 13%, respectively, from net income of $1.1 billion, or $1.96 per common share (diluted), reported for the first quarter of fiscal 2007.

For the first half of fiscal 2007, the Firm reported record net income of $2.4 billion, or $4.17 per common share (diluted), up 16% and 18%, respectively, from net income of $2.1 billion, or $3.52 per common share (diluted) for the first half of fiscal 2006. The 2006 first half results include an after tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.

**Second Quarter Business Highlights**

- Reported record net revenues in all business segments and in the Firm's European and Asian regions, including a 55% increase in Investment Banking revenues from the second quarter of fiscal 2006

- Non-U.S. net revenues represented 48% of the Firm's quarterly net revenues for the second quarter of fiscal 2007

- Named London-based Roger B. Nagioff global head of Fixed Income, marking the first time in the Firm's history that a sole global head of a division has been located outside of the U.S.

- Purchased a 20% interest in the top-level investment management entities of the D.E. Shaw Group

- Agreed to acquire Eagle Energy Partners, significantly expanding the Firm's global energy and commodities platform

* * *

Net revenues (total revenues less interest expense) for the second quarter of fiscal 2007 were a record $5.5 billion, an increase of 25% from $4.4 billion reported in the second quarter of fiscal 2006 and an increase of 9% from the $5.0 billion reported in the first quarter of fiscal 2007. For the first six months of fiscal 2007, the Firm reported record net revenues of $10.6 billion, an increase of 19% from $8.9 billion for the first half of fiscal 2006.

Capital Markets reported record net revenues of $3.6 billion in the second quarter of fiscal 2007, an increase of 17% from $3.1 billion in the second quarter of fiscal 2006, driven by a record performance in Equities Capital Markets. Fixed Income Capital Markets reported net revenues of $1.9 billion, a decrease of 14% from $2.2 billion in the second quarter of fiscal 2006, as strong client demand across most products and increased real estate and credit product revenues were more than offset by continued weakness in the U.S. residential mortgage business and decreased revenues in the Firm's municipal and interest rate products businesses. Equities Capital Markets reported record net revenues of $1.7 billion, nearly double the $878 million reported in the second quarter of fiscal 2006. This performance was driven by record overall customer activity and strength in execution services, prime services and equity derivatives businesses, as well as profitable trading strategies. Investment Banking reported record revenues of $1.2 billion, an increase of 55% from $741 million in the second quarter of fiscal 2006. This increase was driven by record debt origination revenues, which rose 87% to $540 million from $289 million in the second quarter of fiscal 2006, record equity origination revenues, which rose 60% to $333 million from $208 million in the second quarter of fiscal 2006, and record advisory revenues, which rose 14% to $277 million from $244 million in the second quarter of fiscal 2006. Investment Management reported record net revenues of $768 million, an increase of 30% from $592 million in the second quarter of fiscal 2006. This performance was driven by record net revenues in both Asset Management, which increased 33% to $460 million from $347 million in the second quarter of fiscal 2006, and Private Investment Management, which increased 26% to $308 million from $245 million

in the second quarter of fiscal 2006. Assets under management grew to a record $263 billion.

51.     Commenting on the financial results, Defendant Fuld stated the following:

Our record results for the second quarter and the first half reflect our ongoing commitment to achieving diversified growth. With non-U.S. net revenues representing nearly half of our total net revenues for the quarter, our global platform is stronger and more balanced than ever. To build on this momentum, we remain focused on leveraging our resources and capabilities to maximize value for our clients and shareholders.

52.     On July 10, 2007, the Company filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2007 ("Second Quarter 2007 Form 10-Q"). The Second Quarter 2007 Form 10-Q was signed by Defendant O'Meara and revealed that the Company had "unrealized" losses totaling $459 million in the second quarter from mortgages and mortgage-backed assets in the Company's inventory. In addition, the Second Quarter 2007 Form 10-Q contained Sarbanes-Oxley certifications signed by Defendants Fuld and O'Meara which are substantially similar to the certifications contained in ¶ 43.

53.     After this announcement, Lehman Brothers' share price fell $3.76 per share, or over 5 percent, to close on July 10, 2007 at $71.10 per share on unusually heavy trading volume. Although this news had a negative effect on the value of Lehman Brothers shares, the Company's stock price remained inflated as Defendants continued to conceal the true extent of the Company's exposure to the mortgage crisis and the credit market downturn.

54.     In fact, on July 18, 2007, *Bloomberg* published an article entitled "Lehman Brothers Says Subprime Speculation 'Unfounded.'" The article stated in pertinent part as follows:

*Lehman Brothers Holdings Inc., the largest underwriter of U.S. mortgage bonds, denied speculation that it may face greater potential losses from subprime mortgages than previously disclosed.*

Speculation about a planned announcement from Lehman related to its subprime holdings spurred investors to demand higher premiums to insure against the risk of owning Wall Street firms' bonds and helped prompt gains in Treasuries, according to traders including Thomas Tucci, head of U.S. government bond trading at RBC Capital Markets in New York.

"*The rumors related to subprime exposure are unfounded*," Lehman spokeswoman Kerrie Cohen said today. [Emphasis added.]

55.    On September 18, 2007, Lehman Brothers issued a press release announcing the financial results for the third quarter of 2007.  The press release stated in pertinent part as follows:

NEW YORK– September 18, 2007 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $887 million, or $1.54 per common share (diluted), for the third quarter ended August 31, 2007, representing decreases of 3% and 2%, respectively, from net income of $916 million, or $1.57 per common share (diluted), reported for the third quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 were $1.3 billion and $2.21, respectively.

For the first nine months of fiscal 2007, the Firm reported record net income of $3.3 billion, or $5.71 per common share (diluted), up 10% and 12%, respectively, from net income of $3.0 billion, or $5.09 per common share (diluted) for the first nine months of fiscal 2006. The 2006 results include an after-tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.

**Third Quarter Business Highlights**

- Posted record nine months net revenues, net income and earnings per common share (diluted)

- Non-U.S. net revenues represented 53% of the Firm's net revenues for the third quarter of fiscal 2007

- Reported record Investment Management net revenues for the third quarter of fiscal 2007, and record assets under management of $275 billion

* * *

Net revenues (total revenues less interest expense) for the third quarter of fiscal 2007 were $4.3 billion, an increase of 3% from $4.2 billion reported in the third quarter of fiscal 2006 and a decrease of 22% from the record $5.5 billion reported

in the second quarter of fiscal 2007. For the first nine months of fiscal 2007, the Firm reported record net revenues of $14.9 billion, an increase of 14% from $13.1 billion for the first nine months of fiscal 2006.

***Capital Markets reported net revenues of $2.4 billion for the third quarter of fiscal 2007, a decrease of 14% from $2.8 billion in the third quarter of fiscal 2006. Fixed Income Capital Markets reported net revenues of $1.1 billion, a decrease of 47% from $2.0 billion in the third quarter of fiscal 2006, primarily due to lower performances within Credit and Securitized Products. Within Fixed Income Capital Markets, the Firm recorded very substantial valuation reductions, most significantly on leveraged loan commitments and residential mortgage-related positions. These losses were partially offset by large valuation gains on economic hedges and other liabilities. The result of these valuation items was a net reduction in revenues of approximately $700 million.*** Equities Capital Markets reported its second highest net revenue quarter, with net revenues of $1.4 billion, an increase of 64% from $837 million in the third quarter of fiscal 2006. This performance was driven by strong client activity in both Cash and Derivative Products, and represents the third straight quarter that Equities Capital Markets has surpassed $1 billion in net revenues. Investment Banking also reported its second highest net revenue quarter, with net revenues of $1.1 billion representing an increase of 48% from $726 million in the third quarter of fiscal 2006. This performance was driven by record advisory net revenues, which more than doubled to $425 million from $195 million in the third quarter of fiscal 2006, as well as strong equity origination net revenues, which rose 62% to $296 million from $183 million in the third quarter of fiscal 2006. For the quarter, debt origination net revenues were $350 million, consistent with $348 million reported in the third quarter of fiscal 2006. Investment Management reported record net revenues of $802 million, an increase of 33% from $605 million in the third quarter of fiscal 2006. This performance was driven by record Private Investment Management net revenues, which increased 30% to $334 million from $256 million in the third quarter of fiscal 2006, and record Asset Management net revenues, which increased 34% to $468 million from $349 million in the third quarter of fiscal 2006. Assets under management grew to a record $275 billion. [Emphasis added.]

56.    Commenting on the financial results, Defendant Fuld stated the following:

Despite challenging conditions in the markets, our results once again demonstrate the diversity and financial strength of the Lehman Brothers franchise, as well as our ability to perform across cycles. For the quarter, we reported record net revenues in Investment Management, and our second highest net revenues in both Investment Banking and Equities Capital Markets. In addition, more than half of our net revenues for the quarter came from outside the U.S. We remain focused on delivering significant long term value for our clients and shareholders.

57.    In a conference call discussing the financial results, Defendant O'Meara touted Lehman Brothers' "strong" risk management and liquidity position as a "competitive advantage" separating the Company from other troubled Wall Street firms:

> We attribute this performance to several factors: ***Our strong risk management culture with regards to the setting of risk limits and the management of market and counterparty credit risks; and our strong liquidity framework*** . . .
>
> * * *
>
> To reiterate, ***our liquidity position is stronger than ever, we consider our liquidity framework to be a competitive advantage which positions us to support our clients and take advantage of market opportunities even in a stress environment***.
>
> * * *
>
> Before we move on to outlook, I wanted to make a few comments about fair value and marking to market. As I know it has been the subject of much discussion in the marketplace. First of all, we carry all of our financial instruments, inventory and lending commitments at fair value. We have a robust process in place in which employees, independent of the businesses, review the marks for accuracy or reasonableness using all the information available in the marketplace including third-party pricing sources where applicable.
>
> * * *
>
> So overall, despite the fact that some amount of judgment has to be used in determining fair values in a distressed environment, ***we feel very good about our process of marking-to-market and the marks themselves***. Historically, our prudent approach to valuing positions has proven out in past distressed environments. [Emphasis added.]

58.    On October 10, 2007, the Company filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2007 ("Third Quarter 2007 Form 10-Q").  The Third Quarter 2007 Form 10-Q was signed by Defendant O'Meara and reaffirmed the financial results previously released on September 18, 2007.  In addition, the Third Quarter 2007 Form 10-Q contained Sarbanes-Oxley certifications signed by Defendants Fuld and O'Meara which are substantially similar to the certifications contained in ¶ 43.

59.    On December 13, 2007, Lehman Brothers issued a press release announcing the

financial results for the fourth quarter and fiscal year 2007.  The press release stated in pertinent

part as follows:

> NEW YORK– December 13, 2007 – Lehman Brothers Holdings Inc. (ticker
> symbol: LEH) today reported net income of $886 million, or $1.54 per common
> share (diluted), for the fourth quarter ended November 30, 2007, representing
> decreases of 12% and 10%, respectively, from net income of $1.0 billion, or $1.72
> per common share (diluted), reported for the fourth quarter of fiscal 2006. For the
> third quarter of fiscal 2007, net income was $887 million, or $1.54 per common
> share (diluted).
>
> For the 2007 full fiscal year, net income and earnings per common share (diluted)
> increased 5% and 7%, respectively, to a record $4.2 billion and $7.26,
> respectively, compared to $4.0 billion and $6.81, respectively, in fiscal 2006. The
> 2006 results include an after-tax gain of $47 million, or $0.08 per common share
> (diluted), from the cumulative effect of a change in accounting principle
> associated with the Firm's adoption of SFAS 123R on December 1, 2005.
>
> **Full Year Business Highlights**
>
> - Reported record net revenues, net income and earnings per common share
>   (diluted) for the fourth consecutive year
> - Achieved record net revenues across all three business segments
> - Reported record non-U.S. net revenues, which accounted for 50% of overall
>   Firm net revenues for the year, and a record 62% of Firmwide net revenues in
>   the fourth quarter
> - Grew assets under management to a record $282 billion
> - Ranked #1 "Most Admired Securities Firm" by *Fortune*
> - Ranked #1 in both Equity and Fixed Income Research by *Institutional
>   Investor*'s "All-America Research" polls for the fifth consecutive year; ranked
>   #1 "Most Shareholder-Friendly Company," Brokers and Asset Management
>   category by *Institutional Investor*
>
> * * *
>
> Net revenues (total revenues less interest expense) for the fourth quarter of fiscal
> 2007 were $4.4 billion, a decrease of 3% from $4.5 billion reported in the fourth
> quarter of fiscal 2006 and an increase of 2% from $4.3 billion reported in the third
> quarter of fiscal 2007. ***Capital Markets net revenues decreased 10% to $2.7
> billion in the fourth quarter of fiscal 2007 from $3.0 billion in the fourth
> quarter of fiscal 2006. Fixed Income Capital Markets reported net revenues of
> $860 million, a decrease of 60% from $2.1 billion in the fourth quarter of fiscal
> 2006, due to the very challenging markets experienced during the period***,

although strong results from client activity were reported in the Foreign Exchange and Commodities businesses. ***Fixed Income Capital Markets recorded negative valuation adjustments on trading assets, principally in the Firm's Securitized Products and Real Estate businesses. These valuation adjustments were offset, in part, by valuation gains on economic hedges and liabilities, as well as realized gains from the sale of certain leveraged loan positions, resulting in a net revenue reduction in Fixed Income Capital Markets of approximately $830 million***. Equities Capital Markets reported record net revenues of $1.9 billion, more than double the $900 million reported in the fourth quarter of fiscal 2006. This performance was driven by solid customer flow activities as well as gains from private equity and the Firm's investment in GLG Partners. These results represent the fourth straight quarter that Equities Capital Markets has surpassed $1 billion in net revenues. Investment Banking reported net revenues of $831 million, a decrease of 3% from $858 million in the fourth quarter of fiscal 2006, driven by declines in debt and equity origination revenues, which decreased 38% and 6%, respectively, from the prior year's period. Merger and acquisition advisory reported its second-highest net revenue quarter, an increase of 52% from the fourth quarter of fiscal 2006. Investment Management reported record net revenues of $832 million in the fourth quarter of fiscal 2007, an increase of 30% from $640 million in the fourth quarter of fiscal 2006. This performance was driven by record revenues in Asset Management and strong revenues in Private Investment Management. Assets under management grew to a record $282 billion. [Emphasis added.]

60.     Commenting on the financial results, Defendant Fuld stated the following:

Despite what continues to be a difficult operating environment, the Firm's results for the quarter highlight our ability to perform across market cycles and deliver value to our shareholders. Our global franchise and brand have never been stronger, and our record results for the year reflect the continued diversified growth of our businesses. As always, our people remain committed to managing risk and providing the best solutions to our clients.

61.     On January 29, 2008, Lehman Brothers filed its annual report for fiscal year 2007 on Form 10-K with the SEC ("2007 Form 10-K"). The Company's 2007 Form 10-K was signed by Defendants Fuld and Callan and reaffirmed the financial results previously announced on December 13, 2007. In addition, the 2007 Form 10-K also contained Sarbanes-Oxley certifications signed by Defendants Fuld and Callan which are substantially similar to the certifications contained in ¶ 43.

62.     On March 18, 2008, the Company issued a press release announcing the financial results for the first quarter of 2008.  The Company reported a profit of $489 million and disclosed that it held $6.5 billion in "other asset-backed securities" and that it had taken a write-down of just $200 million to reflect the decreased value of those securities.   These announcements served to reassure the investing public, which was concerned about the impact of the roiling credit market on Lehman Brothers, particularly in the wake of the collapse of Bear Stearns just days earlier.  The press release stated in pertinent part as follows:

NEW YORK– March 18, 2008 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $489 million, or $0.81 per common share (diluted), for the first quarter ended February 29, 2008, representing decreases of 57% and 59%, respectively, from net income of $1.15 billion, or $1.96 per common share (diluted), reported for the first quarter of fiscal 2007. Fourth quarter fiscal 2007 net income was $886 million, or $1.54 per common share (diluted).

**First Quarter Business Highlights**

- Experienced record client activity across our Capital Markets businesses, which was offset, in part, by the effect of the continued dislocations in the credit markets that significantly impacted the Firm's results

- Maintained strong liquidity position, with the Holding Company having a liquidity pool of $34 billion and unencumbered assets of $64 billion, with an additional $99 billion at our regulated entities, at quarter end

- Reported record net revenues in the Investment Management segment

- Ranked #2 in announced global M&A transactions for the first two months of calendar 2008, according to Thomson Financial

* * *

**Net Revenues**

Net revenues (total revenues less interest expense) for the first quarter of fiscal 2008 were $3.5 billion, representing decreases of 31% and 20%, respectively, from $5.0 billion reported in the first quarter of fiscal 2007 and $4.4 billion reported in the fourth quarter of fiscal 2007. Net revenues for the first quarter of fiscal 2008 reflect negative mark to market adjustments of $1.8 billion, net of gains on certain risk mitigation strategies and certain debt liabilities.

**Business Segments**

**Capital Markets** reported net revenues of $1.7 billion in the first quarter of fiscal 2008, a decrease of 52% from $3.5 billion in the first quarter of fiscal 2007. Fixed Income Capital Markets reported net revenues of $262 million, a decrease of 88% from $2.2 billion in the first quarter of fiscal 2007, as strong performances in liquid products such as high grade corporate debt, foreign exchange and interest rate products were offset, in part, by continued deterioration in the broader credit markets, in particular residential mortgages, commercial mortgages and acquisition finance. Equities Capital Markets reported net revenues of $1.4 billion, an increase of 6% from $1.3 billion in the first quarter of fiscal 2007, driven by continued growth in prime brokerage and strong activity in execution services.

**Investment Banking** reported net revenues of $867 million, an increase of 2% from $850 million in the first quarter of fiscal 2007. These revenues were driven by strong merger and acquisition advisory revenues, which increased 34% to $330 million from $247 million in the first quarter of fiscal 2007, and higher equity origination revenues, which increased 23% to $215 million from $175 million in the first quarter of fiscal 2007, partially offset by lower revenues in debt origination as compared to the first quarter of fiscal 2007.

**Investment Management** reported record net revenues of $968 million, an increase of 39% from $695 million in the first quarter of fiscal 2007. This performance was driven by record revenues in both Asset Management, which increased 49% to $618 million from $416 million in the first quarter of fiscal 2007, and Private Investment Management, which increased 25% to $350 million from $279 million in the first quarter of fiscal 2007. The Firm reported assets under management of $277 billion, compared to $282 billion at November 30, 2007.

63.    Commenting on the financial results, Defendant Fuld stated the following:

In what remains a challenging operating environment, ***our results reflect the value of our continued commitment to building a diversified platform and our focus on managing risk and maintaining a strong capital and liquidity position***. This strategy has allowed us to support our clients through these difficult and volatile markets, while continuing to build and strengthen our global franchise for our shareholders. [Emphasis added.]

64.    Also on March 18, 2008, the Company held a conference call to discuss the

financial results.  During the conference call, Defendant Callan further reassured the market

about the Company's strength and stability relative to its exposure to the mortgage and credit

markets.  Defendant Callan made the following false and misleading statements:

> We saw a quarter where ***our risk management discipline allowed us to avoid any single outsized loss***. And it's been our operating philosophy for a decade, which many people are very familiar with, that ***we remain closely focused on our liquidity, our long-term capital position precisely for the purpose of weathering a difficult market environment that we've seen surfacing in recent weeks. So we're set up for that***.

* * *

> So I think it's fair to say ***we continue to do a very, very good job managing the risk on residential mortgages***, an area that I think we are credited with a lot of expertise, a great franchise.

* * *

> Let me talk about outlook for a moment, which you've probably gotten message so far, but looking forward, despite the positive developments of Fed actions in the past two days and few weeks, we still don't anticipate the challenging market conditions abating any time soon and we have planned our business accordingly. ***As we look out to the remainder of the year, we certainly will remain vigilant around risk, capital, and liquidity. As we talked about last quarter, as a firm we remained very cautious overall, but we continue to feel good about our competitive position***.

* * *

> Now, let me conclude by noting that we don't expect that this extremely challenging period is going to end in the near term. However, ***we do believe we have the leadership, the experience, the risk management discipline, the capital strength, and certainly the liquidity to ride out the cycle***. In addition, we believe that the current markets will continue to present us with a lot of client and trading opportunities which we look forward to that come from market dislocation. And as we successfully meet these challenges, capture these opportunities, ***we certainly believe we are positioning ourselves well for the long-term***. [Emphasis added.]

65.    With regard to the Company's capital requirements, Defendant Callan stated the

following:

*We had disciplined liquidity and capital management, which we consider to be a core competency, and maintain robust liquidity to date and we have executed close to two thirds of our full-year capital plan at the end of the first quarter*.

\* \* \*

The average tenor of our long-term debt has continued to extend and is seven years at this point. We do believe that long-term debt in general will be harder to obtain throughout 2008, we had that strong point of view since late last year and therefore we will continue to pre-fund as we have done so far this year, our liquidity needs, as we see opportunities in the markets. And consistently with that, *we have already completed two-thirds of our capital plan needs for 2008 as we come out of the first quarter*. [Emphasis added.]

66.    On April 8, 2008, Lehman Brothers filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2008 ("First Quarter 2008 Form 10-Q").  The First Quarter 2008 Form 10-Q was signed by Defendant Callan, contained Sarbanes-Oxley certifications signed by Defendants Fuld and Callan which are substantially similar to the certifications contained in ¶ 43, and reaffirmed the financial results for the Company previously released on March 18, 2008.

67.    However, the First Quarter 2008 Form 10-Q also acknowledged that the entire $6.5 billion of Lehman Brothers' "other asset-backed securities" consisted of CDOs, and revealed for the first time that 25% of those securities were rated BB+ or lower – a junk rating. The First Quarter 2008 Form 10-Q stated the following regarding the Company's investments in "other asset-backed securities," including CDOs:

The Company purchases interests in and enters into derivatives with collateralized debt obligation securitization entities ("CDOs"). The CDOs to which the Company has exposure are primarily structured and underwritten by third parties. The collateralized asset or lending obligations held by the CDOs are generally related to franchise lending, small business finance lending, or consumer lending. *Approximately 25% of the positions held at February 29, 2008 and November 30, 2007 were rated BB+ or lower (or equivalent ratings) by recognized credit rating agencies*. In determining the fair value interests in CDOs, the Company considers prices observed for similar transactions and data for relevant benchmark instruments, such as swap obligations for similar obligations referenced by the

30

instrument. ***In both reference periods, the value in the benchmark instruments as well as market developments caused a decline in the fair value of interests in CDOs, not actual defaults on swap obligations***. [Emphasis added.]

68.     The First Quarter 2008 Form 10-Q further questions about the value of the Company's assets.  Specifically, the Form 10-Q reported that the Company held $38.8 billion in "Level 3" assets, which are illiquid assets that trade so infrequently that there is no reliable market price for them, and which are valued based on management assumptions.  Level 3 assets include CDOs and other derivative securities, and the infrequent trading market for these assets was particularly difficult since the market for such instruments all but evaporated in 2007 in the wake of the subprime mortgage collapse.

69.     As of the first quarter 2008, Level 3 assets represented 5% of the Company's total assets, and totaled 171% of its shareholder equity.  Strikingly, while the First Quarter 2008 Form 10-Q reported a $228 million gain on those Level 3 assets during the first quarter, Defendant Callan had stated during the Company's March 18, 2008 conference call that Lehman Brothers had written down the value of its Level 3 assets by $875 million.

70.     At a conference held on May 21, 2008, David Einhorn, President of hedge fund Greenlight Capital LLC, provided a presentation in which he analyzed the discrepancies between Lehman Brothers' March 18, 2008 financial results announcement and the Company's First Quarter 2008 Form 10-Q filed with the SEC on April 8, 2008.  During the presentation, Einhorn laid out the inexplicably small write-down taken on Lehman Brothers' CDO portfolio and the more than $1 billion disparity between the reported values of the Company's Level 3 assets between March 18 and April 8.  Mr. Einhorn recounted his efforts to obtain an explanation from Lehman, and the constantly changing – and largely implausible – stories that Company management provided in response.   Indeed, Mr. Einhorn explained that, when he asked

Defendant Callan to clarify how Lehman Brothers could justify writing down just 3% of those securities, Defendant Callan responded that the Company "would expect to recognize further losses" during the second quarter of 2008. After the presentation, Lehman Brothers' stock closed at $39.56 per share, down $2.44 for the day.

71. The implication of Mr. Einhorn's presentation, beyond the potential losses that Lehman Brothers had yet to reveal, is that the Company's reported first quarter profit was achieved only by overstating the value of its mortgage-backed assets and improperly deferring recognition of losses to later periods. In the wake of Mr. Einhorn's presentation, the price of Lehman Brothers shares fell nearly $6 per share, or almost 15%, over the following days.

72. On June 2, 2008, Standard & Poor's lowered its credit rating for Lehman Brothers, citing questions about the Company's financing of its operations. Lehman Brothers shares fell nearly $3, or 8%, in response to that downgrade.

73. The Company faced continuing concerns about its liquidity the following day, as Lehman Brothers was forced to deny rumors that it had resorted to borrowing from the Federal Reserve's "discount window." But a report on June 3, 2008 in *The Wall Street Journal* that Lehman Brothers intended to raise an additional $4 billion in capital – following upon other significant fund raising earlier in 2008, including a $4 billion bond offering in January 2008 and the sale of $1.9 billion in preferred shares in February 2008 – heightened concerns about the Company's ability to access the capital it needed. Lehman Brothers shares fell another $3 per share on June 3, 2008 in response to those concerns.

74. The statements issued by Defendants during the Class Period were materially false and misleading when made because Defendants failed to disclose or indicate the following: (1) the extent and nature of the Company's exposure to the sub-prime mortgage market

deterioration and the losses that the Company would incur as a result of such derivatives; (2) the Company's failure to timely write-down its positions on CDOs and mortgage-backed security originations, and the losses incurred as a result of its exposure to these securities; (3) the overstated value of the Company's mortgage-backed assets; (4) the Company's improper deferred recognition of losses to later periods in order to report continued profits in earlier periods; (5) the inadequate reserves for the Company's exposure to the mortgage and credit crisis; (6) the Company's GAAP violations as a result of its false and misleading financial statements; and (7) the Company's inadequate internal and financial controls.

### The Truth Emerges

75.    On June 9, 2008, prior to the market opening, Lehman Brothers issued a press release announcing, one week ahead of schedule, the financial results for the second quarter of 2008.  Lehman Brothers reported a net loss of $2.8 billion – nearly ten times the loss analysts had anticipated and the first quarterly loss in the Company's history – following write-downs of $3.7 billion to the Company's mortgage-backed assets.  The press release stated in pertinent part as follows:

> NEW YORK, June 9, 2008 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) announced today that continued challenging market conditions will result in an expected net loss of approximately $2.8 billion, or ($5.14) per common share (diluted) for the second quarter ended May 31, 2008, compared to net income of $489 million, or $0.81 per common share (diluted), for the first quarter of fiscal 2008 and $1.3 billion, or $2.21 per common share (diluted), for the second quarter of fiscal 2007. For the first half of fiscal 2008, the Firm expects to report a net loss of approximately $2.3 billion, or ($4.33) per common share (diluted), compared to net income of $2.4 billion, or $4.17 per common share (diluted), for the first half of fiscal 2007.
>
> The Firm expects to report net revenues (total revenues less interest expense) for the second quarter of fiscal 2008 of negative ($0.7) billion, compared to $3.5 billion for the first quarter of 2008 and $5.5 billion for the second quarter of fiscal 2007. Net revenues for the second quarter of fiscal 2008 reflect negative mark to market adjustments and principal trading losses, net of gains on certain debt

liabilities. Additionally, the Firm incurred losses on hedges this quarter, as gains from some hedging activity were more than offset by other hedging losses. For the first six months of fiscal 2008, the Firm expects to report net revenues of $2.8 billion, compared to $10.6 billion for the first half of fiscal 2007.

During the fiscal second quarter, the Firm further strengthened its liquidity and capital position (all below amounts estimated as of May 31, 2008):

- Grew the Holding Company liquidity pool to an estimated $45 billion from $34 billion at the end of the prior quarter

- Decreased gross assets by approximately $130 billion and net assets by approximately $60 billion

- Reduced gross leverage to under 25.0x from 31.7x at the end of the first quarter, and reduced net leverage to under 12.5x from 15.4x

- Reduced exposure to residential mortgages, commercial mortgages and real estate investments by an estimated 15-20% in each asset class

- Reduced acquisition finance exposures by an estimated 35%

- Reduced aggregate non-investment grade inventory (including funded acquisition finance assets) by an estimated 20%

- Completed the budgeted full year fiscal 2008 unsecured funding plan

- Increased the Firm's long-term capital through the issuance of $4 billion of convertible preferred stock in April and approximately $5.5 billion of public benchmark long-term debt

* * *

### Business Segments

**Capital Markets** is expected to report net revenues of negative ($2.4) billion in the second quarter of fiscal 2008, compared to $1.7 billion in the first quarter of fiscal 2008 and $3.6 billion in the second quarter of fiscal 2007. Fixed Income Capital Markets is expected to report net revenues of negative ($3.0) billion, compared to $0.3 billion in the first quarter of 2008 and $1.9 billion in the second quarter of 2007. Excluding mark to market adjustments, related hedges and structured note liability gains, client activity in securitized products, municipals and commodities remained strong, while credit, interest rate and financing were down from last quarter but each up versus the year ago period. Equities Capital Markets is expected to report net revenues of $0.6 billion, a decrease from $1.4 billion in the first quarter of fiscal 2008 and $1.7 billion in the second quarter of

2007, as record revenues in prime brokerage and solid execution services activity were offset, in part, by lower volatility revenues as well as estimated losses of approximately $0.3 billion on private equity and principal investments.

**Investment Banking** is expected to report net revenues of $0.9 billion, consistent with $0.9 billion in the first quarter of fiscal 2008 and a decrease from $1.2 billion in the second quarter of fiscal 2007. Debt underwriting revenues are expected to be $0.3 billion, consistent with $0.3 billion in the first quarter of fiscal 2008 and a decrease from $0.5 billion in the second quarter of 2007, as strong high grade debt underwriting revenues were offset by continued weakness in high yield new issuance. Equity underwriting revenues are expected to be $0.3 billion, an increase from $0.2 billion in the first quarter of fiscal 2008 and consistent with $0.3 billion in the second quarter of 2007. Merger and acquisition advisory revenues are expected to be $0.2 billion, a decrease from $0.3 billion in both the first quarter of fiscal 2008 and the second quarter of 2007.

**Investment Management** is expected to report net revenues of $0.9 billion, a decrease from record revenues of $1.0 billion in the first quarter of fiscal 2008 and an increase from $0.8 billion in the second quarter of fiscal 2007. Asset management revenues are expected to be $0.5 billion, a decrease from $0.6 billion in the first quarter of fiscal 2008 on lower gains from minority interests in third party alternative investment managers, and consistent with $0.5 billion in the second quarter of 2007. The Firm expects to report assets under management of approximately $277 billion, consistent with the prior quarter. Private Investment Management is expected to report revenues of $0.4 billion, consistent with $0.4 billion in the first quarter of fiscal 2008 and an increase from $0.3 billion in the second quarter of 2007, with strength across both fixed income and equity products.

76.    Commenting on the financial results, Defendant Fuld stated the following:

I am very disappointed in this quarter's results. Notwithstanding the solid underlying performance of our client franchise, we had our first-ever quarterly loss as a public company. However, with our strengthened balance sheet and the improvement in the financial markets since March, we are well-positioned to serve our clients and execute our strategy.

77.    Also on June 9, 2008, Lehman Brothers issued a press release announcing that it raised $6 billion in capital – 50% more than previously reported – through the sale of $4 billion in common stock and $2 billion in preferred stock, thus further diluting the position of current shareholders.

78.    After the disclosure, Moody's lowered its rating of Lehman Brothers to "negative" from "stable."   In addition, the price of the Company's shares plummeted 12%, dropping from $32.29 to close at $28.47.

79.    The investing public was shocked at the extent of the Company's losses and write-downs.   David Hendler, an analyst at CreditSights Inc., stated: "It's kind of sobering for people who have been listening to the company these last six to nine months that they had everything under control."

80.    Similarly, a *Bloomberg* article entitled "Greenlight's David Einhorn Sees Additional Losses at Lehman" stated the following:

> David Einhorn, president of hedge fund Greenlight Capital LLC, comments on Lehman Brothers Holdings Inc.'s $6 billion capital raise and $2.8 billion second-quarter loss.
>
> Einhorn, who's betting Lehman shares will fall, spoke in an interview today after the firm held a conference call with investors. Einhorn is the author of ``Fooling Some of the People All of the Time,'' a book he's promoting about his experience betting against Allied Capital Corp.
>
> On additional losses:
>
> "***The call did nothing to allay my suspicions that there are additional losses that Lehman has not yet recognized***."
>
> "There are signs already from the press release that the company has more to go, particularly in the commercial mortgage backed securities areas, where they only wrote down $700 million gross. ***It's unclear to me why the writedown would be so small***."
>
> "***The burden is on them to be much more forthcoming and transparent in their disclosures and discussion and analysis of their high-risk assets***."
>
> On the $6 billion capital raise:
>
> "This is the third capital raise. The first two they said they didn't need to do. This one is not to install confidence.  It's not to go after short sellers. It is to replace losses.  ***They are raising $6 billion of capital that they said they didn't need in order to replace losses that they said they did not have***."

On management's credibility:

"*This raises management credibility issues. These results combined with their previous statements raise further management credibility issues*."

This "confirms a lot of things we've been saying.  The credit market did not really deteriorate between February and May.  *Most of these losses are losses that were probably evident quarters ago*." [Emphasis added.]

81.    On June 10, 2008, *The Wall Street Journal* published an article entitled "Big Loss at Lehman Intensifies Crisis Jitters."  The article stated in pertinent part as follows:

Lehman's larger-than-expected loss was accompanied, as anticipated, by word that the firm will seek to raise $6 billion in fresh capital. On Wall Street, the loss underscored the challenges Lehman and its rivals must face as they dramatically reduce their reliance on borrowed money. The use of debt, which helped fuel record profits when markets were booming but also led to excessive risk-taking, has come back to haunt them.

* * *

Lehman shares tumbled 8.7%, or $2.81, to $29.48 in New York Stock Exchange composite trading at 4 p.m. Lehman plans to offer $4 billion in common stock, priced at $28 a share, and another $2 billion in preferred shares that will convert to common stock.

*Part of the stock decline stems from investor frustration over the $6 billion in fresh capital raised by the company. That infusion has increased its cushion against potential losses but is diluting the value of Lehman's common-stock by about 30%*.

*Some shareholders have grown increasingly leery of Lehman's management, which has bolstered its balance sheet with $12 billion so far this year. In mid-March, Lehman Chief Financial Officer Erin Callan said the firm "took care of our full-year needs" when it raised $1.9 billion through an offering of preferred stock in February. In late March, Lehman raised another $4 billion*. Although it said the money wasn't really needed, it wanted to allay fears about its capital position in the wake of the sale of Bear to J.P. Morgan.

*"There is a credibility issue here*," said William B. Smith, president of SAM Advisors LLC, which holds about 45,000 Lehman shares and was buying more Monday. "Never did I ever think I would say that Fuld and his team had one, but they do. *If you don't need capital, why are you raising it?*"

* * *

Moody's Investors Service lowered its outlook for the bank's credit ratings to negative, expressing concerns about Lehman's ability to manage the risks in its still-large exposures to commercial and residential mortgages and signaling the market may not have much tolerance for further losses.

"The rating action also reflects Moody's concerns over risk management decisions that resulted in elevated real estate exposures and the subsequent ineffectiveness of hedges to mitigate these exposures in the recent quarter," Moody's wrote in a release. "Any additional net valuation marks that result in firm-wide losses in coming quarters would raise serious concerns about the effectiveness of Lehman's risk management and may create additional market unease about the firm, potentially weakening its franchise." [Emphasis added.]

82.    Finally, on June 12, 2008, Defendants Callan and Gregory were ousted from their positions with the Company as a result of the losses.  The Company named Herbert (Bart) H. McDade III as President and Chief Operating Officer, and Ian Lowitt as Chief Financial Officer. On this date, the *Associated Press* published an article entitled "Lehman Brothers Removes Finance, Operating Chiefs."  The article stated in pertinent part the following:

NEW YORK (AP) -- Lehman Brothers Holdings Inc. shook up its management Thursday, removing two top executives in a concession that attempts to quell Wall Street anger over recent losses have failed.

The nation's fourth-largest investment bank said Chief Financial Officer Erin Callan and Chief Operating Officer Joseph Gregory have been removed from their positions, days after the investment bank announced a $3 billion quarterly loss.

Investors were shaken after the company disclosed Monday it needed $6 billion of fresh capital to offset that loss, its first since going public in 1994.

"***When you have a stumble of this magnitude, change is not a bad thing***," said Lauren Smith, an analyst with Keefe, Bruyette & Woods. "I view the change, on the margin, as a good thing, ***but this runs a lot deeper than just changing a few high level managers***."

Since March, Callan had been taking on an increasingly more prominent profile as the face of Lehman during the credit crisis. She regularly met with analysts and appeared at investor conferences to talk up the company.

On Monday, Callan again waved the flag -- telling analysts on a telephone call that Lehman's books were in order and that the fresh dose of capital would allow traders to pursue new opportunities. But her pep talk failed and shares began to plummet toward a record low.

***The lack of confidence in Lehman's leadership has been hanging over the company for weeks***, and it was unclear if the management upheaval will be enough to satisfy critics.

* * *

***Shares have lost more than 20 percent this week and were down nearly 2 percent at midday***. [Emphasis added.]

83.     Because of Defendants' wrongful course of conduct during the Class Period, the outlook for Lehman Brothers is bleak.  The value of the firms' assets continues to decline, and analysts are predicting that the Company could face further losses and write-downs, declining revenue, and a compressed return on equity.  Defendants' false and misleading statements during the Class Period concealed the true extent of the Company's exposure to the credit and housing crisis.  The Company's belated disclosures about the true nature and extent of its financial exposure served to artificially inflate Lehman Brothers stock price during the Class Period.  Now that the truth has been exposed, Lehman Brothers faces an uncertain future.

## VIOLATIONS OF GAAP

84.     The Company's financial statements during the Class Period were false and misleading as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to Lehman Brothers' improper accounting for, and disclosures about, its revenues.   Such improper accounting violated GAAP rules.

85.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a

particular time.  Regulation S-X (17 C.F.R. § 210.4 01(a)(1)) states that financial statements filed

with the SEC which are not prepared in compliance with GAAP are presumed to be misleading

and inaccurate.  Regulation S-X requires that interim financial statements must also comply with

GAAP, with the exception that interim financial statements need not include disclosures which

would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §

210.10-01(a).

86.    Given these accounting irregularities, the Company announced financial results

that were in violation of GAAP and that violated the following principles:

(a)    The principle that "interim financial reporting should be based upon the

same accounting principles and practices used to prepare annual financial

statements" (APB No. 28, ¶ 10);

(b)    The principle that "financial reporting should provide information that is

useful to present to potential investors and creditors and other users in

making rational investment, credit, and similar decisions" (FASB

Statement of Concepts No. 1, ¶ 34);

(c)    The principle that "financial reporting should provide information about

the economic resources of an enterprise, the claims to those resources, and

effects of transactions, events, and circumstances that change resources

and claims to those resources" (FASB Statement of Concepts No. 1, ¶ 40);

(d)    The principle that "financial reporting should provide information about

an enterprise's financial performance during a period" (FASB Statement

of Concepts No. 1, ¶ 42);

(e)     The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶ 50);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" (FASB Statement of Concepts No. 2, ¶ 79); and

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that the uncertainties and risks inherent in business situations are adequately considered"

87.     The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. § 229.303).

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased or otherwise acquired Lehman Brothers common stock between September 13, 2006 and June 6, 2008, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any

subsidiary or affiliate of Lehman Brothers and the directors, officers and employees of Lehman Brothers or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

89.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, Lehman Brothers common stock was actively traded on the New York Stock Exchange ("NYSE"), an open and efficient market, under the symbol "LEH".  Record owners and other members of the Class may be identified from records maintained by Lehman Brothers and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

90.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

91.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

92.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Lehman Brothers;

(d)     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Lehman Brothers;

(e)     whether the market price of Lehman Brothers' common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     the extent to which the members of the Class have sustained damages and the proper measure of damages.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

94.    The market for Lehman Brothers common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Lehman Brothers common stock traded at artificially inflated prices during the Class Period.  The artificial inflation continued until the time Lehman Brothers admitted that it was experiencing increased losses and these admissions were communicated to, and/or digested by, the securities markets.  Plaintiff and other members of the Class purchased or otherwise acquired Lehman Brothers common stock relying upon the integrity of the market price of Lehman Brothers common stock and market information relating to Lehman Brothers, and have been damaged thereby.

95.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Lehman Brothers common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

96.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Lehman Brothers' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Lehman Brothers and its business, prospects and operations, thus causing

the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

97.     Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; and knowingly or severely recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

98.     Indeed, Defendants, by virtue of their receipt of information reflecting the true facts regarding Lehman Brothers and its business practices, their control over and/or receipt of Lehman Brothers' allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Lehman Brothers, were active and culpable participants in the fraudulent scheme alleged herein. These Defendants knew and/or severely recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The ongoing fraud as described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and/or severe recklessness and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

99.     Additionally, each of the Individual Defendants had knowledge of or recklessly disregarded that the public statements and documents the Company issued or disseminated were materially false and misleading and each was motivated to conceal the fraud alleged in order for

Company insiders to sell 2,739,738 shares of Lehman Brothers stock for proceeds of over $200 million.  Of that figure, over $167 million in gross proceeds were received by certain of the Individual Defendants.  The Individual Defendants' insider trading during the Class Period is summarized in the chart below:

| Richard S. Fuld, Jr.: Chairman of the Board and CEO | | | |
| --- | --- | --- | --- |
| **Date of Sale** | **# Share Sold** | **Price/Share** | **Total Proceeds** |
| 9/18/2006 | 500,000 | $69.60 | $35,050,568 |
| 6/15/2007 | 291,864 | $77.20 | $22,636,375 |
| 12/1/2006 | 74,460 | $73.67 | $5,485,468 |
| 6/15/2007 | 508,136 | $77.56 | $39,410,012 |
| 12/4/2007 | 202,587 | $62.63 | $12,688,024 |
| **Fuld Totals** | 1,577,047 | | $115,270,447 |
| **Joseph M. Gregory: former President and COO (through 6/12/08)** | | | |
| **Date of Sale** | **# Share Sold** | **Price/Share** | **Total Proceeds** |
| 4/25/2007 | 495,503 | $77.59 | $38,656,271 |
| 12/1/2006 | 72,251 | $73.67 | $5,322,731 |
| 12/4/2007 | 126,846 | $62.63 | $7,944,365 |
| **Gregory Totals** | 694,600 | | $51,923,367 |
| **Christopher M. O'Meara: former CFO (replaced 12/1/07)** | | | |
| **Date of Sale** | **# Share Sold** | **Price/Share** | **Total Proceeds** |
| 12/1/2006 | 5,874 | $73.67 | $432,738 |
| 12/4/2007 | 3,225 | $62.63 | $201,982 |
| **O'Meara Totals** | 9,099 | | $634,719 |

## STATUTORY SAFE HARBOR

100.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made.  Nor was it stated that actual results "could differ materially from those projected."  Nor were the forward-looking

statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of Lehman Brothers who knew that those statements were false when made.

## LOSS CAUSATION

101.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  Defendants' fraudulent scheme and false and misleading statements and omissions artificially inflated Lehman Brothers' stock price during the Class Period.

102.    These false and misleading statements, individually and collectively, concealed Lehman Brothers' true financial circumstances and future business prospects, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about Lehman Brothers was revealed.  While each of these misrepresentations was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate Lehman Brothers' stock price and the image of its future business prospects to give the market the false notion that Lehman Brothers was engaged in adequate and conservative banking and investment practices and had disclosed the true extent of the Company's exposure to the mortgage and credit crisis. Defendants' false and misleading statements had the intended effect and caused, or were a substantial contributing cause of Lehman Brothers' stock trading at artificially inflated levels throughout the Class Period.

103.    The true picture of Lehman Brothers' business, operations and finances slowly began to emerge on July 10, 2007, when the Company revealed "unrealized" losses of $459 million in its Second Quarter 2007 Form 10-Q.  This news raised growing concern that Lehman Brothers' may face greater losses from sub-prime mortgages than what was previously disclosed, and the Company denied this speculation as "unfounded" on July 18, 2007.  While other Wall Street firms were forced to disclose massive losses and write-downs as a result of the credit and mortgage market downturn, Lehman Brothers postponed the inevitable and continued to downplay the Company's exposure to the crumbling sub-prime market.  Finally, on June 9, 2008, when Lehman Brothers announced a loss of nearly $3 billion and write-downs of $3.7 billion to its mortgage-backed assets.  As a result of the information revealed to the market on this day, doubt was cast upon the veracity of Defendants' prior statements during the Class Period, causing the Company's stock price to plummet approximately 12%.  Over the course of the next few trading days after the disclosure, the Company's stock price would lose approximately 20%.

104.    The rapid decline in Lehman Brothers' stock price following the June 9, 2008 disclosure was a direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market.  Thus, the revelation of truth at the close of the Class Period, as well as the resulting clear market reaction, support a reasonable inference that the market understood that Lehman Brothers' prior statements were false and misleading.

105.    In sum, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation dissipated out of the stock, and Plaintiff and the Class were damaged suffering true economic losses.

106.    The decline in Lehman Brothers' stock price in June of 2008 was a direct result of the nature and extent of the revelations made to investors and the market, regarding Lehman Brothers' exposure to the credit and mortgage market crisis, its lack of internal and financial controls and its risky investment practices, that had been concealed or misrepresented by Defendants' scheme and misstatements.  The timing and magnitude of Lehman Brothers' stock price decline negates any inference that the losses suffered by Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the Class was a direct and proximate result of Defendants' scheme and misrepresentations and omissions which artificially inflated Lehman Brothers' stock price, and the subsequent significant decline in the value of Lehman Brothers' stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the market place.

## PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

107.    The market for Lehman Brothers' publicly traded common stock was open, well-developed and efficient at all times.  As a result of these materially false and misleading statements and failures to disclose, Lehman Brothers' publicly traded common stock traded at artificially inflated priced during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Lehman Brothers' publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Lehman Brothers, and have been damaged thereby.

108.    At all relevant times, the market for Lehman Brothers' common stock was an efficient market for the following reasons, among others:

    (a)     Lehman Brothers' stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    (b)     As a regulated issuer, Lehman Brothers regularly made public filings, including its Form 10-K, Forms 10-Q and related press releases with the SEC and the NYSE;

    (c)     Lehman Brothers regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    (d)     Lehman Brothers was followed by several securities analysts employed by major brokerage firms who wrote research reports which were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace.

109. As a result of the foregoing, the markets for Lehman Brothers' common stock promptly digested current information regarding Lehman Brothers from all publicly available sources and reflected such information in the prices of Lehman Brothers common stock.

110. Under these circumstances, all purchasers of Lehman Brothers' common stock during the Class Period suffered similar injury through their purchase of Lehman Brothers' common stock at artificially inflated prices and a presumption of reliance applies.

111. At the times they purchased or otherwise acquired Lehman Brothers' common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning

the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies. Plaintiff will also rely, in part, upon the presumption of reliance established by a material omission.

112.    In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and the other members of the Class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

## COUNT I
### Violations Of Section 10(b) Of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

113.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

114.    During the Class Period, Lehman Brothers and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of

Lehman Brothers common stock; and (iii) cause Plaintiff and other members of the Class to purchase Lehman Brothers stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Lehman Brothers and the Individual Defendants, and each of them, took the actions set forth herein.

115.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Lehman Brothers common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Lehman Brothers, as alleged below.

116.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete and accurate information.

117.    Lehman Brothers and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of

the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Lehman Brothers as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lehman Brothers' value, performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Lehman Brothers and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Lehman Brothers common stock during the Class Period.

118. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his or her responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination

of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

119.    These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lehman Brothers' operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.    As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

120.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lehman Brothers' common stock was artificially inflated during the Class Period.   In ignorance of the fact that the market price of Lehman Brothers' shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the

Class acquired Lehman Brothers common stock during the Class Period at artificially inflated high prices and were damaged thereby.

121.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Lehman Brothers, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Lehman Brothers common stock during the Class Period, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

122.    By virtue of the foregoing, Lehman Brothers and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

123.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### COUNT II
### Violations of Section 20(a) of The Exchange Act
### Against the Individual Defendants

124.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

125.    The Individual Defendants were and acted as controlling persons of Lehman Brothers within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the

Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

126.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

127.    As set forth above, Lehman Brothers and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for judgment as follows:

(a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding Plaintiff and the other members of the Class damages in an amount

which may be proven at trial, together with interest thereon;

(c)     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment

interest, as well as their reasonable attorneys' and experts' witness fees and other

costs; and

(d)     Such other relief as this Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated: June 18, 2008                  **LAW OFFICES OF CURTIS V. TRINKO, LLP**


By:  /s Curtis V. Trinko

Curtis V. Trinko (CT-1838)
Wai K. Chan (WC-0743)
16 West 46th Street, 7th Floor
New York, New York 10036
Tel: 212 490-9550
Fax: 212 986-0158
Email: Ctrinko@trinko.com

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
Christopher S. Jones
Lester R. Hooker
2424 North Federal Highway
Suite 257
Boca Raton, FL 33431
Main 561.394.3399
Fax: 561.394.3082

**Attorneys for Plaintiff Operative Plasterers and
Cement Masons International Association Local
262 Annuity Fund**

### CERTIFICATION OF NAMED AND/OR LEAD PLAINTIFF

I, Riccardo Iaccarino, on behalf of the Operative Plasterers' & Cement Masons' International Association Local 262 Annuity Fund ("Fund"), certify that:

1. I am authorized by the Board of Trustees of the Fund, in my capacity as the General Counsel, to initiate litigation on the Fund's behalf and to execute this Certification.

2. I have reviewed a complaint and I authorize Saxena White P.A. and to act on the Fund's behalf in this matter.

3. The Fund did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.

4. The Fund is willing to serve as a Lead Plaintiff or class representative, either individually or as part of a group. The Fund understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

5. Neither I nor the Fund will accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6. The Fund understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Fund's decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all my transactions in the securities of Lehman Brothers Holdings, Inc.. in the class period from September 13, 2006 through June 6, 2008, as follows:

| Type of Security (Common stock) | Purchase/Acquisition or Sale/Disposition | Quantity | Trade Date (mm/dd/yy) | Price per Share/Security ($) |
|---|---|---|---|---|
| SEE ATTACHED SCHEDULE A | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

8. During the three years prior to the date of this Certification, the Fund has only sought to serve, and has served as a representative party for a class in an action filed under the Private Securities Litigation Reform Act, in the following instances:

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this 10 day of June 2008

Riccardo Iaccarino
Name (print)

Signature

# SCHEDULE A TO CERTIFICATION OF
# The Operative Plasterers' & Cement Masons' International Association Local 262 Annuity Fund

| PURCHASES | | | |
|---|---|---|---|
| Date | Shares | Unit Price | Total Cost |
| 6/1/2007 | 125 | $75.29 | $9,411.25 |
| 6/5/2007 | 60 | $74.57 | $4,474.20 |
| 8/17/2007 | 60 | $58.15 | $3,488.77 |
| 9/18/2007 | 60 | $62.30 | $3,738.06 |
| 10/3/2007 | 155 | $64.41 | $9,983.27 |
| 10/23/2007 | 310 | $57.70 | $17,887.03 |
| 10/31/2007 | 75 | $62.88 | $4,715.94 |
| 12/5/2007 | 240 | $60.05 | $14,413.08 |
| 12/6/2007 | 170 | $59.89 | $10,181.04 |
| 3/13/2008 | 420 | $46.05 | $19,340.24 |

| SALES | | | |
|---|---|---|---|
| Date | Shares | Unit Price | Total Proceeds |
| 6/26/2007 | 95 | $74.16 | $7,045.23 |
| 7/10/2007 | 25 | $72.17 | $1,804.22 |
| 7/20/2007 | 20 | $68.06 | $1,361.17 |
| 7/24/2007 | 45 | $67.73 | $3,047.85 |
| 11/20/2007 | 155 | $60.82 | $9,427.08 |
| 11/21/2007 | 160 | $58.55 | $9,368.60 |
| 3/3/2008 | 175 | $48.95 | $8,566.88 |

{}