UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPERATIVE PLASTERERS AND CEMENT MASONS INTERNATIONAL ASSOCIATION LOCAL 262 ANNUITY FUND, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>LEHMAN BROTHERS HOLDINGS, INC., RICHARD S. FULD, JR., CHRISTOPHER M. O'MEARA, JOSEPH M. GREGORY, and ERIN CALLAN,<br><br>Defendants. | NO. 08-CV-5523 (LAK)<br><br><u>JURY TRIAL DEMANDED</u> |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE PENSION FUND GROUP FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF ITS SELECTION OF COUNSEL AS LEAD COUNSEL FOR THE CLASS**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND................................................................... 3

ARGUMENT .................................................................................................................................. 7

I.      The Pension Fund Group Should Be Appointed Lead Plaintiff ............................................ 7

        A.    The Pension Fund Group Believes It Has the Largest Financial
             Interest in the Relief Sought by the Class................................................................... 7

        B.    The Pension Fund Group Satisfies the Relevant Requirements of Rule 23 ................. 8

            i.    The Pension Fund Group's Claims Are Typical of the Claims of the Class .......... 9

            ii.   The Pension Fund Group Will Fairly and Adequately Represent
                the Interests of the Class ...................................................................................... 10

        C.    The Members Of The Pension Fund Group Are the Prototypical
            Lead Plaintiffs Envisioned by the PSLRA................................................................ 11

II.     This Court Should Approve the Pension Fund Group's Choice of Lead Counsel .............. 12

CONCLUSION............................................................................................................................. 13

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Albert Fadem Trust v. Citigroup, Inc.*,
   239 F. Supp. 2d 344 (S.D.N.Y. 2002) .................................................................................7, 9

*Ferrari v. Impath, Inc.*,
   No. 03 Civ. 5667 (DAB), 2004 WL 1637053 (S.D.N.Y. July 20, 2004) ...............................11

*Glauser v. EVCI Center Colleges Holding Corp.*,
   236 F.R.D. 184 (S.D.N.Y. 2006) ........................................................................................7, 15

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004) .......................................................................................................11

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) .....................................................................................................11

*In re Comverse Tech., Inc. Sec. Litig.*,
   No. 06-cv-1825(NGG)(RER), 2007 WL 680779 (E.D.N.Y. Mar. 2, 2007) ..............................8

*In re Doral Fin. Corp. Sec. Litig.*,
   414 F. Supp. 2d 398 (S.D.N.Y. 2006) .......................................................................................6

*In re eSpeed, Inc. Sec. Litig.*,
   232 F.R.D. 95 (S.D.N.Y. 2005) ............................................................................................7, 9

*In re Olsten Corp. Sec. Litig*,
   3 F. Supp. 2d 286 (E.D.N.Y. 1998) ....................................................................................9, 11

*In re Party City Sec. Litig.*,
   189 F.R.D. 91 (D.N.J. 1999) .....................................................................................................6

*Kaplan v. Gelfond*,
   240 F.R.D. 88 (S.D.N.Y. 2007) .....................................................................................6, 9, 10

*Xianglin Shi v. Sina Corp.*,
   No. 05 Civ. 2154(NRB), 2005 WL 1561438 (S.D.N.Y. July 1, 2005) .........................9, 10, 11

**STATUTES AND OTHER AUTHORITIES**

15 U.S.C. § 78u-4 ................................................................................................................ *passim*

Fed. R. Civ. P. 23 ................................................................................................................. *passim*

H.R. Conf. Rep. No. 104-369 (1995) ............................................................................................12

The Alameda County Employees' Retirement Association ("ACERA"), the Government of Guam Retirement Fund ("Guam"), the Northern Ireland Local Governmental Officers Superannuation Committee ("NILGOSC"), The City of Edinburgh Council as Administering Authority of the Lothian Pension Fund ("Lothian") and the Operating Engineers Local 3 Trust Fund ("Operating Engineers") (collectively the "Pension Fund Group"), respectfully submit this memorandum in support of their motion to be appointed as Lead Plaintiff pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and for approval of their selection of the law firms of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") and Schiffrin Barroway Topaz & Kessler, LLP ("Schiffrin Barroway") as Lead Counsel for the Class.

## PRELIMINARY STATEMENT

This action arises from allegations concerning violations of the federal securities laws by Lehman Brothers Holdings, Inc. ("Lehman" or the "Company") and certain of its officers (collectively, "Defendants"). During the period from September 13, 2006 through June 6, 2008 (the "Class Period"), Defendants disseminated materially false and misleading information concerning the Company's operations and financial condition while suppressing or recklessly ignoring information known to them about the Company's business and finances, including the Company's massive exposure related to its investments backed by residential and commercial mortgages and real estate. Defendants' misstatements artificially inflated the price of Lehman stock and caused substantial damage to the Company's investors.

Pursuant to the PSLRA, this Court must appoint the "most adequate plaintiff" to serve as Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). In that regard, the Court must consider which

movant has the "largest financial interest" in the relief sought by the Class in this litigation and whether there has been a prima facie showing that that movant is an adequate and typical class representative under Rule 23 of the Federal Rules of Civil Procedure.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

The Pension Fund Group believes that it is the "most adequate plaintiff" under the PSLRA to serve as Lead Plaintiff on behalf of investors in this action.  As set forth in more detail below, the Pension Fund Group's significant financial interest in this matter is evidenced by, among other things, its collective loss of approximately $28 million on its members' investment in Lehman stock.  The Certifications required by the PSLRA setting forth the Pension Fund Group's transactions in Lehman stock are attached as Exhibits C-G, respectively, to the Declaration of Gerald H. Silk ("Silk Decl.").  Accompanying charts reflecting the calculations of the losses of the Pension Fund Group are attached as Exhibit H to the Silk Decl.  These transactions and losses demonstrate that the Pension Fund Group has an extremely large financial interest in this matter – one believed to be greater than any competing movant.

Moreover, as sophisticated institutional investors with experience supervising counsel in complex securities litigation, the members of the Pension Fund Group are the prototypical lead plaintiffs envisioned by the PSLRA.  These institutions share common goals of strengthening corporate governance to protect investors from fraudulent reporting by publicly traded companies such as Lehman, as well as ensuring that the Class will benefit from the active involvement and supervision of class counsel.  The members of the Pension Fund Group are determined to work together to seek Lead Plaintiff appointment and prosecute the case on behalf of the Class.  Thus, the Court can be assured that the appointment of the Pension Fund Group – sophisticated institutional investors experienced in litigating securities class actions that have

affirmed their commitment to vigorously represent the interests of the Class – will fulfill Congress' goal in enacting the PSLRA to empower institutional investors with a real financial interest in the litigation.

## FACTUAL AND PROCEDURAL BACKGROUND

Lehman, an investment bank based in New York City, is one of the largest financial institutions in the United States and its stock trades on the New York Stock Exchange. The complaint in this action alleges that during the Class Period, Lehman and certain of its officers misrepresented the Company's exposure to and losses from mortgage-backed assets and real estate investments – particularly those tied to subprime residential mortgages and, consequently, overstated the Company's earnings. As numerous mortgage lenders (who issued the very loans that backed Lehman's investments) fell into bankruptcy, and the Company's peer's acknowledged massive losses from their own mortgage-backed investments, Lehman insisted that its sophisticated hedging strategies insulated it from such risk. After numerous inconsistencies in the Company's public statements led to increasing questions from investors and analysts, Lehman acknowledged that it had incurred losses of $2.8 billion from investments tied to mortgages and real estate.

Specifically, the Complaint alleges that, at the start of the class period, September 13, 2006, Lehman reported net income of $916 million for what Defendant Richard Fuld, Lehman's CEO, called the Company's "best third quarter results ever" and, in December 2006, the Company reported record annual income of $4 billion. The Company continued to report record earnings as the losses at mortgage lenders led to the constriction of the market for mortgage-backed securities, reporting on June 12 2007, for example, that the Company had earned net

3

income of $1.3 billion for the second quarter of 2007, an increase of 27% over the same quarter during the prior year, based on "record net revenues in all business segments."

Just a month after reporting record results in June 2007, the Company's second quarter Form 10-Q filed with the SEC on July 10 2007 revealed an "unrealized loss" of $459 million on mortgage-backed investments.  That disclosure provided the first hint that Lehman might have significant exposure to the unfolding subprime crisis, and the Company's stock fell 5% in response to such concerns.  The Company was quick to rebuff concerns about greater exposure, assuring investors that "***The rumors related to subprime exposure are unfounded***."  (Emphasis added).  Lehman continued to report solid financial results even as the turmoil in the subprime markets spread, causing the markets for complex instruments tied to various forms of debt, such as collateralized debt obligations ("CDOs"), to stall.  On a September 2007 conference call, Lehman again disclosed strong quarterly results and Defendant Christopher O'Meara, then the Company's CFO, held Lehman apart from other Wall Street banks citing the Company's "strong risk management culture" and "prudent approach to valuing positions."  Over the next two months, the impact of the subprime collapse on Wall Street banks crystallized as Lehman's peers announced billions in losses on mortgage-backed investments.  Undeterred, in December 2007 Lehman announced record net income for 2007 of $4.2 billion, and fourth quarter net income of $886 million, on "record net revenues across all three business segments."

Lehman's efforts to conceal its losses on its mortgage and real estate investments began to unravel after the Company announced financial results for the first quarter of 2008 on March 18, 2008, reporting a profit of $489 million.  In the press release announcing those results, the Company also reported that it held $6.5 billion in "other asset-backed securities" and that it had taken a write-down of just $200 million to reflect the decreased value of those securities.

4

Defendant Fuld assured investors at the Company's annual meeting in April 2008 that "*the worst is behind us*." (Emphasis added). The filing of the Company's Form 10-Q on April 8, 2008, however, revealed inconsistencies with Lehman prior statements, which were highlighted in a May 21, 2008 presentation by David Einhorn, a prominent investment manager. Mr. Einhorn questioned the adequacy of the Company's write-down of its CDOs, and the valuation of Lehman's "Level III" assets.[1] In response to Mr. Einhorn's presentation, the price of Lehman shares fell nearly $6 per share, or almost 15%.

The questions raised in Mr. Einhorn's presentation set off a frenzy of speculation about Lehman, prompting many analysts to question the Company's viability. On June 2, 2008, Standard & Poor's lowered its credit rating for Lehman citing questions about the Company's financing of its operations. Lehman shares fell nearly $3, or 8%, in response to that downgrade. A report that day in The Wall Street Journal that Lehman intended to raise an additional $4 billion in capital heightened concerns about the Company's ability to access the capital it needed. Lehman shares fell another $3 per share on June 3 in response to those concerns.

Concerns about Lehman's solvency prompted the Company to accelerate the announcement of its second quarter 2008 results from June 16, 2008 to June 9. That day, the Company announced a shocking quarterly loss of $2.87 billion – nearly ten times the loss analysts had anticipated – following write-downs of $3.7 billion to mortgage-backed assets and real estate investments. The Company also revealed that it raised $6 billion in capital – 50% more than previously reported – through the sale of common and preferred stock. Following that disclosure, Moody's lowered its rating of Lehman to "negative" from "stable." In response, the price of Lehman shares fell roughly 12%, dropping from $32.29 to close at $28.47.On Friday,

---

[1] Level III assets are illiquid assets that trade so infrequently that there is no reliable market price for them, and which are thus valued based on management assumptions. As of the first quarter, Level III assets represented 5% of the Company's total assets, and totaled 171% of its shareholder equity.

June 12, 2008, the Company removed Defendant Erin Callan as CFO and Defendant Joseph Gregory as President, without specifying the reason.

On April 29, 2008, the first currently pending securities class action against Lehman, styled *Southeastern Pennsylvania Transportation Authority v. Lehman Brothers Holdings Inc., et al*, No. 08-CV-2431, was filed in the Northern District of Illinois. On April 30, 2008, counsel in that action published a notice on Prime Newswire informing investors of a class period of September 13, 2006 through July 30, 2007 and that the deadline to move for appointment as Lead Plaintiff is June 30, 2008.[2] *See* Silk Decl., Exhibit A. On June 18, 2008, the first securities class action against Lehman in this District, styled *Operative Plasterers and Cement Masons International Association Local 262 Annuity Fund, et al v. Lehman Brothers Holdings, Inc., et al*, No. 08-CV-5523, was filed. That same day, counsel for the plaintiff in that action published a notice in *Business Wire* alerting investors to a Class Period of September 13, 2006 through June 6, 2008. *See* Silk Decl., Exhibit B.[3] The PSLRA permits any member of the class to move for appointment as Lead Plaintiff within 60 days of the first-published notice. *See* 15 U.S.C. § 78u-4(a)(3)(A). The Pension Fund Group has satisfied this requirement by making this motion.

---

[2] Another class action complaint, *Reese v. O'Meara*, No. 08-CV-1119, filed in the Northern District of Illinois on February 22, 2008, was voluntarily dismissed.

[3] The complaint in the *Operative Plasterers and Cement Masons* action filed in this District (referred to herein as the "Complaint") alleges the longest filed class period – September 13, 2006 through June 6, 2008. For purposes of determining a lead plaintiff movant's financial interest under PSLRA, the longest filed and publicly-noticed class period applies. *See*, *e.g.*, *Kaplan v. Gelfond*, 240 F.R.D.88, 93 (S.D.N.Y. 2007) ("For the purposes of this analysis, we use the longer class period with the earlier start date."); *In re Party City Sec. Litig.*, 189 F.R.D. 91, 94 n.3 (D.N.J. 1999) ("The *Catanzarite Action* is relied upon for purposes of this motion because the class period alleged therein covers the longest class period alleged in the actions filed against the Defendants."). The investor ultimately appointed Lead Plaintiff will have the obligation to determine, based on its investigation, the appropriate class period and scope of the particular claims asserted in the operative consolidated class action complaint. *In re Doral Fin. Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 402-03 (S.D.N.Y. 2006) (noting that narrowing the Class Period, if appropriate at all, should be done at a later stage in the litigation).

# ARGUMENT

## I. The Pension Fund Group Should Be Appointed Lead Plaintiff

The Pension Fund Group respectfully submits that it should be appointed Lead Plaintiff because it is the movant "most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The PSLRA sets forth the procedure for selecting the lead plaintiff in class actions arising under the securities laws and provides a presumption favoring the plaintiff or group of plaintiffs with the largest financial interest in the action. Under the PSLRA, the Court "shall" adopt a presumption that the most adequate plaintiff is "the person or group of persons that…(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *Albert Fadem Trust v. Citigroup, Inc.*, 239 F. Supp. 2d 344, 347 (S.D.N.Y. 2002).

### A. The Pension Fund Group Believes It Has the Largest Financial Interest in the Relief Sought by the Class

The Pension Fund Group respectfully submits that it has the largest financial interest of any qualified movant in this action and should therefore be appointed Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii). In analyzing financial interest, courts typically consider four factors: (i) the number of gross shares purchased during the class period; (ii) the number of net shares purchased during the class period; (iii) the total net funds expended to acquire those shares; and (iv) the movant's approximate losses. *See, e.g., Glauser v. EVCI Center Colleges Holding Corp.*, 236 F.R.D. 184, 187 (S.D.N.Y. 2006); *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 100 (S.D.N.Y. 2005). Based on these four factors, the Public Pension Funds believes they it has the largest financial interest of any lead plaintiff movant.

7

During the Class Period, the Pension Fund Group purchased 1,007,338 shares of Lehman common stock on a gross basis, and sold 461,696 shares, and thus had net purchases of 545,642 shares of common stock. The Pension Fund Group had net expenditures of $37.2 million on its purchases of common stock. As a result of Lehman's misconduct and subsequent market correction of the prices of the Company's stock, the Pension Fund Group sustained losses, calculated under the PSLRA, of $28.2 million on a first-in, first-out ("FIFO") basis and $27.6 million on a last-in, first-out ("LIFO") basis.[4] The magnitude of the Pension Fund Group's collective financial interest is illustrated in the following chart:

| Factor | Pension Fund Group's Position |
|---|---|
| **Gross Purchases:** | 1,007,338 shares |
| **Net Purchases:** | 545,642 shares |
| **Net Expenditures:** | $37,210,558 |
| **Approximate FIFO Loss:** | $28,260,751 |
| **Approximate LIFO Loss:** | $27,677,251 |

In light of this extremely large financial interest, the Pension Fund Group believes it is entitled to the statutory presumption as the most adequate plaintiff and should be appointed Lead Plaintiff.

### B. The Pension Fund Group Satisfies the Requirements of Rule 23

The Pension Fund Group should also be appointed Lead Plaintiff because it "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *See* 15 U.S.C. §

---

[4] Courts commonly employ either the "FIFO" or "LIFO" methods for calculating financial interest for purposes of appointing a Lead Plaintiff under the PSLRA. *See, e.g., In re Comverse Tech., Inc. Sec. Litig.*, No. 06-cv-1825(NGG)(RER), 2007 WL 680779, at *7 n.10 (E.D.N.Y. Mar. 2, 2007) (noting that "Courts have recognized two potential accounting methods when assessing gains/losses that result from the purchase and sale of securities" and identifying FIFO and LIFO as those methods). Under the FIFO method, sales are offset against the movant's inventory of stock acquisitions, starting with the earliest and moving chronologically forward. Under the alternative LIFO method, sales are offset against the movant's inventory of stock acquisitions, starting with the latest and moving chronologically backward. Losses calculated on both a FIFO and LIFO basis for each U.S. Pension Fund are included in the charts attached as Exhibit H to the Silk Decl.

8

78u-4(a)(3)(B)(iii)(I)(cc); *Albert Fadem Trust*, 239 F. Supp. 2d at 347; *In re Olsten Corp. Sec. Litig*, 3 F. Supp. 2d 286, 294 (E.D.N.Y. 1998).

Of the four prerequisites to class certification, "typicality and adequacy of representation are the only provisions [of Rule 23] relevant to the determination of lead plaintiff under the PSLRA." *Kaplan v. Gelfond*, 240 F.R.D. 88, 94 (S.D.N.Y. 2007) (Buchwald, J.) (citation omitted). Furthermore, "at this stage of litigation, only a preliminary showing of typicality and adequacy is required." *Id.* (citing *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. at 102). As detailed below, the Pension Fund Group unquestionably satisfy these requirements.

### i.   The Pension Fund Group's Claims Are Typical of the Claims of the Class

The Pension Fund Group satisfies the typicality requirements of Rule 23. Typicality can be established by showing that the claims of the proposed lead plaintiff "arise from the same conduct from which the other class members' claims and injuries arise." *Xianglin Shi v. Sina Corp.*, No. 05 Civ. 2154(NRB), 2005 WL 1561438, at *3 (S.D.N.Y. July 1, 2005) (Buchwald, J.) (internal citation and quotation marks omitted). However, the claims of the lead plaintiff need not be identical to the claims of the class to satisfy typicality. *See id.* (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.*, 229 F.R.D. 395, 412 (S.D.N.Y. 2004)).

Here, the Pension Fund Group's claims are typical of the claims of the members of the proposed class who also purchased or otherwise acquired Lehman stock at artificially inflated prices during the Class Period and suffered damages after the subsequent market correction. In sum, the Pension Fund Group satisfies the typicality requirement because, just like all other class members, its members: (1) purchased or otherwise acquired Lehman stock during the applicable period; (2) at prices allegedly artificially inflated by defendants' materially false and misleading

9

statements and/or omissions; and (3) suffered damages thereby. *See Xianglin Shi*, 2005 WL 1561438, at *3 (finding typicality where movant "executed stock trades during the proposed class period at prices alleged to have been affected by the alleged conduct of the defendants" because "[t]hese claims are similar in substance to the allegations of the other class members, who claim similar injuries."). The Pension Fund Group and all class members therefore have identical, non-competing and non-conflicting interests in establishing Defendants' liability.

### ii. The Pension Fund Group Will Fairly and Adequately Represent the Interests of the Class

The Pension Fund Group will also fairly and adequately represent the Class. "The adequacy requirement is satisfied where: (1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Kaplan*, 240 F.R.D. at 94.

The Pension Fund Group's members have demonstrated their adequacy by retaining highly experienced counsel, timely deciding to work together as Lead Plaintiffs, and submitting Certifications reflecting their understanding of the obligations owed by the Lead Plaintiff to the Class. *See* Certifications of attached as Exhibits C-G, respectively, to the Silk Decl. Through their prior experience in prosecuting securities class actions, as well as their joint involvement in the pension fund community, the members of the Pension Fund Group have demonstrated an ability to effectively work together and monitor class counsel. The Pension Fund Group is committed to protecting the interests of the Class by working together and being actively involved in prosecuting the case and overseeing counsel.

Moreover, having suffered over $28 million in losses as a result of the misconduct at Lehman, the Pension Fund Group has a significant financial interest in the litigation and can be

counted on to vigorously pursue recovery for the Class from all culpable parties. As such, the interests of the Pension Fund Group are perfectly aligned with those of the Class, and there is no evidence of any antagonism between the Pension Fund Group and the Class. Lastly, the Pension Fund Group has shown its adequacy by retaining highly qualified counsel with extensive experience in prosecuting securities class actions.

### C. The Members of the Pension Fund Group Are the Prototypical Lead Plaintiffs Envisioned by the PSLRA

In addition to satisfying the preliminary requirements of Rule 23, the appointment of the Pension Fund Group as Lead Plaintiff would also fulfill a critical legislative goal behind Congress' enactment of the PSLRA – to encourage sophisticated institutions with large financial interests to serve as lead plaintiff in securities class actions. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 264 (3d Cir. 2001) (noting that the legislative intent of the PSLRA is to encourage large institutional investors to serve as lead plaintiff); *see also Olsten*, 3 F. Supp. 2d at 296 (same).

Indeed, the members of the Pension Fund Group are all large pension funds with substantial assets and, as such, are precisely the type of institutional investors that Congress sought to summon and empower when it enacted the PSLRA. *See Xianglin Shi,* 2005 WL 1561438, at *5 ("Because the size and experience of institutional investors can be of significant assistance to the prosecution of the action, a number of courts 'have understood [the PSLRA] to favor large institutional investors' as lead plaintiff.'") (citation omitted); *Ferrari v. Impath, Inc.*, No. 03 Civ. 5667 (DAB), 2004 WL 1637053, at *3 (S.D.N.Y. July 20, 2004) (stating that institutional investors are the type of lead plaintiff that Congress wanted to encourage to participate in securities litigation and to exercise control over the selection and actions of plaintiff's counsel); *see also Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 n.13 (2d Cir. 2004)

(describing the main purpose of the PSLRA's lead plaintiff provision as "empower[ing] one or several investors with a major stake in the litigation to exercise control over the litigation as a whole."). Finally, as explained more fully below, the Pension Fund Group has demonstrated its adequacy by selecting highly qualified and experienced counsel to represent the Class.

## II. This Court Should Approve the Pension Fund Group' Choice of Lead Counsel

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to this Court's approval. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). Courts should not disturb the lead plaintiff's choice of counsel unless necessary to "protect the interests of the plaintiff class." H.R. Conf. Rep. No. 104-369, at 35, 104th Cong. 1st Sess. (1995).

The Pension Fund Group has retained the law firms of Bernstein Litowitz and Schiffrin Barroway – counsel highly experienced in prosecuting securities class actions – to serve as Lead Counsel for the Class. Bernstein Litowitz and Schiffrin Barroway are highly-experienced in the areas of securities litigation and class actions, and have successfully prosecuted numerous securities fraud class actions and obtained excellent results on behalf of defrauded investors around the country. Further, counsel from Bernstein Litowitz and Schiffrin Barroway have the skill and knowledge that will enable them to prosecute this action effectively and expeditiously. *See*, *e.g.*, Bernstein Litowitz's and Schiffrin Barroway's firm biographies attached as Exhibits I and J, respectively, to the Silk Decl. Accordingly, the Court should approve the Pension Fund Group's selection of Bernstein Litowitz and Schiffrin Barroway as Lead Counsel for the Class.

Both Bernstein Litowitz and Schiffrin Barroway are approved by ACERA to represent it in connection with its securities litigation matters. ACERA, after determining to seek appointment as Lead Plaintiff in this matter, directed its counsel in this case, Schiffrin Barroway, to confer with Bernstein Litowitz to determine whether Bernstein Litowitz's institutional clients

shared an interest in partnering with ACERA to serve together as Lead Plaintiff. As a result of ACERA's direction to its counsel, the members of the Pension Fund Group determined to work together and jointly seek appointment as Lead Plaintiff.

Accordingly, the Pension Fund Group's choice of experienced counsel should be appointed Lead Counsel for the Class.

## CONCLUSION

For the above reasons, Pension Fund Group respectfully requests that the Court appoint the Pension Fund Group as Lead Plaintiff and approve its choice of counsel to serve as Lead Counsel for the Class.

DATED: June 30, 2008
New York, New York

Respectfully submitted,

By:       /s/ Gerald H. Silk

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Gerald H. Silk (GS-4565)
Avi Josefson (AJ-3532)
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Tel: 212-554-1400

*Proposed Lead Counsel for the Class*

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Sean M. Handler
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: 610-667-7706

*Proposed Lead Counsel for the Class*

*Additional Plaintiffs' Counsel*

**SPECTOR ROSEMAN & KODROFF, P.C.**
Robert M. Roseman (RR-1103)
Andrew D. Abramowitz
David Felderman
Rachel E. Kopp
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
Tel.: 215-496-0300

**LABATON SUCHAROW LLP**
Christopher J. Keller
140 Broadway
New York, New York 10005
Tel.: 212)-907-0853

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
Christopher S. Jones
Lester R. Hooker
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: 561.394.3399

14