# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

OPERATIVE PLASTERERS AND CEMENT MASONS INTERNATIONAL ASSOCIATION LOCAL 262 ANNUITY FUND, Individually And On Behalf of All Others Similarly Situated,

Plaintiffs,

vs.

RICHARD S. FULD, JR.; CHRISTOPHER M. O'MEARA; JOSEPH M. GREGORY; ERIN CALLAN; IAN LOWITT; MICHAEL L. AINSLIE; JOHN F. AKERS; ROGER S. BERLIND; THOMAS H. CRUIKSHANK; MARSHA JOHNSON EVANS; SIR CHRISTOPHER GENT; ROLAND A. HERNANDEZ; HENRY KAUFMAN; JOHN D. MACOMBER; ABN AMRO HOLDING N.V.; ANZ SECURITIES, INC.; BANC OF AMERICA SECURITIES LLC; BBVA SECURITIES INC.; BNY CAPITAL MARKETS, INC.; CABRERA CAPITAL MARKETS, LLC; CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID; CIBC WORLD MARKETS CORP.; CITIGROUP GLOBAL MARKETS INC.; DAIWA SECURITIES SMBC EUROPE LIMITED; DnB NOR MARKETS; DZ FINANCIAL MARKETS LLC; RBS GREENWICH CAPITAL; HARRIS NESBITT CORP.; HSBC SECURITIES (USA) INC.; HVB CAPITAL MARKETS, INC.;

(Caption continued on next page)

NO. 08-CV-5523 (LAK)
ECF CASE

JURY TRIAL DEMANDED

# AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

LOOP CAPITAL MARKETS, LLC; MELLON
FINANCIAL MARKETS, LLC; MERRILL
LYNCH, PIERCE, FENNER & SMITH INC.;
MIZUHO SECURITIES USA, INC.;
MORGAN STANLEY & CO. INC.;
nabCAPITAL SECURITIES, LLC;
NATIONAL AUSTRALIA BANK LIMITED;
RBC DAIN RAUSCHER INC.; SANTANDER
INVESTMENT SECURITIES INC.; SCOTIA
CAPITAL (USA) INC.; SIEBERT CAPITAL
MARKETS; SG CORPORATE &
INVESTMENT BANKING; SOVEREIGN
SECURITIES CORPORATION, LLC;
SUNTRUST ROBINSON HUMPHREY, INC.;
TD SECURITIES (USA) LLC; UBS
SECURITIES LLC; UTENDAHL CAPITAL
PARTNERS, L.P.; WACHOVIA CAPITAL
MARKETS, LLC; WELLS FARGO
SECURITIES, LLC; WILLIAMS CAPITAL
GROUP, L.P.,

Defendants.

# TABLE OF CONTENTS

Page

I.   SUMMARY OF THE ACTION ................................................................. 2

II.  OVERVIEW OF THE SEPARATE CLAIMS ............................................ 7

III. JURISDICTION AND VENUE ............................................................... 8

IV.  PARTIES AND RELEVANT NON-PARTIES ......................................... 9

  A.   Plaintiffs ....................................................................................... 9

  B.   Relevant Non-Parties ................................................................. 12

  C.   Defendants ................................................................................. 13

    1.   Insider Defendants .......................................................... 13

    2.   Director Defendants ........................................................ 15

    3.   Underwriter Defendants .................................................. 16

V.   VIOLATIONS OF THE SECURITIES ACT ......................................... 24

  A.   Background On The Real Estate And Mortgage Markets ........... 25

    1.   Expansion Of The U.S. Mortgage Industry And The
         Advent Of Non-Prime Loans ........................................... 25

    2.   Wall Street's Role In Mortgage Securitization ................. 27

    3.   The ABX .......................................................................... 30

    4.   The CMBX ....................................................................... 31

    5.   Lehman's Exposure To The Mortgage And Real
         Estate Markets ................................................................ 32

    6.   Lehman Was A Major Originator Of Subprime And
         Alt-A Loans ..................................................................... 33

    7.   Lehman Was A Leader In Mortgage Securitization ......... 36

    8.   Lehman Amassed A $90 Billion Portfolio Of
         Mortgage And Asset-Backed Holdings ............................ 37

         a.   Lehman's Residential Real Estate Exposure ........ 37

i

          b.      Lehman's Commercial Real Estate Exposure................................38

    9.      Lehman Increased Its Leverage To Grow Its Mortgage Inventory ..................................................................42

    10.     Lehman Was Required To Report Assets At Their Fair Value...........................................................................43

B.    The Real Estate And Mortgage Markets Collapse.............................................47

    1.      The U.S. Housing Bubble Bursts In 2006.................................................47

    2.      Declines In Mortgage-Backed Securities.................................................51

    3.      Hedge Funds Fail In May And July Of 2007, And Bear Stearns Collapses In March 2008 ...................................55

    4.      Lehman's Deteriorating Mortgage And MBSs Performance ........................................................................56

    5.      Increasing Numbers Of Loan Repurchases.................................................59

    6.      Margin Calls On Non-Prime Lenders .........................................62

    7.      Lehman's Declining Originations And Securitizations.......................................................................63

    8.      Lehman Closes BNC And Suspends Lending At Aurora ...................................................................................65

C.    Lehman's Lack Of Transparency And Undisclosed Exposure To Real Estate And Mortgage-Related Losses ...................................66

    1.      Lehman's Lack Of Transparency Regarding Its Real Estate And Mortgage-Related Holdings ................................66

    2.      Lehman Failed To Disclose Its Alt-A Exposure And Inability To Hedge Alt-A ...............................................70

    3.      Lehman's Purported Risk Mitigation And Hedging.................................74

    4.      Lehman Pushed Mortgage Assets To Level 3 ..........................................78

    5.      Lehman's Overstated Real Estate And Mortgage-Related Holdings Prevent A Sale Of The Company In September 2008 ........................................................82

D.    Lehman's Collapse And Bankruptcy ...................................................................83

1.  September 10, 2008 Pre-Release Of Financial Results ................................................................83

2.  September 15, 2008 Bankruptcy Filing ......................85

E.  Summary Of Lehman's Securities Offerings.........................85

F.  The False And Misleading Offering Materials ....................88

1.  2Q07 Financial Results ........................................93

2.  3Q07 Financial Results ........................................98

3.  4Q07 Financial Results ......................................102

4.  2007 Fiscal Year-End Results ...........................103

5.  1Q08 Financial Results ......................................107

6.  2Q08 Financial Results ......................................110

G.  Underwriting Of The Offerings ........................................110

H.  Causes Of Action Under The Securities Act ....................113

COUNT I  Violations Of Section 11 Of The Securities Act Against The Securities Act Defendants..........................................................113

COUNT II  Violations Of Section 12 Of The Securities Act Against The Underwriter Defendants.......................................................116

COUNT III  Violations Of Section 15 Of The Securities Act Against The Securities Act Individual Defendants And Defendants Gregory And Lowitt ...............................................................................118

VI.  VIOLATIONS OF THE EXCHANGE ACT ..................................119

A.  The Exchange Act Defendants' Pre-Class Period Statements ..........................................................................119

B.  The Exchange Act Defendants' False And Misleading Statements During The Class Period ...............................122

1.  2Q07 Financial Results ......................................122

2.  3Q07 Financial Results ......................................124

3.  4Q07 Financial Results ......................................129

4. 2007 Fiscal Year-End Results..................................................................135

5. 1Q08 Financial Results..........................................................................138

6. 2Q08 Financial Results..........................................................................146

7. 3Q08 Pre-Released Financial Results And Writedown Announcement ..................................................................156

C. The Insider Defendants' Scienter..........................................................................158

1. Evidence Of Intentional Or Reckless Conduct .......................................158

2. Motive And Opportunity.........................................................................164

D. Loss Causation ....................................................................................................166

E. The Presumption Of Reliance .............................................................................169

F. Causes Of Action Under The Exchange Act ......................................................170

COUNT IV  Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against The Insider Defendants ..................170

COUNT V  Violations Of Section 20(a) Of The Exchange Act Against The Insider Defendants ..................................................................................174

COUNT VI  Violations Of Section 20A Of The Exchange Act Against Defendant Fuld..........................................................................................175

VII. CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ................................................................................................................176

VIII. PRAYER FOR RELIEF ..................................................................................178

IX. DEMAND FOR JURY TRIAL ........................................................................179

Court-appointed Lead Plaintiffs Alameda County Employees' Retirement Association, Government of Guam Retirement Fund, Northern Ireland Local Government Officers' Superannuation Committee, City of Edinburgh Council as Administering Authority to the Lothian Pension Fund, and Operating Engineers Local 3 Trust Fund, along with additional plaintiffs Police and Fire Retirement System of the City of Detroit, Brockton Contributory Retirement System, Teamsters Allied Benefit Funds, American European Insurance Company, Inter-Local Pension Fund Graphics Communications Conference of the International Brotherhood of Teamsters, and Marsha Kosseff (collectively, "Plaintiffs"), bring this action individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or acquired publicly-traded securities of Lehman Brothers Holdings Inc. ("Lehman," or the "Company") (unless otherwise specifically denoted including stock, preferred shares, bonds, and/or call options or put options) between June 12, 2007, and September 15, 2008, (the "Class Period"), and who were damaged as a result of the allegations set forth herein (the "Class").[1]

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on, *inter alia,* an investigation made by and through the undersigned counsel, which included, but was not limited to, interviews and consultations with former employees of Lehman and its subsidiaries, as well as a review of: (1) public filings with the Securities and Exchange Commission ("SEC"); (2) research reports by securities and financial analysts; (3) transcripts of Lehman investor conference calls; (4) Company presentations at analyst conferences; (5) press releases and media reports related to the Company's operations and financial results; (6) media

---

[1]  The Class is further defined in ¶509, below.

reports and public filings of other entities engaged in the mortgage industry; (7) economic analysis of stock-price movement and pricing data; (8) publicly available filings in legal actions involving Lehman; (9) documents related to Lehman's bankruptcy petition filed on September 15, 2008; (10) testimony and documents presented before the United States House of Representatives' Committee on Oversight and Government Reform; and (11) various other documents and materials related to the Company's business practices.

Plaintiffs' investigation into the factual allegations contained herein is continuing, and many of the facts related to Plaintiffs' allegations are known only by Lehman and the Defendants named herein or are exclusively within their custody or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after Plaintiffs have had a reasonable opportunity for discovery.

## I.   SUMMARY OF THE ACTION

1.     This case arises from Lehman's lack of transparency and undisclosed exposure to losses from its massive real estate and mortgage portfolio while the Insider Defendants repeatedly and publicly distinguished Lehman from its peers and claimed a strong capital base and superior hedging and risk management practices.  As a result, Defendants were able to raise billions of dollars from public investors through false and misleading offering documents.  Ultimately, however, Lehman petitioned for bankruptcy on September 15, 2008 – the largest corporate bankruptcy in the history of the United States.

2.     Lehman was a major participant in all aspects of the mortgage and real estate markets, including originating residential and commercial mortgages; securitizing loans; marketing various asset-backed instruments; and investing directly in real estate.  Well before the Class Period started on June 12, 2007, the real estate and mortgage markets were in the midst of an unprecedented meltdown that adversely affected the market value of real estate and mortgage

assets.  Hundreds of companies with mortgage exposure had taken massive mortgage-related writedowns, ceased operations or petitioned for bankruptcy.

3.      In an environment defined by: (i) a decline in property values; (ii) an increase in mortgage defaults; (iii) a decline in the value of mortgage backed securities ("MBSs"); (iv) rating agency downgrades of MBSs; and (v) severe financial difficulties experienced by mortgage originators and other investment banks, firms like Citigroup, Merrill Lynch, Morgan Stanley, Bear Stearns, and UBS booked enormous gross losses related to their mortgage assets and the credit squeeze in 2007.  For example, in June 2007, Bear Stearns announced that it would provide a $3.2 billion bailout of two of its hedge funds after they experienced significant mortgage-related losses.  Those funds collapsed in July after incurring additional losses on their mortgage positions.

4.      Lehman, however, increased its leverage position as it expanded its real estate and mortgage portfolio before and during the Class Period, reaching over thirty times shareholder equity by the end of the first quarter of 2008.  Lehman assured investors, falsely, that its exposure to the real estate market meltdown was well contained, due, in part, to its claimed excellence in "hedging" against losses in that sector.  Lehman's efforts to appear better situated than other institutions (or than its actual circumstances) were pervasive throughout the Class Period.  For example, when the two aforementioned Bear Stearns hedge funds failed in July 2007, Lehman spokesperson Kerrie Cohn stated on July 18, 2007: "The rumors regarding [Lehman's] subprime exposure are totally unfounded."  In truth, however, Lehman had just originated nearly $4 billion in subprime loans in the second quarter ended May 31, 2007, alone, amounting to roughly 25% of Lehman's $17 billion in residential loan originations in that quarter.

3

5.      Lehman's financial reports during the Class Period lacked transparency, masking Lehman's exposure to mortgage-related losses.  For instance, despite the severe conditions in the real estate and mortgage markets during the second quarter of 2007 (ending May 31, 2007), Lehman's SEC filings disclosed no gross writedowns of its real estate and mortgage-related assets during the quarter, but instead reported that the Company increased its holdings of such assets.  Likewise, when reporting its third quarter 2007 results on September 18, 2007, Lehman omitted material information regarding Lehman's (internal) gross writedowns of its real estate mortgage portfolio.  Even when specifically asked for a simple breakdown of the gross versus net writedowns (offset by hedges) associated with the mortgage assets, Defendant Christopher O'Meara, the Chief Financial Officer at the time, refused to provide the information: "[K]nowing the gross numbers particularly in that business, I don't think is really a meaningful thing."

6.      Lehman's lack of disclosures and opaque reports were particularly misleading with respect to its exposure to so-called "Alt-A" investments.  The term "Alt-A" is supposed to describe a mortgage that, for various reasons, has a risk profile between prime and subprime. According to witness accounts and additional sources unavailable to investors at the time, however, Lehman's Alt-A portfolio was largely comprised of high-risk loans that did not resemble conventional Alt-A loans and were in fact more similar to subprime.  Lehman's reports disclosed no meaningful information about its Alt-A portfolio during the Class Period.  Even when Lehman, in its Form 10-Q for the first quarter of 2008, first included a separate line item for "Alt-A," it lumped together Alt-A holdings with "prime" holdings.

7.      Lehman claimed that its superior risk management practices "hedged" against losses in its real estate and mortgage portfolio.  However, Lehman disclosed no meaningful

information about its supposed "economic hedges" – such as how much of its portfolio the Company had hedged, the dollar amount of total holdings, what percentage was hedged, and the specific financial instruments used to hedge mortgage-backed assets.   In truth, Lehman's "economic hedges" presented an undisclosed risk of ***additional*** losses from the hedges themselves.

8.     Against a backdrop of taking inadequate writedowns and claiming superior risk management practices, Lehman managed to report ***record*** profit for fiscal year 2007, including net income of $877 million for the fourth quarter of 2007, and gave record, lucrative bonuses to its executives.   The Defendants also raised over $30 billion from investors during the Class Period through offerings of debt and equity securities.   Unlike a retail bank, Lehman, as an investment bank, did not have a large deposit base and had to raise capital from independent sources for investment and liquidity purposes to replace losses.   After raising approximately $1.9 billion in a preferred share offering in February 2008, Defendant Erin Callan, Lehman's then-Chief Financial Officer, publically stated that the offering "took care of our full-year needs." Shortly thereafter, however, Lehman raised an additional $4 billion through a preferred share offering in April 2008.

9.     Internally, Lehman's management acknowledged that warning signs were evident and that management had not moved "early/fast enough."    An internal January 2008 presentation, for example, indicated that "[v]ery few of the top financial issuers have been able to escape damage from the subprime fallout."  Further, the internal presentation warned that "a small number of investors account for a large portion of demand [for Lehman issues], liquidity can disappear quite fast."   Likewise, an internal June 2008 memorandum recognized that conditions were "clearly not sustainable" as the firm remained in "illiquid asset [origination] too

much/too long" and behaved "too much like investors, not traders" and practiced undisciplined capital allocation.

10.     Ultimately, the truth about Lehman's financial condition and illiquid assets materialized in a series of announcements and events.  Before the markets opened on June 9, 2008, Lehman announced $700 million in ***additional*** losses due to ineffective hedges and a net loss of approximately $5.14 per share for the second quarter of 2008, dwarfing Wall Street's consensus estimates of losses.  On the heels of Lehman's June 9, 2008 announcement, Lehman's Chief Executive Officer and Chairman, Defendant Richard Fuld, replaced Lehman's president, Defendant Joseph Gregory, and demoted Defendant Erin Callan, who later left Lehman.  Fitch, Inc. ("Fitch") and Moody's Investor Services ("Moody's") downgraded Lehman's credit rating, and the price of Lehman's common stock fell, closing down nearly 9% to $29.48.

11.     The June 9 announcement only partially revealed the relevant truth, however, and Lehman raised an additional $6 billion through the offering of common and preferred shares immediately following the announcement.   Lehman's management continued to mislead investors about Lehman's massive exposure.   By September 9, 2008, for example, Lehman executives internally calculated that the Company required at least $3 billion in additional capital.   That same day, JPMorgan's co-CEO, Steve Black, telephoned Defendant Fuld and demanded $5 billion from Lehman to cover lending positions.   With regard to the value of Lehman's assets, Wall Street executives who privately reviewed Lehman's real estate portfolio in September 2008 believed it to be overvalued by billions of dollars, with Lehman's $32.6 billion in commercial real estate holdings overvalued by as much as 35%.

12.     Nevertheless, on September 10, 2008, less than three months after the $6 billion share offerings, Defendants Fuld and Lowitt held a conference call and assured investors that the

Company did not need additional capital.  In an earnings pre-release, they reported a $3.9 billion loss for the third quarter of 2008, as well as $7 billion in gross writedowns on its residential and commercial real estate holdings.  In announcing the results during the conference call, Defendant Ian Lowitt, who replaced Callan as chief financial officer, stated that "[t]he majority of our write-downs were in Alt-A driven by increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges."  Contrary to Defendants' earlier statements, Lowitt continued: "[U]nfortunately, there is no correct hedge for Alt-A assets . . . ."  On this news Lehman's shares declined 7% from the prior day's close to $7.25 per share.

13.    By September 15, 2008, Lehman's share price declined over 94% from the previous day to $0.21 per share.  Before the markets opened on September 15, Lehman filed its petition for bankruptcy, claiming assets of $639 billion and liabilities of $613 billion. Bankruptcy proceedings are underway, and Lehman is in the process of selling assets to satisfy its creditors.  The asset sales have been at fractions of book value or previously assumed levels of value.  In the aftermath, the Federal Bureau of Investigation ("F.B.I."), as well as the United States Department of Justice, are investigating Lehman and its senior executives for fraud.

## II.    <u>OVERVIEW OF THE SEPARATE CLAIMS</u>

14.    Plaintiffs assert claims in Counts I, II, and III for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o against the Securities Act Defendants, defined below in ¶333.  In Counts I through III, Plaintiffs assert strict liability and negligence claims on behalf of themselves and the Class against the Defendants who are statutorily liable.  Plaintiffs specifically disclaim any allegations of fraud in connection with the Securities Act claims, which are not based on any allegations of knowing or reckless misconduct on the part of any defendant.

7

15.     Separately, in Counts IV through VI, Plaintiffs assert claims for violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), against the Exchange Act Defendants identified below in ¶488.

## III.   JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1331.  The claims alleged herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a); and the rules and regulations promulgated thereunder, including Rule 10b-5.

17.     Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b), (c), and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this district.  At all times relevant to this Complaint, the headquarters and principal offices of Lehman were located within this district at 745 Seventh Avenue, New York, New York 10019.

18.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

IV.     **PARTIES AND RELEVANT NON-PARTIES**

A.      **Plaintiffs**

19.     Court-appointed Lead Plaintiff Alameda County Employees' Retirement Association ("ACERA") is located in Oakland, California, and provides retirement, disability, and death benefits to the employees, retirees, and former employees of the County of Alameda. ACERA manages $5.6 billion in assets for over 10,000 members. ACERA purchased Lehman common stock during the Class Period, as well as Lehman 7.95% Non-Cumulative Perpetual Convertible Preferred Stock, Series J, and Lehman 6.875% Subordinated Notes Due 2037, at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

20.     Court-appointed Lead Plaintiff Government of Guam Retirement Fund ("GGRF") is located in Maite, Guam, and provides annuities and other benefits to its members who complete a prescribed number of years in government service. Guam maintains over $1.6 billion in net assets held in trust for pension benefits. Guam purchased Lehman common stock during the Class Period, as well as Lehman 6.875% Subordinated Notes Due 2037, at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

21.     Court-appointed Lead Plaintiff Northern Ireland Local Government Officers' Superannuation Committee ("NILGOSC") is located in Belfast, Northern Ireland, and administers the Local Government Pension Scheme for Northern Ireland. NILGOSC maintains a pension fund with net assets of over £3.1 billion. Membership is open to employees working in local government and to employees in the public sector who are not eligible to join another plan

9

(such as the Teachers', Lecturers', or Firefighters' plans).   NILGOSC purchased Lehman common stock during the Class Period at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

22.     Court-appointed Lead Plaintiff City of Edinburgh Council as Administering Authority of the Lothian Pension Fund ("Lothian") is located in Scotland, and pays pensions to former employees of the City Council, East, Mid and West Lothian Councils, the former Regional and District Councils, and the Lothian and Borders Fire and Rescue Service, as well as a number of public sector organizations.   The Lothian Pension Fund is valued at over £2.976 billion.  Lothian purchased Lehman common stock during the Class Period at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

23.     Court-appointed Lead Plaintiff Operating Engineers Local 3 Trust Fund ("Operating Engineers") is located in Alameda, California, and provides pension plans for working and retired members throughout its four-state jurisdiction.   Operating Engineers purchased Lehman common stock during the Class Period at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

24.     Additional Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit P&F") is a public pension fund organized for the benefit of the active and retired police officers and firefighters of the City of Detroit, Michigan.  Detroit P&F purchased Lehman 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P, Lehman 5.625% Notes Due

2013, and Lehman 6.5% Subordinated Notes Due 2017 during the Class Period at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

25.     Additional Plaintiff Brockton Contributory Retirement System ("Brockton") is one of approximately one hundred contributory retirement systems for public employees within the Commonwealth of Massachusetts.  Brockton purchased Lehman common stock during the Class Period, as well as Lehman 7.95% Non-Cumulative Perpetual Convertible Preferred Stock, Series J, Lehman 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P, Lehman 5.625% Notes Due 2013, Lehman 6.75% Subordinated Notes Due 2017, Lehman 6.2% Notes Due 2014, Lehman 6.5% Subordinated Notes Due 2017, and Lehman 6.875% Subordinated Notes Due 2037, at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

26.     Additional Plaintiff Teamsters Allied Benefit Funds ("Teamsters"), located in Elmsford, New York, purchased Lehman 7% Notes Due 2027 at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period and the price of Lehman's securities dropped significantly.

27.     Additional Plaintiff American European Insurance Company ("AEI"), based in Buffalo, New York, offers property and casualty insurance to individuals and businesses.  AEI purchased Lehman 7.95% Non-Cumulative Perpetual Convertible Preferred Stock, Series J, at artificially inflated prices and suffered damages when the truth about the Company's financial

results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

28.     Additional Plaintiff Inter-Local Pension Fund Graphic Communications Conference of the International Brotherhood of Teamsters ("Inter-Local Pension Fund"), based in Carol Stream, Illinois, has more than $1.6 billion in assets and provides benefits to over 22,000 retired workers in more than 65 local unions.   Inter-Local Pension Fund purchased Lehman common stock during the Class Period, as well as Lehman 6.75% Subordinated Notes Due 2017, Lehman 6.875% Notes Due 2018, Lehman 7.5% Subordinated Notes Due 2038, and Lehman 7% Notes Due 2027, at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

29.     Additional Plaintiff Marsha Kosseff purchased Lehman 7.95% Non-Cumulative Perpetual Convertible Preferred Stock, Series J, at artificially inflated prices and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period causing the price of Lehman's securities to drop significantly.

**B.     <u>Relevant Non-Parties</u>**

30.     Lehman is a corporation organized under the laws of the state of Delaware with its headquarters located at 745 Seventh Avenue, New York, New York 10019.  Lehman operated as a global investment bank and purported to be "an innovator in global finance" with a "leadership position in equity and fixed income sales, trading and research."  Lehman's common stock traded on the New York Stock Exchange.  On September 15, 2008, in the Southern District of New York, Lehman filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  For this reason, Lehman is not named as a defendant in this action.

31.     Lehman Brothers Inc. ("LBI"), based in New York, New York, is a wholly owned subsidiary of Lehman, and operated as a registered broker-dealer under the Exchange Act.  LBI's services included brokerage, mergers and acquisitions and restructuring advice, debt and equity underwriting, market making, debt and equity research, and real estate and private equity investments.  On September 17, 2008, the Securities Investor Protection Corporation ("SIPC") moved for an order commencing liquidation and protection under the automatic stay provisions of the Bankruptcy Code.  The Bankruptcy Court granted the request to commence liquidation on September 19, 2008.  For this reason, LBI is not named as a defendant in this action.

C.     **Defendants**

1.     **Insider Defendants**

32.     Defendant Richard S. Fuld, Jr. ("Fuld") joined Lehman in 1969 and was Chairman of the Board of Directors of the Company beginning in April 1994 and Chief Executive Officer ("CEO") of the Company beginning in November 1993.  Throughout the Class Period, Fuld was chair of Lehman's Executive Committee, which had the authority, in the intervals between meetings of the Board of Directors, to exercise all the authority of the Board of Directors, except for those matters that the Delaware General Corporation Law or the Company's Restated Articles of Incorporation reserves to the full Board of Directors.  Defendant Fuld was also chairman and CEO of LBI.

33.     Defendant Christopher M. O'Meara ("O'Meara") served as the Company's Chief Financial Officer ("CFO"), Controller, and Executive Vice President from 2004 until December 1, 2007.  O'Meara joined Lehman in 1994, and prior to serving as CFO, he operated as Lehman's Global Controller.  As Controller, O'Meara supervised Lehman's internal accounting programs and procedures.  In his role as the head of Risk Management, O'Meara was also

13

responsible for supervising Lehman's risk mitigation strategies and procedures.  Beginning on

December 1, 2007, O'Meara served as the head of Worldwide Risk Management.

34.     Defendant Joseph M. Gregory ("Gregory") was, at all relevant times, the

Company's President and Chief Operating Officer ("COO"), until being forced to resign in June

2008.   Defendant Gregory, in his role as COO, oversaw the day-to-day management of

Lehman's operations and previously served as head of Lehman's Equities Division, in charge of

the overall equities business, and Fixed Income Division, including Lehman's mortgage

business.   From April 2000 until May 2002, Gregory was Lehman's Chief Administrative

Officer, and from 1996 to April 2000, Gregory was head of Lehman's Global Equities Division,

in charge of the overall equities business.   From 1991 to 1996, Gregory served as co-head of

Lehman's Fixed Income Division.   From 1980 to 1991, Gregory held various management

positions in the Fixed Income Division, including head of Lehman's mortgage business.

35.     Defendant Erin Callan ("Callan") became the Company's CFO and Executive

Vice President on December 1, 2007, and served in that position until she resigned in June 2008.

Callan joined Lehman in 1995 and served in various capacities at the Company, including head

of the Investment Banking Global Hedge Fund Coverage Group, the Global Finance Solutions

Group and Global Finance Analytics Group.

36.     Defendant Ian Lowitt ("Lowitt") replaced Callan as CFO in June 2008 and also

served as the Co-Chief Administrative Officer.   Lowitt oversaw Lehman's finance organization,

including Financial Control, Investor Relations, Planning and Analysis, Product Control, Tax,

and Treasury.   In his role as Co-Chief Administrative Officer, he was responsible for the global

oversight of Risk Management.   Lowitt was also a member of Lehman's Executive Committee

during the Class Period.   Lowitt was Chief Administrative Officer for Lehman Europe from July

14

2005 until October 2006.  Prior to that, Lowitt served as Treasurer and Global Head of Tax from 2000 until 2005.  Lowitt joined Lehman in 1994.

37.     Defendants Fuld, O'Meara, Gregory, Callan, and Lowitt are referred to collectively as the "Insider Defendants."   The Insider Defendants, because of their senior positions at Lehman, were controlling persons of the Company and possessed the power and authority to control the contents of Lehman's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors – *i.e.*, the market.

### 2.     Director Defendants

38.     Defendant Michael L. Ainslie ("Ainslie") was at all relevant times a director of Lehman and signed the shelf registration statement dated May 30, 2006, and filed with the SEC on Form S-3 (the "Shelf Registration Statement") in his capacity as a director of Lehman.

39.     Defendant John F. Akers ("Akers") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.

40.     Defendant Roger S. Berlind ("Berlind") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman. Defendant Berlind was also a director of LBI.

41.     Defendant Thomas H. Cruikshank ("Cruikshank") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.  Defendant Cruikshank was also a director of LBI.

42.     Defendant Marsha Johnson Evans ("Evans") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in her capacity as a director of Lehman.

43.     Defendant Sir Christopher Gent ("Gent") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman. Defendant Gent was also a director of LBI.

44.     Defendant Roland A. Hernandez ("Hernandez") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.

45.     Defendant Henry Kaufman ("Kaufman") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.

46.     Defendant John D. Macomber ("Macomber") was at all relevant times a director of Lehman and signed the Shelf Registration Statement in his capacity as a director of Lehman.

### 3.     Underwriter Defendants

47.     Defendant ABN Amro Holding N.V. ("ABN"), based in Amsterdam, The Netherlands, is an international bank that provides investment services.  ABN underwrote and sold $15 million of Lehman 6.75% Subordinated Notes Due 2017.

48.     Defendant ANZ Securities, Inc. ("ANZ") is an affiliated company of ANZ Bank, based in Melbourne, Australia, which provides a full range of financial products and services to business, corporate, and institutional clients.  ANZ underwrote and sold $15 million of Lehman 6.75% Subordinated Notes Due 2017; $10 million of Lehman 7% Notes Due 2027; and $22.5 million of Lehman 6.2% Notes Due 2014.

49.     Defendant Banc of America Securities LLC ("BOA"), based in New York City, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  BOA underwrote and sold 8,039,988 depositary shares of Lehman Series J Shares and, on information and belief,

sold an equivalent percentage of the additional shares sold pursuant to the over-allotment.  BOA also underwrote and sold $25 million of Lehman 6.875% Notes Due 2018.

50.     Defendant BBVA Securities Inc. ("BBVA"), based in New York City, provides securities brokerage and research services.  BBVA operates as a subsidiary of Banco Bilbao Vizcaya Argentaria.  BBVA underwrote and sold $40 million of Lehman 5.625% Notes Due 2013 on that offering; $22.5 million of Lehman 6.2% Notes Due 2014; $15 million of Lehman 6.75% Subordinated Notes Due 2017; $10 million of Lehman 7% Notes Due 2027; and $15 million of Lehman 6.875% Subordinated Notes Due 2037.

51.     Defendant BNY Capital Markets, Inc. ("BNY"), based in New York City, is a boutique investment banking firm that offers corporate finance advisory services.  BNY also provides fixed-income securities.  BNY is a subsidiary of The Bank of New York Mellon Corporation.  BNY underwrote and sold $25 million of Lehman 6.875% Notes Due 2018; $15 million of Lehman 6.75% Subordinated Notes Due 2017; and $15 million of Lehman 6.875% Subordinated Notes Due 2037.

52.     Defendant Cabrera Capital Markets, LLC ("Cabrera"), based in Chicago, Illinois, is an institutional brokerage firm that offers municipal and corporate financial advisory services.  Additionally, Cabrera offers securities clearance, public agency financings, and brokerage services.  Cabrera underwrote and sold $20 million of Lehman 7.50% Subordinated Notes Due 2038; $22.5 million of Lehman 6.2% Notes Due 2014; and $10 million of Lehman 7% Notes due 2027.

53.     Defendant Caja de Ahorros y Monte de Piedad de Madrid ("Caja Madrid") operates as a savings bank in Spain.  Caja Madrid underwrote and sold $30 million of Lehman 6.5% Subordinated Notes Due 2017.

17

54.     Defendant CIBC World Markets Corp. ("CIBC"), based in New York City, provides a range of credit and capital market products, investment banking, and merchant banking services in North America and worldwide.   CIBC is a subsidiary of the Canadian Imperial Bank of Commerce.   CIBC underwrote and sold $15 million of Lehman 6.75% Subordinated Notes Due 2017.

55.     Defendant Citigroup Global Markets Inc. ("CGMI"), based in New York City, is a subsidiary of Citigroup Inc., a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.   CGMI underwrote and sold 8,112,456 depositary shares of Lehman Series J Shares and, on information and belief, sold an equivalent percentage of the additional shares pursuant to the over-allotment.   CGMI also underwrote and sold $25 million of Lehman 6.875% Notes Due 2018; $40 million of Lehman 5.625% Notes Due 2013; $15 million of Lehman 6.75% Subordinated Notes Due 2017; $22.5 million of Lehman 6.2% Notes Due 2014; $10 million of Lehman 7% Notes Due 2027; and $15 million of Lehman 6.875% Subordinated Notes Due 2037.

56.     Defendant Daiwa Securities SMBC Europe Limited ("Daiwa"), based in London, England, is an investment banking firm that provides equity, fixed income, investment banking, underwriting derivatives, and strategic advisory services.   Daiwa is a subsidiary of Daiwa Securities Group Inc.  Daiwa underwrote and sold $40 million of Lehman 5.625% Notes Due 2013; $22.5 million of Lehman 6.2% Notes Due 2014; and $10 million of Lehman 7% Notes Due 2027.

57.     Defendant DnB NOR Markets ("DnB NOR"), based in Oslo, Norway, provides capital markets services.  DnB NOR underwrote and sold $25 million of Lehman 6.875% Notes Due 2018.

58.     Defendant DZ Financial Markets LLC ("DZ Financial"), based in New York City, provides securities brokerage and underwriting services.  DZ Financial underwrote and sold $22.5 million of Lehman 6.2% Notes Due 2014; $10 million of Lehman 7% Notes Due 2027; $3 million of Lehman 3.19% Notes Due 2009; and $3 million of Lehman 3.16% Notes Due 2009.

59.     Defendant RBS Greenwich Capital ("Greenwich"), based in Greenwich, Connecticut, is a security brokerage firm.  Greenwich operates as a subsidiary of Greenwich Capital Holdings, Inc.   Greenwich underwrote and sold $15 million of Lehman 6.875% Subordinated Notes Due 2037.

60.     Defendant Harris Nesbitt Corp. ("Harris Nesbitt"), based in New York City, is an investment bank that provides investment, underwriting, and corporate banking services in the United States.  Harris Nesbitt underwrote and sold $22.5 million of Lehman 6.2% Notes Due 2014; $10 million of Lehman 7% Notes Due 2027; $3 million of Lehman 3.19% Notes Due 2009; and $3 million of Lehman 3.16% Notes Due 2009.

61.     Defendant HSBC Securities (USA) Inc. ("HSBC"), based in New York City, is an investment banking firm.  HSBC is a subsidiary of HSBC Holdings plc.  HSBC underwrote and sold $25 million of 6.875% Notes Due 2018; $15 million of Lehman 6.75% Subordinated Notes Due 2017; and $30 million of Lehman 6.5% Subordinated Notes Due 2017.

62.     Defendant HVB Capital Markets, Inc. ("HVB"), based in New York City, is a securities broker/dealer.  HVB underwrote and sold $30 million of Lehman 6.5% Subordinated Notes Due 2017 and $15 million of Lehman 6.75% Subordinated Notes Due 2017.

63.     Defendant Loop Capital Markets, LLC ("Loop Capital"), based in Chicago, Illinois, is a boutique investment banking and brokerage firm.  Loop Capital offers corporate and public finance, financial advisory, municipal finance, equity research, and securities sales and

19

trading services.  Loop Capital underwrote and sold $20 million of Lehman 7.50% Subordinated Notes Due 2038.

64.     Defendant Mellon Financial Markets, LLC ("Mellon"), based in Pittsburgh, Pennsylvania, is an underwriting subsidiary of Mellon Financial Corporation and provides underwriting, trading, and sales services to investors.  Mellon underwrote and sold $40 million of Lehman 5.625% Notes Due 2013; $22.5 million of Lehman 6.2% Notes Due 2014; $10 million of Lehman 7% Notes Due 2027; and $30 million of Lehman 6% Notes Due 2012.

65.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), based in New York City, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Merrill Lynch underwrote and sold 8,040,120 depositary shares of Lehman Series J Shares and, on information and belief, sold an equivalent percentage of the additional shares pursuant to the over-allotment.

66.     Defendant Mizuho Securities USA, Inc. ("Mizuho"), based in New York City, is a securities brokerage firm that provides underwriting services.  Mizuho operates as a subsidiary of Mizuho Securities Co., Ltd.   Mizuho underwrote and sold $15 million of Lehman 6.75% Subordinated Notes Due 2017; $10 million of Lehman 7% Notes Due 2027; and $22.5 million of Lehman 6.2% Notes Due 2014.

67.     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley"), based in New York City, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Morgan Stanley underwrote and sold 8,039,988 depositary shares of Lehman Series J Shares

and, on information and belief, sold an equivalent percentage of the additional shares pursuant to the over-allotment.

68.     Defendant nabCapital Securities, LLC ("nabCapital"), based in New York City, is a division of Defendant National Australia Bank Limited ("National"), based in Melbourne, Australia, a financial services firm that operates as an international financial services organization that provides a comprehensive and integrated range of financial products and services.   nabCapital underwrote and sold $25 million of Lehman 6.875% Notes Due 2018. National underwrote and sold $30 million of Lehman 6.5% Notes Due 2017.

69.     Defendant RBC Dain Rauscher Inc. ("RBC"), based in Minneapolis, Minnesota, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.   RBC underwrote and sold 990,000 depositary shares of Lehman Series J Shares and, on information and belief, sold an equivalent percentage of the additional shares pursuant to the over-allotment.   RBC also underwrote and sold $15 million of Lehman 6.875% Subordinated Notes Due 2037.

70.     Defendant Santander Investment Securities Inc. ("Santander"), based in New York City, is a wholly owned subsidiary of Banco Santander Central Hispano, S.A.   Santander provides various financial services including asset management, brokerage, and corporate finance.   Santander underwrote and sold $15 million of Lehman 6.75% Subordinated Notes Due 2017 and $30 million of Lehman 6.5% Subordinated Notes Due 2017.

71.     Defendant Scotia Capital (USA) Inc. ("Scotia"), based in New York City, is an investment bank that provides securities underwriting and brokerage services.   Scotia underwrote and sold $25 million of Lehman 6.875% Notes Due 2018; $15 million of Lehman 6.75%

Subordinated Notes Due 2017; $22.5 million of Lehman 6.2% Notes Due 2014; $10 million of Lehman 7% Notes Due 2027; and $30 million of Lehman 6% Notes Due 2012.

72.     Defendant Siebert Capital Markets ("Siebert"), based in New York City, is a brokerage firm.  Siebert is a division of Muriel Siebert & Co., a wholly owned subsidiary of Siebert Financial Corp.  Siebert underwrote and sold $15 million of Lehman 6.75% Subordinated Notes Due 2017.

73.     Defendant SG Corporate & Investment Banking ("Societe Generale"), based in Paris, France, is an investment bank that focuses on corporate finance, structured finance, mergers and acquisitions.  Societe Generale operates as a subsidiary of Societe Generale Group. Societe Generale underwrote and sold $30 million of Lehman 6.5% Subordinated Notes Due 2017.

74.     Defendant Sovereign Securities Corporation, LLC ("Sovereign"), based in Philadelphia, Pennsylvania, is a securities brokerage firm that provides underwriting services. Sovereign operates as a subsidiary of Sovereign Bank.  Sovereign underwrote and sold $25 million of Lehman 6.875% Notes Due 2018; $22.5 million of Lehman 6.2% Notes Due 2014; and $10 million of Lehman 7% Notes Due 2027.

75.     Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust"), based in Atlanta, Georgia, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. SunTrust underwrote and sold 990,000 depositary shares of Lehman Series J Shares and, on information and belief, sold an equivalent percentage of the additional shares pursuant to the over-allotment.  SunTrust also underwrote and sold $25 million of Lehman 6.875% Notes Due 2018; $40 million of Lehman 5.625% Notes Due 2013; $15 million of Lehman 6.75%

Subordinated Notes Due 2017; $15 million of Lehman 6.875% Subordinated Notes Due 2037; $22.5 million of Lehman 6.2% Notes Due 2014; and $10 million of Lehman 7% Notes Due 2027.

76.     Defendant TD Securities (USA) LLC ("TD Securities"), based in New York City, is an investment banking and securities brokerage firm.  TD Securities is a subsidiary of TD Holdings II Inc.  TD Securities underwrote and sold $25 million of Lehman 6.875% Notes Due 2018.

77.     Defendant UBS Securities LLC ("UBS"), based in New York City, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  UBS underwrote and sold 8,039,988 depositary shares of Lehman Series J Shares and, on information and belief, sold an equivalent percentage of the additional shares pursuant to the over-allotment.

78.     Defendant Utendahl Capital Partners, L.P. ("Utendahl"), based in New York City, is an investment bank.  Utendahl underwrote and sold $22.5 million of Lehman 6.2% Notes Due 2014 and $10 million of Lehman 7% Notes Due 2027.

79.     Defendant Wachovia Capital Markets, LLC ("Wachovia"), based in Charlotte, North Carolina, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Wachovia underwrote and sold 8,039,988 depositary shares of Lehman Series J Shares and, on information and belief, sold an equivalent percentage of the additional shares pursuant to the over-allotment.   Wachovia also underwrote and sold $15 million of Lehman 6.75% Subordinated Notes Due 2017.

80.     Defendant Wells Fargo Securities, LLC ("Wells Fargo"), based in San Francisco, California, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Wells Fargo underwrote and sold 990,000 depositary shares of Lehman Series J Shares and, on information and belief, sold an equivalent percentage of the additional shares pursuant to the over-allotment.  Wells Fargo also underwrote and sold $25 million of Lehman 6.875% Notes Due 2018; $40 million of Lehman 5.625% Notes Due 2013; and $15 million of Lehman 6.75% Subordinated Notes Due 2017.

81.     Defendant Williams Capital Group, L.P. ("Williams Capital"), based in New York City, is an investment banking firm providing debt and equity underwriting and corporate finance advisory services.  Williams Capital underwrote and sold $20 million of Lehman 7.50% Subordinated Notes Due 2038; $25 million of Lehman 6.875% Notes Due 2018; and $30 million of Lehman 6% Notes Due 2012.

82.     The Defendants described in ¶¶47-81 are referred to collectively as "Underwriter Defendants."

## V.     <u>VIOLATIONS OF THE SECURITIES ACT</u>

83.     In the allegations and claims set forth in this section of the Complaint, Plaintiffs assert strict liability and negligence claims pursuant to the Securities Act on behalf of themselves and the Class.  Plaintiffs' Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of any of the Defendants.  Plaintiffs' Securities Act claims do not allege fraud and do not sound in fraud, and Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act.

A.     **Background On The Real Estate And Mortgage Markets**

1.     **Expansion Of The U.S. Mortgage**
        **Industry And The Advent Of Non-Prime Loans**

84.     The decade between 1995 and 2005 was defined by a dramatic rise in home ownership.  According to the Research Department of the Federal Reserve Bank of San Francisco ("FRBSF"), after decades of relative stability, the rate of U.S. homeownership began to surge in the mid-1990s, as 12 million more Americans became homeowners between 1994 and 2004.  The increased demand also resulted in a growth in new home construction.  In 2005, according to the U.S. Census Bureau, 1,283,000 newly-constructed single-family houses sold compared with an average of 609,000 per year from 1990 to 1995.

85.     The FRBSF reported that one of the most important factors explaining the broad-based increase in homeownership was innovation in the mortgage finance industry.  The increasing number of individuals seeking home loans resulted in a rapid expansion in the residential mortgage industry, and unbeknownst to investors, loan originators such as Lehman began to compete for potential borrowers by lowering underwriting standards and offering new loan products geared towards borrowers with weaker credit.

86.     For example, loan originators reduced minimum qualifying credit scores, allowed borrowers to finance a greater percentage of the property value or carry a higher debt load (such as "no money down loans").  Many of these riskier mortgages are generally referred to as "subprime loans."  "Subprime" describes "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."  *See Sub-prime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee*

25

*on Financial Services,* 110th Cong. (2007) (Statement of Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd.).

87.     The growth in home ownership was precipitated in significant part by the growth in subprime lending.  According to Harvard University's Joint Center for Housing Studies, between 2001 and 2005, the subprime market grew from just $210 billion (in real terms) to $625 billion, amounting to approximately 20% of the total residential loans originated in 2005.  The FRBSF observed that "it seems probable that the growth in the subprime market [gave] many households access to credit that would previously have been denied."  This time period also saw a dramatic growth in Alt-A loans, a characteristic of which was reduced or eliminated documentation required to secure a mortgage (commonly referred to as a "liar loan").  According to a report by rating agency Standard & Poor's ("S&P"), Alt-A originations increased from less than $20 billion in 2000 to more than $300 billion in 2005.

88.     In addition to lowering underwriting standards or waiving documentation requirements, subprime and Alt-A mortgage originators offered: (1) interest-only mortgages that allowed borrowers to pay only interest for a period of time (typically 5-10 years); (2) negative amortization loans, which allowed borrowers to make a minimum payment that was less than the monthly accrued interest on the mortgage, thus increasing the principal amount owed on the loan; and (3) initial fixed-rate mortgages (often at relatively low "teaser" rates) that later converted to adjustable market rates, otherwise known as adjustable rate mortgages or "ARMs."

89.     The growth of the commercial mortgage market followed a course similar to the residential market.  A robust secondary market grew for commercial mortgages, and lending standards for commercial loans declined.  For example, in April 2007, Moody's described its concern over the "continued slide" in commercial lending standards.  Moody's observed that,

like residential lenders, commercial lenders were requiring less documentation.   Further, commercial mortgages originated in the first quarter of 2007 exceeded the estimated value of the underlying properties by 11%.   Moody's also noted that the vast majority of mortgages allowed for interest-only payments and many included secondary financing.   Moody's also highlighted that property values had reached "unprecedented highs."

90.   As detailed below, Lehman, through its related entities and subsidiaries, was among the market leaders in originating hundreds of billions of dollars in subprime and Alt-A loans before and throughout the Class Period.   Lehman was also one of the largest originators of commercial mortgages.

## 2.   Wall Street's Role In Mortgage Securitization

91.   Historically, the residential mortgage industry was characterized by a lending institution (*i.e.*, the loan originator) making a loan to a borrower and holding the corresponding note from the borrower to maturity.   To protect itself from risk that a borrower would default on the loan, the originator held a lien on the property as collateral for the loan.   By 1990, however, a new model emerged, as secondary market participants began purchasing mortgages from the loan originators soon after the mortgages were issued.   Put simply, the mortgage business largely transitioned from the traditional "originate-to-hold" model to the "originate-to-securitize" model. This allowed the loan originators to obtain immediate capital to underwrite more loans, and the mortgage purchasers in the secondary market assumed the risk of default associated with the loans.

92.   Wall Street firms were among the largest purchasers of mortgages on the secondary market.   In a process known as securitization, the firms pooled mortgages into MBSs and sold interests in the underlying cash flow from the mortgages to investors, who received a right to future payments as borrowers made principal and interest payments.   Wall Street firms

27

collected large fees for structuring, underwriting, and servicing the MBSs.  These large fees fueled the demand for loans to securitize, which led to even more competition among lenders for borrowers and, to increase the pool of borrowers, contributed to a marked decline in lending standards.

93.     Residential MBSs ("RMBSs") are typically divided into senior, mezzanine, and equity "tranches," each of which possesses a different risk profile and credit rating based on the priority of the cash flow from payments on the underlying mortgages.  The senior tranches are paid first and, during the Class Period, generally were highly rated by the rating agencies (which include Moody's, Fitch, and S&P).  For example, senior tranches frequently garnered AA and AAA ratings.  After the senior tranche is fully paid, the middle tranches (referred to as mezzanine tranches) receive their share of the proceeds.  Mezzanine tranches are generally rated lower than the senior tranches.   The process of distributing the mortgage proceeds continues down the tranches through to the bottom (and lowest-rated) tranches, referred to as equity tranches or "residuals."  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage borrowers are current on their mortgages.

94.     Similar to residential mortgages, commercial mortgages were packaged into commercial mortgage-backed securities ("CMBSs") and other complicated derivative structures for sale to investors.  The CMBS market began in the early 1990s and increased rapidly. According to the Commercial Mortgage Securities Association, more than $165 billion in CMBSs were issued in the U.S. in 2005, and by 2006 more than $600 billion in CMBS bonds were outstanding.  As with residential loans, the explosion in securitization activity − and the keen competition to "qualify" more and more borrowers for such loans − contributed to a decline in lending standards for commercial mortgages.  For example, according to rating agency DBRS,

the percentage of interest-only commercial loans packaged into CMBSs rose from less than 5% in 2002 to 57% in the second quarter of 2007.

95.     Interest rates affect the value of mortgage-related securities.  Most directly, rising interest rates negatively affect borrowers whose underlying loans are ARMs, meaning that the interest rate paid by the borrower changes along with the prevailing market interest rates.  For example, if an RMBS is backed by a pool of non-prime ARMs, a rise in interest rates increases the borrowers' monthly payments (often by a large amount), increasing the likelihood that some borrowers will default on their mortgages, thereby decreasing the value of the security.

96.     Rising interest rates also have a negative effect on borrowers in fixed-rate mortgages.  While housing prices were rising, many people (including those purchasing homes as an investment) borrowed more than they could afford, believing that they could take advantage of the price appreciation and refinance into mortgages with better terms once their equity interest increased.  Increasing interest rates make such re-financing less attractive.

97.     A slowdown in housing price appreciation or a decline in housing prices also lowers the value of RMBSs.  Counting on housing price appreciation, many borrowers believed that they could simply refinance into better terms or sell the property for a profit.  Instead, when prices failed to rise, these borrowers (often investors) became encumbered with mortgages they could not afford.

98.     Similar problems extended to commercial mortgages, as lenders provided mortgages for close to the entire value of a property.  Further, commercial lenders originated mortgages with monthly payments greater than the projected monthly income on the properties.

99.     Declining prices also created incentives for certain borrowers to abandon their mortgages.  If prices decline such that the value of a home is less than the outstanding amount on

the mortgage (especially likely in those situations where lenders provided mortgages for amounts close to the total value of the home), a borrower who cannot afford the mortgage payments has an incentive to simply walk away from the "upside down" mortgage.

100.    Investment banks such as Lehman served as crucial links in the chain between non-prime mortgage originators and the ultimate MBS investors.  To obtain a ready supply of loans to pool and securitize, investment banks, including Lehman, entered into purchase agreements and extended warehouse lines of credit to loan originators.  In the purchase agreements, investment banks agreed to purchase a certain amount of mortgages from a loan originator.  Through warehouse lines of credit, investment banks extended credit to loan originators to fund a cycle of mortgage lending.  In return for the line of credit, the originator typically agreed to grant the investment bank the right to either buy the mortgages or sell securities on a certain portion of the mortgage pool.

101.    As described in more detail below, Lehman, through its related entities and various wholly owned subsidiaries, was both a warehouse lender and a market leader in securitizing hundreds of billions of dollars of MBSs comprised of subprime and Alt-A mortgages, before and during the Class Period.

### 3.    The ABX

102.    In January 2006, several banks, including Lehman, collaborated with Markit Group Limited to create the ABX indices ("ABX"), which provide value transparency to RMBSs.  The ABX tracks the performance of various RMBS tranches backed by subprime collateral and was used during the Class Period as a barometer for assessing how subprime loan-related assets were performing in the market place.  The RMBS-referenced tranches have different ratings, from AAA to BBB-, and are considered representative samples of other RMBS tranches backed by subprime collateral with the same ratings.

103.    The various components of the ABX are classified by vintage (*i.e.*, the year that the underlying subprime collateral was issued).  The ABX tracks bond prices and the cost of buying protection against default.  A decrease in bond price in the ABX indicates a higher cost for protection against default, indicating that the market anticipates higher rates of default on the securities.

### 4.    The CMBX

104.    Analogous to the ABX, in conjunction with various market makers (including Lehman), Markit Group Limited created the CMBX indices ("CMBX"), which provide value and pricing information on the CMBS market.  Similar to the ABX, the CMBX provides a measure of the cost of insuring against default for various tranches of CMBSs, each with different credit ratings.  A rise in the cost of protection indicates that the market expects higher rates of default on CMBSs.

105.    In contrast to the ABX, however, which tracks bond prices, the CMBX is expressed as a "spread."  This spread is the difference between the yield of the bond tranche and the current yield offered by government bonds (commonly referred to as the "risk-free" rate).  Accordingly, when bond prices fall, the spread increases and the index goes up.  A high index value means that the financial community sees these bonds as being at a higher risk of defaulting.  Thus, an increase in the CMBX represent an increase in the cost of protecting against default.

106.    While a *decrease* in the ABX indicates a lower bond price and higher likelihood of default, an *increase* in the CMBX represents a higher cost for default protection and a higher likelihood of default.

5. **Lehman's Exposure To The**
   **Mortgage And Real Estate Markets**

107.   Lehman participated directly in all aspects of the residential and commercial mortgage markets, and its mortgage-related businesses comprised the Company's single largest revenue component.  This participation included originating mortgages, purchasing mortgages, packaging mortgages into securities, and marketing the securities to investors.  Indeed, the Company promoted itself as "a market leader in securitization transactions, including securitizations on residential and commercial loans," and a "fully vertically integrated mortgage business" that was "involved in every step of the financial process," including "the origination, structuring and underwriting of asset-backed securities."

108.   Lehman also claimed that its vertically-integrated mortgage business minimized risks associated with holding mortgage-related assets on its balance sheet.  Lehman represented this as a factor that differentiated Lehman from its peers, which were not vertically integrated and which held non-prime loans on their balance sheet (along with the risk exposure) until they accumulated a large enough loan pool to securitize.

109.   As Defendant Callan explained during an investor conference on February 6, 2008, Lehman "didn't look at participating in the residential mortgage market as taking a directional bet one way or the other."  Instead, Lehman sought only to hold mortgage assets on its books long enough so that they could be securitized and sold to investors.  As Callan described: "[w]e looked at it as a business where we could take a spread out of this originating to distribute.  If you have that mindset, your inclination then is to hedge whatever inventory you get long, until the timeframe to which you can distribute the inventory through a securitization or otherwise.  That was our model."

110.    Defendant Callan further differentiated Lehman's vertically-integrated structure and business model from its peers during the February 6, 2008, Credit Suisse investor conference:

> It doesn't come from Goldman's model of taking a proprietary bet, or Morgan Stanley's model, or even Merrill's model of warehousing a significant amount of product.  It just comes from a basic focus and philosophy that we really didn't want to go long the product or short the product.  ***We wanted to originate to distribute and we hedged that origination capability***.

(Emphasis added.)

111.    Despite this supposed originate-to-distribute model, the mortgages and mortgage-related assets on Lehman's balance sheet ballooned during the Class Period and exposed Lehman, the assets of which were highly leveraged, to massive losses when the mortgage market and the market for mortgage-backed assets declined, and the value of Lehman's assets deteriorated.

### 6.    Lehman Was A Major Originator Of Subprime And Alt-A Loans

112.    Before the start of the Class Period, Lehman entered the loan origination market when it acquired subprime mortgage originator BNC Mortgage LLC ("BNC") and Alt-A originator Aurora Loan Services LLC ("Aurora").

113.    Lehman's subsidiaries provided whole loans that, according to Lehman's website, served "as a direct source of 'raw product' to the Firm's securitization and trading platforms." Given the lucrative fees to be obtained through securitizations, Lehman sought increasing numbers of loans to pool and securitize during the Class Period.  According to its 2007 Form 10-K, Lehman originated approximately $60 billion in residential mortgages during 2006 and $47 billion during 2007.  Twenty-five percent of the loans Lehman originated through its subsidiaries were subprime loans.  For example, BNC assisted in originating $24 billion in

subprime home loans in 2005, up from $3 billion in 2001, according to a June 28, 2007 article in *The Wall Street Journal*.

**Aurora Loan Services**

114.    During the second quarter of 2003, Lehman acquired a controlling interest in Aurora, a residential loan originator and servicer of predominantly "Alt-A mortgage products." As Lehman reported in its Form 10-Q filed with the SEC on July 15, 2003, the acquisition of Aurora "add[ed] long-term value to [Lehman's] mortgage franchise by allowing further integration of the business platform.  The mortgage loans originated by [Aurora] are expected to provide a source of loan product for our securitization pipeline."

115.    According to former employees, including Confidential Witness ("CW") 1, Aurora's former controller, and CW2, Aurora's Vice President of Credit Policy, all of Aurora's production went to Lehman, with Aurora acquiring loans in the name of its subsidiary Lehman Brothers Bank, FSB.[2]  According to CW3, after Lehman obtained loans through Aurora, Lehman handled all secondary transactions and handled all pricing out of New York.[3]  According to CW3, Lehman dictated what loans Aurora was buying and had to approve Aurora's guidelines. According to CW4, who worked for Aurora from 2005 until April 2008 as a deal coordinator and transactions analyst on securitization deals, Aurora purchased pools of closed loans on behalf of Lehman for securitization deals.  CW4 explained that Lehman also purchased pools of loans from subprime originators such as Countrywide, New Century, American Home Mortgage, and

---

[2]  CW1 was Aurora's controller until August 2006.  CW2 was a Vice President of Credit Policy for Aurora from mid-2005 until January 2008.

[3]  CW3 worked as a Vice President at Aurora from early 2002 to fall 2007.  From mid-2004 until fall 2007, CW3 was a Vice President in the servicing department.

Washington Mutual.  According to CW5, Aurora bought mortgages from about 10,000 brokers and originators around the country.[4]

**BNC Mortgage**

116.    Lehman acquired a stake in BNC in 2000 after helping BNC management take the company private, and it acquired BNC as an indirect wholly-owned subsidiary in 2004.  During the Class Period, Lehman described BNC as its "subprime origination platform."

117.    BNC focused on subprime originations until it closed in August 2007.  Numerous former employees stated that BNC sold roughly 75% of its production to Lehman, and as 2007 progressed and the market for non-prime loans deteriorated, Lehman purchased an even higher percentage of BNC's loans.

118.    Weak underwriting standards at BNC caused Lehman to acquire poor quality loans that Lehman held in its portfolio.  CW6, who was asked by Steven F. Skolnik ("Skolnik"), BNC's CEO, to come to BNC in January 2006 to help him "clean it up," described the weak underwriting practices at BNC.[5]  According to CW6, BNC had poor underwriting standards and inappropriate authority and reporting lines relative to processing mortgages.  CW6 characterized BNC's sales and underwriting practices as "some of the things that were most egregious in terms of the mistakes the sub-prime mortgage industry made."  CW6 elaborated that BNC's sales organization had an inappropriate level of control and authority over the processing of mortgages and underwriting decisions.   For example, according to CW6, much of the processing of

---

[4]  CW5 worked in quality control at Aurora for several years until early 2008.

[5]   CW6 was BNC's Executive Vice President and COO from January 2006 until early 2008.  CW6 was hired by Skolnik after previously working with Skolnik while both were at Countrywide Home Loans.  CW6 reported directly to Skolnik, and both CW6 and Skolnik worked under the direction of Thomas L. Wind ("Wind"), a Managing Director at Lehman and Head of Americas Residential Mortgage Origination.

mortgages, in terms of collecting documents from borrowers and providing them to underwriters, was significantly and inappropriately influenced by BNC's salespersons. CW6 indicated that, even before viewing tangible indicators, CW6 and Skolnik knew that the approach at BNC was flawed because they had seen the same problems while working at other lenders.

119. CW6 explained that BNC's poor underwriting and loan processing practices led to first-payment defaults. A first payment default occurs when a borrower does not pay the first mortgage payment on time or within the grace period. CW6 recalled that, throughout 2006 and into 2007, BNC experienced an increase in first-payment defaults. CW6 described first payment defaults as the best and "early indicator of defaults to come."

120. CW6 stated that poor underwriting continued at BNC even after CW6 joined in 2006. CW6 stated that, along with Ted Janulis ("Janulis") and Wind at Lehman, and Skolnik at BNC, all four were aware of BNC's problems and the need for change. According to CW6, however, little progress was made regarding BNC's substandard underwriting practices because the company was quickly into wind-up mode and closing offices.

### 7.    Lehman Was A Leader In Mortgage Securitization

121. In addition to being among the leading originators of non-prime loans and commercial mortgages, Lehman held itself out as a "market leader" in asset-backed securitizations, including the securitization of residential and commercial mortgages. According to a *Bloomberg* article dated September 15, 2008, "[Lehman] underwrote more mortgage-backed securities than any other firm" in 2007.

122. The Federal Reserve Bank of New York ranked Lehman eighth in volume of mortgage-backed securitizations in 2006. According to its 2007 Form 10-K, Lehman securitized more than $100 billion in residential mortgages in 2007.

123.    Before and during the Class Period, Lehman was also a leader in originating and underwriting CMBSs, securitizing nearly $20 billion in commercial mortgages during 2007 alone.

**8.      Lehman Amassed A $90 Billion Portfolio
Of Mortgage And Asset-Backed Holdings**

124.    Although Defendants represented that Lehman's vertically-integrated business model with respect to originating and securitizing mortgages allowed it to minimize risk by avoiding "a directional bet" on the U.S. real estate market, Lehman vastly increased its exposure to losses in the mortgage market during the Class Period.

125.    At the very time the mortgage and housing markets were melting down in 2006 and 2007 (*see* Section V.C. below), and mortgage assets were becoming increasingly illiquid, Lehman increased its portfolio of mortgage-related assets.  The aggregate value of this portfolio grew by an astonishing 54% in 2007, from $57.7 billion at year-end 2006 to over $89.1 billion by year-end 2007.  Lehman's reported aggregate mortgage-related holdings are set forth on a quarter-by-quarter basis below:

| (in $ millions) | 4Q06 | 1Q07 | 2Q07 | 3Q07 | 4Q07 | 1Q08 | 2Q08 |
|---|---|---|---|---|---|---|---|
| Mortgage and Asset-Backed Securities | 57,726 | 72,929 | 79,634 | 88,007 | 89,106 | 84,609 | 72,461 |

**a.      Lehman's Residential Real Estate Exposure**

126.    In its 2007 Form 10-K, filed on January 29, 2008, Lehman reported for the first time its residential mortgage holdings, including whole loans, mortgage-backed securities, and mortgage servicing rights:

| (in billions) | 11/30/07 |
|---|---|
| *Residential* | |
| Whole Loans | $ 14.235 |
| Securities | 16.709 |
| Servicing and Other | 1.235 |
| Total Residential | $ 32.179 |

127.    In its Form 10-Q for the first quarter of 2008, filed on April 9, 2008, Lehman reported a breakdown of its subprime and Alt-A/Prime mortgage-related positions for the first time in an SEC filing.  Lehman's reported holdings for the end of 2007 and the first two quarters of 2008 are set forth in the following chart:

| (in billions) | 11/30/07 | 2/29/08 | 5/31/08 |
|---|---|---|---|
| *U.S. Residential Subprime* | | | |
| Whole Loans | $ 3.226 | $ 1.295 | $ 1.048 |
| Securities | 1.995 | 2.692 | 1.686 |
| Other | 0.055 | 0.030 | 0.021 |
| Total | $ 5.276 | $ 4.017 | $ 2.755 |
| | | | |
| *U.S. Residential Alt-A/Prime* | | | |
| Whole Loans | $3.7 | $ 3.7 | $ 2.1 |
| Securities | 7.8 | 9.2 | 6.5 |
| Servicing and Other | 1.2 | 1.7 | 1.2 |
| Total Alt-A/Prime | $ 12.7 | $ 14.6 | $ 10.2 |

128.    During the Class Period, the Company lumped its Alt-A positions together with "Prime" but did not break down the Alt-A portion.  It was not until a March 18, 2008, conference call that Defendant Callan revealed for the first time that, of the $14.6 billion in Alt-A/Prime residential mortgages, "[t]hat's primarily alt-A.  There's a pretty small component of prime in there.  So if there's $1 billion of prime, that's probably the most that's in there."

### b.    Lehman's Commercial Real Estate Exposure

129.    As with the residential mortgage market, during the Class Period Lehman became increasingly involved in all aspects of the commercial mortgage market – origination of

commercial mortgages, securitization of mortgages, and marketing of securities backed by commercial mortgages.  Lehman also invested directly in the broader real estate market via projects throughout the United States.

130.    Lehman aggressively increased its commercial mortgage originations before and during the Class Period.  It originated approximately $27 billion in commercial mortgages in 2005 and $34 billion in 2006.  In 2007, Lehman increased its origination activity even as the real estate markets deteriorated, originating $60 billion in commercial mortgages.  According to CW7, a senior vice president in Lehman's commercial real estate group, Lehman's commercial side originated all of its own loans and did not purchase them from other companies.[6]

131.    According to a Goldman Sachs analyst, as of March 2008, Lehman had more commercial holdings than any other firm.  It had over $10 billion more than its nearest competitor, Citigroup, and more than double the commercial holdings of Morgan Stanley, Bear Stearns, and JPMorgan.  At the end of fiscal 2007, Lehman had more than $38.9 billion in commercial whole loans and securities on its books, as set forth in the following chart:

| (in billions) | 11/30/07 |
|---|---|
| *U.S. Commercial Mortgages* | |
| Whole Loans | $ 26.2 |
| Securities and Other | 12.7 |
| Total | $ <u>38.9</u> |

132.    Prior to and during the Class Period, Mark Walsh ("Walsh") was the head of Lehman's Global Real Estate Group.  All aspects of Lehman's real estate operations reported to Walsh, which was different than at other Wall Street firms, where responsibilities were divided among several people.  As reported on September 30, 2008, Walsh did not have to go through

---

[6]  CW7 worked for Lehman from 1996 to early 2008, serving as a senior vice president in the commercial real estate group immediately prior to his departure.

Lehman's risk management channels:  "There were reportedly capital committees and processes under way that everyone else had to go through, and Walsh didn't have to go through them." Dana Rubinstein, "Mark Walsh, Lehman's Unluckiest Gambler," *New York Observer*, Sept. 30, 2008.  Thus, Walsh had extraordinary authority to commit large amounts of capital to projects.

133.    In various media reports after Lehman's bankruptcy, persons doing business with Lehman and Walsh described how Lehman took larger undisclosed risks in its real estate investments than its peers.  As reported in *The New York Times*:

> "Lehman always had a reputation for being one of the most aggressive lenders in the commercial space," said Robert M. White Jr., the president of Real Capital Analytics, a New York research firm.
>
> One real estate investment broker described Lehman as "the real estate A.T.M."
>
> "They definitely were the mavericks out there, said the broker, who did not want to be identified to protect his business relationships.  "If you needed money, you could get it."

Terry Pristin, "Risky Real Estate Deals Helped Doom Lehman," *The New York Times*, Sept. 17, 2008.

134.    Similarly, one capital market broker contrasted Lehman's business model with those of its peers:  "You talk to Morgan Stanley, they have $3 billion worth of [commercial mortgage-backed securities] exposure in the States.  Lehman had $30 billion."  Mark Walsh, "Lehman's Unluckiest Gambler," *New York Observer*, Sept. 30, 2008.

135.    Lehman often increased its risk by investing in both debt and equity in the same deal.  Lehman also increased its risk by providing bridge equity to help deals close quickly.  In this role, Lehman provided a short term equity loan to close the deal, intending to replace the loan with equity partners after the deal closed.  As the market continued to deteriorate, however, Lehman was unable to replace its bridge equity positions.

40

136.    Throughout 2006 and 2007, as the real estate and credit markets collapsed, Lehman aggressively invested in real estate projects.  In 2006, Lehman invested a total of $2 billion in deals with SunCal Companies ("SunCal"), a southern California developer that has suffered severely from the housing downturn.  For example, Lehman invested heavily in SunCal's McAllister Ranch development northeast of Los Angeles, where housing prices have declined by close to 40% in just the past year.  SunCal has defaulted on some of the debt and the project has been halted for some time – with three square miles of land fenced off and a golf course and buildings left unfinished.  According to recent press reports, this investment had already cost Lehman $235 million by the start of the Class Period.  Another SunCal investment involved the purchase of 2.25 acres of land in southern California for $110.2 million.

137.    *The New York Times* reported in September 2008 that Lehman and a partner spent $1.3 billion on a large office complex in Arlington, Virginia, in May 2007.  Lehman retains a large equity interest in the property.  In June 2007, Lehman and partners invested over $1 billion in another large office complex in Austin, Texas, and it still had $1 billion in debt and equity in the deal as of the summer of 2008.  In July 2007, Lehman teamed with a partner to buy a national portfolio of warehouses for $1.85 billion, and Lehman provided 80% of the equity, in addition to financing, to get the deal closed quickly.  According to *The New York Times*, Lehman was unable to sell the warehouse mortgages or its equity position.

138.    As reported in *Fortune* in July 2008, Lehman partnered with Tishman Speyer to pay $22.2 billion in October 2007 for a leveraged buyout of Archstone-Smith, the owner of hundreds of upscale apartment buildings throughout the United States.  Lehman contributed $250 million in equity and led a group of lenders providing $4.6 billion in bridge equity.  At the same time, however, the commercial real estate market had plummeted.  Rather than walking

away from the deal by paying a break-up fee that amounted to a fraction of the purchase price, Lehman proceeded with the levered buyout.  As reported by the *The Wall Street Journal* on October 1, 2008, Lehman was therefore stuck with more than $2 billion in bridge equity that it was unable to sell.

### 9.     Lehman Increased Its Leverage To Grow Its Mortgage Inventory

139.    Even as assets deteriorated, Lehman increased its leverage position as it expanded its mortgage portfolio, reaching over thirty times shareholder equity by the second half of 2007, as set forth in the chart below:

| Debt to Equity Ratios | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1Q06 | 2Q06 | 3Q06 | 4Q06 | 1Q07 | 2Q07 | 3Q07 | 4Q07 | 1Q08 |
| Gross Leverage: | 25.1 | 25.4 | 25.8 | 26.2 | 28.1 | 28.7 | 30.3 | 30.73 | 31.7 |
| Net Leverage: | 13.5 | 13.8 | 13.5 | 14.5 | 15.4 | 15.4 | 16.1 | 16.14 | 15.4 |

140.    As a result of Lehman increasing its leverage to fund its mortgage and mortgage-related assets, Lehman's mortgage-related inventory came to represent significant percentages of shareholders' equity prior to and during the Class Period.

141.    As Lehman's mortgage and mortgage-related assets comprised a greater percentage of Lehman's shareholders equity, the Company faced an increased risk that a smaller percentage decline in the value of these assets would erode its shareholder equity and render the Company insolvent.  For example, because Lehman's mortgage and mortgage-related assets were roughly four times its shareholder equity in the second quarter of 2007, if Lehman wrote down the value of these assets by just 25% during the quarter, the loss would have been equal to its total shareholder equity.

### 10.     Lehman Was Required To
###            Report Assets At Their Fair Value

142.     Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.   GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA").   SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures.   Regulation S-X requires that interim financial statements must also comply with GAAP, except that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.   17 C.F.R. § 210.10-01(a).

143.     Under GAAP, financial instruments and other inventory positions must be reported at fair value.   GAAP, specifically FAS 157, *Fair Value Measurements* ("FAS 157"), states that "[f]air value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."   FAS 157, ¶5.   Some assets have readily ascertainable values ("Level 1" as explained below).   For example, the value of 100 shares of Microsoft is equal to 100x, where x is the share price on a particular date.   Some assets do not have a readily available market for identical assets, and FAS 157 provides guidance regarding the fair value of such assets.

144.     Further, FAS 157 explains that "the objective of a fair value measurement is to determine the price that would be received to sell the asset or paid to transfer the liability at the measurement date (an exit price)."   FAS 157, ¶7.

145.     FAS 157 indicates that fair value is measured using valuation techniques that are

43

appropriate in the circumstances and for which sufficient data are available and segregates the inputs, or assumptions, used in the valuation techniques into two categories – observable and unobservable.  FAS 157, ¶18.  Observable inputs are inputs from sources independent of the reporting entity (*i.e.,* the Company), whereas unobservable inputs are the reporting entity's own assumptions about the assumptions market participants would use.  FAS 157, ¶21.  Further, FAS 157 establishes a fair value hierarchy, prioritizing the inputs to valuation techniques used to measure fair value into three broad levels (Levels 1 through 3).  FAS 157, ¶22.  Specifically, FAS 157 provides the following, in relevant part:

> The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3).  In some cases, the inputs used to measure fair value might fall in different levels of the fair value hierarchy.  The level in the fair value hierarchy within which the fair value measurement in its entirety falls shall be determined based on the lowest level input that is significant to the fair value measurement in its entirety.

> \*   \*   \*

> Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date.

> \*   \*   \*

> **Level 2 inputs are inputs other than quoted prices included within Level 1 that are observable** for the asset or liability, either directly or indirectly.

> \*   \*   \*

> **Level 3 inputs are unobservable inputs** for the asset or liability.  Unobservable inputs shall be used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date.  However, the fair value measurement objective remains the same, that is, an exit price from the perspective of a market participant that holds the asset or owes the liability.  Therefore, unobservable inputs shall reflect the reporting entity's own assumptions about the assumptions that market participants would use in pricing the asset or liability (**including assumptions about risk).  Unobservable inputs shall be developed based on the best information available in the circumstances**,

which might include the reporting entity's own data. In developing unobservable inputs, the reporting entity need not undertake all possible efforts to obtain information about market participant assumptions. ***However, the reporting entity shall not ignore information about market participant assumptions that is reasonably available without undue cost and effort. Therefore, the reporting entity's own data used to develop unobservable inputs shall be adjusted if information is reasonably available without undue cost and effort that indicates that market participants would use different assumptions.***

FAS 157, ¶¶22-30 (emphasis added).

146.    As indicated above, Level 1 inputs are unadjusted, whereas Level 2 and Level 3 inputs may require adjustments to measure fair value appropriately. Regarding Level 2 inputs, FAS 157 provides that the adjustments are based on factors specific to the asset and may include factors such as the condition of the asset and the volume and level of activity in the markets within which the inputs are observed. FAS 157, ¶29. With regard to Level 3 inputs, however, adjustments must include assumptions about risk and the inputs must be adjusted for risk:

> Assumptions about risk include the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and/or the risk inherent in the inputs to the valuation technique.[15]

> [15] A measurement (for example, a "mark-to-model" measurement) that does not include an adjustment for risk ***would not represent a fair value measurement if market participants would include one in pricing the related asset*** or liability.

FAS 157, ¶A25, n.15 (emphasis added).

147.    Moreover, the SEC's Staff Accounting Bulletin No. 59 ("SAB 59"), *Accounting for Noncurrent Marketable Equity Securities*, specifies that declines in the value of investments in marketable securities caused by general market conditions or by specific information pertaining to an industry or an individual company "require further investigation by management." In this regard, SAB 59 states, "[a]cting upon the premise that a write-down may be required, management should consider all available evidence to evaluate the realizable value of its investment."

148.    The responsibility for preparing the financial statements in conformity with

GAAP rests with the Company's management, as, for example, set forth in the AICPA Auditing

Standards ("AU"):

> The financial statements are management's responsibility . . . .  Management is
> responsible for adopting sound accounting policies and for establishing and
> maintaining internal control that will, among other things, initiate, authorize,
> record, process, and report transactions (as well as events and conditions)
> consistent with management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities, and equity are within
> the direct knowledge and control of management . . . .  Thus, the fair presentation
> of financial statements in conformity with generally accepted accounting
> principles is an implicit and integral part of management's responsibility.

AU 110.03 (footnote omitted).

149.    Further, GAAP provides authoritative pronouncements on fundamental

accounting principles, such as the Financial Accounting Standards Board Concept Statements

("FASCON") concerning the detail and clarity required in financial statements, including:

> a.  The principle that financial reporting should provide information that is
>     useful to present and potential investors and creditors and other users in
>     making rational investment, credit and similar decisions (FASCON 1,
>     ¶34);
>
> b.  The principle that financial reporting should provide information about the
>     economic resources of an enterprise, the claims to those resources, and the
>     effects of transactions, events, and circumstances that change resources
>     and claims to those resources (FASCON 1, ¶40);
>
> c.  The principle that financial reporting should provide information about an
>     enterprise's financial performance during a period.  "Investors and
>     creditors often use information about the past to help in assessing the
>     prospects of an enterprise.  Thus, although investment and credit decisions
>     reflect investors' and creditors' expectations about future enterprise
>     performance, those expectations are commonly based at least partly on
>     evaluations of past enterprise performance." (FASCON 1, ¶42);
>
> d.  The principle that financial reporting should provide information about
>     how management of an enterprise has discharged its stewardship
>     responsibility to owners (stockholders) for the use of enterprise resources
>     entrusted to it.  "To the extent that management offers securities of the
>     enterprise to the public, it voluntarily accepts wider responsibilities for

46

accountability to prospective investors and to the public in general." (FASCON 1, ¶50);

e.  The principle that financial reporting should be reliable in that it represents what it purports to represent.   That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2, ¶¶58-59);

f.  The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2, ¶79);

g.  The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2, ¶81); and

h.  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2, ¶¶95, 97).

150.    Despite these GAAP provisions, Lehman failed to properly value its assets at fair value and shifted assets into Level 3 as described below.

**B.    The Real Estate And Mortgage Markets Collapse**

151.    By early 2006, the U.S. entered a period marked by a steep decline in home price appreciation and rising mortgage interest rates, which, combined, led to an unparalleled number of mortgage delinquencies and home foreclosures.  By 2007, the crisis spread to the commercial real estate market.  The collapsing real estate markets materially affected the market value of the billions of dollars of whole mortgages and MBSs on Lehman's balance sheet.

**1.    The U.S. Housing Bubble Bursts In 2006**

152.    According to Dr. Ben S. Bernanke, Chairman of the Federal Reserve Board, a "substantial correction" in the U.S. housing market had occurred by October 2006.

153.    On December 26, 2006, S&P released its S&P/Case-Shiller Home Price Indices, the leading measure of U.S. home prices.  According to S&P, home prices "peaked in mid-2004 and then demonstrate[d] a dramatic drop in annual returns, particularly apparent in the last year."

That same day Robert J. Shiller, professor at Yale University, Chief Economist at MacroMarkets LLC, and co-founder of the S&P/Case-Shiller Index, said that "home price gains are continuing their steep deceleration . . . .  We can clearly see that the monthly price declines are wide spread nationally."  On January 7, 2007, Professor Shiller added, "country-wide, home price declines appear to show no signs of slowing down."

154.    On March 27, 2007, S&P released its January 2007 data for the S&P/Case-Shiller Home Price Indices, and stated "the dismal growth in the . . . composite is now at rates not seen since January 1994 . . . the annual declines in the composites are a good indicator of the dire state of the U.S. residential real estate market."

155.    On November 27, 2007, S&P released September 2007 data for its S&P/Case-Shiller Home Price Indices, showing a third quarter price decline of 1.7%, the largest quarterly decline in the index's 21-year history.  That same day Professor Shiller observed, "[c]onsistent with prior 2007 reports, there is no real positive news in today's data.  Most of the metro areas continue to show declining or decelerating returns on both an annual and monthly basis."

156.    In a February 26, 2008 press release titled "Year End Numbers Mark Widespread Declines According to the S&P/Case-Shiller® Home Price Indices," S&P quoted Professor Shiller who said:

> We reached a somber year-end for the housing market in 2007 . . . .  Home prices across the nation and in most metro areas are significantly lower than where they were a year ago. Wherever you look things look bleak, with 17 of the 20 metro areas reporting annual declines and the remaining three reporting flat or moderate growth rates. Looking closely at these negative returns, you will see that 14 of the metro areas are also reporting record lows and eight are in double digit decline. The monthly data paint a similar picture, with all metro areas now reporting at least four consecutive negative monthly returns.

157.    The sharp decline in home prices is illustrated in the following chart:



S&P/Case-Shiller Home Price Indices

158.   As U.S. housing prices fell, interest rates increased sharply between 2005 and the first half of 2007, as reflected on the following chart:



159.   This combination of dropping home values and rising interest rates was particularly damaging for borrowers who had purchased homes with ARMs.  As long as housing prices continued to increase, borrowers could refinance their loans or sell their homes for big gains.  As prices dropped, however, many borrowers who had ARMs found it impossible to afford the increasing payments when rates adjusted upward in 2006 and 2007, and were unable

49

to refinance the loans because the outstanding mortgage debt exceeded the value of the home, leading to an unprecedented number of mortgage defaults and home foreclosures.

160.    On July 30, 2007, RealtyTrac, publisher of the largest and most comprehensive national database of foreclosed and bank-owned properties, issued its Midyear 2007 U.S. Foreclosure Market Report, and reported a total of 925,986 foreclosure filings during the first six months of 2007, up more than 30% from the previous six months, and up more than 55% from the first six months of 2006.

161.    On September 18, 2007, RealtyTrac published its August 2007 U.S. Foreclosure Market Report, and reported a total of 239,851 foreclosure filings during just the month of August, up 37% from the previous month and up 112% from August 2006.   RealtyTrac commented: "[t]his is the highest number of foreclosure filings in a single month that RealtyTrac has reported since it began issuing the monthly report in January 2005.  The national foreclosure rate of one foreclosure filing for every 519 households for the month is also the highest figure ever issued in the report."

162.    On January 29, 2008, RealtyTrac released data showing a total of 215,749 foreclosure filings in December, up 97% from December 2006, bringing the fourth-quarter 2007 total to 642,150 filings, up 86% from the fourth quarter of 2006.  James Saccacio, CEO of RealtyTrac, stated: "[t]he year ended with a monthly increase of 7 percent in December, making it the fifth straight month with more than 200,000 foreclosure filings reported and giving the fourth quarter the highest quarterly total we've seen since we began issuing our report in January 2005."  According to RealtyTrac, foreclosure filings for 2007 exceeded two million, up 75% from 2006.

163.    The rapid increase in mortgage defaults and home foreclosures between 2005 and 2007, at precisely the time when Lehman had expanded its mortgage-related business and had amassed a portfolio of nearly $90 billion in mortgage-backed assets (including significant exposure to assets backed by Alt-A and subprime loans, which was unknown to investors at the time), compromised the value and diminished the marketability of these assets on Lehman's balance sheet.

<h3 style="text-align:center">2.    <u>Declines In Mortgage-Backed Securities</u></h3>

164.    During the first half of 2007, the ABX plummeted, indicating that the cost of insuring subprime RMBSs had increased dramatically.   The ABX indicated that the value of RMBSs backed by subprime mortgages was deteriorating at a near-historic pace throughout 2007.   For example, the following chart, representing BBB rated tranches, illustrates the dramatic decline in 2007:

**Figure 5: ABX.BBB 06-2**



**Source:** Markit

165.    In addition to the ABX, in the first half of 2007, given the rise in delinquencies and defaults, the rating agencies – such as Fitch, S&P, and Moody's – downgraded MBSs.  The rating agency downgrades on MBS tranches reflected the reduced value of the tranches.  For example, in the first quarter of 2007, Moody's stated that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."  Moreover, in June, Moody's noted that, "within the 2006 vintage . . . the performance of late-2006 pools is generally worse than that of early-2006 pools." Further, "following the pattern of serious delinquencies . . . cumulative losses for late 2006 pools have trended higher than those for early 2006 pools at the same points of seasoning."

166.    The following chart illustrates the unprecedented ratings downgrades in RMBSs and home equity asset-backed securities, by year:

| Negative rating action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Subprime 1st lein | | | Subprime 2nd lein | | | Subprime all Lein | | |
| Vintage | $ | # tranche | # deals | $ | # tranche | # deals | $ | # tranche | # deals |
| 2002 | 2.90% | 13.80% | 48.80% | 1.50% | 4.00% | 9.10% | 2.90% | 13.20% | 46.40% |
| 2003 | 1.70% | 10.10% | 38.50% | 0.70% | 2.90% | 11.10% | 10.60% | 9.60% | 36.50% |
| 2004 | 0.90% | 6.20% | 34.30% | 1.70% | 5.90% | 44.00% | 0.90% | 6.20% | 35.00% |
| 2005 | 0.60% | 3.60% | 20.90% | 3.30% | 18.50% | 85.40% | 0.70% | 4.90% | 28.00% |
| 2006 | 13.40% | 48.00% | 92.10% | 60.00% | 84.50% | 91.80% | 16.70% | 52.30% | 92.00% |
| Positive rating action | | | | | | | | |
| | Subprime 1st lein | | | Subprime 2nd lein | | | Subprime all Lein | | |
| Vintage | $ | # tranche | # deals | $ | # tranche | # deals | $ | # tranche | # deals |
| 2002 | 2.10% | 6.40% | 20.80% | 6.70% | 17.30% | 63.60% | 2.30% | 7.00% | 23.50% |
| 2003 | 2.80% | 8.60% | 26.40% | 9.20% | 30.10% | 83.30% | 2.90% | 10.00% | 30.50% |
| 2004 | 1.20% | 3.30% | 15.00% | 7.20% | 22.30% | 56.00% | 1.40% | 4.30% | 17.90% |
| 2005 | 0.00% | 0.00% | 0.00% | 5.30% | 9.60% | 39.60% | 0.20% | 0.90% | 4.40% |
| 2006 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Source: Moodys (26 October 2007) | | | | | | | | |

167.    Following the deterioration in RMBSs, CMBSs also began to decline in value in 2007.  As early as April 2007, Moody's indicated that it would require more protection for investors in CMBSs because of a "continued slide" in lending standards.  Similar to residential mortgages, commercial mortgage delinquencies steadily increased throughout 2007.  According

to the Federal Reserve Board, the overall delinquency rate was 1.1% in the second quarter of 2007, but rose to 1.94% in the fourth quarter, the highest level since 2001.

168.    Beginning in mid-2007, indices tracking CMBS tranches indicated an increasing risk of default in all the tranches.  Starting in mid-2007, the CMBX indicated that the risk of default increased dramatically for all tranches of CMBSs.  As noted above, in contrast to the ABX, an ***increase*** in the CMBX indicates that the market expects rising defaults.  The following chart illustrates that CMBX spreads widened beginning in mid-2007, even for the highest rated tranches, indicating that the market expected large increases in defaults and losses on CMBSs:



169.    Further, the following charts illustrate that spreads widened for the AAA and BBB tranches of CMBSs from May 2008 through the end of the Class Period, indicating continued deterioration in the expected performance of these securities:

53





### 3.   Hedge Funds Fail In May And July Of 2007, And Bear Stearns Collapses In March 2008

170.    On May 3, 2007, UBS announced that it was closing an in-house hedge fund after suffering huge losses investing in the U.S. mortgage securities industry.  The fund, Dillon Read Capital Management, had been in existence for less than two years.

171.    On July 17, 2007, Bear Stearns Companies Inc. ("Bear Stearns") sent letters to investors in two of its hedge funds that invested in subprime debt instruments, informing them that "preliminary estimates show there is effectively no value left for the investors in the Enhanced Leverage Fund and very little value left for the investors in the High-Grade Fund." Bear Stearns warned that bonds that had high credit ratings were experiencing "unprecedented declines" in value.

172.    In response to the collapse of the two Bear Stearns hedge funds, Richard Bove, an analyst with Punk Ziegel & Co., commented that Bear Stearns' announcement should trigger a mass revaluation of portfolios with similar subprime debt instruments held by Wall Street banks. Bove noted that the collapse of the two hedge funds revealed troubles with the entire system. "The banks are overstating the quality of assets on their balance sheets," he said. "When they go back and look at these securities, it could be up to a 15- to 20-per-cent devaluation."

173.    The July 17, 2007 announcement of the collapse of the two Bear Stearns hedge funds led to speculation that Lehman would announce it had greater exposure to subprime mortgages and that it would be taking large losses on those assets.  On July 18, 2007, in response to the rumors, Lehman spokesperson Kerrie Cohan stated:  "[t]he rumors regarding [Lehman's] subprime exposure are totally unfounded."  *See Reuters*, "Lehman denies rumors about its subprime exposure," July 18, 2007.  As would be revealed much later, however, Lehman in fact had significant subprime exposure.

174.     Even after Bear Stearns provided a $3.2 billion infusion for one of the hedge funds, both funds filed for bankruptcy protection.  On Tuesday, August 14, 2007, Lehman's shares fell sharply on news that the two hedge funds were collapsing.  According to the *Dow Jones News Service*:

> Lehman and Bear Stearns tend to be twinned in investors' minds, because they are smaller and less diversified than Wall Street giants Goldman Sachs Group (GS), Merrill Lynch & Co. (MER) and Morgan Stanley (MS).  Yet Lehman is seen as taking more risk than Bear Stearns.  And in the current environment, Lehman may be paying a price for its relative silence about its exposure to troubled mortgages and high-risk debt.

175.     The collapse of Bear Stearns, once the country's fifth-largest investment bank, occurred on March 16, 2008.  To avert a looming bankruptcy, JPMorgan eventually paid $10 per share to acquire Bear Stearns in a deal that required the Federal Reserve Bank to guarantee $29 billion of Bear Stearns's troubled assets.

### 4.     Lehman's Deteriorating Mortgage And MBSs Performance

176.     Data on the performance of RMBSs issued and sold by Lehman from 2005 to 2007 indicate that loans in Lehman's securitization pools experienced increased deficiencies and defaults prior to and throughout the Class Period.  Lehman collected, aggregated, and tracked the performance of its mortgage pools in order to comply with SEC Regulation AB.

177.     When analyzed by "vintage" (*i.e.*, the year in which the loans were issued), the data reported pursuant to Regulation AB illustrate that loans originated in 2006 experienced markedly higher rates of delinquency and foreclosure than comparable loans originated in 2005.  The data further illustrate that the 2007 vintage fared significantly worse than both the 2005 and the 2006 vintages.  The comparison of these loan pools thus shows that, in terms of delinquency and foreclosure rates, loans in the 2007 pool declined far more rapidly than comparable loans originated in 2005 and 2006.

178.    By July 2007 – just seven months after they had been issued – 1.55% of the loans in Lehman's 2007 loans pools were delinquent.  In contrast, the 2005 loan pools did not reach that level of delinquency until January 2007, twenty-five months after issuance.  Further, the 2006 loan pools did not reach that level of delinquency until December 2007, twelve months after issuance.  Thus, by July 2007, residential loans issued in 2007 were becoming delinquent nearly twice as fast as comparable loans in 2006 and more than three times as quickly as comparable loans originated in 2005.

179.    By November 2007, eleven months after issuance and at the end of Lehman's fiscal 2007 year, over 4% of the 2007 loan pool was delinquent.  By comparison, when the 2005 and 2006 loan pools had "aged" eleven months, their total delinquency rates were just 0.78% and 1.46%, respectively.

180.    Witnesses confirm that the performance of loans in Lehman's securitizations deteriorated before and during the Class Period.  According to CW5, Lehman was forced to "replace" loans in some securities.  CW3 also confirmed that, based on certain performance issues, Lehman was required to purchase problem loans out of securitization entities issuing securities.  For example, if a loan was going into foreclosure, Lehman would have to purchase it from the entity.  Indeed, CW5 recalled that, between March and April of 2006, Lehman put funds back into two securitization entities, SASCO and LXS, because mortgages in these entities were not performing.

181.    According to CW5, Lehman employed a group of forensic auditors that it housed in Aurora's offices.  Around May or June 2006, this quality control special investigations team was asked to review a sample of loans in SASCO and LXS.  The group found that 40 to 50% of the sample had material misrepresentations.

182.    According to CW5, in approximately September 2006, Aurora's quality control special investigations unit went through another sample of the loans in the same securities. Most of these loans were originated by Aurora's "strategic partners," which were correspondents that received preferential treatment. These strategic partners included First Magnus Financial, the Alt-A originator that ceased originating loans in August 2007, according to the Inside Mortgage Finance newsletter. According to CW5, the quality control special investigations unit found that 72 to 73% of the pool of loans contained fraudulent misrepresentations.

183.    Aurora's quality control special investigations unit performed targeted audits of SASCO and LXS throughout most of 2007. According to CW5, the unit performed about four to five other targeted reviews for those securities, and consistently found that roughly 70% of loans underlying those securities should be repurchased.

184.    Aurora continued to service loans after the loans were pooled and securitized. For example, Aurora serviced a large portfolio of Alt-A loans during the Class Period. Between the end of 2005 and spring 2008, the performance of these loans deteriorated severely, as illustrated in the following chart:

| Delinquencies, Foreclosures, and Bankruptcies in Aurora's Conventional Alt-A Loan Servicing Portfolio | | | |
|---|---|---|---|
| As of | Principal Balance of Loan Servicing Portfolio ($ Billions) | Percent of Loans Delinquent at Least 30 Days, in Foreclosure, or in Bankruptcy | Principal Balance of Loans Delinquent at Least 30 Days, in Foreclosure, or in Bankruptcy ($ Billions) |
| 12/31/2005 | 62.1 | 2.0% | 1.2 |
| 12/31/2006 | 73.6 | 4.2% | 3.1 |
| 12/31/2007 | 68.8 | 9.5% | 6.5 |
| 3/31/2008 | 67.3 | 11.9% | 8.0 |

185.    CW4 confirmed that, by spring of 2008, Aurora's servicing department indicated that 12% of the loans Aurora serviced were in some phase of delinquency.

186.   By spring 2007, Lehman told its employees that the subprime market was declining severely.  CW8 explained that, in spring 2007, Lehman held a major conference for employees in Phoenix, Arizona.[7]  According to CW8, Lehman reported at this conference that the market's appetite for subprime loans had changed, and, as a result, Lehman was supposed to "tighten up guidelines."  Further, the underwriters were told that they were not going to produce the loans they had been producing because "there's a problem on the horizon."

### 5.   Increasing Numbers Of Loan Repurchases

187.   As set forth above, delinquency and foreclosure data on Lehman-issued MBSs from 2005 to 2007 demonstrated the deteriorating credit quality of its mortgages and mortgage-backed assets during the Class Period.  In addition, confidential witnesses confirmed this decline in credit quality on the basis of repurchase requests.

188.   Toward the end of CW9's tenure in late 2006, many of the loans Aurora acquired went into default immediately upon acquisition.[8]  Given the early defaults, Lehman was faced with a large amount of repurchase requirements from its securitizations.  In turn, Aurora would attempt to force the parties from which it acquired the loans to repurchase the problem loans according to representations and warranties in the purchase agreements.

189.   CW9 described how Aurora was having trouble getting originators to repurchase loans in 2006.  According to CW9, many of the originators from which Aurora bought loans were not able to repurchase problem loans.  CW9 stated that large amounts of Aurora's repurchase requests to mortgage originators were outstanding, with some delinquent over 400

---

[7]  CW8 worked as an underwriter and account executive at BNC in Tampa, Florida, from May 2003 to October 2007.

[8]  CW9 worked as a contract administrator and repurchase coordinator at Aurora from the fall of 2004 to the fall of 2006.  CW8 was responsible for filing claims against originators, such as Countrywide, when loans defaulted or went into foreclosure.

days.  CW4 confirmed that making repurchase requests to lenders was a "lost cause," as so many were going out of business.  Instead, the defaulted loans sat on the books.  According to CW4, the increase in loan defaults was discussed at meetings and in emails.

190.    CW3 confirmed that, beginning in the fall of 2006, Aurora's repurchase requests to correspondent lenders were increasing.   CW3 described how the group working on repurchases at Aurora was "buried" with work beginning in the fall of 2006.  While Aurora needed the correspondents to repurchase the loans, a lot of them were going out of business.  Thus, CW3 confirmed the large number of outstanding repurchase requests, some as much as two years old.

191.    Additionally,  according  to  CW10,  who  worked  almost  exclusively  with repurchase requests from investors, the repurchase requirements were not limited to Lehman-issued MBSs.[9]   According to CW10, Lehman's subprime originator, BNC, was itself facing dramatically increasing numbers of repurchase requests from loan purchasers who claimed that certain  loans  violated  BNC's  representations  and  warranties.    While  CW10  was  the  only employee focusing on repurchase requests at the beginning, the repurchase requests increased dramatically and more employees began working on repurchase requests.  CW10 would review each repurchase request and would do a write-up on each request.  According to CW10, BNC held weekly meetings to review repurchase requests.  The meetings included senior management from Lehman, Gail Schlenz (BNC's head of underwriting who had come to BNC from Lehman in New York) and her subordinates, the head of quality control at BNC, and representatives from various other departments of BNC.

_____

[9]   CW10 worked at BNC from fall of 2005 until October 2007.  CW10 worked as a Due Diligence Underwriter in the Secondary Marketing Department, but focused almost exclusively on investors' repurchase requests.

192.    As a result of unfulfilled requests, Lehman sued counterparties for failing to repurchase loans.  As early as June 22, 2006, Lehman sued Master Financial, Inc. ("MFI"), a loan originator based in California, for failing to repurchase loans that it had sold to Lehman. According to the Company's complaint, Lehman "is informed and believes and based thereon alleges that MFI failed to follow the contractually required 'legal, proper, prudent and customary practices'" in originating the loans at issue.  Lehman further claimed that "the misrepresentations and other irregularities, including payment defaults [on the loans] . . . lowered their value considerably as investment loans.  Because MFI failed and refused to repurchase the irregular, non-conforming and poorly-performing loans when demand was made, [Lehman] was then obligated to liquidate them by foreclosure or resale at considerable discount due to their reduced value, resulting in significant losses."  Lehman sued other lenders during this time period.  For example, in August 2007, Lehman sued Fieldstone Mortgage Company for failing to repurchase delinquent loans.

193.    The myriad repurchase requests made by, to, and on behalf of Lehman before and during the Class Period further demonstrate the rapidly deteriorating value of Lehman's mortgage and mortgage-related assets held on its balance sheet.  Moreover, Lehman's and its subsidiaries' inability to successfully pursue repurchase requests resulted in a dramatic increase in Lehman's exposure to high risk, and in some cases, non-performing, mortgage assets during this time period.

194.    Despite the rise in repurchase requests and the inability of Lehman's subsidiaries to collect on their repurchase requests, CW3 stated that Aurora did not cease doing business with many of its correspondent lenders, as it needed to fulfill Lehman's securitization needs. According to CW3, Aurora continued to buy low quality loans despite the increasing problems in

the industry.  CW9 and CW11 confirmed that Aurora continued to buy loans from certain lenders even though they had large numbers of outstanding unpaid repurchase claims.[10]  In addition, CW9 prepared a detailed spreadsheet of first-payment defaults that was sent to Lehman traders before being sent to correspondent lenders.  CW16, who reported to Rich McKinney, Lehman's U.S. Securitization Chief, was among the recipients.

195.    CW12, a managing director in Lehman's contract finance department, explained that Aurora's "loss management" unit dealt with the various counterparties with respect to repurchases.[11]  This unit reported to CW12.  CW12 further recalled that repurchase requests increased in 2007 with hundreds of millions of dollars worth of non-performing loans remaining with Aurora.

### 6.    Margin Calls On Non-Prime Lenders

196.    Given the rapidly declining performance of non-prime mortgages, in early 2007, warehouse lenders such as Lehman began making margin calls on originators due to the decreased value of underlying mortgage assets used in connection with such credit lines.  For example, in March 2007 Lehman made the first in a series of margin calls on its warehouse line of credit to Alt-A mortgage lender American Home Mortgage ("AHM"), claiming that the value of AHM's notes had dropped significantly.  Following three months of margin calls by Lehman, and after Lehman had declared AHM in default of its payment obligations, AHM declared bankruptcy in August 2007.

---

[10]  CW11 worked as a High Risk Specialist/Mortgage Fraud Investigator for Aurora in Colorado from November 2004 to March 2008.  CW15 handled Aurora's quality control investigations and supplied information to the contract administration department with repurchase recommendations.

[11]  CW12 worked for Lehman for 21 years until leaving in February 2008, most recently reporting to Rich McKinney, Lehman's U.S. Securitization Chief.  CW12 worked on closing whole loan transactions, which were pools of loans that Lehman purchased from other parties.

197.    Further, Lehman issued numerous margin calls to Accredited, another mortgage lender on the Company's credit facilities, in early 2007.  Again, these margin calls resulted from a decline in the value of the collateral used to secure those facilities – the lender's mortgages.

198.    On July 5, 2007, Lehman cut off a $1.5 billion credit line to Option One Mortgage Corporation, a subsidiary of H&R Block Inc.

### 7.    Lehman's Declining Originations And Securitizations

199.    Given the increasing problems in the mortgage market in 2006 and 2007, origination and securitization businesses declined substantially.  Lehman experienced the decline directly, with both its origination and securitization business slowing severely:

| Quarter Ended | Mortgage Origination ($ Billions) | Mortgage Securitization ($ Billions) |
|---|---|---|
| 2Q07 | 36 | 42.766 |
| 3Q07 | 26 | 36.592 |
| 4Q07 | 17 | 15.184 |
| 1Q08 | 4 | 6.868 |
| 2Q08 | 2.5 | 6.727 |

200.    As the securitization market slowed, Lehman was forced to account for many of the securitization deals as secured financings instead of sales.  Securitizers, such as Lehman, prefer to account for securitization deals as sales rather than secured financings.  Secured financings do not allow for the removal of securitized assets from the balance sheet.  For financial institutions, the removal of non-performing assets from the balance sheet is one of the economic benefits of engaging in the sale of securitized assets.

201.    For each quarter of 2006, Lehman stated in its SEC filings that it "is a market leader in securitization transactions, including securitizations of residential and commercial loans."  Further, Lehman indicated that the vast majority of its securitization transactions were

designed to be booked as sales, not as secured financings, which would have to remain on Lehman's balance sheet.

202.    As demonstrated in the following chart, starting in 2007, as the mortgage and securitization markets deteriorated, Lehman's inventory that did not qualify for sales treatment was significantly higher than at the end of 2006:

| Quarter Ended | Total Mortgage Inventory ($ Billions) | Accounted For As Secured Financings Under FAS 140 ($ Billions) |
|---|---|---|
| 4Q06 | 57.726 | 5.5 |
| 2Q07 | 79.634 | 14.7 |
| 3Q07 | 88.007 | 13.6 |
| 4Q07 | 89.106 | 12.8* |
| 1Q08 | 84.609 | 10.2 |

* Reported as 12.8 in Lehman's 2007 Form 10-K and 11.9 in its Form 10-Q for the first quarter of 2008.

203.    Former employees confirm that Lehman was having trouble qualifying its securitizations as sales.  CW13 worked as a vice president at Lehman dealing with mortgage product control on the prime trading desk from the beginning of 2006 until July 2007, focusing on prime and Alt-A mortgages.  CW13 confirmed that, even with prime deals, Lehman was having trouble selling the lower-rated tranches.  According to CW13, if Lehman could not sell the required percentage of a securitization deal, then it would remain on Lehman's balance sheet. According to CW12, securitizations slowed by the summer 2007.

204.    Additionally, the delinquent and defaulting mortgage assets that accumulated in Lehman's holdings throughout the Class Period had a negative impact on its liquidity and capital resources.  According to Lehman's 2007 fiscal year-end Form 10-K, "[l]iquidity, that is ready access to funds, is essential to our businesses."  Lehman faced significant liquidity problems due in large part to the decline in value of mortgage-related assets.  Lehman purchased many of its assets using secured credit obtained under tri-party repurchase agreements.  If the market value

of the pledged assets declined, secured lenders would impose "haircuts" (discounts) on Lehman. The reduced availability of secured financing would force Lehman to draw down on its liquidity pool in order to execute transactions.

205.    As the following chart illustrates, Lehman's reported surplus capital declined over the Class Period:

| Quarter | LBI Net Capital ($ millions) | Excess Over Minimum Net Capital Requirement ($ millions) |
|---------|------------------------------|----------------------------------------------------------|
| 4Q06    | 4,700                        | 4,200                                                    |
| 1Q07    | 4,600                        | 4,100                                                    |
| 2Q07    | 4,100                        | 3,600                                                    |
| 3Q07    | 3,100                        | 2,600                                                    |
| 4Q07    | 2,700                        | 2,100                                                    |
| 1Q08    | 3,300                        | 2,500                                                    |
| 2Q08    | 3,800                        | 3,100                                                    |

206.    Lehman was forced to raise additional capital for general corporate purposes via several multi-billion dollar securities offerings in February, April, and June 2008.  The capital increases in the first and second quarters of 2008 in the above chart reflect the increase in capital from these offerings.  Even as late as September 10, 2008, however, Defendant Lowitt stated that Lehman maintained a "very strong liquidity position."

### 8.    Lehman Closes BNC And Suspends Lending At Aurora

207.    In August 2007, Lehman announced that it was shutting down BNC.  According to a Lehman press release announcing the closure, "Market conditions have necessitated a substantial reduction in . . . resources and capacity in the subprime space."

208.    Similarly, by January 2008, Lehman ceased Aurora's wholesale and correspondent lending divisions.  According to Lehman's  January 17, 2008, press release:

> Lehman Brothers announced today that it will substantially reduce its resources and capacity in the U.S. residential mortgage origination space in light of the dislocation in the mortgage markets. As a result, the Firm is suspending its

Wholesale and Correspondent lending activities at its Aurora Loan Services subsidiary. Aurora will continue to originate loans through its direct lending channel, and will maintain its servicing business.

**C.   Lehman's Lack Of Transparency And**
**Undisclosed Exposure To Real Estate And**
**Mortgage-Related Losses**

209.   Lehman's public filings during the Class Period lacked transparency into Lehman's real estate and mortgage-related holdings and its exposure to loss from those holdings. Lehman overstated the value of its Alt-A assets, failed to reveal its inability to hedge losses on its Alt-A related assets, shifted large amounts of mortgage assets into the Level 3 accounting category allowing discretionary valuations that would avoid larger writedowns, and failed to disclose details regarding its "economic hedges" and the true risk of loss from those investments. Moreover, Lehman carried various real estate and mortgage holdings at inflated values.

**1.   Lehman's Lack Of Transparency Regarding**
**Its Real Estate And Mortgage-Related Holdings**

210.   As described above, the U.S. housing and mortgage markets collapsed throughout 2006 and 2007.  Lehman's SEC filings for the second quarter of 2007, however, failed to disclose any meaningful details regarding its nearly $80 billion in mortgage-related holdings (as of May 31, 2008) and any associated writedowns of those assets.  Instead, in response to a question during the second quarter conference call to discuss its earnings, Defendant O'Meara simply noted that "some amount of marks were taken in the period," but did not provide any detail about the amount of any writedowns or even what assets were written down.  Further, O'Meara provided no detail regarding hedging activities (including that Lehman could not hedge its Alt-A assets), other than stressing that "we do have hedging strategies that are in place and have proven to be quite effective."   Defendant O'Meara also stated that conditions were improving in the subprime market:  "As I mentioned, toward the end of the period we actually

saw that getting into better condition, particularly for the new originations of sub-prime assets. So this is turning out to be a vintage challenge here where the '06 vintage is one that is particularly challenged but the newer originations, which are being originated to a higher credit quality, are the subject of great investor demand at this point."

211.    Lehman's disclosures for the third quarter were similarly opaque and concealed Lehman's true exposure to losses from the collapsing real estate market.  During the third quarter, the mortgage and MBS markets continued to deteriorate, and Lehman's peers recorded massive writedowns of their mortgage-related holdings.  For example, Merrill Lynch announced a $7.9 billion mark-to-market writedown in the third quarter, leaving it with a $20.9 billion portfolio of residential subprime mortgages and collateralized debt obligations ("CDOs") at the end of the quarter.  Similarly, Citigroup disclosed "credit and trading losses of $5.9 billion on loans and mortgage-backed securities," and UBS wrote down roughly $3.7 billion on its mortgage-backed securities, which totaled approximately $15.3 billion at the end of the quarter.

212.    Lehman, however, still did not disclose details on its mortgage-related holdings, which totaled $88 billion at the end of the quarter.  For example, while Lehman disclosed on September 18, 2007, that it took a net $700 million writedown of assets (net of hedging gains), it did not disclose how much of this was attributed to its mortgage-related assets.  When asked directly on a conference call later that day, Defendant O'Meara refused to reveal the amount of gross writedowns.  Instead, he insisted that "knowing the gross numbers particularly in that business, I don't think is really a meaningful thing."

213.    Lehman's lack of transparency continued into the fourth quarter of 2007.  On December 13, 2007, Lehman released its 2007 fourth quarter and year-end financial results, but it continued to misrepresent and omit material information about Lehman's gross writedowns.

For example, during an investor conference call that day, while O'Meara acknowledged that Lehman wrote down its residential and commercial mortgage portfolio by $1.5 billion net of hedging gains, he refused to disclose information regarding Lehman's commercial mortgage-related portfolio.  O'Meara stated that Lehman wrote down its CMBS holdings "in a significant way," but he refused to disclose the amount of the CMBS gross writedown.  To the contrary, when asked about the gross writedown, O'Meara responded "we're not giving that."

214.    In Lehman's 2007 Form 10-K, Lehman failed to provide details on its mortgage-related holdings, including the extent and quality of its Alt-A holdings.  Further, Lehman again failed to disclose that it could not hedge its Alt-A assets and that its economic hedges could themselves result in additional losses when the supposedly-hedged assets also declined in value.

215.    Despite the continued severe problems in the U.S. residential and commercial mortgage markets and Lehman's extensive exposure to mortgage-related holdings, Lehman took a total net writedown of only $1.5 billion on its mortgage and asset-backed holdings in the fourth quarter.  Lehman's mortgage-related assets at the time totaled over $70 billion (excluding assets accounted for as secured financings rather than sales).  Lehman's net writedown was markedly smaller than those taken by its competitors.  For example, Citigroup recorded writedowns of $17.4 billion, leaving it with approximately $37 billion in subprime related assets as of year end.  Merrill Lynch recorded net writedowns of $9.9 billion of its approximately $14.7 billion in asset-backed CDOs in the fourth quarter.  Merrill Lynch also recorded a net writedown of $1.6 billion related specifically to its U.S. subprime residential mortgages, leaving it with $2.7 billion of those assets at year end.

216.    Lehman's lack of disclosures regarding its mortgage-related holdings and exposure to loss from those holdings continued into the first quarter of 2008.  On March 18,

2008, Lehman announced its first quarter results, and reported $800 million and $700 million writedowns (net of hedging gains) in its residential and commercial mortgage holdings, respectively.   In its Form 10-Q for the first quarter, Lehman provided limited additional information on its mortgage-related holdings, but it grouped its Alt-A holdings into the same category as prime and did not provide a breakdown.   Further, it continued to withhold information regarding its hedges.

217.   Lehman also failed to disclose its exposure to loss on its commercial real estate portfolio.  For example, in the first quarter, Lehman took a $1.1 billion gross writedown of its $36 billion commercial real estate portfolio – approximately 3%.  At the same time, the index of "AAA" CMBSs declined about 10% in the first quarter of 2008, and lower-rated securities fell even further.

218.   On March 20, 2008, in an article titled "The Debt Shuffle," *Condé Nast Portfolio* reported upon the lack of transparency.  Specifically, the article reported:

> ***Lehman's write-downs seem tiny***:  Lehman finished the quarter with $87.3 billion of real estate assets.  These include residential mortgages and commercial real estate paper.  The bank only wrote these assets down by 3 percent.  And its Level III assets — the hardest to value portion of these instruments — were written down by only the same percentage.  ***The indexes and publicly traded instruments and companies that serve as proxies for these securities generally fell more than that in the quarter***.

(Emphasis added.)

219.   The Insider Defendants' opaque reporting continued in the second quarter of 2008.   On June 9, 2008, Lehman reported its preliminary 2008 second quarter results, and announced a gross writedown of $2.4 billion in its residential mortgage-related holdings and $1.0 billion in its commercial-related holdings.   Further, Lehman disclosed that its net commercial writedown was $1.3 billion, as its commercial "hedges" had increased its loss by $400 million. Lehman again did not disclose the amount and quality of its Alt-A holdings and that it could not

hedge those assets.

220. As *Bloomberg News* reported on June 10, 2008, David Einhorn, president and co-founder of hedge fund Greenlight Capital Inc., questioned the reasons for the lack of transparency, stating:

> The burden is on [Lehman] to be much more forthcoming and transparent in their disclosures and discussion and analysis of their high-risk assets . . . . This confirms a lot of things we've been saying. The credit market did not really deteriorate between February and May. ***Most of these losses are losses that were probably evident quarters ago.***

(Emphasis added.)

221. Further, in a June 10, 2008, research report titled "Too Many Inconsistencies," Wachovia Capital Markets analyst Douglas Sipkin downgraded Lehman's rating from "Outperform" to "Market perform" and wrote that,

> ***We underestimated how poorly marked [Lehman's] assets were***. In addition, the larger capital raise at meaningfully lower prices indicates that the Company did not have, and potentially still does not have, a complete grasp of its exposures.

(Emphasis added.)

222. As described in more detail herein, just three months later, on September 10, 2008, Lehman pre-announced a staggering $7 billion gross writedown of its mortgage-related holdings for the third quarter of 2008. Further, during a conference call to discuss their results, Defendant Lowitt admitted that the majority of the writedown related to its Alt-A holdings, and that Lehman could not hedge those assets. Lehman filed for bankruptcy a few days later.

## 2. Lehman Failed To Disclose Its Alt-A Exposure And Inability To Hedge Alt-A

223. An Alt-A mortgage is supposed to be a mortgage that is less risky than subprime and closer in risk to prime (also known as A-paper). As noted above, Lehman was a leader in origination and securitization of what it ***called*** Alt-A mortgages. In truth, Lehman's Alt-A

70

programs were more akin to subprime than prime.  CW1, CW3, and CW14 explained that
Aurora offered high risk products, such as Mortgage Maker, that were better described as "Alt-
B."[12]  Mortgage Maker became a larger part of Aurora's volume, with CW3 and CW14
indicating that Mortgage Maker made up over half of Aurora's production in early 2007.

224.   In addition to the Mortgage Maker product, Aurora documents describing its
various mortgage guidelines indicate that Aurora produced numerous other risky loan products
that resembled subprime.  A Fair Isaac Corporation ("FICO") score is a measure of credit risk
and has a range of 300 to 850, and the median credit score in the U.S. is 723.  As described by
the Federal Reserve Bank of New York, a subprime borrower generally has a credit score below
660.  Lehman, however, indicated in its public filings that it "generally define[s] U.S. subprime
residential mortgage loans as those associated with borrowers having a credit score in the range
of 620 or lower using the Fair Isaac Corporation's statistical model, or having other negative
factors within their credit profiles."  *See, e.g.*, 2007 Form 10-K at 105 n.1.  According to Aurora
documents, its guidelines permitted loans for the full value of a property (*i.e.*, no down payment)
to persons with FICO scores in the low 600s.  Aurora also allowed for mortgage payments up to
half of a borrower's gross monthly income, not taking into account additional expenses for taxes,
food, and other necessities.  Aurora guidelines also described numerous loan products with no
documentation requirements.  Further, Aurora had various negative amortization products.  For
example, for a one million dollar mortgage, at 95% of the value of the property, and without
documentation, Aurora's guidelines allowed credit scores down to 620.  With regard to no

---

[12]   CW3 was a vice president at Aurora from 2002 until fall 2007, first in the secondary
marketing department until mid-2004, and then in the servicing department.  CW14 worked for
Aurora from 2006 until April 2008 in several positions, including underwriting, fraud
investigation, and purchase review.

documentation loans, Aurora's guidelines simply indicated that the type of job must be one that "reasonably supports" the ability to repay the mortgage debt.  Finally, for full documentation programs, the guidelines allowed for loans up to four million dollars with a credit score of 600.

225.   Further, CW2, a Vice President of Credit Policy at Aurora until January 2008, explained that Aurora started working on Alt-B products in late 2005.  According to CW2, Aurora's Alt-B products accepted FICO scores down to 540.  CW2 recalled that, with a FICO score of 560 or 580, a borrower could get a stated income loan.  Even with a blemished credit history or recent bankruptcy, Aurora had products allowing for financing of the entire purchase price of the home.  CW2 worked with Ken Linton, Lehman's Senior Vice President on the Mortgage Trading Desk, in making credit policy.  In CW2's opinion, Lehman and Aurora should not have been producing loans down at the Alt-B level, as the borrowers could not afford the loans.  CW15, a Credit Policy Coordinator at Aurora from 2004 until the beginning of 2008, recalled that Aurora began loan programs in mid-2004 that would be considered subprime, although Aurora did not label them as subprime.

226.   Other witnesses describe the poor underwriting procedures at Aurora, as the emphasis was on volume rather than quality.   According to CW5, Lehman put strategic supervisors in place at Aurora, including Lehman employee Mark Golan ("Golan"), who spearheaded Aurora's repurchase area, called the Contract Administration area.  Golan and management had a sales mentality, however, and did not want to cut off too much business.  CW5 recalled how Golan stormed out of a meeting and yelled at the vice president of special investigations, loud enough for everyone in the vicinity to hear: "Your people find too much fraud!"  According to CW5, Aurora focused on increasing loan volume regardless of the quality of the loans, particularly for its strategic partners.

227.   CW5 confirmed that Aurora's strategic partners received preferential treatment. The loans of these correspondents were not carefully reviewed because of the volume of loans that these companies provided and their perceived financial stability.  For example, given the quantities, quality control could only examine a small percentage of the total loans sent.  If quality control discovered bad loans, Aurora simply shipped those loans back, but did not examine the remaining pool of loans given the volume.  This increased the likelihood of retaining problem loans from correspondents.  CW15 stated that Aurora would buy loans, filtered through Lehman, that they did not review, and some were outside of Aurora's guidelines.

228.   According to both CW3 and CW4, Lehman and Aurora were very slow to raise their underwriting guidelines; slower than the rest of the industry.  CW3 observed that Aurora only seriously tightened its guidelines in the late spring of 2007, after other lenders had already made these changes.

229.   As the securitization markets dried up, Lehman was unable to sell its Alt-A related holdings, and Lehman amassed large amounts of Alt-A mortgages and mortgage-backed assets on its books.  Lehman's Alt-A loans and securities declined in value prior to and during the Class Period, but Lehman failed to disclose the values of these assets and the risk of loss associated with them.  Indeed, until its first quarter 2008 Form 10-Q, Lehman's SEC filings did not even include the term "Alt-A."

230.   Even when it began including Alt-A holdings in its financials, Lehman lumped together its supposedly Alt-A holdings with prime holdings into a single category labeled "Alt-A/Prime."  Lehman's SEC filings described its Alt-A loans as having creditworthiness close to prime: "The Company generally defines U.S. Alt-A residential mortgage loans as those associated with borrowers who may have creditworthiness of 'prime' quality but may have traits

that prevent the loans from qualifying as 'prime.'  Those traits could include documentation deficiencies related to the borrowers' income disclosure, referred to as partial or no documentation; or the underlying property may not be owner-occupied despite full or lower documentation of the borrowers' income levels."

231.    When, on September 10, 2008, Lehman pre-released its third quarter 2008 results, and reported a massive $3.9 billion loss, as well as $7.8 billion in additional gross writedowns on its residential and commercial real estate holdings, Defendant Lowitt admitted: "The majority of our write-downs were in Alt-A driven by increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges. Unfortunately, there is no correct hedge for Alt-A assets as there is in subprime with ABX."

### 3.    Lehman's Purported Risk Mitigation And Hedging

232.    Lehman failed to disclose that it lacked appropriate risk mitigation procedures.  It also failed to disclose adequate information regarding its hedging activities related to its mortgage-backed assets.  Moreover, Lehman failed to disclose the true risk of loss from its hedging activities.

233.    Lehman was required to disclose all significant concentrations of credit risk arising from all financial instruments:

> [A]n entity shall disclose all significant concentrations of credit risk arising from *all* financial instruments, whether from an individual counterparty or groups of counterparties.  *Group concentrations of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions.*  The following shall be disclosed about each significant concentration:
>
> a. *Information about the (shared)* activity, region, or *economic characteristic that identifies the concentration*

b. ***The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity***

c. The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and ***the nature and a brief description of the collateral or other security supporting those financial instruments***

d. The entity's policy of entering into master netting arrangements to mitigate the credit risk of financial instruments, information about the arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk.[13] (Emphasis added.)

234.    An effective risk management process for investment activities includes, among other things, "the identification, measurement, and reporting of risk exposures."  63 Fed. Reg. 20191, 20194 (Apr. 23, 1998).

235.    At the beginning of the Class Period, Lehman stated in its second quarter 2007 Form 10-Q that the Company actively managed its "mortgage-related positions through dynamic risk management strategies."  As revealed later, this included the use of supposed "economic hedges."  Indeed, by the first quarter of 2008, during the Company's earnings conference call, Defendant Callan falsely reported that "[w]e are very well hedged. . . . [W]e would consider ourselves at this point net short in the residential asset class."

236.    Additionally, in the Company's 2007 fiscal year-end Form 10-K, Lehman stated that a "comprehensive risk management structure" existed with several risk control processes in

---

[13]  FAS 107, *Disclosures About Fair Value of Financial Instruments* ("FAS 107"), as amended by FAS 133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133").

place to document "risk capacity and tolerance levels" and to "monitor and enforce" adherence to risk control policies. Further, Lehman stated that the Company measured "quantifiable risks using methodologies and models based on tested assumptions" and that it identified emerging risks through monitoring of "portfolios, new business development, unusual or complex transactions and external events and market influences."

237. Moreover, Lehman's Executive Committee reviewed "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed." And, the Committee "allocates the usage of capital to each of our businesses and establishes trading and credit limits for counterparties." Despite this, Lehman and the Insider Defendants failed to disclose the true risk of loss associated with Lehman's mortgage-related positions.

238. In fact, Lehman employees working in the Company's fixed income business disagreed with Lehman's public statements regarding its risk management and exposure to mortgage-related assets. CW16 described how Lehman employees were "skeptical" of Lehman's announcements that it was well-positioned and well-hedged to withstand a housing downturn, especially given large numbers of layoffs at Lehman's mortgage originators, BNC and Aurora. CW16 worked for Lehman from 2000 to 2008, first as an analyst in the Fixed Income Analytics Division and then in the Fixed Income Research Group, rising to vice president.

239. High ranking employees, including senior risk managers, also raised concerns over the Company's risk management and exposure to mortgage-related investments, both prior to and during the Class Period. Lehman ousted certain senior risk managers from their positions after they raised concerns regarding Lehman's risk management and mortgage-related holdings. For example, as reported by *Bloomberg Markets*, "Lehman on the Brink," both Michael Gelband ("Gelband"), head of Lehman's Fixed Income Division, and Madelyn Antoncic ("Antoncic"),

Lehman's Chief Risk Officer, were "pushed aside" after they "urged caution" with respect to Lehman's mortgage positions. Indeed, *Bloomberg Markets* reported that Mr. Gelband left Lehman's Fixed Income Division in May 2007 to become head of Global Markets after he "balked at taking more risk." In September 2007, Lehman removed Antoncic as Chief Risk Officer and reassigned her to a government relations position within the Company. Lehman continued its issuance and investment in mortgage-backed securities even after these risk concerns were raised.

240.    Further, Lehman failed to disclose that its hedging activities could not mitigate, and could actually *increase*, its exposure to mortgage-related losses. While Lehman's competitors wrote down net billions of dollars in their mortgage-related assets, Lehman and the Insider Defendants instead promoted their ability to avoid losses due to superior use of so-called "economic hedges" and focused investors on writedowns net of hedging gains as opposed to gross mortgage writedowns. Insider Defendants did not disclose any information on writedowns in the second quarter of 2007, or on gross writedowns in their third quarter 2007 Form 10-Q. Indeed, even when specifically asked on September 18, 2007, for a simple breakdown of the gross versus net writedowns (offset by hedges) associated with the mortgage assets, Defendant O'Meara refused to provide the information and instead emphasized that net writedowns were the relevant figures for investors: "[K]nowing the gross numbers particularly in that business, I don't think is really a meaningful thing."

241.    Insider Defendants failed to describe adequately the financial instruments used to hedge mortgage-backed assets. Insider Defendants also failed to disclose the dollar amounts and percentage of mortgage assets hedged. Further, Insider Defendants failed to disclose the risk that the "hedges" could cause a loss at the same time that the hedged assets decreased in value. Thus,

Lehman investors faced an undisclosed risk, which materialized at the end of the Class Period, that Lehman's "economic hedges" would actually increase the loss associated with the Company's mortgage-related positions. Lehman's "economic hedges," rather than offset mortgage-related losses, increased the loss from those assets by an additional $700 million dollars in the second quarter of 2008.

242.   Additionally, as noted above, Lehman amassed a significant amount of what it characterized as Alt-A mortgage assets and only admitted near the end of the Class Period that these assets could not be hedged.

### 4.   Lehman Pushed Mortgage Assets To Level 3

243.   As noted above, Level 3 assets are valued at the discretion of management based on internal modeling, as opposed to market data.

244.   Improperly categorizing assets as Level 3 is a means of manipulating valuation. Consistent with the failure to write down overvalued mortgage-related assets, Lehman increasingly transferred Level 2 assets to Level 3 during the Class Period. According to Brad Hintz, a research analyst at Sanford C. Bernstein & Co. LLC and the CFO at Lehman several years prior to the Class Period, Level 3 valuations for securities are "best guesses, not disciplined by actual market data." Improperly categorizing assets as Level 3 is a means of falsifying valuation.

245.   Observable pricing information regarding mortgage-related assets includes, for example, the ABX – which Lehman assisted in creating – and the analogous CMBX. According to the AICPA's October 3, 2007, White Paper, "Measurements Of Fair Value In Illiquid (Or Less Liquid) Markets":

> Level 2 inputs also include inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs). For example, the pricing indicated by the ABX credit

derivative index for subprime mortgage bonds may be a Level 2 input when used as an input to the valuation of a security backed by subprime mortgage loans.

246.    Notably, the AICPA White Paper from October 3, 2007, reiterates that it is not "appropriate to disregard observable prices, even if that market is relatively thinner as compared to previous market volume.  Even if the volume of observable transactions is not sufficient to conclude that the market is 'active,' such observable transactions would still constitute Level 2 inputs that must be considered in the measurement of fair value."

247.    The ABX showed significant deterioration in the value of subprime RMBSs throughout 2007, and the CMBX indicated increasing risk of default in CMBSs.  At the same time, Lehman's Level 3 inventory increased dramatically during the Class Period.  The percentage of Level 3 assets net of derivative liabilities in Lehman's inventory was 7.55% at the end of the first quarter of 2007, and rose to 8.48%, 12.74%, and 14.98% for the remaining quarters of fiscal 2007.  It further rose to 15.1% and 17.01% in the first two quarters of 2008.

248.    Moreover, during the third quarter of 2007, Lehman dramatically increased the percentage of its mortgage and asset-backed securities categorized as Level 3:

| LEHMAN'S MORTGAGE AND ASSET-BACKED SECURITIES CATEGORIZED AS LEVEL 3 (includes securitizations accounted for as secured financings under FAS 140) | | | | |
|---|---|---|---|---|
| Quarter Ended | Total Mortgage and Asset-Backed Securities ($ millions) | Mortgage and Asset-Backed Securities in Level 3 ($ millions) | Percent Categorized as Level 3 | Total Net Level 3 Assets ($ millions) |
| 2Q07 | 79,634 | 9,932 | 12.5% | 20,839 |
| 3Q07 | 88,007 | 22,746 | 25.9% | 32,437 |
| 4Q07 | 89,106 | 25,194 | 28.3% | 38,884 |
| 1Q08 | 84,609 | 23,812 | 28.1% | 40,205 |
| 2Q08 | 72,461 | 20,597 | 28.4% | 37,911 |

249.    As shown in the chart above, in the third quarter of 2007, Level 3 mortgage assets increased to almost $23 billion from $9.9 billion.  Of this increase, more than $9 billion were assets that were reclassified as Level 3 during that quarter.

250.    As discussed above, however, observable market data indicated that the mortgage and mortgage-related financial instruments were experiencing deteriorating financial conditions, as exhibited by, among other things, the record high default levels.  A "reduction in liquidity in the capital markets" or a "decline in global trading activity" did not provide legitimate justification to transfer such assets to Level 3.

251.    Lehman dramatically increased its Level 3 assets during the Class Period due to purported declines in pricing visibility.   In other contexts, however, Insider Defendants acknowledged significant visibility.  For example, on December 13, 2007, Defendant O'Meara stated, with respect to Lehman's writedowns during the quarter:

> They're certainly in there and significant.  Alt-A across the capital structure.
> Each of these in terms of how these market values are established, there are at the
> top of the capital structure, particularly in AAA in both prime and subprime, there
> is market discovery.  So there are transactions being executed in the AAA space.
> As you move down the capital structure, there aren't transactions being executed,
> maybe there are some, but it's not as visible and not as much information on it
> and so the way to model them out is you have to default to the information that is
> visible which is the index trading around ABX in the different parts of the capital
> structure for ABX and so those inputs or that information around the ABX is used
> to price out the cash products in the bottom parts of the capital structure.  ***But
> there are some trades being done.  We've got good visibility into them.***
>
> There are many of them that are being done because we're around them.  We're
> either participating in them or we're having a look at them.  For the most part.
> And so we do have intelligence around the pricing information for these
> instruments.

(Emphasis added.)

252.    On February 6, 2008, Defendant Callan stated: "The interesting thing about the Commercial mortgage market is there's still an active B piece in mez class buyer base.  So, there's an active risk-taking buyer base that hasn't changed; pension funds, insurance funds, who always do their old fashioned good real estate due diligence.  So in virtually all the cases, we can sell off what we consider the risk classes of these deals."

253.   On March 18, 2008, Defendant Callan stated: "[W]e began to see a lot more transparency in the alt-A sector late in the quarter, allowing us to mark positions based on observable prices, much less use of models."   Callan explained: "People are familiar with the developments around the Peloton fund and really create a lot of market transparency.   And this included loans as well as securities across the cap structure.   In Europe there's a more liquid derivative market evolving, which is providing us a better basis to value those positions."

254.   Also on March 18, 2008, Defendant Callan stated that, during the quarter "[w]e saw a great opportunity in what happened with alt-A pricing, around the Peloton fund, execution, transactions around that situation" and that Lehman marked its portfolio down accordingly. Callan further commented that "there was so much transparency around the Peloton situation, with respect to the alt-A assets."

255.   On June 16, 2008, Defendant Fuld confirmed Defendant Callan's earlier statements that Lehman "had the benefit of much greater price visibility, due to the number of assets that were sold, especially in the commercial and residential mortgage area."

256.   Defendant Lowitt also stated on June 16, 2008, that, "[a]lthough certain sectors of the markets are currently distressed, there has been recent sales activity in many asset classes, allowing us to benchmark prices.   The strong flows we've seen over the past quarter have given us very good transparency in the marks we have against our remaining positions."   Lowitt further stated that residential mortgage asset sales of approximately $11 billion and purchases of approximately $6 billion of product this quarter, across the capital structure and across loan types including Alt-A and subprime, gave Lehman "good transparency in our pricing."

257.   Defendant Lowitt further stated on June 16, 2008, that, "[w]e've had a lot of transparency in the residential space, in the commercial space, as a result of all the sales" and

that "we have seen a huge amount of flow through all of those different categories and that's what's provided the information that we needed in order to mark them to where the market is currently trading and the fact that there's so much flow going through gives you a sense of the markets are in fact trading and there is great price transparency around those and we are marked to what that set of data is telling us."

> **5.      Lehman's Overstated Real Estate
> And Mortgage-Related Holdings Prevent
> A Sale Of The Company In September 2008**

258.    During 2008, the Insider Defendants unsuccessfully attempted to sell Lehman, or certain of its assets, several times.  In conjunction with management's attempts to sell the Company, various Wall Street executives reviewed Lehman's real estate portfolio, as reported in *The Wall Street Journal* on October 6, 2007.  The executives believed the portfolio to be overvalued by billion of dollars.  Further, according to *The Wall Street Journal*, in the days before filing for bankruptcy, Lehman tried to sell its commercial holdings to various banks, including Goldman Sachs, Credit Suisse, Barclays PLC, and Bank of America, but all declined to buy the portfolio.  According to *The Wall Street Journal*, Wall Street executives estimated that Lehman's $32.6 billion in commercial real estate holdings was overvalued by as much as 35%. Media reports indicated that Mark Walsh – the head of Lehman's Global Real Estate Group – faced hostile questions regarding Lehman's valuation of its commercial assets.

259.    Moreover, according to a Lehman document reviewed by *The Wall Street Journal*, Lehman "marked" some European securities backed by real estate loans at 97.9% of par value, or nearly 98 cents on the dollar.  Lehman valued similar U.S. assets at 56 cents on the dollar, even though the European market for such securities has declined as well.

260.    Further demonstrating the overstated value of Lehman's assets, Federal Reserve Chairman Bernanke stated on October 15, 2008, that the government could not lend money to

Lehman and prevent its bankruptcy because the Company lacked sufficient collateral.  Treasury Secretary Paulson corroborated Chairman Bernanke's reason as to why the government was unable to lend to Lehman when, during an October 23, 2008, interview with *The New York Times*, he stated that the value of Lehman's assets created "a huge hole" on the Company's balance sheet.

### D.      Lehman's Collapse And Bankruptcy

#### 1.      September 10, 2008 Pre-Release Of Financial Results

261.    On September 9, 2008, Lehman issued a press release announcing that it was accelerating the release of its third quarter earnings results.  Specifically, Lehman stated that it "will announce its expected third quarter fiscal 2008 results as well as key strategic initiatives for the Firm on Wednesday, September 10, 2008 in a press release that will be issued at approximately 7:30 a.m." and that "[a] conference call to discuss the Firm's expected financial results, outlook and strategy will be held at 8:00 a.m. ET that day."

262.    On September 10, 2008, Lehman pre-released its third quarter 2008 results and reported a $3.9 billion loss, as well as another ***$7.8 billion in gross writedowns including $7 billion on its residential and commercial real estate holdings***.  In addition, the release stated that strategic sales of majority stakes in business components would "enhance the Firm's already strong capital base."

263.    The Company also held a conference call on September 10, 2008, in connection with its pre-released third quarter 2008 financial results.  During the conference call, Defendant Fuld stated that the "decisions announced today will best protect the core client franchise, and create a very clean, liquid balance sheet."  Defendant Lowitt went on to state that Lehman remained liquid:

I'll now provide an update on ***our liquidity position which remains very strong.***

*We have maintained our strong liquidity and capital profiles even in this difficult environment and the potential sale of IMD further improves our capital position.*

Even under the scenario of limited debt issuing capacity in 2009 we anticipate that core Lehman will have ample cash capital to sustain its business opportunities.

No, I think that – we think that clearly with out capital position at the moment is, it's strong.  (Emphasis added.)

264.    Mike Mayo, a Deutsche Bank AG bank analyst, asked whether Lehman would need to raise $4 billion as part of the plan.  Defendant Lowitt, replied: "We don't feel that we need to raise that extra amount."  Further, Lowitt said: "Our capital position at the moment is strong."

265.    As for the $7 billion writedowns in residential and commercial mortgages, Defendant Lowitt admitted that "[t]he majority of our write-downs were in Alt-A driven by [an] increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges.  *Unfortunately, there is no correct hedge for Alt-A assets* as there is in subprime with ABX." (Emphasis added.)

266.    As reported by *The Wall Street Journal* on October 6, 2008, however, Lehman executives had calculated before September 9, 2008, that the Company would need at least $3 billion in additional capital, and outside bankers advised Lehman not to hold the September 10 conference call because of these financing questions.

267.    In addition, Steven Black, co-CEO of JPMorgan's investment bank, phoned Defendant Fuld on September 9 before the conference call, and again on September 11, and stated that JPMorgan needed $5 billion in additional collateral to cover lending positions.  Jane Buyers Russo, head of JPMorgan's broker-dealer unit, also phoned Lehman's treasurer, Paolo Tonucci, and told him Lehman would have to turn over $5 billion in collateral that JPMorgan

had asked for days earlier, according to *The Wall Street Journal*. Fulfilling the request temporarily froze Lehman's computerized trading systems and nearly left Lehman with insufficient capital to fund its trading and other operations.

### 2. September 15, 2008 Bankruptcy Filing

268. Just four days after the September 10 conference call, before the markets opened, Lehman filed for bankruptcy protection. Lehman's bankruptcy is the largest in U.S. history, with over $613 billion in listed debt (over two times the size of the next largest bankruptcy) and over 100,000 creditors.

269. On October 7, 2008, *The Wall Street Journal* reported that the F.B.I. is investigating whether Lehman and its management misled investors before its bankruptcy filing on September 15, 2008. According to *The Wall Street Journal*, the U.S. Attorney's Offices for the Southern and Eastern Districts of New York, and for the District of New Jersey, are also probing whether Lehman overvalued its real estate assets, misled investors concerning the Company's financials in connection with its equity offerings in June 2008, and misled investors by misrepresenting the Company's financial condition during the conference calls with analysts and investors. Further, government investigators have issued subpoenas to individuals concerning Lehman's representations to investors and valuations regarding approximately $32.6 billion in commercial real estate holdings. Defendants Fuld and Callan, Mark Walsh, former managing director and head of Lehman's Global Real Estate Group, as well as several Wall Street analysts, have been subpoenaed.

### E. Summary Of Lehman's Securities Offerings

270. The Securities Act claims are brought on behalf of investors who purchased Lehman equities or bonds in or traceable to the following offerings:

| PREFERRED STOCK OFFERINGS | | | |
|---|---|---|---|
| **DATE** | **SECURITY (CUSIP)** | **VOLUME** | **PRICE** |
| February 5, 2008 (the "Series J Offering") | 7.95% Non-Cumulative Perpetual Preferred Stock, Series J (the "Series J Shares") (52520W317) | 75.9 million depositary shares representing 759,000 Series J Shares[14] | $25 per Series J depositary share, or $2,500 per Series J Share |
| April 4, 2008 (the "Series P Offering") | 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P (the "Series P Shares") (52523J453) | 4 million Series P Shares | $1,000 per Series P Share |
| June 12, 2008 (the "Series Q Offering") | 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series Q (the "Series Q Shares") (52520W218) | 2 million Series Q Shares | $1,000 per Series Q Share |

| COMMON STOCK OFFERING | | |
|---|---|---|
| **DATE** | **VOLUME** | **PRICE** |
| June 9, 2008 (the "June 9 Common Offering") | 143 million shares of common stock | $28 per share |

| BOND OFFERINGS | | |
|---|---|---|
| **DATE** | **SECURITY (CUSIP)** | **VOLUME** |
| May 9, 2008 (the "May 9 Offering") | 7.50% Subordinated Notes Due 2038 (5249087N4) | $2 billion |
| April 24, 2008 (the "Apr. 24 Offering") | 6.875% Notes Due 2018 (5252M0FD4) | $2.5 billion |
| February 20, 2008 (the "Feb. 20 Offering") | 3.19% Notes Due 2009 (5252M0DY0) | $300 million |
| January 22, 2008 (the "Jan. 22 Offering") | 5.625% Notes Due 2013 (5252M0BZ9) | $4 billion |

---

[14] In addition to the 66 million depositary shares sold on the offering, an additional 9.9 million depositary shares were sold pursuant to an over-allotment completed on February 12, 2008.

| January 14, 2008<br>(the "Jan. 14 Offering") | 3.16% Notes Due 2009<br>(5252M0BW6) | $300 million |
|---|---|---|
| December 21, 2007<br>(the "Dec. 21 Offering") | 6.75% Subordinated Notes Due 2017<br>(5249087M6) | $1.5 billion |
| September 28, 2007<br>(the "Sept. 28 Floating 1<br>Offering") | 2.65% Notes Due 2009<br>(524908X54) | $400 million |
| September 28, 2007<br>(the "Sept. 28 Floating 2<br>Offering") | 2.65% Notes Due 2009<br>(52520WDK4) | $272.2 million |
| September 28, 2007<br>(the "Sept. 28 Floating 3<br>Offering") | 2.65% Notes Due 2008<br>(52520WDF5) | $175 million |
| September 28, 2007<br>(the "Sept. 28 2.63% Offering") | 2.63% Notes Due 2008<br>(524908X21) | $100 million |
| September 27, 2007<br>(the "Sept. 27 Floating 1<br>Offering") | 2.97% Floating Rate LIBOR Notes Due<br>2009 (Extendable to 2013)<br>(524908W97) | $1.135 billion |
| September 27, 2007<br>(the "Sept. 27 Floating 2<br>Offering") | 2.97% Notes Due 2009<br>(524908S27) | $465 million |
| September 27, 2007<br>(the "Sept. 27 2.99% Offering") | 2.99% Notes Due 2008<br>(524908R77) | $320 million |
| September 26, 2007<br>(the "Sept. 26 6.2% Offering") | 6.2% Notes Due 2014<br>(52517P5X5) | $2.25 billion |
| September 26, 2007<br>(the "Sept. 26 7% Offering") | 7% Notes Due 2027<br>(52517P5Y3) | $1 billion |
| August 30, 2007<br>(the "Aug. 30 2.57% Offering") | 2.57% Notes Due 2008<br>(52517P5H0) | $175 million |
| August 30, 2007<br>(the "Aug. 30 2.84% Offering") | 2.84% Notes Due 2008<br>(52517P5E7) | $250 million |
| August 30, 2007<br>(the "Aug. 30 2.83% Offering") | 2.83% Notes Due 2008<br>(52517P5D9) | $590 million |
| August 30, 2007<br>(the "Aug. 30 2.81% Offering") | 2.81% Notes Due 2008<br>(52517P5C1) | $220 million |
| August 28, 2007<br>(the "Aug. 28 4.48% Offering") | 4.48% Notes Due 2022<br>(52517P4Z1) | $750 million |
| August 27, 2007<br>(the "Aug. 27 2.49% Offering") | 2.49% Notes Due 2008<br>(52517P5A5) | $100 million |
| July 19, 2007<br>(the "July 19 6.5% Offering") | 6.5% Subordinated Notes Due 2017<br>(524908R36) | $2 billion |

| July 19, 2007 (the "July 19 6% Offering") | 6% Notes Due 2012 (52517P4C2) | $1.5 billion |
|---|---|---|
| July 19, 2007 (the "July 19 6.875% Offering") | 6.875% Subordinated Notes Due 2037 (524908R44) | $1.5 billion |

271.    The above-listed offerings of Lehman equities and Lehman bonds are referred to collectively herein as the "Offerings."

272.    Each of the Offerings was conducted pursuant to the shelf registration statement dated May 30, 2006, and filed with the SEC pursuant to Form S-3 ("Shelf Registration Statement"), a prospectus dated May 30, 2006 (the "2006 Prospectus"), and either a prospectus supplement or pricing supplement issued in connection with that Offering.  As to each Offering, the Shelf Registration Statement, 2006 Prospectus, and the prospectus or pricing supplement for that Offering are referred to collectively as the "Offering Materials."

273.    As discussed below, the Offering Materials incorporated by reference documents that contain materially false and misleading statements.  Accordingly, as to each Offering, the Offering Materials contained untrue statements and omissions of material fact.

**F.**    **The False And Misleading Offering Materials**

274.    The Securities Act Defendants are liable for violations of the Securities Act arising out of the sale of Lehman equities and bonds pursuant to the Offering Materials issued in connection with the Offerings identified above, (¶270) respectively, which were materially false and misleading.  As set forth above, at the time of each of these Offerings, Lehman failed to disclose its massive exposure to losses from its mortgage-related assets and to write down such assets adequately to reflect their true fair value.  This undisclosed exposure directly effected the various SEC filings incorporated in the Offering Materials identified below, rendering them untrue as discussed below in greater detail.

275.     The 2006 Prospectus states that it is part of the Shelf Registration Statement. Because the above Offerings were conducted pursuant to a shelf registration statement, the date of each offering – and not the prior date of the registration statement – is the "effective date" of the Shelf Registration Statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

276.     The 2006 Prospectus also expressly incorporates by reference Lehman's Forms 10-K, 10-Q and 8-K that were filed with the SEC prior to the date of every Offering conducted pursuant to the 2006 Prospectus.  Specifically, the 2006 Prospectus states:

> Information that we file after the date of this registration statement and prior to the effectiveness of this registration statement shall be deemed to be incorporated by reference into this prospectus and information that we file later with the SEC will automatically update information in this prospectus.  In all cases, you should rely on the later information over different information included in this prospectus or the prospectus supplement or supplements.  We incorporate by reference . . . any future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 (other than information in the documents or filings that is deemed to have been furnished and not filed).
>
> *   *   *
>
> All documents we file pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and before the later of (1) the completion of the offering of the securities described in this prospectus and (2) the date our affiliates stop offering securities pursuant to this prospectus shall be incorporated by reference in this prospectus from the date of filing of such documents.

277.     Accordingly, on the date of each of the Offerings set forth above, the 2006 Prospectus and Shelf Registration Statement incorporated by reference each of the false and misleading documents filed pursuant to Forms 10-K, 10-Q or 8-K, that had been filed prior to the date of each respective Offering.  As to each such Offering, the false and misleading documents that were incorporated in the Shelf Registration Statement and 2006 Prospectus and which rendered them untrue as of the date of that Offering, are as follows:

| OFFERING | AMOUNT | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS | PARAGRAPH REFERENCE |
|---|---|---|---|
| Series J Offering | $1.8975 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K | ¶¶278-290, 292-302, 304, 306-318 |
| Series P Offering | $4 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K | ¶¶278-290, 292-302, 304, 306-320 |
| Series Q Offering | $2 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | ¶¶278-290, 292-302, 304, 306-330 |
| June 9 Common Offering | $4 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | ¶¶278-290, 292-302, 304, 306-330 |

| OFFERING | AMOUNT | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS | PARAGRAPH REFERENCE |
|---|---|---|---|
| May 9 Offering | $2 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | ¶¶278-290, 292-302, 304, 306-328 |
| Apr. 24 Offering | $2.5 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | ¶¶278-290, 292-302, 304, 306-328 |
| Feb. 20 Offering | $300 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K | ¶¶278-290, 292-302, 304, 306-318 |
| Jan. 22 Offering | $4 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K | ¶¶278-290, 292-302, 304 |
| Jan. 14 Offering | $300 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K | ¶¶278-290, 292-302, 304 |
| Dec. 21 Offering | $1.5 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K | ¶¶278-290, 292-302, 304 |

| OFFERING | AMOUNT | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS | PARAGRAPH REFERENCE |
|---|---|---|---|
| Sept. 28 Floating 1 Offering | $400 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | ¶¶278-290, 292 |
| Sept. 28 Floating 2 Offering | $272.2 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | ¶¶278-290, 292 |
| Sept. 28 Floating 3 Offering | $175 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | ¶¶278-290, 292 |
| Sept. 28 2.63% Offering | $100 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | ¶¶278-290, 292 |
| Sept. 27 Floating 1 Offering | $1.135 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | ¶¶278-290, 292 |
| Sept. 27 Floating 2 Offering | $465 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | ¶¶278-290, 292 |
| Sept. 27 2.99% Offering | $320 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | ¶¶278-290, 292 |
| Sept. 26 6.2% Offering | $2.25 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | ¶¶278-290, 292 |
| Sept. 26 7% Offering | $1 billion | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K | ¶¶278-290, 292 |
| Aug. 30 2.57% Offering | $175 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | ¶¶278-290 |
| Aug. 30 2.84% Offering | $250 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | ¶¶278-290 |
| Aug. 30 2.83% Offering | $590 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | ¶¶278-290 |
| Aug. 30 2.81% Offering | $220 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | ¶¶278-290 |
| Aug. 28 4.48% Offering | $750 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | ¶¶278-290 |
| Aug. 27 2.49% Offering | $100 million | June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | ¶¶278-290 |

| OFFERING | AMOUNT | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS | PARAGRAPH REFERENCE |
|---|---|---|---|
| July 19 6.5% Offering | $2 billion | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | ¶¶278-290 |
| July 19 6% Offering | $1.5 billion | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | ¶¶278-290 |
| July 19 6.875% Offering | $1.5 billion | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | ¶¶278-290 |

## 1.    2Q07 Financial Results

278.    On June 12, 2007, before the market opened, Lehman issued a press release, filed

with the SEC on Form 8-K, announcing its financial results for the quarter ended May 31, 2007

(the "6/12/07 8-K").  The 6/12/07 8-K reported a 25% increase in net revenues to $5.5 billion, a

27% increase in net income to $1.3 billion, and a 31% increase in earnings per share ("EPS") to

$2.21 per diluted common share for the second quarter.  In addition, for the first six months of

2007, the Company reported record net revenues of $10.6 billion, an increase of 19% over 2006.

With respect to the Capital Markets segment, the press release reported net revenues of $3.6

billion, with the Fixed Income division generating $1.9 billion in net revenues, a 14% decrease

from 2006.

279.    On July 10, 2007, Lehman filed with the SEC its Quarterly Report on Form 10-Q

for the quarter ended May 31, 2007 ("2Q07 10-Q"), which Defendant O'Meara signed, reporting

"record net revenues, net income and diluted earnings per share," for the second quarter of 2007.

The 2Q07 10-Q reported net revenue of $5.51 billion, net income of $1.27 billion, net income

applicable to common stock of $1.25 billion, EPS of $2.33 and diluted EPS of $2.21, and

revenue from Principal Transactions of $2.88 billion.

280.    The 2Q07 10-Q also reported total assets for the second quarter of $605.86

billion, comprised, in part, of $285.68 billion in financial instruments and inventory positions

owned.   Of the $285.68 billion in financial instruments and inventory positions owned, the Company reported that $79.63 billion related to mortgages and mortgage-backed positions and $15.89 billion related to real estate held for sale.

281.   With respect to the performance of its Capital Markets segment, the 2Q07 10-Q reported gross revenue of $13.61 billion, net revenue of $3.59 billion, revenue from Principal Transactions of $2.64 billion, Fixed Income revenues of $1.89 billion, income before taxes of $1.35 billion, and Capital Markets segment assets of $595.5 billion.

282.   With respect to the performance of the Capital Markets Fixed Income segment, the 2Q07 10-Q reported "net revenues decreased 14% and 6% for the three and six months, respectively, compared to the corresponding 2006 periods," but stated that the Company "continue[d] to actively risk manage [its] mortgage-related positions through dynamic risk management strategies."

283.   The 2Q07 10-Q also reported that Lehman had certain internal control measures in place to monitor and limit risk:

> We utilize a number of risk measurement methods and tools as part of our risk management process.  One risk measure that we utilize is a comprehensive risk measurement framework that aggregates market event risk and counterparty risks. Market event risk measures the potential losses beyond those measured in market risk such as losses associated with a downgrade for high quality bonds, defaults of high yield bonds and loans, dividend risk for equity derivatives, deal break risk for merger arbitrage positions, defaults for mortgage loans and property value losses on real estate investments.  Utilizing this broad risk measure, our average risk for the three months ended May 31, 2007 resulted in a comparative increase from the three months ended February 28, 2007 and November 30, 2006.  The comparative increases in this broad risk measure are largely attributable to growth in the Company's business activities across all business segments and general credit spread movements in the market during the period.

284.   The 2Q07 10-Q also reported that Lehman's "Financial instruments and other inventory positions owned . . . are presented at fair value."  In addition, the 2Q07 10-Q stated:

Fair value is defined as the price at which an asset or liability could be exchanged in a current transaction between knowledgeable, willing parties.  Where available, fair value is based on observable market prices or parameters or derived from such prices or parameters.  Where observable prices or inputs are not available, valuation models are applied.  These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity.  The valuation process to determine fair value also includes making appropriate adjustments to the valuation model outputs to consider risk factors.

Beginning December 1, 2006, assets and liabilities recorded at fair value in the Consolidated Statement of Financial Condition are categorized based upon the level of judgment associated with the inputs used to measure their fair value.

\* \* \*

An asset or a liability's characterization within the fair value hierarchy is based on the lowest level of significant input to its valuation.

285.    In Note 3 to the Consolidated Financial Statements presented in the 2Q07 10-Q, Lehman reported that the Company carried $79.63 billion in mortgages and mortgage-backed positions on its books.  Of this total, Note 4 to the 2Q07 10-Q indicated that $24 million were classified as Level 1 assets, $69.67 billion as Level 2 assets, and $9.93 billion as Level 3 assets. Lehman further reported that $119 million of its Level 2 liabilities related to mortgages and mortgage-backed positions.

286.    Lehman also reported that $96 million of its Level 3 mortgages and mortgage-related assets related to net transfers into Level 3 during the second quarter, while $241 million related to realized gains and $459 million related to unrealized losses incurred in connection with these positions during the second quarter.  For the six months ended May 31, 2007, the Company reported net transfers into Level 3 of $234 million, realized gains of $429 million and unrealized losses of $585 million.

287.    Additionally, the 2Q07 10-Q reported a $9.1 billion investment grade interest in residential mortgage securitizations, a $1.7 billion non-investment grade interest in residential mortgage securitizations and a $600 million interest in other securitizations at quarter end.

Lehman further noted that $5.2 billion of its investment grade interests related to "agency collateralized mortgage obligations."

288.   The 2Q07 10-Q also contained certifications by Defendants Fuld and O'Meara who stated therein:

I [Fuld/O'Meara], certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Lehman Brothers Holdings Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual

report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

289.    The 2Q07 10-Q also contained certifications executed by Defendants Fuld and

O'Meara pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1350

("SOX"), wherein each stated:

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), I, [Fuld/O'Meara], certify that:

1. The Quarterly Report on Form 10-Q for the quarter ended May 31, 2007 (the "Report") of Lehman Brothers Holdings Inc. (the "Company") as filed with the Securities and Exchange Commission as of the date hereof, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

290.    The 2Q07 10-Q also stated the following regarding managements' assessment and

the effectiveness of the Company's internal disclosure controls and procedures:

Our management, with the participation of the Chairman and Chief Executive Officer and the Chief Financial Officer of Holdings (its principal executive officer and principal financial officer, respectively), evaluated our disclosure controls and procedures as of the end of the fiscal quarter covered by this Report.

Based on that evaluation, the Chairman and Chief Executive Officer and the Chief Financial Officer have concluded that, as of the end of the fiscal quarter covered by this Report, our disclosure controls and procedures are effective to ensure that information required to be disclosed by Holdings in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported

within the time periods specified in the SEC's rules and forms, and include controls and procedures designed to ensure that information required to be disclosed by Holdings in such reports is accumulated and communicated to our management, including the Chairman and Chief Executive Officer and the Chief Financial Officer of Holdings, as appropriate to allow timely decisions regarding required disclosure.

There was no change in our internal control over financial reporting that occurred during the fiscal quarter covered by this Report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

291.    The foregoing statements in ¶¶278-290 contained untrue statements of material facts and omitted to state material facts for the reasons set forth above in § V.C.1-4.   The Securities Act Defendants also failed to disclose Lehman's exposure to losses associated with Lehman's mortgage-related positions and failed to adequately write down such assets to reflect their true value in the second quarter of 2007.  Moreover, the Securities Act Defendants failed to disclose that certain mortgage-related assets, including Alt-A mortgages, could not be effectively hedged to mitigate losses, and that Lehman's hedging activities exposed investors to additional losses.

### 2.    3Q07 Financial Results

292.    On September 18, 2007, before the market opened, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for the quarter ended August 31, 2007 ("9/18/07 8-K").  The 9/18/07 8-K reported, *inter alia*, net income of $887 million, diluted earnings per common share of $1.54, and net revenues of $4.3 billion.  For the first nine months of 2007, the Company reported record net income of $3.3 billion, or $5.71 per diluted common share.  The 9/18/07 8-K also reported Capital Markets net revenues of $2.4 billion for the third quarter, of which Fixed Income contributed $1.1 billion in revenues, a 47% decrease from the third quarter of 2006.  The 9/18/07 8-K went on to state that "[w]ithin Fixed Income Capital Markets, the Firm recorded very substantial valuation reductions, most significantly on leveraged

loan commitments and residential mortgage-related positions.  These losses were partially offset by large valuation gains on economic hedges and other liabilities.  The result of these valuation items was a net reduction in revenues of approximately $700 million."

293.    On October 10, 2007, Lehman filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended August 31, 2007 ("3Q07 10-Q").  The 3Q07 10-Q was signed by Defendant O'Meara.  The 3Q07 10-Q contained management's certifications of the Company's financial statements and internal controls over financial reporting, as well as those certifications required pursuant to SOX.  These certifications were substantially similar to those set forth above at ¶¶288, 289 and were signed by Defendants Fuld and O'Meara.  The 3Q07 10-Q also contained statements concerning the Company's risk management and management's evaluation and the effectiveness of the Company's internal disclosure controls, substantially similar to those set forth above at ¶290.

294.    In the 3Q07 10-Q, the Company reported net revenue of $4.3 billion, net income of $0.8 billion, net income applicable to common stock of $0.87 billion, EPS of $1.61 and diluted EPS of $1.54.  In addition, the Company reported revenue from Principal Transactions of $1.61 billion.

295.    With respect to the performance of its Capital Markets segment, Lehman reported third quarter 2007 gross revenue of $12.8 billion, net revenue of $2.4 billion, revenue from Principal Transactions of $1.3 billion, Fixed Income revenues of $1.0 billion, and Capital Markets segment assets of $648.2 billion.

296.    Additionally, the 3Q07 10-Q reported that its Principal Transactions revenues decreased 28%, "with the decrease quarter over quarter generally attributable to negative

valuation adjustments taken in our Capital Markets segment."  Regarding this decrease, Lehman

further stated:

> Net revenues for our Fixed Income component of our Capital Markets business segment decreased 47% and 19% for the 2007 three and nine months, respectively.  Our Capital Markets—Fixed Income businesses were the most affected by the market dislocations, risk re-pricing and de-levering that swept through the global capital markets during our third quarter.  The adverse changes in the credit markets and continued correction in certain asset-backed security market segments impacted our valuations for certain inventory assets and lending commitments.  We recorded very substantial valuation reductions, most significantly on leveraged loan commitments and residential mortgage-related positions.  ***These losses were partly offset by large valuation gains relating to economic hedges and liabilities.  The impact of these valuation adjustments was a net reduction to revenues in Capital Markets—Fixed Income of approximately $700 million***.

(Emphasis added.)

297.    Like in the 2Q07 10-Q, Lehman represented in the 3Q07 10-Q that it "measure[s]

financial instruments and other inventory positions owned . . . at fair value."

298.    The 3Q07 10-Q also stated:

> Generally, assets and liabilities carried at fair value and included in [Level 3] are certain mortgage and asset backed securities, certain corporate debt, certain private equity investments and certain derivatives.

> Financial assets and liabilities presented at fair value and categorized as Level III are generally those that are marked to model using relevant empirical data to extrapolate an estimated fair value.  The models' inputs reflect assumptions that market participants would use in pricing the instrument in a current period transaction and outcomes from the models represent an exit price and expected future cash flows.  Our valuation models are calibrated to the market on a frequent basis.  The parameters and inputs are adjusted for assumptions about risk and current market conditions.  Accordingly, results from valuation models in one period may not be indicative of future period measurements.  Valuations are independently reviewed by employees outside the business unit and, where applicable, valuations are back tested comparing instruments sold to where they were marked.

> During the 2007 three months, Level III assets increased to 12% of total Financial instruments and other inventory positions owned and measured at fair value, compared to 8% in the trailing quarter.  The increase in Level III assets resulted largely from the reclassification of approximately $9.8 billion of assets previously categorized as Level II assets into the Level III category in the third quarter of

2007.  Reduced liquidity in the capital markets resulted in a decrease in the observability of market prices for certain financial instruments, particularly for mortgage products.

299.    Purportedly in line with the foregoing valuation measurements, the 3Q07 10-Q reported total assets for the quarter of $659.216 billion, comprised, in part, of $302.297 billion in financial instruments and inventory positions owned.  Of the $302.297 billion in financial instruments and inventory positions owned, the Company reported that $88.007 billion related to mortgages and mortgage-backed positions and $20.04 billion related to real estate held for sale.

300.    The 3Q07 10-Q further reported that, of the $88.007 billion in mortgages and mortgage-backed positions recorded as of August 31, 2007, $222 million were classified as Level 1 assets, $65.03 billion as Level 2 assets, and $22.74 billion as Level 3 assets.  The Company also categorized as Level 2 assets $246 million in mortgages and mortgage-backed positions sold but not yet purchased.

301.    Breaking out its Level 3 assets, Lehman reported $1.854 billion in periodic payments, purchases and sales, $9.588 billion in net transfers into Level 3, $213 million in realized gains and $829 million in unrealized losses.  For the nine months ended August 31, 2007, Lehman reported $5.39 billion in Level 3 periodic payments, purchase and sales, $9.57 billion net transfers into Level 3, $687 million in realized gains, and $1.11 billion in unrealized losses.

302.    Additionally, the Company reported retained interests in asset securitizations in the third quarter, stating that, as of August 31, 2007, the Company carried $9.2 billion in retained investment grade interests in residential mortgage securitizations, $1.7 billion in non-investment grade interests in residential mortgage securitizations, and a $3.4 billion retained interest in other securitizations.    The Company further stated that the $3.4 billion exposure "included

101

approximately $3.2 billion of investment grade commercial mortgages and approximately $0.1 billion of non-investment grade commercial mortgages."

303.    The foregoing statements in ¶¶292-302 contained untrue statements of material facts and omitted to state material facts for the reasons set forth above in § V.5.1-4.   The Securities Act Defendants also failed to disclose Lehman's full loss exposure from its mortgage-related investments and failed to write down such assets adequately to reflect their true fair value.   Moreover, the Securities Act Defendants failed to disclose that certain mortgage-related assets, including Alt-A mortgages, could not be effectively hedged to mitigate losses, and that Lehman's hedging activities exposed investors to additional losses.

### 3.    4Q07 Financial Results

304.    On December 13, 2007, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for the fourth quarter and full year ended November 30, 2007 ("12/13/07 8-K").   The 12/13/07 8-K reported net income of $886 million, or $1.54 per common share (diluted), for the fourth quarter of 2007, or decreases of 12% and 10%, respectively, from the fourth quarter of 2006.   The 12/13/07 8-K also reported net revenues of $4.4 billion for the fourth quarter, along with Capital Markets revenues of $2.7 billion, and $860 million in Fixed Income net revenues.   For the 2007 full fiscal year, the Company reported that net income and earnings per diluted common share increased 5% and 7%, respectively, to a record $4.2 billion and $7.26.   The 12/13/07 8-K further stated:

> Fixed Income Capital Markets recorded negative valuation adjustments on trading assets, principally in the Firm's Securitized Products and Real Estate businesses. These valuation adjustments were offset, in part, by valuation gains on economic hedges and liabilities, as well as realized gains from the sale of certain leveraged loan positions, ***resulting in a net revenue reduction in Fixed Income Capital Markets of approximately $830 million.***

(Emphasis added.)

305.     The 12/13/07 8-K was materially false and misleading for the reasons set forth above in § V.5.1-4.  The Securities Act Defendants also failed to disclose Lehman's exposure to loss from its mortgage-related investments and failed to write down mortgage-related assets adequately to reflect their true fair value.  Moreover, the Securities Act Defendants failed to disclose that certain mortgage-related assets, including Alt-A mortgages, could not be hedged to mitigate losses, and that Lehman's hedging activities could result in additional losses.

### 4.     2007 Fiscal Year-End Results

306.     On January 29, 2008, Lehman filed its Annual Report on Form 10-K with the SEC for the fiscal year ended November 30, 2007 ("2007 10-K").  The 2007 10-K was signed by Defendants Fuld, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber.  The 2007 10-K also contained management's certifications of the Company's financial statements and internal controls over financial reporting, as well as those certifications required pursuant to SOX.  These certifications were substantially similar to those set forth above at ¶¶288, 289, and were signed by Defendants Fuld and Callan.  The 2007 10-K also contained statements concerning the Company's risk management and management's evaluation and the effectiveness of the Company's internal disclosure controls, which were substantially similar to those set forth above at ¶290.

307.     In the 2007 10-K, the Company reported net revenue for the 2007 fiscal year of $19.257 billion, including revenues from Principal Transactions of $9.197 billion, net income of $4.192 billion, net income applicable to common stock of $4.125 billion, EPS of $7.63 and diluted EPS of $7.26.

308.     With respect to the performance of its Capital Markets segment in fiscal 2007, Lehman reported gross revenues of $51.897 billion, net revenues of $12.257 billion, revenues

from Principal Transactions of $8.4 billion, Fixed Income revenues of $5.977 billion, income before taxes of $4.199 billion, and segment assets of $680.5 billion.

309.    In discussing the performance of the Company's Capital Markets Fixed Income segment, Lehman reported the following values which "generally contributed to the decline of Capital Markets – Fixed Income revenues in 2007 from 2006":

| Gain/(Loss) in Billions | Gross | Net |
|---|---|---|
| Residential Mortgage-Related Positions | $ (4.7) | $ (1.3) |
| Commercial Mortgage-Related Positions | (1.2) | (0.9) |
| Collateralized Debt and Lending Obligation Positions | (0.6) | (0.2) |
| Municipal Positions | (0.2) | ---- |
| High-Yield Contingent Acquisition Loans and Facilities | (1.0) | (0.4) |
| Valuation of Debt Liabilities | 0.9 | 0.9 |
| **TOTAL** | **$ (6.8)** | **$ (1.9)** |

(Footnotes omitted.)

310.    As in its prior filings with the SEC, Lehman again represented in the 2007 10-K that: "[W]e measure financial instruments and other inventory positions owned . . . at fair value."

311.    The 2007 10-K reported total assets for the 2007 fiscal year of $691.063 billion, financial instruments and inventory positions owned of $313.129 billion, of which the Company stated that $89.106 billion related to mortgages and asset-backed positions.

312.    The 2007 10-K also discussed Lehman's Level 3 assets, making representations substantially similar to those set forth above at ¶¶285, 286, 298, 300, 301.  In addition, the 2007 10-K stated:

> During the 2007 fiscal year, our Level III assets increased, ending the year at 13% of Financial instruments and other inventory positions owned, measured at fair value and with our derivatives on a net basis.  The increase in Level III assets resulted largely from the reclassification of approximately $11.4 billion of mortgage and asset-backed securities, including approximately $5.3 billion in U.S. subprime residential mortgage-related assets, previously categorized as Level II assets into the Level III category.  This reclassification generally occurred in the second half of 2007, reflecting the reduction of liquidity in the capital markets that resulted in a decrease in the observability of market prices.

Approximately half of the residential mortgage-related assets that were classified as Level III at the end of the 2007 fiscal year were whole loan mortgages.  In particular, the decline in global trading activity impacted our ability to directly correlate assumptions in valuation models used in pricing mortgage-related assets, including those for cumulative loss rates and changes in underlying collateral values to current market activity.  Additionally and during the fiscal year, the increase of assets characterized as Level III was also attributable to the acquisition of private equity and other principal investment assets, funded lending commitments that had not been fully syndicated at the end of the fiscal year as well as certain commercial mortgage-backed security positions.

313.    The Company further broke down a portion of its $89 billion position in mortgage and asset-backed securities in the 2007 10-K, as set forth in the chart below:

| In Billions | Nov. 30, 2007 | Nov. 30, 2006 |
|---|---|---|
| Residential and Asset-Backed: | | |
|    Whole Loans | $ 19.587 | $ 18.749 |
|    Securities | 16.488 | 7.923 |
|    Servicing | 1.183 | 0.829 |
|    Other | 0.086 | 0.016 |
|    Total Res. and Asset-Backed | $ 37.344 | $ 27.517 |
| Commercial: | | |
|    Whole Loans | $ 26.200 | $ 22.426 |
|    Securities | 12.180 | 1.948 |
|    Other | 0.588 | 0.351 |
|    Total Commercial | $ 38.938 | $ 24.725 |
| **TOTAL** | **$ 76.282** | **$ 52.242** |

314.    The Company also reported a $5.276 billion exposure to subprime residential mortgages, and stated that $3.226 billion of this exposure related to whole loans, while $1.995 billion related to retained interests in securitizations and $55 million to other subprime exposure.

315.    The 2007 10-K also broke down Lehman's $89.106 billion mortgage exposure into Level 1, Level 2, and Level 3 assets, reporting $240 million in Level 1, $63.672 billion in Level 2, and $25.194 billion in Level 3 assets.  Regarding the losses attributable to Lehman's Level 3 assets, the 2007 10-K stated:

Net revenues (both realized and unrealized) for Level III financial instruments are a component of Principal transactions in the Consolidated Statement of Income.

105

Net realized gains associated with Level III financial instruments were approximately $1.3 billion for the fiscal year ended November 30, 2007. The net unrealized loss on Level III non-derivative financial instruments was approximately $2.5 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized losses from mortgage and asset-backed positions. The net unrealized gain on Level III derivative financial instruments was approximately $1.6 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized gains from equity and interest rate-related derivative positions. Level III financial instruments may be economically hedged with financial instruments not classified as Level III; therefore, gains or losses associated with Level III financial instruments are offset by gains or losses associated with financial instruments classified in other levels of the fair value hierarchy.

316. With respect to its Level 3 asset value during fiscal year 2007, Lehman reported $6.914 billion in net payments, purchases and sales, $11.373 billion in net transfers into Level 3, $995 million in realized gains and $2.663 billion in unrealized losses.

317. The Company also reported $11.3 billion in retained interests in securitizations. Of this total, the Company stated that it retained $7.1 billion in investment grade interests in residential mortgage securitizations, $1.6 billion in non-investment grade interests in residential mortgage securitizations, $2.4 billion in investment grade interests in commercial mortgage securitizations, and $26 million in non-investment grade interests in commercial mortgage securitizations.

318. The 2007 10-K also contained representations concerning Lehman's risk management:

Our goal is to realize returns from our business commensurate with the risks assumed. Our business activities have inherent risks that we monitor, evaluate and manage through a comprehensive risk management structure. These risks include market, credit, liquidity, operational and reputational exposures, among others.

The bases of our risk control processes are:

· We establish policies to document our risk principles, our risk capacity and tolerance levels.
· We monitor and enforce adherence to our risk policies.

·   We measure quantifiable risks using methodologies and models based on
    tested assumptions.
·   We identify emerging risks through monitoring our portfolios, new
    business development, unusual or complex transactions and external
    events and market influences.
·   We report risks to stakeholders.

319.   The foregoing statements in ¶¶306-318 contained untrue statements of material

facts and omitted to state material facts for the reasons set forth above in § V.C.  The Securities

Act Defendants also failed to disclose Lehman's exposure to loss from its mortgage-related

investments and adequately write down mortgage-related assets to reflect their true fair value.

Moreover, the Securities Act Defendants failed to disclose that certain mortgage-related assets,

including Alt-A mortgages, could not be effectively hedged to mitigate losses, and that

Lehman's hedging activities exposed investors to additional losses.

### 5.   1Q08 Financial Results

320.   On March 18, 2008, Lehman issued a press release filed with the SEC on Form

8-K announcing its financial results for the quarter ended February 29, 2008 ("3/18/08 8-K").

The 3/18/08 8-K reported net income of $489 million, or $0.81 EPS, for the quarter, along with

net revenues of $3.5 billion, reflecting "negative mark to market adjustments of $1.8 billion, net

of gains on certain risk mitigation strategies and certain debt liabilities."  Lehman also reported

Capital Markets net revenues of $1.7 billion in the first quarter, a decrease of 52% from the first

quarter of 2007.  In addition, Lehman reported Fixed Income Capital Markets net revenues of

$262 million, a decrease of 88% from $2.2 billion in the first quarter of fiscal 2007.

321.   On April 8, 2008, Lehman filed its quarterly report with the SEC on Form 10-Q

for the 2007 quarter ended February 29, 2008 ("1Q08 10-Q").  Defendant Callan signed the

1Q08 10-Q that included managements' certifications of the Company's interim financial

statements and internal controls over financial reporting, as well as those certifications required

pursuant to SOX, which were substantially similar to those set forth above at ¶¶288, 289, and were signed by Defendants Fuld and Callan.   The 1Q08 10-Q also contained statements concerning the Company's risk management and managements' evaluation and the effectiveness of the Company's internal disclosure controls, substantially similar to those set forth above at ¶290.

322.    In the 1Q08 10-Q, the Company reported net revenues of $3.507 billion, net income of $489 million, net income applicable to common stock of $465 million, EPS of $0.84 and diluted EPS of $0.81.   In addition, the Company reported revenues from Principal Transactions of $773 million.

323.    Moreover, in the 1Q08 10-Q, the Company disclosed total assets of $786.035 billion, financial instruments and inventory positions owned of $326.658 billion.   Of the $326.658 billion in financial instruments and inventory positions owned, the Company disclosed that $84.609 billion related to mortgages and asset-backed positions.

324.    With respect to the performance of its Capital Markets segment, Lehman reported in the 1Q08 10-Q gross revenues of $10.512 billion, net revenues of $1.672 billion, revenue from Principal Transactions of $420 million, Fixed Income revenues of $262 million, income before taxes of $236 million, and Capital Markets segment assets of $774.6 billion.

325.    In the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the 1Q08 10-Q, the Company attributed the reduction in Capital Markets Principal Transactions revenues to approximately $1.8 billion in "negative valuation adjustments made on certain components of Capital Markets inventory."

326.    The 1Q08 10-Q also reported a $4.017 billion exposure to the subprime mortgage market:  $1.295 billion in residential subprime whole loans, $2.692 billion in retained interests in

subprime-backed securitizations, and $30 million in other subprime exposure as of February 29, 2008.

327.    The 1Q08 10-Q also reported that Lehman classified $270 million of its $84.6 billion in mortgage and asset-backed securities as Level 1 assets, $60.527 billion as Level 2 assets, and $23.812 billion as Level 3 assets.  The Company further reported that the quarterly change in its Level 3 assets resulted from $46 million in net payments, purchases and sales, $519 million in net transfers out of Level 3, $83 million in realized gains and $750 million in unrealized losses.  The 1Q08 Form 10-Q further reported net gains (unrealized/realized) of $228 million on Level 3 assets.

328.    In addition, the Company reported the following valuation adjustments to its real estate and mortgage-related positions for the three months ended February 29, 2008:

| Gain/(Loss) in Billions | Gross | Net |
|---|---|---|
| Residential Mortgage-Related Positions | $ (3.0) | $(0.8) |
| Commercial Mortgage-Related Positions | (1.1) | (0.7) |
| Collateralized Debt and Lending Obligation Positions | (0.2) | (0.1) |
| Acquisition Finance Facilities (Funded and Unfunded) | (0.7) | (0.5) |
| Real Estate-Related Investments | (0.3) | (0.3) |
| Valuation of Debt Liabilities | 0.6 | 0.6 |
| **TOTAL** | $ (4.7) | $ (1.8) |

### 6.    2Q08 Financial Results

329.    On June 9, 2008, before the markets opened, Lehman issued a press release filed with the SEC on Form 8-K announcing its financial results for the quarter ended May 31, 2008 ("6/9/08 8-K").  The 6/9/08 8-K reported that Lehman expected a net loss for the quarter of $2.8 billion or $5.14 per share.  The 6/9/08 8-K also disclosed negative net revenues of $0.7 billion, compared with $5.5 billion in net revenues for the second quarter of 2007.  Further, the Company reported that for the first half of 2008, it expected to report a net loss of approximately $2.3 billion, or $4.33 per diluted common share.

330.    The 6/9/08 8-K further reported:

> Net revenues for the second quarter of fiscal 2008 reflect negative mark to market adjustments and principal trading losses, net of gains on certain debt liabilities. Additionally, the Firm incurred losses on hedges this quarter, as gains from some hedging activity were more than offset by other hedging losses.  For the first six months of fiscal 2008, the Firm expects to report net revenues of $2.8 billion, compared to $10.6 billion for the first half of fiscal 2007.

331.    The foregoing statements in ¶¶320-330 contained untrue statements of material facts and omitted to state material facts for the reasons set forth above in § V.C.  The Securities Act Defendants also failed to disclose the risk of loss associated with Lehman's mortgage-related assets and adequately write down mortgage-related assets to reflect their true fair value. Moreover, the Securities Act Defendants failed to disclose that certain mortgage-related assets, including Alt-A mortgages, could not be effectively hedged to mitigate losses, and that Lehman's hedging activities exposed investors to additional losses.

### G.    Underwriting Of The Offerings

332.    The Underwriter Defendants are liable to investors who purchased Lehman equities or bonds in or traceable to the respective offerings each underwrote.  Specifically, the Underwriter Defendants' respective liability for the Offerings is as follows:

| OFFERING | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION) |
|---|---|
| Series J Offering | BOA (8,039,988 shares)[15] <br> CGMI (8,112,456 shares) <br> Merrill Lynch (8,040,120) <br> Morgan Stanley (8,039,988 shares) <br> RBC (990,000 shares) <br> SunTrust (990,000 shares) <br> UBS (8,039,988 shares) <br> Wachovia (8,039,988 shares) <br> Wells Fargo (990,000 shares) |
| May 9 Offering | Cabrera ($20 million) <br> Loop Capital ($20 million) <br> Williams Capital ($20 million) |
| Apr. 24 Offering | BOA ($25 million) <br> BNY ($25 million) <br> CGMI ($25 million) <br> DnB NOR ($25 million) <br> HSBC ($25 million) <br> nabCapital ($25 million) <br> Scotia ($25 million) <br> Sovereign ($25 million) <br> SunTrust ($25 million) <br> TD Securities ($25 million) <br> Wells Fargo ($25 million) <br> Williams Capital ($25 million) |
| Feb. 20 Offering | DZ Financial ($3 million) <br> Harris Nesbitt ($3 million) |
| Jan. 22 Offering | BBVA ($40 million) <br> CGMI ($40 million) <br> Daiwa ($40 million) <br> Mellon ($40 million) <br> SunTrust ($40 million) <br> Wells Fargo ($40 million) |
| Jan. 14 Offering | DZ Financial ($3 million) <br> Harris Nesbitt ($3 million) |
| Dec. 21 Offering | ABN Amro ($15 million) <br> ANZ ($15 million) <br> BBVA ($15 million) |

---

[15] The shares sold by each Underwriter Defendant in the Series J Offering reflect the 66 million depositary shares sold in the initial offering.  On information and belief, each underwriter sold an equivalent percentage of the additional shares sold pursuant to the over-allotment.

| OFFERING | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION) |
|---|---|
| | BNY ($15 million) <br> CGMI ($15 million) <br> CIBC ($15 million) <br> HSBC ($15 million) <br> HVB ($15 million) <br> Mizuho ($15 million) <br> Santander ($15 million) <br> Scotia ($15 million) <br> Siebert ($15 million) <br> SunTrust ($15 million) <br> Wachovia ($15 million) <br> Wells Fargo ($15 million) |
| Sept. 26 6.2% Offering | ANZ ($22.5 million) <br> BBVA ($22.5 million) <br> Cabrera ($22.5 million) <br> CGMI ($22.5 million) <br> Daiwa ($22.5 million) <br> DZ Financial ($22.5 million) <br> Harris Nesbitt ($22.5 million) <br> Mellon ($22.5 million) <br> Mizuho ($22.5 million) <br> Scotia ($22.5 million) <br> Sovereign ($22.5 million) <br> SunTrust ($22.5 million) <br> Utendahl ($22.5 million) <br> Wells Fargo ($22.5 million) |
| Sept. 26 7% Offering | ANZ ($10 million) <br> BBVA ($10 million) <br> Cabrera ($10 million) <br> CGMI ($10 million) <br> Daiwa ($10 million) <br> DZ Financial ($10 million) <br> Harris Nesbitt ($10 million) <br> Mellon ($10 million) <br> Mizuho ($10 million) <br> Scotia ($10 million) <br> Sovereign ($10 million) <br> SunTrust ($10 million) <br> Utendahl ($10 million) <br> Wells Fargo ($10 million) |
| July 19 6.5% Offering | Caja Madrid ($30 million) <br> HSBC ($30 million) <br> HVB ($30 million) |

| OFFERING | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION) |
|---|---|
| | National ($30 million) Santander ($30 million) Societe Generale ($30 million) |
| July 19 6% Offering | Mellon ($30 million) Scotia ($30 million) Williams Capital ($30 million) |
| July 19 6.875% Offering | BBVA ($15 million) BNY ($15 million) CGMI ($15 million) Greenwich ($15 million) RBC ($15 million) SunTrust ($15 million) |

### H.    Causes Of Action Under The Securities Act

### COUNT I

### Violations Of Section 11 Of The Securities Act Against The Securities Act Defendants

333.    This Count is asserted against Defendants Fuld, O'Meara, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, Macomber (the "Securities Act Individual Defendants"), and the Underwriter Defendants (collectively, the "Securities Act Defendants") for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired the securities sold on the Offerings.

334.    The Securities Act Defendants' liability under this Count is predicated on these Defendants' respective participation in the Offerings, which were conducted pursuant to the Shelf Registration Statement.  The Shelf Registration Statement contained untrue statements and omissions of material fact.  This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Securities Act

113

Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

335.    The Shelf Registration Statement contained untrue statements of material fact and omitted other material facts necessary to make the statements not misleading.  The specific documents containing such untrue statements and omissions that were incorporated by reference in the Shelf Registration Statement with regard to each Offering are identified above at ¶277.

336.    Defendants Fuld and O'Meara were executive officers and representatives of the Company who were responsible for the contents and dissemination of the Shelf Registration Statement.  Defendants Ainslie, Akers, Berlin, Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber were directors of Lehman at the time the Shelf Registration Statement became effective as to each Offering.  Further, the Securities Act Individual Defendants signed the Shelf Registration Statement, or documents incorporated by reference, in their capacities as officers or directors of Lehman.  As such, the Securities Act Individual Defendants caused to be issued, and participated in the issuance of the Shelf Registration Statement, which contained untrue statements of material fact and omitted other material facts necessary to make the statements not misleading.  By reasons of the conduct alleged herein, each of these Defendants violated Section 11 of the Securities Act.

337.    As officers and directors of Lehman, the Securities Act Individual Defendants owed to the purchasers of the securities issued in the Offerings the duty to make a reasonable and diligent investigation of the statements contained in the Shelf Registration Statement, and any incorporated documents, at the time it became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue and misleading.  These defendants did not make a reasonable investigation or

possess reasonable grounds to believe that the statements contained in the Shelf Registration Statement were true, without omissions of any material facts, and were not misleading. Accordingly, the Securities Act Individual Defendants acted negligently and are therefore liable to the members of the Class who purchased Lehman equities and bonds sold in the Offerings.

338.     As underwriters of the Offerings, the Underwriter Defendants owed to the purchasers of Lehman preferred shares and bonds the duty to make a reasonable and diligent investigation of the statements contained in the Shelf Registration Statement, and any incorporated documents, at the time it became effective, to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue and misleading.   The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Shelf Registration Statement, or any incorporated documents, were true and without omissions of any material facts and were not misleading.   Accordingly, the Underwriter Defendants acted negligently and are therefore liable to the members of the Class who purchased Lehman preferred shares or bonds sold on the respective Offerings in which each Underwriter Defendant participated.

339.     The members of the Class who acquired Lehman equities or bonds sold on the Offerings did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein and could not have reasonably discovered such facts or conduct.

340.     None of the untrue statements or omissions alleged herein were forward-looking statements but, rather, concerned existing facts.   Moreover, the Defendants named in this Count

did not properly identify any of these statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

341.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that this Complaint was filed asserting claims arising out of the falsity of the Shelf Registration Statement.  Less than three years elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time that this Complaint was filed.

342.    Plaintiffs and the other members of the Class have sustained damages.  The value of the securities sold pursuant to the Offerings has declined substantially subsequent to and due to the Securities Act Defendants' violations of Section 11 of the Securities Act.

343.    By reason of the foregoing, the Securities Act Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Lehman equities or bonds sold on the Offerings pursuant to the Shelf Registration Statement.

## COUNT II

### Violations Of Section 12 Of The Securities
### Act Against The Underwriter Defendants

344.    This Count is asserted against the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Lehman preferred shares or bonds in the Offerings.

345.    The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of Lehman preferred shares and bonds offered pursuant to the 2006 Prospectus and pursuant to the prospectus supplement or pricing supplement issued in connection with each Offering.  The 2006 Prospectus contained untrue statements of material fact and omitted other material facts

necessary to make the statements not misleading, and failed to disclose material facts, as set forth above in the chart provided at ¶277.

346.    The Underwriter Defendants are sellers within the meaning of the Securities Act because they: (a) transferred title to Plaintiffs and other members of the Class who purchased in the Offerings; and (b) solicited the purchase of Lehman preferred shares or bonds by Plaintiffs and other members of the Class, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interests of Lehman, including but not limited to commissions on their own sales of those securities and separate commissions on the sale of those securities by non-underwriter broker-dealers.   The Underwriter Defendants used means and instrumentalities of interstate commerce and the United States mail.

347.    The Underwriter Defendants owed to Plaintiffs and all other purchasers or other acquirers of Lehman preferred shares or bonds in the Offerings the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials with respect to each Offering, to ensure that such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading.  The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained and incorporated by reference in the 2006 Prospectus at the time of each Offering in which they participated were true and without omissions of any material facts and were not misleading.  Accordingly, the Underwriter Defendants are liable to Plaintiffs and the other members of the Class who purchased Lehman preferred shares or bonds in the Offerings in which each Underwriter Defendant participated.

348.    Plaintiffs and other members of the Class purchased or otherwise acquired Lehman preferred shares or bonds in the Offerings pursuant to the materially untrue and

misleading 2006 Prospectus and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the 2006 Prospectus.

349.   Plaintiffs and other members of the Class offer to tender to the Underwriter Defendants those Lehman preferred shares or bonds that the members of the Class purchased on the Offerings and continue to own in return for the consideration paid for those securities, together with interest thereon.

350.   By virtue of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and other members of the Class who purchased Lehman preferred shares or bonds in the Offerings pursuant to the 2006 Prospectus, have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to the Underwriter Defendants who participated in the respective Offerings in which those securities were purchased.  Plaintiffs and the members of the Class who have sold the securities that they purchased in these Offerings are entitled to rescissory damages.

## COUNT III

### Violations Of Section 15 Of The Securities
### Act Against The Securities Act Individual
### Defendants And Defendants Gregory And Lowitt

351.   This Count is asserted against the Securities Act Individual Defendants, as well as Defendants Gregory and Lowitt (collectively, the "Securities Act Control Person Defendants") for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired Lehman equities or bonds sold on the Offerings.

352.   At all relevant times, the Securities Act Control Person Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.

Each of the Securities Act Control Person Defendants served as an executive officer or director of Lehman prior to and at the time of the Offerings.

353.    The Securities Act Control Person Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Lehman's business affairs.  As officers and directors of a publicly owned company, the Securities Act Control Person Defendants had a duty to disseminate accurate and truthful information with respect to Lehman's financial condition and results of operations.  Because of their positions of control and authority as officers or directors of Lehman, the Securities Act Control Person Defendants were able to, and did, control the contents of the Shelf Registration Statement and 2006 Prospectus, which contained materially untrue financial information.

354.    By reason of the aforementioned conduct, each of the Securities Act Control Person Defendants is liable under Section 15 of the Securities Act, jointly and severally, with Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class who purchased Lehman preferred shares or bonds in the Offerings.  As a direct and proximate result of the conduct of Lehman and the Securities Act Control Person Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Lehman securities.

## VI.    VIOLATIONS OF THE EXCHANGE ACT

### A.    The Exchange Act Defendants' Pre-Class Period Statements

355.    On March 14, 2007, Lehman announced its financial results for the first quarter of fiscal 2007, reporting purported "record net revenues in the Capital Markets and Investment Management segments."  According to Defendant Fuld, these "results clearly demonstrate[d] that [Lehman was] better positioned than ever to create value for [its] clients and [its]

119

shareholders."

356.     During a conference call held that same day, Defendant O'Meara echoed Fuld's sentiments, stating that Lehman was "well positioned to benefit from this evolving situation [the dislocations in the mortgage markets] given our experience in this sector as well as our ample liquidity and risk management practices" and that Lehman expected "to see various opportunities as a result of the market dislocations."  O'Meara further commented on the "current dislocations in the subprime mortgage market" and its impact on Lehman's financial results and outlook. Specifically, he disregarded any suggestion that these dislocations were indicative of a widespread crisis, stating (1) that they were merely "consistent with late cycle trends where credit standards and pricing are lowered to maintain volumes when liquidity is ample"; (2) had "been exacerbated by a wave of early payment defaults and more recently the bankruptcy of a number of monoline subprime mortgage lenders"; and (3) that Lehman saw "the subprime challenges as being a reasonably contained situation."  Defendant O'Meara reassured investors that, although Lehman was "not immune to these events, [it] believe[d] [it] ha[d] done a very good job of managing the risks within [its] securitization business including the active hedging strategies [it] employed to mitigate [its] risks."

357.     Defendant O'Meara downplayed Lehman's subprime exposure, stating that it accounted for only a small fraction – less than 3% – of its firm-wide revenues over the past six quarters and that, "[i]n terms of origination, [Lehman] remain[ed] far more active in the prime and Alt-A space which accounted for 75% of [its] origination volumes in the third quarter."

358.     Defendant O'Meara also downplayed any significant impact of subprime delinquencies potentially spreading to the broader market and the economy as a whole. Specifically, he stated that (1) "when you think about the subprime business, itself, it is not

something that's going to itself create a big event in the economy"; (2) "this is reasonably well contained at this point"; and (3) "we're not expecting that this is going to be the catalyst to make a change in the economy."  O'Meara likewise downplayed Lehman's exposure to losses resulting from further market dislocations, stating "it is subject to the same hedging principles that we talked about earlier, and it's been working quite effectively."

359.    Defendant O'Meara also denounced any domino-type "contagion from subprime to other areas of mortgage[s] like prime or Alt-A, stating "[w]e have seen the delinquency rates in Alt-A in the marketplace have ticked up a bit but they are within the expectation range so that they've ticked up is not when some folks think of that as a real big surprise, it's in an expectation range when you model out what the expectations are . . . ."

360.    Defendant O'Meara also assured investors that Lehman's balance sheet was well-protected, stating that it "actively hedged the interest rate and credit components of [its] inventory positions including [its] non-investment grade retained interest in securitizations," "[t]he majority of which are prime mortgage related."  Defendant O'Meara also indicated that Lehman's whole loans were "certainly lower" than they had been prior to the weakening of the subprime market, but that these declines were "factored through in the mark-to-market process, [and had] been taken into consideration."

361.    In response to the foregoing statements, the price of Lehman common stock rose $0.72 per share or 1.01% from its opening price of $71.00 on March 14, 2007, to close at $71.72 that same day on extraordinarily high volume of 22,950,300 shares traded.  Lehman's stock price continued to rise another $1.31 per share or 1.83%, to close at $73.03 on March 15, 2007 on heavy volume of 9,657,900 shares traded.  In total, Lehman shares gained $2.03 or 2.86% between the opening of market on March 14, 2007, and the close of market on March 15, 2007.

B.     **The Exchange Act Defendants' False And
        Misleading Statements During The Class Period**

1.     **2Q07 Financial Results**

362.   On June 12, 2007, Lehman issued a press release announcing its financial results for the quarter ended May 31, 2007, as detailed in ¶278 above.  The statements therein were false and misleading for the reasons set forth above in ¶291.

363.   Further, the Company held a conference call that same day to discuss the foregoing results.  During the conference call, Defendant O'Meara stated, "conditions in the U.S. subprime mortgage business remain challenging during the quarter, although we did see some signs of improvement by the end of the period.  We continue to believe the subprime market challenges are and will continue to be reasonably contained to this asset class."

364.   Despite these "challenging" market conditions and calls for investment banks such as Lehman to be more transparent with their exposure, Lehman failed to disclose the amount of writedowns it took in its mortgage and mortgage-related asset portfolio when it announced its second quarter results on June 12, 2007.

365.   During the conference call, analysts asked Defendant O'Meara about Lehman's subprime and Alt-A exposure, as well as the impact of rising delinquency rates on Lehman's mortgage-backed securities.   For example, Merrill Lynch analyst Guy Moszkowski asked O'Meara whether Lehman's decreased first quarter fixed income revenues were the result of "meaningful marks that [Lehman] might have made in residual positions in subprime or Alt A securitizations."   O'Meara responded and that "while these positions are moving around and being marked on a day to day basis, *we do have hedging strategies that are in place and have proven to be quite effective*."

366.   When asked by Deutsche Bank analyst Mike Mayo to discuss Lehman's subprime and Alt-A mortgage exposure, O'Meara stated only that Lehman "didn't give out what Alt A is or the other businesses inside the securitization business system."

367.   In response to the foregoing statements, the price of Lehman common stock rose $1.24 per share or 1.64% from its closing price of $75.68 on June 11, 2007 to open at $76.92 on June 12, 2007, on heavy volume of 13,709,400 shares traded.  Lehman's share price fell slightly during the day, following the Company's conference call, but still closed at $76.06 on June 12, 2007, up $0.38 per share or 0.50% from its closing price on June 11, 2007.

368.   Analysts responded positively to this news.  On June 28, 2007, Fitch upgraded Lehman's credit rating from A+ to AA- and maintained its "Stable" outlook, stating, *inter alia*, that Lehman's exposure to the subprime mortgage market "has been well-managed" and should not materially impact future earnings.

369.   On July 10, 2007, Lehman filed its Quarterly Report on Form 10-Q for the quarter ended May 31, 2007, as detailed in ¶¶279-290 above.  The statements therein were false and misleading for the reasons set forth above in ¶291.

370.   As set forth above (¶171), in July 2007, two Bear Stearns hedge funds simultaneously collapsed.  Shortly thereafter, questions regarding Lehman's subprime exposure began to circulate throughout the market, negatively affecting the price of Lehman securities. The Company issued a statement on July 18, 2007, through its spokesperson Kerrie Cohen, who stated: "The rumors regarding subprime exposure are totally unfounded."

371.   The July 18, 2007, statement was materially false and/or misleading because Lehman faced a substantial risk of loss in its residential mortgage-related assets due to rising default and delinquency rates and a slowing market for subprime securitizations, which resulted

in declines in the fair value of Lehman's residential mortgage-related assets. Indeed, shortly after this statement, in August 2007, Lehman announced that it was shut down its own subprime mortgage originator, BNC.

### 2. 3Q07 Financial Results

372. On September 18, 2007, before the market opened, Lehman issued a press release announcing its financial results for the quarter ended August 31, 2007, as detailed in ¶292 above. The statements therein were false and misleading for the reasons set forth above in ¶303.

373. That same day the Company hosted a conference call with analysts and investors to discuss the Company's third quarter results. During the call, Defendant O'Meara discussed the deterioration of the credit market, specifically with respect to subprime mortgages and related CDOs. In relevant part, O'Meara stated:

> Before we move on to outlook I want to make a few comments about fair value and marking to market, as I know it has been a subject of much discussion in the marketplace. First of all *we carry all of our financial instruments, inventory, and lending commitments at fair value. We have a robust process in place in which employees independent of the businesses review the marks for accuracy or reasonableness, using all information available in the marketplace, including third-party pricing sources where applicable*.

> \* \* \*

> On mortgage positions, we saw significant spread widening in the quarter in all products. Given the nature of the asset class, many of our mortgage positions are mark-to-market using valuation models. The underlying inputs of these models are based on market activity, and there have been a significant number of real world trades executed in the market, which are used to validate our marks, and *although many of these assets don't appear to be trading at their fundamental values, we have marked our book to the actual prices being transacted in the market. Fair value means marking to levels at which the assets will trade, not where we think they should trade*.

> Said differently, it is important to know that the inputs to our valuation models, such as credit loss assumptions, pre-payment speeds, and investor yield requirements, are calibrated so that the output prices from these models are consistent with real world trades being done in the market. And these are the same models we use to value client collateral that we take in against secured

lending.  We feel very good about the marks that are on these positions, despite the fact this market has come under significant liquidity stress, and activity levels particularly in the junior securities of capital structures have been reduced significantly.

Our mortgage and mortgage backed inventory increased during the period by less than 10%.  The amount of our U.S. subprime mortgage inventory at quarter end was $6.3 billion, which includes those amounts we have sold to third parties, but have to gross up under FAS 140.  I am sorry, it excludes the 6.3, excludes those amounts we have sold to third parties, but have to gross up under FAS 140.

Of the 6.3 billion of subprime assets, $5.4 billion is whole loan inventory, the vast majority of which was originated within the last six months, and of the remaining $900 million, 230 million are below investment grade securities, and the rest are investment grade securities.  At quarter end we had in total approximately $1.6 billion of non-investment grade interest in residential mortgage securitizations, including the 230 million in subprime I just mentioned.  This is down slightly from the second quarter level.

*  *  *

Barring any unforeseen circumstances, we feel that the worst of this credit correction is behind us.  We have taken significant negative marks across all asset classes this period, and we have taken actions to resize our mortgage origination platform in-line with what we believe will be a smaller securitization market for the foreseeable future.

(Emphasis added.)

374.    During the conference call, analysts asked Defendant O'Meara to break out the "hits" Lehman took on its mortgage-backed securities portfolio, on a gross and net basis during the quarter.  O'Meara admitted that the "hits" were "big on both sides," but did not answer the question, emphasizing instead the Company's "dynamic hedging strategies, particularly around the mortgage business," and stating that "knowing the gross numbers particularly in that business, I don't think is really a meaningful thing."  He added:

On the leverage loan side, we did take very significant hits as we have mentioned, and we sized that by saying they were in excess of a billion dollars, and not a small amount in excess of a billion dollars, how about that?  Not 50 or 100 million more, but I don't want to give the details of it.

125

It may put us in a position where some investors might try to figure out what those marks are, and we don't want that.  We want to competitively keep that to ourselves.  But they were significant and we are marked at the current market.

375.    Defendant O'Meara also represented that "the bulk" of the marks taken to the mortgage portfolio were to "lower rated instruments."

376.    Deutsche Bank analyst Mike Mayo asked Defendant O'Meara to provide more detail on the $700 million net writedown Lehman took on its mortgage portfolio during the quarter and to specify how much Lehman gained on its hedges to offset greater losses.  O'Meara refused, saying "it is just hard when you look at all of the component pieces . . . to break them out individually."

377.    Analysts also asked questions of Defendant O'Meara regarding Lehman's Level 3 assets.  For example, Merrill Lynch analyst Guy Moszkowski asked whether the "$4 billion or so that was sort of involuntary asset growth" in Lehman's Level 3 assets during the quarter was reflective of deleveraging the Company's Level 2 portfolio.  O'Meara responded in the negative, stating:

> the mortgage positions are up a bit as we have continued to originate albeit at a slower pace, and we're originating and the securitization levels are down, so we haven't securitized everything that we have originated, just given where the market is so we've built up a little bit although it's not a real significant amount, we have built up some whole loans that are going to be delayed in securitization given the market conditions**.**

378.    Further, in response to questions from UBS analyst Glenn Schorr regarding "what falls into [Lehman's] Level 3 bucket?"  O'Meara stated:

> We had 22 billion of that at the end of the second quarter, as you mentioned Glenn, and that number will be higher this period, as we would expect.  We are thinking right now and we're still finalizing this, but that will represent about 8% of the total assets that get marked, the inventory, and that that would be higher percentage-wise and dollar-wise, maybe it would be 10 or 11% to think.

379.    Analyst Schorr attempted to obtain more information, asking Defendant O'Meara why, conceptually, one would not expect Level 3 assets to be lower, given the notion that "things that require the most judgment might fall into that structured and less liquid camp."  O'Meara responded, acknowledging that "if the spreads widen out and liquidity pulls away, [Level 3 assets] are harder to value," but stated that these assets could also "slip into the Level 3 category, because there is not enough good price discovery in the marketplace, so they require some judgment."  O'Meara also represented that there was a lot of "movement from Level 2 down to Level 3, particularly at certain of the mortgage products."

380.    The foregoing statements had their intended effect, causing the price of Lehman shares to rise $1.36 per share, or 2.32%, from the closing price of $58.62 on September 17, 2007, to open at $59.98 on September 18, 2007.  Following the Company's conference call statements, Lehman's share price continued to rise another $4.51, or 7.69%, throughout the day, to close at $64.49 on September 18, 2007, on extraordinarily heavy volume of 44,602,900 shares traded.

381.    The foregoing statements in ¶¶373-379 were materially false and misleading for the reasons set forth above in § V.C.1-4.  The Exchange Act Defendants failed to disclose Lehman's full loss exposure from its mortgage-related investments and failed to adequately write down such assets to reflect their true fair value, despite: 1) increasing delinquencies and defaults in its loan pools known from internal reports and tracking software; 2) internal discussions regarding the meltdown in the residential mortgage market and the likely deterioration of the commercial mortgage market; 3) risk concerns raised by senior managers Gelband, Lehman's former head of its Fixed Income Division, and Antoncic, Lehman's former Chief Risk Officer; 4) margin calls made by Lehman on mortgage originators; 5) the rise in loan repurchase requests to and from Lehman's own mortgage originators for non-performing and fraudulent loans;

6) repurchase lawsuits filed by Lehman against mortgage originators in connection with non-performing and fraudulent loans; 7) a reduction in securitization opportunities for mortgages; 8) decreased liquidity in the larger asset-backed securities markets; 9) the more than doubling of Level 3 mortgage-related assets in Lehman's inventory, to over $9.5 billion; and 10) knowing that Alt-A mortgage-related assets could not be hedged to mitigate losses. Moreover, the Exchange Act Defendants concealed the risk of loss associated with Lehman's mortgage-related assets by failing to adequately describe the "economic hedges" against losses, including the amounts and percentage of assets hedged, as well as failing to disclose the additional risk of loss associated with the Company's hedging activity.

382.    On October 10, 2007, Lehman filed its Quarterly Report on Form 10-Q for the quarter ended August 31, 2007, as detailed in ¶¶293-302 above. The statements therein were false and misleading for the reasons set forth above in ¶303.

383.    On November 14, 2007, Lehman management presented at the Merrill Lynch Banking and Financial Services Investor Conference. In a November 15, 2007, report issued by Punk Ziegel & Company, analyst Bove discussed Lehman's presentation, stating that:

> *Unlike numbers of its competitors, Lehman suggested that there will not be a meaningful mark down. In fact, the company suggested that it was short many of the offending securities. This would mean that Lehman could make money where others are losing.*
>
> *      *      *
>
> However, Lehman went beyond these assertions suggesting that it had no major losses in the impacted areas for the industry. The company argued that its business is benefiting from the problems surfacing elsewhere. In essence, as customers move their accounts away from impacted firms, Lehman along with Goldman Sachs (GS/$233.31/Market Perform) is getting the business.

384.    At the conference, Defendant Lowitt, stated that "[w]e've had success in our hedging and so we don't believe that there will be any requirement for substantial markdowns

and certainly no requirement for us to announce anything.  We're very comfortable with where we are with regard to that."

385.    Lehman's management's representations during the November 14, 2007 presentation, as summarized by Bove, were materially false and/or misleading for the reasons set forth above in § V.C.1-4.  Indeed, Lowitt gave the false impression that it had no major losses related to mortgages, when, in fact, it had incurred losses in its mortgage portfolio that it concealed from investors.

### 3.    4Q07 Financial Results

386.    On December 13, 2007, Lehman issued a press release announcing its financial results for the fourth quarter and full year ended November 30, 2007, as detailed in ¶304 above. The statements were false and misleading for the reasons stated above in ¶305.

387.    That same day, the Company hosted a conference call to discuss the foregoing financial results.  Commenting on the Company's financial results, Defendant O'Meara stated, "it reflects the strength of our risk management culture in terms of managing our overall risk appetite, seeking appropriate risk reward dynamics and exercising diligence around risk mitigation" and "reinforces the importance of our disciplined liquidity and capital management framework which sets us up to operate our business through periods of market stress."  During the conference call, O'Meara further stated, in relevant part:

> Now I'll walk you through the valuation adjustments.  For the period, we incurred a net revenue reduction from positioned valuation changes of approximately 830 million in our Fixed Income capital markets business.  Most significantly in residential and commercial mortgage related positions.  On a gross basis, these valuation changes reduced revenues by approximately $3.5 billion, including $2.2 billion from our residential mortgage business.  We had gains on hedges of about $2 billion, which reduced the aggregate revenue impact from $3.5 billion negative to $1.5 billion negative.
>
> Additionally, the impact was further reduced by two items.  Approximately $320 million of realized gains from the sale of certain leveraged lending positions

during the quarter versus their valuations at the end of the third quarter, and approximately [$]320 million of gains on our structured note liabilities under FAS 159 and 157.  As a result, revenues in our residential mortgage business were negative for the period, given the significant asset repricing that extended across subprime, Alt A and prime mortgage product, coupled with declines in both origination and securitization volumes.

* * *

In terms of our mortgage inventory at year end, this totaled $91 billion, reflecting in part the decline in securitization activity over the period.  Of this, $12 billion reflects those amounts we have sold to third parties but have to gross up under FAS 140 and we are not at risk for.  The remaining $79 billion is roughly evenly split between residential mortgage-related inventory and commercial mortgage-related inventory.  Within the residential mortgage piece, our subprime balance sheet exposure amounted to $5.3 billion, compared to $6.3 billion last quarter.

This $5.3 billion subprime breaks down as follows. 3.2 of whole loans, 1.9 of investment grade securities, and about $160 million of non investment grade securities and residuals.  In addition, we had approximately $1 billion of ABS-CDOs on the balance sheet at quarter end.  And after consideration of hedges, we remain modestly net short in the ABS-CDO asset class . . . In terms of other exposures, we have largely mitigated our risk.

388.    Analysts also posed questions of Defendants O'Meara and Callan during the conference call, particularly with respect to the $5.3 billion subprime portfolio Lehman reported for the quarter.  O'Meara responded, in relevant part:

The 5.3 billion subprime is not -- we started out the period with 6.3 as we mentioned.  That 5.3 that's here now is not the same as the 6.3 that was here at the beginning of the period.  Much of it is the same because there has been a slowdown in activity but we have had sales of whole loans.  We have done a couple of securitizations and sold out senior pieces, not junior pieces and then we've written down some things.  We've taken on some positions.  ***But we've had significant write downs percentage wise but that is a manageable number for us.  The 5.3.***  And much of that as we mentioned, the non investment grade portion, albeit less meaningful than it was, that terminology, less meaningful than it was at times in the past, the non investment grade piece and residuals is $160 million.

(Emphasis added.)

389.    In response to questions from Deutsche Bank analyst Mike Mayo regarding Lehman's CMBS exposure, Defendant O'Meara stated, in relevant part:

the CMBS balance sheet is about as we said about half of the $79 billion of risk assets on the balance sheet that's in the mortgage and related category.  So call it about $40 billion, spread out all over the world, that was written down with the -- we did have some gains from some realized gains in Asia, not in the other categories.  But that has been written down in a significant way.  That's included in the 3.5.

**Mike Mayo** - Deutsche Bank - Analyst

I'm sorry.  How much of those charges were for CMBS?

**Chris O'Meara** - Lehman Brothers Holdings Inc. - Global Head of Risk Management

CMBS versus whole loans?  Much of what we have in there is whole loans. . . . And you don't have good price discovery for those same type of assets and so we put them in level 3.  Much of them are whole loans.  On average, they're maybe 70% LTV, loan to value ratio.  But with the credit spread widening, those have had a reduction in value.

**Mike Mayo** - Deutsche Bank - Analyst

I'm sorry, just one last.  How much of the charges were for CMBS specifically?  How much were CMBS written down?

**Chris O'Meara** - Lehman Brothers Holdings Inc. - Global Head of Risk Management

We're not giving that.  It's a significant difference of the portion between the 2.2 and the 3.5.

390.    Analysts also questioned Defendants O'Meara and Callan about the increase in

Level 3 assets Lehman reported for the quarter:

**Glenn Schorr** - UBS - Analyst

Level 3 comments, 13%, that's up from around 12%.  If your fair value positions went up in line with your net assets, that means just a couple -- level 3 assets went up a couple of billion from last quarter.  Is that about right?

**Chris O'Meara** - Lehman Brothers Holdings Inc. - Global Head of Risk Management

I think it was about 11, Glen.  So 11 to 13 is -- yeah, it's a few billion, maybe 6 billion.

**Glenn Schorr** - UBS - Analyst

131

Yes.  Is that stuff moving in from level 2?  Similar last quarter, less liquidity.

**Erin Callan** - Lehman Brothers Holdings Inc. - CFO

Some of that is purchased.

**Chris O'Meara** - Lehman Brothers Holdings Inc. - Global Head of Risk Management

There's lots of things going on.  Some of that is transferring in from level 2.

391.    On December 13, 2007, Lehman booked a $3.5 billion gross ($830 million net) reduction to revenue on account of negative valuation adjustments to its mortgage-related portfolio during the fourth quarter, $2.2 billion of which related to mortgages.  Analysts questioned Defendant O'Meara about the writedowns Lehman took during the quarter:

**Glenn Schorr** - UBS - Analyst

I think we all assume that things related to CDO and subprime and you made your comment about commercial real estate, consume up most of the write downs.  I don't know if you want to talk about what losses you're using in your models or if you want to tell us what piece of the writedowns were things other than subprime and CDOs, meaning, really want to get to Alt-A, Prime, anything else.

**Chris O'Meara** - Lehman Brothers Holdings Inc. - Global Head of Risk Management

They're certainly in there and significant.  Alt-A across the capital structure. Each of these in terms of how these market values are established, there are at the top of the capital structure, particularly in AAA in both prime and subprime, there is market discovery.  So there are transactions being executed in the AAA space. As you move down the capital structure, there aren't transactions being executed, maybe there are some, but it's not as visible and not as much information on it and so the way to model them out is you have to default to the information that is visible which is the index trading around ABX in the different parts of the capital structure for ABX and so those inputs or that information around the ABX is used to price out the cash products in the bottom parts of the capital structure.  But there are some trades being done.  We've got good visibility into them.  There are many of them that are being done because we're around them.  We're either participating in them or we're having a look at them.  For the most part.  And so we do have intelligence around the pricing information for these instruments.

**Erin Callan** - Lehman Brothers Holdings Inc. - CFO

I think, Glenn, just thinking about that, then, below the AAA part of the cap structure, I mean obviously the ABX is transparent in terms of its inputs and HPA assumptions.  Take a look at that, give you some good guidance as to what the cumulative loss assumptions are.

392.    Analysts sought further clarifications on Lehman's writedowns.  For example, Deutsche Bank analyst Mike Mayo stated, "You don't expect the $830 million of net charges to reoccur but you had $700 million last quarter, net and probably didn't think that would recur either.  Conditions can get worse.  The question really is . . . .  In terms of the subprime, the $5.3 billion, how much has that been written down, in terms of the CDOs, the $1 billion, how much has that been written down?"  Defendant O'Meara answered by stating that "we've had significant writedowns percentage wise, but that is a manageable number for us."

393.    In response to the foregoing statements, the price of Lehman common stock rose $0.61 per share or 1.00% from its opening price of $60.76 on December 13, 2007 to close at $61.37 that day, on extraordinarily heavy volume of 28,482,700 shares traded.  Lehman shares continued to rise another $0.87 per share or 1.42% in response to this news to close at $62.24 on December 14, 2007, for a total gain of $1.48 per share or 2.44%.

394.    The foregoing statements in ¶¶387-392 were materially false and misleading for the reasons set forth above in § V.5.1-4.  The Exchange Act Defendants failed to disclose Lehman's exposure to loss from its mortgage-related investments and to take adequate writedowns despite: 1) the delinquencies and defaults in loans in Lehman's own loan pools known from internal reports and tracking software; 2) internal discussions regarding the meltdown in the residential mortgage market and the likely deterioration of the commercial mortgage market; 3) risk concerns raised by senior managers Gelband, Lehman's former head of its Fixed Income Division, and Antoncic, Lehman's former Chief Risk Officer, 4) margin calls made by Lehman on mortgage originators; 5) the rise in loan repurchase requests to and from

Lehman's own mortgage originators for non-performing and fraudulent loans; 6) repurchase lawsuits filed by Lehman against mortgage originators in connection with non-performing and fraudulent loans; 7) a reduction in securitization opportunities for mortgages; 8) decreased liquidity in the larger asset-backed securities markets; 9) the continued shift of additional assets into Level 3 mortgage-related inventory; 10) increased delinquencies in commercial mortgages; and 11) knowing that Alt-A mortgage-related assets could not be hedged to mitigate losses. Moreover, the Exchange Act Defendants concealed the risk of loss associated with Lehman's mortgage-related assets by failing to adequately describe the "economic hedges" against losses, including the amounts and percentage of assets hedged, as well as failing to disclose the additional risk of loss associated with the Company's hedging activity.

395.   On January 10, 2008, after meeting with CFO Erin Callan, Deutsche Bank Global Markets Research analyst Mike Mayo maintained Deutsche Bank's "Buy" rating for Lehman's stock and issued a report stating:  "Our sense is that Lehman is positioned for market share gains given a more consistent culture, greater stability with risk management, and benefits from investment spending, especially non-U.S. (now half of the firm)."   Mayo provided further information from his meeting with Callan, stating:

> Most importantly for the long-term, Lehman has a stable culture.  ***As opposed to several of its peers, Lehman needed no capital injection or dramatic downsizing (head count should remain flattish this year).***  The culture showed that risk management is effective, with business managers seeming more integrated than its peers.
>
> *   *   *
>
> Lehman's culture of risk management starts with the CEO . . . .  The bottom line is that the CEO seems involved in ensuring that potential upside justifies major risks that are taken.
>
> (Emphasis added.)

396.    Defendant Callan's statements were materially false and misleading because they further reassured investors that Lehman possessed superior risk management compared to its peers and had ample capital, and that this would continue to be an effective way to offset losses and even increase market share despite the non-performing mortgage assets that Lehman retained.

### 4.    2007 Fiscal Year-End Results

397.    On January 29, 2008, Lehman filed its Annual Report on Form 10-K with the SEC for the fiscal year ended November 30, 2007, as detailed in ¶¶306-318 above.   The statements were false and misleading for the reasons set forth above in ¶319.

398.    On January 29, 2008, based on the foregoing representations, Deutsche Bank Global Markets Research analyst Mike Mayo issued a research note maintaining his "Buy" rating for the stock and stating, "[n]et net, Lehman has done a good job managing its risks to date.  While we believe more write downs in leveraged loans and commercial mortgages are likely, we have confidence in management's ability to monitor these risks and take appropriate actions to mitigate potential losses."

399.    In response, the price of Lehman common stock rose $1.64 per share or 2.69% from its opening price of $60.89 on January 29, 2008 to close at $62.53 that day.  Lehman shares continued to rise another $1.52 per share or 2.43% over the next two days in response to this news to close at $64.05 on January 31, 2008, for a total gain of $3.16 per share or 5.19%.

400.    On February 6, 2008, Lehman participated in a Credit Suisse Financial Services Forum.  During the forum, speaking on behalf of the Company, Defendant Callan touted the Company's "discipline around liquidity, risk management, capital and expenses" in the second half of 2007, one component of which, Callan explained, "is the active hedging of the residential mortgage book, which [Lehman] started in fiscal 2006."

135

401.     Defendant Callan also acknowledged during the forum that Lehman's mortgage inventory was "the thing everybody's interested in," and stated, in relevant part:

> Which is the total mortgage book at $90 billion; 12 of that is really a FAS 140 gross-up.  So, really breaking down the Residential book and the Commercial book into the two pieces we talked about on the fourth quarter earnings call, $37 billion on Residential and $39 billion on Commercial.

> \* \* \*

> Residential.  On the Residential side, when we look at the $37 billion of assets, so that's after the deduction of the FAS 140 gross-up, the composition of that portfolio is a combination of whole loans being roughly 44%; prime whole loans being roughly half of that portfolio; and Europe being almost a third of that portfolio.  So, just to give you some perspective on what's in that $16 billion.

> We've talked a lot about subprime.  We reported 5.3 at the end of the quarter.  It's a little bit down from there – 39% in the form of retained interest and substantially all of those retained interest in securities rated single A or better.  And the remaining component in whole loans.  ***So, feeling pretty good about that portfolio.***

402.     Turning to Lehman's Commercial mortgage portfolio, Callan stated, in relevant part:

> Again, I want to give you some more information on Commercial than we have in the past. $39 billion of Commercial mortgage exposure, in which the vast majority comes in the form of whole loans and 30-odd percent comes in the form of securities, which are substantially in the category of AA rated or better.

> \* \* \*

> And I think it was mentioned earlier when I looked at some of the comments, maybe it was mentioned by David [Benier].  But CMBX actually bears very little relationship to the whole portfolio as we market.  And that's just because it's one data point, but there are lots of other data points, including sales in the market bid list and actual transactions to look at.

403.     Finally, Defendant Callan addressed the increase in Lehman's Level 3 assets during the quarter stating, in relevant part:

> I want to talk for a minute on Level III.  At the end of Q4 it represented approximately 6% of our assets, 11% of our inventory.  This comes up several

times and people ask us how assets have gone into Level III, and we talked about this on the fourth quarter earnings call.

But the majority of the assets that have moved into Level III are assets moving out of Level II.  And it's merely a function that won't surprise you.  The liquidity environment we're in, the ability to have good data points and inputs on pricing.  And so other than a pretty small amount, this has really come from, particularly in the mortgage asset class -- and you see the numbers doubled there, which is the most significant amount, have come from the movement of certain mortgage asset classes into that arena.

404.    In response to Defendant Callan's reassurances about Lehman's position and ability to navigate through the current mortgage market, Credit Suisse analyst Susan Roth Katzke published a favorable report on the firm's future prospects.  Katzke wrote that "[m]anagement's comments [at the forum] ought to increase confidence that such outperformance can continue."  Notably, Katzke stated that Lehman "differentiated itself" in terms of risk management expertise in 2007.  With respect to the Company's mortgage portfolio, Katzke also noted that "[w]hile there's clearly risk of near term mark-downs, management is more confident that this portfolio will prove money good over the long term."  Katzke then reiterated her Outperform rating for the Company.

405.    In response, the price of Lehman common stock increased $2.30 or 3.95% from its closing price of $58.18 on February 6, 2008 to close at $60.48 per share on February 7, 2008.

406.    The foregoing statements in ¶¶400-404 were materially false and misleading for the reasons set forth above in § V.C.  The Exchange Act Defendants failed to disclose Lehman's exposure to loss from mortgage-related assets despite: 1) increasing delinquencies and defaults in loans in Lehman's loan pools known from internal reports and tracking software; 2) internal discussions regarding the meltdown in the residential mortgage market and the likely deterioration of the commercial mortgage market; 3) risk concerns raised by senior managers Gelband, Lehman's former head of its Fixed Income Division, and Antoncic, Lehman's former

137

Chief Risk Officer; 4) margin calls made by Lehman on mortgage originators; 5) the rise in loan repurchase requests to and from Lehman's own mortgage originators for non-performing and fraudulent loans; 6) repurchase lawsuits filed by Lehman against mortgage originators in connection with non-performing and fraudulent loans; 7) a reduction in securitization opportunities for mortgages; 8) decreased liquidity in the larger asset-backed securities markets; 9) knowing that Alt-A mortgage-related assets could not be hedged to mitigate losses. Moreover, the Exchange Act Defendants concealed the risk of loss associated with Lehman's mortgage-related assets by failing to adequately describe the "economic hedges" against losses, including the amounts and percentage of assets hedged, as well as failing to disclose the additional risk of loss associated with the Company's hedging activity.

### 5.    1Q08 Financial Results

407.    On March 18, 2008, Lehman issued a press release announcing its financial results for the quarter ended February 29, 2008, as detailed in ¶320 above.    The statements therein were false and misleading for the reasons set forth above in ¶331.

408.    That same day, the Company hosted a conference call to discuss the foregoing results.  During the conference call, Defendant Callan, speaking on behalf of the Company, stated that Lehman's "continued diligence around risk management, which includes the active involvement of [its] senior management team" and "risk management discipline allowed [it] to avoid any single outsize loss" during the quarter.  Callan also addressed the Company's liquidity:

> And it's been our operating philosophy for a decade, which many people are very familiar with, that we remain closely focused on our liquidity, our long-term capital position, precisely for the purpose of weathering a difficult market environment that we've seen surfacing in recent weeks.  So we're set up for that.
>
> Further, we believe the fed's actions are a strong positive step towards stabilizing the capital markets and certainly enhancing liquidity for quality assets.  I will come back to that in more detail later when I discuss our secured funding status.

\* \* \*

*We had disciplined liquidity and capital management, which we consider to be a core competency, and maintained robust liquidity* to date, and we've executed close to two-thirds of our full-year capital plan at the end of the first quarter.  And I will give you more details on that.

So let me conclude by noting that we don't expect that this extremely challenging period is going to end in the near term.  However, we do believe we have the leadership, the experience, the risk management discipline, the capital strengths, and certainly the liquidity to ride out the cycle.

409.    Defendant Callan further discussed mark-to-market adjustments the Company

recorded during the quarter, stating:

*We look at the mark to market adjustments as more temporary in nature*, as they reflect mark to market accounting related to the pricing of similar transactions in a liquidity constrained environment that we're living in and driven by many technical factors, which may not reflect intrinsic value.

*And I'd really like to contrast that with write-off, which are more permanent in nature and refer to impairment.*  So I know there's been a lot of dialogue in recent weeks about the whole mark to market accounting mechanism, but I just wanted to highlight that this is under the mark to market accounting framework and not necessarily reflective of permanent impairment of the assets.

The gross revenue reduction, gross numbers for the quarter, from mark to market, prehedges, was approximately $4.7 billion.

After hedges, we had a net impact of 1.8 billion, which I think is a pretty good testament to our hedging and risk mitigation capabilities that are core to our franchise.

So let me speak a moment about the composition of the net 1.8 write-down. Residential mortgage related positions accounted for 800 million, net.  The 800 million net relates to 3 billion gross.  *So I think it's fair to say we continue to do a very, very good job managing the risk on residential mortgages, an area that I think we're credited with a lot of expertise*, a great franchise.

Non-residential asset backed positions of an additional net 100 million. Commercial mortgages and related real estate up 1 billion.  And 1 billion is net from 1.4 billion, reflecting the fact that it's much more difficult to hedge the commercial asset class.  And I'll talk about the exposures a little bit later.

(Emphasis added.)

410.    Regarding the Company's exposure to deteriorating market conditions, Defendant

Callan stated:

> For mortgages, the first asset class I want to talk about, our total balance sheet ended 85 billion down from 89 at 2007 year end.  If we exclude the FAS 140 gross-up for amounts sold to third parties and accounted for as financings, the balance sheet decline to 74 billion from 77.

> So let me break out the 74.  32 billion of residential mortgages, 36 billion of commercial mortgages, 7 billion of non-resi asset-backed securities.  Within resi, as you see, the number is only down slightly, which is not the whole story.  We actually sold a fair amount of assets during the quarter and bought opportunistically some very attractive assets that we saw available on the market. So that doesn't reflect a static situation.

> Subprime, which has been an intense focus which includes both whole loans and securities, now totals 4 billion versus 5.3 at year end.  We continue to have significant hedging against that balance sheet exposure.

> Whole loans were 1.3 of the 4 and the remaining amounts are primarily investment grade securities. 82% of which are AAA or AA, so very high quality.

> ***Prime and alt-A make up 14.6 billion versus 12.7 at year end.  Again reflecting a fair amount of assets sold and bought opportunistically, and also includes a meaningful component of servicing which we added during the quarter, which really does reflect a very natural hedge for the mortgage asset class.***

> \* \* \*

> And for residential securities it was a pretty different story for this quarter than last.  We began to see a lot more transparency in the alt-A sector late in the quarter, allowing us to mark positions based on observable prices, much less use of models.

> \* \* \*

> So let me turn to the commercial mortgage portfolio. 36 billion of commercial mortgages, 25 billion represents loans, 11 represents securities.   Within the securities asset class, 85% are AA and AAA rated.

> \* \* \*

> Again, questions on how we value the commercial portfolio, we look at a number of data points including activity in loans with similar property types and similar regions because there's a very regional element to this.   We look at recent securitizations, we look at loan syndications, CMBS spreads and the CMBX

140

Index.  And in fairness, as opposed to last quarter, we have seen similar spread experiences in recent securitizations as a CMBX, so what was a divergence in the last quarter has really converged to be pretty identical pricing as securitization and CMBX.

Delinquencies in commercial mortgages continue to be very low at approximately 40 basis points.  Our research expectations that they would not exceed 70 in a difficult environment but however, ***I will note that our valuations reflect how the market is pricing these positions, not the fundamentals of the asset class, regardless of our view on their intrinsic value***.

(Emphasis added.)

411.    Regarding the Company's Level 3 assets, Defendant Callan also stated that "we expect a slight increase for the quarter to 39 billion.  This represents 5% of total assets."

412.    Defendant Callan also stated, "[a]s we look out to the remainder of the year, we certainly will remain vigilant around risk, capital, and liquidity.  As we talked about last quarter, as a Firm we remain very cautious overall."  Callan further stated Lehman **"*took care of [its] full year needs*" when it raised $1.9 billion through its offering of preferred stock in February**.

413.    Similarly, when UBS analyst Schorr asked Callan to provide more color on her earlier remarks that certain asset mark downs, which Lehman took as being temporary, not permanent, in nature, Callan stated:

Yes, the activity really in purchases and sales took place in resi's.  Close to 2 billion between sales and purchases in that asset class, and really in the alt-A space.  We saw a great opportunity in what happened with alt-A pricing, around the [Peloton] fund, execution, transactions around that situation.  So we were excited to have the ability to have some dry powder there and to get up the sale of some other assets, other agency-related product in order to buy what we thought was alt-A at a very good price.

***We are very well hedged***.  I mean, it's always a little challenging how you look at it, ***we would consider ourselves at this point net short in the residential asset class***.

**Glenn Schorr** - UBS - Analyst

Net short in resi.  So that would mean that wherever you bought it, to find a reasonable market, so you marked the whole portfolio down, and then the 10

141

points that we fell in the quarter, in March so far, you're kind of numb to it because you're hedged there still.

**Erin Callan** - Lehman Brothers Holdings Inc. - CFO

Exactly.   And remember, despite whether we did actually buy or sell in the quarter, there was so much transparency around the [Peloton] situation, with respect to alt-A assets, the marks are going to be what they're going to be, right?  So it really didn't matter that we happened to buy or sell assets at that point because we would have marked the book either way.

414.    Banc of America Securities analyst Michael Hecht also questioned Defendant

Callan about the Company's Level 3 assets.  In response, Callan stated:

Yes, we did have some shifts across buckets at the end of the quarter so let me − let me just give you some breakdowns on that.  One sec.  Transfers in, transfers out, just want to double-check it for you.

At the end of the quarter -- I mean, at the end of the year, we were about 38.8 in total level three assets.  In terms of what happened in level three asset changes this quarter, we had net sort of payments, purchases, or sales of 1.8 billion.  We had net transfers in of 1.1 billion.  So stuff that was really moved in or recharacterized from level two.  And then there was about 875 million of write-downs.  So that gives you a balance of 38,682 as of February 29.

415.    In response to the foregoing statements, the price of Lehman common stock rose

$14.74 per share or 46.43% from its closing price of $31.75 on March 17, 2008, to close on

March 18, 2008 at $46.49, on extraordinarily heavy volume of 143 million shares traded.

416.    The foregoing statements in ¶¶408-414 were materially false and misleading for

the reasons set forth above in § V.C.  The Exchange Act Defendants failed to disclose Lehman's

lack of liquidity and exposure to loss from mortgage-related assets despite: 1) increasing

delinquencies and defaults in Lehman's loan pools known from internal reports and tracking

software; 2) internal discussions regarding the meltdown in the residential mortgage market and

the likely deterioration of the commercial mortgage market; 3) risk concerns raised by senior

managers Gelband, Lehman's former head of its Fixed Income Division, and Antoncic,

Lehman's former Chief Risk Officer, 4) margin calls made by Lehman on mortgage originators;

5) the rise in loan repurchase requests to and from Lehman's own mortgage originators for non-performing and fraudulent loans; 6) repurchase lawsuits filed by Lehman against mortgage originators in connection with non-performing and fraudulent loans; 7) a reduction in securitization opportunities for mortgages; 8) decreased liquidity in the larger asset-backed securities markets; 9) the continued shift of additional assets into Level 3 mortgage-related inventory; and 10) knowing that Alt-A mortgage-related assets could not be hedged to mitigate losses.  Moreover, the Exchange Act Defendants concealed the risk of loss associated with Lehman's mortgage-related assets by failing to adequately describe the "economic hedges" against losses, including the amounts and percentage of assets hedged, as well as failing to disclose the additional risk of loss associated with the Company's hedging activity. Furthermore, Defendant Callan's statement that the February offering satisfied Lehman's capital needs for 2008 was false and misleading.

417.   On Wednesday March 19, 2008, Bernstein analyst Brad Hintz reported that Lehman had $87 billion in "troubled" assets that would probably cause Lehman more losses. Hintz stated: "For the first time in its earnings release, Lehman provided a detailed breakdown of its balance sheet exposure to troubled asset classes . . . .   Regrettably, the picture was not pretty . . . .  Until these troubled assets are removed from Lehman's balance sheet, we would expect the firm will be exposed to further write downs in the upcoming quarters."  Hintz lowered his share-price estimate for Lehman 7.1% to $65.

418.   As the market absorbed this information, which only partially disclosed the Exchange Act Defendants' fraudulent scheme to inflate its mortgage-based assets, Lehman's shares fell to $42.23 on March 19, 2008, down $4.26, or 9.16%, from their March 18, 2008, closing price of $46.49.

419.     On March 31, 2008, Lehman announced the issuance of 3,000,000 shares of 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P, with a par value of $1.00 per share and a liquidation preference of $1,000 per share supposedly in response to "investor interest" and to "bolster the Firm's capital and increase financial flexibility." Defendant Callan stated that "[g]iven the challenging environment and our previously stated view that it will likely continue the balance of the year, issuing convertible preferred is appropriate as it optimizes our funding and accelerates our plan to reduce leverage, and at the same time minimizes dilution to our shareholders . . . .  We also felt this was the right time as there was a window of opportunity in the market, as we have received significant interest from several key institutional investors, who have been strong supporters of the Firm over time."

420.     On April 1, 2008, Lehman increased the previously announced preferred offering by one million shares.  Defendant Callan stated that "[t]he significant oversubscription for this deal demonstrates the confidence that investors have in Lehman Brothers.  The success of the transaction is also reflective of the strength of the business model, the capital base and liquidity profile of the Firm as we continue to successfully weather challenging environments."

421.     On this news, the price of Lehman common stock rose 18%, increasing $6.70 to $44.34 per share.

422.     On April 8, 2008, Lehman filed its quarterly report with the SEC on Form 10-Q for the quarter ended February 29, 2008, as detailed in ¶¶321-328 above.  The Form 10-Q contained statements that were false and misleading for the reasons set forth above in ¶331.  Moreover, the gain of $228 million on Level 3 assets reported in the 1Q08 Form 10-Q directly contradicted Defendant Callan's earlier statement during the March 17, 2008, conference call

where she stated that "there was about 875 million of write-downs" in Level 3 assets, as detailed in ¶¶327, 414 above.

423.   In response to the foregoing statements, the price of Lehman common stock fell $3.13 per share or 7.17% from its closing price of $43.67 on April 8, 2008, to close at $40.54 on April 9, 2007.  By comparison, the Dow Jones Industrial Average ("DJIA") fell a total of 134.13 points or 0.99% over the same time period.

424.   Lehman's CEO, Defendant Fuld, reassured investors at the Company's annual meeting on April 15, 2008, saying "the worst is behind us."

425.   The foregoing statements in ¶¶419, 420, 424 were materially false and misleading for the reasons set forth above in § V.C.  The Exchange Act Defendants concealed Lehman's lack of liquidity and the risk of loss associated with Lehman's mortgage-related positions despite: 1) increasing delinquencies and defaults in loans known from internal reports and tracking software; 2) internal discussions regarding the meltdown in the residential mortgage market and the likely deterioration of the commercial mortgage market; 3) risk concerns raised by senior managers Gelband, Lehman's former head of its Fixed Income Division, and Antoncic, Lehman's former Chief Risk Officer; 4) margin calls made by Lehman on mortgage originators; 5) the rise in loan repurchase requests to and from Lehman's own mortgage originators for non-performing and fraudulent loans; 6) repurchase lawsuits filed by Lehman against mortgage originators in connection with non-performing and fraudulent loans; 7) a reduction in securitization opportunities for mortgages; 8) decreased liquidity in the larger asset-backed securities markets; 9) the continued shift of additional assets into Level 3 mortgage-related inventory; and 10) knowing that Alt-A mortgage-related assets could not be hedged to mitigate losses.  Moreover, the Exchange Act Defendants concealed the risk of loss associated with

Lehman's mortgage-related assets by failing to adequately describe the "economic hedges" against losses, including the amounts and percentage of assets hedged, as well as failing to disclose the additional risk of loss associated with the Company's hedging activity.

### 6.        2Q08 Financial Results

426.    On June 9, 2008, Lehman issued a press release announcing its financial results for the quarter ended May 31, 2008, as detailed in ¶¶329, 330 above.  The statements therein were false and misleading for the reasons set forth above in ¶331.

427.    That same day the Company hosted a conference call to discuss these preliminary results.  During the conference call, speaking on behalf of the Company, Defendant Callan stated, in relevant part:

> Our gross and net mark-to-market adjustments this quarter were $3.6 billion and $3.7 billion, respectively, and came primarily in the residential and commercial mortgage books.  For the quarter we benefited from the widening of our credit spreads on our own debt and recorded approximately $400 million of gains on structured debt liabilities since the end of February.

> Our hedges on illiquid assets generated approximately $100 million of additional losses this quarter, as gains from some hedging activities were more than offset by losses in others; and I will talk about that in more detail.

> The overall efficiency of hedges this quarter was significantly impacted from the unprecedented dislocation between our derivative hedges and the underlying cash market, a theme that took place throughout the broader capital markets.

> *   *   *

> In residential mortgages our gross adjustments were approximately $2.4 billion.  These losses arose primarily from two different factors.  First, the collapse of a large mortgage hedge fund, Peloton, and the events around Bear Stearns at the beginning of the quarter caused significant price deterioration, particularly at the top of the capital structure for [residential] assets.

> Second, as I mentioned earlier, we actively reduced our exposure throughout the quarter, particularly in high-risk positions such as nonperforming loans and subprime, which allowed us better pricing information on this asset class.  Our residential hedges provided only $400 million of benefits this quarter; in other words hedges offset approximately 17% of the losses.

146

\* \* \*

In other nonresidential asset-backed securities, our growth and net adjustments were approximately $300 million.   There are a variety of different debt instruments included in this category, such as franchise related whole business financings, student loans, small business loans, auto loans, credit card, most of which were categorized as level 2 assets in the first quarter. These assets include securitized asset-backed issuances as well as whole loans.

In response to specific questions on this category, these assets do not include any ABS CDO balances, where our exposure in ABS CDOs is approximately $600 million and is included in our residential mortgage exposure line.

\* \* \*

Commercial mortgages and real estate had gross mark to markets totaling approximately $1 billion.

\* \* \*

Thus our hedges, including single name and indexed derivatives, had losses of approximately $400 million, resulting in an aggregate commercial mark to market adjustment of $1.4 billion.

\* \* \*

Moving on, in acquisition finance our growth in net mark to market adjustments were approximately $300 million and $400 million, respectively.  ***It has been suggested we have not been sufficiently aggressive in marking our inventory. In fact, I believe our successful hedging performance over the past year has muted the magnitude of our gross markdowns.***

To give you the cumulative size of gross losses we have taken on these asset classes since the beginning of fiscal '07, most of which occurred in the past 12 months, in residential mortgages and other asset backed securities we have taken over $11 billion of aggregate write-downs.  In commercial mortgages and real estate held for sale we have taken approximately $3.5 billion of gross write-downs.  In acquisition finance we have written down almost $2 billion of assets.

In total we have taken approximately $17 billion in gross mark to market adjustments since the beginning of last year, offset by hedging benefits of approximately $7.5 billion.

\* \* \*

From a risk management perspective, we continue to operate in our disciplined manner we are known for.   Our balance sheet and exposure levels declined

147

throughout the period as discussed; and this was reflected in our risk numbers as well.

*  *  *

***We do not intend to lower our leverage ratios. . . .  To be clear, we do not expect to use the proceeds of this equity raise to further decrease leverage, but rather to take advantage of future market opportunities . . . we stand extremely well capitalized to take advantage of these new opportunities.***

(Emphasis added.)

428.    Analysts also asked about the sale of assets, the magnitude of the loss, and the discrepancy between the Exchange Act Defendants' prior statements:

**Guy Moszkowski** - Merrill Lynch - Analyst

Can you respond maybe to critics who are going to say that the $130 billion of asset sales must be the absolute easiest assets to sell?  Can you give us some flavor for some of the more difficult asset class reductions; and whether they are in line with those overall percentages; and the extent to which you might have therefore bitten the bullet with some of those more difficult asset classes and then reflected those prices across the remainder of the book?

**Erin Callan** - Lehman Brothers Holdings Inc. - EVP, CFO

Yes, so it very much is the latter, Guy.  So just to get some anecdotal evidence of that at this point -- and we will give more next week.  But in terms of the residential book and what we sold there, the vast majority of what we sold was in the form of whole loans, not the securities portion.  So the securities portion arguably has greater price transparency in the market.  So we sold whole loans, and a significant part was in subprime and NPLs.

So we did sell the risk asset classes which did give us a tremendous amount of visibility back into pricing the rest of our inventory.

The story on the commercial side is very similar.  Virtually everything that we sold on the commercial side was in the whole loan category.  That does reflect the market appetite that it is harder to find a bid for cash securities without providing financing, which we were generally loath to do.  So the bids that we found were back into a conventional home loan market.

I mentioned selling to 170 customers those assets; I think it gives us a very, very strong sense of where the bid is. And 20% of those sales were mezzanine.

148

So these sales were not limited to our AAA securities portfolio.  In fact if anything it was the other way around.  We were selling the risk component of these asset classes.

* * *

**Glenn Schorr** - UBS - Analyst

So in April you had the capital raise and it was a little bit of a reverse inquiry, and I think something that you mentioned as not overly critical from a corporate finance perspective.  Then in mid-May you talked about marks being something a lot smaller than the first quarter's marks.  You mentioned May was better.

So it just felt like this was a bigger loss than I think we all kind of braced for.  The ineffective hedges and the impact of March and all that stuff, it just seemed to accelerate in May, even though May you mentioned was just a better month.  I am not sure --

**Erin Callan** - Lehman Brothers Holdings Inc. - EVP, CFO

Yes, so let me make some comments on that.  So the corollary to the write-down number for this quarter, okay, the mark to market adjustment of 3.6 growth actually compares apples-to-apples in Q1 something about $5 billion.  So there definitely was a slowdown in the pace of write-downs on a gross basis.

So it is all in the hedging in terms of the outcome, and a lot of that came through during the month of April.  We talked about the resi part, the cap structure being affected in March.  April had a lot to do with derivatives and cash conversion, and diversions that went on during that month.

And there is some part of the portfolio, just to be practical, that even though it is marked throughout the quarter you do your final marking obviously at the end of the quarter on the more difficult to mark collateral.  So that by nature will be backended in terms of how the losses come through the P&L.

* * *

**Mike Mayo** - Deutsche Bank - Analyst

Then last question is the harder one.  How do we know that you have taken enough write-downs in your real estate book?  That is the general question.  But maybe some specifics.

What percent have you written down your residential mortgages?  You had $11 billion of gross write-downs.  What is that on a percentage basis of the original total?

149

**Erin Callan** - Lehman Brothers Holdings Inc. - EVP, CFO

Okay, I don't have the original total in front of me; so I can come back to you on that, what that specifically translates into.

I think in terms of the confidence level on write-downs, you know it is the following two points.  One is that the aggregate number is very large that we have taken since Q3 predictably last year.  So that gives me confidence in the actual accumulated loss across those portfolios, resi and commercial.

I think you the other piece though that is very, very important is we were probably the most active seller of assets in the market this quarter across all these asset classes.  As I talked about earlier we weren't selling AAAs.  We were selling the entire capital structure and we were selling risk assets.

I think unquestionably our price visibility we got from these transactions was tremendous.  So much more activity for us certainly than we did last quarter.  So I think the confidence level about the remaining inventory can only be higher than it was given all that sales activity, the visibility, the number of clients we dealt with, and the resultant impact on our remaining inventory.

\* \* \*

**David Trone** - Fox-Pitt Cochran Caronia - Analyst

In the Alt-A segment there was the high-profile sale by UBS.  Is it safe -- could you characterize where you were relative to that price?

**Erin Callan** - Lehman Brothers Holdings Inc. - EVP, CFO

Relative to the UBS prices from their presentation back a month and a half ago?

**David Trone** - Fox-Pitt Cochran Caronia - Analyst

Yes.

**Erin Callan** - Lehman Brothers Holdings Inc. - EVP, CFO

Well, what I can tell you is that at the time of their presentation our marks were consistent with theirs.  Obviously there has been price action since then, but it was consistent with their marks at that point in time.

**David Trone** – Fox-Pitt Cochran Caronia - Analyst

Okay.  Then switching gears to your creditor or counterparty comment, you said things are fine.  How is that different?  Obviously it is different from mid-March.

But could you kind of contrast the less obviously nature of the discussions between now versus the tougher period when Bear Stearns was collapsing?

150

**Erin Callan** - Lehman Brothers Holdings Inc. - EVP, CFO

Yes, I think to be fair the discussions at this point are not about our viability or the fact that we will be here or the fact that we have sufficient liquidity, I think we put that to bed on a number of different levels through our own actions.  Obviously to some extent through the Fed's actions.

So, I don't think there is any question on the part of our any of our counterparties or lenders that they will be repaid by Lehman Brothers.  I think there is a good debate that's being had about the investment banking sector, its return profile as we move forward in a lower leveraged environment.

But we are not having any conversation with counterparties or lenders about whether they feel confident extending funds and credit to us.

429.   In response to the foregoing statements, the price of Lehman shares fell $2.81 or 8.7% from its closing price of $32.29 on June 6, 2008, to close at $29.48 on June 9, 2008, on heavy volume of 168 million shares traded.

430.   The foregoing statements partially revealed the truth about the Exchange Act Defendants' fraud, including providing a better picture of the true fair value of Lehman's mortgage-related assets during the Class Period.  However, these statements did not reveal the full truth regarding Lehman's mortgage-related assets during the Class Period, or its dire capital position.  According to Treasury Secretary Paulson, during an October 23, 2008, interview with *The New York Times*, "Lehman announced bad earnings around the middle of June, and we told Fuld that if he didn't have a solution by the time he announced his third-quarter earnings, ***there would be a serious problem****. . . .  We pressed him to get a buyer."

431.   On June 16, 2008, Defendant Fuld admitted that the Company's $2.8 billion quarterly loss was "my responsibility" and stated "I am the one who ultimately signs off."  Fuld explained:

Years ago we made a decision to build out the best-in-class commercial and residential mortgage origination and distribution platforms.  We created significant revenues and net income over those years that funded many of the Firm's investments that have diversified our core franchise today.  We made

active decisions to deploy our capital.  Some of which in hindsight were poor choices, because *we really didn't react quickly enough to the eroding environment*.  For example, we accumulated positions in leveraged loans that we believed we could syndicate and clearly not all of those got sold.  Together, the accumulation of all these positions ultimately led to our decision this past quarter to aggressively delever.  (Emphasis added.)

432.    During the same conference call, however, Defendant Fuld stated "[o]ur capital and liquidity positions have never been stronger."  Defendant Lowitt further stated:

Next, let me review *our liquidity position which has never been stronger*.

\* \* \*

In conclusion I reviewed with you the strength we continue to see in our client franchise and our strong capital and liquid position.

\* \* \*

With regard to the rating agencies, I believe that their focus is on the earnings power going forward.  They are very comfortable with the capital and I took you through what the capital ratios were, which I think we'll see when all the Qs come out but our expectation is that pre the capital raise, we were going to be among the strongest and post the capital raise we certainly are confident that will be the case.  So we don't believe there will be any issues around capital.  You've got a sense of just how strong our liquidity position is.

433.    Lehman's shares fell to $25.14 on June 17, 2008, down $2.06 or 7.57% from their June 16, 2008, closing price of $27.20.

434.    On July 10, 2008, Lehman filed its Quarterly Report on Form 10-Q with the SEC for the quarter ended May 31, 2008 (the "2Q08 10-Q").  The 2Q08 10-Q was signed by Defendant Lowitt and contained SOX-required certifications and management's certifications over internal controls and financial reporting substantially similar to those set forth above at ¶¶288, 289 signed by Defendants Fuld and Lowitt.  The 2Q08 10-Q also contained statements concerning the Company's risk management and management's evaluation and the effectiveness of the Company's internal disclosure controls, substantially similar to those set forth above at ¶290.

435.    In the 2Q08 10-Q, the Company reported net revenue of ($0.668 billion), net income of ($2.774 billion), net income applicable to common stock of ($2.873 billion), EPS of ($5.14) and diluted EPS of ($5.14).  In addition, the Company reported revenue from Principal Transactions of ($3.442 billion).

436.    Moreover, in the 2Q08 10-Q, the Company disclosed total assets of $639.432 billion, financial instruments and inventory positions owned of $269.409 billion, financial instruments and inventory positions sold but not yet purchased of $141.507 billion, and financial instruments and inventory positions pledged or otherwise encumbered of $43.031 billion.  Of the $269.409 billion in financial instruments and inventory positions owned, the Company disclosed that $72.461 billion relate to mortgages and asset-backed positions.

437.    The Company also disclosed a $2.755 billion exposure to subprime residential mortgages as of May 31, 2008, with a $1.048 billion exposure to whole loans, a $1.686 billion exposure to subprime mortgage-backed securities, and $21 million in other subprime exposure.

438.    With respect to the classification of its mortgage and asset-backed securities, the Company disclosed that $347 million were classified as Level 1, $51.517 billion as Level 2, and $20.597 billion as Level 3 assets.

439.    The 2Q08 10-Q also contained statements regarding Lehman's Level 3 assets, substantially similar to those set forth above at ¶¶285, 286, 300, 301.  In addition, the 2Q08 10-Q stated that "[m]anagement believes the methodology adopted to allocate valuation adjustments on a portfolio to individual positions is reasonable and consistently applied during the periods presented."

440.    The 2Q08 10-Q also reported that Lehman's Level 3 mortgage and asset-backed securities were comprised of net payments, purchases and sales of ($2.159 billion), net transfers

into Level 3 of $31 million, realized losses of $107 million and unrecognized losses of $2.12 billion.

441. The Company further reported $1.9 billion in net unrealized losses on Level 3 non-derivative financial instruments for the second quarter of 2008.

442. The 2Q08 10-Q also reported that Lehman retained $5.3 billion in investment-grade interests in securitizations, $1.2 billion in non-investment grade interests in securitizations, $1.6 billion of investment grade interests in commercial mortgage securitizations, and approximately $0.1 billion of non-investment grade interests in commercial mortgage securitizations. The 2Q08 10-Q stated that "the Company owned approximately $614.6 million . . . of equity securities in CDOs" and $3.7 billion in credit default swaps with underlying investment grade collateral of $16.5 billion.

443. The 2Q08 10-Q also discussed the impact of current market events upon the Company's second quarter performance, noting that in marking its positions to market, the Company "recorded negative valuation adjustments of approximately $4.0 billion on certain components of its financial inventory."

444. In addition, the Company reported the following valuation adjustments to its real estate and mortgage-related positions for the three months ended May 31, 2008:

| Gain/(Loss) in Billions | Gross | Net |
|---|---|---|
| Residential Mortgage-Related Positions | $ (2.4) | $ (2.0) |
| Other Asset-Backed-Related Positions | (0.4) | (0.4) |
| Commercial Mortgage and Real-Estate Related Investments | (0.9) | (1.3) |
| Acquisition Finance Facilities (Funded and Unfunded) | (0.3) | (0.4) |
| Valuation of Debt Liabilities | (0.4) | 0.4 |
| **TOTAL** | **$ (3.6)** | **$(3.7)** |

(Footnotes omitted.)

445. With respect to its residential mortgage exposure, the Company reported the following in its 2Q08 10-Q:

154

| Residential Mortgages (in $ billions) | May 31, 2008 | February 29, 2008 |
|---|---|---|
| U.S. | | |
| *Alt-A/Prime* | | |
| Whole Loans | 2.1 | 3.7 |
| Securities | 6.5 | 9.2 |
| Servicing & Other | 1.6 | 1.7 |
| Subtotal | 10.2 | 14.6 |
| | | |
| *Subprime/2nd Lien* | | |
| Whole Loans | 1.1 | 1.3 |
| Securities | 1.7 | 2.7 |
| Subtotal | 2.8 | 4.0 |
| | | |
| *Other U.S.* | | |
| Whole Loans | 1.0 | 1.6 |
| Securities | 0.3 | 0.5 |
| Subtotal | 1.3 | 2.1 |
| | | |
| Europe | | |
| Whole Loans | 3.6 | 5.0 |
| Securities | 5.7 | 4.5 |
| Subtotal | 9.3 | 9.5 |
| | | |
| Asia-Pacific | | |
| Whole Loans | 0.5 | 0.3 |
| Securities | 0.2 | 0.4 |
| Subtotal | 0.7 | 0.7 |
| | | |
| Other Asset-Backed Securities | 0.6 | 0.9 |
| **TOTAL** | **24.9** | **31.8** |

(Footnotes omitted.)

446.    The Company also provided additional information regarding its $39.8 billion in commercial mortgage holdings, reporting $19.5 billion in senior positions, $5.9 billion in mezzanine, $1.9 billion in non-performing loans, $7.2 billion in equity positions and $5.3 billion in commercial mortgage-backed securities.  The Company further broke down this exposure by reporting $19.9 billion in whole loans, $9.5 billion in securities and other positions, and $10.4 billion in real estate held for sale.

447.    In response to the foregoing statements, the price of Lehman common stock fell $2.33 per share or 11.87% from its opening price of $19.63 on July 10, 2008 to close at $17.30 that day, on heavy volume of 153,195,900 shares traded.   Lehman shares continued to fall another $2.87 per share or 16.6% in response to this news to close at $14.43 on July 11, 2008, for a total loss of $5.20 per share or 26.49%.   In comparison, the DJIA fell a total of 47.47 points or 0.43% over the same time period.

448.    The foregoing statements in ¶¶427, 428, 432, 434-446, while partial disclosures, were materially false and misleading for the reasons set forth above in § V.5.  The Exchange Act Defendants concealed Lehman's lack of liquidity and the risk of further loss associated with Lehman's mortgage-related positions and that Alt-A mortgage-related losses could not be hedged.

### 7.    3Q08 Pre-Released Financial
Results And Writedown Announcement

449.    On September 10, 2008, Lehman pre-released its third quarter 2008 results, and held a conference call to report a $3.9 billion loss, as well as another $7.8 billion in gross writedowns on its residential and commercial real estate holdings, as detailed in ¶¶262-265 above.

450.    The statements made in the September 10, 2008, press release and during the subsequent conference call were materially false and misleading for the reasons set forth above in §§ V.C.-D. and D.1.  Defendants Fuld and Lowitt also concealed the lack of liquidity faced by Lehman as a result of the Company's inability to raise capital and remain liquid as a result of its mortgage-related positions, as detailed in ¶¶266, 267.

451.    The foregoing statements partially revealed the truth about the Exchange Act Defendants' fraud, including providing a better picture of the true fair value of Lehman's

mortgage-related assets during the Class Period, and the potential capital constraints the Company faced.  However, these statements did not reveal the full truth regarding the actual fair value of Lehman's mortgage-related assets during the Class Period, or its dire capital position.

452.    Indeed, the Exchange Act Defendant's lack of full disclosure led Defendant Lowitt to later acknowledge that, "the announcements made on September 10 did little to quell the rumors in the market and the concerns about the viability of the Company."

453.    As the market digested the massive loss disclosed by the Company on September 10, 2008, and the extent of its remaining exposure to the reeling mortgage market, the price of Lehman shares fell $1.90, or 20.77%, to close at $7.25 on September 10, 2007.

454.    Following Lehman's announcements on Wednesday, September 10, 2008, conditions for the Company continued to worsen, with its stock price falling an additional 41.73% on Thursday, September 11, 2007, to close at $4.22.  The price of Lehman common stock further plummeted 94.25% from its close of $3.65 on Friday, September 12, 2008, to close at $0.21 on Monday, September 15, 2008.

455.    The Class Period ends on September 15, 2008, the day Lehman petitioned for bankruptcy, making it the largest corporate bankruptcy in U.S. history.  Later that day, Lehman issued another press release confirming the filing of its Bankruptcy petition.  In an affidavit submitted that day in connection with the bankruptcy filing, Defendant Lowitt discussed the purported events leading to the Chapter 11 filing.  Specifically, Lowitt contended, in relevant part:

> Ultimately, the onset of instability in the financial and credit markets over the past several months created significant liquidity problems for Lehman Brothers. Despite infusions of liquidity by central banks into the financial system, broad asset classes, particularly domestic subprime residential mortgages and structured credit products, remained thinly traded throughout this period….

The devaluation of the Lehman Brothers' pledged assets also had an adverse impact on borrowing availability. The reduced availability of secured financing forced Lehman Brothers to draw down on its liquidity pool in order to execute transactions. This loss of liquidity created a chain reaction of adverse economic consequences. With diminished cash to fund transactions, major credit rating agencies put the Company's credit ratings on negative watch with potential for multiple downgrades.

456.    As a result of Lehman's bankruptcy filing, investors finally became aware of the truth regarding Lehman's financial position.

### C.    The Insider Defendants' Scienter

457.    The Insider Defendants each acted with scienter with respect to the materially false and misleading statements alleged herein.  In addition to the facts and circumstances alleged above, the Insider Defendants' knowledge of falsity and recklessness is further evident from their awareness, as top officers of the Company, of important developments in Lehman's core business; pervasive problems discussed internally at Lehman; the deliberate refusal to provide greater transparency into mortgage-related assets; the Insider Defendants' admissions; and the Insider Defendants' motive and opportunity.

### 1.    Evidence Of Intentional Or Reckless Conduct

458.    The Insider Defendants were responsible for and oversaw Lehman's mortgage-related operations.  The Insider Defendants were the highest ranking officers at Lehman: Fuld served as the CEO from 1993; O'Meara served as the Company's CFO, Controller, and Executive Vice President from 2004 until December 1, 2007, and after that headed Lehman's Worldwide Risk Management; Gregory served as COO and oversaw the day-to-day management of Lehman's operations; Callan was Lehman's CFO and Executive Vice President from December 1, 2007 until June 2008; and Lowitt, who replaced Callan as CFO in June 2008, also served as Co-Chief Administrative Officer and was on Lehman's Executive Committee.

459.    Defendant Fuld chaired, and Callan and Lowitt participated in, the Company's Executive Committee, which was responsible for assessing Lehman's risk exposure and related disclosures.  Lehman's Executive Committee reviewed "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed."  Additionally, the Committee "allocate[d] the usage of capital to each of our businesses and establishes trading and credit limits for counterparties."  According to Callan, the Executive Committee consisted of thirteen people, including herself and Fuld, who met twice a week for two hours at a time and "devote[d] a significant amount of that time to risk."  Callan stated that the Executive Committee addressed "any risk that passes a certain threshold, any risk that we think is a hot topic" and "anything else during the course of the week that's important."  Further, Callan stated that the Executive Committee was "intimately familiar with the risk that we take in all the different areas of our business.  And Dick [Fuld] in particular . . . keeps very straight lines into the businesses on this topic."

460.    Additionally, as set forth in ¶¶32-36, 458, the Insider Defendants possessed extensive industry, accounting and/or finance experience and education sufficient to understand and alert them to the serious consequences to the Class of their fraudulent scheme.

461.    By virtue of their roles as Lehman's key officers, the Insider Defendants were aware of important transactions and circumstances affecting Lehman's core business.  Lehman's mortgage-related business and mortgage-related holdings were integral to its core business operations.  As described in § V.A.6-7 above, mortgage origination and securitization was a massive and crucial aspect of Lehman's business.  Lehman originated approximately $60 billion in residential mortgages during 2006 and $47 billion during 2007; it also originated approximately $34 billion in commercial mortgages in 2006 and $60 billion in 2007.  Lehman

securitized more than $100 billion in residential mortgages in 2007, and approximately $20 billion in commercial mortgages.

462.    Lehman's mortgage origination and securitization businesses contributed to the Principal Transactions line of the Company's revenue and, for fiscal years 2005-2007, Principal Transactions contributed roughly 50% of Lehman's net sales.    From its origination and securitization businesses, during the Class Period, Lehman amassed nearly $90 billion in mortgage-related holdings – more than four times its shareholder equity.

463.    As described above, the collapse of the mortgage and securitization markets did not occur suddenly, and Lehman's competitors took large writedowns associated with mortgage-related holdings.    Further, during the Class Period, the market was focused on Lehman's exposure to mortgage-related losses.    Thus, throughout the Class Period, the Insider Defendants publically addressed the performance of Lehman's mortgage-related businesses and its exposure to loss on mortgage-related holdings.

464.    As set forth above in ¶¶288, 289, 293, 306, 321, 434, Defendants Fuld, O'Meara, Callan and Lowitt signed quarterly and annual SOX certifications during the Class Period attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as well as Lehman's internal control over financial reporting.

465.    In addition, a January 2008 internal presentation made by Eric Felder, a Lehman executive, acknowledged that the mortgage crisis was having a severe impact on the Company's operations and liquidity position.    Slides accompanying Felder's presentation stated that "[v]ery few of the top financial issuers have been able to escape damage from the subprime fallout."

The presentation also warned that, because "a small number of investors account for a large portion of demand [for Lehman issues], liquidity can disappear quite fast."

466.    Moreover, in a May 26, 2008, email from David Goldfarb, the Chief Strategy Officer at Lehman, to Defendants Fuld and Gregory, Goldfarb raised the issue of securing additional capital and using refunds to buy Lehman's shares and prop up the price of Lehman's shares, stating "[i]f we did raise $5 billion, I like the idea of aggressively going into market and spending 2 of the 5 buying back lots of stock (and hurting Einhorn bad!!)"   That same day, Defendant Fuld responded to Goldfarb in an email and stated "I agree with all of it."

467.    Further, an internal memorandum from June 2008 that was produced on behalf of Defendant Fuld to the House of Representatives Committee on Oversight and Government Reform in response to a request for "e-mails and documents that were sent to or from [Defendant Fuld]," asked, "Why did we allow ourselves to be so exposed?"   The reasons cited for the Company's exposure included that:   "Conditions clearly [were] not sustainable.   Saw warning signs.   Did not move early, fast enough.   Not enough discipline in our capital allocation."

468.    On June 16, 2008, Defendant Fuld admitted that "we really didn't react quickly enough to the eroding environment" and that the Company's $2.8 billion quarterly loss was "my responsibility" because "I am the one who ultimately signs off."   Likewise, on September 10, 2008, in announcing a further $3.9 billion quarterly loss, Defendant Lowitt contradicted earlier statements and admitted that there was "no correct hedge for Alt-A assets."

469.    Further, on September 9, 2008, JPMorgan co-CEO Black had directly contacted Defendant Fuld and demanded an additional $5 billion as collateral from Lehman to cover lending positions, as detailed in ¶¶11, 267 above.   On that same date, Lehman had internally

calculated that the Company required at least an additional $3 billion in capital, as detailed in ¶¶11, 266 above.

470.     Moreover, Lehman and its subsidiaries prepared numerous reports that indicated internally during the Class Period that Lehman's mortgage and real estate businesses were deteriorating, and that the deterioration would become more severe.  For example, according to CW7, a senior vice president in Lehman's Global Real Estate Group, internal Lehman documents from as early as 2006 discussed how a meltdown in the commercial mortgage market would follow a meltdown in the residential market.  Given the subprime mortgage meltdown throughout 2007, a report commissioned by Lehman's senior management confirmed the danger to the commercial mortgage and CMBS markets beginning in mid-2007.  CW7 believes that the report was likely commissioned for the Chairman's office.

471.     According to CW3 and CW9, Lehman was in regular communication with Aurora and received numerous performance reports on the loans Aurora serviced for Lehman.  CW2 worked with the Lehman trading desk and provided it with reports on product performance.  CW9 also received monthly reports from Lehman management on loan claims, including repurchase requests and make whole claims.

472.     According to CW17, CW18, and CW19, Aurora prepared monthly reports on first payment defaults, delinquencies of 30, 60, and 90 days, and foreclosures.[16]  CW19 recalled that

---

[16]  CW17 was a vice president of credit risk at Aurora from May 2006 to March 2008.  CW17 was responsible for the quality of loans underwritten on the residential mortgage side, supporting both retail and correspondent lending.  CW18 worked as a high risk specialist/fraud analyst at Aurora from the beginning of 2007 to January 2008.  CW18's group would audit between 1,000 and 1,300 loans per month that were in either first payment default or early payment default to check for fraud.  If the group concluded that fraud was involved, it would recommend that the correspondent lender repurchase the loan.  CW19 was a manager of financial analysis for

these reports were then sent to Lehman's Home Loan Finance section. From these reports, CW19 noticed that delinquencies and foreclosures began increasing in 2006. Further, CW19 recalled that the increased delinquencies were a regular topic of discussion during monthly performance meetings and that staffing increased in the loss mitigation department to address the escalating delinquencies.

473.   According to CW20, who worked as a manager in BNC's Due Diligence and Repurchase Department from January 2006 until the fall of 2007, that department participated in monthly meetings at which BNC's management was informed of the difficulties in selling BNC's loans in the secondary market. CW20 also stated that reports were distributed monthly to Lehman regarding all of the reasons that BNC's loans were not selling. The reports broke down the problems by category, including, for example, appraisal and credit issues.

474.   Internal reporting systems also indicated that loans in Lehman's pools experienced increased deficiencies and defaults. According to CW21, Lehman used a Collateral Analysis System to analyze the pools of loans it purchased from various third parties.[17] The Collateral Analysis System analyzed and compiled information and computed weighted averages regarding components of the pools. According to CW21, the system categorized loans by product type, and it would consider characteristics of a pool to ascertain potential pricing losses. CW21 stated that Lehman marketed lower quality loans, and as the securitization market constricted, Lehman was stuck with many lower quality loans.

---

Aurora's servicing side from 2005 until October 2007. CW19 handled financial reporting, budgeting, and forecasting, and reported to Aurora's CFO, John Skoba.

[17]   CW21 was an associate in Lehman's securitized products group from June 2006 to March 2008. CW21 reported first to Lehman's former securitization chief David Sherr, who left on September 14, 2007 to start the hedge fund One William Street Capital, and then to Rich McKinney, who took over as securitization chief.

475.    Against this backdrop, the Insider Defendants refused to provide transparency into Lehman's mortgage-related assets.  Such lack of transparency can only be a conscious decision.  Defendants Fuld, O'Meara, and Callan refused to provide transparency and basic information about Lehman's holdings even when asked direct questions by analysts and investors regarding exposure to loss from mortgage-related positions and hedging activities during the Class Period.  Among other things, the Insider Defendants failed to disclose: (1) the net or gross writedowns Lehman recorded in the second quarter of 2007; (2) the amount of gross mortgage-related writedowns Lehman recorded in the third quarter of 2007; (3) the full extent of Lehman's mortgage-related exposure and losses associated with Alt-A mortgage assets; (4) the amount of gross writedowns Lehman recorded in its CMBS portfolio in the second, third, and fourth quarters of 2007; and (5) any meaningful information about the Company's "economic hedges" including its inability to hedge Alt-A exposure.

### 2.    Motive And Opportunity

476.    The Insider Defendants were motivated to commit the fraud alleged herein in order to obtain massive bonuses and other rewards under the Company's compensation plans.

477.    For 2007, in the midst of record declines in the mortgage and mortgage securitization markets, Lehman reported its highest ever earnings.  Given Lehman's reported results, its compensation pool reached a record $9.5 billion – 9.5% higher than the previous year – as 2007 year-end earnings rose 5% from a year earlier.  The Insider Defendants' compensation was directly tied to the Company's short-term performance.

478.    According to Lehman's March 5, 2008, Proxy Statement, the Compensation Committee based executive compensation award recommendations upon whether the Company exceeded certain benchmarks during the year, including, among others, percentage increases in Lehman's fiscal 2007 net revenues (10%), pretax income (2%), net income (4%) and earnings

per share (7%) over fiscal 2006.  Lehman also awarded additional compensation to executives for purportedly "[s]uccessfully navigating the difficult credit and mortgage market environments and maintaining the Firm's strong risk controls."  For fiscal 2007, Lehman made the following compensation awards to the Individual Defendants:

(a)      Defendant Fuld received an annual salary of $750,000, a cash bonus of $4,250,000 and a restricted stock bonus of $35 million, for total compensation of $40 million.  According to the Company's March 5, 2008 Proxy Statement, the formula that determined Fuld's compensation award for fiscal 2007 was based on declining percentages of Lehman's pre-tax income, with a maximum percentage of 0.75%.  This formula was based on the Company's pre-tax income for fiscal 2007 of $6 billion.  In the Company's March 5, 2008 Proxy Statement, Fuld's $40 million compensation award for Fiscal 2007 was purportedly justified, in part, by "his role in leading the Company through the challenging market environment, and orchestrating the Company's strategic direction and objectives including the continued diversification of the Company across businesses, regions and products which was important to the Company's financial performance in Fiscal 2007";

(b)      Defendant O'Meara received an annual salary of $200,000, a cash bonus of $2,650,000 and a restricted stock award of $6,642,857, for total compensation of $9,492,857;

(c)      Defendant Gregory received an annual salary of $450,000, a cash bonus of $4.5 million and a massive restricted stock award of $29 million, for total compensation of $34 million; and

(d)      Defendant Lowitt received an annual salary of $200,000, a cash bonus of $2.65 million and a restricted stock award of $6.64 million, for total compensation of

165

$9.49 million.

479.     As further evidence of motive to conceal Lehman's exposure to loss from mortgage assets, Lehman raised billions of dollars in capital during the Class Period through a combination of common stock, preferred stock and bond offerings, at times when Callan claimed that the Company had more than adequate capital and larger-than-ever liquidity pools. Defendant Callan claimed on June 9, 2008, that Lehman did not intend to use the $6 billion in capital Lehman raised on June 9, 2008, as set forth above at ¶427, to decrease leverage or shore up its mortgage-related positions.

480.     The Insider Defendants' also had opportunity by virtue of their positions as Lehman's top officers, their control over Lehman and its public statements, and their superior access to internal information.

### D.     Loss Causation

481.     Plaintiffs and other members of the putative Class suffered economic losses as the price of Lehman's stock fell in response to the issuance of partial corrective disclosures and/or the materialization of risks concealed by the Defendants from Lehman's investors.

482.     Throughout the Class Period, as detailed above, the price of Lehman's securities was artificially inflated as a direct result of Defendants' material misrepresentations and omissions regarding the Company.  As the true financial condition of the Company was revealed, however, and the risks associated with its condition materialized, the inflation that had been caused by Defendants' materially false and misleading statements and omissions was eliminated from the price of the Company's securities, causing significant damages to Plaintiffs and the other members of the Class.  Lehman's securities consistently reacted to information in the market, including, but not limited to, the following:

- On June 12, 2007, Lehman issued a misleading press release announcing its financial results for the quarter ended May 31, 2007.  On this news, Lehman's common stock rose 0.50%.

- On September 18, 2007, Lehman issued a misleading press release announcing its financial results for the quarter ended August 31, 2007.  On this news, Lehman's common stock rose 10.01%.

- On March 18, 2008, Lehman issued a misleading press release announcing its financial results for the quarter ended February 29, 2008.  On this news, Lehman's common stock rose 46.43%.

- On March 19, 2008, Bernstein Research analyst Brad Hintz reported that Lehman had $87 billion in "troubled" assets that would probably cause Lehman more losses.  On this news, Lehman's common stock fell 9.16%.

- On June 2, 2008, S&P downgraded Lehman's credit rating.  On this news, Lehman's common stock fell 8.1%.

- On June 9, 2008, Lehman issued a misleading press release announcing its financial results for the quarter ended May 31, 2008.  On this news, Lehman's shares declined 8.7% and continued to fall an additional 19.44% over the next two days.

- On Wednesday June 11, 2008, *Financial Times* reported that Lehman had sought to raise additional capital from South Korean financial institutions.  On this news, Lehman's shares closed down 13.6%.

- On Tuesday June 17, 2008, *The Wall Street Journal* reported that accounting rules could force Lehman to take back onto its books billions of dollars in assets it had structured in

off balance sheet securitization vehicles.  In connection with this news, Lehman's shares fell 7.57%.

- On August 25, 2008, South Korea's financial regulator suggested that Korean Development Bank ("KDB") take a cautious approach to acquiring an overseas investment bank.  As a result, Lehman's shares fell 6.67%.

- On September 8, 2008, Lehman announced that it would release its third quarter 2008 results, as well as key strategic initiatives for the Company, on Thursday, September 18, 2008, in a press release after the close of the markets.  Analysts at Bernstein Research and Oppenheimer predicted further writedowns in the third quarter of between $4 and $5 billion.  As a result of this news, Lehman's shares finished down 12.7%.

- On September 9, 2008, the Dow Jones newswires reported that talks between KDB and Lehman had broken down. On this news Lehman's shares plummeted approximately 45%.  Lehman then announced that it would pre-release its third quarter results before the market opened the following day.

- On September 10, 2008, Lehman pre-released its third quarter 2008 results and reported a $3.9 billion loss as well as another $5.6 billion in net writedowns on its residential and commercial real estate holdings.  On this news, Lehman's shares declined a further 7% from the prior day's close.

- On September 15, 2008, Lehman filed for bankruptcy.  As a result, Lehman's shares declined over 94% on September 15, 2008.

483.   The declines in the price of Lehman's securities following these and other revelations, and the resulting damages suffered, are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by

Defendants and to the market's adjustment of the newly emerging truth about Lehman's financial condition.   Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants named herein, or been aware of the truth behind Defendants' material misstatements, they would not have purchased Lehman securities at artificially inflated prices.

       **E.**     **The Presumption Of Reliance**

484.   The market for Lehman securities was, at all relevant times, an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the price of these securities.

485.   Lehman securities traded on national and international exchanges such as on the New York Stock Exchange – a highly efficient market.   The Company was consistently followed, before and throughout the Class Period, by a number of securities analysts who published reports regarding Lehman.   The price of Lehman securities reacted promptly to the dissemination of new information regarding the Company.   Lehman securities were actively traded throughout the Class Period.

486.   Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Lehman securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

487.   At the times they purchased or otherwise acquired Lehman securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.   As a result, Plaintiffs and other members of the Class are also entitled to rely upon Defendants' material omissions during the Class Period.

F.      **Causes Of Action Under The Exchange Act**

**COUNT IV**

**Violations Of Section 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder Against The Insider Defendants**

488.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against the Insider Defendants.

489.    During the Class Period the Insider Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lehman securities; and (iii) cause Plaintiffs and other members of the Class to purchase Lehman securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Insider Defendants, and each of them, took the actions set forth herein.

490.    The Insider Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Lehman common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Insider Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

491.    In addition to the duties of full disclosure imposed on the Insider Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the

170

integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 *et seq.*) and S-K (17 C.F.R. § 229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete and accurate information.

492.    The Insider Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the United States mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Lehman as specified herein.  The Insider Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Lehman's value, performance and liquidity, which included the making of, or the participation in, the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Lehman and its business, operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Lehman securities during the Class Period.

493.    Each of the Insider Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Insider Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Insider Defendants, by virtue of his or her responsibilities and activities as a senior executive officer and/or director of

the Company, was privy to, and participated in, the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Insider Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Insider Defendants were aware of the Company's dissemination of information to the investing public, which they knew was materially false and misleading or recklessly disregarded the truth of the information they disseminated.

494.    The Insider Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.   The Insider Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lehman's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.    As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Insider Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

495.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lehman securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of

Lehman securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Insider Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Insider Defendants but not disclosed in public statements by the Insider Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Lehman securities during the Class Period at artificially inflated prices and were damaged thereby.

496.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Lehman, which were not disclosed by the Insider Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Lehman securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

497.    By virtue of the foregoing, the Insider Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

498.    As a direct and proximate result of the Insider Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT V

### Violations Of Section 20(a) Of The
### Exchange Act Against The Insider Defendants

499.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.  This claim is asserted against the Insider Defendants.

500.    The Insider Defendants were and acted as controlling persons of Lehman within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Insider Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Each of the Insider Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

501.    In addition, each of the Insider Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

502.    As set forth above, the Insider Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Insider Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Insider Defendants' wrongful conduct, Plaintiffs and other

174

members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT VI

### Violations Of Section 20A Of The
### Exchange Act Against Defendant Fuld

503.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

504.    This Claim is brought pursuant to Section 20A of the Exchange Act against Defendant Fuld on behalf of all members of the Class damaged by Defendant Fuld's insider trading during the Class Period.

505.    As detailed herein, Defendant Fuld was in possession of material, non-public information concerning Lehman.  Defendant Fuld took advantage of his possession of material, non-public information regarding Lehman to make millions of dollars in insider trading profits during the Class Period.

506.    Defendant Fuld's sale of Lehman securities was made contemporaneously with Plaintiffs' and Class members' purchases of Lehman securities during the Class Period.

507.    For example, on June 13, 2007, Defendant Fuld sold 291,864 shares of stock at $77.20 per share for proceeds of $22,692,426.  On June 14, 2007, Lead Plaintiff NILGOSC purchased 1,300 shares of Lehman at $78.3963 per share, for a total cost of $101,915.19.  On June 15, 2007, NILGOSC purchased 1,800 shares of Lehman at $79.5325 per share, for a total cost of $143,158.50.  Also on June 15, 2007, NILGOSC purchased 100 shares of Lehman at $79.70 per share, for a total cost of $7,970.  On June 19, 2007, Lead Plaintiff Operating Engineers purchased 4,500 shares of Lehman at $80.9702 per share, for a total cost of

175

$364,365.90. Similarly, on June 20, 2007, Operating Engineers purchased 2,200 shares of Lehman at $81.6462 per share, for a total cost of $179,621.64.

508. All members of the Class who purchased shares of Lehman securities contemporaneously with sales by Defendant Fuld have suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of Section 10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Exchange Act Defendants' false and misleading statements and concealment. At the time of the purchases of the securities by members of the Class, the fair and true market value of the securities was substantially less than the price paid by these Class members.

## VII.  CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

509. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other persons and entities, except Defendants and their affiliates, who purchased or acquired publicly-traded securities of Lehman and its subsidiaries (including stock, preferred shares, bonds, and/or call options or who sold put options) between June 12, 2007, and September 15, 2008 (the "Class Period"), and who were damaged thereby.[18] Excluded from the Class are (i) Defendants, (ii) the officers and directors of each defendant, (iii) any entity in which Defendants have or had a controlling interest; and (iv) members of Defendants' immediate families and the legal representatives, heirs, successors or assigns of any such excluded party.

_____

[18]  This excludes, for instance, purchasers of CDOs, MBSs, or pass-through securities that are not general obligations of Lehman or its subsidiaries.

510.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, the Lehman securities at issue actively traded on the New York Stock Exchange, an open and efficient market.  Record owners and other members of the Class may be identified from records maintained by Lehman and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

511.    Plaintiffs claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

512.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

513.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

>    (a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

>    (b)    whether Defendants participated in and pursued the common course of conduct complained of herein;

>    (c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period

misrepresented material facts about the business, finances, financial condition and prospects of Lehman;

(d)     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, finances, value, performance and prospects of Lehman;

(e)     whether the market price of Lehman's securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     the extent to which the members of the Class have sustained damages and the proper measure of damages.

514.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

VIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

(a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

(c)     Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and expert witness' fees and other costs;

(d)     An order requiring the Section 20(A) Defendant Fuld to disgorge the profits of his

insider sales of Lehman common stock during the Class Period;

(e)     Awarding Plaintiffs and the members of the Class rescission and/or rescissory

damages; and

(f)     Such other relief as this Court deems appropriate.

## IX.     DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: October 27, 2008                          BERNSTEIN LITOWITZ BERGER
                                                 & GROSSMANN LLP


                                                 _David R. Stickney_ / with permission
                                                 DAVID R. STICKNEY    by J. Brn Wilker

                                                 JOHN P. COFFEY
                                                 AVI JOSEFSON
                                                 1285 Avenue of the Americas, 38th Floor
                                                 New York, NY 10019
                                                 Tel:    (212) 554-1400
                                                 Fax:    (212) 554-1444
                                                         -and-
                                                 DAVID R. STICKNEY
                                                 DAVID A. THORPE
                                                 JON F. WORM
                                                 12481 High Bluff Drive, Suite 300
                                                 San Diego, CA 92130
                                                 Tel:    (858) 793-0070
                                                 Fax:    (858) 793-0323

                                                 *Co-Lead Counsel for Plaintiffs*

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP

_John A. Kehoe_ /with permission
by J. Ben-Witters

JOHN A. KEHOE

JOHN A. KEHOE
BENJAMIN J. HINERFELD
MICHELLE M. NEWCOMER
RICHARD A. RUSSO, JR.
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056

*Co-Lead Counsel for Plaintiffs*

SPECTOR ROSEMAN KODROFF
    & WILLIS, P.C.
ROBERT M. ROSEMAN (RR-1103)
ANDREW D. ABRAMOWITZ
DAVID FELDERMAN
RACHEL E. KOPP
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel:    (215) 496-0300
Fax:    (215) 496-6611

*Counsel for Lead Plaintiff Northern Ireland Local*
*Government Officers' Superannuation Committee*

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
THOMAS A. DUBBS
ERIC J. BELFI
JONATHAN GARDNER
140 Broadway
New York, NY 10005
Tel:    (212) 907-0853

*Counsel for Lead Plaintiff City of Edinburgh*
*Council as Administering Authority of the Lothian*
*Pension Fund*

180

SAXENA WHITE P.A.
MAYA SAXENA
JOSEPH E. WHITE III
CHRISTOPHER S. JONES
LESTER R. HOOKER
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Tel:    (561) 394-3399

*Counsel for Lead Plaintiff Operating Engineers Local 3 Trust Fund, named Plaintiff Brockton Contributory Retirement System, and named Plaintiff Teamsters Allied Benefit Funds*

MURRAY, FRANK & SAILER LLP
MARVIN L. FRANK
275 Madison Ave, Suite 801
New York, NY 10016
Tel:    (212) 682-1818
Fax:    (212) 682-1892

*Counsel for named Plaintiff Marsha Kosseff*

POMERANTZ HAUDEK BLOCK
   GROSSMAN & GROSS LLP
MARC I. GROSS
100 Park Avenue
New York, NY 10017
Tel:    (212) 661-1100
Fax:    (212) 661-8665

*Counsel for named Plaintiff American European Insurance Company*

181

COHEN, MILSTEIN, HAUSFELD
   & TOLL, PLLC
STEVEN J. TOLL
JULIE REISER
1100 New York Avenue NW
Suite 500, West Tower
Washington, D.C. 20005
Tel:    (202) 408-4600
Fax:    (202) 408-4699

*Counsel for named Plaintiff Inter-Local Pension Fund Graphic Communications Conference of the International Brotherhood of Teamsters*

**CERTIFICATION PURSUANT TO**
**THE FEDERAL SECURITIES LAWS**

I, Robert L. Gaumer, on behalf of the Alameda County Employees' Retirement Association ("ACERA" or "Plaintiff"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am Chief Counsel of ACERA. I have reviewed the Amended Complaint and authorized its filing by Schiffrin Barroway Topaz & Kessler, LLP.

2. ACERA did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. ACERA is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. ACERA's transactions in Lehman Brothers Holdings Inc. common stock, Lehman Subordinated 6.875% Notes Due 2037, and Lehman 7.95% Non-Cumulative Perpetual Convertible Preferred Stock Series J are set forth in the chart attached hereto.

5. ACERA has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re Coca-Cola Enterprises, Inc. Sec. Litig.*, No. 1:06-CV-00275-TWT (N.D. Ga.)

   *Operative Plasterers and Cement Masons International Association Local 262 Annuity Fund v. Lehman Brothers Holdings, Inc.*, et al., Case No. 08-cv-5523 (S.D.N.Y.)

6. ACERA has otherwise sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in the following:

   *Mizzaro v. Home Depot, Inc.*, No. 1:06-CV-1151 (ODE) (N.D. Ga.)

   *Pappas v. Countrywide Financial Corp, et. al.*, No. CV 07-5295 (ODW) (C.D. Ca.)

   *Koresterer v. Washington Mutual, Inc., et al.*, No. 1:07-cv-9801 (S.D.N.Y.)

7. ACERA will not accept any payment for serving as a representative party on behalf of the Class beyond ACERA's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22ᵗʰ day of October, 2008.

Robert L. Gaumer
Chief Counsel
*Alameda County Employees' Retirement Association*

## SCHEDULE A

| Date | Purchase or Sale | Type of Securities | Number of Securities | Price of Securities |
|---|---|---|---|---|
| 6/26/2007 | Purchase | Com Stk | 4,000 | 74.1361 |
| 6/27/2007 | Purchase | Com Stk | 47,300 | 73.8434 |
| 6/29/2007 | Purchase | Com Stk | 4,000 | 74.5341 |
| 8/28/2007 | Purchase | Com Stk | 24,975 | 54.1516 |
| 8/30/2007 | Purchase | Com Stk | 7,500 | 53.2453 |
| 10/15/2007 | Purchase | Com Stk | 1,701 | 63.7733 |
| 11/1/2007 | Purchase | Com Stk | 10,186 | 60.9745 |
| 6/9/2008 | Cover Short | Com Stk | 18,487 | 29.6527 |
| 6/9/2008 | Purchase | Com Stk | 70,475 | 28.0000 |
| 8/1/2008 | Purchase | Com Stk | 5,230 | 17.7500 |
| 8/6/2008 | Purchase | Com Stk | 3,980 | 20.2400 |
| 8/6/2008 | Purchase | Com Stk | 1,250 | 20.2400 |
| 8/13/2008 | Purchase | Com Stk | 500 | 16.1100 |
| 12/10/2007 | Sale | Com Stk | 11,887 | 65.0919 |
| 5/27/2008 | Short Sale | Com Stk | 18,487 | 36.3952 |
| 8/6/2008 | Sale | Com Stk | 3,980 | 20.2400 |
| 8/6/2008 | Sale | Com Stk | 1,250 | 20.2400 |
| 9/9/2008 | Sale | Com Stk | 21,896 | 8.7588 |
| 9/9/2008 | Sale | Com Stk | 50,004 | 8.7588 |
| 9/9/2008 | Sale | Com Stk | 71,925 | 8.6632 |
| 9/9/2008 | Sale | Com Stk | 71,925 | 7.9536 |
| 9/15/2008 | Sale | Com Stk | 1,250 | 0.2024 |
| 5/6/2008 | Purchase | Sub Nt 6.875% | 280,000 | 92.1820 |
| 5/20/2008 | Purchase | Sub Nt 6.875% | 80,000 | 90.0000 |
| 5/21/2008 | Purchase | Sub Nt 6.875% | 85,000 | 89.5000 |
| 5/22/2008 | Purchase | Sub Nt 6.875% | 80,000 | 87.6570 |
| 5/27/2008 | Purchase | Sub Nt 6.875% | 570,000 | 85.6250 |
| 5/28/2008 | Purchase | Sub Nt 6.875% | 345,000 | 85.1420 |
| 6/3/2008 | Purchase | Sub Nt 6.875% | 105,000 | 86.5110 |
| 6/11/2008 | Purchase | Sub Nt 6.875% | 150,000 | 86.7340 |
| 6/12/2008 | Purchase | Sub Nt 6.875% | 75,000 | 86.2000 |
| 6/13/2008 | Purchase | Sub Nt 6.875% | 190,000 | 85.9080 |
| 6/16/2008 | Purchase | Sub Nt 6.875% | 300,000 | 87.1050 |
| 7/1/2008 | Purchase | Sub Nt 6.875% | 165,000 | 86.2730 |

| | | | | |
|---|---|---|---|---|
| 7/11/2008 | Purchase | Sub Nt  6.875% | 115,000 | 85.0550 |
| 7/15/2008 | Purchase | Sub Nt  6.875% | 175,000 | 84.0000 |
| | | | | |
| 6/16/2008 | Purchase | 7.95% Series J | 1,250 | 21.6250 |
| 6/16/2008 | Purchase | 7.95% Series J | 3,025 | 21.6250 |
| 7/16/2008 | Purchase | 7.95% Series J | 590 | 13.2500 |
| 8/11/2008 | Purchase | 7.95% Series J | 5,675 | 16.7500 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Joe T. San Agustin, on behalf of Government of Guam Retirement Fund ("GGRF"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of GGRF. I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2. GGRF did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. GGRF is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. GGRF transactions in Lehman Brothers Holdings Inc. common stock and 6.875% Notes Due 2018 are set forth in the chart attached hereto.

5. GGRF has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Operative Plasterers and Cement Masons International Association Local 262 Annuity Fund v. Lehman Brothers Holdings, Inc.,* et al., Case No. 08-cv-5523 (S.D.N.Y.)

6. GGRF will not accept any payment for serving as a representative party on behalf of the Class beyond GGRF's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of September, 2008.

Joe T. San Agustin
Chairman
*Government of Guam Retirement Fund*

**The Government of Guam Retirement Fund**
**Transactions in Lehman Brothers Holdings, Inc.**

**Common Stock**

| Transaction | Date | Shares | | Price |
|-------------|------|--------|---|-------|
| Purchase | 8/17/2007 | 28,000 | $ | 58.15 |
| Purchase | 8/30/2007 | 15,513 | $ | 53.81 |
| Purchase | 8/30/2007 | 1,787 | $ | 53.82 |
| Purchase | 9/12/2007 | 1,127 | $ | 56.18 |
| Purchase | 9/12/2007 | 937 | $ | 56.56 |
| Purchase | 9/12/2007 | 4,107 | $ | 57.24 |
| Purchase | 9/12/2007 | 11,913 | $ | 57.04 |
| Purchase | 9/13/2007 | 8,450 | $ | 59.21 |
| Purchase | 9/13/2007 | 3,972 | $ | 59.67 |
| Purchase | 9/13/2007 | 1,894 | $ | 60.13 |
| Purchase | 9/14/2007 | 1,800 | $ | 59.13 |
| Purchase | 9/14/2007 | 3,300 | $ | 59.11 |
| Purchase | 9/14/2007 | 4,200 | $ | 59.15 |
| Purchase | 9/17/2007 | 1,561 | $ | 58.60 |
| Purchase | 9/17/2007 | 1,237 | $ | 58.50 |
| Purchase | 9/17/2007 | 3,202 | $ | 58.48 |
| Purchase | 9/18/2007 | 19,800 | $ | 61.83 |
| Purchase | 9/18/2007 | 7,800 | $ | 61.83 |
| Purchase | 10/2/2007 | 1,000 | $ | 63.64 |
| Purchase | 10/16/2007 | 2,300 | $ | 60.45 |
| Purchase | 10/31/2007 | 21,600 | $ | 62.88 |
| Purchase | 10/31/2007 | 8,600 | $ | 62.88 |
| Purchase | 11/30/2007 | 5,200 | $ | 62.43 |
| Purchase | 12/5/2007 | 13,400 | $ | 60.08 |
| Purchase | 12/13/2007 | 14,400 | $ | 61.28 |
| Purchase | 12/13/2007 | 12,300 | $ | 61.28 |
| Purchase | 3/12/2008 | 25,700 | $ | 46.02 |
| Purchase | 3/14/2008 | 11,900 | $ | 41.68 |
| Purchase | 3/17/2008 | 4,900 | $ | 31.52 |
| Purchase | 3/17/2008 | 2,200 | $ | 31.09 |
| Sale | 7/10/2007 | (10,900) | $ | 72.17 |
| Sale | 7/20/2007 | (7,100) | $ | 67.89 |
| Sale | 7/24/2007 | (23,600) | $ | 67.86 |
| Sale | 11/21/2007 | (16,800) | $ | 58.15 |
| Sale | 11/21/2007 | (42,200) | $ | 58.55 |
| Sale | 2/12/2008 | (700) | $ | 57.38 |
| Sale | 2/12/2008 | (1,400) | $ | 58.34 |
| Sale | 2/12/2008 | (6,300) | $ | 56.41 |
| Sale | 2/12/2008 | (1,800) | $ | 57.03 |
| Sale | 2/13/2008 | (4,223) | $ | 55.49 |
| Sale | 2/13/2008 | (3,432) | $ | 54.91 |
| Sale | 2/13/2008 | (845) | $ | 54.79 |
| Sale | 3/3/2008 | (14,600) | $ | 48.95 |

| | | | | |
|---|---|---|---|---|
| Sale | 5/20/2008 | (20,500) | $ | 41.56 |
| Sale | 5/30/2008 | (57,000) | $ | 36.80 |
| Sale | 6/2/2008 | (32,700) | $ | 34.10 |
| Sale | 6/11/2008 | (41,600) | $ | 26.01 |

**Transactions in 6.875% Notes Due 2018**

| Transaction | Date | Units | Par Value |
|---|---|---|---|
| Purchase | 4/17/2008 | 1,315,000 | 99.67 |
| Purchase | 8/1/2008 | 610,000 | 94.30 |

*Spector, Roseman & Kodroff, P.C.*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, David Murphy, as an authorized representative of Northern Ireland Local Government Officers' Superannuation Committee ("NILGOSC") ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff makes this certification pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995, and as required by Section 21D(a)(2) of Title I of the Securities Exchange Act of 1934.

2.     Plaintiff has reviewed the complaint filed in the Lehman Brothers Holdings Inc. action.

3.     Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action arising under Title I of the Securities Exchange Act of 1934.

4.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

5.     Following is a list of Plaintiff's transactions in Lehman Brothers Holdings Inc. securities that are the subject of this action during the Class Period specified in the Complaint:

*See,* **attached chart.**

*Spector, Roseman & Kodroff, P.C.*

6.      During the three year period preceding the date of this Certificate, Plaintiff has sought to serve as a representative party on behalf of a class under Title I of the Securities Exchange Act of 1934 for the following actions: **(Please indicate any other class action cases in which you are or have been involved in during the prior three years.)**

None

7.      Plaintiff agrees not to accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.      Plaintiff makes this Certification without waiver of any applicable privileges and without waiver of any right to challenge the necessity for, or the constitutionality of, this Certification, or to object to the filing of this Certification on any ground whatsoever.

I declare under penalty of perjury that the matters stated in this Certification are true to the best of my knowledge, information and belief.

Executed this 30th day of the month of June, 2008 at Templeton House, Belfast, United Kingdom.

_____

**David Murphy**
**Deputy Secretary**
On Behalf of NILGOSC

*Spector, Roseman & Kodroff, P.C.*

**Northern Ireland Local Government Officers' Superannuation Committee**
**Transactions in Lehman Brothers Holdings Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 3/2/07 | 1,500 | $ 72.4806 |
| Purchase | 3/2/07 | 2,800 | $ 72.3236 |
| Purchase | 3/2/07 | 3,900 | $ 72.3301 |
| Purchase | 3/5/07 | 500 | $ 71.6450 |
| Purchase | 3/5/07 | 1,600 | $ 71.2161 |
| Purchase | 3/5/07 | 6,800 | $ 71.7503 |
| Purchase | 3/6/07 | 6,300 | $ 73.8148 |
| Purchase | 3/6/07 | 200 | $ 73.2400 |
| Purchase | 3/7/07 | 1,900 | $ 74.1169 |
| Purchase | 3/7/07 | 5,000 | $ 74.1691 |
| Purchase | 3/7/07 | 900 | $ 74.1166 |
| Purchase | 3/8/07 | 7,000 | $ 75.8724 |
| Purchase | 3/8/07 | 1,800 | $ 75.6937 |
| Purchase | 3/9/07 | 5,300 | $ 75.5263 |
| Purchase | 3/9/07 | 600 | $ 75.3340 |
| Purchase | 3/9/07 | 1,000 | $ 75.5400 |
| Purchase | 3/12/07 | 1,600 | $ 74.9565 |
| Purchase | 3/12/07 | 3,400 | $ 75.3878 |
| Purchase | 3/12/07 | 600 | $ 74.9745 |
| Purchase | 3/12/07 | 400 | $ 75.0465 |
| Purchase | 3/13/07 | 15,000 | $ 73.9837 |
| Purchase | 4/3/07 | 5,600 | $ 70.7689 |
| Purchase | 4/4/07 | 5,500 | $ 71.0681 |
| Purchase | 4/5/07 | 1,600 | $ 71.3384 |
| Purchase | 4/5/07 | 1,600 | $ 71.5814 |
| Purchase | 4/9/07 | 4,800 | $ 71.8628 |
| Purchase | 4/10/07 | 1,600 | $ 72.2993 |
| Purchase | 4/10/07 | 2,500 | $ 72.3047 |
| Purchase | 4/11/07 | 2,600 | $ 71.3595 |
| Purchase | 4/11/07 | 1,000 | $ 71.5050 |
| Purchase | 4/11/07 | 4,500 | $ 71.3296 |
| Purchase | 4/11/07 | 500 | $ 71.2915 |
| Purchase | 4/12/07 | 2,600 | $ 71.7009 |
| Purchase | 4/12/07 | 300 | $ 72.2000 |
| Purchase | 4/13/07 | 2,500 | $ 72.1126 |
| Purchase | 4/13/07 | 800 | $ 71.9494 |
| Purchase | 4/13/07 | 200 | $ 71.9980 |
| Purchase | 4/16/07 | 4,500 | $ 75.8471 |
| Purchase | 4/16/07 | 2,200 | $ 76.0135 |
| Purchase | 4/17/07 | 500 | $ 75.8500 |
| Purchase | 4/17/07 | 4,800 | $ 75.9884 |
| Purchase | 4/18/07 | 500 | $ 77.2700 |
| Purchase | 4/18/07 | 6,000 | $ 77.3484 |
| Purchase | 4/18/07 | 200 | $ 77.5200 |

*Spector, Roseman & Kodroff, P.C.*

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 4/19/07 | 4,800 | $ 77.6049 |
| Purchase | 4/19/07 | 700 | $ 77.8048 |
| Purchase | 4/19/07 | 300 | $ 76.6462 |
| Purchase | 4/19/07 | 200 | $ 77.3950 |
| Purchase | 4/20/07 | 200 | $ 77.7221 |
| Purchase | 4/20/07 | 1,200 | $ 78.0136 |
| Purchase | 4/20/07 | 2,100 | $ 77.7608 |
| Purchase | 6/14/07 | 1,300 | $ 78.3963 |
| Purchase | 6/15/07 | 100 | $ 79.7000 |
| Purchase | 6/15/07 | 1,800 | $ 79.5325 |
| Purchase | 7/23/07 | 700 | $ 68.8859 |
| Purchase | 7/23/07 | 1,300 | $ 68.8910 |
| Purchase | 7/24/07 | 14,400 | $ 66.8957 |
| Purchase | 7/25/07 | 900 | $ 66.6003 |
| Purchase | 7/25/07 | 6,800 | $ 66.9431 |
| Purchase | 7/26/07 | 2,200 | $ 65.6317 |
| Purchase | 8/6/07 | 1,000 | $ 55.9126 |
| Purchase | 8/6/07 | 3,400 | $ 57.5250 |
| Purchase | 8/7/07 | 1,000 | $ 59.7336 |
| Purchase | 8/7/07 | 800 | $ 60.6019 |
| Purchase | 8/7/07 | 2,600 | $ 58.9271 |
| Purchase | 8/7/07 | 1,100 | $ 60.4238 |
| Purchase | 8/8/07 | 600 | $ 63.9056 |
| Purchase | 4/8/08 | 9,300 | $ 44.2043 |
| Purchase | 4/8/08 | 3,900 | $ 44.2186 |
| Purchase | 5/13/08 | 3,400 | $ 42.9663 |
| Purchase | 5/13/08 | 2,000 | $ 43.2472 |
| Purchase | 5/13/08 | 1,300 | $ 42.9184 |
| Purchase | 5/14/08 | 1,500 | $ 43.0512 |
| Purchase | 5/14/08 | 1,000 | $ 43.0361 |
| Purchase | 5/14/08 | 800 | $ 42.7630 |

## CERTIFICATION

I, Geik Drever, Head of Investments & Pensions of The City of Edinburgh Council on behalf of The Lothian Pension Fund ("Lothian") hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Lothian.  I have reviewed a complaint prepared against Lehman Brothers Holdings, Inc. ("Lehman") alleging violations of the federal securities laws;

2.      Lothian did not purchase securities of Lehman at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Lothian is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.      Lothian's transactions in the securities of Lehman during the class period as reflected in Exhibit A, are attached hereto;

5.      Lothian has not sought to serve as a representative party in a class action under the federal securities laws during the last three years, except for the following:

*Smith et al v. Eli Lilly and Company, et al.*, No. 1:07-cv-01310-JBW (E.D.N.Y.) – (*not appointed*)
*Connecticut Retirement v. Amgen Inc et al*, No. 2:07-cv-02536-PSG-PLA (C.D. Cal.) – (*not appointed*)
*Steinberg v. Ericsson LM Tel. Co.*, No. 1:07-cv-09615-RPP (S.D.N.Y.) – (*not appointed*)
*The City of Edinburgh Council on Behalf of the Lothian Pension Fund v. Vodafone Group Public Ltd. Co.*,
No. 1:07-cv-09921-PKC (S.D.N.Y.) – (*appointed*)
*The City of Taylor General Employees Retirement System v. Sanofi Aventis*, No. 1:07-cv-10279-GBD
(S.D.N.Y.) – (*appointed*)
*Claude A Reese v. Robert A Malone et al*, No. 2:07-cv-07511-RGK-RC (C.D. Cal.) – (*appointed*)

6.      Beyond its pro rata share of any recovery, Lothian will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 25 day of June, 2008.

Geik Drever
Head of Investments & Pensions
*The City of Edinburgh Council on behalf of The
Lothian Pension Fund*

**EXHIBIT A**

**TRANSACTIONS IN
LEHMAN BROTHERS HOLDINGS, INC.**

| ACCOUNT | TRANSACTION TYPE | DATE | No. Of Shares | PRICE PER SHARE | COST/PROCEEDS |
|---|---|---|---|---|---|
| LPFW | Purchase | 20-Nov-07 | 47,400 | $59.38 | ($2,814,612.00) |
| LPFW | Purchase | 20-Nov-07 | 7,700 | $59.26 | ($456,302.00) |
| LPFW | Purchase | 29-Nov-07 | 5,300 | $62.19 | ($329,607.00) |
| LPFW | Purchase | 3-Dec-07 | 10,900 | $61.49 | ($670,241.00) |
| LPFW | Purchase | 7-Dec-07 | 21,600 | $63.67 | ($1,375,272.00) |
| LPFW | Sale | 5-Mar-08 | -48,100 | $49.38 | $2,375,178.00 |
| LPFW | Sale | 6-Mar-08 | -5,700 | $45.84 | $261,288.00 |
| LPFW | Sale | 6-Mar-08 | -6,900 | $45.64 | $314,916.00 |
| LPFW | Purchase | 13-Mar-08 | 10,800 | $44.33 | ($478,764.00) |
| LPFW | Purchase | 18-Mar-08 | 35,900 | $38.46 | ($1,380,714.00) |
| LPFW | Purchase | 19-Mar-08 | 12,900 | $45.73 | ($589,917.00) |
| LPFW | Purchase | 25-Mar-08 | 12,700 | $45.21 | ($574,167.00) |
| LPFW | Purchase | 27-Mar-08 | 14,800 | $40.36 | ($597,328.00) |
| LPFW | Purchase | 31-Mar-08 | 15,300 | $39.03 | ($597,159.00) |
| LPFW | Purchase | 1-Apr-08 | 1,300 | $41.15 | ($53,495.00) |
| LPFW | Sale | 28-Apr-08 | -32,900 | $47.52 | $1,563,408.00 |
| LPFW | Purchase | 23-May-08 | 45,100 | $36.24 | ($1,634,424.00) |

## CERTIFICATION OF LEAD PLAINTIFF

I, Thomas Hendricks, on behalf of Operating Engineers Local 3 Trust Funds ("Funds"), certify that:

1. I am authorized by the Board of Trustees of the Funds, in my capacity as the Executive Director, to initiate litigation on the Funds' behalf and to execute this Certification.

2. I have reviewed a complaint and I authorize counsel to act on the Funds' behalf in this matter.

3. The Funds did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.

4. The Funds are willing to serve as a Lead Plaintiff or class representative, either individually or as part of a group.  The Funds understand that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

5. Neither I nor the Funds  will accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6. The Funds understand that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Funds' decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all transactions in the securities of Lehman Brothers Holdings Inc., in the class period  from  September 13, 2006 through and including June 6, 2008, as follows:

| Type of Security  (Common stock) | Purchase/Acquisition or Sale/Disposition | Quantity | Trade Date (mm/dd/yy) | Price per Share/Security ($) |
|---|---|---|---|---|
| Common Stock–Cusip 524908100 | | | | |
| | | | | |
| SEE ATTACHED SCHEDULE A | | | | |
| | | | | |
| | | | | |

8. During the three years prior to the date of this Certification, the Funds  has only sought to serve, and has served as a representative party for a class in an action filed  under  the  Private  Securities  Litigation  Reform  Act,  in  the  following instances:

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this 26th day of June 2008

_Thomas Hendricks_
Name (print)                                           Signature

**SCHEDULE A-1 TO CERTIFICATION OF OPERATING ENGINEERS LOCAL 3 TRUST FUNDS**

| PURCHASES | | | |
|---|---|---|---|
| Date | # Shares | Price/share | Total Cost |
| 11/28/2006 | 477 | $75.21 | $35,875.17 |
| 12/27/2006 | 3,002 | $78.15 | $234,617.40 |
| 1/16/2007 | 1,214 | $82.64 | $100,323.26 |
| 1/26/2007 | 4,838 | $80.66 | $390,227.75 |
| 2/13/2007 | 5,548 | $82.61 | $458,327.49 |
| 2/26/2007 | 2,108 | $78.62 | $165,737.28 |
| 6/5/2007 | 29,725 | $75.04 | $2,230,439.15 |
| 6/6/2007 | 52,775 | $74.09 | $3,910,168.35 |
| 6/19/2007 | 4,500 | $80.97 | $364,365.90 |
| 6/20/2007 | 2,200 | $81.65 | $179,621.64 |
| 6/27/2007 | 17,900 | $73.83 | $1,321,549.84 |
| 6/27/2007 | 6,800 | $73.70 | $501,178.36 |
| 7/24/2007 | 5,600 | $69.08 | $386,848.00 |
| 8/2/2007 | 4,025 | $60.09 | $241,876.33 |
| 8/2/2007 | 10,400 | $60.16 | $625,670.24 |
| 10/24/2007 | 114 | $57.42 | $6,545.88 |

**SCHEDULE A-2 TO CERTIFICATION OF OPERATING ENGINEERS LOCAL 3 TRUST FUNDS**

| SALES | | | |
|---|---|---|---|
| Date | # Shares | Price/share | Total Proceeds |
| 8/4/2006 | 322 | $67.55 | $21,751.10 |
| 8/28/2006 | 11,928 | $64.24 | $766,230.86 |
| 9/8/2006 | 2,000 | $65.47 | $130,944.60 |
| 9/18/2006 | 1,500 | $71.34 | $107,014.05 |
| 9/20/2006 | 800 | $71.79 | $57,428.40 |
| 9/26/2006 | 700 | $74.11 | $51,880.43 |
| 9/26/2006 | 11,246 | $73.63 | $828,054.22 |
| 10/12/2006 | 600 | $76.52 | $45,909.72 |
| 11/15/2006 | 600 | $75.20 | $45,121.08 |
| 12/5/2006 | 900 | $75.43 | $67,887.72 |
| 1/3/2007 | 600 | $79.00 | $47,402.58 |
| 1/11/2007 | 700 | $80.49 | $56,341.67 |
| 1/22/2007 | 500 | $82.26 | $41,132.05 |
| 1/23/2007 | 3,100 | $82.19 | $254,789.00 |
| 1/30/2007 | 1,300 | $80.73 | $104,951.34 |
| 2/7/2007 | 300 | $85.43 | $25,629.60 |
| 2/15/2007 | 500 | $83.62 | $41,812.10 |
| 3/6/2007 | 300 | $74.12 | $22,236.72 |
| 3/27/2007 | 477 | $71.65 | $34,179.24 |
| 3/27/2007 | 5,500 | $72.61 | $399,360.50 |
| 4/10/2007 | 200 | $72.23 | $14,446.30 |
| 4/24/2007 | 5,600 | $77.43 | $433,613.60 |
| 4/25/2007 | 3,002 | $76.40 | $229,361.20 |
| 5/1/2007 | 12,200 | $75.01 | $915,134.20 |
| 5/14/2007 | 1,214 | $75.01 | $91,068.08 |
| 5/30/2007 | 2,621 | $73.18 | $191,804.78 |
| 6/14/2007 | 3,416 | $77.67 | $265,303.98 |
| 6/27/2007 | 13 | $73.95 | $961.36 |
| 9/5/2007 | 3,280 | $54.28 | $178,041.68 |
| 9/18/2007 | 12,300 | $59.78 | $735,321.06 |
| 9/25/2007 | 1,124 | $59.88 | $67,299.61 |
| 10/16/2007 | 1,039 | $60.66 | $63,021.27 |
| 10/19/2007 | 114 | $59.66 | $6,801.06 |
| 11/1/2007 | 757 | $60.47 | $45,772.23 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Ronald Zajac, on behalf of the Police and Fire Retirement System of the City of Detroit ("Detroit P&F"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the General Counsel of Detroit P&F. I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2. Detroit P&F did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Detroit P&F is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Detroit P&F's transactions in Lehman Brothers Holdings Inc. common stock, 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P, 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series Q, 5.625% Notes Due 2013, 6.875% Subordinated Notes Due 2037 and 6.5% Subordinated Notes due 2017 are set forth in the chart attached hereto.

5. Detroit P&F has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *In re Dot Hill Systems Corporation Securities Litigation,* Case No. 06-cv-228 (S.D. Cal.)
    *In re Bausch & Lomb, Incorporated Securities Litigation,* Case No. 06-cv-6294 (W.D.N.Y.)
    *In re KLA-Tencor Corp. Securities Litigation,* Case No. 06-cv-4065 (N.D. Cal.)
    *Police and Fire Retirement System of the City of Detroit v. Safenet, Inc., et al.,*
    Case No. 06-cv-5797 (S.D.N.Y.)
    *In re Marvell Technology Group, Ltd. Securities Litigation,* Case No. 06-cv-6286 (N.D. Cal.)
    *In re WSB Financial Group Securities Litigation,* Case No. 07-cv-1747 (W.D. Wash.)
    *In re SiRF Technology Holdings, Inc. Securities Litigation,* Case No. 08-cv-856 (N.D. Cal.)

6. Detroit P&F has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

    *In re Boston Scientific Corporation Securities Litigation,* Case No. 05-cv-11934 (D. Mass.)
    *In re Sonus Networks, Inc. Securities Litigation,* Case No. 06-cv-10040 (D. Mass.)
    *In re Aetna, Inc. Securities Litigation,* Case No. 07-cv-4451 (E.D. Pa.)
    *In re Verifone Holdings, Inc. Securities Litigation,* Case No. 07-cv-6140 (N.D. Cal.)
    *In re UBS AG Securities Litigation,* Case No. 07-cv-11225 (S.D.N.Y.)
    *In re Societe Generale Securities Litigation,* Case No. 08-cv-2495 (S.D.N.Y.)
    *City of St. Clair Shores Police and Fire Retirement System v. Gildan Activewear Inc., et al.,*
    Case No. 08-cv-5048 (S.D.N.Y.)

*Operative Plasterers and Cement Masons International Association Local 262 Annuity Fund v. Lehman Brothers Holdings, Inc.*, et al., Case No. 08-cv-5523 (S.D.N.Y.)

7. Detroit P&F will not accept any payment for serving as a representative party on behalf of the Class beyond Detroit P&F's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29ᵀᴴ day of September, 2008.

Ronald Zajac
General Counsel
*Police and Fire Retirement System
of the City of Detroit*

**Policemen and Firemen Retirement System of the City of Detroit**
**Transactions in Lehman Brothers Holdings, Inc.**

**Common Stock**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Purchase | 8/6/2007 | 3,500 | $ | (54.40) |
| Purchase | 9/21/2007 | 200 | $ | 62.69 |
| Purchase | 9/21/2007 | 100 | $ | 62.70 |
| Purchase | 10/5/2007 | 100 | $ | 64.31 |
| Purchase | 10/12/2007 | 200 | $ | 64.56 |
| Purchase | 10/18/2007 | 200 | $ | 59.25 |
| Purchase | 1/15/2008 | 300 | $ | 56.01 |
| Purchase | 2/14/2008 | 4,200 | $ | 54.55 |
| Purchase | 4/3/2008 | 200 | $ | 44.16 |
| Purchase | 4/4/2008 | 1,300 | $ | 42.94 |
| Purchase | 4/4/2008 | 4,600 | $ | 43.07 |
| Purchase | 4/7/2008 | 1,200 | $ | 44.66 |
| Purchase | 6/9/2008 | 3,900 | $ | 29.48 |
| Purchase | 6/20/2008 | 900 | $ | 24.20 |
| Purchase | 8/5/2008 | 1,900 | $ | 19.75 |
| Sale | 8/1/2007 | (800) | $ | 59.70 |
| Sale | 8/28/2007 | (10,300) | $ | 54.70 |
| Sale | 8/29/2007 | (2,471) | $ | 54.21 |
| Sale | 8/29/2007 | (2,471) | $ | 54.37 |
| Sale | 8/29/2007 | (2,472) | $ | 54.07 |
| Sale | 8/29/2007 | (1,486) | $ | 54.04 |
| Sale | 9/25/2007 | (4,800) | $ | 59.97 |
| Sale | 10/25/2007 | (4,600) | $ | 56.97 |
| Sale | 11/9/2007 | (900) | $ | 58.07 |
| Sale | 12/12/2007 | (1,100) | $ | 62.28 |
| Sale | 12/21/2007 | (100) | $ | 64.57 |
| Sale | 3/17/2008 | (37,600) | $ | 24.16 |
| Sale | 4/29/2008 | (800) | $ | 46.57 |
| Sale | 5/13/2008 | (2,300) | $ | 43.24 |
| Sale | 5/16/2008 | (1,500) | $ | 43.72 |
| Sale | 5/28/2008 | (3,300) | $ | 36.11 |
| Sale | 6/9/2008 | (13,500) | $ | (28.42) |
| Sale | 6/10/2008 | (400) | $ | 27.43 |
| Sale | 6/27/2008 | (100) | $ | 22.25 |
| Sale | 9/12/2008 | (9,600) | $ | 3.80 |
| Sale | 9/12/2008 | (6,400) | $ | 3.74 |
| Sale | 9/12/2008 | (6,500) | $ | 3.68 |

**Transactions in 7.25% Non-Cumulative Perpetual Convertible**
**Preferred Stock, Series P**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Purchase | 4/1/2008 | 141 | $ | 1,114.38 |
| Purchase | 4/1/2008 | 281 | $ | 1,000.00 |
| Purchase | 4/2/2008 | 293 | $ | 1,204.04 |

| | | | | |
|---|---|---|---|---|
| Purchase | 4/10/2008 | 70 | $ | 1,129.01 |
| Purchase | 5/2/2008 | 50 | $ | 1,260.65 |
| Purchase | 6/5/2008 | 75 | $ | 1,017.89 |
| Purchase | 8/22/2008 | 338 | $ | 611.23 |
| Purchase | 8/22/2008 | 153 | $ | 620.39 |
| Purchase | 8/22/2008 | 100 | $ | 626.46 |
| Purchase | 8/22/2008 | 124 | $ | 620.39 |
| Purchase | 8/22/2008 | 247 | $ | 611.23 |
| Purchase | 8/22/2008 | 99 | $ | 626.46 |
| Sale | 5/15/2008 | (100) | $ | 1,205.64 |
| Sale | 6/12/2008 | (169) | $ | 844.05 |
| Sale | 6/12/2008 | (106) | $ | 854.62 |
| Sale | 7/14/2008 | (130) | $ | 599.18 |
| Sale | 8/18/2008 | (405) | $ | 575.88 |
| Sale | 9/12/2008 | (76) | $ | 302.50 |
| Sale | 9/12/2008 | (126) | $ | 320.00 |
| Sale | 9/15/2008 | (268) | $ | 2.50 |

**Transactions in 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series Q**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 6/9/2008 | 254 | 1,000.00 |
| Purchase | 6/9/2008 | 127 | 1,064.00 |
| Sale | 6/12/2008 | (381) | 861.53 |

**Transactions in 5.625% Notes Due 2013**

| Transaction | Date | Units | Par Value |
|---|---|---|---|
| Purchase | 1/31/2008 | 1,780,000 | 101.51 |
| Sale | 4/9/2008 | (365,000) | 99.45 |
| Sale | 9/15/2008 | (1,415,000) | 34.75 |

**Transactions in 6.875% Subordinated Notes Due 2037**

| Transaction | Date | Units | Par Value |
|---|---|---|---|
| Purchase | 6/3/2008 | 30,000 | 86.51 |
| Purchase | 6/11/2008 | 30,000 | 86.73 |
| Purchase | 6/12/2008 | 25,000 | 86.20 |
| Purchase | 6/13/2008 | 40,000 | 85.91 |
| Purchase | 6/16/2008 | 60,000 | 87.11 |
| Purchase | 7/1/2008 | 35,000 | 86.27 |
| Purchase | 8/19/2008 | 300,000 | 82.69 |
| Sale | 9/15/2008 | (20,000) | 3.50 |
| Sale | 9/15/2008 | (500,000) | 3.75 |

**Transactions in 6.5% Notes Due 2017**

| Transaction | Date | Units | Par Value |
|---|---|---|---|
| Purchase | 4/7/2008 | 810,000 | 100.04 |
| Sale | 6/12/2008 | (810,000) | 91.73 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Harold P. Hanna, Jr., on behalf of the Brockton Contributory Retirement System ("BROCKTON"), hereby certify, as to the claims asserted under the federal     securities laws, that:

1.   I am the Executive Director of BROCKTON.  I have reviewed the complaint and authorized its filing by Lead Counsel.

2.   BROCKTON did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.   BROCKTON is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.   BROCKTON's transactions in Lehman Brothers Holdings Inc. common stock, 5.625% Notes Due 2013, 6.75% Notes Due 2017, 6.2% Notes Due 2014, 6.5% Notes Due 2017 and 6.875% Subordinated Notes Due 2037, 7.95% Non-Cumulative Perpetual Preferred Stock, Series J (the "Series J Shares"), and 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P (the "Series P Shares"), are set forth in the Schedule A attached hereto.

5.   BROCKTON has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff, as set forth in the Schedule B attached hereto.

6.   BROCKTON will not accept any payment for serving as a representative party on behalf of the Class beyond BROCKTON's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 23 day of September, 2008.


_____
Harold P. Hanna, Jr.,
Executive Director

| SCHEDULE A1 - Common Stock Transactions | | | |
|---|---|---|---|
| BROCKTON CONTRIBUTORY RETIREMENT SYSTEM | | | |
| LEHMAN BROTHERS HOLDINGS, INC. | | | |
| Trade Date | Buy/Sale | # Shares | Price/share ($) |
| 12/4/2007 | Buy | 1,260 | 58.7199 |
| 12/4/2007 | Buy | 430 | 58.7199 |
| 12/5/2007 | Buy | 1,700 | 61.9114 |
| 12/10/2007 | Buy | 830 | 64.891 |
| 12/12/2007 | Buy | 1,310 | 61.5754 |
| 12/18/2008 | Buy | 1,110 | 60.3739 |
| 12/19/2008 | Buy | 4,490 | 61.5882 |
| 1/14/2008 | Buy | 430 | 58.2529 |
| 1/14/2008 | Buy | 990 | 58.2529 |
| 1/18/2008 | Sale | (1,310) | 53.4311 |
| 2/15/2008 | Sale | (2,080) | 53.9721 |
| 3/18/2008 | Buy | 1,560 | 44.0596 |
| 4/7/2008 | Buy | 590 | 45.3348 |
| 4/8/2008 | Buy | 610 | 43.9714 |
| 4/18/2008 | Buy | 730 | 44.9903 |
| 6/3/2008 | Sale | (1,230) | 31.3686 |
| 6/3/2008 | Sale | (2,280) | 31.3686 |
| 6/6/2008 | Sale | (1,160) | 33.5125 |

**SCHEDULE A2 - Debt securities transactions**

**BROCKTON CONTRIBUTORY RETIREMENT SYSTEM**
**LEHMAN BROTHERS HOLDINGS, INC.**

**5.625% Notes Due 2013**

| Trade Date | Buy/Sale | Par Value | Price/Bond |
|---|---|---|---|
| 1/16/2008 | Buy | $100,000 | 100.081 |

**6.75% Notes Due 2017**

| Trade Date | Buy/Sale | Par Value | Price/Bond |
|---|---|---|---|
| 12/17/2007 | Buy | $80,000 | 99.926 |

**6.2% Notes Due 2014**

| Trade Date | Buy/Sale | Par Value | Price/Bond |
|---|---|---|---|
| 9/19/2007 | Buy | $460,000 | 99.916 |
| 11/15/2007 | Sale | $90,000 | 100.177 |

**6.5% Notes Due 2017**

| Trade Date | Buy/Sale | Par Value | Price/Bond |
|---|---|---|---|
| 9/11/2007 | Buy | $95,000 | 98.896 |
| 9/12/2007 | Buy | $75,000 | 98.648 |
| 9/19/2007 | Buy | $95,000 | 99.901 |
| 4/29/2008 | Sale | $20,000 | 98.091 |

**6.875% Subordinated Notes Due 2037**

| Trade Date | Buy/Sale | Par Value | Price/Bond |
|---|---|---|---|
| 6/3/2008 | Buy | $15,000 | 86.511 |

**7.95% Non-Cumulative Perpetual Preferred Stock, Series J**

| Trade Date | Buy/Sale | # Shares | Price/Share ($) |
|---|---|---|---|
| 6/16/2008 | Buy | 350 | 21.625 |
| 6/16/2008 | Buy | 200 | 21.625 |

**7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P**

| Trade Date | Buy/Sale | # Shares | Price/Share ($) |
|---|---|---|---|
| 6/18/2008 | Buy | 3 | 887.900 |
| 7/11/2008 | Buy | 10 | 570.000 |
| 7/11/2008 | Buy | 5 | 682.594 |
| 7/11/2008 | Buy | 5 | 598.316 |
| 7/24/2008 | Buy | 5 | 710.602 |
| 7/25/2008 | Buy | 5 | 660.916 |
| 7/28/2008 | Buy | 5 | 616.838 |
| 7/31/2008 | Buy | 5 | 646.858 |

# Schedule B

In re Navistar International Corporation Securities Litigation, Case No. 1:08-cv-00107 (N.D. IL)

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Andrew Mackle, on behalf of the Teamster Allied Benefit Funds, hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Fund Manager of the Teamster Allied Benefit Funds.  I have reviewed the complaint and authorized its filing by Lead Counsel.

2. Teamster Allied Benefit Funds did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Teamster Allied Benefit Funds is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Teamster Allied Benefit Fund's transactions in Lehman Brothers Holdings Inc. 7.00% Notes Due 2027 are set forth in the Schedule A attached hereto.

5. Teamster Allied Benefit Funds sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification.

Not applicable

6. Teamster Allied Benefit Funds has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff, as set forth in the Schedule B attached hereto:

7. Teamster Allied Benefit Funds will not accept any payment for serving as a representative party on behalf of the Class beyond Teamster Allied Benefit Fund's pro - rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11TH day of September, 2008.

_____
Andrew Mackle,
Fund Manager

## Schedule A

**Lehman Brothers Holdings, Inc. 7.00% Notes Due 2027**

| Trade Date | Buy/Sale | Par Value | Price/Bond |
|------------|----------|-----------|------------|
| 9/17/07 | Buy | $35,000 | 99.808 |
| 9/17/07 | Buy | $ 4,000 | 99.808 |

## Schedule B

In re Patterson Companies, Inc. Securities Litigation, Case No. 0:05-cv-01891 (MN)

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, Steve Klein, on behalf of American European Insurance Company ("AEI"), make this declaration pursuant to Section 21D(a)(2) of the Securities Exchange Act of 1934 and Section 27(a)(2) of the Securities Act of 1933, as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed the Complaint in this action, and authorize Pomerantz Haudek Block Grossman & Gross LLP to file a comparable Complaint on AEI's behalf.

3.    AEI did not purchase Lehman Brothers Holding Inc. 7.95% Perpetual Preferred Stock, Series, J, ("Series J Preferred Stock") at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934 or the Securities Act of 1933.

4.    AEI is willing to serve as a representative party on behalf of a Class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action and that the firm of Pomerantz Haudek Block Grossman & Gross LLP may exercise its discretion in determining whether to move on AEI's behalf for appointment as lead plaintiff.

5.    To the best of my current knowledge, the attached sheet lists all of AEI's transactions in Lehman Brothers, Inc. Series J Preferred Stock during the Class Period.

6.    During the three-year period proceeding the date on which this Certification is signed, AEI has not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    AEI agrees not to accept any payment for serving as a representative party on behalf of

the class as set forth in the Complaint, beyond its pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty or perjury that the foregoing is true and correct.


Executed _October 13th 2008_, at _New York NY_      _____
                 **(Date)**                            **Steve Klein, Treasurer**
                                               **American European Insurance Co.**

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 2/5/2008 | Purchase | 10,000 | $25.00 |
| 7/14/08 | Purchase | 1,000 | $13.37 |
| 7/15/08 | Purchase | 1,000 | $10.86 |
| 9/8/2008 | Sale | 3,700 | $11.99 |
| 9/8/2008 | Sale | 2,300 | $11.80 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, Lawrence C. Mitchell, on behalf of the Inter-Local Pension Fund Graphic Communications Conference of the International Brotherhood of Teamsters, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed a class action complaint asserting securities claims involving Lehman Brothers, and wish to join as a plaintiff and class representative.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's transactions in Lehman Brothers bonds issued during the Class Period and in Lehman Brothers common stock were as follows:

| DATE | TRANSACTION (buy/sell) | NO. OF SHARES | PRICE PER SHARE |
|------|------------------------|---------------|-----------------|
| _____ | (See attached sheets.) | _____ | _____ |

5.     During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws except as follows:

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing true and correct.

Executed this 24th Day of October, 2008.

_Lawrence C. Mitchell_

Lawrence C. Mitchell
Executive Director
Inter-Local Pension Fund
Graphic Communications Conference
of the International Brotherhood of Teamsters

Inter-Local Pension Fund of the Graphic Communications Conference of the
International Brotherhood of Teamsters

Transactions in Lehman Brothers Bonds Issued Between 6/12/07 and 9/15/08

**Description: 6.75% (Fixed) Issued 12/21/2007**
**Cusip: 5249087M6 / Sedol: B2N6LW7**

| Trade Date | Transaction Type (Buy/Sell) | Face Value ($) | Price ($) |
|---|---|---|---|
| 17-Dec-07 | Buy | 260,000 | 99.926 |
| 11-Jan-08 | Buy | 35,000 | 103.333 |
| 13-Mar-08 | Sell | -25,000 | 90.251 |
| 15-Jul-08 | Sell | -10,000 | 91.879 |

**Description: 6.875% (Fixed) Issued 4/24/2008**
**Cusip: 5252M0FD4 / Sedol: B2R1DV1**

| Trade Date | Transaction Type (Buy/Sell) | Face Value ($) | Price ($) |
|---|---|---|---|
| 17-Apr-08 | Buy | 5,000 | 100.6 |
| 17-Apr-08 | Buy | 73,000 | 99.669 |
| 17-Apr-08 | Buy | 30,000 | 99.669 |
| 17-Apr-08 | Sell | -73,000 | 100.385 |

**Description: 7.5% (Fixed) Issued 5/9/2008**
**Cusip: 5249087N4 / Sedol: B2R9YX4**

| Trade Date | Transaction Type (Buy/Sell) | Face Value ($) | Price ($) |
|---|---|---|---|
| 02-May-08 | Buy | 150,000 | 99.279 |
| 05-Jun-08 | Buy | 45,000 | 93.843 |
| 31-Jul-08 | Sell | -25,000 | 89.457 |

**Description: 7% (Fixed) Issued 9/26/2007**
**Cusip: 52517P5Y3 / Sedol: B27Z2Y9**

| Trade Date | Transaction Type (Buy/Sell) | Face Value ($) | Price ($) |
|---|---|---|---|
| 19-Sep-07 | Buy | 51,000 | 99.808 |
| 19-Sep-07 | Buy | 35,000 | 99.808 |

Inter-Local Pension Fund of the Graphic Communications Conference of the
International Brotherhood of Teamsters

Transactions in Lehman Brothers Common Stock Between 6/12/07 and 9/15/08

| Trade Date | Transaction Type (Buy/Sell) | # Shares | Share Price ($) |
|---|---|---|---|
| 6/18/2007 | Buy | 400 | 79.986 |
| 6/19/2007 | Buy | 600 | 81.124 |
| 6/20/2007 | Buy | 800 | 81.665 |
| 6/20/2007 | Buy | 300 | 80.927 |
| 6/21/2007 | Buy | 500 | 78.362 |
| 6/22/2007 | Buy | 600 | 77.656 |
| 6/26/2007 | Buy | 400 | 74.732 |
| 6/27/2007 | Buy | 2,600 | 75.087 |
| 6/28/2007 | Buy | 2,800 | 76.16 |
| 6/29/2007 | Buy | 700 | 75.993 |
| 6/29/2007 | Buy | 100 | 75.993 |
| 1/14/2008 | Buy | 4,200 | 58.186 |
| 2/14/2008 | Buy | 7,000 | 54.36 |
| 3/18/2008 | Buy | 9,500 | 43.35 |
| 3/18/2008 | Buy | 2,600 | 38.358 |
| 6/4/2008 | Buy | 1,500 | 31.841 |
| 6/9/2008 | Buy | 14,400 | 28 |
| 7/10/2008 | Buy | 4,900 | 17.083 |
| 7/28/2008 | Buy | 9,600 | 15.963 |
| 9/10/2008 | Sell | -4,200 | 7.568 |
| 9/11/2008 | Sell | -15,777 | 4.303 |
| 9/11/2008 | Sell | -36,523 | 4.303 |
| 9/12/2008 | Sell | -20,100 | 3.758 |

## CERTIFICATION

I, Marsha Kosseff, do hereby certify that:

1. I have reviewed the Amended Class Action Complaint for Violations of the Federal Securities Laws and have authorized its filing.

2. I purchased Lehman Brothers Holdings, Inc. Non-Cumulative Perpetual Preferred Series J securities which are included as a subject of the complaint, *but not* at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. In the three years prior to the date of this certification, I have neither sought to serve nor served as a representative party on behalf of a class in an action brought under the federal securities laws.

5. During the Class Period, June 12, 2007 to September 15, 2008, inclusive, I engaged in the following transaction:

### TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | NO. OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| Buy | 2/5/2008 | 400 | $25.00 |

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on 9/24/2008       Signature   *Marsha Kosseff*
                                          Marsha Kosseff