UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- X
                                                                         :
In re:                                                                   :
                                                                         :
LEHMAN BROTHERS SECURITIES                                               :    Civil Action 09 MD 2017
AND ERISA LITIGATION                                                     :    (LAK)
                                                                         :
This Document Applies to:                                                :
                                                                         :
*In re Lehman Brothers Equity/Debt Securities*                           :
*Litigation,* 08 Civ. 5523 (LAK)                                         :
                                                                         :
------------------------------------------------------------------------- X

# DEFENDANTS' JOINT MEMORANDUM OF LAW
# IN SUPPORT OF THEIR MOTION TO DISMISS THE
# THIRD AMENDED CLASS ACTION COMPLAINT

**Table of Contents**

Page

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 1

   I.   THE TAC FAILS TO STATE A SECURITIES ACT CLAIM ...................................... 1

       A.  Plaintiffs Lack Standing To Bring Claims For 48 PPN Offerings............................. 1

       B.  The Claims Of All New Plaintiffs And 37 Other Offerings Must Be Dismissed........ 2

       C.  The Offering Materials Were Not Actionable ............................................................ 4

           1.  Repo 105 Transactions ..................................................................................... 4

           2.  Risk Management........................................................................................... 13

           3.  Liquidity ........................................................................................................ 17

           4.  Valuation Of Commercial Real Estate Assets .................................................. 19

           5.  Concentration Of Risk.................................................................................... 22

       D.  The Principal Protection Note Offering Materials Are Not Actionable.................... 26

           1.  Investors Were Told The PPNs Were Unsecured Obligations Of Lehman.......... 27

           2.  The PPN Offering Materials Explained The Payout Structure Of The Notes And The Impact Of Principal Protection Provided By Lehman ............... 28

           3.  The PPN Offering Materials Adequately Disclosed That Payment Was Subject To Lehman's Credit Risk ..................................................................... 29

       E.  Plaintiffs' Section 11 Claims Against Defendant Callan Should Be Dismissed........ 31

       F.  The Section 15 Claims Fail As A Matter of Law ...................................................... 31

  II.  THE EXCHANGE ACT CLAIMS SHOULD BE DISMISSED.................................... 32

       A.  The Legal Standard ................................................................................................. 32

       B.  The TAC Fails To Plead Any Material Misstatement Or Omission Under The Exchange Act Claims .............................................................................................. 32

           1.  The TAC Fails To Plead Any Misstatements Against Gregory.......................... 32

2. The TAC Fails To Plead Any Misstatement Against Any Officer Defendant Regarding Lehman's Deleveraging ....................................... 32

3. The TAC Fails To Plead Any Misstatement Against Any Officer Defendant Related To Liquidity ....................................... 34

C. The TAC Fails To Plead Scienter ....................................... 35

1. The TAC Fails To Plead Facts Showing Motive And Opportunity .................... 36

2. The TAC Fails To Allege Conscious Misbehavior Or Recklessness ................... 36

    a. TAC's Repo 105-Related Allegations Do Not Plead Scienter ...................... 37

        (1) Fuld, Gregory, and Lowitt ....................................... 40

    b. No Facts Are Alleged Giving Rise To A Strong Inference Of Scienter Regarding Risk, Hedging, Or Concentration ................................. 42

        (1) Plaintiffs' Allegations Confirm That The Officer Defendants Made Reasonable Business Decisions When Exceeding Internal Risk Limits ....................................... 43

        (2) Allegations Regarding Lehman's Hedging Strategy And Stress Testing Do Not Demonstrate Scienter ................................. 45

        (3) Risk Concentration Allegations Do Not Plead Scienter ...................... 46

    c. Plaintiffs' Liquidity Allegations Do Not Plead Scienter ............................. 47

D. The TAC Fails To Plead Loss Causation ....................................... 50

1. Market-wide Phenomena Leading To A "Run On The Bank" – Not Alleged Misstatements – Caused The Loss ....................................... 50

2. Plaintiffs' New And Strained Loss Causation Theory ........................................ 51

3. Plaintiffs Do Not Plead A Corrective Disclosure Or Materialization Of A Concealed Risk ....................................... 53

    a. The TAC Does Not Plead Corrective Disclosure Of Repo 105 Transactions Or Their Alleged Net Leverage Impact ................................... 54

    b. The TAC Does Not Plead Corrective Disclosure Revealing "The Truth" Of Risk And Concentration Limits And Policies .............................. 57

    c. The TAC's Liquidity-Related Allegations Do Not Plead Loss Causation ....................................... 57

E. Plaintiffs' Section 20A And 20(a) Claims Should Be Dismissed............................. 59

    1. Section 20A Claim Against Fuld Should Be Dismissed ..................................... 59

    2. Section 20(a) Claims Against Officer Defendants Should Be Dismissed............ 59

CONCLUSION ........................................................................................................... 60

**Table of Authorities**

**Page**

Cases

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756
(1974) ............................................................................................................ 3

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir.
2007) ........................................................................................................... 60

*Ciresi v. Citicorp.*, 782 F. Supp. 819 (S.D.N.Y. 1991) ............................... 43

*Crown, Cork & Seal v. Parker*, 462 U.S. 345, 103 S. Ct. 2392
(1983) ........................................................................................................... 3

*DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003) ................................. 27

*Dodds v. Cigna Sec., Inc.*, 12 F.3d 346 (2d Cir. 1993) ............................. 31

*Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569
(S.D.N.Y. 2001) .......................................................................................... 31

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. J.P.
Morgan Chase & Co.*, 553 F.3d 187 (2d Cir. 2009) ...............................9, 16, 21, 35

*Elam v. Neidorff*, 544 F. 3d 921 (8th Cir. 2008) ........................................ 49

*Enron Corp. Sec. Derivative & ERISA Litig.*, 235 F. Supp. 2d 549
(S.D. Tex. 2002) .......................................................................................... 12

*Fait v. Regions Fin. Corp.*, No. 09 Civ. 3161 (LAK), 2010 WL
1883487 (S.D.N.Y. May 10, 2010) ..................................................19, 20, 25, 47

*Finkel v. Stratton Corp.*, 962 F.2d 169 (2d Cir. 1992) ................................ 2

*First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763 (2d
Cir.1994) ..................................................................................................... 50

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F.
Supp. 2d 349 (S.D.N.Y. 2007) ................................................................. 20

*Fulton Cty. Employees' Ret. Sys. v. MGIC Inv. Corp.*, No. 08 Civ
04582010, WL 601364 (E.D. Wis. Feb. 18, 2010) ................................. 50

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) ................... 21, 26

*Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) ................ 11

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002) ........................................ 10, 16

*Healthcare Fin. Group, Inc. v. Bank Leumi USA*, 669 F. Supp. 2d
    344 (S.D.N.Y. 2009) .................................................................................................. 50

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d
    424 (S.D.N.Y. 2000) .................................................................................................. 31

*In re Am. Express Co. Sec. Litig.*, No. 02 Civ. 5533 (WHP), 2008
    WL 4501928 (S.D.N.Y. Sept. 26, 2008) ................................................................... 39

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp.
    2d 192 (S.D.N.Y. 2004) ............................................................................................. 35

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No.
    08 Civ. 11278, 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .................................. 16

*In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576
    (S.D.N.Y. 2006) ........................................................................................................ 25

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ............................................ 35, 47

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y.
    2004) ..................................................................................................................... 15, 44

*In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64 (D. Conn. 1994) ........................................ 3, 4

*In Re Countrywide Fin. Corp. Sec. Litig.*, 07-cv-05295-MRP
    (MANx), 2009 WL 943271 (C.D. Cal. Apr. 6, 2009) .............................................. 31

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132
    (C.D. Cal. 2008) .................................................................................................. 11, 12

*In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850 (E.D.N.Y. 1990) ............................................ 4

*In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006) ..................................... 57

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249
    (S.D.N.Y. 2004) ........................................................................................................ 19

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429
    (S.D.N.Y. 2005) .......................................................................................................... 4

*In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189
    (S.D.N.Y. 2004) ........................................................................................................ 16

*In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277
    (S.D.N.Y. 2008) ........................................................................................................ 51

*In re Int'l Rectifier Corp. Sec. Litig.*, No. CV 07-02544-JFW
(VBKx), 2008 WL 4555794 (C.D. Cal. May 23, 2008) ...................................... 44

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y.
2005) ................................................................................................................ 23

*In re Lehman Bros. Secs. & ERISA Litig.*, No. 09 MD 2017 (LAK),
2010 WL 545992 (S.D.N.Y. Feb. 17, 2010) ........................................................ 1

*In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466
(E.D.N.Y. 2006) ............................................................................................... 24

*In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272
(S.D.N.Y. 2009) ............................................................................................... 10

*In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546
(S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ...................................... 56

*In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236 (S.D.N.Y.
2007) ................................................................................................................ 59

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y.2005) ...................... 54, 60

*In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527 (S.D.N.Y. 2007) ................... 54

*In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248
(S.D.N.Y. 2005) ............................................................................................... 20

*In re Security Capital Assurance, Ltd. Sec. Litig.*, No. 7 Civ. 11086
(DAB), 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010) .............................. 36, 54, 56

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247
(S.D.N.Y. 2008) ............................................................................................... 59

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) .......................... 32

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8
(S.D.N.Y. 2001) ................................................................................................. 9

*In re Van Wagoner*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004) ............................ 12

*In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y.
2004) ................................................................................................................ 12

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) ................... 11

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ............................................... 37

*Korwek v. Hunt*, 827 F.2d 874 (2d Cir. 1987) ............................................... 3, 4

*Kruse v. Wells Fargo Home Mortg., Inc.*, No. 02-CV-3089 (ILG),
2006 WL 1212512 (E.D.N.Y. May 3, 2006) ............................................... 3, 4

*Landmen Partners Inc. v. Blackstone Group, LP*, 659 F. Supp. 2d
532 (S.D.N.Y. 2009) ..................................................................................... 21

*Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) .......................................... 34

*Lattanzio v. Deloitte & Touch*, 476 F.3d 147 (2d Cir. 2007) ...................................................... 50

*Len v. Associated Inns & Rest. Co.*, 833 F. Supp. 362 (S.D.N.Y.
1993) ........................................................................................................... 2

*Lentell v. Merrill Lynch & Co., Inc.*, 396. F.3d 161 (2d Cir. 2005) ................................. 52, 53, 57

*Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998) ...................................................... 29

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71,
126 S. Ct. 1503 (2006) ................................................................................... 32

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ........................................................................ 41

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) .......................................... 27

*Palmer v. Stassinos*, 236 F.R.D. 460 (N.D. Cal. 2006) ............................................................. 4

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d
662 (S.D.N.Y. 2008) ..................................................................................... 10

*Plumbers & Steamfitters Local 777 Pension Fund v. Canadian
Imperial Bank of Commerce*, No. 08 Civ. 8143 (WHP), 2010
WL 961596  (S.D.N.Y. March 17, 2010) ......................................................... 46

*Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*,
No. 08 Civ. 10841 (JSR), slip op. at 6-7 (S.D.N.Y. June 1, 2010) ................... 1, 2, 4

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ....................................................................... 32

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ....................................................................... 36

*Rubin v. Long Island Lighting Co.*, 578 F. Supp. 608 (E.D.N.Y.
1984) ........................................................................................................... 25

*Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459 (S.D.N.Y. 2009) .............................................. 16

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ................................................... 60

*South Cherry Street, LLC v. Hennessee Group, LLC*, 573 F.3d 98
(2d Cir. 2009) ............................................................................................... 36, 37

*Stevelman v. Alias Research, Inc.*, 174 F.3d 79 (2d Cir. 1999) .................................................. 46

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499 (2007) ...........................................................................................32, 35, 44

*Walters v. Edgar*, 163 F.3d 430 (7th Cir. 1998) ........................................................ 4

*Yu v. State St. Corp.*, No. 08 Civ. 8235 (RJH), 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010) .................................................................................... 9

*Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005) ..................................................................... 2

*Zerman v. Ball*, 735 F.2d 15 (2d Cir. 1984) ................................................................. 29

Statutes

15 U.S.C. § 77k(a) ......................................................................................................... 1, 31

15 U.S.C. § 77k(b)(3)(A) ................................................................................................. 12

15 U.S.C. § 77k(b)(3)(C) ................................................................................................. 11

15 U.S.C. § 77*l* ................................................................................................................... 1

15 U.S.C. § 77m ................................................................................................................. 2

15 U.S.C. § 77z-2(c)(1) .................................................................................................... 10

17 C.F.R. § 229.303 (Reg. S-K, Item 303) ....................................................7, 10, 34

17 C.F.R. § 230.430B(f)(2) .............................................................................................. 31

TABLE OF ABBREVIATIONS AND DEFINED TERMS

| ABBREVIATION | DESCRIPTION | EXHIBIT |
|---|---|---|
| **Lehman Brothers Holdings Inc. Filings** | | |
| 2006 10-K | Lehman Brothers Holdings, Inc. Annual Report on Form 10-K for the fiscal year ending November 30, 2006, filed with the SEC on February 13, 2007 | 3 |
| 2007 1Q | Lehman Brothers Holdings, Inc. Quarterly Report on Form 10-Q for the quarter ending February 28, 2007, filed with the SEC on April 9, 2007 | 4 |
| 2007 Proxy St. | Lehman Brothers Holdings, Inc. Proxy Statement on Form DEF 14A, filed with the SEC on February 26, 2007 | 39 |
| 2008 Proxy St. | Lehman Brothers Holdings, Inc., Proxy Statement on Form DEF 14A filed with the SEC on March 5, 2008 | 40 |
| 2007 2Q | Lehman Brothers Holdings, Inc. Quarterly Report on Form 10-Q for the quarter ending May 31, 2007, filed with the SEC on July 10, 2007 | 5 |
| 2007 3Q | Lehman Brothers Holdings, Inc. Quarterly Report on Form 10-Q for the quarter ending August 31, 2007, filed with the SEC on October 10, 2007 | 6 |
| 2007 10-K | Lehman Brothers Holdings, Inc. Annual Report on Form 10-K for the fiscal year ending November 30, 2007, filed with the SEC on January 29, 2008 | 7 |
| 2008 1Q | Lehman Brothers Holdings, Inc. Quarterly Report on Form 10-Q for the quarter ending February 29, 2008, filed with the SEC on April 9, 2008 | 8 |
| 2008 2Q | Lehman Brothers Holdings, Inc. Quarterly Report on Form 10-Q for the quarter ending May 31, 2008, filed with the SEC on July 10, 2008 | 9 |
| Sept. 10, 2008 8-K | Lehman Brothers Holdings, Inc. Current Report on Form 8-K filed with the SEC on September 10, 2008 | 47 |
| **Conference Call Transcripts** | | |
| 2007 2Q Call | Transcript of Lehman Brothers Holdings Inc. Second Quarter | 49 |

| | 2007 Earnings Conference Call (June 12, 2007) | |
|---|---|---|
| 2008 1Q Call | Transcript of Lehman Brothers Holdings Inc. First Quarter 2008 Earnings Conference Call (March 18, 2008) | 11 |
| **Offering Materials** | | |
| Base Pro. | Base Prospectus included in Registration Statement, filed with the SEC pursuant to Rule 424(b)(2), dated May 30, 2006 | 22 |
| Pro. Supp. | Lehman Brothers Holdings Inc. Prospectus Supplement for Medium-Term Notes, Series I, to Prospectus dated May 30, 2006 (May 30, 2006) | 23 |
| PS No. 1 (52522L566) | Lehman Brothers Holdings Inc. Pricing Supplement No. 1 for CUSIP 52522L566, to Prospectus dated May 30, 2006, Prospectus Supplement dated May 30, 2006, Underlying Supplement No. 100 dated January 28, 2008, and Product Supplement No. 550-I, dated November 27, 2007 (February 28, 2008) | 19 |
| PS No. 1 (52522L202) | Lehman Brothers Holdings Inc. Pricing Supplement No. 1 for CUSIP 52522L202, to Prospectus dated May 30, 2006, Prospectus Supplement dated May 30, 2006, Underlying Supplement No. 750 dated June 18, 2007, and Product Supplement No. 220-I, dated March 6, 2007 (June 18, 2007) | 20 |
| PS No. 1 (52522L525) | Lehman Brothers Holdings Inc. Pricing Supplement No. 1 for CUSIP 52522L525 to Prospectus dated May 30, 2006, Prospectus Supplement dated May 30, 2006, Underlying Supplement No. 1100 dated January 15, 2008, and Product Supplement No. 550-I, dated November 27, 2007 (January 28, 2008) | 21 |
| Prod. Supp. 550-I (Nov. 27, 2007) | Lehman Brothers Holdings Inc. Product Supplement No. 550-I, to Prospectus dated May 30, 2006 and Prospectus Supplement dated May 30, 2006 (November 27, 2007) | 24 |
| Prod. Supp. 220-I (March 6, 2007) | Lehman Brothers Holdings Inc. Product Supplement No. 220-I, to Prospectus dated May 30, 2006 and Prospectus Supplement dated May 30, 2006 (March 6, 2007) | 25 |
| Prod. Supp. 1050-I (March 14, 2008) | Lehman Brothers Holdings Inc. Product Supplement No. 1050-I, to Prospectus dated May 30, 2006 and Prospectus Supplement dated May 30, 2006 (November 14, 2008) | 26 |
| PS No. 2 | Lehman Brothers Holdings Inc. Pricing Supplement No. 2 for | 33 |

| | | |
|---|---|---|
| (52520W564) | CUSIP 52520W564 to prospectus dated May 30, 2006, prospectus supplement dated May 30, 2006, product supplement no. 220-I dated March 6, 2007, and underlying supplement no. 720, dated March 7, 2007 (March 30, 2007) | |
| PS No. 166 (52517PX63) | Lehman Brothers Holdings Inc. Pricing Supplement No. 166 for CUSIP 52517PX63 to Prospectus Supplement dated May 30, 2006 and Prospectus dated May 30, 2006 (April 23, 2007) | 34 |
| | **Documents** | |
| SFAS 105 | Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 105, *Disclosure of Information about Financial Instruments with Off-Balance-Sheet Risk and Financial Instruments with Concentrations of Credit Risks.* | 13 |
| SFAS 107 | Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 107, *Disclosures About Fair Value of Financial Instruments* | |
| SFAS 133 | Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities* | 44 |
| SFAS 140 | Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* | |
| SFAS 157 | Financial Accounting Standards Board – Statement of Financial Accounting Standards No. 157, *Fair Value Measurement* | |
| SOP 94-6-1 | Financial Accounting Standards Board Staff Position, No. 94-6-1, *Terms of Loan Products that May Give Rise to a Concentration of Credit Risk* | 14 |
| SOP 94-6 | AICPA Statement of Position No. 94-6, *Disclosure of Certain Significant Risks and Uncertainties* | 15 |
| | **Defined Terms** | |
| Class Period | Between June 12, 2007 and September 15, 2008 | |
| CRE | Commercial Real Estate | |

xi

| | | |
|---|---|---|
| Defendants | Underwriter Defendants (as defined in Notice of Motion), Director Defendants, Officer Defendants, and UBSFS | |
| Director Defendants | Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Roland A. Hernandez, Henry Kaufman, and John D. Macomber | |
| E&Y | Ernst & Young LLP | |
| Examiner | Anton R. Valukas, the examiner appointed by the court in Lehman's bankruptcy proceedings, In re Lehman Brothers Holdings Inc., 08-13335 | |
| Exchange Act | Securities Exchange Act of 1934 | |
| FASB | Financial Accounting Standards Board | |
| FID | Lehman's Fixed Income Division | |
| GAAP | Generally Accepted Accounting Principles | |
| GREG | Lehman's Global Real Estate Group | |
| Lehman | Lehman Brothers Holdings Inc. | |
| Non-Officer Defendants | Underwriter Defendants (as defined in Notice of Motion), Director Defendants, and UBSFS | |
| Officer Defendants | Richard S, Fuld, Jr., Joseph M. Gregory, Christopher M. O'Meara, Erin Callan and Ian Lowitt | |
| PCAOB | Public Company Accounting Oversight Board | |
| PPN | Principal Protection Notes | |
| Reform Act | Private Securities Litigation Reform Act | |
| SAC | Second Amended Consolidated Class Action Complaint | |
| Securities Act | Securities Act of 1933 | |
| TAC | Third Amended Class Action Complaint | |
| UBSFS | UBS Financial Services, Inc. | |

## PRELIMINARY STATEMENT

This is Plaintiffs' fourth complaint.  In this latest iteration, they have abandoned many of their prior allegations or tried to recast them.  While the motion to dismiss the SAC was pending, the Examiner issued his Report.[1]  As if it were manna from heaven, Plaintiffs have relied on certain parts of the Report, but ignore its conclusions.  The Report found no colorable claim against any party arising out of four of the five topics that are the subject of the TAC – risk management, concentration of risk, liquidity or asset valuations.  Only with respect to the fifth topic, Repo 105, did the Report find a colorable claim against certain of the Officer Defendants and E&Y, and none of those claims arose under the securities laws. Not surprisingly, Plaintiffs' effort to turn the Report into a basis for securities law violations fails.[2]

## ARGUMENT

## I.     THE TAC FAILS TO STATE A SECURITIES ACT CLAIM

### A.     Plaintiffs Lack Standing To Bring Claims For 48 PPN Offerings

Plaintiffs lack Article III standing for offerings in which no named plaintiff purchased securities because they cannot allege injury traceable to those offerings.  *See In re Lehman Bros. Secs. & ERISA Litig.*, No. 09 MD 2017 (LAK), 2010 WL 545992, at *3 (S.D.N.Y. Feb. 17, 2010) (*Lehman MBS*).[3]  Although Plaintiffs dropped claims based on 540 offerings alleged in the

---

[1] All references to the "Report" or "ER" are to the Report of Anton R. Valukas, Examiner, Vols. 1-9, Appendices 1-23, Dkt. No. 7531, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Mar. 11, 2010).

[2] "Defendants" are the "Underwriter Defendants," the "Director Defendants," "Officer Defendants," and "UBSFS," as defined in the preceding Abbreviations & Defined Terms.  Defendants incorporate by reference, to the extent applicable to claims against the Defendants, arguments made in the E&Y brief.

[3] *See also Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, No. 08 Civ. 10841 (JSR), slip op. at 6-7 (S.D.N.Y. June 1, 2010) (Ex. 2) (dismissing Section 11 and 12 claims for lack of standing) (*MissPers*).  While *Lehman MBS* relied on the lack of constitutional standing, plaintiffs who did not purchase the security that is the subject of the registration statement and the prospectus at issue also lack statutory standing under the Securities Act.  *See, e.g.*, 15 U.S.C. § 77k(a); 15 U.S.C. § 77*l*.

SAC, they still pursue claims relating to 48 PPN offerings in which no named plaintiff invested. *See* TAC App. B.  They lack standing to do so and their claims must be dismissed.[4]

### B.    The Claims Of All New Plaintiffs And 37 Other Offerings Must Be Dismissed

This Court granted Plaintiffs leave to amend to take account of the ER.[5]  Plaintiffs never mentioned any intention to add new named plaintiffs, and have not made any motion for leave to amend for that purpose or for new plaintiffs seeking to intervene.  Nevertheless, the TAC purports to assert claims on behalf of 25 plaintiffs who were not named in the SAC, and who are the only named plaintiffs for 37 challenged offerings.[6]  The claims of these new plaintiffs should be dismissed, not only because they failed to seek leave to intervene, but because their claims are barred by the statute of limitations.

Section 11 and 12(a)(2) claims must be brought within one year after the untrue statement or omission was or should have been discovered by the exercise of reasonable diligence and, in no event, more than three years after the security was offered to the public.  15 U.S.C. § 77m. Here, the new plaintiffs' claims were not asserted until the TAC was filed on April 23, 2010 – over a year after the original Plaintiffs filed the SAC on February 23, 2009.  The new plaintiffs, by exercising reasonable diligence, should have discovered the misstatements and omissions alleged in the SAC when it was filed, as the information was readily available to them.  *See, e.g., Len v. Associated Inns & Rest. Co.*, 833 F. Supp. 362, 375 (S.D.N.Y. 1993).  The claims the new plaintiffs seek to assert are barred by the one-year statute of limitations and should be dismissed.[7]

---

[4]  Plaintiffs also lack standing to bring any Section 12 claims because Plaintiffs fail to allege that they purchased any securities in the relevant public offerings.  *See Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005); *MissPers*, at 14-15 (Ex. 2).  Plaintiffs allege only that they "purchased or otherwise acquired" securities and have conspicuously deleted their prior allegation that such purchases were made "in the Offerings."  *Compare* TAC ¶¶ 133 & 136 *with* SAC ¶¶ 256 & 261.

[5]  Pretrial Order No. 14, dated March 17, 2010 (granting leave to amend "[i]n light of the recent filing of the Examiner's Report").

[6]  A complete list of the 25 new plaintiffs and the 37 offerings is in Appendix A.

[7]  Furthermore, the three-year statute of repose bars any claims on behalf of plaintiffs who purchased securities in offerings prior to April 23, 2007.  *See Finkel v. Stratton Corp.*, 962 F.2d 169, 174 (2d Cir. 1992) (dismissing Section 11 and 12 claims as beyond the three-year statute of repose).

Nor will class action tolling refresh their untimely claims. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756 (1974); *Crown, Cork & Seal v. Parker*, 462 U.S. 345, 103 S. Ct. 2392 (1983). Such tolling is inapplicable where, as here, the original plaintiffs lacked standing to bring claims that new plaintiffs seek to assert. In both cases, the Supreme Court held that the filing of a class action complaint tolls the statute of limitations on the claims of absent class members who later seek to intervene or file individual actions when a motion to certify the class is denied. The Court reasoned that failure to toll in those circumstances would frustrate the policies underlying Rule 23, which were designed to promote judicial economy and efficiency by reducing the volume of litigation. *Am. Pipe*, 414 U.S. at 553-54, 94 S. Ct. at 766; *Crown*, 462 U.S. at 350-52, 103 S. Ct. at 2396-97.

But in both *American Pipe* and *Crown* there was no question that the original plaintiffs had constitutional and statutory standing. Indeed, the *American Pipe* Court specifically limited its ruling to cases in which class certification was denied for reasons *other than* "lack of standing of the representative." 414 U.S. at 553, 94 S. Ct. at 766. And because tolling under *American Pipe* "invit[es] abuse," *Crown,* 462 U.S. at 354, 103 S. Ct. at 2398 (Powell, J., concurring),[8] courts have been hesitant to expand it where the policy considerations no longer make sense.[9] Accordingly, courts routinely hold that *American Pipe* does not toll the statute of limitations on claims that the named plaintiffs in a putative class action lacked standing to assert.[10] Just this

---

[8]   *See also Am. Pipe*, 414 U.S. at 561, 94 S. Ct. at 770 (Blackmun, J., concurring) ("Our decision . . . must not be regarded as encouragement to lawyers in a case of this kind to frame their pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights.").

[9]   In *Korwek v. Hunt*, for instance, the Second Circuit held that "the tolling doctrine enunciated in *American Pipe* does not apply to permit a plaintiff to file a subsequent class action following a definitive determination of the inappropriateness of class certification." 827 F.2d 874, 879 (2d Cir. 1987). The court noted that tolling in such circumstances might enable putative class members to "piggyback one class action onto another and thus toll the statute of limitations indefinitely." *Id.* at 878 (citation omitted).

[10]   *See Kruse v. Wells Fargo Home Mortg., Inc.*, No. 02-CV-3089 (ILG), 2006 WL 1212512, at *5-6 (E.D.N.Y. May 3, 2006) (statute of limitations was not tolled for proposed intervenors where original plaintiffs lacked standing, because tolling would impermissibly permit an end-run around the prohibition on subsequent class action filings); *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994) (Cabranes, J.) ("if the original plaintiffs lacked standing to bring their claims in the first place, the filing

week, Judge Rakoff so held, dismissing with prejudice claims made on offerings in which no named plaintiff purchased, noting that adding new plaintiffs would not cure the problem because their claims would be time-barred. *MissPers*, at 7 (Ex. 4).[11]

Here, the Court lacked Article III jurisdiction over the claims in the SAC relating to the offerings for which no named plaintiff purchased securities. Thus, unlike *American Pipe*, where class certification was denied for failure to satisfy Rule 23, the filing of earlier class complaints cannot extend the statute of limitations for new plaintiffs because Article III jurisdiction never attached to those claims in the first place. *See Walters v. Edgar*, 163 F.3d 430, 432-33 (7th Cir. 1998), *Palmer v. Stassinos*, 236 F.R.D. 460, 465 n.6 (N.D. Cal. 2006). Accordingly, all claims of the 25 new plaintiffs should be dismissed as time-barred, and all claims relating to the 37 offerings for which the new plaintiffs serve as the only purported representatives must be dismissed for lack of standing. *See* Appendix A.

**C. The Offering Materials Were Not Actionable**

**1. Repo 105 Transactions**

*a. No material misstatements or omissions*. Plaintiffs allege that the Offering Materials were false or misleading because (1) Lehman's audited financial statements and quarterly financial statements violated GAAP by accounting for Repo 105 transactions as sales rather than financings, *see* TAC ¶¶ 61-69, and (2) Lehman failed to break out Repo 105 transactions in the footnotes to those consolidated statements and highlight their effect on its reported "net leverage ratio." *See id.* ¶¶ 26-60. None of these allegations states a claim.

*Accounting treatment of Repo 105 complied with GAAP*. Under GAAP, Repo 105 transactions were sales (rather than financings) and they were reported as such on Lehman's

---

of a class action complaint does not toll the statute of limitations for other members of the purported class"); *In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850, 856 (E.D.N.Y. 1990).

[11]   We are aware of one court in this District that has ruled to the contrary, s*ee In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 456 (S.D.N.Y. 2005), but it failed to consider the potential for abuse that was identified by Justices Blackmun and Powell, which led to the decisions in *Korwek*, *Kruse*, *Colonial*, and *Crazy Eddie*.

financial statements.[12]  E&Y audited Lehman for many years, and the TAC alleges that E&Y "knew about Lehman's use of Repo 105 transactions."  TAC ¶ 225.  The TAC further alleges that E&Y publicly stated that, in its opinion, Lehman's year-end financial statements presented fairly in all material respects the consolidated financial position of Lehman in conformity with GAAP.  *Id.* ¶ 224.[13]  Similarly, E&Y publicly stated in reports contained in Lehman's quarterly filings that it was "not aware of any material modifications that should be made to the consolidated financial statements . . . for them to be in conformity with U.S. [GAAP]."  TAC ¶ 224.  The TAC alleges that E&Y thus concluded that Repo 105 transactions *should* be treated as "sales" for accounting purposes under SFAS 140, and approved the manner of presentation of such transactions as part of the aggregate derivatives disclosure.  TAC ¶ 124.  As E&Y explains, *those conclusions were – and remain – correct* under the GAAP provisions applicable at that time.  E&Y Br. *passim*.

*"Balance sheet management."*  Plaintiffs contend that the failure to report Repo 105 transactions as financings reduced Lehman's reported net leverage ratio "as of the end of each reporting period during the Class Period," which had the effect of creating a false impression of Lehman's balance sheet.  TAC ¶ 37.  Allegedly, this was because cash received from Repo 105 transactions was used to pay down other existing liabilities reducing net assets (the numerator), while having no effect on tangible equity (the denominator) in the net leverage ratio.  *Id.* ¶ 31.  This reduction was purportedly "wholly illusory," because Lehman had an obligation to repurchase the securities, which would increase the net leverage ratio shortly after the quarter closed.  *Id.* ¶ 32.

But Plaintiffs ignore (and in fact delete from their most recent appendices of relevant offerings and documents incorporated into the Offering Materials) the very filings in which

---

[12] Lehman would subsequently pay its counterparty and the assets sold (or substantially similar assets) would be re-sold to Lehman and return to Lehman's balance sheet.  TAC ¶ 32; *see also* E&Y Br. at 5-6.

[13]  *See also* 2006 10-K at 74 (Ex. 3).

Lehman disclosed to investors that its intra-quarter balance sheet may be, and at times was, larger than its balance sheet reported at quarter- or year-end.[14]  In documents specifically incorporated into *every offering subject to the Securities Act claims*, Lehman disclosed in blunt words utterly ignored in the TAC that the overall size of its balance sheet "*will fluctuate from time to time, may be higher than the year-end or quarter-end amounts.*"  *See, e.g.*, 2006 10-K at 51 (Ex. 3) (emphasis added).[15]  Not only did Lehman disclose that during the interim periods it *might* have more assets, it revealed that it *did*, and the magnitude of the variance: "total assets at quarter-ends were, on average, approximately 4% and 5% lower than amounts based on a monthly average over the four and eight quarters ended November 30, 2006, respectively."  *Id.*

Lehman's efforts to derisk its balance sheet were anything but "illusory."  Following year-end 2007, Lehman's 2008 quarterly reports detailed the firm's concerted move to reduce its exposure to less liquid assets.  The reductions in problematic assets were dramatic: Lehman reduced (i) total net assets by close to $60 billion, approximately 17% of assets outside its matched book; (ii) its exposures to residential mortgages, commercial real estate holdings and its leverage loan portfolio by approximately 50%, 40% and 70% respectively; and (iii) total exposure to less liquid assets by nearly half, from approximately $114 billion to $61.5 billion. *See* Appendix B.  Nothing was false or omitted, as the reported details of the assets comprising the net leverage metric prove that Lehman was actively managing its balance sheet in the face of the seething economic crisis, its efforts to deleverage were dramatic and its financial statements fairly and accurately reflected its true financial condition at periodic points in time.

*Lehman correctly accounted for and disclosed the forward contract as a derivative.*  In a Repo 105 transaction, Lehman sold $105 worth of liquid securities in exchange for $100 in cash, and later repurchased the $105 in securities for $100.  For the duration of the transaction,

---

[14]   *Compare* SAC App. A (detailing 2006 10-K filing for each offering).

[15]   *See, e.g.*, 2007 1Q at 59 (Ex. 4); *see also* with respect to the Exchange Act claims 2007 2Q at 45 (Ex. 5); 2007 3Q at 46 (Ex. 6), incorporating 2006 10-K.

Lehman would record the fair market value of the right to repurchase $105 in securities for $100 – a $5 value – as a derivative forward contract on its balance sheet.  These assets were incorporated into Lehman's derivative inventory and properly disclosed in its financial statements,[16] and the securities laws contain no rules requiring additional disclosure about Repo 105 transactions, or any line item rule requiring them to be separately broken out or identified. *See, e.g.*, Regulation S-K, Item 303(a)(4) (no specific disclosure requirement for Repo 105-type transactions).  Thus, no such disclosure was necessary.

*Materiality.*  Plaintiffs have also failed to show that Lehman's use of Repo 105 transactions resulted in *material* misstatements or omissions in the Offering Materials.  They assert that Repo 105 transactions improperly reduced Lehman's reported *net* leverage, which "supposedly compared the Company's riskiest assets to its available stockholders equity to absorb losses sustained by such assets," TAC ¶ 27, thereby misleading investors by suggesting that Lehman was not highly leveraged.

*First*, Plaintiffs assert that they knew nothing about Repo 105 transactions until the release of the ER, but that ignorance did not prevent them from affirmatively and repeatedly alleging in their prior complaints that Lehman was very highly leveraged.  *See, e.g.*, Amended Complaint ("AC") ¶¶ 4, 111, 141; SAC ¶¶ 4-5.  They did so because Lehman unambiguously disclosed its *total* leverage near and above 30x during the Class Period – a statistic the prior pleadings repeatedly cited to show Lehman had high leverage.  *Id.*  The TAC now pretends that these disclosures were never made, and that investors would never have understood how heavily

---

[16]   For example, in the 2007 10-K, the derivative asset from the Repo 105 transaction was included in the balance sheet as part of multiple line items in Note 3 to the Financial Statements regarding "Financial Instruments and Other Inventory Positions."  2007 10-K at 86, 103, 106 (Ex. 7); *see* ER 982-83 n.3787. Lehman's quarterly and annual financial statements contained additional disclosures relating to its derivatives and other contractual arrangements, including: Note 1 to the financial statements, discussing "Derivative Financial Instruments;" Note 4, which breaks out the fair value of derivatives according to SFAS 157 level; Note 8, which describes the use of derivatives to manage interest rate and currency exposure of Lehman's borrowings portfolio; and Note 9 regarding "Commitments, Contingencies and Guarantees."  *See, e.g.*, 2007 10-K at 95, 106-07, 116, 119-21 (Ex. 7); 2008 1Q at 12, 18, 22-26, 31 (Ex. 8); 2008 2Q at 12, 24, 26-34, 39 (Ex. 9).

leveraged Lehman was because its *net* leverage ratios were, allegedly, materially understated.

No explanation is offered as to why investors would not have reached the same conclusion as Plaintiffs did in their prior complaints based on the disclosed total leverage ratios (which the TAC never claims were inaccurate, much less materially so), or why analysts concurred with the Plaintiffs' prior pleadings that Lehman was highly leveraged.[17]  Net and total leverage measure the *same* relationship – the amount of assets supported by equity and therefore risk to an investor from a decline in the value of assets.  Even assuming Lehman's *net* leverage was materially misstated, the total leverage ratios Lehman reported made it crystal clear that Lehman was very highly leveraged.  Between the second quarter of 2007 and the first quarter of 2008, Lehman reported that its total leverage ratio was between 28.7x and 31.7x.[18]  Moreover, Lehman's *reported* total leverage ratio continuously increased until the second quarter of 2008,[19] and was always higher than (near or more than double) both the reported net leverage and the "actual" net ratios that Plaintiffs contend should have been reported.  *See* TAC ¶ 38 tbl. 2.[20]

*Second*, as E&Y explains, Repo 105 transactions are appropriately reported as sales under GAAP, so there was nothing misstated about Lehman's net leverage ratios.  *See* E&Y Br. at 7-9.  Moreover, the contention that the alleged understatement of net leverage was meaningful is analytically unsound.  Through Repo 105 transactions, Lehman took highly liquid securities,

---

[17]   *See, e.g.*, ER at 852 (quoting *Equity Research Report: Lehman Brothers Holdings Inc. (LEH)*, Bank of America, (June 9, 2008) at 1, 3 (Ex. 10)) ("Lehman is the most levered large investment bank to the fixed income market, and hence a more challenging fixed income market (with higher long-term interest rates, lower volatility, and wider credit spreads) could hurt them the most.").

[18]   *See* 2007 10-K at 29 (30.7x) (Ex. 7); 2007 2Q at 65 (28.7x) (Ex. 5); 2007 3Q at 68 (30.3x) (Ex. 6); 2008 1Q at 72 (31.7x) (Ex. 8); 2008 2Q at 56 (24.3x) (Ex. 9).

[19]   As Appendix A to the TAC shows, Lehman's second quarter 2008 ended after the last of the offerings underwritten by the Underwriter Defendants took place.

[20]   Thus, Lehman disclosed to investors that its *total* leverage ratio had *increased* from 26.2x to 30.7x from 2006 to 2007, a 17% increase, and similarly disclosed that from the first quarter of 2007 through the first quarter of 2008, its leverage ratio had again increased.  *See* 2007 2Q at 65 (Ex. 5); 2007 3Q at 68 (Ex. 6); 2007 10-K at 29 (Ex. 7); 2008 1Q at 72 (Ex. 8); 2008 2Q at 89 (Ex. 9).  In fact, Lehman disclosed in its relevant 10K reports, all of which were incorporated into the Offering Materials, that its leverage ratio had steadily increased every year since 2004 from 23.9x to 30.7x.  *See* 2007 10-K at 29 (Ex. 7).

sold them, and used the proceeds to pay down short-term debt.  The same result would have obtained if the sales had not been pursuant to repurchase agreements.

*Third*, Plaintiffs declare Lehman's net leverage ratio to be materially misleading by insisting that an internal Lehman metric defines "materiality" for purposes of the federal securities laws.  That metric was used to assess when to reopen and adjust Lehman's balance sheet.[21]   But Lehman's internal measure of whether to make balance sheet adjustments does not govern whether its consolidated financial statements were materially misleading *for purposes of the securities laws.*  Here, Plaintiffs must allege that the misstatement or omission "would have otherwise been significant to a reasonable investor deciding how to act."  *Yu v. State St. Corp.*, No. 08 Civ. 8235 (RJH), 2010 WL 668645, at *27-28 (S.D.N.Y. Feb. 25, 2010).  In this case, the "significance of the misstatement in relation to the company's operations" was immaterial.  *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. J.P. Morgan Chase & Co.*, 553 F.3d 187, 197-98 (2d Cir. 2009).  The TAC does not allege any material effect on earnings, net worth, or working capital.  Indeed, as the TAC acknowledges, throughout 2007 and the first quarter of 2008, the Repo 105 transactions were at or less than 6% of total liabilities.  TAC ¶ 39.  This is within the range of variance disclosed in Lehman filings that were incorporated by reference in the Offering Materials.[22]   Neither was net leverage ratio a meaningful measure in isolation. Investors who wanted information about deleveraging through asset sales or the types of underlying assets held would look to Lehman's filings, which provided detailed break-downs of holdings by asset classes.  *See* Appendix B.  The net leverage ratio would only be "misleading" if Lehman misrepresented the *reasons* behind the reductions in net leverage ratio.[23]   *See*

---

[21]   Plaintiffs rely on a statement allegedly in E&Y's workpapers that "[m]ateriality is usually defined [and was so defined by Lehman with respect to net leverage] as any item individually, or in the aggregate, that moves net leverage by 0.1 or more."  TAC ¶ 28; *see* ER at 955.

[22]   *See In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (holding that failure to disclose 9% difference in operating income was insufficient to establish liability under Section 11 on a Rule 12(b)(6) motion).

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).  The TAC does not – and cannot – allege that any of the Offering Materials misrepresented the reasons for changes in the net leverage ratio.

  *Finally*, Plaintiffs allege violations of Item 303 of Regulation S-K because the Offering Materials did not disclose the impact of Repo 105 transactions on Lehman's future financial condition or operating results.  *See* TAC ¶ 42.  However, to establish a claim based on Item 303, Plaintiffs must allege sufficient facts to show (1) a trend existed at the time of the offering; (2) the Defendants had "actual knowledge" of the trend; and (3) it was material.  *See* 15 U.S.C. § 77z-2(c)(1).  Plaintiffs have done none of that.  First, as discussed above, the forward repurchase commitment is not material.  Second, Plaintiffs have failed to plead that any Defendant had knowledge of any such trend.[24]  Indeed, because an Item 303 allegation requires "actual knowledge" of the alleged material undisclosed trend, the assertion that any such trend was omitted is grounded in fraud and is subject to the heightened pleading requirements of Rule 9(b). *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 295 (S.D.N.Y. 2009).  Yet Plaintiffs specifically "disclaim[ed] any reference to or reliance upon fraud allegations" and base their Securities Act claims entirely on strict liability or negligence.  *See* TAC ¶¶ 23, 120.  Thus, Plaintiffs' Item 303-based claim should independently be dismissed because it requires Plaintiffs to plead "actual knowledge" – which contradicts Plaintiffs' theory of negligence.[25]

  b. *Defenses established on the face of the TAC.  First*, the TAC establishes the "reliance" defense under Section 11(b)(3)(C) for alleged misstatements in the 2007 10-K, which

---

[23] Indeed, the ER acknowledges that the net leverage ratio calculation is a "brutal, rudimentary measurement," which "did not capture the quality of the assets."  ER at 805.

[24] *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008) (defendants had no duty to disclose an alleged "known trend" where plaintiffs did not allege that defendants were aware of such trend).

[25] *See NovaGold*, 629 F. Supp. 2d at 295 ("[d]efendants by definition could not have been acting with negligence if they had actual knowledge that they were making false statements" and the "complaint thus fails to allege that defendants made objectionable statements . . . with knowledge of their falsity").

were audited by E&Y and constitute "expertised" statements.[26]  *See* 15 U.S.C. § 77k(b)(3)(C). Each of the alleged Repo 105 misstatements relates to Lehman's decision to account for those transactions as sales rather than as financings under GAAP.  *See* TAC ¶¶ 44-60.  Expert accounting judgments about the application of GAAP are precisely what underwriters, directors, and officers are entitled to rely upon under Section 11(b)(3)(C).[27]

The TAC also concedes E&Y both knew about Lehman's use and accounting treatment of Repo 105 transactions and issued an unqualified audit opinion for Lehman's 2007 10-K, certifying that Lehman's financial statements were prepared in accordance with GAAP and fairly presented Lehman's financial condition and operations in all material respects.  TAC ¶¶ 40(f), 224, 226.  E&Y stated it had conducted its audit in accordance with PCAOB standards[28] and concluded on the basis of its audit that the financial statements "present fairly, in all material respects, the consolidated financial position of Lehman."  2007 10-K at 84 (Ex. 7).  Defendants were entitled to rely on these statements and the accounting judgments they reflected.[29] Nowhere does the TAC allege that the Non-Officer Defendants thought or had reason to believe Lehman's use of or accounting for Repo 105 transactions was improper; and only in the TAC's

---

[26]  Affirmative defenses under Section 11 may be established on the face of the complaint.  *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003).

[27]  *See* 15 U.S.C. § 77k(b)(3)(C); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174-75 (C.D. Cal. 2008) (dismissing claim against underwriters where it was established on the face of the complaint that underwriters could reasonably rely on accounting-related statements in a registration statement); *see also Glassman v. Computervision Corp.*, 90 F.3d 617, 629-30 (1st Cir. 1996) (holding that it was "plaintiffs' responsibility to plead factual allegations, not hypotheticals, sufficient to reasonably allow the inference that" underwriter defendants had not acted with due diligence and denying plaintiffs' motion for leave to amend complaint on that basis).

Although Lehman's allegedly false statements about "net leverage ratio" did not appear in its financial statements, but rather in the MD&A section, there is no dispute that the ratio was based entirely on financial statements which, at year-end, E&Y audited and, at interim periods, E&Y reviewed, and was only "misleading" insofar as the accounting treatment and non-disclosure of Repo 105 transactions in those financial statements did not comply with GAAP.

[28] Such standards require that it "perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement."  2007 10-K at 84 (Ex. 7).

[29]  *See Countrywide*, 588 F. Supp. 2d at 1174-75; *see also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994).

Exchange Act portion – not incorporated into the Securities Act portion – do Plaintiffs make such an allegation against the Officer Defendants and E&Y.  Instead, the TAC establishes that there were no "red flags" that would have undermined the reliability of Lehman's audited financials, and specifically pleads that for the Securities Act claims all of the Defendants were merely negligent – and "specifically exclude[s]" any claim of recklessness, much less fraud.[30] TAC ¶ 120.  Particularly where, as here, the complaint otherwise establishes the statutory reliance defense on its face, it is incumbent upon Plaintiffs to make *some* showing of "red flags" that might tend to undermine the Defendants' reasonable reliance on E&Y as accounting experts.[31]  The TAC not only presents none, it disclaims that there were any.[32]

*Second*, for Lehman's interim financial statements included in its quarterly reports, the Non-Officer Defendants' due diligence defense is also established on the face of the TAC.  *See* 15 U.S.C. § 77k(b)(3)(A).  There is no contention that the structure of Repo 105 transactions was different at quarter-end periods than at year-end.  Moreover, the TAC specifically alleges later that E&Y "knew about Lehman's use of Repo 105 transactions to manage its balance sheet at the end of each quarter."  TAC ¶ 226.  And all of the alleged misstatements related to Repo 105 transactions are based entirely on the *same* accounting judgments and disclosures that were

---

[30]  *Cf. In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 673 (S.D.N.Y. 2004) (denying summary judgment on Section 11(b)(3)(c) defense where there were multiple "red flags" that "strip[ped the] defendant of his confidence of the accuracy of [the] registration statement"); *Enron Corp. Sec. Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 707 (S.D. Tex. 2002) (denying motion to dismiss where complaint was "filled with allegations of red flags . . . at least some of which should have alerted an underwriter doing due diligence investigations to look deeper and question more").  The very concept of a red flag is that the defendant saw something that should have put it on notice to inquire further.  Other courts have recognized that this cannot be the case where there is no "red flag" that would trigger the defendant's duty to inquire.  *See, e.g., In re Van Wagoner*, 382 F. Supp. 2d 1173, 1185-86 (N.D. Cal. 2004) ("[W]here a transaction derives its suspiciousness from specific details associated with the audited company's business, the plaintiff must plead facts suggesting the [defendant's] awareness of those . . . 'red flags.'").

[31]  *See Countrywide*, 588 F. Supp. 2d at 1181-82 (dismissing claims against underwriters based upon accounting-related statements incorporated into registration statement where complaint did not adequately allege red flags or plead that underwriters' reliance on accounting-related statements was unreasonable).

[32]  The Repo 105 allegations should also be dismissed because the TAC shows there is no loss causation as the result of any Repo 105 allegation.  *See* E&Y Br. at 25-6.

contained in Lehman's audited year-end financials, TAC ¶¶ 40-60; to wit, treatment of Repo 105 transactions as sales rather than as financings is entirely proper under GAAP.

In the review reports that E&Y filed with each 10-Q Report, E&Y stated that it was "not aware of any material modifications that should be made to the . . . financial statements . . . for them to be in conformity with [GAAP]." *See id.* ¶ 40(d). E&Y also stated that its review had been conducted in accordance with PCAOB standards and that it had applied analytical procedures and made inquiries of persons responsible for financial and accounting matters.[33] Finally, the TAC establishes that there were no "red flags" related to non-expertised statements that would have put Defendants on notice of material misstatements or that it was not reasonable to rely on Lehman's auditors about accounting-related judgments. *See* TAC ¶¶ 148, 231. Not only was it reasonable for the Defendants to rely on E&Y's view about what GAAP requires, it is hard (if not impossible) to imagine who else the Defendants should have consulted about Lehman's interim financial statements. In sum, the TAC itself alleges that E&Y knew all relevant facts about Repo 105 and the TAC disclaims any reason why the Non-Officer Defendants should have ignored E&Y on this issue. As such, the due diligence defense for these Defendants is established on the face of the TAC.

### 2.    Risk Management

Plaintiffs fault general statements in the Offering Materials that Lehman "monitor[ed] and enforce[ed] [sic] adherence to [its] risk policies," the "Finance Committee [oversaw] compliance with policies and limits," Lehman "ensure[d] that appropriate risk mitigants [were] in place," and it considered the impact of potential transactions on "overall risk appetite," *id.* ¶ 74, contending that these statements were materially false "because Lehman's risk management framework and risk mitigants, including its risk appetite limits, were routinely

---

[33]    *See, e.g.*, 2007 1Q at 40 (Ex. 4); 2007 2Q at 43 (Ex. 5); 2007 3Q at 44 (Ex. 6); 2008 1Q at 42 (Ex. 8); 2008 2Q at 53 (Ex. 9).

overruled, disregarded and violated throughout the Class Period." *Id.* None states a securities claim.

*First*, Plaintiffs do not allege that Lehman did not have the risk management policies that it disclosed, that the specific management procedures disclosed to the public were not followed, or even that any decisions by senior executives to exceed risk limits were prohibited by Lehman's policies.[34] Rather, they focus on the specific management judgments that were the product of these disclosed procedures and fault them for their purported excesses. *See* TAC ¶¶ 75-78, 83. But these allegations incorrectly assume that the limits were static, and that Lehman publicly represented them to be as such. As repeatedly disclosed in SEC filings, Lehman's "overall risk limits and risk management policies [were] established by management's Executive Committee," which would account for upward (as well as downward) revisions depending on how the Executive Committee "balanc[ed] risks and returns."[35] In discussing risk, Lehman further disclosed that specific "transactions and/or situations [were] addressed and discussed with management's Executive Committee when appropriate."[36]

The investing public therefore knew that risk limits and management policies were dynamic and that Lehman executives decided whether to permit exceptions to a particular limit

---

[34] Lehman's disclosures about its risk management policies and procedures were not false. Lehman had "sophisticated policies, procedures, and metrics in place to estimate the risk that the firm could assume without jeopardizing its ability to achieve a target rate of return, and to apprise management and the Board whether Lehman was within various risk limits." ER at 48-49. Lehman also maintained an "extensive risk management system, which was operated by the Global Risk Management Group," and risk managers were "embedded in the various business lines, and its Finance Department." *Id.* App. 8 at 1. In fact, "[w]ithin the industry, Lehman's risk management function was widely regarded as among the best." *Id.* at 2.

[35] 2007 2Q at 70 (Ex. 5); 2007 3Q at 73 (Ex. 6) (same); *see* 2007 10-K at 69 (Ex. 7) (limits and policies determined by Risk Committee, which includes management's Executive Committee); 2008 1Q at 77 (Ex. 8) (same). 2007 2Q at 70 (Ex. 5); 2007 3Q at 73 (Ex. 6) (same); *see* 2007 10-K at 69 (Ex. 7) ("Our goal is to realize returns from our business commensurate with the risks assumed."); 2008 1Q at 77 (Ex. 8) (same). The Executive Committee was authorized to approve breaches of the firm-wide risk appetite limit. ER App. 8 at 16.

[36] 2007 2Q at 71 (Ex. 5); 2007 3Q at 74 (Ex. 6) (same).

14

or policy.[37]  Lehman's "risk limits and stress tests . . . did not impose legal requirements on

management or prevent management and the Board from exceeding those limits if they chose to

do so" as the role of those limits was to "cause management to consider whether a particular

investment or a broad business strategy was worth the risk it carried."  ER at 49.  Lehman did not

"abandon" its risk limits and policies when it followed the *disclosed procedures* to exceed prior

limits or set new ones.  *See id.* at 168-69 ("Lehman's officers were entitled to set and decide to

exceed risk limits, which were merely tools to assist them in their investment decisions, not legal

restraints on their authority.").[38]

Moreover, risk management is a matter of business judgment.  Lehman told investors that

while it deployed "various risk mitigation and risk monitoring techniques," they were "subject to

judgments as to the timing and duration of their application," that under circumstances of

increased market volatility Lehman's measure of its own risk would be impacted, and that as a

result it "may not be able to reduce" positions or exposure in a "timely, cost-effective way or in a

manner sufficient to offset the increase in measured risk."  2007 10K at 37; *see also id.* at 22 (Ex.

7).  In hindsight, Plaintiffs challenge business decisions about how executives managed the

multitude of risks during the most tumultuous and destructive economic period since the Great

Depression.  This allegation "is, at bottom, a mismanagement claim," not a securities disclosure

violation.  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376-77 (S.D.N.Y. 2004).

Likewise, allegations that Lehman increased its mortgage assets during a time of deterioration in

---

[37]  For example, Lehman told investors that its "average risk" for certain quarters was greater than it had
been in past.  *See* 2007 2Q at 75 (Ex. 5); 2007 3Q at 78 (Ex. 6).

[38]  Similarly, Plaintiffs' allegations that Lehman's disclosures about its "overall risk appetite" were false
(e.g., TAC ¶¶ 74-75) because Lehman's senior managers made business decisions to increase and/or
exceed them do not state a Section 11 claim, either.  Plaintiffs cite to no instance in which Lehman
publicly disclosed its internal risk appetite limits (let alone represented that the Company would never
change its internal risks limits and policies) and identify no regulation or rule that would have required
such disclosure in the first instance.

the real estate markets, TAC ¶ 72, its stress tests did not include certain investments, *id.* ¶ 79,[39] and by late summer 2008 its hedges could not counteract the deteriorating real estate market, *id.* ¶ 81, are, at most, allegations of corporate mismanagement.

*Second*, as for Lehman's alleged "fail[ure] to ensure that appropriate risk mitigants were in place," *id.*, Lehman warned investors that "the effectiveness of our approach to managing risks can never be completely assured." 2007 3Q at 73 (Ex. 6). Lehman also disclosed that, while it had been successful hedging risks for certain real estate asset classes, it also had experienced difficulty hedging risks for others.[40] Specific warnings to investors about the limitations of Lehman's risk management render immaterial any misstatement or omission.[41] Investors do not need to be spoon-fed that no hedge is fool proof. *See In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 212 (S.D.N.Y. 2004).

*Third*, the challenged disclosures include general statements by Lehman touting its risk management, e.g., TAC ¶¶ 74, 81-82, and are no different from statements courts repeatedly hold immaterial as "no more than puffery."[42] In light of Lehman's disclosure that "the effectiveness of our approach to managing risks can never be completely assured," no reasonable investor would have understood Lehman as representing that its risk mitigation decisions guaranteed success during unprecedented industry-wide turmoil in the real estate and credit markets.

---

[39] Plaintiffs' allegation that Lehman misrepresented that its stress testing included all real estate assets, *see* TAC ¶¶ 79-80, is unfounded given Lehman's disclosures that stress testing covered only "certain products." 2007 10-K at 70 (Ex. 7); 2008 1Q at 78 (Ex. 8); 2008 2Q at 94 (Ex. 9).

[40] *See, e.g.*, 2008 1Q Call at 14 (Ex. 11) (stating it was more difficult to hedge commercial real estate assets than residential assets).

[41] *See Halperin*, 295 F.3d at 357; *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 472-73 (S.D.N.Y. 2009) (applying bespeaks caution doctrine to claims that defendant's "risk management system was not as robust as described in the . . . Prospectus").

[42] *See, e.g.*, *ECA*, 553 F.3d at 204 (statements touting "highly disciplined" risk management practices and "focus on financial discipline" are "no more than 'puffery' which does not give rise to securities violations"); *In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08 Civ. 11278, 2009 WL 4823923, at *12 (S.D.N.Y. Dec. 14, 2009).

*Finally*, the TAC alleges that Lehman "routinely violated its Value at Risk ('VaR')

limits." TAC ¶ 83.  The TAC asserts that Lehman's GREG, High Yield, and FID businesses

were repeatedly in breach of VaR limits during the Class Period and that Lehman allegedly

breached its firm-wide VaR limits approximately 44 times during the Class Period. *Id.* From

these allegations, Plaintiffs conclude that Lehman's general representation that it "monitor[ed]

daily trading net revenues compared to reported historical simulation VaR" was inaccurate. *Id.*

But Lehman publicly disclosed the increase in its average historical simulation VaR, as well as

the number of days that its daily net trading loss exceeded the simulation VaR. *See, e.g.*, 2007

10-K at 70-71 (Ex. 7); 2008 1Q at 78-79 (Ex. 8).  Likewise, Lehman disclosed it relied on

historical data to measure VaR and such measurements had "inherent limitations," including that

"historical market conditions" and changes in market risk factors may not be accurate predictors

of future conditions and risk factors. *See, e.g.,* 2007 10-K at 70 (Ex. 7).  Nowhere do Plaintiffs

allege that Lehman did not monitor daily trading net revenues, as disclosed.

### 3.    Liquidity

The TAC alleges that Lehman understated its liquidity risk because it had tens of billions

of dollars in immediate short-term obligations (through Repo 105 transactions) that were not

reported as required by Regulation S-K as "known" commitments "certain to have a material

effect on Lehman's financial condition and results of operation." TAC ¶ 86.[43]  Because GAAP

required Repo 105 transactions to be reported as sales, this allegation is wrong.  It also suffers

from other flaws.

*First*, the contention that "Lehman's obligation to repay the Repo 105 cash borrowings

and to repurchase the underlying assets collateralizing the loans immediately after the quarter

closed" had a material impact on its liquidity, TAC ¶ 86, ignores that the securities repurchased

after the end of the quarter were highly liquid.  *See* TAC ¶ 190, ER at 796-97 ("[T]he vast

---

[43]  While the TAC makes a general assertion at the outset that "as the Class Period continued, Lehman's
reported liquidity pool included large amounts of encumbered assets," the Securities Act portion of the
TAC alleges no facts to support this assertion.  TAC ¶ 1.

majority of securities utilized in these transactions were investment grade, with all but a few falling within the A to AAA range."). Exchanging cash for highly liquid securities (by buying them), therefore, *could not* have had a material impact on Lehman's liquidity; those securities were essentially as good as cash in the first place.[44]

*Second*, the TAC alleges that the failure to break out Repo 105 transactions and corresponding short-term liabilities resulted in a material and undisclosed negative impact to Lehman's reported liquidity pool. TAC ¶¶ 86-87. But this presumes that the obligation to repurchase the highly liquid securities in the Repo 105 transactions would be funded by the liquidity pool (rather than, for example, financed). The TAC's failure to allege this critical fact cannot be mended by Plaintiffs' *ipse dixit* pronouncements.

*Third*, Lehman adequately warned investors of the potential liquidity risks in the relevant Offering Materials. Lehman's filings cautioned that the liquidity pool's size was based in part on judgments about future events. 2007 10-K at 17 (Ex. 7). Likewise, Lehman warned investors that it relied upon "external borrowings for the vast majority" of its funding, that "failures in our industry are typically the result of insufficient liquidity," TAC ¶ 85, and that its "liquidity could be impaired by an inability to access secured and/or unsecured debt markets" or by an inability to sell assets or unforeseen outflows of cash or collateral. 2007 10-K at 37 (Ex. 7). [45]

---

[44]   Plaintiffs further complain that Lehman should have discussed the amount of cash available after repayment of Repo 105 borrowing, the ability to borrow more capital in light of a reduction in debt rating or change in leverage ratio due to repayment; the effect of repayment on Lehman's cost of capital/credit rating, and the economic substance and purpose of Repo 105 transactions. TAC ¶ 86. But these all *presume* that the Repo 105 transactions had a material impact on Lehman's operations. Moreover, because the TAC's liquidity claims are based upon Lehman's accounting treatment and presentation of Repo 105 transactions, which E&Y concluded was appropriate under GAAP, *see supra* Section I.C.1, the Defendants are entitled to rely on the statutory defense of reliance on the expertised portions of the financial statements and the due diligence defense as to the interim financial statements on the face of the TAC.

[45]   Plaintiffs also claim Lehman's liquidity statements were false because Lehman had accumulated a "heavy concentration of illiquid assets with deteriorating values" that could not be sold "without incurring significant losses." TAC ¶ 88. But the TAC offers no explanation why a loss in value to assets would affect the liquidity pool. The TAC further asserts that by the July 2007 start of the Class Period, Lehman had already internally determined that its "liquidity pool was short $400 million to meet commitments looking out one year forward." *Id.* But nowhere do Plaintiffs identify the timing or source of these

### 4.     Valuation Of Commercial Real Estate Assets

Having abandoned the bulk of their prior sweeping claims about Lehman's valuation judgments, Plaintiffs now limit themselves to charges that Lehman's CRE portfolio was overvalued during the first and second quarters of 2008.  *See* TAC ¶¶ 93-95, 101.  In particular, Plaintiffs allege that Lehman overvalued: (1) one particular CRE asset, Archstone, by $200 million to $450 million as of the end of 2008 1Q, and by $200 to $500 million as of the end of 2008 2Q; and (2) one particular CRE asset class (the "PTG Assets") by "tens or hundreds of millions of dollars as of 2Q08."  *Id.* ¶¶ 94, 100.  Plaintiffs also point to several third party statements made post-bankruptcy filing and claim those hindsight opinions constitute "additional facts showing that Lehman's commercial real estate holdings were overvalued."  *Id.* ¶¶ 102-03.

*Lehman's CRE valuations were truly held opinions.*  Plaintiffs readily acknowledge that Lehman valued Archstone and the PTG Assets using "model[s]" and "method[s]" that were based on "various assumptions."  *Id.* ¶¶ 92, 97-98.  Yet the TAC never alleges Lehman should, or could, have valued these assets without using models.  In effect, Plaintiffs concede these assets were illiquid, and that their value could not be readily determined from observable transactions.  As this Court has stated on several occasions, the fair value of such illiquid assets is "not a matter of objective fact" but "of judgment and opinion."  *Fait*, 2010 WL 1883487, at *4 & n.38 (addressing fair value in context of assets acquired as goodwill and collecting cases).  These allegations only state a viable Section 11 or 12 claim if the TAC alleges that Lehman "did not truly hold the opinion at the time it was issued."  *Id.* at *3 & n.31.  Plaintiffs must plead "particularized" facts showing "that management believed that the [valuation] figure was materially overstated," or that Lehman "knowingly or recklessly misstated" its CRE valuation.

---

allegations, or any of the assumptions that such an alleged projection or analysis would have required. Plaintiffs have failed to plead any facts showing, either at quarter-end (August 31, 2007) or when the 2007 3Q Report was filed (October 10, 2007), that the statement that Lehman "'maintain[ed] a liquidity pool . . . that covers expected cash outflows for twelve months in a stressed liquidity environment,'" TAC ¶ 88, was false, or that Lehman did not actually believe the statement to be true.  *See Fait v. Regions Fin. Corp.*, No. 09 Civ. 3161 (LAK), 2010 WL 1883487, at *4 & n.38 (S.D.N.Y. May 10, 2010); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004).

*Id.* at *4-5.[46]  But the TAC specifically disclaims that any Defendant engaged in intentional or reckless conduct in connection with the Securities Act claims.  *See* TAC ¶¶ 23, 120.[47]

At its core, Plaintiffs' valuation theory rests on the mistaken proposition that the particular methodology applied by the Examiner – with the benefit of hindsight – was objectively correct, while the models used by Lehman were objectively improper.  But this ignores the very nature of valuation models[48] and there is no basis for saying that the valuation reached by one model was "true" while another was "false."  Instead, "[t]he question of material falsity . . . is whether plaintiffs' allegations, if true, would support a strong inference that these representations were false – not because the values  were 'wrong' in some empirical sense, but because the totality of the evidence would give rise to a strong inference that management did not give its honest opinion."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 363 (S.D.N.Y. 2007).

*Alleged overvaluations were immaterial.*  At the end of 2008 1Q, Lehman's total assets were more than $786 billion.  *See* 2008 1Q at 5 (Ex. 8).  At the same time, Plaintiffs allege that Archstone was overvalued by at most $450 million.  *See* TAC ¶ 94.  This alleged overvaluation represented less than 0.06% of Lehman's total assets at the time.  Similarly, at the end of 2008 2Q, Lehman's alleged overvaluation of Archstone represented less than 0.08% of Lehman's total assets.[49]  Courts have routinely dismissed claims that allege such a *de minimis* impact on total

---

[46]  Lehman disclosed that an increasing amount of its mortgage-related assets were becoming harder to value and, therefore, that the Company's valuations relied increasingly upon management's judgment. 2007 10-K at 41 (Ex. 7).

[47]  Even putting aside the TAC's disclaimer, Plaintiffs do not plead any facts establishing that Lehman knowingly or recklessly misstated its CRE valuations.  Indeed, Plaintiffs do not allege that any of Lehman's valuations violated the Exchange Act.

[48]  "[S]ome valuation models may be more or less reliable than other models, have more or less predictive power, or hew more or less closely to the conventional wisdom on a subject, but they are nonetheless opinions and not objective facts."  *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005).

[49]  *See* 2008 2Q at 5 (Ex. 9) (total assets over $639 billion) and TAC ¶ 94 (Archstone overvalued by up to $500 million).

assets, and have done so even where the purported impact is much greater than the negligible one alleged here.  *See ECA*, 553 F.3d at 204 ("An accounting classification decision that affects less than one-third of a percent of total assets does not suggest materiality.").[50]

Of necessity, Plaintiffs engage in statistical sleight of hand – cherry-picking smaller numbers from Lehman's disclosures to make their allegations appear more significant.  For example, Plaintiffs allege that Lehman's mark-to-market adjustments for Archstone and PTG assets should have been 20% higher in 2008 1Q and 15% higher in 2008 2Q, while its pretax income should have been 40% lower in the 1Q and its net losses 7% higher in the 2Q.  *See* TAC ¶¶ 94, 100.  These micro-metrics are inappropriate for assessing materiality: if a company with millions of dollars of assets reports a net loss of $1,000 when in fact it lost $2,000, the $1,000 difference is not material even though the reported loss was understated by 100%.  *See Landmen*, 659 F. Supp. 2d. at 541 (rejecting argument that a particular investment "accounted for 69% of the decline in revenue" of one business group; proper context was the company's overall revenue or assets under management).  So too here.

*PTG assets.*  Plaintiffs only vaguely allege that Lehman's PTG assets "were overvalued by tens or hundreds of millions of dollars as of 2Q08."  TAC ¶ 100.  Even if the PTG Assets were overvalued by $1 billion, which Plaintiffs do not allege, this would represent less than 0.16% of Lehman's $639 billion of total assets.[51]

---

[50]  *See also Landmen Partners Inc. v. Blackstone Group, LP*, 659 F. Supp. 2d 532, 541 (S.D.N.Y. 2009) (dismissing claims as immaterial because impact on 0.4% of total assets "does not even come close to the 5% threshold that serves as an appropriate starting place" for materiality analysis) (internal citation omitted); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613-14 (S.D.N.Y. 2008) (alleged omission accounting for "only 0.4%" of annual revenue "is simply too small to be material as a matter of law when considered in the broader context of the company's revenues and expenses"), *aff'd*, 347 Fed. App'x 665 (2d Cir. 2009).

[51]  None of the Underwriter Defendants participated in offerings in which Lehman's Second Quarter 2008 financial statements were included, and they are the only ones the TAC alleges misstated PTG assets.  TAC ¶¶ 100-01.

*Post-bankruptcy statements are impermissible fraud by hindsight.* Plaintiffs also point to several competing opinions about Lehman's CRE valuation that were expressed after the firm's bankruptcy. *Id.* ¶¶ 102-03. These allegations are nothing more than improper fraud by hindsight. In any event, the assertion that other market observers disagreed with Lehman's valuation judgments while (and after) Lehman was melting down does nothing to establish that Lehman did not truly hold those opinions months earlier; these after-the-fact statements do not salvage Plaintiffs' defective valuation claim.

### 5. Concentration Of Risk

Finally, the TAC alleges that, until the 2008 2Q Report, Lehman's Offering Materials omitted "required disclosures relating to significant concentrations of credit risk" associated with its mortgage and real estate related assets. TAC ¶ 105. Plaintiffs also allege that throughout the Class Period Lehman failed to disclose sufficient details about risks concentrated in "highly risky Alt-A loans, illiquid commercial real estate assets, and leveraged loan commitments." *Id.* These claims also should be rejected.

*Significant disclosures.* Plaintiffs' allegations ignore the fact that Lehman's public filings disclosed the credit and other risks associated with concentrated holdings, *e.g.*:

- "Holding large and concentrated positions may expose us to losses . . . in our market-making, specialist, block trading, underwriting, proprietary trading, principal investment and lending businesses in the event of unfavorable market movements." 2007 10-K at 16 (Ex. 7).

- Detailed tables in SEC filings throughout the class period showing the dramatic increase in leveraged loan positions. *See* 2007 2Q at 68 (Ex. 5).

- Breaking down commercial real estate mortgages by property type and geographic region and, for residential mortgages, providing geographic region and credit risk for U.S. holdings. *See* 2008 1Q at 56-57 (Ex. 8).

*Timing.* Plaintiffs rely on conclusory allegations without regard to the timing of a particular offering or the context of rapidly changing market conditions. Defendants argued in the round of briefing addressed to the SAC that Plaintiffs must plead specific facts to establish that the Offering Materials omitted information about significant risk concentrations at the time

of each offering because the sufficiency of Securities Act claims must be evaluated by the facts and disclosures as they existed at the time the offerings were made. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005). This is especially important for Lehman's disclosures about concentrations of risk, because assets in Lehman's portfolio grew over time, and the timing of this growth is critical to determining when a risk concentration might have developed. TAC ¶¶ 105-08.

     Even Plaintiffs admit that the nature and scope of Lehman's disclosures of these concentrations changed over time. *Id.* ¶¶ 105-06. Lehman disclosed the growth and risks of the particular assets that Plaintiffs identify.[52] Yet Plaintiffs make no showing that any of the Offering Materials omitted information relating to such concentrations of risk that existed at the time of filing. In arguing that Lehman should have disclosed certain information before it judged risk concentrations to be significant – or before they had developed at all – Plaintiffs are impermissibly arguing fraud by hindsight.[53]

     Plaintiffs' latest allegations also fail because they rely on documents from before the Class Period without demonstrating that the conditions allegedly described in them were present later, in the midst of an incredibly volatile market. Even if the cited documents were to have revealed the existence of risk concentrations or the belief of management that these concentrations were "significant," they are not evidence of any fact that existed at the time of a relevant offering unless it is plausible that Lehman's vast portfolio of assets and the underlying market for those assets somehow remained static throughout the entire Class Period, which of course they did not. For example, Plaintiffs cite to an internal Lehman audit report and an

---

[52] *See also* Defendants' Motion to Dismiss Plaintiffs' Securities Act Claims in the SAC at 37-38, 41-42, 50-51, 58-59; Defendants' Reply Memorandum in Support of Their Motion to Dismiss Plaintiffs' Securities Act Claims in the SAC at 26, 38-40 (detailing Lehman's disclosures of its illiquid investments including real estate assets and loans that could not be securitized).

[53] For example, Plaintiffs attempt to use Lehman's write-down of its CRE positions in the second and third quarters of 2008 (when there are no claims against the Underwriter Defendants) to allege that its holdings of these assets was a concentration of risk. *See* TAC ¶ 107. This ignores the rapidly changing market conditions between the time of the relevant public filings and these write-downs.

internal e-mail, respectively dated February and March 2007 – months prior to the Class Period – and to growth in asset classes that took place in fiscal year 2006.  TAC ¶ 105-07.  None of these supports Plaintiffs' allegations that the Offering Materials *during the Class Period* omitted material information or violated GAAP.

*Improper categories of concentrations.*  The only basis for Plaintiffs' allegation that Lehman "fail[ed] to disclose material facts about [its] concentration of mortgage and real estate related risks" is that this constitutes an actionable omission under SFAS 107, which "requires disclosure of significant concentrations of credit risk."  *Id.* ¶¶ 104-05.  But SFAS 107 does not require a discussion of assets using Plaintiffs' preferred descriptors, which are simply not cognizable under any GAAP provision.[54]  Nor does GAAP require issuers to paint the description of their assets in offering materials in derogatory shades.[55]  These purported "concentrations of credit risk" are also not plausible on their face.  "Illiquid assets" and "leveraged loan commitments," *id.* ¶ 105, are descriptive phrases rather than categorical ones.  On the other hand, geographic concentrations (e.g., United States or country-specific risk[56]) or industrial concentrations (e.g., "financial institutions," which Lehman disclosed was its "most significant industry concentration"[57]) might be meaningful to a reasonable investor.  Since Plaintiffs can identify no duty that Lehman violated by not breaking out such assets as the TAC

---

[54]   Indeed, the SEC's March 2008 Sample Letter confirms that there is no separate requirement to disclose the "nature and type of assets underlying any asset-backed securities, for example, the types of loans (sub-prime, Alt-A, or home equity lines of credit)," although firms "may" consider such disclosures.  SEC Div. of Corp. Finance Letter, at 1-2 (Ex. 12).  The letter further confirms that firms must apply their own "judgment" in using "unobservable inputs to determine the fair value" of assets and liabilities.  *Id.*

[55]   *See In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 479-80 (E.D.N.Y. 2006) (no requirement for bank to describe mortgage backed securities in "pejorative terms" where it was "apparent from the quarterly reports" that company was "heavily involved" in mortgage-backed securities) (internal citation omitted).

[56]   *See, e.g.*, SFAS 105 at 39 ¶ 100-05 (Ex. 13) (requiring disclosures of exposures with individual counterparty or groups of counterparties in same industry or region or having similar economic characteristics).

[57]   2007 2Q at 16 (Ex. 5); 2007 3Q at 18 (Ex. 6); 2007 10-K at 106 (Ex. 7); 2008 1Q at 22 (Ex. 8).

suggests and describing them in pejorative terms, this allegation must be dismissed.[58]

*No "significant" concentrations.*  As the FASB explained in SOP 94-6-1 (Ex. 14), *see* TAC ¶ 104, "[j]udgment is required to determine whether loan products have terms that give rise to a concentration of credit risk."[59]  The AICPA SOP No. 94-6 (Ex. 15), *see* TAC ¶ 104, also acknowledges that the determinations of which risk concentrations are "significant," and therefore should be disclosed, are within the business judgment of the issuer.[60]  This judgment is necessary to provide content to the GAAP rules calling for disclosure of significant concentrations of credit risk; after all, "the goals of full disclosure and fair dealing embodied by the securities laws are not furthered by requiring issuers and proxy solicitors to inundate the investing public."[61]  Lehman's opinion during the Class Period that the purportedly undisclosed "concentrations of credit risk" alleged in the TAC were not significant was a judgment, and therefore cannot be actionable unless it was not truly held, which Plaintiffs do not allege.  *See Fait*, 2010 WL 1883487, at *5; TAC ¶¶ 23, 120.

Nor is there any basis for such an allegation asserting that certain assets were "highly risky" or "illiquid."  Like bare allegations describing the growth of asset categories in Lehman's portfolio, such allegations fail to show the existence of any significant concentrations of risk or management's judgment of them.  TAC ¶¶ 106-08.  Nor do the cited documents cure their deficient allegations.  Like the data they proffer about the growth of Lehman's assets, Plaintiffs neither provide these documents to the Court in an appendix nor offer citations that would allow the Court to review them.  More importantly, none of these documents supports their

---

[58]  *See In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) (plaintiffs "point to no accounting or reporting requirements which would require the disaggregation of acquisition costs").

[59]  FASB Staff Position SOP 94-6-1, ¶ 7, dated Dec. 19, 2005 (Ex. 14).

[60]  AICPA SOP 94-6, dated Dec. 30, 1994 (Ex. 15).

[61]  *Rubin v. Long Island Lighting Co.*, 578 F. Supp. 608, 614 (E.D.N.Y. 1984).

allegations.[62]

Finally, Plaintiffs' discussions about the asset categories that concern them make no specific allegation that Lehman's alleged omissions violated GAAP, much less how so. A passing reference to GAAP standards without demonstrating the basis for the violation is inadequate; the TAC's allegations leave the Court with "no possibility at all of assessing materiality as a matter of law." *Garber,* 537 F. Supp. 2d at 613. Specificity in pleading a violation of GAAP is especially necessary here because Lehman's independent auditor reviewed the presentation of financial results, including concentration of risks, and found it to be consistent with GAAP. *See supra* Section I.C.1.

## D.    The Principal Protection Note Offering Materials Are Not Actionable

Plaintiffs focus narrowly on whether the "pricing supplement" for each PPN offering was misleading, TAC ¶ 118(a), (b), (c), ignoring (1) that the pricing supplement was just one of several documents that, together, constitute the relevant offering materials, and (2) the law that requires offering documents to be read "as a whole." [63]   *DeMaria v. Andersen*, 318 F.3d 170, 180

---

[62]   The relevant section of the internal audit report, *see* TAC ¶ 105, advises that Lehman's stress tests include a review for concentration of risk, but nowhere indicates any belief in any significant risk concentrations in Lehman's portfolio. Lehman Management Action Plans Draft Report, dated Feb. 26, 2007 (Ex. 16). The March 2007 e-mail that Plaintiffs cite about Alt-A loans, *see* TAC ¶ 106, has no bearing on risk concentrations, and does not even state, as Plaintiffs allege, that Lehman's Alt-A loans were closer to subprime. E-mail from D. Kritikos to J. Goodman, dated Mar. 12, 2007 (Ex. 17). Rather, it only describes how Aurora's product is mixed between subprime and Alt-A loans. *Id.* Finally, the November 2007 GREG presentation, *see* TAC ¶ 107, not only *never* describes any significant concentrations of risk, but also in fact provides an internal assessment that GREG's portfolio was "well-diversified by region, property and risk type" – the opposite of an undue concentration of risk. Lehman Global Real Estate Update, dated Nov. 6, 2007, at 7 (Ex. 18). Moreover, Plaintiffs' claims are belied by their pleading that Lehman followed the recommendations in the GREG presentation to reduce its CRE holdings before it judged a significant risk could develop. *See* TAC ¶ 107.

[63]   Every PPN pricing supplement explained that the Offering Materials consisted of, at a minimum, Lehman's Base Prospectus, the "MTN Prospectus Supplement," and the pricing supplement, and often a "product supplement" and an "underlying supplement." *See, e.g.*, PS No. 1 (52522L566) at 1 (Ex. 19); PS No. 1 (52522L202) at 1 (Ex. 20); PS No. 1 (52522L525) at 1 (Ex. 21). Moreover, each pricing supplement advised investors to read *each* of the documents constituting the relevant Offering Materials, provided internet links to those documents, and directed investors to specific "key risk" sections of those documents. *See, e.g.*, PS No. 1 (52522L566) at 2 (Ex. 19); PS No. 1 (52522L202) at 2 (Ex. 20); PS No. 1 (52522L525) at 2 (Ex. 21).

(2d Cir. 2003).  When the PPN Offering Materials are read as a whole, no reasonable investor could have been misled.  The Materials disclose fully the information that Plaintiffs allege was misrepresented or omitted.  *See, e.g.*, *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 2003).

## 1.  Investors Were Told The PPNs Were Unsecured Obligations Of Lehman

Plaintiffs contend that references in the PPN pricing supplements to "principal protection" were false or misleading because the PPNs had "no security interest or collateral" and investors received "no interest in any instruments used by Lehman to hedge its obligations." TAC ¶ 118(a)(i) & (ii).  But nothing in the Offering Materials suggested that the PPNs provided investors with any security interest or any interest in underlying instruments.  Rather, the Offering Materials disclosed in no uncertain terms that the PPNs were unsecured:

- The Base Prospectus explained: "[t]he debt securities offered by this prospectus will be [Lehman's] *unsecured* obligations."  Base Pro. at 8 (Ex. 22) (emphasis added); *see also id.* at 2.

- The MTN Prospectus Supplement stated the PPNs were "senior debt securities and will rank on an equal basis with all of our other *unsecured* debt."  Pro. Supp. at S-13 (Ex. 23) (emphasis added).

- The Product Supplements disclosed that "[t]he notes are the senior *unsecured* obligations of Lehman Brothers Holdings Inc."  Prod. Supp. 550-I (Nov. 27, 2007) at 1 (Ex. 24) (emphasis added); *see also, e.g.*, Prod. Supp. 220-I (March 6, 2007) at 1 (Ex. 25); Prod. Supp. 1050-I (March 14, 2008) at 1 (Ex. 26).

- Each pricing supplement disclosed, on the very first page, that the PPNs "are not deposit liabilities of Lehman Brothers Holdings Inc. and are not FDIC-insured."  PS No. 1 (52522L566) at 1 (Ex. 19); *see also, e.g.*, PS No. 1 (52522L202) at 1 (Ex. 20); PS No. 1 (52522L525) at 1 (Ex. 21).

The MTN Prospectus Supplement also made clear that payment on the PPNs would come *solely* from Lehman and from income earned by Lehman's subsidiaries: "The notes will be solely our obligations. . . . If these sources [distributions to Lehman from its subsidiaries] are not adequate, we may be unable to make payments of principal or interest in respect of the notes and

you could lose all or a part of your investment." Pro. Supp. at S-7 (Ex. 23).[64]  The Offering

Materials were equally clear that investors had no interest in any hedging activity in which

Lehman might engage or in the derivative component of the PPN.[65]

> ### 2.   The PPN Offering Materials Explained The Payout Structure Of The Notes And The Impact Of Principal Protection Provided By Lehman

As the preceding quotations from the Offering Materials make clear, the PPNs were

similar to traditional bonds in some respects – most notably, in their priority in the capital

structure of Lehman, with the PPNs ranking "on an equal basis with all of our other unsecured

debt." Pro. Supp. at S-13 (Ex. 23).  However, the PPNs were quite different from "traditional

bonds" in terms of their payout structure.[66]  Unlike traditional bonds, investors in PPNs generally

did not receive periodic interest payments and a predetermined principal payment at maturity.

Payments were made only at maturity, and the amount of the payment was dictated primarily by

the performance of the linked derivative (*e.g.*, a stock index, a basket of currencies) during the

life of the note.  The "principal protection" aspect of the PPNs, plainly described in the Offering

Materials, merely provided investors with downside protection if the linked index or currency

basket performed poorly (while simultaneously allowing the investor upside potential if the

derivative performed well).[67]  The Offering Materials made abundantly clear that Lehman alone

---

[64]  *See also* Base Pro. at 2 (Ex. 22) ("Since we are primarily a holding company, our cash flow and consequent ability to satisfy our obligations under the offered securities are dependent upon the earnings of our subsidiaries . . .").

[65]  *See, e.g.*, Prod. Supp. 550-I (Nov. 27, 2007) at SS-6 (Ex. 24) ("No note holder shall have any rights or interest in our hedging activity or any positions we may take in connection with our hedging activity."); Prod. Supp. 220-I (March 6, 2007) at SS-9 (Ex. 25) (same); Pro. Supp. at S-30 (Ex. 23) ("No holder of an indexed note will, as such, have any rights of a holder of the index property referenced in the note. . . ."); Base Pro. at 10 (Ex. 22) (same).

[66]  Plaintiffs mischaracterize a document issued by UBSFS *after* Lehman's bankruptcy as stating that PPNs were "no different from traditional bonds."  TAC ¶ 119.  In fact, that document stated, accurately, the same essential information that was contained in the Offering Materials:  "Similar to traditional bonds, if the issuer is unable to pay its obligations under the terms of the structured product, then the structured product becomes a defaulted obligation of the issuer." *Structured Products: Lehman Q&A*, UBS Financial Services Inc., at 2 (Sept. 23, 2008) (Ex. 27).

[67]  This feature distinguished the PPNs from other structured products issued by Lehman, in which investors were fully exposed to the downside risk inherent in an investment in the underlying derivative.

provided the principal protection, which was only as good as Lehman's creditworthiness. The Offering Materials accurately described the PPNs as carrying *Lehman's* backing, but not FDIC insurance or security. *See supra* at Section I.D.1.

> **3.      The PPN Offering Materials Adequately Disclosed That Payment Was Subject To Lehman's Credit Risk**

Defendants had no obligation to disclose the obvious fact that if Lehman became insolvent, investors would not receive full payment on the notes. *See* TAC ¶ 118(b), (c). "It is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market." *Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir. 1984) (citation omitted). Courts have rejected claims analogous to those made here.[68] In any event, the PPN Offering Materials contained more than sufficient disclosure of the risk Lehman would be unable to make payment. Lehman disclosed that the notes were "solely our obligations," that there was a risk that "we may be unable to make payments of principal or interest in respect of the notes and you could lose all or a part of your investment," Pro. Supp. at S-7 (Ex. 23),[69] and that the PPNs were "senior debt securities." *Id.* at S-13. Plaintiffs appear to concede that such disclosures, had they appeared in the pricing supplement, would be adequate. TAC ¶ 118(c). But since the Offering Materials must be read as a whole, and since the pricing supplements expressly advise investors to read the risk sections of the underlying documents (and also provided internet hyperlinks), a reasonable investor would have understood repayment

---

The "principal protection" name was not a Lehman-specific moniker, but was consistent with industry convention for naming securities possessing this feature. Samples of offerings with similar titles are contained in Exhibits 28 through 32.

[68]    *See, e.g.*, *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998) (broker-dealer need not disclose that it might profit from use of collateral posted by plaintiff in short sale transaction because "[a]n investor who is ignorant of the fact that free cash or securities may be used to earn interest or other kinds of financial returns is simply not reasonable by any measure"); *Zerman*, 735 F.2d at 21 (no obligation to disclose that, in connection with a margin account, investor "might be required to put up more money if the market went down").

[69]    This warning was contained in the "Risk Factors" section of the Prospectus Supplement, which investors were advised, in virtually every pricing supplement, to "review carefully." *See, e.g.*, PS No. 1 (52522L566) at 2 (Ex. 19); PS No. 1 (52522L202) at 2 (Ex. 20); PS No. 1 (52522L525) at 2 (Ex. 21).

was dependent on Lehman's ability to pay.  *See I. Meyer Pincus & Assocs. P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir. 1991) (rejecting argument that cautionary language was "buried" where offering document "unambiguously communicates the importance of reading all relevant material contained within the prospectus").

Plaintiffs also contend that pricing supplements from earlier in 2007 were not as explicit about the risk posed by Lehman's creditworthiness as were pricing supplements from later in 2007 and 2008.  TAC ¶ 118(b), (c).  But *every* pricing supplement for the PPNs included a prominent reference to Lehman's credit rating,[70] which is only relevant to Lehman's ability to pay on the PPNs.  That the disclosures in the pricing supplements became increasingly explicit during 2007 is merely a byproduct of the increasing dislocation in credit markets during that time, and the increasing relevance of the risk posed by Lehman's (and all other issuers') creditworthiness.[71]  In light of these changing market conditions, as early as April 2007, pricing supplements disclosed that the value of the notes would be affected by, among other factors, "the creditworthiness of Lehman Brothers Holdings Inc."[72]  By June 2007, the pricing supplements began to disclose that the creditworthiness of Lehman could affect "the ability of the issuer to meet its obligations."[73]  And as Plaintiffs concede, beginning in October 2007, the pricing supplements included, among the "Key Risks," the warning that an investment in the notes was subject to Lehman's "credit risk" or "creditworthiness."  TAC ¶ 118(c).  When added to the disclosures in the incorporated MTN Prospectus Supplement and other Offering Materials, these disclosures adequately and appropriately explained that payment on the PPNs was dependent on

---

[70]  *See, e.g.*, PS No. 2 (52520W564), at 3 (Ex. 33) (offering of March 30, 2007); PS No. 1 (52522L202) at 3 (Ex. 20); PS No. 1 (52522L525) at 3 (Ex. 21).

[71]  Of course, though the focus on credit risk sharpened over time, Lehman retained its investment grade credit ratings until the time of its bankruptcy.  It would, moreover, create perverse incentives if more explicit disclosures regarding credit risk – appropriately made in response to ever-worsening market dislocations – were used as a basis for finding that earlier disclosures were insufficient.

[72]  PS No. 166 (52517PX63) at 6 (Ex. 34).

[73]  PS No. 1 (52522L202) at 3 n.1 (Ex. 20).

Lehman's solvency.

### E.   Plaintiffs' Section 11 Claims Against Defendant Callan Should Be Dismissed

Section 11 liability is expressly limited to strictly defined classes of defendants including those who signed the registration statements, those who are or are about to become directors or partners, accountants, and underwriters.  15 U.S.C. § 77k(a).[74]  Callan does not fit into any of these delineated categories.  She did not become CFO until December 1, 2007 and never signed the 2006 shelf registration statement or the 2006 Prospectus.  Plaintiffs apparently rely on a tenuous link from the 2006 shelf registration statement to the 2006 Prospectus that purportedly incorporated by reference any potential future SEC filing.  SAC ¶¶ 165-69, 246-47.[75]  However, having never signed the registration statement or prospectus, Callan cannot be liable under Section 11.

### F.   The Section 15 Claims Fail As A Matter of Law

Absent primary liability under Section 11 or 12(a)(2), there can be no control person liability under Section 15 of the Securities Act.  *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 n.1 (2d Cir. 1993).  All the Section 15 claims should therefore be dismissed.[76]

---

[74]  *See In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 437 (S.D.N.Y. 2000); *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 575-76 (S.D.N.Y. 2001).

[75]  Rule 430B(f)(2) makes clear that where Rule 424(b)(2) supplements are used to update a shelf registration, a new effective date for purposes of Section 11 liability is established only with respect to *the issuer and underwriters*.  17 C.F.R. § 230.430B(f)(2) (emphasis added); *see also* SEC Release 33-8591, section V(B)(1)(b)(iii)(B) ("[W]e believe that for other persons, including directors, signing officers, and experts, the filing of a form of prospectus should not result in a later Section 11 liability date than that which applied prior to our new rules."). (Ex. 35) Plaintiffs' prior reliance on Rule 430B(f)(4) is therefore misplaced because that section applies to issuers who do not utilize Rule 424 prospectus supplements to update an automatic shelf registration, but rather update the registration by filing a new prospectus under Section 10(a)(3) of the Securities Act.  *See In Re Countrywide Fin. Corp. Sec. Litig.*, 07-cv-05295-MRP (MANx), 2009 WL 943271, at *7 (C.D. Cal. Apr. 6, 2009) (Under Rule 430B, officer did not sign the shelf registration for purposes of Section 11 liability "because the subsequent Rule 424(b)(2) supplements and Rule 433 free-writing prospectus did not meet the exceptions that Rule 430B makes for filings required under the '33 Act § 10(a)(3) or a fundamental change under Regulation S-K Item 512(a)(1)(ii).").

[76]  The Section 15 claims against Gregory and Lowitt should be dismissed for the additional reason that the TAC does not allege that they violated Section 11.  *See* ¶ TAC 121.

## II.    THE EXCHANGE ACT CLAIMS SHOULD BE DISMISSED[77]

### A.    The Legal Standard

Under Rule 9(b) and the Private Securities Litigation Reform Act, the complaint must specify each misleading statement, set forth the facts on which a belief that a statement is misleading was formed, and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, , 547 U.S. 71, 81-82, 126 S. Ct. 1503, 1511 (2006).  The court must consider all plausible non-fraudulent inferences.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499, 2509 (2007).  The Exchange Act claims here should be dismissed because the TAC fails to plead (1) any material misstatement or omission, (2) scienter, or (3) loss causation.

### B.    The TAC Fails To Plead Any Material Misstatement Or Omission Under The Exchange Act Claims

To plead a material misstatement or omission, plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal citations omitted).

#### 1.    The TAC Fails To Plead Any Misstatements Against Gregory

The TAC does not attribute a single statement to Gregory, and does not allege that he signed any of the SEC filings at issue in the Exchange Act claims.  For this reason alone, the Exchange Act claims against him should be dismissed.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993) (stating fraud cannot be pled through unattributed statements).

#### 2.    The TAC Fails To Plead Any Misstatement Against Any Officer Defendant Regarding Lehman's Deleveraging

The TAC alleges that Lehman "turned to Repo 105 transactions to create the illusion that it was delivering on its promise to the market to deleverage by selling [illiquid] assets, when in reality Lehman was only able to achieve the appearance of deleveraging through undisclosed

---

[77]   The Exchange Act section does not allege that the misstatements in TAC ¶¶ 89-103 concerning Lehman's valuation of commercial real-estate are also Exchange Act violations.  *See* TAC ¶ 170.

32

Repo 105 transactions." TAC ¶ 156. [78]  However, Lehman's deleveraging through reduced exposure to troubled illiquid assets was accomplished through outright sales and mark-downs, both of which were disclosed in granular detail.  Lehman's SEC filings each quarter contained detailed break-downs of Lehman's holdings by asset class, including commercial real estate, residential mortgages, and leveraged finance, and showed quarter-to-quarter reductions of those asset classes.  *See* Appendix B (showing reduction in those asset classes by 46%).  In addition, increases in shareholder equity reduced Lehman's net leverage.  *See, e.g.*, 2008 2Q at 56 (Ex. 9). Moreover, contemporaneous analyst reports show that the market was focused on the extent to which Lehman reduced its exposure to specific illiquid asset classes quarter to quarter.  *See, e.g.*, *Equity Research Report: Lehman Brothers (LEH)*, The Buckingham Research Group, at 1 (June 9, 2008) (Ex. 36) ("Riskier assets have been reduced, with mortgage assets down by 15-20% and leveraged loans down 35%.").  Any investor interested in the amount of illiquid assets in each category at quarter end would look not to the net leverage ratio that presented a composite calculation of various activities of the Company, but to the line items disclosing the assets held in each category.

---

[78]   The TAC criticizes Callan's March 18, 2008 statement that "[w]e did, very deliberately, take leverage down for the [first] quarter [of 2008]," TAC ¶ 184, as failing to disclose that the decline was allegedly attributable to Repo 105 transactions.  Callan's statements about net leverage were not misleading. Lehman reduced leverage in 2008 by reducing exposure to illiquid assets and raising additional equity. Plaintiffs admit that Lehman's "actual net leverage ratio" (excluding Repo 105 transactions) declined from the end of 2007 4Q to the end 2008 2Q.  TAC ¶ 38.  The TAC also criticizes Callan's June 9, 2008 statement that the reduction in Lehman's net leverage ratio in 2008 2Q from selling "less liquid asset categories."  TAC ¶ 190.  However, as stated in the June 9, 2008 preannouncement press release for 2008 2Q, Lehman had "[d]ecreased gross assets by approximately $130 billion and net assets by approximately $60 billion" including "[r]educed exposure to residential mortgages, commercial mortgages and real estate investments by an estimated 15-20% in each asset class, . . . . [r]educed acquisition finance exposures by an estimated 35%" and "[r]educed aggregate non-investment grade inventory (including funded acquisition finance assets) by an estimated 20%."  Lehman's 2008 2Q MD&A accurately stated that this program of asset reductions, together with almost $6 billion equity raises, resulted in a "decrease in the Company's gross and net leverage ratios to 24.34x and 12.06x at May 31, 2008, respectively, from 30.73x and 16.14x at November 30, 2007."  2008 2Q at 56, 86 (Ex. 9).

### 3.     The TAC Fails To Plead Any Misstatement Against Any Officer Defendant Related To Liquidity

As defined broadly by SEC regulations, liquidity refers "to the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash." Instruction 5 to Item 303, Regulation S-K, 17 C.F.R. § 229.303(a) (2008). There is, however, no SEC statute, rule or regulation that defines the type of assets that should be included or excluded from a reporting firm's liquidity pool calculation. *See* ER at 1480.

Plaintiffs allege that Lehman senior officers misstated the estimated value of the firm's liquidity pool in each of the three quarters in 2008. *See* TAC ¶¶ 185, 192, 194, 202. But liquidity disclosures in part reflect forward-looking expectations about a firm's ability to readily convert assets to cash based on known characteristics about various asset classes, historical experiences with funding sources and current market conditions.[79] Statements by Lehman officers that the firm's liquidity pool was "robust" or "strong" are non-actionable expressions of opinion. *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58 (2d Cir. 1996). In addition, none of the individual statements Plaintiffs challenge was false. When Callan in the first quarter of 2008 called Lehman's liquidity pool "robust," TAC ¶ 18, Lehman's liquidity pool was, in fact, valued at $34.3 billion, well above the $29.8 billion figure reported for the corresponding quarter in the prior year. Plaintiffs' reference to a single internal e-mail reflecting generalized concerns about *capital* (*i.e.*, Lehman's amount of "tangible equity") does not provide particularized allegations that the reported *liquidity* numbers were materially overstated. *See* TAC ¶ 186. Similarly, when Plaintiffs plead that on June 16, 2008, Fuld and Lowitt stated that Lehman's liquidity position was $45 billion and that it had "never been stronger," TAC ¶ 194, and that, one

---

[79]  *See* Item 303, Regulation S-K, 17 C.F.R. § 229.303(a)(1) (2008); *Commission Statement about Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 33-8056 and Exchange Act Release No. 34-45321 (Jan. 22, 2002) (Ex. 37); *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Securities Act Release No. 33-6835 and Exchange Act Release No. 34-26831 (May 24, 1989) (Ex. 38). Lehman's filings explained that its liquidity pool was an estimate "intended to cover expected cash outflows for twelve months in a stressed liquidity environment." 2008 2Q at 80 (Ex. 9).

quarter later, on September 10, 2008, Fuld and Lowitt stated that Lehman maintained a "strong" liquidity position with an estimated liquidity pool of $42 billion, TAC ¶ 202, those statements were objectively true.  The reported $45 billion figure at the end of 2008 2Q and the $42 billion figure at the end of 2008 3Q were substantially larger than the figures reported in the prior year and for 2008 1Q.  *See* 2007 2Q at 57 (Ex. 5) (reporting $25.7 billion); 2007 3Q 62 (Ex. 6) (reporting $36 billion); 2008 1Q at 65 (reporting $34 billion) (Ex. 8).

### C.    The TAC Fails To Plead Scienter

The TAC fails to allege facts that give rise to a "strong inference" that any of the Officer Defendants made any statement with knowledge of its falsity or in reckless disregard of its truth. *Tellabs*, 551 U.S. at 324.  Moreover, the TAC fails to show how each Officer Defendant individually acted with scienter.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005) (Kaplan, J.) ("[The group pleading doctrine] does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made."); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 217 (S.D.N.Y. 2004).

 Plaintiffs must allege facts showing that each Officer Defendant either (1) "had the motive and opportunity to commit fraud" or (2) engaged in "conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 187, 198 (2d Cir. 2009).  However, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs* 551 U.S. at 323-324, 127 S. Ct. at 2510.  The inference of scienter "must be . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324, 127 S. Ct. at 2510.

Here, the alleged facts present a "plausible nonculpable explanation[] for the [Officer Defendants'] conduct."  *Id.*   During the spring and summer of 2007, at the start of the Class Period, Lehman's management thought that the subprime market was nearing the bottom of a down cycle and that this presented substantial opportunities for Lehman to pursue an aggressive countercyclical growth strategy – a strategy Lehman had pursued successfully in the late 1990s. *See* ER at 91-92, 154, 169.  However, as the magnitude and impact of the real estate and credit

crises increased and became clearer, Lehman adjusted its business strategy – including the balance sheet and risk management strategies and holdings of different classes of assets. Ultimately, the Officer Defendants were unable to shield the Company and its security holders (including themselves) from unprecedented and unforeseen changes in the marketplace.  The demise of Lehman may suggest in hindsight that the Officer Defendants failed to fully appreciate the depth and breadth of the financial crisis and made mistakes in exercising business judgment, but it does not establish or support any inference – much less a strong one – that they were engaged in fraud.  *See*, *e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (citation omitted).

### 1.   The TAC Fails To Plead Facts Showing Motive And Opportunity

Critically, there are no allegations that any Officer Defendant benefited in a concrete and personal way from any purported fraud.  To the contrary, all of the Officer Defendants either retained or increased their holdings of Lehman stock during the Class Period.  *See* 2007 Proxy St. at 15 (Ex. 39); 2008 Proxy St. at 18 (Ex. 40); Callan Forms 3 & 4 (Ex. 41). This "suggest[s] the absence of any nefarious motives."  *In re Security Capital Assurance, Ltd. Sec. Litig.*, No. 7 Civ. 11086 (DAB), 2010 WL 1372688, at *24 (S.D.N.Y. Mar. 31, 2010) (citations omitted).

The only motives that the TAC does suggest are general corporate motives, such as "avoid[ing] reporting losses through writedowns" and reducing risk of "ratings downgrades." TAC ¶¶ 152, 156.  To demonstrate fraudulent intent, however, a complaint must do more than "allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation."  *South Cherry Street, LLC v. Hennessee Group, LLC,* 573 F.3d 98, 109 (2d Cir. 2009).  The TAC falls far short of this standard.

### 2.   The TAC Fails To Allege Conscious Misbehavior Or Recklessness

The strength of the allegations supporting an inference of conscious misbehavior or recklessness must be "correspondingly greater" where, as here, there is no motive to commit

fraud.  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  A defendant's conduct must be "highly unreasonable and . . .  an extreme departure from the standard of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *South Cherry*, 573 F.3d at 109.  None of Plaintiffs' Repo 105, liquidity or risk allegations pleads scienter.

        **a.**        **TAC's Repo 105-Related Allegations Do Not Plead Scienter**

The TAC alleges that the Officer Defendants in their various capacities and at various times were aware that business units engaged in Repo 105 transactions in order to meet the balance sheet targets that had been set for each unit and that this was the sole purpose of the transactions.  TAC ¶¶ 149-150.  At the same time, the TAC admits that Repo 105 transactions resembled so-called "Ordinary Repo" transactions in "all material respects" and therefore provided Lehman with the short-term capital that every investment bank needs.  TAC ¶¶ 29, 31. Both purposes are legitimate.

Setting balance sheet targets is not evidence of scienter.  It is normal business practice for financial firms to allocate their balance sheet capacity among their various business units with the goal of maximizing profitability by taking on risk within reasonable limits rather than letting the various units engage in a free-for-all grab for available balance sheet usage.  Enforcing balance sheet limits at quarter end provides discipline to business units, and it would be impossible to manage the risk of an investment bank without a "regime of limits."  TAC ¶ 149. Indeed, Plaintiffs concede balance sheet management is a prudent business practice: "balance sheet limits [] were designed to contain [Lehman's] overall risk and maintain net leverage ratio within the range required by ratings agencies."  TAC ¶ 78.  Likewise, the ER acknowledges that "[t]here is nothing necessarily improper about balance sheet management; it is a normal business practice used by many institutions."  *Id*. at 822-23 & 822 n.3166; *see also* ER at 48-49.

Lehman started using Repo 105 transactions only after (1) their use was codified in the accounting rules, (2) Lehman consulted counsel and outside auditors, (3) Lehman developed an internal written policy for their use, and (4) E&Y vetted that policy.  In 2001, following the

adoption of SFAS 140, the heads of various Lehman business units, in consultation with inside and outside auditors and lawyers, reviewed the requirements of SFAS 140. ER at 765, n. 2949. Lehman then drafted an official, internal Accounting Policy covering Repo 105 transactions. Repo 105 Accounting Policy Manual (Ex. 42). E&Y was consulted and discussed the policy with Lehman, and "clearly. . . concurred with Lehman's approach." ER at 949. As described in the policy, the internationally known law firm of Linklaters issued a "true sale at law" opinion under the applicable UK law. E&Y was aware of the Linklaters opinion and that Lehman could not obtain a "true sale" opinion of Repo 105 transactions under U.S. law. TAC ¶¶ 65, 228. The Accounting Policy was distributed to all "business people" within the firm. ER at 766. Repo 105 transactions were done by various business units at the trading desk level.[80] Lehman strictly enforced the Accounting Policy for Repo 105 transactions performed by each business unit. ER at 798 ("product controllers were responsible for 'transactional policing' and booking Repo 105 transactions manually and in a manner that complied with United States GAAP."). Lehman policed the transactions to ensure that only liquid securities were used in Repo 105s and its Global Head of Accounting Policy was consulted when business units proposed new applications of Repo 105 to ensure compliance with the accounting policy and SFAS 140. ER at 794-95.

The TAC alleges that Lehman used Repo 105 to create the misleading appearance of delevering. TAC ¶¶ 156-57. But the TAC does not contend that Repo 105 transactions had any impact on reported total leverage, the metric that was the basis for the Plaintiffs' allegations in their prior pleadings that Lehman was "highly leveraged" throughout the Class Period. *See supra* Section I.C.1. Moreover, Lehman could have sold liquid securities outright and achieved the same balance sheet impact and net leverage, although an outright sale would be slightly *less*

---

[80]  *See* TAC ¶ 147 (e) (describing use by Liquid Markets group); ¶ 147 (f) (describing use by FID); ¶ 147 (g) (describing use by the United States Agencies trading desk); ¶ 149 (alleging that "each business unit" could use Repo 105s to "sell down assets" to meet balance sheet targets); ¶ 212 (describing FID's "unsuccessful efforts . . . to use RMBS and CMBS in Repo 105 transactions"); *see also* ER at 815-16 (describing Repo 105 transactions as being originated and executed by traders to reach balance sheet targets).

profitable.  ER App. 17 at 32.  Repo 105 gave Lehman the ability to receive coupon payments on the securities during the term of the repo.  *Id*. at 33-34.  In an outright sale, "Lehman would have lost all the net earnings associated with the securities position."  *Id*. at 34.  As compared to an outright sale, there is an incentive to use Repo 105s to continue to earn income.  *Id*.  It is not a compelling inference that the Officer Defendants would have knowingly violated GAAP by using Repo 105 transactions when Lehman could have achieved the same balance sheet target and net leverage number by the outright sale of the securities, with the only cost being the loss of "incremental income" from receiving the coupon.  *See id*. at 32-35.

        The more compelling inference is that the Officer Defendants had an honest belief that the transactions were legal, as well as accounted for and disclosed in accordance with GAAP, and were legitimate sales transactions for business units to obtain funding and stay within their balance sheet targets.  The TAC alleges that E&Y "knew about Lehman's use of Repo 105 transactions to manage its balance sheet at the end of each quarter," TAC ¶ 226, and that E&Y never communicated to the Officer Defendants or any other senior management any concern about the accounting for Repo 105 transactions as sales, or footnote or other disclosure relating to these transactions, or the validity of Linklaters' opinion.  *See* TAC ¶¶ 233, 236-38.  Plaintiffs do not allege that the Officer Defendants were ever aware of or received any information that the use of Repo 105 transactions violated accounting rules, or that additional disclosure of these transactions was required.  Nor do they allege that any Officer Defendant (or other Lehman employee) attempted to conceal the transactions from anyone.  To the contrary, these transactions were openly discussed among the relevant business people.  The Officer Defendants (to the extent they were aware of them at all) had no reason to question the legitimacy or accounting for these transactions.  These allegations (and lack of allegations) contradict Plaintiffs' theory that the Officer Defendants were trying to fraudulently dodge disclosure obligations or GAAP requirements.  *Cf. In re Am. Express Co. Sec. Litig*., No. 02 Civ. 5533 (WHP), 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008) (holding that complaint did not plead scienter when confidential witnesses did not show that concerns of GAAP violations were

communicated to defendants).[81]

### (1)   Fuld, Gregory, and Lowitt

Plaintiffs plead no facts to show that Defendants Fuld or Gregory was even aware of the existence of Repo 105 transactions, much less that either of them had reason to know of any alleged impropriety and simply chose to disregard the risk.

The TAC's lone allegation regarding Repo 105 with respect to Gregory is that, in advance of a March 28, 2008 Executive Committee meeting, he received an agenda that included as a topic "Repo 105/108," and that Lehman President McDade "testified that the purpose of that meeting was to request Gregory's 'blessing in freezing Lehman's Repo 105 usage.'"  TAC ¶¶ 210-11.  Conspicuously absent is any allegation that McDade or anyone else suggested to Gregory that Repo 105 transactions were improper or inadequately disclosed.  Indeed, there are no allegations regarding what was actually discussed at that March 28 meeting, or whether McDade ever discussed with Gregory at that meeting (or at any other time) his alleged desire for Gregory's "blessing."  In sum, the TAC provides no inference whatsoever that Gregory knew or should have known of any alleged improprieties surrounding the use of Repo 105 transactions.  Thus, not surprisingly, the ER did not identify any potentially colorable claims against Gregory.

With respect to Fuld, the TAC throws out ambiguous allegations, in a single paragraph, which comprise nothing more than Plaintiffs' interpretation of the Examiner's own interpretation of another officer's impressions of what Fuld understood.  *See* TAC ¶ 211.  Thus, the Repo 105 allegations against Fuld are doubly removed from the actual facts and do not suffice for pleading scienter.  Even if the TAC had alleged adequately that Fuld was aware of Lehman's use of Repo 105 transactions, there is no allegation that he believed their use, much less their accounting, to

---

[81]  The TAC resorts to pointing to certain employees *other than* the Officer Defendants using vague, arguably pejorative terms for Repo 105 such as "window dressing," and describing the transactions as a "lazy way" (not an "improper way") to achieve balance sheet targets.  However, the TAC does *not* allege that the Officer Defendants ever heard these descriptions, or that Repo 105 transactions should be accounted for as financings rather than sales, or that these transactions rendered financial statements misleading.  Nor does it allege that any Officer Defendant shared this view.

be somehow improper.

Plaintiffs seek to establish Fuld's knowledge of Repo 105 transactions by alleging that he received in advance the agenda for the March 28, 2008 Executive Committee meeting.  TAC ¶ 211.  Yet, Fuld is not alleged to have read this agenda and Plaintiffs concede that Fuld did not even attend the meeting.  TAC ¶ 211.  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (to plead scienter a plaintiff must "specifically allege[]" a defendant's "knowledge of facts or access to information contradicting their public statements").  Moreover, there is no allegation that the agenda on its face, or anyone at this or any other Executive Committee meeting, ever raised any question about the accounting treatment or disclosures of Repo 105 transactions.  *See* TAC ¶ 210.

Next, Plaintiffs allege that in June 2008 McDade recalled having discussions with Fuld about Repo 105.  But Plaintiffs cite to no documents that corroborate such purported discussions. Neither Plaintiffs, the Examiner, McDade, nor any confidential witness allege that McDade told Fuld that Repo 105 transactions were improper or that Lehman's disclosures were inadequate, or that McDade otherwise presented Fuld with information that should have caused Fuld to inquire about Repo 105 transactions.[82]  Indeed, the alleged McDade discussions are not even probative of what Fuld knew or said, but simply relate to what McDade allegedly "understood" Fuld to be "familiar with."  TAC ¶ 211.  The allegations reflect McDade's state of mind, not Fuld's, and certainly do not plead scienter.

The allegations as to Lowitt are equally insufficient.  Lowitt did not become Lehman's CFO until June 2008**,** he is not alleged to have made any misleading statements about Repo 105, and the only SEC filing he signed is one for a quarter in which the magnitude of Repo 105 transactions was essentially unchanged.  ER at 875.  The TAC's supposed scienter allegations as to Lowitt, e.g., TAC ¶¶ 209, 212, plead nothing more than that Lowitt was aware of Repo 105

---

[82]   None of Lehman's three chief financial officers during the Class Period is alleged to have ever discussed Repo 105 transactions with Fuld.  *See* TAC ¶¶ 207-09.

transactions, transactions that Lehman had utilized for several years prior to Lowitt becoming CFO, and for which there was an accounting policy vetted with Lehman's outside auditor, E&Y, well before Lowitt's tenure.  There is no allegation that Lowitt was told or otherwise believed that the transactions were improper or that additional disclosure was required.

> **b.     No Facts Are Alleged Giving Rise To A Strong Inference Of Scienter Regarding Risk, Hedging, Or Concentration**

The TAC relies on the ER in describing Lehman's risk management program and alleging that internal risk limits were at times exceeded.  But it ignores the Examiner's conclusion that there is "insufficient evidence to support a determination that Lehman's senior officers' conduct with respect to risk management was outside the business judgment rule or reckless or irrational."  ER at 51.  It also ignores that Lehman met regularly with the SEC to discuss the Company's risk management policies and procedures and reported its decisions to exceed internal risk limits.[83]  The SEC has acknowledged that it was aware of Lehman's decisions to exceed internal risk limits, including concentration limits, and did not "second-guess" them "so long as the limit excesses were properly escalated within Lehman's management."  ER at 114.  It is inconceivable that the Officer Defendants could have had any intent to deceive when they made the SEC aware of every decision made by the Company on these matters.  The $100 million ER reached the same conclusion.  *Id*. at 186 ("Management's disclosure of the risk appetite excesses to the SEC supports the view that management did not believe it was acting imprudently, much less violating the law, by taking on a higher level of risk than was consistent with the firm's pre-existing risk policies and limits.").

The allegations of the TAC present a "plausible non-culpable explanation for the [Officer Defendants'] conduct," namely, that they "were entitled to set and decide to exceed risk limits,

---

[83]   The administrator of the SEC's CSE program recently testified before Congress that participants in the CSE program, which included Lehman, "had to provide the Commission on an ongoing basis with extensive information regarding its capital and risk exposures, including market and credit risk exposures, as well as an analysis of the holding company's liquidity risk."  *SEC Regulation of Investment Banks: Testimony Before the Financial Crisis Inquiry Commission*, 111th Cong. 7 (Statement of Erik R. Sirri, Former Director of Trading and Markets at the SEC) (May 5, 2010) (Ex. 43).

which were merely tools to assist them in their investment decisions, not legal restraints on their authority.  They made considered business decisions to do so because of profit-making opportunities."  ER at 168-69.  When these actions are viewed in context, as opposed to with the benefit of hindsight, the non-culpable inference is strengthened.  *See, e.g., Ciresi v. Citicorp.*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991).[84]

(1)     **Plaintiffs' Allegations Confirm That The Officer Defendants Made Reasonable Business Decisions When Exceeding Internal Risk Limits**

Plaintiffs contend that "in pursuit of an aggressive growth strategy, the Officer Defendants knew of, but recklessly disregarded the warnings of Lehman's risk managers" and decided to exceed internal risk limits.  *See* TAC ¶ 216.  At best, this amounts to a conclusory allegation that the Officer Defendants were reckless in making business decisions (which they deny), not that they made public statements with reckless disregard to their truth.[85]

As purported evidence of scienter, the TAC alleges that (i) Lehman's Executive Committee established the Company's overall risk limits and policies; (ii) senior managers were provided with reports on risk management (including exposures, position concentrations and risk-taking activities); and (iii) after reviewing these reports, as well as having vigorous internal discussions, and at times disagreements with its risk personnel, senior managers sometimes decided to approve transactions that resulted in the Company temporarily exceeding its internal risk limits.  *See* TAC ¶¶ 216-17.  These allegations *demonstrate* that Lehman's risk decisions were informed, made pursuant to an established process, and the result of considered

---

[84]   The allegations as to Lowitt are even more thin.  Lowitt did not become CFO or serve on the Executive Committee until June 12, 2008.  There are no allegations that identify any conduct of Lowitt relating to the exceeding of risk limits.  While the TAC identifies statements that Lowitt made in 2007 regarding risk at an investors' conference, there are no allegations supporting that Lowitt had any reason to believe that they were inaccurate, let alone that Lowitt made them with an intent to deceive.

[85]   As the Examiner stated, "[t]he decisions by Lehman's management must also be considered in context.  In many respects, Lehman's transactions were no different than those conducted by other market participants and were, in some respects, *less aggressive than those of their competitors*.  For example, several financial institutions suffered catastrophic losses on investments in CDOs and credit default swaps; Lehman prudently limited its exposure in these areas."  ER at 170 (emphasis added).

43

deliberation.  Indeed, the Examiner acknowledged that, "[w]ithin the industry, Lehman's risk management function was widely regarded as among the best."  ER App. 8 at 2 (emphasis added) (citing to Federal Reserve Bank of New York's assessment and comparison of risk management practices at the four largest investment banks).  *See also supra* Section I.C.2.  Criticisms of corporate strategy calls do not support the "cogent and compelling" inference of scienter required by *Tellabs*.  551 U.S. at 324, S. Ct. 2510; *see also Citigroup*, 330 F. Supp. 2d at 375 (discussing alleged failure to adhere to risk management policies and noting that "[s]uch allegations of mismanagement. . . are insufficient to support a securities fraud claim under section 10(b)").

For example, Lehman decided to fulfill its contractual commitments to Archstone even though doing so meant it would exceed its risk limits until its Archstone exposure could be sold down.  *See* TAC ¶ 164.  Lehman weighed the alternatives.  On one hand, it expected profit from the transaction of more than $1.3 billion over 10 years and believed it could syndicate the debt.  On the other hand, it would have to pay a $1.5 billion break-up fee and absorb damage to its reputation if it failed to proceed with the transaction.  *See* ER at 365, 369.  As the Examiner acknowledged, "Lehman's management seriously considered the risks involved in the Archstone transaction, tried to manage it, and ultimately decided that the rewards would outweigh the risks."  *Id*. at 173.  Plaintiffs essentially fault Lehman for not predicting the escalating market crisis that ultimately affected "Lehman's attempts at selling Archstone [and other] bridge equity."  *Id*. at 128.

As for allegations that Fuld and Gregory sought to remove insiders who opposed Lehman's risk management practices, such personnel decisions are business judgments about the value of particular employees to the organization, and cannot be the basis for scienter.[86]

_____

[86]  *See In re Int'l Rectifier Corp. Sec. Litig.*, No. CV 07-02544-JFW (VBKx), 2008 WL 4555794, at *16 (C.D. Cal. May 23, 2008) ("Resignations or terminations by themselves do not support a strong inference of scienter."); *cf.* ER App. 8 at 46-47, n. 243 (according to the SEC, O'Meara, Antoncic's replacement as Chief Risk Officer, provided "more information" and had "better management skills" than Antoncic); *id*.

### (2)   Allegations Regarding Lehman's Hedging Strategy And Stress Testing Do Not Demonstrate Scienter

Plaintiffs also contend that business decisions regarding hedging strategy and methods of stress testing give rise to a strong inference that the Officer Defendants acted with scienter, ignoring the fact that Lehman did not disclose to the investing public its competitively sensitive testing program, the inputs into its stress testing, or the results of its stress tests.

*First*, the TAC alleges that, "Lehman senior officers elected not to hedge certain of Lehman's assets because of the difficulty and possible repercussions inherent in hedging investments as illiquid as Lehman's." TAC ¶ 220. Even if true, these allegations relate only to business judgment about assets that might have been hedged and an acknowledgement that certain assets such as commercial real estate were difficult if not impossible to effectively hedge, but they do not support an inference of fraud. Moreover, Lehman warned investors that "our hedging strategies and other risk management techniques may not be fully effective in mitigating our risk exposure," and "the recent mortgage and credit market downturn . . . have at times limited the effectiveness of our hedging strategies and have caused us to incur significant losses, and they may do so in the future." *See*, *e.g.*, 2007 10-K at 22 (Ex. 7).

*Second*, Plaintiffs allege that O'Meara "was aware that Lehman's principal investments were not considered in stress testing" and points to the example that Lehman started taking steps to include private equity transactions in its stress testing in 2008. TAC ¶ 220. However, the TAC does not allege that certain assets or scenarios were not included in Lehman's stress testing with intent to defraud the investing public. Historically, the practice had been not to include "un-traded assets such as its commercial real estate or private equity investments" because these "assets did not trade freely [and therefore] they were not considered susceptible to stress testing over a short period of time." ER at 67. Moreover, the SEC was well aware "that Lehman's stress tests excluded untraded investments and did not question exclusion" because it had been

---

at 149 ("Examiner did not find any evidence to suggest that Antoncic's replacement was related to the risk limit or risk disclosure issues that had occurred during the prior three to four months.").

the norm to "limit stress tests only to traded positions." *Id*. at 182. The TAC merely points to improvements in stress testing that Lehman undertook toward the end of 2007, and falls far short of alleging any intent to deceive by not making these improvements earlier. The more compelling inference is that Lehman sought to improve its stress testing over time as markets became more volatile.

(3)     **Risk Concentration Allegations Do Not Plead Scienter**

While the TAC claims that the risk concentration allegations are actionable under both the Securities Act and the Exchange Act, TAC ¶ 170, it does not even try to make allegations of fraud or scienter about risk concentration disclosures. It merely incorporates the allegations from the Securities Act section of the TAC, which specifically *disclaim* any reliance on fraud.[87] TAC ¶¶ 23, 170. Because the TAC has not alleged scienter for any statements relating to risk concentration, those allegations must be dismissed. *See Plumbers & Steamfitters Local 777 Pension Fund v. Canadian Imperial Bank of Commerce*, No. 08 Civ. 8143 (WHP), 2010 WL 961596, *13 (S.D.N.Y. March 17, 2010) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)) ("Vague claims of GAAP violations are insufficient to support an inference of 'intent to defraud.'").

In any event, the TAC's factual allegations fall far short of what is required for an inference of scienter. Lehman reported its holdings in residential and commercial real estate and leveraged loans and discussed the risks associated with large and concentrated holdings, and the impact of a changing economic environment on the types of investments owned. *See supra* Section II.B.2; Appendix B. The TAC nevertheless claims that up until the 2008 2Q, Lehman's filings were materially misleading because Lehman allegedly did not satisfy the level of disclosure required under GAAP in the event of significant credit risk. TAC ¶¶ 104-05. But Plaintiffs fail to allege that the Officer Defendants knowingly or recklessly disregarded

---

[87] TAC ¶ 173 also makes allegations about the views expressed during 2007 2Q earnings call regarding subprime market challenges and Lehman's Alt-A origination business. While the TAC does not relate these statements directly to risk concentration, they are addressed below.

applicable GAAP standards or intentionally underplayed risks that they appreciated.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 448  (Kaplan, J.) (allegations that a company's financial reports violated GAAP or internal policies does not establish that individual defendants issued those reports with the requisite fraudulent intent).[88]  Further, the cited GAAP provisions do not provide bright-line rules, but instead require judgment in their application.[89]

With respect to allegations that Lehman's filings did not "adequately or meaningfully" disclose risk concentrations in Alt-A loans, commercial real estate, and leverage loans.  TAC ¶ 105, Lehman's disclosure of the risks its business faced was detailed and thorough and exceeded SEC guidance.  *See supra* Section I.C.5.; SEC Div. of Corp. Finance Letter (Ex. 12).  Moreover, whether Lehman's risk concentration disclosures captured all of the risks facing the firm is a non-actionable opinion unless not honestly held, which is not even alleged here.  *Fait*, 2010 WL 1883487 at *3, n.31.[90]

### c. Plaintiffs' Liquidity Allegations Do Not Plead Scienter

Plaintiffs allege that the Officer Defendants knew or recklessly disregarded the misleading nature of statements regarding Lehman's liquidity position and problems.  *See* TAC ¶

---

[88]  None of these allegations can support scienter against Lowitt in any event, as he did not become CFO until June 12, 2008 (*i.e.*, until 2008 2Q).

[89]  *See* SOP 94-6-1 ¶ 7 (Ex. 14) ("Judgment is required to determine whether loan products have terms that give rise to a concentration of credit risk."); SOP 94-6 ¶¶ 10-11 (Ex. 15) ("current vulnerability to certain concentrations" creating a "reasonable possibility" of a "near-term impact should be disclosed"); SFAS 133 p.197 ¶ 531(d)15A (Ex. 44) (discussing disclosure of "significant" concentrations of credit risks).

[90]  The TAC alleges that on the 2007 2Q earnings call, O'Meara expressed the view that the subprime market challenges were "reasonably contained" within that asset class.  TAC ¶ 173; *see also* 2007 2Q Call at 2 (Ex. 49).  However, Plaintiffs do not even try to show that O'Meara knew whether problems in the subprime section were spreading to other areas of the real estate market.  Indeed, government officials at that time were also expressing the belief that the subprime sector's problems were "contained."  *See, e.g.*, Transcript of Paulson interview, *The Kudlow Report*, dated July 23, 2007 (Ex. 45) ("I don't deny there's a problem with subprime mortgages, but I really do believe that's containable.").  The TAC also references O'Meara's comments during that call describing the "lion's share" of Lehman's mortgage originations as Alt-A and opined that Lehman had "terrific performance on the origination side around the Alt-A business." TAC ¶ 173.  An expression of opinion such as that a business is "terrific," is not a material misstatement.  *See supra* Section I.C.2.  In addition, there is no allegation in the TAC that O'Meara did not honestly believe the opinion he expressed.

213.  Significantly, there is no authoritative statement from the SEC about the type of assets that can be included in a liquidity pool calculation.[91]  Accordingly, it would be difficult, if not impossible, to plead that a statement regarding the value of the liquidity pool could have been incorrect, let alone intentionally or recklessly made.  There is no allegation that Lehman's senior officers subjectively believed the reported liquidity figures were incorrect.

In fact, there can be no credible allegation that Lehman sought to hide which assets it was including in its liquidity pool.[92]  Beginning in mid-March 2008, immediately following the near-collapse of Bear Stearns, teams of monitors from the SEC and the FRBNY took up residence at Lehman to review and monitor its financial condition.  ER at 1482-83.  During this time Lehman provided the SEC and the FRBNY with a continuous stream of liquidity updates, including daily liquidity pool estimates.  *See id.* at 1409-10, 1512.  In particular, the SEC and the FRBNY were aware that Lehman had deposited $2 billion in cash with Citibank and $5 billion of collateral with JPMorgan, but neither entity directed Lehman to remove those assets from its liquidity pool.  *See id.* 1470-72, 1475-76.  Lehman had every reason to expect that the SEC would scrutinize the components of its liquidity pool, as the SEC had notified Lehman that such scrutiny was a key feature of the CSE program.  *See id.* 1473-74.  The presence of Lehman's principal regulator, as well as the FRBNY, negates any inference that Lehman tried to

---

[91]  *See Public Policy Issues Raised by the Lehman Examiner Report: Hearing Before the H. Fin. Services Comm.*, 111th Cong. 7 (statement by Mary L. Schapiro, SEC Chairman) (May 5, 2010) (Ex. 46) ("[T]he standards regarding the types of assets that could be included in this liquidity pool, and the manner in which those assets could be held, was not set forth in a commission regulation and were otherwise unclear.")

[92]  The TAC points to Lehman's Asset Liability Committee's ("ALCO") analyses projecting deficits of cash capital, which never materialized, as evidence that Lehman concealed its alleged liquidity problems.  TAC ¶ 176.  ALCO was tasked with tracking and monitoring the firm's monthly projections for cash capital and maximum cumulative outflow.  ER at 126.  ALCO members would review analyses of liquidity projections on a daily basis, which allowed them to make informed business decisions.  *Id.* at 125-26.  For example, as the TAC acknowledges, when confronted with an analysis on June 30, 2007 projecting future deficits of cash capital, Lehman took certain actions in the third quarter of 2007, such as refraining from entering into future high yield or commercial real estate transactions.  *See* TAC ¶ 176.  ALCO shows how Lehman managed its liquidity by reviewing and addressing potential future deficits through proactive measures.

misrepresent the estimated value of the liquidity pool during the Class Period.

More specifically, Plaintiffs cannot raise a sustainable inference of scienter as to Fuld or Lowitt with respect to statements made on September 10, 2008 regarding the Company's liquidity pool based on allegations that the "reported liquidity pool consisted of encumbered assets." *See* TAC ¶ 202.[93]  Plaintiffs do not advert to a single fact showing that Fuld or Lowitt knew that a portion of liquidity pool assets were allegedly impaired or that the estimated value of the liquidity pool was less than $42 billion.  Also, during the 2008 third-quarter conference call, Lowitt clearly stated that as of the prior evening, Lehman's "liquidity pool remained essentially unchanged at $41 billion," and there is no contention that by granting JPMorgan an alleged broader "security interest in practically all Lehman accounts at JP Morgan," ER at 1457; TAC ¶ 202, Lehman materially altered the stated value of the liquidity pool.  In addition, the alleged September 2008 JPMorgan collateral calls do not bear on Fuld's or Lowitt's states of mind with respect to the value of Lehman's liquidity pool.  The alleged JP Morgan September 9, 2008 call was only a request for additional collateral and there is no indication as to whether Lehman had decided how to respond prior to the September 10, 2008 conference call.  *See* TAC ¶ 203.

Last, the fact that Fuld and Lowitt made statements about Lehman's liquidity shortly before the Company filed for bankruptcy does not establish that any statement was made with scienter.  *Elam v. Neidorff*, 544 F. 3d 921, 930 (8th Cir. 2008) ("inferring scienter from [] temporal proximity . . . is nothing more than speculation") (citation omitted).  The irrelevance of temporal proximity is accentuated in this case by the rapidly deteriorating market conditions in the weeks immediately preceding the bankruptcy.  Indeed, Fuld and Lowitt never stated that

---

[93]  There is no allegation, nor could there be, that Defendants O'Meara or Gregory were aware of the inclusion of allegedly encumbered assets in the liquidity pool, were involved in creating any of the allegedly misleading statements concerning the level of the pool, or made any such statements.  In addition, the Examiner found that no Lehman officer, including Fuld or Lowitt, breached any fiduciary duty "by acting with actual or constructive knowledge to cause Lehman to make misleading statements about liquidity."  ER at 1479.

Lehman had enough liquidity to withstand a run on the bank.[94]

**D.      The TAC Fails To Plead Loss Causation**

To state a claim for securities fraud, a plaintiff must explain the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touch*, 476 F.3d 147, 157 (2d Cir. 2007) (internal quotes omitted).  Loss causation "require[s] both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." *Id.* (citation omitted and emphasis in original).  Yet Plaintiffs devote a mere nine of the TAC's 269 paragraphs to the critical element of loss causation.  Essentially, they argue that Lehman's bankruptcy constituted a "corrective disclosure" to all alleged misstatements on various topics made over the 15-month Class Period.  The argument does not work.  The TAC's conclusory loss causation allegations also fail to link Plaintiffs' losses with any non-disclosure, as opposed to the extraordinary market-wide collapse of unforeseen magnitude and a run on the bank.

**1.      Market-wide Phenomena Leading To A "Run On The Bank" – Not Alleged Misstatements – Caused The Loss**

''[W]hen the plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,  and a plaintiff's claim fails when 'it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 772 (2d Cir.1994).  Courts have rejected securities fraud complaints on causation grounds when the alleged misstatements coincided with the real estate and credit crises that caused the market-wide declines seen during the Class Period.  *See, e.g.*, *Healthcare Fin. Group, Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 349 (S.D.N.Y. 2009).

---

[94]   *See Fulton Cty. Employees' Ret. Sys. v. MGIC Inv. Corp*., No. 08 Civ 0458, 2010 WL 601364 (E.D. Wis. Feb. 18, 2010) at *16 (concluding that defendant's statement that an entity maintained "'substantial liquidity' to cover margin calls was not false or misleading" because defendant "did not say that [the entity] had *enough* liquidity") (emphasis in original).

The TAC fails to account for the unquestionable impact of the financial crisis that affected Lehman and other peer institutions.  Lehman's steady share decline throughout the Class Period coincides perfectly with "marketwide phenomenon[a]" – a crisis in the subprime market that unexpectedly spread to the rest of the real estate market, collapse of the financial markets generally, unprecedented market-wide liquidity crisis, and previously unimagined government intervention and support for institutions other than Lehman, without which virtually every major U.S. financial institution would have failed.  These events led to the end of the investment banking business model.  Lehman's fellow CSEs either collapsed and were then acquired by a bank (Bear Stearns), merged into a bank (Merrill Lynch), or converted to a bank holding company within days of Lehman's bankruptcy filing (Morgan Stanley and Goldman Sachs).

Plaintiffs acknowledge that Lehman was only one part of a broader industry collapse.  In their SAC, Plaintiffs characterized the real estate and mortgage markets as "in the midst of an unprecedented meltdown."  SAC ¶ 2.  And in their Initial Complaint, Plaintiffs alleged that the market "environment" during the relevant period was defined by, among other things, "severe financial difficulties experienced by mortgage originators and other investment banks," including "Citigroup, Merrill Lynch, Morgan Stanley, Bear Stearns, and UBS."  Initial Compl. ¶ 3.[95] Indeed, the stock price of other financial firms show an erosion similar to that of Lehman's stock during the Class Period, with the S&P Financial Sector Index dropping nearly 50% during that time.  *See* Appendix C.  The TAC fails to plead facts that would show Plaintiffs' losses were caused by the alleged misstatements as opposed to intervening events.

## 2.    Plaintiffs' New And Strained Loss Causation Theory

Neither the SAC nor the Initial Complaint even mentioned Repo 105.  The explanation is simple: there was no "corrective" disclosure of Repo 105.  As a result, the TAC now alleges a Rube Goldberg-type causal chain: (1) Lehman engaged in $50 billion in Repo 105 transactions in

---

[95]  "[S]tatements in superseded pleadings . . . are still admissions for evidentiary purposes."  *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 291 n.96 (S.D.N.Y. 2008).

which it exchanged highly liquid assets for cash; (2) that materially impacted Lehman's $786 billion balance sheet; (3) by impacting the balance sheet those transactions had some impact on Lehman's reported net leverage; (4) the resulting "artificially" low net leverage figure in some unexplained way allowed Lehman to partially conceal its ownership of "sticky" residential and commercial real estate assets and leveraged loans (even though the exact volume of assets owned in each such category was disclosed every quarter); (5) concealing its exposure to "sticky" assets in turn allowed Lehman to hide the internal risk limit violations that permitted the prior accumulation of those assets; and (6) eventually, Lehman's holdings of illiquid assets required "enormous writedowns and triggered the liquidity crisis that ended Lehman's existence." *See* TAC ¶ 248.

Stripped of its contortions, the TAC alleges that misstatements throughout the Class Period made Lehman's financial condition appear stronger than it was and inflated Lehman's share price.  However, the allegation that "but for the claimed misrepresentations or omissions, the Plaintiffs would not have entered into the detrimental securities transaction" only pleads transaction causation, not loss causation.  *Lentell v. Merrill Lynch & Co., Inc.*, 396. F.3d 161, 172 (2d Cir. 2005)  (internal cite omitted). At best, the TAC alleges that investors might not have purchased Lehman's shares if its reported net leverage was higher, but it does not plead that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell*, 396. F.3d at 175 (internal cite omitted).  This is a creative but ineffective attempt to create loss causation in the absence of any corrective disclosure.  It fails due to the extreme attenuation and lack of logical connection between Repo 105 transactions and the ultimate cause of Lehman's failure.

Plaintiffs' theory of loss causation does not make sense, even if one accepts the TAC's allegation that the cause of Lehman's bankruptcy was a lack of liquidity.  *See* TAC ¶ 248.  The TAC alleges that Lehman's liquidity crisis revealed the "interrelated" risks supposedly concealed by Repo 105 transactions.  These transactions allegedly were entered into "to remove assets temporarily from the balance sheet." *Id*.  But Repo 105 transactions removed highly liquid

assets from the balance sheet, not "toxic assets." *See* TAC ¶ 190.  This could not possibly have masked a liquidity crisis.  With or without any Repo 105 transaction, Lehman had either actual cash or a highly liquid security of similar value.  In addition, even if Lehman's reported net leverage was incorrect as a result of improperly accounting for Repo 105 transactions, that alleged GAAP violation did not conceal (or change) the reduction of specific categories of troubled assets, data which is more informative.[96]  *See supra* Section II.B.2; Appendix B. Finally, the ever-present risk that assets could decline in value over time is not "concealed" by an allegedly misstated net leverage number.  The assets that declined in value would have done so regardless of whether Repo 105 transactions removed, pledged, sold or did nothing at all to Lehman's highly liquid assets.

### 3.    Plaintiffs Do Not Plead A Corrective Disclosure Or Materialization Of A Concealed Risk

Loss causation is usually pleaded by pointing to a "corrective" disclosure that reveals the falsity of prior statements, followed by a drop in the stock price.  *Lentell*, 396 F.3d at 175.  The "Loss Causation" section of the TAC refers to four disclosure events that preceded Lehman's bankruptcy, none of which constitutes a corrective disclosure of the misstatements alleged in the TAC: the June 9, 2008 2Q earnings report; Lehman's September 8 announcement that it would release 3Q results and strategic initiatives on September 18; market reports that negotiations with Korea Development Bank ("KDB") had failed; and the 2008 3Q earnings report.  TAC ¶¶ 243-46.  The TAC fails to demonstrate a correlation between any of these four disclosures and any of the alleged misstatements.

---

[96]   *See SEC Regulation of Investment Banks: Testimony Before the Financial Crisis Inquiry Commission*, 111th Cong. 7, App. at 5 (Statement of Erik Sirri, Former SEC Director of Trading and Markets) (May 5, 2010) (Ex. 43) ("[T]wo firms with identical 33-to-1 leverage ratios (assets-to-net worth) may have very different risk profiles. *The degree of risk arising from leverage is dependent on the type of assets and liabilities making up the balance sheet.*  Assets that are highly liquid can be sold quickly to close out financing and, thereby, reduce leverage.  The risk arises from assets that cannot be quickly sold or whose sale will cause markets to drop and that are financed with short-term loans.") (emphasis added).

In the absence of a corrective disclosure, the TAC must allege that the risk created by the alleged misstatements "materialized in some way other than by a public disclosure, and that such materialization caused the loss. . . ."  *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 546 (S.D.N.Y. 2007).  Where courts have held that materializations of risks other than public disclosures resulted in shareholders' losses, those materializations were sudden and caused the stock value to plummet.  *Rhodia*, 531 F. Supp. 2d at 546 (citing *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 284 (S.D.N.Y.2005)).  Here, the TAC does not allege a direct and foreseeable causal relationship between the alleged misstatements and a concealed risk materialized by Lehman's bankruptcy.  Instead, the TAC alleges an attenuated, complex chain between the alleged misstatements and the "several interrelated concealed risks," TAC ¶ 248, with a "slow, steady decline" of Lehman's share price throughout the entire Class Period leading to bankruptcy.  *See Rhodia*, 531 F. Supp. 2d at 546.  This does not plead loss causation.  *Id.*; *Security Capital,* 2010 WL 1372688 at *29.  Throughout the entire Class Period the price of Lehman's stock fell steadily.  *See* Appendix D.  And, throughout this period, there was no "corrective" disclosure related to any of the topics Plaintiffs claim were concealed.

### a.       The TAC Does Not Plead Corrective Disclosure Of Repo 105 Transactions Or Their Alleged Net Leverage Impact

Plaintiffs allege that in the 2008 2Q and 3Q earnings reports, Lehman continued to misrepresent its net leverage and perpetuate the misrepresentation, reporting artificially reduced leverage of 12.1x and 10.6x respectively, the lowest of the Class Period.  TAC ¶¶ 38, 190, 201.  Despite the alleged continuing misstatements, Lehman's stock steadily and for a long period *decreased* in value.  Courts refuse to find loss causation where "the price of [] stock declined steadily over the course of the Class Period, *while* Plaintiffs allege that the misrepresentations were being made, and *before* the 'truth was revealed' to the public."  *Security Capital,* 2010 WL 1372688 at *29.

Between the start of the Class Period on June 12, 2007 and June 6, 2008, the last trading day before the first "partial" disclosure alleged, Lehman's stock price declined 57% ($76.06 to

$32.29).  *See* Appendix E.  None of this loss can be attributed to the alleged misstatements regarding Repo 105, as the TAC does not purport to allege a disclosure of a concealed risk about Repo 105.  Nor is there any correlation between the stock price and the reported net leverage. The stock price steadily declined throughout this period, even as net leverage increased, then remained steady, and then decreased.

Plaintiffs allege that the first "partial" disclosure was the 2008 2Q earnings announcement.  TAC ¶ 243.  Lehman reported $2.8 billion in losses, negative $700 million in revenues, and $4 billion in mark-to-market write-downs.[97]  Lehman announced that "[r]educed net leverage to under 12.5x from 15.4x," and did not make any "correction" of previously reported net leverage numbers.[98]  Ignoring the announced losses, the TAC alleges that Lehman's share price declined 8.7% "on [the] news" that Lehman was taking write-downs.  TAC ¶ 243. But the write-downs of certain assets are not the manifestation of any Repo 105 impact on reported net leverage.  Asset write-downs lowered both reported net leverage and what Plaintiffs allege was the "actual" net leverage for 2008 2Q (what net leverage would have been but-for Lehman's accounting for Repo 105 transactions as sales).  Reported net leverage declined from the previous quarter by 21.4%, and "actual" net leverage declined by 19.6%.  TAC  ¶ 38 (indicating reported net leverage went from 15.4x to 12.1x and "actual" net leverage went from 17.3x to 13.9x).  In fact, the "actual" net leverage of 13.9x was lower than any prior quarter's reported net leverage during the Class Period.  This decrease in net leverage occurred between 2008 1Q and 2Q, *even though Repo 105 usage was relatively constant between those quarters*. TAC ¶ 38 (indicating $49.1 billion in Repo 105 usage in 2008 1Q and $50.4 billion at the end of 2008 2Q).[99]

---

[97]  2008 2Q at 4 (Ex. 9).

[98]  *Id.*

[99]  Because commercial real estate, residential real estate, and leveraged loans went into the calculation of net leverage, the reported net leverage figure was decreased by the sale and write-downs of those assets, as well as by increases in stockholder's equity.  *See* 2007 10-K at 63 (Ex. 7) (defining net leverage as net assets divided by tangible equity).  Lehman's net leverage declined between 2008 1Q and 2Q despite

The next two "partial" disclosures occurred one day apart from each other.  *See* Appendix F (illustrating drop in stock price between the 1st and 4th alleged partial disclosures).  The second "partial" disclosure is Lehman's announcement on September 8 that it would pre-release earnings and disclose strategic initiatives on September 18.  TAC ¶ 244.  The third is "market reports" on September 9 that negotiations with KDB had failed.  TAC ¶ 245.  The TAC does not tie these "disclosures" to previously concealed facts, and acknowledges that on these dates the market was full of rumors about Lehman.  TAC ¶ 244-45; *see also Security Capital,* 2010 WL 1372688 at *32.  Analyst and media stories predicting Lehman's future behavior and reports of KDB talks failing are insufficient to "show[] that it was the incremental revelation of Defendants' fraudulent misrepresentations, and not the actions of third parties or other circumstances of the market, that caused the decline in [] share price . . . ."  *Id.*; *see also In re Omnicom Group, Inc. Sec. Litig*., 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501, 512 (2d Cir. 2010) (holding an analyst report is not a corrective disclosure if it simply puts a new spin on previously disclosed facts).

The last alleged "corrective" disclosure was the September 10, 2008 earnings release, which announced $3.9 billion in losses, and negative $2.9 billion in revenues.[100]  The TAC alleges that statements about the decline in net leverage over the quarter just ended from 12.1x to 10.6x were "materially false and misleading because they failed to disclose that Lehman engaged in tens of billions of dollars in Repo 105 transactions at quarter end."  TAC ¶ 201.  This allegation is highly misleading.  First, the earnings release cannot be corrective if it does not correct.  Second, the earnings release says nothing about Repo 105 transactions.  Third, Lehman decreased its net leverage at the same time it reduced Repo 105 usage by $24 billion, or approximately 50%, from the previous quarter.  ER App. 17 at 36-37.  The TAC fails to allege

---

Repo 105 usage remaining relatively constant and declined during the last quarter of Lehman's existence despite the fact Repo 105 transactions had been cut in half during that period.  ER App. 17 at 36-37.  This was due in part to Lehman's sales of illiquid assets and write-downs of the values of assets that remained in its inventory.

[100]   Sept. 10, 2008 8-K at 1 (Ex. 47).

that Lehman's never-disclosed Repo 105 transactions and their impact on reported net leverage caused Plaintiffs' losses.

> **b.**     **The TAC Does Not Plead Corrective Disclosure Revealing "The Truth" Of Risk And Concentration Limits And Policies**

Plaintiffs allege no corrective disclosure that revealed "the truth" regarding Lehman's risk management limits and policies.  None of the partial disclosures that Plaintiffs rely on revealed that Lehman allegedly had made business decisions to increase or exceed internal risk limits.  Nor do Plaintiffs allege a corrective disclosure revealing that Lehman's opinions about the strength of its risk management system were false.  *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 283 (S.D.N.Y. 2006) ("Where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed – i.e. a corrective disclosure.").

Plaintiffs cannot point to any corrective disclosure concerning concentrations of risk.  *See Lentell*, 396 F.3d at 175.  With respect to misrepresentations about the extent and quality of Lehman's Alt-A holdings, Plaintiffs allege that the 2008 2Q disclosure continued to misrepresent Lehman's exposure by grouping Alt-A and prime loans together into one category and continued to omit the fact that Lehman's Alt-A loans allegedly were "more akin" to subprime loans.  TAC ¶ 106.  But Plaintiffs never allege that Lehman revealed the alleged falsity of its leveraged loans positions or commercial real estate holdings.  That Lehman took write-downs on these assets as the financial crisis widened and deepened is not a disclosure that revealed a higher level of exposure to the risks these assets posed.  Instead, it speaks to the universal, industry-wide declining value of these assets.

> **c.**     **The TAC's Liquidity-Related Allegations Do Not Plead Loss Causation**

The TAC makes the conclusory assertion that Repo 105 transactions concealed Lehman's liquidity problems and that Lehman's liquidity crisis was the manifestation of the concealed risk of the alleged misstatements regarding Repo 105 transactions.  TAC ¶¶ 37, 146, 182.  But, as Plaintiffs admit, Repo 105 transactions were sales of "highly liquid" securities in exchange for

cash.  TAC ¶ 190.  Thus by themselves they had no detrimental effect on Lehman's liquidity.

Moreover, Repo 105 transactions' impact on net leverage could not have concealed the liquidity

crisis that ended Lehman's existence because net leverage declined significantly (through asset

sales, write-downs and increases in stockholders' equity) between 2008 1Q and 3Q, even though

Repo 105 transactions remained relatively constant between 2008 1Q to the end of 2008 2Q, and

declined by half by the end of 2008 3Q.  ER App. 17 at 36-37.

Finally, the four "corrective" disclosures identified are not corrective of anything because

they do not in any way reveal any liquidity problem at Lehman.  To the contrary, the second and

third partial disclosures (announcing the date of Lehman's earning release and KDB leaking that

it had been but was no longer in discussions with Lehman) did not refer directly to liquidity.  The

first and fourth partial disclosures contained positive statements as to Lehman's liquidity that

Plaintiffs claim were misleading because encumbered assets allegedly were included in the

liquidity pool.  TAC ¶¶ 159-160, 191-92, 202.  On June 9, 2008, Callan reported that Lehman

"grew its liquidity pool to almost $45 billion – its 'largest ever,'" and was going to raise an

additional $6 billion through a common and preferred stock offering.  TAC ¶ 191, 243.  On

September 10, 2008, a press release estimated Lehman's liquidity pool at $42 billion, which was

reiterated by Lowitt and Fuld on the earnings call that day.  TAC ¶ 202.  According to the TAC's

allegations, Lehman perpetuated its misstatements as to its liquidity position until the very end.

This is the exact opposite of corrective disclosure.  Regardless of whether Lehman had a $42

billion liquidity pool on September 10, 2008 or the $25 billion pool that Plaintiffs allege, the

TAC also alleges that just two days later Lehman's pool had plummeted to less than $2 billion.

TAC ¶ 203-04.  Once a runs starts, as former SEC Chair Cox recently testified, "no amount of

liquidity was going to be enough to withstand a run on the bank."  Cox at 42.[101]

Lehman's bankruptcy was not a manifestation of a liquidity problem at the Company.

---

[101]   SEC Regulation of Investment Banks: *Hearing on the Shadow Banking System Before the Financial Crisis Inquiry Commission*, Tr. 42 (2010) (statement of Christopher Cox, Former SEC Chairman) (Ex. 48).

The simple fact is that virtually no amount of cash or highly liquid securities is sufficient in the face of a "run on the bank" when all customer and counterparties take their business away.  Once investor confidence in a trading institution fails and parties will not trade with an entity or provide it with short-term financing, it is nearly impossible for such an institution to maintain sufficient liquidity to continue its operations, at least without government backing.

### E.    Plaintiffs' Section 20A And 20(a) Claims Should Be Dismissed

Plaintiffs' failure to state a claim under § 10(b) and Rule 10b-5 defeats both their §20A claim against Fuld and their § 20(a) claim against all of the Officer Defendants.

### 1.    Section 20A Claim Against Fuld Should Be Dismissed

Plaintiffs bringing a cause of action under §20A must plead "(1) a predicate violation of the Exchange Act or its rules and regulations…; (2) that the defendant traded the security at issue contemporaneously with the plaintiff; and (3) that the defendant was in possession of material, nonpublic information at the time of the trade." *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007) (internal quotation marks and citation omitted).  Because the TAC fails to plead a predicate violation of the Exchange Act, the §20A claim against Fuld necessarily fails.  Moreover, Plaintiffs have failed to plead that Fuld was in possession of material, non-public information at the time of the trades at issue, which Plaintiffs allege took place on June 13, 2007.  *See* TAC ¶ 268.  Plaintiffs plead that, at the earliest, Fuld learned about Repo 105 in March 28, 2008.  *See* TAC ¶ 211.  Similarly, Plaintiffs' allegations that Fuld misrepresented Lehman's liquidity position or knew that it was publicly overvalued focus on events that occurred in 2008, well after the date of Fuld's alleged sale of Lehman stock.  *See* TAC ¶¶ 194, 201, 202.  Plaintiffs therefore have failed to plead that Fuld was in possession of material, non-public information when he allegedly traded in Lehman securities.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 (S.D.N.Y. 2008).

### 2.    Section 20(a) Claims Against Officer Defendants Should Be Dismissed

To state a claim for control person liability under § 20(a), Plaintiffs must plead, among other things, a predicate violation of the Exchange Act.  *SEC v. First Jersey Sec., Inc.*, 101 F.3d

1450, 1472 (2d Cir. 1996).  As stated above, Plaintiffs have failed to allege a primary violation of the Exchange Act.  Accordingly, their claim against the Officer Defendants under § 20(a) fails as a matter of law.  Moreover, § 20(a) requires allegations that the defendant was in some meaningful sense a culpable participant in the fraud.  This requires particularized allegations supporting an inference that the defendant acted with scienter.  Where courts have not found scienter, they have not found a violation of § 20(a).  *See*, *e.g.*, *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).[102]  Even if Plaintiffs were to have pleaded a primary violation against one of the Officer Defendants (and they have not), Plaintiffs' failure to plead that the other Officer Defendants acted with scienter would be an additional reason to dismiss the § 20(a) claims as against those Officer Defendants.

## CONCLUSION

For the foregoing reasons, the Securities Act and Exchange Act claims alleged in the TAC should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure without leave to replead.

Dated:  New York, New York
        June 4, 2010

---

[102]  *But see Parmalat*, 497 F. Supp. 2d at 532, n.42.

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By: __/s/ Michael J. Chepiga_____
Michael J. Chepiga
(*mchepiga@stblaw.com*)
Mary Elizabeth McGarry
(*mmcgarry@stblaw.com*)
Erika H. Burk
(*eburk@stblaw.com*)
Bryce A. Pashler
(bpashler@stblaw.com)
425 Lexington Avenue
New York, NY 10017
Tel:  (212) 455-2000
Fax: (212) 455-2502

*Attorneys for Defendants Christopher M. O'Meara and Joseph M. Gregory*


GIBSON, DUNN & CRUTCHER LLP

By: __/s/ Marshall R. King_____
Marshall R. King
(*mking@gibsondunn.com*)
Oliver M. Olanoff
(*oolanoff@gibsondunn.com*)
Julie I. Smith
(*jismith@gibsondunn.com*)
200 Park Avenue
New York, NY 10166
Tel:  (212) 351-4000
Fax: (212) 351-4035

*Attorneys for Defendant UBS Financial Services, Inc.*


CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: __/s/ Mitchell A. Lowenthal_____
Mitchell A. Lowenthal
*mlowenthal@cgsh.com*)
Meredith E. Kotler
(*mkotler@cgsh.com*)
Victor L. Hou
(*vhou@cgsh.com*)
One Liberty Plaza
New York, NY 10006
Tel:  (212) 225-2000
Fax: (212) 225-3999

*Attorneys for All Underwriter Defendants Except HVB Capital Markets, Inc. and Incapital LLC*


ALLEN & OVERY LLP

By: __/s/ Patricia M. Hynes_____
Patricia M. Hynes
(*patricia.hynes@allenovery.com*)
Todd Fishman
(*todd.fishman@allenovery.com*)
1221 Avenue of the Americas
New York, NY 10020
Tel:  (212) 610-6300
Fax: (212) 610-6399

*Attorneys for Defendant Richard S. Fuld, Jr.*

BOIES, SCHILLER & FLEXNER LLP

By:\_\_/s/ David R. Boyd_____
David R. Boyd (*admitted pro hac vice*)
(*dboyd@bsfllp.com*)
5301 Wisconsin Avenue, N.W.
Suite 800
Washington, D.C. 20015
Tel:  (202) 237-2727
Fax: (202) 237-6131

Jonathan P. Krisbergh
(*jkrisbergh@bsfllp.com*)
575 Lexington Avenue
New York, NY 10022
Tel:  (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Defendant Incapital LLC*

FRIED FRANK HARRIS SHRIVER & JACOBSON
LLP

By:\_\_/s/ Audrey Strauss_____
Audrey Strauss
(*audrey.strauss@friedfrank.com*)
Israel David
(*israel.david@friedfrank.com*)
One New York Plaza
New York, NY 10004
Tel:  (212) 859-8000
Fax: (212) 859-4000

*Attorneys for Defendant Joseph M. Gregory*

DECHERT LLP

By:  \_\_/s/ Andrew J. Levander_____
Andrew J. Levander
(*andrew.levander@dechert.com*)
Kathleen N. Massey
(*kathleen.massey@dechert.com*)
Adam J. Wasserman
(*adam.wasserman@dechert.com*)
1095 Avenue of the Americas
New York, NY 10026
Tel: (212) 698-3500
Fax: (212) 698-3599

*Attorneys for Defendants Michael L. Ainslie,
John F. Akers, Roger S. Berlind, Thomas H.
Cruikshank, Marsha Johnson Evans, Sir
Christopher Gent, Roland A. Hernandez,
Henry Kaufman, and John D. Macomber*

KASOWITZ BENSON TORRES & FRIEDMAN LLP

By:\_\_/s/ Mark P. Ressler_____
Mark P. Ressler
(*mressler@kasowitz.com*)
Michael Hanin
(*mhanin@kasowitz.com*)
1633 Broadway
New York, NY 10019
Tel:  (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Defendant HVB Capital Markets,
Inc.*

PROSKAUER ROSE LLP

By:   /s/ Robert J. Cleary
Robert J. Cleary
(*rjcleary@proskauer.com*)
Dietrich L. Snell
(*dsnell@proskauer.com*)
Mark E. Davidson
(*mdavidson@proskauer.com*)
Seth D. Fier
(*sfier@proskauer.com*)
1585 Broadway
New York, NY 10036
Tel:  (212) 969-3000
Fax: (212) 969-2900

*Attorneys for Defendant Erin Callan*

WILLKIE FARR & GALLAGHER LLP

By:   /s/ Kelly M. Hnatt
Kelly M. Hnatt
(*khnatt@willkie.com*)
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8672
Fax: (212) 728-9672

*Attorneys for Defendant Ian Lowitt*

**APPENDIX A**

**<u>NEW NAMED PLAINTIFFS</u>**

1. Stacey Oyler
2. Montgomery County Retirement Board
3. Stuart Bregman
4. Irwin and Phyllis Ingwer
5. Carla LaGrassa
6. Robert Feinerman
7. John Buzanowski
8. Steven Ratnow
9. Sydney Ratnow
10. Mohan Ananda
11. Fred Mandell
12. Roy Wiegert
13. Lawrence Rose
14. Ralph Rosato
15. Juan Tolosa
16. Neel Duncan
17. Nick Fotinos
18. Arthur Simons
19. Richard Barrett
20. Joe Rottman
21. Miriam Wolf
22. Harry Pickle (trustee of Charles Brooks)
23. Barbara Moskowitz
24. David Kotz
25. Ed Davis

**COMMON STOCK/PREFERRED STOCK AND NOTES/BOND OFFERINGS[1]**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | NEW NAMED PLAINTIFFS |
|---|---|---|---|---|---|
| June 15, 2007 | Medium-Term Notes, Series I (52517P2S9) | $35,000,000 | | June 12, 2007 Form 8-K | Stacey Oyler |
| July 19, 2007 | 6% Notes Due 2012 (52517P4C2) | $1,500,000,000 | Calyon ($30 million) ING ($30 million) Mellon ($30 million) Scotia ($30 million) Williams Capital ($30 million) | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Montgomery County Retirement Board |
| August 1, 2007 | Partial Principal Protection Notes Linked to a Basket of Global Indices (524908J92) | $1,700,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Stuart Bregman |
| August 22, 2007 | Annual Review Notes with Contingent Principal Protection Linked to an Index (52517P4Y4) | $2,500,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Irwin and Phyllis Ingwer |
| August 29, 2007 | Medium-Term Notes, Series I (52517P4T5) | $1,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Carla LaGrassa |
| January 30, 2008 | Medium-Term Notes, Series I (5252M0BX4) | $28,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Irwin and Phyllis Ingwer; Robert Feinerman |
| February 5, 2008 | Lehman Notes, Series D (52519FFE6) | $43,895,000 | A.G. Edwards BOA Charles Schwab CGMI E. D. Jones Fidelity Capital Incapital Morgan Stanley | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | John Buzanowski |

---

[1] This list includes only those offerings from Appendix A of the TAC for which Plaintiffs have added new named plaintiffs in the TAC, and for which there were no named plaintiffs previously included in the SAC.

## COMMON STOCK/PREFERRED STOCK AND NOTES/BOND OFFERINGS

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | NEW NAMED PLAINTIFFS |
|---|---|---|---|---|---|
| | | | Muriel Siebert Raymond James RBC Capital UBS Investment Wachovia Securities | | |
| February 14, 2008 | Medium-Term Notes, Series I Principal Protected Notes Linked to MarQCuS Portfolio A (USD) Index (5252M0DK0) | $14,600,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Irwin and Phyllis Ingwer |
| February 27, 2008 | Medium-Term Notes, Series I (5252M0CQ8) | $15,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Irwin and Phyllis Ingwer |
| March 13, 2008 | Medium-Term Notes, Series I (5252M0EH6) | $23,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Robert Feinerman |
| April 21, 2008 | Medium-Term Notes, Series I (5252M0FA0) | $20,000,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q | Steven Ratnow |
| May 7, 2008 | Buffered Semi-Annual Review Notes Linked to the Financial Select Sector SPDR® Fund (5252M0FR3) | $2,550,000 | | June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K March 18, 2008 Form 8-K April 8, 2008 Form 10-Q | Sydney Ratnow |

**UBS-UNDERWRITTEN STRUCTURED PRODUCT OFFERINGS[2,3]**

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | NEW NAMED PLAINTIFFS |
|---|---|---|---|---|---|
| March 30, 2007 | 100% Principal Protection Notes Linked to a Global Index Basket (52520W564) (524908VP2) | $32,000,000 | UBSF | March 14, 2007 Form 8-K | Mohan Ananda Fred Mandell |
| March 30, 2007 | Performance Securities with Partial Protection Linked to a Global Index Basket (52520W556) (524908VQ0) | $23,500,000 | UBSF | March 14, 2007 Form 8-K | Roy Wiegert |
| April 30, 2007 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517PX63) | $18,900,000 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q | Lawrence Rose |
| July 31, 2007 | Performance Securities with Partial Protection Linked to a Global Index Basket (52520W358) | $17,008,330 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Ralph Rosato |
| August 31, 2007 | 100% Principal Protection Notes Linked to an International Index Basket (52522L186) | $8,238,780 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Mohan Ananda |
| August 31, 2007 | 100% Principal Protection Notes Linked to a Global Index Basket (52522L889) | $16,946,020 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q | Mohan Ananda |

---

[2] This list includes only those offerings from Appendix B of the TAC for which Plaintiffs have added new named plaintiffs in the TAC, and for which there were no named plaintiffs previously included in the SAC.

[3] Offerings in bold represent some form of principal protection.

## UBS-UNDERWRITTEN STRUCTURED PRODUCT OFFERINGS

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | NEW NAMED PLAINTIFFS |
|---|---|---|---|---|---|
| **September 28, 2007** | **Performance Securities with Partial Protection Linked to a Global Index Basket (52522L244)** | **$21,821,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K** | **Juan Tolosa** |
| **October 31, 2007** | **Medium-Term Notes, Series I, 100% Principal Protection Notes Linked to an Asian Currency Basket (52520W341)** | **$32,861,710** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q** | **Neel Duncan Juan Tolosa** |
| **October 31, 2007** | **Return Optimization Securities with Partial Protection Linked to the S&P 500 Index (52522L293)** | **$38,850,000** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q** | **Nick Fotinos** |
| October 31, 2007 | Return Optimization Securities Linked to an Index (52522L319) | $11,876,070 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q | Arthur Simons |
| October 31, 2007 | Return Optimization Securities Linked to an Index (52522L335) | $52,814,490 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q | Arthur Simons |
| **November 30, 2007** | **100% Principal Protection Notes Linked to an Asian Currency Basket (52520W333)** | **$53,027,100** | **UBSF** | **March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q** | **Richard Barrett** |

## UBS-UNDERWRITTEN STRUCTURED PRODUCT OFFERINGS

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | NEW NAMED PLAINTIFFS |
|---|---|---|---|---|---|
| **November 30, 2007** | **Return Optimization Securities with Partial Protection Linked to the S&P 500® Index (52522L459)** | **$29,713,150** | **UBSF** | **March 14, 2007 Form 8-K** **April 9, 2007 Form 10-Q** **June 12, 2007 Form 8-K** **July 10, 2007 Form 10-Q** **September 18, 2007 Form 8-K** **October 10, 2007 Form 10-Q** | **Lawrence Rose** |
| **December 31, 2007** | **Return Optimization Securities with Partial Protection Linked to the S&P 500® Index (52522L491)** | **$36,010,650** | **UBSF** | **March 14, 2007 Form 8-K** **April 9, 2007 Form 10-Q** **June 12, 2007 Form 8-K** **July 10, 2007 Form 10-Q** **September 18, 2007 Form 8-K** **October 10, 2007 Form 10-Q** **December 13, 2007 Form 8-K** | **Fred Mandell** |
| **January 31, 2008** | **100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517P4N8)** | **$20,373,000** | **UBSF** | **March 14, 2007 Form 8-K** **April 9, 2007 Form 10-Q** **June 12, 2007 Form 8-K** **July 10, 2007 Form 10-Q** **September 18, 2007 Form 8-K** **October 10, 2007 Form 10-Q** **December 13, 2007 Form 8-K** **January 29, 2008 Form 10-K** | **Lawrence Rose** |
| February 8, 2008 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500® Financials Index (52522L657) | $48,310,620 | UBSF | March 14, 2007 Form 8-K April 9, 2007 Form 10-Q June 12, 2007 Form 8-K July 10, 2007 Form 10-Q September 18, 2007 Form 8-K October 10, 2007 Form 10-Q December 13, 2007 Form 8-K January 29, 2008 Form 10-K | Joe Rottman Fred Mandell |
| **February 29, 2008** | **100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates** | **$15,827,000** | **UBSF** | **March 14, 2007 Form 8-K** **April 9, 2007 Form 10-Q** **June 12, 2007 Form 8-K** **July 10, 2007 Form 10-Q** **September 18, 2007 Form 8-K** **October 10, 2007 Form 10-Q** **December 13, 2007 Form 8-K** | **Miriam Wolf** |

## UBS-UNDERWRITTEN STRUCTURED PRODUCT OFFERINGS

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | NEW NAMED PLAINTIFFS |
|---|---|---|---|---|---|
| | (5252M0CZ8) | | | January 29, 2008 Form 10-K | |
| February 29, 2008 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500® Index (52522L574) | $51,565,320 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K | Fred Mandell |
| February 29, 2008 | 100% Principal Protection Notes Linked to an Asian Currency Basket (52523J412) | $13,692,000 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K | Harry Pickle (trustee of Charles Brooks) |
| March 31, 2008 | Return Optimization Securities with Partial Protection Notes Linked to the MSCI EM Index (52522L814) | $4,314,700 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K | Harry Pickle (trustee of Charles Brooks) |
| March 31, 2008 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000® Index (52522L798) | $13,688,610 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K | Barbara Moskowitz |

## UBS-UNDERWRITTEN STRUCTURED PRODUCT OFFERINGS

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | NEW NAMED PLAINTIFFS |
|---|---|---|---|---|---|
| May 30, 2008 | Return Optimization Securities with Partial Protection Linked to the S&P 500® Financials Index (52523J230) | $17,018,280 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q | David Kotz |
| June 16, 2008 | 100% Principal Protection Absolute Return Notes Linked to the Euro/U.S. Dollar Exchange Rate (52520W283) | $8,083,300 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | Ralph Rosato |
| June 30, 2008 | 100% Principal Protection Absolute Return Barrier Notes (52523J248) | $12,167,700 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q<br>September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | Ed Davis |
| June 30, 2008 | 100% Principal Protection Absolute Return Barrier Notes (52523J255) | $4,035,700 | UBSF | March 14, 2007 Form 8-K<br>April 9, 2007 Form 10-Q<br>June 12, 2007 Form 8-K<br>July 10, 2007 Form 10-Q | Ed Davis |

## UBS-UNDERWRITTEN STRUCTURED PRODUCT OFFERINGS

| ISSUE DATE | SECURITY (CUSIP) | VOLUME | UNDERWRITER DEFENDANTS | DOCUMENTS INCORPORATED INTO OFFERING MATERIALS | NEW NAMED PLAINTIFFS |
|---|---|---|---|---|---|
| | | | | September 18, 2007 Form 8-K<br>October 10, 2007 Form 10-Q<br>December 13, 2007 Form 8-K<br>January 29, 2008 Form 10-K<br>March 18, 2008 Form 8-K<br>April 8, 2008 Form 10-Q<br>June 9, 2008 Form 8-K | |

**APPENDIX B**

# Lehman Brothers Holdings Inc.

Reductions in Exposure to Residential and Commercial Mortgage, Other Asset-Backed Securities, and Leveraged Loans

| Mortgages, Asset-Backed Securities and Real Estate Held for Sale, net | Q4 2007 [1] | Q1 2008 [1] | Q2 2008 [2] | Q3 2008 [3] | Difference Between Q4 2007 and Q3 2008 | % Change from Q4 2007 and Q3 2008 |
|---|---|---|---|---|---|---|
| Residential Mortgages | 32,179 | 31,752 | 24,902 | 17,200 | (14,979) | -47% |
| Commercial Mortgages | 38,938 | 36,110 | 29,390 | 24,000 | (14,938) | -38% |
| Other Asset-Backed | 6,163 | 6,553 | 6,482 | 4,600 | (1,563) | -25% |
| Real Estate Held for Sale, net | 12,800 | 12,900 | 10,400 | 8,600 | (4,200) | -33% |
| Total | 90,080 | 87,315 | 71,174 | 54,400 | (35,680) | -40% |
| Acquisition Finance Facilities | | | | | | |
| High Yield (Leveraged Loans) | 23,900 | 17,800 | 11,500 | 7,100 | (16,800) | -70% |
| Total Exposure | 113,980 | 105,115 | 82,674 | 61,500 | (52,480) | -46% |

Notes:

[1] 2008 1Q at 20 (Residential, Commercial, Other Asset-Backed), 21 (Real Estate Held for Sale, net), 58 (High Yield).

[2] 2008 2Q at 25 (Residential, Commercial, Other Asset-Backed), 26 (Real Estate Held for Sale, net), 72 (High Yield).

[3] Sept. 10, 2008 8-K at Attachment II (Residential, Commercial, Other Asset-Backed), Attachment V (Real Estate Held for Sale, net), Attachment VII (High Yield).

**APPENDIX C**

Daily Closing Value for the S&P 500 Financials Index
6/12/07 - 9/15/08 (Class Period)



**APPENDIX D**

# Lehman Brothers Holdings Inc.
## Daily Closing Stock Price
### 6/12/07 - 9/15/08 (Class Period)



Source: Bloomberg

**APPENDIX E**

| Decline of Lehman Share Price between Start of Class Period and Last Trading Day before 1st "Partial" Disclosure | | | | | | |
|---|---|---|---|---|---|---|
| Dates | Earnings Announcements | Reported Net Leverage | % Change in Reported Net Leverage | Share Price Decline | Decline in Share Price | % Decline in Share Price |
| 6/12/2007 | Q2 2007 | 15.4x | | $76.06 | | |
| 9/18/2007 | Q3 2007 | 16.1x | 4.5% | $64.49 | ($11.57) | -15.2% |
| 9/18/2007 | Q3 2007 | 16.1x | | $64.49 | | |
| 12/13/2007 | Q4 2007 | 16.1x | No Change | $61.37 | ($3.12) | -5% |
| 12/13/2007 | Q4 2007 | 16.1x | | $61.37 | | |
| 3/18/2008 | Q1 2008 | 15.4x | -4.3% | $46.49 | ($14.88) | -24% |
| 3/18/2008 | Q1 2008 | 15.4x | | $46.49 | | |
| 6/6/2008 | Day before 1st "Partial" Disclosure | | | $32.29 | ($14.20) | -31% |
| Total | | | | $76.06 | | |
| | | | | $32.29 | ($43.77) | -58% |

**APPENDIX F**

Decline of Lehman Share Price between 1st and 4th Alleged "Partial" Disclosures

| Dates | Events | Reported Net Leverage | % Change in Net Leverage from Previous Quarter | Share Price Decline | Decline in Share Price | % Decline in Share Price |
|---|---|---|---|---|---|---|
| 6/6/2008 | | | | $32.29 | | |
| 6/9/2008 | Q2 2008 Earnings Announcement | 12.1x | -21.4% | $29.48 | ($2.81) | -8.7% |
| 6/9/2008 | Q2 2008 | | | $29.48 | | |
| 9/8/2008 | 2nd "Partial" Disclosure: Announcement that earnings will be pre-released | | | $14.15 | ($15.33) | -52% |
| 9/9/2008 | 3rd "Partial" Disclosure: Media Reports of KDB Talks Failing | | | $7.79 | ($6.36) | -45% |
| 9/10/2008 | 4th "Partial" Disclosure: Q3 2008 Earnings Announcement | 10.6x | -12.4% | $7.25 | ($0.54) | -7% |
| Total | | 12.1x | | $32.29 | | |
| | | 10.6x | -12.4% | $7.25 | ($25.04) | -78% |