UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

LEHMAN BROTHERS SECURITIES AND
ERISA LITIGATION

This document applies to:                                    09 MD 2017 (LAK)

*In re Lehman Brothers Equity/Debt Securities
Litigation*, 08 Civ. 5523 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## OPINION


Appearances:


| | |
|---|---|
| Max W. Berger | Patricia M. Hynes |
| Steven B. Singer | Todd Fishman |
| Boaz A. Weinstein | ALLEN & OVERY LLP |
| David R. Stickney | *Attorneys for Defendant Richard S. Fuld, Jr.* |
| Elizabeth P. Lin | |
| Jon F. Worm | David R. Boyd |
| BERNSTEIN LITOWITZ BERGER & GROSSMAN | Jonathan P. Krisbergh |
| LLP | BOISE, SCHILLER & FLEXNER LLP |
| | *Attorneys for Defendant Incapital LLC* |
| David Kessler | |
| John A. Kehoe | Audrey Strauss |
| Benjamin J. Hinerfeld | Israel David |
| John J. Gross | FRIED FRANK HARRIS SHRIVER & JACOBSON |
| Richard A. Russo, Jr. | LLP |
| Nichole Browning | *Attorneys for Defendant Joseph M. Gregory* |
| BARROWAY TOPAZ KESSLER MELTZER & | |
| CHECK, LLP | Mark P. Ressler |
| | Michael Hanin |
| *Co-Lead Counsel for Plaintiffs* | KASOWITZ BENSON TORRES & FRIEDMAN |
| | LLP |
| | *Attorneys for Defendant HVB Capital* |
| | *Markets, Inc.* |

Michael J. Chepiga
Mary Elizabeth McGarry
Erika Burk
Bryce A. Pashler
SIMPSON THACHER & BARTLETT LLP
*Attorneys for Defendants Christopher M.*
*O'Meara and Joseph M. Gregory*

Mitchell A. Lowenthal
Meredith E. Kotler
Victor L. Hou
CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for All Underwriter Defendants*
*Except HVB Capital Markets, Inc. and*
*Incapital LLC*

Marshall R. King
Oliver M. Olanoff
Julie I. Smith
GIBSON, DUNN & CRUTCHER LLP
*Attorneys for Defendant UBS Financial*
*Services, Inc.*

Kelly M. Hnatt
WILLKIE FARR & GALLAGHER LLP
*Attorneys for Defendant Ian Lowitt*

Robert J. Cleary
Dietrich L. Snell
Mark E. Davidson
Seth D. Fier
PROSKAUER ROSE LLP
*Attorneys for Defendant Erin Callan*

Andrew J. Levander
Kathleen N. Massey
Adam J. Wasserman
DECHERT LLP
*Attorneys for Defendants Michael L. Ainslie,*
*John F. Akers, Roger S. Berlind, Thomas H.*
*Cruikshank, Marsha Johnson Evans, Sir*
*Christopher Gent, Roland A. Hernandez,*
*Henry Kaufman, and John D. Macomber*

Miles N. Ruthberg
Jamie L. Wine
Kevin H. Metz
Peter A. Wald
LATHAM & WATKINS LLP
*Attorneys for Defendant Ernst & Young LLP*

Table of Contents

*Facts*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *Parties.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        *Plaintiffs*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        *Defendants*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        *Relevant Non-Party* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *Prior Proceedings.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *The TAC.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *Repo 105.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    *Allegedly Misleading Statements*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        *Net Leverage Ratio.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        *"Securities Sold Under Agreements to Repurchase".* . . . . . . . . . . . . . . . . . 13
        *Risk Approach.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        *Liquidity.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        *Accounting Practices.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Discussion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.    *Legal Standard*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II.   *Standing*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.  *Exchange Act Claims*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      A.   *The Standard.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      B.   *Individual Defendants.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
           1.   *Existence of materially false and misleading statements or omissions.* . . 24
                a.   *Repo 105 and net leverage*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
                     (1)   *SFAS 140.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
                     (2)   *Compliance with GAAP*. . . . . . . . . . . . . . . . . . . . . . . . . . . 30
                     (3)   *Treating Repo 105 transactions as sales*. . . . . . . . . . . . . 35
                     (4)   *Failure to disclose Repo 105 transactions*. . . . . . . . . . . 37
                b.   *Risk management policies.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
                     (1)   *Exceeding risk limits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
                     (2)   *Adequacy of mitigants.* . . . . . . . . . . . . . . . . . . . . . . . . . . 42
                     (3)   *Stress tests.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
                     (4)   *Value-at-Risk.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
                c.   *Liquidity*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
                d.   *Concentrations of credit risk.* . . . . . . . . . . . . . . . . . . . . . . . . . . 51
           2.   *Scienter.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
                a.   *Motive and opportunity.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
                b.   *Circumstantial evidence of conscious misbehavior or recklessness*
                     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
                     (1)   *Repo 105 Transactions.* . . . . . . . . . . . . . . . . . . . . . . . . . 59
                     (2)   *Risk management*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
                     (3)   *Concentrations of credit risk.* . . . . . . . . . . . . . . . . . . . . 66

|   |   |   |   |
|---|---|---|---|
| C. | E&Y. | | [67] |
| | 1. | Statements regarding GAAS. | [69] |
| | 2. | Statements regarding GAAP. | [75] |
| D. | Loss Causation. | | [78] |
| E. | The Other Exchange Act Claims. | | [82] |
| | 1. | Section 20(a). | [82] |
| | 2. | Section 20A. | [84] |

IV.    Securities Act. ................................................ [85]
 A.    Timeliness. ................................................ [86]
 B.    Statutory standing under Section 12. ........................ [89]
 C.    Existence of actionable material misstatements and omissions in the Offering Materials. .............................................. [91]
  1.    Valuation of commercial real estate. ................... [91]
  2.    Structured products offering materials and PPNs ........ [95]
 D.    Section 11 claims against Callan. ........................... [98]
 E.    Affirmative defenses of non-E&Y defendants. ................ [101]
  1.    Availability of the affirmative defenses on a motion to dismiss. ...... [102]
  2.    Applicability of defenses. ........................... [102]
 F.    Securities Act claims against E&Y. ......................... [104]
 G.    Section 15 claims. ......................................... [105]

Conclusion. ...................................................... [106]

ii

LEWIS A. KAPLAN, *District Judge.*

The September 2008 collapse of Lehman Brothers Holdings Inc. ("Lehman") disrupted the entire economy and greatly affected owners of the company's securities. This case concerns more than $31 billion in Lehman debt and equity securities issued pursuant to a May 30, 2006 shelf registration statement (the "Registration Statement"), a base prospectus of the same date, and various prospectus, product, and pricing supplements (collectively, the "Offering Materials"), which incorporated by reference several of Lehman's SEC filings.

Plaintiffs are pension funds, companies, and individuals, each of which purchased some of these securities. They sue Lehman's former officers, directors, and auditors, as well as underwriters of the securities, under Sections 11, 12, and 15 of the Securities Act of 1933[1] ("Securities Act") and Lehman's former officers and auditors under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934[2] ("Exchange Act") and Rule 10b-5 thereunder.[3] The complaint[4] alleges that the Offering Materials were false and misleading because they incorporated by reference Lehman's financial statements, which in turn contained misleading statements and omissions concerning Lehman's (1) use of "Repo 105" transactions and their effect on Lehman's reported net leverage, (2) risk management policies, (3) liquidity risk, (4) concentrations of credit risk, and (5) the value of Lehman's commercial real estate holdings. It alleges also that certain of Lehman's former officers made false and misleading oral statements about most of these subjects.

---

[1]   15 U.S.C. §§ 77k, *l, o.*

[2]   15 U.S.C. §§ 78j, 78t, 78t-1.

[3]   17 C.F.R. § 240.10b-5.

[4]   The operative complaint is the Third Amended Class Action Complaint for Violations of the Federal Securities Laws ("TAC"), 09 MD 2017 (LAK), DI 278.

The matter is before the Court on defendants' motions to dismiss the TAC for failure to state a claim upon which relief may be granted.[5]

## Facts

*Parties*

  *Plaintiffs*

Plaintiffs are pension funds, companies, and individuals each of which purchased Lehman common stock or other Lehman securities, including structured products like principal protection notes ("PPNs"), issued pursuant to the Offering Materials. The Court has appointed the Alameda County Employees' Retirement Association ("ACERA"), the Government of Guam Retirement Fund ("GGRF"), the Northern Ireland Local Government Officers' Superannuation Committee ("NILGOSC"), the City of Edinburgh Council as Administering Authority of the Lothian Pension Fund ("Lothian"), and the Operating Engineers Local 3 Trust Fund ("Operating Engineers") as lead plaintiffs.[6] They sue both under (1) the Securities Act, purportedly on behalf of all persons who purchased the securities listed in TAC Appendices A and B, and (2) the Exchange Act, allegedly on behalf of all persons who purchased or otherwise acquired Lehman common stock and call options, or who sold put options, between June 12, 2007, and September 15, 2008 (the "Class

---

[5]     The defendants filed three briefs in support of their motions to dismiss: a joint brief, a brief on behalf of defendant Ernst & Young LLP, and a brief on behalf of the Director Defendants. Citations to those documents respectively are indicated by "Def. Br. at __," "E&Y Br. at ___," and "DD Br. at ___." The defendants filed also three reply briefs. Citations to those documents are indicated in the same order by "Def. Rep. Br. at ___," "E&Y Rep. Br. at ___," and "DD Rep. Br. at ___." Citations to the plaintiffs' brief are indicated by "Pl. Br. at ___."

[6]     TAC ¶ 6.

3

Period").

*Defendants*

There are four categories of defendants in this case.

The Insider Defendants are five of Lehman's former officers: Richard S. Fuld, Jr., Christopher M. O'Meara, Joseph M. Gregory, Erin Callan, and Ian Lowitt.  Fuld was Lehman's chairman and chief executive officer at all relevant times.[7]  O'Meara was its chief financial officer, controller and executive vice president from 2004 until December 1, 2007, when he became global head of risk management.[8]  Gregory was Lehman's president and chief operating officer until June 12, 2008.[9]  Callan served as its chief financial officer and executive vice president from December 1, 2007, until June 12, 2008.[10]  Lowitt succeeded Callan as chief financial officer on June 12, 2008, and served in that capacity until Lehman filed for bankruptcy on September 15, 2008.[11]  Fuld and O'Meara signed the Registration Statement.[12]

---

[7]     *Id.* ¶ 8.

[8]     *Id.* ¶ 9.

[9]     *Id.* ¶ 10.

[10]    *Id.* ¶ 11.

[11]    *Id.* ¶ 12.

[12]    *Id.* ¶¶ 8-9.

4

The Director Defendants are nine former Lehman directors,[13] each of whom signed the Registration Statement in that capacity.[14]

Defendant Ernst & Young LLP ("E&Y") was Lehman's outside auditor.[15]  It audited Lehman's financial statements for the 2007 fiscal year and reviewed Lehman's interim financial statements during the Class Period.[16]

The Underwriter Defendants are fifty-one entities, each of which allegedly underwrote one or more of the offerings in which the securities at issue were purchased.[17]  UBS

---

[13]      Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Roland A. Hernandez, Henry Kaufman, and John D. Macomber.  *Id.* ¶ 14.

[14]      *Id.*

[15]      *Id.* ¶ 15.

[16]      *Id.*

[17]      *Id.*  Appendices A & B; *see also* Defendants' Notice of Motion.  The entities are A. G. Edwards & Sons, Inc., ABN AMRO Incorporated, ANZ Securities, Inc., Banc of America Securities LLC, BBVA Securities Inc., BNP Paribas S.A., BNY Mellon Capital Markets, LLC, Cabrera Capital Markets LLC, Caja de Ahorros y Monte de Piedad de Madrid, Calyon Securities (USA) Inc., Charles Schwab & Co., Inc., CIBC World Markets Corp., Citigroup Global Markets Inc., Commerzbank Capital Markets Corp., Daiwa Capital Markets Europe Limited, DnB NOR Markets Inc. (the trade name of which is DnB NOR Markets), DZ Financial Markets LLC, Edward D. Jones & Co., L.P., Fidelity Capital Markets Services (a division of National Financial Services LLC), Fortis Securities LLC, BMO Capital Markets Corp. (f/k/a Harris Nesbitt Corp.), HSBC Securities (USA) Inc., HVB Capital Markets, Inc., Incapital LLC, ING Financial Markets, Loop Capital Markets, LLC, M.R. Beal & Company, Mellon Financial Markets, LLC (n/k/a BNY Mellon Capital Markets, LLC), Merrill Lynch, Pierce, Fenner & Smith, Inc., Mizuho Securities USA, Inc., Morgan Stanley & Co. Inc., Muriel Siebert & Co., Inc., nabCapital Securities, LLC, National Australia Bank Ltd., Natixis Bleichroeder Inc., Raymond James & Associates, Inc., RBC Capital Markets Corp. (f/k/a RBC Dain Rauscher Inc.), RBS Securities Inc. (f/k/a Greenwich Capital Markets Inc., d/b/a RBS Greenwich Capital), Santander Investment Securities Inc., Scotia Capital (USA) Inc., SG Americas Securities LLC, Siebert Capital Markets (the advertising name of Muriel Siebert & Co., Inc.), Sovereign Securities

5

Financial Services Inc. ("UBS"), one of the Underwriter Defendants, underwrote all of the structured product securities listed in TAC Appendix B, as well as some securities listed in TAC Appendix A. UBS is the only entity sued under Securities Act Section 12.

*Relevant Non-Party*

Lehman was a global investment bank, headquartered in New York, the common stock of which was traded on the New York Stock Exchange. It filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on September 15, 2008.[18] It is not a defendant in this case.

*Prior Proceedings*

Plaintiffs have filed many complaints in this multidistrict proceeding,[19] the most significant of which was Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC").[20] The SAC asserted claims under Sections 11, 12, and 15 of the Securities Act as well as under Exchange Act Sections 10(b), 20(a), 20A, and Rule 10b-5 against the Insider Defendants, the Director Defendants, and the Underwriter Defendants, principally on the theory that the Offering Materials were misleading in that they overstated Lehman's financial condition by

---

Corporation LLC, SunTrust Robinson Humphrey, Inc., TD Securities (USA) LLC, UBS, UBS Investment Bank, UBS Securities LLC, Wachovia Capital Finance, Wachovia Securities, LLC, and Wells Fargo Securities, LLC, and The Williams Capital Group, L.P.

[18]    *Id.* ¶ 7.

[19]    *See, e.g.*, 09 MD 2017 (LAK), DIs 1, 30.

[20]    09 MD 2017 (LAK), DI 30.

failing to disclose properly the value and allegedly risky nature of Lehman's exposure to mortgage and real-estate related assets.  It did not name E&Y as a defendant.

On April 27, 2009, the defendants moved to dismiss the SAC for failure to state a claim on which relief could be granted.  On January 26, 2010, after the motions were briefed fully, the Court heard oral argument and reserved decision.

On March 11, 2010, while the motions to dismiss were pending, the court-appointed examiner in the Lehman bankruptcy proceeding issued a nine-volume report on his investigation of Lehman.[21]  At a subsequent conference, the Court learned that plaintiffs intended to amend the SAC in light of the report.  Consequently, the Court denied without prejudice the then-pending motions to dismiss and granted plaintiffs leave to amend the SAC.[22]  Plaintiffs filed the TAC on April 23, 2010.

*The TAC*

The Securities Act and Exchange Act claims both allege that the Offering Materials and the financial statements they incorporated by reference[23] contained false and misleading

---

[21]    Report of Anton R. Valukas, Examiner, *In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Mar. 11, 2010), DI 7531.  Citations to the Examiner's Report will be denoted "ER."

[22]    09 MD 2017 (LAK), DI 240.

[23]    The Exchange Act claims are premised, in part, on Lehman's SEC filings during the Class Period.  TAC ¶ 171.  These include Lehman's (1) Form 10-Q for the quarter ended May 31, 2007 (filed July 10, 2007) ("2Q07"), (2) Form 10-Q for the quarter ended August 31, 2007 (filed October 10, 2007) ("3Q07"), (3) Form 10-K for the fiscal year ended November 30, 2007 (filed December 13, 2007) ("2007 10-K"), (4) Form 10-Q for the quarter ended February 29, 2008 (filed April 8, 2008) ("1Q08"), (5) Form 8-K (filed June 9, 2008) ("6/9/08 8-K"), (6) Form 8-K (filed June 16, 2008) ("6/18/08 8-K"), and (7) Form 10-Q for the

statements with respect to Lehman's:

- use of "Repo 105" transactions, which it alleges Lehman used to reduce artificially its net leverage,[24]

- risk management practices,[25]

- liquidity risk,[26] and

- significant concentrations of credit risk.[27]

The Exchange Act claims allege also that former Lehman officers made false and misleading statements of the same character,[28] while the Securities Act claims allege also two additional bases of Securities Act liability – that the Offering Materials[29] overvalued Lehman's commercial real estate holdings[30] and, insofar as they related to PPNs, were materially misleading because they promised but did not provide "principal protection."[31]

_____

quarter ended May 31, 2007 (filed July 10, 2008) ("2Q08").

[24]

*See, e.g.*, TAC ¶¶ 26-69.

[25]

*See, e.g.*, *id.* ¶¶ 70-84.

[26]

*See, e.g.*, *id.* ¶¶ 85-88.

[27]

*See, e.g.*, *id.* ¶¶ 104-109.

[28]

*See, e.g., id.* ¶¶ 170-205.

[29]

The Securities Act claims are based on alleged misstatements and omissions contained in Lehman's 2Q07, 3Q07, 2007 10-K, 1Q08, 6/9/08 8-K, and 6/18/08 8-K, which were incorporated by reference into the Offering Materials.

[30]

*See, e.g.*, *id.* ¶¶ 89-103.

[31]

*Id.* ¶¶ 110-119.

8

The Exchange Act Section 10(b) and Rule 10b-5 claims are asserted against the Insider Defendants and E&Y.[32]  The TAC asserts also Section 20(a) Exchange Act claims against the Insider Defendants[33] and a Section 20A insider trading claim against Fuld alone.[34]

The Securities Act claims are premised on Sections 11, 12(a)(2) and 15.  The Section 11 claims are asserted against all defendants except Gregory and Lowitt.[35]  The Section 12(a)(2) claims are asserted against only defendant UBS and are based on the alleged misstatements in the Structured Product Offering Materials only.[36]  The Section 15 claims are asserted against former Lehman officers Fuld, O'Meara, Callan, Gregory, and Lowitt.[37]

---

PPNs are a specific type of structured security.  Lehman's structured products had two components – a fixed income security and a derivative.  The fixed income component typically was a highly rated debt instrument like a U.S. Treasury bond.  The derivative often was an option linked to the performance of a single security.  As discussed in more detail below, the TAC alleges that the offering materials related to the structured products listed in TAC Appendix B (the "Structured Product Offering Materials") contained all of the material misstatements and omissions that the Offering Materials contained.  They allege also that a subset of the Structured Product Offering Materials related to the PPNs listed in bold in TAC Appendix B (the "PPN Offering Materials") contained additional misstatements related to principal protection.  The Structured Product Offering Materials incorporated by reference Lehman's 2007 10-Q for the quarter ended February 28, 2007 (filed April 9, 2007) ("1Q07").

[32]
       *Id.* ¶ 252.

[33]
       *Id.* ¶ 261.

[34]
       *Id.* ¶ 265.

[35]
       *Id.* ¶ 121.

[36]
       *Id.* ¶ 133.

[37]
       *Id.* ¶ 141.

*Repo 105*

Allegations concerning a type of transaction known as a "Repo 105," and its effect on Lehman's net leverage, are critical to many of the TAC's claims.

"Repo" is short for repurchase agreement.  A repo is a two-step transaction that may be used to obtain short-term funding.[38]  In the first step, the entity needing funds – the transferor – transfers securities or other assets to a counter-party in exchange for cash.  It concurrently agrees to reacquire the transferred assets at a future date for an amount equal to the cash exchanged plus an agreed-upon charge that may be analogized to, and are here referred to, as interest.[39]  In the second stage, the transferor pays the counter-party the original cash amount plus the agreed-upon interest, and the counter-party returns the originally transferred assets.  The repo thus is like a loan.  In the first step, the counter-party provides cash to the transferor in exchange for a promise by the transferor to repurchase the transferred assets.  In the second step, the transferor repays the counter-party with interest and gets its collateral back.  The length of time between the initial transfer and the repurchase date can vary, as can the interest and the transferee's ability to use the assets while the repo is in place.[40]

The TAC alleges that Lehman used two types of repo transactions.[41]  It calls the first

---

[38]    ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES, Statement of Financial Accounting Standards No. 140 ¶ 96. (Fin. Accounting Standards Bd. 2000) ("SFAS 140").

[39]    *Id.*

[40]    *Id.* ¶ 97.

[41]    *See* TAC ¶¶ 29-31.

an "Ordinary Repo."  It alleges that Lehman accounted for the Ordinary Repos as financings, recording the cash it received from counter-parties as assets and its obligations to repurchase the securities plus the interest as liabilities.[42]  The collateral – the transferred assets – remained on Lehman's balance sheet as assets.  Hence, Ordinary Repos, depending upon whether Lehman held the financing proceeds or used them to reduce other debt, increased or did not change Lehman's reported net leverage.[43]  The effect of this accounting was to keep the transferred assets on Lehman's balance sheet and increase its reported net leverage.

The second type of repo transaction was known as a "Repo 105."  Repo 105 transactions involved the same two steps as Ordinary Repos.[44]  But Lehman treated them differently for financial reporting purposes.[45]  The asset that was the collateral of a Repo 105 was treated as though it actually had been sold and therefore removed from Lehman's balance sheet.[46]  Further,

---

[42]

    *Id.* ¶ 30.

[43]

    *Id.*

    Net leverage is "the result of net assets divided by tangible equity capital."  *Id.* ¶ 26.  Net assets are "total assets less: (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill."  *Id.*  Tangible equity capital is "stockholders' equity and junior subordinated notes," but does not include "identifiable intangible assets and goodwill."  *Id.*

[44]

    *Id.* ¶ 31.

[45]

    *Id.*

[46]

    *Id.*

    Following the conventions used in the TAC and the Examiner's Report, the Court will use the term Repo 105 to refer to Repo 105 and Repo 108 transactions collectively.  TAC ¶ 1; ER, at 732 n.2847.  Repo 108 transactions were largely the same as Repo 105 transactions except that they were overcollateralized by at least eight percent (hence the name Repo 108) rather than the five percent minimum as occurred in Repo 105.  ER, at 732 n.2847.

Lehman then used the cash received from Repo 105 transactions to pay down other existing liabilities. This practice decreased its net leverage ratio because it reduced the numerator in the ratio (net assets) by (a) the "sale" of the "collateral," and (b) the use of the cash thus obtained to pay down other debt, while having no effect on the denominator (tangible equity).[47]

Plaintiffs allege that Lehman repeatedly used Repo 105 transactions near the ends of its quarterly reporting periods solely to lower its net leverage.[48] They allege also that Lehman's net leverage was an important financial metric because it was an indicator of the company's ability to absorb any losses sustained by its riskiest assets.[49] A lower net leverage indicated that Lehman was better positioned to absorb such losses than did a higher net leverage. The effect of the Repo 105 transactions therefore allegedly was to present Lehman as being in a stronger financial position than it actually was.

Lehman's lower reported net leverage at the end of each quarter allegedly did not last long. Shortly after each quarter closed, Lehman allegedly executed the second step of the Repo 105 transactions, transferring cash to the counter-parties in the amounts it initially had paid plus the agreed-upon interest and reacquiring the assets it had transferred. Lehman then restored the assets to its balance sheet, returning its net leverage to the pre-Repo 105 level.[50] The entire process

---

[47]     *Id.*

[48]     TAC ¶¶ 32, 37, 63, 147-49.

[49]     *Id.* ¶ 27.

[50]     *Id.* ¶ 32.

12

allegedly was repeated prior to the next quarterly reporting date.[51]

*Allegedly Misleading Statements*

The TAC alleges that defendants made material misstatements and omissions in the Offering Materials and Lehman SEC filings, which were incorporated in them,[52] and in oral statements during telephone calls.[53]

*Net Leverage Ratio*

The TAC makes a number of allegations regarding Lehman's portrayal of its net leverage ratio at the end of each fiscal quarter. Lehman's filings and defendants O'Meara, Callan, Lowitt, and Fuld on other occasions represented the company's quarter-ending net leverage ratio at various levels, each in the range of 10.6 to 16.1, from the summer of 2007 through the fall of 2008.[54] The TAC alleges that these representations were false and materially misleading because the ratio had been reduced artificially by the Repo 105 transactions.[55]

---

[51] *Id.* ¶ 37.

[52] *E.g., id.* ¶¶ 24-25, 122, 170.

[53] The pertinent calls allegedly were held on June 12, 2007, September 18, 2007, December 13, 2007, March 18, 2008,  June 9, 2008, and June 16, 2008.

[54] *Id.* ¶¶ 45-46, 48-49, 51-52, 54-55, 56-59, 60, 117(a)-(b), 147, 172, 174, 180, 184, 190, 194-95, 197, 201.

[55] *Id.* ¶¶ 147, 172, 174, 184, 195.

*"Securities Sold Under Agreements to Repurchase"*

Lehman's SEC filings stated that the amounts that the company had in "securities sold under agreements to repurchase" were as follows: $153.332 billion (1Q07), $137.948 billion (2Q07), $169.302 billion (3Q07), $181.732 billion (2007 10-K), $197.128 billion (1Q08), and $127.846 billion (2Q08).[56] They stated further that such securities were "treated as collateralized agreements and financings for financial reporting purposes."[57] The TAC alleges that these statements were false and materially misleading because the financial statements "failed to disclose that, through Lehman's Repo 105 program, tens of billions of dollars in securities sold each quarter pursuant to agreements to repurchase were not treated as 'financings for financial reporting purposes' but were treated as sales by Lehman."[58]

*Risk Approach*

A number of the alleged misrepresentations pertained to Lehman's risk practices. The 2007 quarterly reports represented that "[d]ecisions on approving transactions . . . take into account . . . importantly, the impact any particular transaction under consideration would have on our overall risk appetite."[59] They stated also that Lehman "ensure[d] appropriate risk mitigants were

---

[56]

    *Id.* ¶¶ 45-46, 48-49, 51-52, 54-55, 117(a)-(b), 197.

[57]

    *Id.* ¶ 40(a)

[58]

    *Id.*

[59]

    *Id.* ¶¶ 74, 79, 81, 117(c)-(d).

in place."[60]   On several occasions, Lehman professed to "use stress testing to evaluate risks associated with [its] real estate portfolios."[61]  And, throughout 2007 and 2008, the company's filings represented that Lehman "monitor[ed] daily trading net revenues compared to reported historical simulation VaR [value at risk]."[62]

Lehman purported to "monitor and enforce adherence to [its] risk policies."[63] Specifically, the 2007 and 2008 financial reports stated that the company's "Finance Committee oversees compliance with [risk management] policies and limits."[64]

During a September 18, 2007 conference call, O'Meara stated that Lehman had a "strong risk management culture with regard to the setting of risk limits."[65]  Later, at a November 14, 2007 investor conference, Lowitt stated that Lehman showed substantial growth in challenging markets by, *inter alia*, having an "extremely deep risk culture" and being "very conservative around risk."[66]  On a December 13, 2007 call, O'Meara attributed the quarterly results, in part, to "the strength of [Lehman's] risk management culture in terms of managing [its] overall risk appetite,

---

[60]     *Id.* ¶¶ 74, 79, 81, 117(c)-(d).

[61]     *Id.* ¶¶ 74, 79, 81.

[62]     *Id.* ¶ 83.

[63]     *Id.* ¶ 74.

[64]     *Id.* ¶¶ 74, 79, 81, 117(c)-(d).

[65]     *Id.* ¶ 175.

[66]     *Id.* ¶ 178.

seeking appropriate risk reward dynamics and exercising diligence around risk mitigation."[67] During the same call, Callan attributed Lehman's financial success to its "strong risk and liquidity management."[68] And, on a March 18, 2008 conference call, Callan professed Lehman's "continued diligence around risk management."[69]

The TAC alleges that Lehman's statements about its risk policies materially misled investors because the company, while making these representations, in fact was "pursu[ing] an aggressive growth strategy that caused [Lehman] to assume significantly greater risk" "in 2006 and at the outset of 2007."[70]   Briefly stated, the alleged "strategy focused heavily on acquiring and holding commercial real estate, leveraged loans and private equity assets – areas that entailed far greater risk and less liquidity than Lehman's traditional lines of business."[71]

*Liquidity*

The TAC alleges that Lehman made a number of misstatements and omissions pertaining to its liquidity.  Lehman's 2007 and 2008 SEC filings repeatedly stated that the company "maintain[ed] a liquidity pool . . . that covers expected cash outflows for twelve months in a stressed

---

[67]
    *Id.* ¶ 181.

[68]
    *Id.*

[69]
    *Id.* ¶ 185.

[70]
    *Id.* ¶ 72.

[71]
    *Id.*

liquidity environment."[72]

Defendants allegedly spoke highly of Lehman's liquidity throughout the Class Period.  During the September 18, 2007 conference call, O'Meara stated that Lehman had a "strong liquidity framework" and "strong [] liquidity management," and that Lehman's liquidity position "is now stronger than ever" and provided the company with a "competitive advantage."[73]  During the December 13, 2007 conference call, Callan and O'Meara each made statements assessing the strength of Lehman's liquidity position.[74]  On the March 18, 2008 conference call, Callan "tried to relay the strengths and robustness of [Lehman's] liquidity position," and stated that the company's liquidity pool was structured to "cover expected cash outflows for the next 12 months . . . without being able to raise new cash" and that Lehman had taken "care of [its] full year needs for capital" through a February preferred stock offering.[75]  And, during the June 16, 2008 conference call, Fuld and Lowitt stated that "Lehman's liquidity position had 'never been stronger.'"[76]

Plaintiffs allege that these statements were false and misleading.  Specifically, the TAC alleges that the statements failed to disclose Lehman's significant concentration of credit risks and the impact that the Repo 105 transactions had on Lehman's liquidity.[77]

---

[72]

 *Id.* ¶¶ 87, 88, 198.

[73]

 *Id.* ¶ 176.

[74]

 *Id.* ¶¶ 181-82.

[75]

 *Id.* ¶ 185.

[76]

 *Id.* ¶¶ 194-95.

[77]

 *Id.* ¶ 88.

*Accounting Practices*

The TAC alleges numerous misrepresentations and omissions regarding Lehman's accounting and E&Y's audit and financial statement opinions.  Throughout 2007 and 2008, Lehman represented that its financial statements were "prepared in conformity with" GAAP[78] and that E&Y, having reviewed Lehman's financial statements, was "not aware of any material modifications that should be made to [the statements] for them to be in conformity with" GAAP.[79]  E&Y's report on Lehman's fiscal 2007 financial statements stated that it had conducted its audit in accordance with GAAS and opined that they had been prepared in accordance with GAAP and that they fairly presented the financial condition of the company.[80]  Fuld, O'Meara and/or Callan certified that the 2007 and 2008 financials "fairly present[ed] in all material respects" Lehman's financial condition and did not contain any misleading statements or omissions.[81]

The TAC alleges that these statements were false or misleading.

*Discussion*

I.    *Legal Standard*

In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded

---

[78]

    *Id.* ¶¶ 40(d), (e).

[79]

    *Id.* ¶¶ 40(d), 117(e), 199.

[80]

    *Id.* ¶ 40(f).

[81]

    *Id.* ¶¶ 40(c),(e).

factual allegations and draws all reasonable inferences in the plaintiff's favor.[82]  In order to survive

such a motion, however, "the plaintiff must provide the grounds upon which [its] claim rests through

factual allegations sufficient 'to raise a right to relief above the speculative level'"[83] and "state a

claim for relief that is plausible on its face."[84]

      In deciding a motion to dismiss, a court considers the complaint and "any written

instrument attached to the complaint, statements or documents incorporated into the complaint by

reference, legally required public disclosure documents filed with the SEC, and documents

possessed by or known to the plaintiff and upon which it relied in bringing the suit."[85]

      If matters outside the pleadings are presented and not excluded, Rule 12(d) ordinarily

requires a court to convert the motion to dismiss into one for summary judgment and to provide the

parties with the opportunity to present all pertinent materials.[86]  That Rule, however, is aimed at

ensuring that the plaintiff has notice of what the court might consider in deciding the motion.[87]  The

---

[82]

    *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002).

[83]

    *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. ___, 129 S.Ct. 1937, 1949 (2009) (declining to limit *Twombly* to antitrust cases).

[84]

    *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570) (internal citations omitted).

[85]

    *ATSI Commc'ns., Inc.*, 493 F.3d at 98.

[86]

    Fed. R. Civ. P. 12(d).

[87]

    *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("A finding that plaintiff had notice of documents used by defendant in a 12(b)(6) motion is significant since, as noted earlier, the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason – requiring notice so that the party against whom the motion to dismiss

need to convert a Rule 12(b)(6) motion into a summary judgment motion "is largely dissipated,"

however, when "plaintiff has actual notice of all the information in the movant's papers and has

relied upon these documents in framing the complaint."[88]  This is particularly true for documents

that are "integral to the complaint," but that the plaintiff has chosen not to attach or incorporate by

reference.[89]  In addition, a document that is integral to a complaint in the sense that the plaintiff had

actual notice of and relied upon it in framing the complaint, is properly considered, albeit not for the

truth of the matters asserted,[90] notwithstanding that it has not been attached to or incorporated by

reference into the complaint.

  The parties dispute the question whether the nine-volume Examiner's Report is

---

[88]  is made may respond – that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions."), *cert. denied*, 503 U.S. 960 (1992).

*Id.* (approving district court's consideration of stock purchase agreement and warrant that neither were attached as exhibits to the complaint nor publicly filed because plaintiffs had notice of the documents and they were integral to the complaint).

[89]  *Int'l Audiotext Network v Amer. Tel & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks omitted) (alterations in original); *see also id.* (holding that court properly could consider agreement on motion to dismiss even though not explicitly incorporated because it was "integral" and the complaint relied heavily upon its terms and effect); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002) (holding that court properly considered thirteen contracts governing relationship between musicians and recording companies submitted with defendants' motion to dismiss because they were "integral" to complaint as plaintiffs relied on their terms and effect in drafting it).  *Cf. Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (finding that district court improperly considered documents that "were not attached as exhibits to the amended complaint nor . . . incorporated by reference" but that the complaint "merely discussed" and from which it "presented short quotations").

[90]  *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008).

properly before the Court on the theory that it effectively has been incorporated by reference in the TAC.  This appears to be relevant only to the effort of some defendants to obtain dismissal based on the assertion that the facts and conclusions in the Report affirmatively demonstrate that they acted with due diligence and therefore may not be held liable under the Securities Act.  In view of the fact that the Report, even if it is integral to the TAC, could not properly be considered for the truth of the matters asserted, the point is academic.  In any case, for reasons discussed below, the Examiner's Report would not warrant dismissal of any claims based on the due diligence defense even if its statements and conclusions properly were considered for their truth.

II.     *Standing*

The TAC purports to assert claims based on fifty PPN offerings in which no named plaintiff purchased a security.[91]  Defendants challenge plaintiffs' standing to pursue these claims.

Standing is an essential prerequisite to Article III jurisdiction. The standing inquiry has three elements: a "plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief."[92]

As this Court previously has stated, a plaintiff does not suffer an injury in fact – and therefore has no standing to assert claims – in consequence of false or misleading statements in

---

[91]     When the TAC was filed, it purported to assert claims based on forty-eight PPN offerings in which no named plaintiff had purchased a security.  On November 10, 2010, plaintiff Ralph Rosato withdrew from the action, DI 365, bringing the total such offerings to fifty.

[92]     *Allen v. Wright*, 468 U.S. 737, 751 (1984); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

offering materials for securities that it did not purchase.[93]  As no named plaintiff is alleged to have purchased securities in these fifty PPN offerings, the plaintiffs have no standing to pursue claims based on them.

Plaintiffs argue that they have standing to assert claims based on the fifty PPN offerings notwithstanding the fact that no named plaintiff purchased them because each PPN was offered pursuant to "common prospectuses [that] incorporated the [common] SEC filings that contained the misstatements and omissions," "the false and misleading statements were the same for each Offering," and because "all investors . . . were personally injured by the same false or misleading statements made by the same defendants."[94]

This Court and others have rejected this argument[95] and plaintiffs have provided no authority that undermines that conclusion.  For the reasons stated there, the plaintiffs have no

---

[93]

See *In re IndyMac Mortgage-Backed Securities Litigation*, 718 F. Supp.2d 495, 500-02 (S.D.N.Y. 2010) ("*IndyMac I*"); *In re Lehman Bros. Secs. & ERISA Litig.*, 684 F. Supp.2d 485, 491 (S.D.N.Y. 2010) ("*Lehman MBS*"), *aff'd* ___ F.3d ____, 2011 WL 1778726 (2d Cir. 2011).

[94]

Pl. Br. at 45.

[95]

The plaintiffs in *Lehman MBS* argued that "they [we]re entitled to sue on behalf of a class of all who purchased Certificates offered under documents containing the same disclosure defects that allegedly affected their purchases," and that they could have brought claims for securities they did not purchase because they were offered "pursuant to the same [misleading] shelf registration statements that governed" the securities they did purchase. *Lehman MBS*, 684 F. Supp. 2d at 490, 492.  The Court held that plaintiffs had no standing notwithstanding the fact that common documents contained the alleged misstatements because "[t]he fact remains . . . that plaintiffs have not alleged any injury traceable to the [securities] issued in those offerings."  *Id.  Accord New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.*, No. 08 Civ. 5310 (DAB), 2011 WL 1338195, at *6 (S.D.N.Y. Mar. 31, 2011); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781 (HB), 2010 WL 1257528, at *3-4 (S.D.N.Y. Mar. 31, 2010); *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F.Supp.2d 254, 265-66 (S.D.N.Y. 2010); *Hoffman v. UBS-AG*, 591 F. Supp.2d 522, 530-31 (S.D.N.Y. 2008).

standing to bring claims with respect to the fifty PPN offerings in which they did not purchase securities.[96]

III.    *Exchange Act Claims*

    A.    *The Standard*

        In order to state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."[97]

        A misstatement or omission is actionable only if "material."  A misrepresentation is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]."[98]   That is, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"[99]   Moreover, not every material

---

[96]

    Those offerings, including the two in which only withdrawn plaintiff Rosato purchased securities, are listed in TAC Appendix B.

[97]

    *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase* Co., 553 F.3d 187, 197 (2d Cir. 2009) ("*ECA*") (quoting *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) in turn quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) ("*Ganino*")).

[98]

    *ECA*, 553 F.3d at 197 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)); *Ganino*, 228 F.3d at 162.

[99]

    *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (quoting *Basic Inc.*, 485 U.S. at 231-32); *see TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Beleson v. Schwartz*, No. 09-1281-cv, 2011 WL 1252281, at *2 (2d Cir. Apr. 5, 2011).

omission violates the Exchange Act.  For example, an omission is actionable only if the speaker had a duty to disclose.[100]   Such a duty can arise either (1) from an "affirmative legal disclosure obligation" or (2) if "necessary to prevent existing disclosures from being misleading."[101]  Finally, an expression of opinion is actionable only if "the complaint alleges that the speaker did not truly have the opinion at the time it was issued"[102] or, perhaps, if the speaker expressed the opinion with the knowledge that, or in reckless disregard of whether, the speaker had any basis for it.

The TAC asserts primary claims against the Insider Defendants and E&Y for alleged violations of Sections 10(b) of the Exchange Act and Rule 10b-5.  It advances also control person claims against the Insider Defendants under Section 20 and a claim for insider trading against Fuld under Section 20A.  As the statements and omissions that form the basis of the claims against the Individual Defendants and E&Y, respectively, are different, it is convenient first to deal with the sufficiency of the allegations of falsity and *scienter* with respect to the individual defendants and then to deal with the same issues with respect to E&Y.  The issue of loss causation is similar as to all defendants and is dealt with collectively thereafter.

---

[100]

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360-61 (2d Cir. 2010) ("*In re Morgan Stanley*"); *Resnick v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *In re Time Warner Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("*In re Time Warner*").

[101]

*In re Morgan Stanley*, 592 F.3d at 360-61; *In re Time Warner*, 9 F.3d at 267; *I. Meyer Pincus & Assoc, PC v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991).

[102]

*Lehman MBS*, 684 F. Supp. 2d 485, 494 (S.D.N.Y. 2010) (citing *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1131 (2d Cir.1994) ("A statement of reasons, opinion or belief by such a person when recommending a course of action to stockholders can be actionable under the securities laws if the speaker knows the statement to be false.") (in turn citing *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1094-96, (1991))); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 210 (S.D.N.Y.2003).

B.     Individual Defendants

1.     Existence of materially false and misleading statements or omissions

In order to state a claim for a violation of Exchange Act Section 10(b) or Rule 10b-5, plaintiffs must allege the existence of an actionable material misstatement or omission. The allegations must satisfy the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[103]  Accordingly, the TAC must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[104]

The TAC's Exchange Act claims are based on four categories of alleged misstatements and omissions. It alleges that Lehman and its officers made misleading statements with respect to Lehman's (1) use of and accounting for Repo 105 transactions and their effect on net leverage, (2) risk management policies, (3) liquidity, and (4) concentrations of credit risk.[105]  The

---

[103]

15 U.S.C. § 78u-4(b).

[104]

*Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also* 15 U.S.C. § 78u-4(b)(1) (complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.")

[105]

*See, e.g.*, TAC ¶ 1, 26-69, 70-84, 85-88, 89-103, 104-109, 170-205.

Although the TAC's Exchange Act claims purport to incorporate all of the allegations plaintiffs made with respect to the Securities Act claims, *see* TAC ¶¶ 251, 260, 264, a review of the complaint shows plaintiffs do not base their Exchange Act claims on the alleged misstatements with respect to Lehman's valuation of its commercial real estate assets or any of the statements specifically related to the structured products or PPNs. There are, moreover, no allegations of *scienter* or loss causation with respect to these categories of misstatements. Consequently, they cannot form the basis of a claim under the Exchange Act.

25

misstatements and omissions allegedly were in the 2Q07, 3Q07, 2007 10-K, 1Q08, 6/9/08 8-K, 6/18/08 8-K, 2Q08 and on several specifically identified conference calls by Lehman's officers.[106]

### a.    Repo 105 and net leverage

The Offering Materials stated (1) Lehman's net leverage and amount of securities it sold under agreements to repurchase as of the end of each quarter, (2)  that Lehman prepared its financial statements in accordance with GAAP, and (3) that Lehman treated securities sold under repurchase agreements as financings.[107]   O'Meara, Callan, Lowitt, and Fuld also made similar statements regarding Lehman's reported net leverage.[108]

Defendants allegedly made statements also concerning how Lehman's business practices impacted its net leverage.  During a June 9, 2008 conference call, Callan stated that a large

---

[106]

Defendants argue that the Exchange Act claims against Gregory should be dismissed because "[t]he TAC does not attribute a single statement to Gregory, and does not allege that he signed any of the SEC filings at issue in the Exchange Act claims." Def. Br. at 32. Although the TAC does not allege that Gregory made any oral statements, it does allege that he "oversaw the day-to-day management of Lehman's operations" as Lehman's president, chief operating officer, and as a member of its executive committee.  TAC ¶¶ 10, 75, 221, 262.  Plaintiffs therefore are entitled to rely on the group pleading doctrine's "presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Bisys Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005), *reconsideration denied*, No. 04 Civ. 3840(LAK), 2005 WL 3078482 (S.D.N.Y. Nov. 16, 2005); *see also Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 Fed. Appx. 260, 266 (2d Cir. 2010) (remanding to district court for consideration of liability based on group pleading doctrine).  Accordingly, the TAC states a claim against Gregory for material misstatements and omissions in the Offering Materials if it sufficiently alleges the other elements of its claims.  *See In re Bisys Sec. Litig.*, 397 F. Supp. 2d at 440 ("[T]he group pleading doctrine has no effect on the PSLRA's *scienter* requirement.").

[107]

TAC ¶¶ 40-41, 45-60.

[108]

*Id.*  ¶¶ 56-57, 172, 174, 180, 184, 190, 195, 196, 201.

part of Lehman's quarterly net leverage reduction came from selling "less liquid asset categories" and that Lehman's deleveraging was "complete."[109]   In response to a question about whether the deleveraging had come from disposing of the assets that were "absolute easiest . . . to sell," she stated that the opposite was true and that Lehman had sold many riskier, less liquid assets during the quarter.[110]   Similarly, on a June 16, 2008 conference call, Lowitt represented that the methods Lehman had used to reduce its leverage "included a reduction of assets across the Firm, including residential and commercial mortgages."[111]   The 2Q08 stated also that Lehman's reduction in net leverage came, in part, from a "reduction in assets."[112]

The TAC alleges that these statements were false and misleading because Lehman (1) accounted for the Repo 105 transactions as sales rather than financings in violation of GAAP, (2) failed to disclose its use of Repo 105 transactions and its temporary effect of reducing Lehman's net leverage, and (3) presented a misleading picture of the company in violation of GAAP.[113]   The defendants argue that the claims based on these statements should be dismissed because (1) the financial statements complied with GAAP, and (2) any alleged misstatements were immaterial.

---

[109]

*Id.* ¶ 190.

[110]

*Id.* ¶ 193.

[111]

*Id.* ¶ 195.

[112]

*Id.* ¶ 196.

[113]

*Id.* ¶¶ 41, 63-65.

27

*(1)     SFAS 140*

Plaintiffs first allege that the statements regarding Lehman's reported net leverage ratio, securities sold under agreements to repurchase, and GAAP compliance were false and misleading because Lehman accounted for the Repo 105 transactions as sales rather than as financings in alleged violation of SFAS 140.[114]

SFAS 140 contains "standards for accounting for securitizations and other transfers of financial assets and collateral."[115]  Under SFAS 140, whether a transferred asset properly is accounted for as a sale or a financing is dependent on the degree of control that the transferor has over the asset.[116]  If the transferor retains control, as that term is defined in SFAS 140, over the asset, it should recognize the asset on its balance sheet.  If the transferor surrenders control, "those assets shall be accounted for as a sale" and "derecognize[d]."[117]

A transferor surrenders control over a transferred asset – and therefore may treat the transaction as a sale – only if:

> "a.  The transferred assets have been isolated from the transferor – put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership . . .
>
> "b.  Each transferee . . . has the right to pledge or exchange the assets . . . it received,

---

[114]

   *Id.* ¶¶ 62-65.

   The Examiner's Report did not state a view on the question whether the Repo 105 transactions complied with SFAS 140.  ER, at 964.

[115]

   SFAS 140, at 4.

[116]

   *Id.*

[117]

   *Id.* ¶¶ 5, 9.

and no condition both constrains the transferee (or holder) from taking advantage of its right to pledge or exchange and provides more than a trivial benefit to the transferor . . . [and]

"c.  The transferor does not maintain effective control over the transferred assets through either (1) an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity . . . or (2) the ability to unilaterally cause the holder to return specific assets, other than through a cleanup call."[118]

Plaintiffs allege that the Repo 105 transactions did not comply with SFAS 140's requirements because (1) Lehman was obligated contractually to repurchase the Repo 105 assets,[119] (2) the transactions lacked a business purpose or economic substance,[120] and (3) Lehman was not able to obtain a "true sale at law" opinion from a U.S. law firm, but only from Linklaters, a U.K. law firm.[121]  These allegations are insufficient to make out a violation of SFAS 140 with respect to Lehman's accounting treatment of Repo 105s for three reasons.

First, although Lehman's alleged contractual obligation to repurchase the transferred Repo 105 assets initially might be thought to violate SFAS 140's requirement that the "transferor [not] maintain effective control over the transferred assets through . . . an agreement that both entitles and obligates the transferor to repurchase" them, closer inspection reveals otherwise.[122]  A transferor maintains effective control over an asset pursuant to such an agreement only if, *inter alia*, "the transferor is able to repurchase [the assets] on substantially the agreed terms, even in the event

---

[118]    SFAS ¶ 9; *see also* TAC ¶ 62.

[119]    TAC ¶¶ 35, 64.

[120]    *Id.* ¶¶ 36-37, 63

[121]    *Id.* ¶ 65.

[122]    SFAS 140 ¶ 9(c).

of default by the transferee."[123]  This occurs only if "at all times during the contract term [the transferor] ha[s] obtained cash or other collateral sufficient to fund substantially all of the cost of purchasing replacement assets from others."[124]  The TAC, however, fails to allege that Lehman obtained funds in the Repo 105 transactions sufficient to replace the transferred assets from others. Indeed, it alleges the opposite, as the Repo 105 transactions were over-collateralized by a minimum of five percent.[125]  That is, Lehman transferred at least $105 in assets to its counter-parties for every $100 in cash it received.  Accordingly, Lehman did not obtain cash or other collateral in these transactions sufficient to fund "substantially all" of the cost of replacing the assets it had transferred to its counterparties in the event of counter-party default.  It therefore did not maintain effective control over them within the meaning of SFAS 140.

Second, nothing in SFAS 140 suggests that the business purpose of a transfer has any bearing on whether it should be treated as a sale or as a financing.  According to SFAS 140, the guiding principle is whether the transferor has retained control over the asset.[126]  Thus, an allegation that Lehman had less expensive means of obtaining financing says nothing about whether its accounting treatment of the Repo 105 transactions was consistent with GAAP.

Third, the fact that Lehman allegedly was unable to obtain a "true sale at law" opinion from a U.S.-based law firm does not call into question the conclusion of U.K.-based

---

[123]

     *Id.* ¶ 48(b).

[124]

     *Id.* 140 ¶ 49.

[125]

     *See* TAC ¶ at vi.

[126]

     SFAS 140 at 1, ¶ 9.

Linklaters that the transactions were, in fact, true sales at law under U.K. law. Nothing in SFAS 140 requires the true sale at law opinion to be based on U.S. law.

As plaintiffs have failed to allege any manner in which Lehman violated SFAS 140 in treating the Repo 105 transactions as sales rather than financings, it has failed to allege a material misstatement or omission on this basis.

### (2)    Compliance with GAAP

The fact that Lehman's accounting for the Repo 105 transactions technically complied with SFAS 140 does not mean that Lehman's financial statements complied with GAAP. As the Court of Appeals has stated, "GAAP itself recognizes that technical compliance with particular GAAP rules may lead to misleading financial statements, and imposes an overall requirement that the statements as a whole accurately reflect the financial status of the company."[127] Plaintiffs assert that this is such a case, alleging that the financial statements incorporated into Lehman's Offering Materials and the Insider Defendants' oral statements were false and misleading because the Repo 105 transactions temporarily and artificially lowered the company's reported net leverage at the end of each reporting period.[128]

As noted earlier, net leverage measures the ratio of net assets to tangible equity

---

[127]    *United States v. Ebbers*, 458 F.3d 110, 126 (2d Cir. 2006) ("According to the AICPA's Codification of Statements on Accounting Standards, AU § 312.04, '[f]inancial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in compliance with GAAP.'"), *cert. denied*, 549 U.S. 1274 (2007); *see also In re Global Crossing*, 322 F. Supp. 2d at 339.

[128]    TAC ¶¶ 3, 37 & tbl.1.

capital.[129]  Cash was among Lehman's net assets.[130]  In a Repo 105 transaction, Lehman removed the collateral from its balance sheet, thereby reducing its net assets.  It then used the cash it received to pay down other liabilities.  In consequence, the Repo 105 transactions reduced the amounts of Lehman's net assets while leaving its tangible equity capital unchanged.  This resulted in lower net leverage.[131]  The TAC alleges that Lehman was obligated to, and did, repurchase the assets from the Repo 105 counter-parties in the days after each quarter ended, increasing its net assets without any change to tangible equity capital and resulting in increases in net leverage.[132]

 This repetitive, temporary,  and undisclosed reduction of net leverage at the end of each quarter is sufficient to make out a claim that the Offering Materials and oral statements about net leverage violated the overriding GAAP requirement to present the financial condition of the company accurately, assuming the changes in net leverage that resulted from the Repo 105 transactions were material.

 Whether the changes in net leverage were material is a "fact-specific inquiry."[133] "[I]t is not necessary to assert that the investor would have acted differently if an accurate disclosure was made."[134]  Instead, a fact is material if "there is a substantial likelihood that a reasonable

---

[129]

 *See*, *e.g.*, *id.* ¶ 26; 2007 10-K at 63.

[130]

 TAC ¶ 27.

[131]

 *Id.* ¶ 31.

[132]

 *Id.* ¶ 32.

[133]

 *ECA*, 553 F.3d at 197.

[134]

 *Ganino*, 228 F.3d at 162.

32

shareholder would consider it important in deciding how to [act]" or "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[135] The materiality determination "depends on all relevant circumstances"[136] and a "complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."[137]

Defendants contend that the changes in net leverage due to the Repo 105 transactions were immaterial as a matter of law because (1) the Offering Materials warned that Lehman's financial statements would fluctuate, (2) the Offering Materials accurately reported Lehman's total – as opposed to net – leverage, (3) the Repo 105 transactions were insignificant as compared to Lehman's total liabilities, and (4) Lehman could have sold the assets involved in the Repo 105 transactions and used the proceeds to pay down other liabilities.[138]

Defendants' strongest argument is that Lehman's Offering Materials "bespoke caution," rendering the allegedly misleading net leverage figures immaterial, because they disclosed that the "overall size" of Lehman's balance sheet would "fluctuate from time to time [and might]

---

[135]

See supra notes 98 - 99 and accompanying text (quotations omitted).

[136]

Ganino, 228 F.3d at 162.

[137]

Id. See also Litwin v. Blackstone Group, L.P., 634 F.3d 706, 716-17 (2d Cir. 2011).

[138]

Def. Br. at 7-9.

be higher than the year-end or quarter-end amounts."[139]  Alleged misstatements may be immaterial, and therefore not actionable, when "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."[140]  Cautionary statements, however, must expressly warn of and relate directly to the risk that allegedly brought about the plaintiffs' loss.[141]

The cautions to which defendants point warned only of the risk that the "size" of Lehman's balance sheet might be different at quarter or year-end than at other times.  This disclosure, however, was not sufficiently specific or prominent to support a conclusion as a matter of law that no reasonable investor would have found it important to know that Lehman engaged in transactions, the effect of which was to reduce temporarily its net leverage at the end of each reporting period.

Defendants' other materiality arguments also are insufficient.  Lehman's accurate disclosures of its total leverage may have been relevant and ultimately may even have been more important to investors than net leverage.  But the argument that the Offering Materials' disclosure of total leverage rendered the allegedly misleading net leverage ratios immaterial is undercut significantly by Lehman's assertions that net leverage is "a more meaningful, comparative ratio for companies in the securities industry" than total leverage ratio[142] and that Lehman considered

---

[139]

       *Id.* at 6.

[140]

       *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002).

[141]

       *Id.* at 350; *Hunt v. Alliance N. Am. Gov't Income Trust Inc.*, 159 F.3d 723, 729 (2d Cir. 1998).

[142]

       TAC ¶¶ 26, 33; *see*, *e.g.*, 2007 10-K at 63.

"material," for purposes of reopening its financial statements, changes in its financial reporting that affected net leverage by 0.1 or more.[143]

Moreover, the fact that the Repo 105 transactions were approximately six percent of Lehman's total liabilities did not render the statements immaterial as a matter of law.[144]  Materiality is not determined by "a single numerical or percentage benchmark," but must be considered in all relevant circumstances.[145]  Here, plaintiffs have alleged that net leverage was a significant financial metric for "securities analysts, credit agencies and investors"during the Class Period.[146]  They have alleged also that the Repo 105 transactions resulted in net leverage differences more than fifteen times the difference that Lehman itself considered material.[147]

Finally, the argument that the allegedly misleading net leverage numbers were immaterial because Lehman could have conducted a true sale of the assets it used in the Repo 105

---

[143]

TAC ¶ 28.

Defendants argue that Lehman's internal definition of "material" for purposes of determining "whether to make balance sheet adjustments" does not define materiality for purposes of the federal securities laws.  Def. Br. at 9.  This certainly is true, as private parties can not define their disclosure obligations under the federal securities laws. The fact that Lehman's definition of materiality is not conclusive, however, does not indicate that its content is not probative on the issue of materiality.  That is, even though materiality for purposes of the federal securities laws is not dependent on Lehman's definition, the fact that Lehman considered something material is some evidence that a reasonable investor also would have considered it important in the total mix of information.

[144]

*See* Def. Br. at 9.

[145]

*Ganino*, 228 F.3d at 162-63.

[146]

TAC ¶ 1.

[147]

*Id.* ¶ 38 tbl.2.

transaction and used the proceeds to pay down the debt is not persuasive. Lehman perhaps could have reduced its net leverage by selling the assets it transferred in the Repo 105 transactions and using the proceeds to reduce its liabilities. But the TAC does not allege that Lehman's net leverage numbers were false and misleading because they were reduced from the pre-Repo 105 levels. It alleges that they were false and misleading because they were reduced from that level *and* because they returned to higher levels shortly after each quarter ended. Had Lehman engaged in true sales of those assets, it would have had no obligations to repurchase the collateral and thus undo its net leverage reductions.

### (3) *Treating Repo 105 transactions as sales*

The financial statements incorporated into Lehman's Offering Materials stated that Lehman recorded securities sold under agreements to repurchase as "financings."[148] The TAC alleges that this statement was false and misleading because Lehman treated the Repo 105 transactions as sales.[149]

Defendants make two arguments for dismissal of the claims based on these statements. They argue first that SFAS 140 required that the Repo 105 transactions be treated as

---

[148]

*Id.* ¶ 40(a); *see also* 1Q07 at 12 ("Securities sold under agreements to repurchase . . . are treated as secured financing transactions for financial reporting purposes . . . ."); 2Q07 at 12 ("Securities sold under agreements to repurchase . . . are treated as collateralized agreements and financings for financial reporting purposes . . . ."); 3Q07 at 12 ("Treated as collateralized agreements and financings for financial reporting purposes are . . . [r]epurchase and resale agreements.") (emphasis removed); 2007 10-K (same); 1Q 2008 at 13 (same); 2Q 2008 at 16 (same).

[149]

TAC ¶¶ 31, 40(a).

sales.[150]  But the fact that SFAS 140 may have required that the Repo 105 transactions be treated as sales would not remedy the allegedly misleading nature of Lehman's statement that it treated assets sold under agreements to repurchase as financings.

Defendants next argue that the Offering Materials disclosed, on the page immediately prior to the alleged misstatements, that Lehman would treat transfers of assets as sales when it had surrendered effective control in accordance with SFAS 140.[151]  But that statement does not save the day, at least in the present posture of the case.  First, it purported to describe Lehman's treatment of "[s]ecuritization activities," not transfers pursuant to repurchase agreements, which were discussed in a separate and subsequent section.[152]  Second, the statement complained of was more general than the allegedly misleading statement, which expressly dealt with repurchase agreements and said that securities "sold" under repurchase agreements were treated as financings.  At this stage, the Court cannot conclude as a matter of law that this disclosure sufficiently warned that an asset transferred pursuant to a repurchase agreement might be treated as a sale.[153]

---

[150]

Def. Br. at 5; E&Y Br. *passim*.

[151]

E&Y Br. at 17; 2007 10-K at 96 ("In accordance with SFAS 140, we recognize transfers of financial assets as sales, if control has been surrendered.").

[152]

*Id.* at 96-97.

[153]

*See Halperin*, 295 F.3d at 357 (2d Cir. 2002) ("[W]hen cautionary language is present, we analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.").

### (4)    Failure to disclose Repo 105 transactions

Plaintiffs next allege that the Offering Materials and officers' oral statements were materially false and misleading because they omitted to disclose the Repo 105 transactions.

An omission is actionable only if the speaker had a duty to disclose.[154]  Such a duty exists if (1) there is an "affirmative legal disclosure obligation" or (2) disclosure is "necessary to prevent existing disclosures from being misleading."[155]  Plaintiffs allege that Lehman was required to disclose the Repo 105 transactions because (1) its reported net leverage was materially misleading without the disclosure,[156] and (2) Item 303 of Regulation S-K ("Item 303") in this case required it.[157]  Defendants contend that Lehman had no duty to disclose the Repo 105 transactions.

The federal securities laws impose an obligation on speakers to be both accurate and complete.[158]  While a corporation "is not required to disclose a fact merely because a reasonable investor would very much like to know" it, it has an obligation to do so when "secret information

---

[154]

> *In re Morgan Stanley*, 592 F.3d at 360-61; *Resnick*, 303 F.3d at 154; *In re Time Warner*, 9 F.3d at 267.

[155]

> *In re Morgan Stanley*, 592 F.3d at 360-61; *In re Time Warner*, 9 F.3d at 267; *I. Meyer Pincus & Assoc, PC*, 936 F.2d at 761.

[156]

> Pl. Br. at 20.

[157]

> 17 C.F.R. §§ 229.303.  Defendants claim also that Lehman was required to disclose the Repo 105 transactions under Item 303 because of their effect on its liquidity.  The Court takes up this contention in its discussion of liquidity, *infra* pp. 46 - 51.

[158]

> *In re Morgan Stanley*, 592 F.3d at 365-66; *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002).

renders prior public statements materially misleading."[159]  Thus, a speaker has a duty to disclose if "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available."[160]  Accordingly, a statement of principal investment risks does not create an obligation to disclose the commonly understood risks associated with securities.[161]  By contrast, a statement regarding a company's hedging strategy obliges it to disclose when it alters or suspends that strategy.[162]

The Offering Materials stated Lehman's net leverage ratios, as did many of the officers' oral statements.  The TAC alleges that these statements were materially misleading because they omitted to disclose the fact that Lehman's reported net leverage was temporarily and artificially reduced as a result of the Repo 105 transactions.  The TAC makes factual allegations supporting an inference that such a disclosure would have been material to a reasonable investor.[163]  At this stage of the litigation, such allegations are sufficient.  As plaintiffs sufficiently have alleged that Lehman had a duty to disclose the Repo 105 transactions based on its statements regarding net leverage, the Court need not here address whether Item 303 of Regulation S-K would have required their disclosure.

---

[159]

*In re Time Warner*, 9 F.3d at 268; *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)

[160]

*In re Time Warner*, 9 F.3d at 267-68.

[161]

*In re Morgan Stanley*, 592 F.3d at 366 (citing 48 Fed.Reg. 37,928-2).

[162]

*Caiola*, 295 F.3d at 331.

[163]

*See*, *e.g.*, TAC ¶¶ 1, 27, 28.

> b.    *Risk management policies*

The Offering Materials contained disclosures about Lehman's risk management policies, including statements that Lehman "monitor[ed] and enforc[ed] adherence to [its] risk policies," "ensure[d] that appropriate risk mitigants [we]re in place," took "into account . . . the impact any particular transaction under consideration would have on [Lehman's] overall risk appetite," used "stress tests" to determine the financial consequences of an economic shock to its portfolio, and "monitor[ed] daily trading net revenues compared to reporting historical simulation VaR [value at risk] limits."[164]

Lehman's officers made statements with respect to Lehman's risk management polices as well.  O'Meara repeatedly made statements to the effect that Lehman had "strong [] risk management" and a "strong risk management culture with regard to the setting of risk limits."[165] Lowitt stated that Lehman had an "extremely deep risk culture which is embedded through the firm," that Lehman was "very conservative around risk," and tried not to "hold[] stuff on [its] balance sheet . . . but move[] it on."[166]  Callan similarly made statements on several occasions about Lehman's "strong risk . . .  management."[167]

The TAC alleges that these statements were material to investors because Lehman's

---

[164]

    *See*, *e.g.*, TAC ¶¶ 74, 79, 83, 84.

[165]

    *Id.* ¶ 175; *see also id.* ¶ 180 (fourth quarter results reflected "strength of risk management culture in terms of managing our overall risk appetite, seeking appropriate risk reward dynamics and exercising diligence around risk mitigation.").

[166]

    *Id.* ¶ 178.

[167]

    *Id.* ¶ 181; *see also id.* ¶¶ 187 (alleging statements concerning Lehman's "continued diligence around risk management" and "risk management discipline").

"risk management was critical to loss prevention," and that they were false because Lehman acquired billions of dollars of illiquid, risk assets by failing to abide by its policies.[168]

### (1)    Exceeding risk limits

The Offering Materials stated that Lehman "monitor[ed] and enforc[ed] adherence to [its] risk policies" and that "[m]anagment's Finance Committee oversees compliance with policies and limits."[169]  O'Meara, Lowitt, and Callan also made statements regarding Lehman's allegedly "strong" and "conservative" risk management policies.[170]  The TAC alleges that these statements were materially false and misleading because Lehman "routinely" overruled and disregarded its risk policy limits on the company's total risk appetite and its balance sheet,[171] concentration,[172] and single transaction limits.[173]  Plaintiffs claim that Lehman exceeded its risk appetite limit every month from July 2007 to February 2008,[174] committed to many deals exceeding

---

[168]

   *Id.* ¶ 70.

[169]

   *Id.* ¶ 74.

[170]

   *Id.* ¶¶ 175, 178, 180-81, 187.

[171]

   The balance sheet limit is "designed to contain [Lehman's] overall risk and maintain net leverage ratio within the range required by the ratings agencies."  *Id.* ¶ 78.

[172]

   The concentration limit is "designed to ensure that [Lehman] did not take too much risk in a single, undiversified business or area."  *Id.* ¶ 77.

[173]

   The single transaction limit is "meant to ensure that [Lehman's] investments were properly limited and diversified by business line and by counterparty."  *Id.*

[174]

   *Id.* ¶ 76.  The TAC alleges that Lehman excluded its $2.3 billion bridge equity position in Archstone in its risk appetite calculations and that these should have been included.  *Id.*

the single transaction limit thresholds, and imposed no limit on its leveraged loan bridge equity commitments.[175]  They further allege that Lehman's fixed income division ("FID") and global real estate group ("GREG") exceeded their balance sheet limits at the ends of many quarters within the class period.[176]

Defendants argue that these allegations fail to state a claim because the alleged excesses complied with Lehman's risk management policies.  They contend that those policies were not static, but could be altered by management.  They rely on disclosures in the Offering Materials that the risk management policies were "established by management's Executive Committee," which "balanc[ed] risks and returns" in their formulation.[177]  They note also that the Offering Materials disclosed that specific "transactions and/or situations [were] addressed and discussed with management's Executive Committee when appropriate."[178]

Even assuming that Lehman's risk management policies were not static and properly could be altered by the Executive Committee in a way that would permit the previous policies to be exceeded, the TAC sufficiently alleges that the statements that Lehman "enforc[ed] adherence to [its] risk policies" and that "[m]anagment's Finance Committee oversees compliance with [risk] policies and limits" arguably were materially misleading.  The TAC's allegations, assumed here to be true, establish that Lehman routinely exceeded various risk limits it had created.  The (assumed)

---

[175]
      *Id.* ¶ 77.

[176]
      *Id.* ¶ 78.

[177]
      Def. Br. at 14; *see also*, *e.g.*, 2Q07 at 70; 3Q07 at 73; 2007 10-K at 69; 1Q08 at 77-78; 2Q 08 at 94-94.

[178]
      Def. Br. at 14.

fact that Lehman's Executive Committee routinely revised the established risk limits to permit these excesses is at best in considerable tension with its statement that Lehman "enforc[ed] adherence to [its] risk policies."  Stated differently, it would be materially misleading for a company to claim that it "enforce[d] adherence" to its risk management policies while failing to disclose that it "routinely" alters them as the TAC alleges Lehman to have done.[179]  Moreover, given the allegations of frequent, significant departures from Lehman's internally stated policies, there is enough in the TAC to permit the inference that its senior officers' statements to the effect that Lehman had "strong" and "conservative" risk management were false in the sense that these individuals knew or recklessly disregarded their misleading effect.

### (2)     Adequacy of mitigants

The Offering Materials stated that Lehman "ensure[d] that appropriate risk mitigants" were in place.[180]  The TAC alleges that this statement was false and misleading because Lehman failed to do so, as evidenced by its accumulation of Alt-A residential mortgage assets that could not be directly hedged, its failure to increase its "macro hedges" on its leveraged loan and commercial real estate portfolios, and its relaxation of risk controls to accommodate the growth of its commercial real estate business.[181]  These allegations are insufficient to state a claim.

---

[179]

The defendants' argument that risk management is a matter of business judgment is insufficient for this reason as well.  *Id.* at 15.  While the executive committee may have been empowered to alter Lehman's risk management policies in its business judgment, the fact that it allegedly did so "routinely" while professing to enforce those policies is misleading.

[180]

TAC ¶ 74; *see also* 2Q07 at 70; 3Q07 at 73; 2007 10-K at 69; 1Q08 at 77; 2Q08 at 93.

[181]

TAC ¶¶ 81-82.

The question whether a particular risk mitigant was appropriate when implemented is inherently a matter of judgment or opinion.[182]  In order sufficiently to allege that Lehman's statement that it ensure[d] appropriate risk mitigants were in place was false, plaintiffs were obliged to allege facts that would support a plausible inference that Lehman did not believe that it had done so or, at least, that it was reckless in believing that it had appropriate measures in place.[183]  The TAC is devoid of any such allegations and therefore fails to state a claim on this basis.

### (3)    Stress tests

The Offering Materials stated that Lehman used "stress testing to evaluate risks associated with [its] real estate portfolios."[184]  Plaintiffs contend that this statement was materially false and misleading because "Lehman excluded some of its most risky principal investments – including commercial real estate investments, private equity investments, and leveraged loan commitments – from its stress tests."[185]

Defendants' sole responsive argument is that these statements, considered in context, were not false or misleading because the Offering Materials disclosed that Lehman used stress

---

[182]

See Lehman MBS, 684 F. Supp.2d at 494-95 (holding question whether credit enhancements were "sufficient" or "adequate" to support credit rating constituted opinion).

[183]

Id.; Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp.2d 387, 394 (S.D.N.Y. 2010) (citing cases).

[184]

TAC ¶¶ 79-80; see 1Q07 at 71; 2Q07 at 75; 3Q07 at 78; 2007 10-K at 71; see also 1Q08 at 79 ("The Company uses stress testing to evaluate risks associated with its real estate portfolios."); 2Q08 at 95 ("The Company uses stress testing to evaluate risks associated with its [r]eal estate held for sale positions.").

[185]

TAC ¶¶ 79-80.

testing only with respect to "certain products."[186]  This argument is insufficient to dismiss the claims based on these statements at this stage for at least two reasons.

First, the "certain products" statement on which defendants rely was not made in each of the financial statements containing the allegedly misleading statement.[187]  It did not qualify the alleged misstatement in those Offering Materials in which it was not made.

Second, the Court cannot conclude as a matter of law that the disclosure on which defendants' rely rendered the allegedly misleading statement not misleading.  The full text of the purported warning stated that "[s]tress testing, which measures the impact on the value of existing portfolios of specific changes in market factors for certain products, is performed with regularity."[188] It was located within a paragraph on a different page from the allegedly misleading statement.  That paragraph contained a discussion of the various qualitative and quantitative measures that Lehman used to measure risk.  It stated, essentially, that stress testing was used for certain products and that other method were used for others.[189]  One of the products for which stress testing was said to have been used was Lehman's "real estate portfolios."  But plaintiffs have alleged that Lehman excluded, among others, its commercial real estate investments – inarguably part of its real estate portfolio – from stress testing.  This sufficiently alleges an actionable misstatement at this stage.

---

[186]

     Def. Br. at 16 n.39; *see also* 2007 10-K at 70; 1Q08 at 78; 2Q08 at 94.

[187]

     *See* 1Q07, 2Q07, 3Q07.

[188]

     *See*, *e.g.*, 2007 10-K at 70; 1Q08 at 78; 2Q08 at 94.

[189]

     *Id.*

### (4)    *Value-at-Risk*

Value-at-Risk ("VaR") is "a statistical measure of the potential loss in the fair value of a portfolio due to adverse movement in the underlying risk factors."[190]  The Offering Materials stated that, "[a]s part of [its] risk management control processes, [Lehman] monitor[ed] daily trading net revenues, compared with reported historical simulation VaR as of the end of the prior business day."[191]  They stated also that, in the 2007 fiscal year, there were "four days . . . when [Lehman's] daily net trading loss exceeded [its] historical simulation VaR as measured at the close of the previous business day" and that "[i]n the quarter ended February 29, 2008, there were no days when daily net trading loss exceeded historical simulation VaR as measured at the close of the previous business day."[192]  The TAC alleges that these statements were false and misleading because Lehman and at least three of its business lines – High Yield, FID, and GREG – "routinely exceeded" their respective VaR limits, and Lehman breached its firm-wide VaR limit on 44 occasions, during the class period.[193]

The factual allegations of routine breaches of VaR limits by these business lines and

---

[190]    TAC ¶ 83.

[191]    *Id.*; 1Q07 at 71; 2Q07 at 75; 3Q07 at 78; 2007 10-K at 71; 1Q08 at 79; *see also* 2Q08 ("As part of the Company's risk management control processes, daily trading net revenues are monitored and compared with the reported weighted historical simulation VaR as of the end of the prior business day.").

[192]    2007 10-K at 71; 1Q08 at 79.

[193]    TAC ¶ 83.

The TAC alleges that FID breached its VaR limits every day from mid-October 2007 through mid-May 2008, that GREG breached its VaR limits every day from early October 2007 until September 15, 2008, and that Lehman breached its VaR limit at least forty-four times during the Class Period.  *Id.*

of more than two-score breaches by the firm as a whole are sufficient to permit a reasonable trier of fact to conclude that the statements in the Offering Materials were materially misleading, particularly in light of the suggestion in Lehman's 2007 10-K that breaches of VaR limits were infrequent.

### c.    Liquidity

Many of the Offering Materials stated that Lehman had a "very strong liquidity position" and "maintain[ed] a liquidity pool . . . that covers expected cash outflows for twelve months in a stressed liquidity environment."[194]   O'Meara, Callan, Lowitt, and Fuld each made similar statements on investor conference calls.[195]

---

[194]      TAC ¶¶ 87-88; *see also* 2Q07 at 59; 3Q07 at 62; 2007 10-K at 56; 1Q08 at 65; 2Q08 at 80.

[195]      On the September 18, 2007 conference call, O'Meara stated that Lehman had a "strong liquidity framework," "strong [] liquidity management," a "conservative liquidity frame work," that Lehman's liquidity position "[i]s now stronger than ever," and that it considered its "liquidity framework to be a competitive advantage."  TAC ¶ 176.  On the December 13, 2007 conference call, Callan stated that Lehman's success was attributable to "our strong risk and liquidity management" and that Lehman had "ample liquidity and capital in place."  *Id.* ¶ 181-82.   On the same call, O'Meara stated that Lehman's results "reinforc[ed] the importance of [its] strong liquidity . . . framework," that Lehman's "liquidity position continues to be very strong," and that the company "structured [its] liquidity framework to cover our funding commitment and cash outflows for a 12 month period without raising new cash in the unsecured markets or selling assets outside our liquidity pool."  *Id.*  On the March 18, 2008 conference call, Callan "tried to relay the strengths and robustness of the liquidity position of the firm," referring to its "disciplined liquidity and capital management" and "robust liquidity."  *Id.* ¶ 185.  She stated also that Lehman structured its liquidity pool "to cover expected cash outflows for the next 12 months . . . without being able to raise new cash in the unsecured markets or selling assets outside our liquidity pool," and that it had 100 billion and an additional 99 billion of unencumbered liquidity and did not rely on "esoteric collateral."  *Id.*  On the June 9, 2008 conference call, Callan stated that Lehman's liquidity pool was almost $45 billion, "well in excess of [its] short-term financing liabilities."  *Id.* ¶ 191.  On the September 10, 2008 conference call, Lowitt and Fuld stated that Lehman had "maintained [its] strong liquidity and capital profiles."  *Id.* ¶ 202.

Plaintiffs allege that these statements were materially false and misleading because they failed, in violation of Item 303 of Regulation S-K ("Item 303"), to disclose Lehman's obligations to repurchase the assets used in the Repo 105 transactions immediately after each quarter closed[196] and because Lehman had "liquidity concerns" due to its accumulation of illiquid assets.[197]

With respect to liquidity, Item 303 required a registrant to disclose commitments and off-balance sheet arrangements only if they were reasonably likely to affect its liquidity in a material way.[198]  To state a claim, therefore, plaintiffs were required to allege that the Repo 105 transactions had a material effect on Lehman's liquidity.  Plaintiffs have failed to do so.

Plaintiffs argue that the Repo 105 transactions affected Lehman's liquidity in a material way because their dollar value exceeded the size of Lehman's liquidity pool during the Class Period and that Lehman materially decreased its liquidity pool by exchanging cash for assets in the Repo 105 transactions.[199]  It is true that plaintiffs allege that the size of the Repo 105

---

[196]

Item 303 requires registrants to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any *material* way" and to "discuss the registrant's off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on the registrant's . . . liquidity . . . that is *material* to investors." 17 C.F.R. §§ 229.303(a)(1), (a)(4)(I) (emphasis added).

[197]

*See* TAC ¶ 182.

[198]

17 C.F.R. §§ 229.303(a)(1), (a)(4)(I).

[199]

Pl. Br. at 30 & n.23.

The TAC alleges also, in a completely conclusory manner, that "Lehman's requirement to repurchase the assets covered by the Repo 105 transactions . . . was certain to have a material effect on Lehman's financial condition and results of operation." TAC ¶ 86.  Such conclusory pleading is insufficient to state a claim.  *Twombly*, 550 U.S. at 555 (complaint "requires more than labels and conclusions" to state a claim).

transactions exceeded the size of the liquidity pool during the Class Period.[200]  Lehman's liquidity

pool, however, did not comprise cash alone.  It contained also "highly liquid instruments, including

cash equivalents, G-7 government bonds and U.S. agency securities, investment grade asset and

mortgage–backed securities and other liquid securities that [it] believe[d had] a highly reliable

pledge value."[201]  The TAC alleges that the assets Lehman used as collateral in the Repo 105

transactions were "highly liquid."[202]  Consequently, even assuming that Lehman used liquidity pool

resources in the Repo 105 transactions – an assumption unsupported by any factual allegations – it

---

[200]

*Compare* TAC ¶ 37 tbl. 1 *with* 2007 2Q at 59, 2007 3Q at 62, 2007 10-K at 56, 2008 1Q at 65, 2008 2Q at 80.

[201]

2Q07 at 59; *see also* 3Q07 at 62 ("liquidity pool is invested in liquid instruments, including cash equivalents, G-7 government bonds and U.S. agency securities, investment grade asset and mortgage-backed securities and other liquid securities that we believe have a highly reliable pledge value."); 2007 10-K at 57 ("liquidity pool is invested in liquid instruments, including cash equivalents, G-7 government bonds and U.S. agency securities, investment grade asset-backed securities and other liquid securities that we believe have a highly reliable pledge value."); 1Q08 at 66 ("liquidity pool is invested in liquid instruments, including cash equivalents, G-7 government bonds and U.S. agency securities, investment grade asset-backed securities and other liquid securities that the Company believes have a highly reliable pledge value."); 2Q08 at 81 ("liquidity pool is primarily invested in cash instruments, government and agency securities and overnight repurchase agreements collateralized by government and agency securities.").

[202]

TAC ¶190 ("[T]he Repo 105 transactions shifted highly liquid assets off Lehman's balance sheet.").

Plaintiffs rely on a portion of the Examiner's Report quoted in the defendants' brief to argue that some assets used in the Repo 105 transactions were not "highly liquid" and that a factual dispute exists as to whether the impact from those assets would be material.  Pl. Br. at 30 & n.23.  The quoted portion of the Examiner's Report states that "the vast majority of securities utilized in these transactions were investment grade, with all but a few falling within the A to AAA range."  Def. Br. at 18 (quoting ER at 796-97).  The inference that plaintiffs seek to draw from this quotation – that a sufficient number of the assets used in the Repo 105 were not "highly liquid" to materially change Lehman's liquidity position – directly is contradicted by plaintiffs' own allegations in the complaint that the assets used in the Repo 105 transactions were "highly liquid."  TAC ¶ 190.

is alleged only to have exchanged cash for the sorts of "highly liquid" assets held before the transactions were effected. The TAC accordingly fails to allege that the Repo 105 transactions had a material effect on Lehman's liquidity.

Plaintiffs' allegations with respect to the strength and sufficiency of Lehman's liquidity and the size of the liquidity pool also are insufficient. The TAC claims that those statements were false and misleading because Lehman (1) had predicted monthly cash deficits,[203] (2) needed to provide additional collateral to Citibank and JP Morgan by June 9, 2008,[204] and (3) had encumbered twenty-four percent of its liquidity pool by September 2008.[205]

The complaint does not allege any facts contradicting the statements that Lehman's liquidity position was sufficient to cover its liquidity needs at the time any particular statement was issued. The allegation that Lehman "by the start of the Class Period in July 2007 . . . had already internally determined that its liquidity pool was short $400 million to meet commitments looking out one year forward"[206] is insufficient. This statement, while perhaps supporting an inference that Lehman's liquidity pool was insufficient on the date of that particular determination, says nothing about the sufficiency of Lehman's liquidity pool at the time any of the alleged misstatements in this action was made.[207] The allegation that Lehman had encumbered twenty-four percent of its liquidity

---

[203]

　　　*Id.* ¶¶ 88, 169.

[204]

　　　*Id.* ¶ 159.

[205]

　　　*Id.* ¶ 202.

[206]

　　　*Id.* ¶ 88.

[207]

　　　*See In re Time Warner*, 9 F.3d at 266 (noting that truth of affirmative misstatement must be evaluated at time statement is made).

pool by September 2008 is insufficient for the same reason.

Nor do the allegations with respect to Lehman's collateral postings at JP Morgan and Citi call the truth of its alleged statements into question.[208]  First, as those collateral postings occurred in June 2008, they had no relevance to any earlier statement with respect to liquidity.[209]  Second, the TAC alleges that Lehman was "technically free" to withdraw its deposit at Citi, though doing so would have caused practical problems.  It thus concedes that Lehman could have used the assets if necessary.[210]  Third, even assuming that Lehman would not have been able to liquidate the collateral it had posted at Citi and JP Morgan had the need arisen, there are no allegations that the remainder of the liquidity pool – the unencumbered seventy-six percent – was insufficient for Lehman's expected needs after June 2008.

Finally, the statements that Lehman's liquidity pool was sufficient to meet its expected needs over the next twelve months and that its liquidity position was "strong" were statements of opinion.  They were based on models and assumptions, some of which were disclosed in the Offering Materials,[211] about what would happen in the future.  Such statements are not actionable unless it is alleged sufficiently that the speaker did not truly believe them when they were made.[212]  There are no such allegations here.  Accordingly, the TAC fails to state a claim based on

---

[208]     TAC ¶¶ 159.

[209]     *Id.*

[210]     *Id.*

[211]     *See*, *e.g.*, 2Q07 at 58-60; 3Q07 at 62-63; 2007 10-K at 56-60; 1Q08 at 65-66; 2Q 08 at 80-81.

[212]     *See supra* note 102.

the alleged liquidity misstatements.

### d. *Concentrations of credit risk*

The TAC next alleges that the Offering Materials were false and misleading because they did not disclose adequately Lehman's significant concentrations of credit risk related to "mortgage and real estate related assets" in violation of GAAP,[213] specifically its exposure to (1) Alt-A mortgage-related assets,[214] (2) commercial real estate,[215] and (3) leveraged loans.[216]  They argue that it was required to do so based on AICPA Statement of Position No. 94-6, *Disclosures of Certain Significant Risks and Uncertainties* ("SOP 94-6"), and SFAS No. 107, *Disclosures about Fair Value of Financial Instruments*, as amended by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* (together, "SFAS 107").[217]

The disclosure requirements of SOP 94-6 did not apply to Alt-A assets, commercial

---

[213]    TAC ¶ 1.

[214]    *Id.* ¶ 106.

[215]    *Id.* ¶ 107.

[216]    *Id.* ¶ 108.

[217]    DISCLOSURES ABOUT FAIR VALUE OF FINANCIAL INSTRUMENTS, Statement of Financial Accounting Standards No. 107 (Fin. Accounting Standards Bd. 1991); ACCOUNTING FOR DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES, Statement of Financial Accounting Standards No. 133 (Fin. Accounting Standards Bd. 1998).  *See* Pl. Br. at 35.

They allege also that FASB Staff Position ("FSP") SOP 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk* ("FSP 94-6-1"), provides an additional grounds for the disclosure obligation.  FSP 94-6-1, however, provides guidance on the meaning of SOP 946 and SFAS 107.  *See* FSP 94-6-1, at 3-4.

52

real estate assets, or leveraged loans.  Rather, they required disclosure of risks and uncertainties,

existing, as of the date of each financial statement, in the following areas: "(1) nature of operations,

(2) use of estimates in the preparation of financial statements, (3) certain significant estimates, and

(4) current vulnerability due to certain concentrations."[218]  As the first three areas are facially

inapplicable,[219] the only issue requiring discussion is whether disclosure was required by category

(4).

   The "certain concentrations" that must be disclosed under SOP 94-6 are limited to

those in (1) "the volume of business transacted with a particular customer, supplier, lender, grantor,

or contributor," (2) "revenue from particular products, services, or fund-raising events," (3) "the

available sources of supply of materials, labor, or services, or of licenses or other rights used in the

entity's operations," and (4) "the market or geographic area in which an entity conducts

operations."[220]  Moreover, "[c]oncentrations of financial instruments, and other concentrations not

described in" the above list are specifically excluded.[221]  SOP 94-6 did not require Lehman to

disclose concentrations of Alt-A, commercial real estate, and leveraged loans.

   SFAS 107 is broader than SOP 94-6 in that it requires an entity to "disclose all

significant concentrations of credit risk arising from *all* financial instruments, whether from an

---

[218]    SOP 94-6 ¶ .08.

[219]    *See*, *e.g.*, *id.* ¶ .10 (defining "nature of operations" as "major products or services the reporting entity sells or provides and its principal markets including the location of those markets).

[220]    *Id.* ¶ .21-.22.

[221]    *Id.* ¶ .23.

individual counterparty or groups of counterparties."[222] But the SFAS 107 disclosure obligation runs only to "significant" concentrations of credit risk. The question whether a particular concentration of credit risk is "significant" within the meaning of SFAS 107 is a matter of judgment.[223] Consequently, in order to state a claim that an entity's failure to disclose a concentration of credit risk violated SFAS 107, a plaintiff must plead facts that would permit findings that the entity in fact had "significant concentrations of credit risk" *and* that the entity believed that to be so.[224]

Most of plaintiffs' allegations regarding the Alt-A assets pertain to the quality but not the concentration of these holdings.[225] While quality of course goes to the issue whether they represented credit risks, it does not address the questions whether those holdings amounted to concentrations of such risk that were significant to Lehman overall, let alone whether Lehman so

---

[222]

SFAS at 197.

[223]

*See*, *e.g.*, FSP 94-6-1 ("Judgment is required to determine whether loan products have terms that give rise to a concentration of credit risk.").

[224]

Indeed, plaintiffs fail to respond to this argument. They contend only that "it is difficult to give any credence to Defendants' contention that their failure to disclose [risk concentrations] was 'a judgment, and therefore inactionable unless it was not truly held,' as there was no reasonable basis upon which to characterize Lehman's Alt-A assets as prime." Pl. Br. at 37-38. Whether there was a reasonable basis to characterize Lehman's Alt-A assets as prime is irrelevant to the question whether any of Lehman's holdings of Alt-A assets constituted a significant concentration of credit risk. Lehman either had a significant concentration of credit-risk from its Alt-A assets or it did not, regardless of the characterization as Alt-A or Prime.

[225]

Plaintiffs allege that "an internal Lehman email on March 17, 2007" stated that "[Lehman subsidiary] Aurora's product is far from Alt-A anymore. The traditional Alt-A program is only 40% of Aurora's production . . . the rest 60% of production has 100% [] financing in lower FICOs with non-full documentation, and/or investment properties." TAC ¶ 106; *see also* TAC ¶ 173 (alleging that O'Meara stated in June 2007 that Lehman had "terrific performance on the origination side around the Alt-A business"). Even if this allegation spoke to the concentration of Alt-A assets, the alleged email was sent prior the Class Period and therefore does not speak to Lehman's condition at the time of the alleged omissions.

perceived them.  Nevertheless, the TAC does allege that a Lehman employee on February 20, 2008 wrote, "I remain concerned as a lehman shareholder about our resi[dential] and cmbs [commercial mortgage-backed securities] exposure. . . . having 18b of tangible equity and 90b in resi[dential] (including alt a) and cmbs (including bridge equity) scares me."[226]  This email suffices, for present purposes, to permit an inference that at least one responsible official at Lehman then believed that its Alt-A assets represented a significant concentration of credit risk.  Thus, its failure to disclose these alleged concentrations in the reports following this email arguably violated SFAS 107.[227]

With respect to the alleged commercial real estate concentration, the TAC alleges that, in November 2007, "GREG made a presentation to Lehman's Executive Committee that recognized the significant risks inherent in the over-concentration of its global commercial real estate portfolio" and "recommended reducing the global GREG balance sheet from $58 billion to $43.7 billion by March 31, 2008."[228]  Plaintiffs therefore have alleged facts supporting an inference that, as of that meeting, Lehman believed that it had significant concentrations in commercial real

---

[226]

TAC ¶ 186.

[227]

This claim is not defeated as a matter of law by the fact that the 1Q08 report disclosed the amount of "Alt-A/Prime" holdings.  This disclosure arguably was misleading because (1) Lehman allegedly knew by that point that Alt-A loans were not prime, *id.* ¶¶ 106, 173, and (2) the TAC alleges that less than 7% of that category comprise actual prime loans, *id.* ¶ 106.  *Accord Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp.2d 871, 894 (N.D. Ill. 2004).

[228]

TAC ¶ 107.

The TAC's allegations pertaining to the pre-November 2007 period suggest only that Lehman's commercial real estate holdings were growing and say nothing about whether those holdings were concentrated (let alone significantly so).  *E.g., id.* ¶ 107 (noting that Lehman's global commercial real estate holdings grew by more than 90% during the 2007 fiscal year).

estate.  Those allegations, however, support claims only with respect to the alleged omissions in the 2007 10-K, issued in December 2007.  Plaintiffs concede that, beginning with the 1Q08, Lehman disclosed the amounts and locations of its commercial real estate mortgage holdings.[229]

The allegations regarding leveraged loans, however, are insufficient.  The core of this claim is the allegation that "Lehman's lending pace . . . had . . . doubled . . . for high grade and high yield [loans] combined."[230]  Even if Lehman's leveraged loans had increased as plaintiffs allege, each of Lehman's financial statements disclosed the quantity of "high grade" and "high yield" lending commitments that Lehman had made.[231]  Plaintiffs have pointed to no authority obliging Lehman to make more granular disclosures about its lending commitments, even assuming that the positions amounted to sufficient concentrations of credit risk.

Accordingly, plaintiffs have alleged sufficiently that Lehman, in violation of SFAS 107, failed adequately to disclose significant concentrations of credit risk in (1) its Alt-A holdings in the pertinent documents after February 20, 2008 and (2) commercial real estate holdings in its 2007 Report on Form 10-K in violation of SFAS 107.

---

[229]

Pl. Br. at 38-39.

Plaintiffs contend that these disclosures were insufficient because they did not separately list particularly risky commercial real estate holdings.  The claim at issue, though, pertains to Lehman's commercial real estate holdings in the aggregate – that sum was the subject of GREG's alleged recommendation to the Executive Committee.  Thus, whereas Lehman's combined disclosure of "Prime/Alt-A" assets arguably did not disclose the holdings that plaintiffs claim were obscured, *see supra* note 227, the same cannot be said of Lehman's combined disclosure of all commercial real estate holdings.

[230]

TAC ¶ 108.

[231]

*See* 1Q07 at 23-24; 2Q07 at 27; 3Q07 at 71; 2007 10-K at 65; 1Q08 at 74.

2. *Scienter*

To survive a motion to dismiss Exchange Act claims, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."[232]  The requisite state of mind is an intent to "deceive, manipulate, or defraud."[233]  In this circuit, allegations of recklessness – "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it" – are sufficient.[234]

In evaluating whether a complaint pleads a "strong inference of *scienter*," courts must consider all the facts alleged, inferences favoring plaintiffs rationally drawn from the facts, as well as "plausible, nonculpable explanations for the defendant's conduct."[235]  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[236] Generally, the plaintiffs must allege facts sufficient to show that each defendant "personally knew

---

[232]

15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)

[233]

*ECA*, 553 F.3d at 198  (quoting *Tellabs, Inc.*, 552 U.S. at 313).

[234]

*Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000)); *Teamsters Local 445 Freight Division Pension Fund v. Synex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

[235]

*Tellabs, Inc.*, 552 U.S. at 324.

[236]

*Id.*

of, or participated in, the fraud."[237]   That is, the plaintiff must allege that each defendant had the requisite *scienter*.[238]

A complaint may plead *scienter* "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior."[239]   To establish a strong inference of *scienter* via "motive and opportunity," plaintiffs must allege that defendants "benefitted in some concrete and personal way from the purported fraud."[240]   Motives common to most corporate officers are insufficient.[241]

If plaintiffs have not alleged "motive and opportunity" sufficiently, they may rely successfully upon allegations of "strong circumstantial evidence," "'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive."[242]   A complaint sufficiently may allege strong circumstantial evidence of *scienter* when it alleges that defendants (1) "benefitted in a concrete and personal way from the purported fraud," (2) "engaged in deliberately illegal behavior," (3) "knew facts or had access to information suggesting that their public statements were not accurate," or (4) "failed to check information they had a duty to

---

[237]
      *Mills*, 12 F.3d at 1175.

[238]
      *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 440.

[239]
      *ATSI Commc'ns., Inc.*, 493 F.3d at 99 (quoting *Ganino*, 228 F. 3d at 168-69; *see also ECA* 553 F.3d at 198.

[240]
      *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307-08).

[241]
      *Id.*; *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

[242]
      *ECA*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142).

monitor."[243]

### a.    *Motive and opportunity*

The only allegations arguably suggesting a motive are that (1) ratings agencies and analysts focused on Lehman's leverage ratios, and (2) Lehman could not have deleveraged by selling illiquid real estate and mortgage related assets without negatively impacting earnings or confidence, so (3) Lehman engaged in the Repo 105 transactions to "create the illusion that it was delivering on its promise to the market to deleverage."[244]  But a complaint does not sufficiently allege motive where it alleges only goals "'possessed by virtually all corporate insiders' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability."[245]  The TAC fails to allege that any of the defendants had a motive to commit the alleged fraud and fails also to allege that any of them benefitted from the alleged misrepresentations and omissions in a concrete way.[246]  Accordingly, it fails to allege *scienter* on a motive-and-opportunity basis.

---

[243]

   *Id.*; *Novak*, 216 F.3d at 311; *see Teamsters Local 445 Freight Division Pension Fund*, 531 F.3d at 194.

[244]

   *See*, *e.g.*, TAC ¶¶ 152-157.

[245]

   *South Cherry St. LLC*, 573 F.3d at 109 (quoting *Novak*, 216 F.3d at 308).

[246]

   *See South Cherry St. LLC v. Hennessee Group LLC*, 573 F.3d 98, 108 (2d Cir. 2009) ("Motive . . . could be shown by pointing to 'the concrete benefits that could be realized' from one or more of the allegedly misleading statements or nondisclosures . . . .'") (quoting *Shields*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

*b.     Circumstantial evidence of conscious misbehavior or recklessness*

*(1)     Repo 105 Transactions*

A complaint may allege facts sufficient to give rise to an inference of *scienter* with respect to a misleading financial statement where it alleges that a corporate officer knew of or recklessly failed to learn of "red flags" indicating that the officer's public statements were false or misleading.[247]   Red flags may exist if the complaint alleges the existence of transactions that were large, recurrent, timed near the end of a reporting period, and obviously lacking in business purpose.[248]   This may be true even if the registrant's outside auditor has opined that the company's financial statements were presented in accordance with GAAP.[249]

The TAC alleges sufficient red flags to give rise to an inference of *scienter* with respect to the Repo 105 transactions for any Insider Defendant who, because of his or her corporate role, responsibilities, and actions, knew or recklessly did not know of the misleading nature of the financial reporting of those transactions.   The TAC's principal allegations focus on the size of the

---

[247]

    *In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("*In re Refco*").

[248]

    *Id.* at 648.

[249]

    *Id.* at 656.

    In *Refco*, Refco had made loans to its customers that never would be repaid.  *Id.* at 619.  Rather than disclose these "uncollectible receivables" to the public, Refco engaged in a series of transactions among related entities, the consequence of which was to "hide its dismal financial situation from the public and its investors." *Id.* at 619-20.  The transactions took place a few days before the end of the relevant financial period, were undone within two weeks after, took place in substantially the same form for six years, and had no business purpose.  *Id.*  Judge Lynch found that these allegations sufficiently pled *scienter* for those corporate officers who were or should have been aware of them because of their corporate roles and responsibilities.  *Id.* at 649, 652.

Repo 105 transactions, their temporary effect on net leverage, their timing at the end of each reporting period, and their lack of a true business purpose.  Specifically, Lehman allegedly engaged in between $31.9 and $50.3 billion in Repo 105 transactions at the end of each quarter from the second quarter of 2007 until the second quarter of 2008, with the amount increasing each quarter.[250] Those transactions allegedly reduced Lehman's net leverage ratio by at least 1.5 each quarter.[251] This reduction in net leverage allegedly was temporary, as Lehman was obligated contractually to repay its Repo 105 counter-parties and return the collateral assets to its balance sheet "just days" after each quarter ended.[252]  In consequence, Lehman's net leverage increased immediately after each reporting period ended.[253]  The TAC alleges, moreover, that the Repo 105 transactions lacked any business purpose other than to reduce net leverage in this manner.[254]  Consequently, the TAC

---

[250]

TAC ¶ 37 & tbl.1.

[251]

*Id.* ¶ 38 & tbl.2.

Lehman's reported net leverage at quarter-end during the class period ranged from a low of 12.1 to a high of 16.1.  Plaintiffs allege that if Lehman had not used the Repo 105 transactions, its net leverage ratio would have ranged from a low of 13.9 to a high of 17.8. *Id.*  In these circumstances, a 1.5 point decrease in Lehman's net leverage ratio constitutes at least a 9.3 percent change in Lehman's net leverage in each reporting period.

[252]

*Id.* ¶¶ 1, 32, 35, 37, 64.

[253]

*Id.* ¶¶ 32, 61.

[254]

*Id.* ¶ 63 ("Repo 105 transactions were a more expensive . . . form of short-term financing for Lehman than an Ordinary Repo transaction."); *see also id.* ¶ 148 (quoting several Lehman employees who testified that there was no business purpose for the transactions).

The defendants contend that the Repo 105 transactions had a legitimate business purpose in that they provided a more cost-effective way for Lehman to reduce its net leverage than truly selling the collateral it pledged as part of the Repo 105 transaction.  Def. Br. at 38-39. This contention, however, begs the question of whether it was legitimate for Lehman to engage in unreported off-balance sheet transactions to reduce *temporarily* its net leverage

alleges facts supporting an inference of *scienter* to whatever extent that it alleges that the Insider Defendants knew or recklessly failed to know about the misleading nature of the manner in which these transactions were reported.[255]

The TAC's allegations in this regard are strongest with respect to O'Meara, Callan, and Lowitt. Each was Lehman's chief financial officer at one point during the class period and therefore had primary responsibility for overseeing Lehman's finances.[256] From April to September 2008, each received daily reports called "Daily Balance Sheet and Disclosure Scorecards," which contained "frequent references" to Repo 105 and noted the "daily benefit that Repo 105 transactions provided to Lehman's balance sheet."[257] This would have enabled them to see the daily increase and decrease of the Repo 105 usage and its effect on Lehman's net leverage. It would have demonstrated also the greatly increased usage at the end of each reporting period. Finally, O'Meara, Callan, and Lowitt each was exposed to Repo 105 transactions in their work. O'Meara "actively managed" Lehman's Repo 105 program from the start of the class period until December 1, 2007, and was responsible for setting the Repo 105 usage limits.[258] Lowitt admitted to the Examiner that he was aware of the Repo 105 program for many years and that "Lehman used the transactions to

----

as occurred with the Repo 105 transactions as opposed to permanently reduce it as would have occurred had the assets actually been sold.

[255]

 *See In re Refco*, 503 F. Supp. 2d at 649 ("The red flags on which plaintiffs rely are glaringly suggestive of fraud, but only to those who were or should have been aware of them.").

[256]

 TAC ¶¶ 9, 11, 12.

[257]

 *Id.* ¶ 212.

[258]

 *Id.* ¶¶ 207, 212.

meet balance sheet targets."[259]   Several "senior Lehman executives brought Repo 105 to Callan's attention" while she was CFO.[260]   These allegations are sufficient at this stage to give rise to an inference of *scienter* on the part of these defendants.[261]

The TAC's allegations with respect to Gregory and Fuld are somewhat different. Nevertheless, the TAC alleges that Gregory (1) received reports from O'Meara about the impact of the Repo 105 transactions on Lehman's balance sheet,[262] (2) assisted in setting balance sheet targets and received materials related to Lehman's use of Repo 105 to manage its balance sheet prior to a meeting about them,[263] and (3) was a member of Lehman's executive committee.[264]   It alleges that Fuld was Lehman's chairman and chief executive officer and served on its executive committee,[265] and that O'Meara had a duty to report the impact of the Repo 105 transactions on Lehman's balance sheet to him.[266]   It alleges further that, in June 2008, Bart McDade, Lehman's "balance sheet czar," had specific discussions with Fuld about Lehman's quarter-end Repo 105 usage and that Fuld

---

[259]
 *Id.* ¶ 212.

[260]
 *Id.* ¶¶ 208, 212.

[261]
 *See In re Refco*, 503 F. Supp. 2d at 650.

[262]
 TAC ¶ 207.

[263]
 *Id.* ¶ 210.

[264]
 *Id.* ¶ 211.

[265]
 *Id.* ¶ 8.

[266]
 *Id.* ¶ 207.

admitted to the Examiner that he was focused on reducing the company's net leverage and balance sheet.[267]   Accordingly, the TAC sufficiently alleges facts giving rise to an inference of *scienter* on the part of Gregory and Fuld as well.

The question remains whether that inference is sufficiently "strong" – that is, whether it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[268]

Defendants argue that the "more compelling inference is that the[y] had an honest belief that the [Repo 105] transactions were legal, as well as accounted for and disclosed in accordance with GAAP, and were legitimate sales transactions for business units to obtain funding and stay within their balance sheet targets."[269]   They point to the fact that E&Y knew about Lehman's Repo 105 transactions and approved of their use and the accounting for them, and to the fact that Linklaters provided a "true sale at law" legal opinion, purportedly satisfying one of SFAS 140's requirements.[270]   They point also to the fact that the transactions were used by many of the firm's business units[271] and that Lehman could have reduced its net leverage to the same extent by selling the collateral assets outright, but that Repo 105 was less costly.[272]

---

[267]     *Id.* ¶ 211.

[268]     *Tellabs, Inc.* 552 U.S. at 324.

[269]     Def. Br. at 39.

[270]     TAC ¶¶ 65, 228, 233, 236-38.

[271]     *Id.* ¶¶ 147, 149, 212.

[272]     Def. Br. at 38-39 (quoting ER App. 17 at 32-35.).

The suggestions that defendants believed that the Repo 105 transactions were permissible in and of themselves and that the financial reporting for them, in and of itself, complied with GAAP does not address the core of plaintiffs' claims – that they were used to reduce temporarily and artificially Lehman's net leverage and paint a misleading picture of the company's financial position at the end of each quarter.  The allegations that these transactions were used at the end of each reporting period, in amounts that increased as the economic crisis intensified, to affect a financial metric that allegedly was material to investors, credit rating agencies, and analysts support a strong inference that the Insider Defendants knew, or were reckless in not knowing, that use of the Repo 105 transactions and the manner in which they were accounted for painted a misleading picture of the company's finances.

### (2)    *Risk management*

The TAC alleges facts sufficient to give rise to an inference of *scienter* with respect to the first category of risk management misstatement.  It alleges that Lehman's executive committee established the company's overall risk limits and risk management policies, that Lehman's risk committee "determined 'overall risk limits and risk management policies, including establishment of risk tolerance levels . . . on a weekly basis, or more frequently as needed,'" and that Fuld, Gregory, Callan, Lowitt, and O'Meara sat on those committees.[273]  It therefore sufficiently alleges facts giving rise to an inference that these defendants were involved in setting Lehman's risk policies and knew that the statements concerning enforcement of risk management policies were false.

---

[273] TAC ¶ 216.

The Insider Defendants contend that the alleged facts support an inference that Lehman's and the Insider Defendants' decisions with respect to risk management were business decisions, based on internal reports and discussions, and that the limits were altered pursuant to an established process.[274]  The suggestion is that such an inference would be inconsistent with, or at least not as plausible as, an inference of fraudulent intent.  For present purposes, however, the Court does not agree.  While a trier of fact ultimately might not agree, it is more plausible, in all the circumstances, that Fuld, Gregory, Callan, Lowitt, and O'Meara knew that Lehman routinely altered or knowingly tolerated alteration of Lehman's risk management policies even as the company stated it would monitor and enforce them.  Accordingly, the TAC adequately has alleged a strong inference of *scienter* on the part of Fuld, Gregory, Callan, Lowitt, and O'Meara with respect to the risk management policies.

The TAC makes stress testing statement *scienter* allegations only with respect to O'Meara.  Specifically, it alleges that O'Meara told the Examiner that Lehman "did not even start taking steps to include private equity transactions in its stress tests until 2008."[275]  The TAC, however, fails to allege that Lehman's "private equity transactions" involved commercial real estate. To the contrary, it lists "private equity" assets or transactions separately from "commercial real estate" in the context of stress testing.[276]  In consequence, the allegation that O'Meara knew that "private equity" assets were excluded from stress testing does not give rise to an inference that

---

[274]

Def. Br. at 43-44.

[275]

TAC ¶ 220.

[276]

*See, e.g.*, *id.* ¶¶ 72, 79, 80, 165.

66

O'Meara knew that Lehman's commercial real estate assets were excluded from the stress testing.

### (3)   *Concentrations of credit risk*

Plaintiffs have alleged sufficiently that Lehman violated SFAS 107's disclosure obligations by failing to disclose in particular financial statements discussed above known significant concentrations of credit risk with respect to its holdings of Alt-A and commercial real estate assets. But Lehman is not a defendant in this case. It therefore remains to consider whether the TAC sufficiently pleads *scienter* with respect to these claims as to each Insider Defendant.

The internal February 2008 email discussing Lehman's Alt-A holdings is the only basis supporting an inference that anyone at Lehman knew of significant concentrations of credit risk with respect to these assets. But plaintiffs do not allege which if any of the Insider Defendants received, saw, or otherwise knew of this email. Consequently, there are no allegations supporting an inference of *scienter* on the part of the Insider Defendants with respect to these alleged undisclosed concentrations of credit risk.

The only basis for an inference that Lehman knew that it was obliged by SFAS 107 to disclose a significant concentration of credit risk with respect to commercial real estate assets in its 2007 10-K is the report at the November 6, 2007 Executive Committee meeting.[277] Fuld, O'Meara and Gregory all were members of that committee. Callan and Lowitt, however, did not become members until later.[278] Accordingly, the TAC sufficiently alleges *scienter* in respect of this claim on the part of Fuld, O'Meara and Gregory but not Callan and Lowitt.

---

[277]        *Id.* ¶ 107.

[278]        *Id.* ¶¶ 11, 12.

C.      E&Y

The TAC alleges that E&Y's statements in (1) Lehman's 2007 10-K concerning its audit and Lehman's financial statements, and (2) Lehman's quarterly reports on Form 10-Q for the second and third quarters of 2007 and the first two quarters of 2008 concerning its review of Lehman's financials were materially false and misleading.[279]  While the TAC quotes selectively from those statements, it is useful to quote them more fully.

Insofar as is relevant here, the statements in the 2007 10-K were these:

"We have audited the accompanying consolidated statement of financial condition of Lehman Brothers Holdings Inc. (the 'Company') as of November 30, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended November 30, 2007. . . .  These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

"We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

"In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2007 and 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2007, in conformity with U.S. generally accepted accounting principles."[280]

---

[279]     TAC ¶ 224.

[280]     2007 10-K at 84.

The pertinent statement in each of the 10-Q's was this:

"We have reviewed the consolidated statement of financial condition of Lehman Brothers Holdings Inc. and subsidiaries (the "Company") as of [date], and the related consolidated statement of income for the . . . periods ended [dates], and the consolidated statement of cash flows for the . . . periods ended [dates]. These financial statements are the responsibility of the Company's management.

"We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

"Based on our review, we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles."[281]

Plaintiffs mount parallel attacks on E&Y's statements in the 10-K and the 10-Qs. They allege that the audit, or GAAS, opinion in the 10-K – i.e., the statement that E&Y "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board" – was false because E&Y did not conduct its audits in accordance with those standards.[282] They contend also that the GAAP opinion in the 10-K – i.e., the statement that, in E&Y's "opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2007 and 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2007, in conformity with U.S. generally accepted accounting principles" – was

---

[281] 2Q07 at 43, 3Q07 at 44, 1Q08 at 42, 2Q08 at 53.

[282] TAC ¶ 224; Pl. Br. at 22.

false because that statement did not conform to GAAP.[283]  Similarly, they assert that the statements in the 10-Qs – first that E&Y conducted its "review in accordance with the standards of the" PCAOB and, second, that E&Y, "[b]ased on [its] review, [was] . . .  not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S." GAAP – were false for substantially the same reasons.[284]

### 1.    Statements regarding GAAS

E&Y contends that an auditor's statements of GAAS compliance is an assertion of opinion that is not a misstatement unless the auditor believed it to be false when it was made.[285]  As the TAC is devoid of allegations that E&Y subjectively believed that its statements of GAAS compliance were false, it argues, the Exchange Act claims relating to its GAAS opinions must be dismissed.

Plaintiffs tacitly acknowledge that the TAC does not allege that the GAAS opinion was subjectively false, arguing instead that subjective falsity is not required for purposes of Section 11 of the Securities Act[286] and, by logical extension, to make out a false statement (as distinct from

---

283    *Id.*

284    *Id.*

285    E&Y Br. at 19.  *In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989 (PAC), 2011 WL 31548, at *8 (S.D.N.Y. Jan. 5, 2011); *Fait v. Regions Fin. Corp.*, 712 F. Supp.2d 117, 121 (S.D.N.Y. 2010); *Lehman MBS*, 684 F. Supp. 2d at 494-95; *Tsereteli*, 692 F. Supp.2d at 393; *see also Va. Bankshares*, 501 U.S. at 1095 (1991) ("A statement of belief may be [proven false or misleading] . . . solely as a misstatement of the psychological fact of the speaker's belief in what he says.").

286    Pl. Br. at 22-23.

70

*scienter*) for purposes of Section 10(b) and Rule 10b-5 of the Exchange Act.  This, they say, is the logical import of the fact that the Securities Act provides auditors and others with a due diligence defense to Section 11 claims, which affords them the opportunity to avoid strict liability by proving that they exercised due diligence.  Although plaintiffs do not say so in as many words, their position amounts to the proposition that a complaint that alleges that an auditing firm issued a "clean" audit opinion in circumstances in which one might conclude that the audit had not been conducted in accordance with PCAOB standards sufficiently alleges a false statement even if others reasonably might have agreed with the auditor.   That argument is not persuasive.

As an initial matter, the argument, to the extent it rests on Section 11 of the Securities Act, assumes the very point at issue.  It is true, as plaintiffs contend, that Section 11's purposes include holding auditors and others strictly liable, subject to the due diligence defense, for materially false or misleading statements in the portions of registration statements "expertised" by them.[287]  But that says nothing about what constitutes a false or misleading statement.  So we must look carefully at precisely what the TAC alleges was wrong with the GAAS opinion – in other words, at the precise respects in which the audit allegedly was not conducted in accordance with PCAOB standards – in order to determine whether E&Y's statement that it had conducted a GAAS-compliant audit may be understood as "false."

The TAC points to several General Standards ("GS"), interpretive Statements on

---

[287]
    *See In re Lehman Bros. Mortgage-Backed Securities Litig.*, ___ F.3d ____, 2011 WL 1778726, at *5 (2d Cir. 2011) (*"Lehman MBS"*) ("Section 11 provides the purchasers of registered securities with strict liability protection for material misstatements or omissions in registration statements" made by, *inter alia*, "accountants or other experts consenting to be named as preparing or certifying part of the registration statement.").  *See also Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements.  Other defendants bear the burden of demonstrating due diligence.").

Auditing Standards ("AU"), and Statements of Fieldwork that allegedly are part of GAAS and that E&Y allegedly violated.[288]  Many of those standards are couched in rather general and in some cases inherently subjective terms.  They require, for example, that the auditor plan the audit engagement properly, use "due professional care," exercise "professional skepticism," and "assess the risk of material misstatement due to fraud"[289] – all matters as to which reasonable professionals planning or conducting an audit reasonably and frequently could disagree.[290]  Bearing in mind that E&Y's GAAS opinion, just like those rendered by all or substantially all accounting firms, is explicitly labeled as just that – an opinion that the audit complied with these broadly stated standards – more is necessary to make out a claim that the statement of opinion was false than a quarrel with whether these standards have been satisfied.

In this case, most of plaintiffs' allegations in that respect are conclusory and do not contain factual matter sufficient to support a plausible claim for relief.[291]  But the TAC claims also that E&Y violated GS 3's and AU § 230's requirements of "due professional care" and "professional skepticism" in that E&Y ignored or failed to respond adequately to three "red flags": (1) Lehman's inability to obtain from a U.S.-based law firm a true sale opinion regarding Lehman's accounting

---

[288]

TAC ¶¶ 235-41.

[289]

GS No. 3; AU §§ 230, 311; Statement of Fieldwork No. 1.

[290]

See In re Worldcom, Inc. Sec. Litig., 352 F. Supp.2d 472, 481 (S.D.N.Y. 2005) ("[T]here are different methodologies for conducting a GAAS-compliant audit.").

[291]

The TAC alleges, for example, that E&Y violated AU § 311's requirement of proper audit planning by "not adequately plan[ning] its quarterly reviews and annual audit of Lehman to address its knowledge" of certain facts.  TAC ¶ 238.  It does not, however, identify any planning deficiencies or, for that matter, what planning E&Y did that allegedly was insufficient.

72

treatment of Repo 105s, (2) a netting grid that identified and described the Repo 105s, and (3) E&Y's June 12, 2008 interview with Matthew Lee, the senior vice president in charge of Lehman's Global Balance Sheet and Legal Entity Accounting.[292]

Lehman's use of a true sale at law opinion letter from a U.K.-based law firm was not a red flag. First, given that our legal system sprung from the English one, it would be odd indeed to conclude that the use of an opinion from a well known U.K.-based law firm on a question of common law – whether a true sale at law had occurred – calls into question the accuracy of the opinion's conclusion. Second, and more importantly, the letter is not said to have provided E&Y any indication that Lehman improperly increased its use of the Repo 105 transactions at the end of each reporting period because the opinion that a Repo 105 involved a true sale did not address the issue that is pertinent here. That opinion went only to the question whether the Repo 105s were properly accounted for as sales under SFAS 140, not the question whether the financial statements nevertheless were misleading because the manner in which the Repo 105s were used presented a deceptive picture as to Lehman's net leverage.

Nor was the netting grid a "red flag" that Lehman used the Repo 105 transactions at the end of each quarter to manipulate its reported net leverage ratio. The netting grid disclosed the volumes of Repo 105 transactions on Lehman's balance sheet on November 30, 2006, and February 28, 2007.[293] But it did not disclose to E&Y when these transactions were entered into or that they

---

[292]  Pl. Br. at 68-74.

[293]  ER, at 951-52.

were unwound promptly after the end of each reporting period.[294]  The grid therefore could not have alerted E&Y to the possibility that Lehman was using these transactions to manipulate its net leverage (and overall financial position) at the close of each reporting period.

　　　　The Lee interview, but for its timing, would have been different.  Lee allegedly told E&Y that Lehman had used Repo 105 transactions to remove temporarily $50 billion from its balance sheet at the end of the second quarter of 2008.[295]  Although Lehman's audit committee allegedly had instructed E&Y to report to it any allegations of financial improprieties, E&Y allegedly failed to relay Lee's concerns or investigate them itself.[296]  In these circumstances, and bearing in mind that the issue might appear differently on a fuller record, a trier of fact reasonably might find that E&Y knew by June 2008, when it interviewed Lee, that the Repo 105s may have been used to manipulate the balance sheet, at least at the end of the second quarter of that year.  Had E&Y subsequently issued a "clean" audit opinion, knowing that it had not followed up appropriately on Lee's allegations, that opinion could well have been false.  But the only audit opinion at issue here is the one E&Y expressed with respect to its 2007 audit and that appeared in the 2007 10-K, issued on January 28, 2008.[297]

---

[294]

　　　　E&Y Br. at 24 (citing Netting Grid, DI 298 Ex. 16 at 17).

[295]

　　　　TAC ¶ 230.

[296]

　　　　*Id.*¶¶ 231-33.

[297]

　　　　The statements in the 10-Q's were not opinions on certified financial statements which, in accordance with AU § 508. 07-.10, contain "[a] statement that the audit was conducted in accordance with generally accepted auditing standards."  Rather, they were reports on reviews of interim financial information.  Reviews are not audits.  Indeed, they are governed not by AU § 508, but by AU § 722, which requires no GAAS opinion on such reports.

The Court is mindful of the fact that some courts have considered the sufficiency of securities claims against auditors based upon statements as to the compliance of financial statements with GAAP without regard to the significance of the fact that such statements have been couched as opinions and thus without regard to the importance of the fact-opinion distinction.[298]  But the distinction is important.  E&Y's statement regarding GAAS compliance inherently was one of opinion.  In order for the TAC sufficiently to have alleged that it was false, it  had to allege facts that, if true, would permit a conclusion that E&Y either did not in fact hold that opinion or knew that it had no reasonable basis for it.[299]

The *scienter* analysis with respect to this claim is substantially the same.  As with other defendants, in order to state an Exchange Act claim against an auditor, a complaint must "state with particularity facts giving rise to a strong inference" of *scienter*.[300]  The standard for evaluating assertions of an auditor's *scienter*, however, is "demanding."[301]  The complaint must allege that the auditor's conduct was "'highly unreasonable,'" representing "'an extreme departure from the

---

[298]

See, e.g., *In re Refco*, 503 F. Supp. 2d at 656-57; *In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220 (SAS), 2010 WL 2835545, at *3, 10-11 (S.D.N.Y. Jun. 28, 2010); *The Penn. Ave. Funds v. Inyx Inc.*, No. 08 Civ. 6857 (PKC), 2010 WL 743562, at *6, 11-12 (S.D.N.Y. Mar. 1, 2010); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 602, 609 (S.D.N.Y. 2009); *In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 3d 472, 487 (S.D.N.Y. 2005).

[299]

See *Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1175-76 (10th Cir. 2006).

[300]

15 U.S.C. § 78u-4(b)(2)(A).

[301]

See, e.g., *In re Imax Sec. Litig.*, 587 F. Supp.2d 471, 483 (S.D.N.Y. 2008); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp.2d 370, 385 (S.D.N.Y.2007); *In re Refco*, 503 F. Supp.2d at 657; *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 488 (S.D.N.Y. 2006).

standards of ordinary care'" and "'approximat[ing] an actual intent to aid in the fraud being perpetrated by the audited company.'"[302]  The "accounting judgments which were made [must have been] such that no reasonable accountant would have made the same decisions if confronted with the same facts."[303]  Plaintiffs' allegations respecting "red flags" therefore bear not only on whether E&Y violated the pertinent GAAS requirements, but also on whether it did so with the requisite state of mind.[304]  For the reasons discussed above, the true sale opinion and netting grid were not red flags, the disregard of which could be called highly reckless.  And while E&Y's alleged failure to follow up on the Lee interview arguably would have been a departure from GAAS, the only subsequent E&Y statement at issue is the report on the interim financials in the 2Q08, which contained no statement of a GAAS-compliant audit.  Accordingly, the TAC fails to allege that E&Y made any false or misleading statements with respect to GAAS compliance either in the 2007 10-K or in any of the subsequent 10-Q's, much less that it did so with *scienter.*

### 2.     Statements regarding GAAP

Plaintiffs argue also that E&Y's opinions as to Lehman's preparation of its financial statements in accordance with GAAP were statements of fact and that they were false because those

---

[302]

　　　　*See Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120-21 (2d Cir. 1982)).  *See also In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007).

[303]

　　　　*In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d at 385 (quoting *In re Refco*, 503 F. Supp.2d at 657).

[304]

　　　　*See In re AOL Time Warner*, 381 F. Supp.2d 192, 240 (S.D.N.Y. 2004) ("Allegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter.").

financial statements in fact did not comply with GAAP.

"The representation in the auditor's standard report regarding fair presentation, in all material respects, in conformity with [GAAP] indicates the auditor's *belief* that the financial statements, taken as a whole, are not materially misstated."[305]  Thus, allegations that a company violated GAAP in preparing its financial statements are not sufficient, in and of themselves, to state a claim that an auditor's opinion of GAAP compliance is a factual misstatement. For reasons already discussed, the complaint must allege specific departures from GAAP and, in addition, set forth facts sufficient to warrant a finding that the auditor did not actually hold the opinion it expressed or that it knew that it had no reasonable basis for holding it.

The only alleged departure from GAAP relied upon by plaintiffs in connection with its claim against E&Y relates to Lehman's use of Repo 105s.[306]  The only such departure that the Court finds sufficient is the claim that Lehman's use of such transactions at each quarter-end to reduce its net leverage temporarily resulted in the financial statements portraying the company's leverage in a misleading way, this notwithstanding that plaintiffs have not sufficiently alleged that the accounting treatment of those transactions, in and of itself, was inconsistent with GAAP.[307]  As there is no claim that E&Y did not in fact hold the opinion that it expressed with respect to Lehman's compliance with GAAP, the question thus becomes whether plaintiffs have sufficiently alleged that E&Y had no reasonable basis for believing that Lehman's financial statements were

---

[305]  AU § 312.07 (emphasis added).  *See also In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp.2d at 480.

[306]  TAC ¶¶ 224-33.

[307]  *See supra*.

prepared in accordance with GAAP.  In other words, have plaintiffs sufficiently alleged that E&Y knew enough about Lehman's use of Repo 105s to "window-dress" its period-end balance sheets to permit a finding that E&Y had no reasonable basis for believing that those balance sheets fairly presented the financial condition of Lehman?

Plaintiffs rely for this purpose on precisely the same alleged red flags discussed previously in connection with E&Y's GAAS opinion – the "true sale" opinion, the netting grid, and the Lee interview.  The first two are no stronger in this context than in that.  The Lee interview, however, is a different matter.

The TAC alleges that Lee told E&Y in June 2008 "that Lehman moved $50 billion of inventory off its balance sheet at quarter-end through Repo 105 transactions and that these assets returned to the balance sheet about a week later."[308]  Assuming that is so, E&Y arguably was on notice by June 2008 that Lehman had used Repo 105s to portray its net leverage more favorably than its financial position warranted, a circumstance that could well have resulted in the published balance sheet for that quarter being inconsistent with GAAP's overall requirement of fair presentation.  Accordingly, the TAC adequately alleges that E&Y misrepresented in the 2Q08 that it was "not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles" notwithstanding Lee's disclosure to it.

* * *

In sum, the TAC sufficiently alleges that E&Y, with the requisite *scienter,* made a false or misleading statement in Lehman's 2Q08 in that it professed ignorance of facts warranting

---

[308]    TAC ¶ 230.

material modifications to Lehman's balance sheet when in truth it had received information concerning Lehman's use of Repo 105s temporarily to move $50 billion of inventory off that balance sheet – information that cast into doubt the balance sheet's consistency with GAAP.

D.      *Loss Causation*

Defendants next argue that the TAC fails adequately to plead loss causation.

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."[309]  To make out loss causation, "a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."[310]  In the Second Circuit, loss causation may be established either by (1) a corrective disclosure or (2) a materialization of a concealed risk.[311]  On the latter theory, the complaint must allege that the loss was (1) foreseeable and (2) caused by the materialization of the concealed risk.[312]  A loss is foreseeable if it is "within the zone of risk *concealed* by the misrepresentations and

---

[309]

Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir.), *cert. denied*, 546 U.S. 935 (2005) (quoting *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 172 (2d Cir. 2003)); *see also* 15 U.S.C. § 78u-4(b)(4); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *R.W. Grand Lodge of F.&A.M. of Pa. v. Salomon Bros. All Cap Value Fund*, No. 08-0038-CV, 2011 WL 2268551, at *2 (2d Cir. June 9, 2011) ("affirming dismissal of Plaintiffs' securities fraud claims" because "Plaintiffs have failed to adequately tie a material misrepresentation or omission to an economic loss").

[310]

*Lentell*, 396 F.3d at 175 (quoting *Suez Equity Investors, L.P.*, 250 F.3d 87, 95 (2d Cir. 2001)).

[311]

*In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).

[312]

*Lentell*, 396 F.3d at 173; *Suez Equity Investors*, 250 F.3d at 95.

omissions alleged by the disappointed investor."[313]

Plaintiffs claim that Lehman's misstatements and omissions with respect to the Repo 105 transactions, risk mitigation policies, and concentrations of credit risk caused their losses.  The essence of the argument is that Lehman's financial statements and related communications understated its net leverage, concealed the negative balance sheet impact of its inventory of "sticky" and illiquid assets, misstated its practices with respect to risk management, understated the extent of its exposures on Alt-A and commercial real estate holdings and, more broadly, portrayed Lehman as financially stronger than it was.[314]  They contend that the "massive write-downs that Lehman took in June and September 2008, and the rating agency downgrades that naturally followed,"[315] all of which were followed by declines in the price of Lehman's shares, were the beginnings of the materialization of those risks, risks that ultimately culminated in the ratings downgrades and liquidity crisis that followed and led to Lehman's bankruptcy.[316]

Defendants argue that this fails sufficiently to allege loss causation because Lehman's stock steadily declined through the class period and the company ultimately failed in consequence of a market-wide phenomenon, the "crisis in the subprime market that . . . spread to the rest of the real estate market, collapse of the financial markets generally, [and] market-wide liquidity crisis"

---

[313]

> *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original)).

[314]

> TAC ¶ 248; Pl. Br. at 88-89.

[315]

> Pl. Br. at 89.

[316]

> *Id.* at 87-96.

that affected Lehman's industry generally.[317]  While defendants of course are right about the climate in which Lehman's demise occurred, their argument is not persuasive for reasons previously expressed by this Court.

As an initial matter, plaintiffs need not allege that their entire loss was caused by the misstatements and omissions complained of.  "To plead loss causation, the complaint must allege facts that support an inference that [the defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all *or an ascertainable portion* of the that loss absent the fraud."[318]  Even granting *arguendo* the contribution to Lehman's demise of the market-wide circumstances to which defendants refer, the existence of such a causative factor would not of itself exclude a sufficient causal connection between the alleged misstatements and omissions and a portion of the losses plaintiffs sustained.

Nor are plaintiffs required to allege that the particular misstatements and omissions directly caused the alleged losses.  In *Lentell,* the Court of Appeals concluded that the plaintiffs had failed to plead loss causation in relevant part because they did "not allege that the subject of [the] false recommendations" caused their losses,[319] thus making clear that misstatements or omissions that conceal a risk, the materialization of which causes all or part of the plaintiffs' loss, would suffice.

In this case, the TAC, to the extent previously indicated, adequately alleges misstatements and omissions that overstated Lehman's financial strength, misstated and understated

---

[317]     Def. Br. at 50-51.

[318]     *Lentell,* 396 F.3d at 175 (emphasis added).

[319]     *Id.*

the extent to which it was leveraged, misstated its risk management practices, and understated its exposure to Alt-A and commercial real estate assets.  It adequately alleges as well that it was the materialization of these risks, all minimized by the alleged misstatements and omissions, that destroyed whatever value remained in Lehman's shares.  While it perhaps may be said with some assurance that Lehman, given the assets it held, would have been in trouble in any case, it is entirely plausible to conclude also from the facts alleged in the TAC that the misleading picture that Lehman portrayed played a material part in keeping its stock higher during the class period than it otherwise would have been and, in consequence that some part of the losses the plaintiffs suffered was attributable to the alleged fraud.

This point is well illustrated by *In re Parmalat Securities Litigation*.[320]  Insofar as is relevant here, that case involved the liability of auditors of a company, insiders of which, to the auditors' knowledge, engaged in a scheme involving misleading transactions and off-shore entities that created a false appearance that the company was financially strong and permitted the company to raise capital for a long period during which it actually had been losing money.  The auditors gave "clean" opinions on the company's financial statements throughout.  But the scheme eventually became unsustainable and the company failed.  The precise causes of the failure came to light only after the failure, and the auditors contended that the plaintiffs had failed adequately to allege loss causation.  But the court rejected that argument for reasons quite pertinent here:

> "Among the risks concealed by these reports [i.e., the auditors' opinions] was that Parmalat had massive undisclosed debt and was unable to service it.  Defendants reasonably could have foreseen that Parmalat's inability to service its debt would lead to a financial collapse.  The concealed risk materialized when Parmalat suffered a liquidity crisis on December 8, 2003 and was unable to pay bonds as they became due . . . .  That the true extent of the fraud was not revealed to the public until

---

[320]

375 F. Supp.2d 278 (S.D.N.Y. 2005).

February – after Parmalat shares were worthless and after the close of the Class Period – is immaterial where, as here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder and bondholder value."[321]

In this case, the alleged misstatements and omissions concealed the extent of Lehman's exposure to asset classes, the precarious nature of which, a jury could find, was foreseeable and, indeed, though plaintiffs perhaps need not so prove, in fact foreseen by some.[322] They created the impression that Lehman took greater steps to limit and manage its risk than in fact it allegedly did.   And they overstated Lehman's financial strength generally and understated the extent to which it was leveraged.   According to the TAC, it was the materialization of the risks thus concealed that ultimately killed Lehman.   In consequence, plaintiffs are entitled to an opportunity to attempt to prove that some ascertainable amount of the losses they suffered was attributable to the allegedly false picture of relative security attributable to those misstatements and omissions.[323]

E.      *The Other Exchange Act  Claims*

1.      *Section 20(a)*

The Insider Defendants seek dismissal of the Section 20(a) claims on the ground that

---

[321]

    *Id.* at 307.

[322]

    *E.g.,* Michael Lewis, The Big Short: Inside the Doomsday Machine (2010).

[323]

    Defendants make a number of perhaps more granular loss causation arguments.   Some depend on the premise that  loss causation is established only where a price decline follows corrective disclosure, which they argue did not occur here.   Def. Br. at 54-56.   As defendants acknowledge elsewhere, however, that premise is not correct as loss causation may be alleged sufficiently where the complaint pleads that the risk created by the alleged fraud materialized in some other way and caused the loss (*id.* at 54) – precisely plaintiffs' theory here.   And there are others.   Suffice it to say here that the Court has considered each of them and found each wanting in light of the discussion in the text.

the TAC lacks particularized allegations that any was a culpable participant in the alleged fraud.[324]

The Court recognizes that there is a difference in view as to whether such allegations – as distinct from proof at trial – are required.  It is aware also that the Second Circuit's recent decision in *Lehman MSB*,[325] a case dealing, insofar as is relevant here, only with a question under Section 15 of the Securities Act,[326] cited *SEC v. First Jersey Securities, Inc.*,[327] for the proposition that a Section 20(a) plaintiff must "show that [a] 'controlling person was in some meaningful sense a culpable participant in the fraud." But it did not discuss, let alone resolve, the question whether a Section 20(a) complaint, in order to state a legally sufficient claim for relief, must allege culpable participation.  That question remains open in this Circuit.

This Court previously has held that a Section 20(a) plaintiff need not allege culpable participation at the pleading stage and that it does not read *First Jersey Securities* as so requiring, for reasons set forth in greatest detail in *Parmalat*.[328]   In any case, the TAC adequately alleges *scienter*, and thus culpable participation, on the part of all of these defendants save that it does not do so with respect to defendants Callan and Lowitt solely with regard to the claim based upon inadequate disclosure concerning concentrations of credit risk.  Accordingly, the point for the most

---

[324]

Def. Br. at 59-60.

[325]

2011 WL 1778726.

[326]

15 U.S.C. § 77*o*.

[327]

101 F.3d 450 (2d Cir. 1996).

[328]

*In re Parmalat Secs. Lit.,* 375 F. Supp.2d at 307-10.  *Accord, e.g., STMicroelectronics v. Credit Suisse Group,* __ F. Supp.2d __, No. 08 CV 3201 (RJD), 2011 WL 1238817, at *7 (E.D.N.Y. Mar. 31, 2011); *Sedona Corp. v. Ladenburg Thalmann & Co.,* No. 03 Civ. 3120(LTS), 2006 WL 2034663, at *2 (S.D.N.Y. July 19, 2006).

part is academic.

### 2.  *Section 20A*

Defendant Fuld seeks dismissal of the Section 20A claim against him.

A defendant violates Section 20A of the Exchange Act[329] "by purchasing or selling a security while in possession of material, nonpublic information . . . to any person who, contempoaraneously with the purchase or sale of securities that is the subject of [a violation of the Exchange Act], has purchased . . . or sold . . . securities in the same class."[330]

The TAC alleges sales by Fuld of Lehman securities contemporaneously with purchases of Lehman securities by some plaintiffs.[331]  The question is whether it sufficiently alleges that he had material nonpublic information at those times.

Paragraph 266 of the TAC alleges generally that Fuld possessed material, non-public information "[a]s detailed herein" without stating when he allegedly possessed that information or the subject of the information allegedly possessed.  Plaintiffs' brief states that the subject was "the adherence to Lehman's risk management at the time he sold his Lehman stock."[332]  But the paragraph of the TAC it cites for that proposition does not support it.  Plaintiffs thus have pointed to nothing in the complaint that supports the assertion that Fuld possessed material non-public

---

[329]  15 U.S.C. § 78t-1.

[330]  15 U.S.C. § 78t-1(a).

[331]  TAC ¶ 268.

[332]  Pl. Br. at 99.

information at the time of the sales that were contemporaneous with purchases by certain plaintiffs.

Accordingly, the Section 20A claim against defendant Fuld is insufficient.

## IV.   *Securities Act*

Sections 11 and 12 of the Securities Act impose strict liability on certain enumerated categories of parties for material misstatements or omissions contained in covered financial communications.[333]  Only five categories of persons may be held liable under Section 11[334] – issuers, those who sign a registration statement, an issuer's directors, "experts" who have consented to having their reports included in the registration statement, and underwriters of the offered securities.[335]  Only a statutory seller – one who either transferred title to a purchaser or successfully solicited the transfer for financial gain[336] – may be liable under Section 12.[337]  Section 15 imposes

---

[333]

> *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 358 ("Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions. Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications."); 15 U.S.C. §§ 77k(a), 77*l*(a)(2)).

[334]

> 15 U.S.C. § 77k(a).

[335]

> *Id.*

[336]

> *Pinter v. Dahl*, 486 U.S. 622, 642 (1988); *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1988).

[337]

> 15 U.S.C. § 77*l*(a)(2); *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987) ("Section 12(s) imposes liability on persons who offer or sell securities[.]").

liability on individuals or entities that controlled any person who committed a primary violation.[338]

The TAC asserts claims under Section 11 against Fuld, O'Meara, Callan, the Director Defendants, the Underwriter Defendants (the foregoing referred to collectively as the "Securities Act Defendants"), and E&Y based on allegedly false and misleading statements in Lehman's financial statements that were incorporated into the Offering Materials.  It asserts claims under Section 12 against UBS with regard to the Structured Note Offering Materials.  It asserts control person claims under Section 15 against Fuld, O'Meara, Callan, Gregory, and Lowitt based on their alleged control of Lehman.

### A.    Timeliness

The TAC includes twenty-four named plaintiffs that were not plaintiffs in the SAC.  These newly added plaintiffs are the only alleged purchasers of securities in thirty-five of the challenged offerings.[339]  Defendants move to dismiss these plaintiffs' claims as untimely.[340]

"Claims under Sections 11, 12(a)(2) and 15 must be 'brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.'"[341]  Defendants argue that the Securities Act's one

---

[338]

   *In re Morgan Stanley*, 592 F.3d at 358 (quoting 15 U.S.C. § 77*o*); *Rombach*, 255 F.3d at 177-78.

[339]

   Def. Br. at 2, Ex. A; Pl. Br. at 55.  Before Ralph Rosato withdrew, the TAC contained twenty-five such plaintiffs, asserting claims respecting thirty-seven such offerings.

[340]

   Def. Br. at 2.

[341]

   *See In re IndyMac Mortgage-Backed Securities Litig.*, ___ F. Supp.2d ____, 2011 WL 2508254, at *5 (S.D.N.Y. June 21, 2011) ("*IndyMac II*") (quoting 15 U.S.C. § 77m).

year statute of limitations bars the claims of the newly added plaintiffs that were not contained in the SAC because they were on actual or inquiry notice of the facts giving rise to the action no later than February 23, 2009, the date the SAC was filed, which was more than a year before the filing of the TAC on April 23, 2010.

Plaintiffs do not dispute defendants' argument, but contend that the claims nevertheless are timely because the running of the prescriptive period was tolled under *American Pipe & Constr. Co. v. Utah*,[342] where the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."[343]  Defendants counter that *American Pipe* tolling does not apply when the "original plaintiffs lack standing to bring claims that the new plaintiffs seek to assert."[344]

For reasons discussed in a recent opinion in another case,[345] this Court is persuaded that the filing of a class action suspends the running of applicable statutes of limitations for all putative class members even where the putative class plaintiff did not have standing to assert the claims at issue.  Accordingly, the newly added plaintiffs' claims are not barred by the Securities Act's one year statute of limitations.

---

[342]

414 U.S. 538 (1974).

[343]

*Id.* at 554.

[344]

Def. Br. at 2.  They make this assertion notwithstanding the fact that there never has been any determination whether the SAC's named plaintiffs lacked standing to bring the pertinent claims.  Nevertheless, for the reasons discussed *supra*, the SAC's named plaintiffs lacked standing to assert claims regarding these offerings, *to wit*, offerings in which they had not purchased securities.

[345]

*See IndyMac II*, 2011 WL 2508254, at *5-6 (S.D.N.Y. June 21, 2011).

The statute of repose is another matter.  As this Court has noted,

> "[N]o Section 11 claim may be brought more than three years after the security was bona fide offered to the public, and no Section 12(a)(2) claim may be brought more than three years after the sale.  Section 15 imposes vicarious liability for persons controlling violators of Sections 11 and 12. Claims under that section therefore are subject to the statute of repose governing the primary violation."[346]

Defendants argue that certain of plaintiffs' claims are barred by the three year statute of repose.[347] Plaintiffs have not responded to this argument.

Although some cases have reached a different result, this Court is persuaded that neither *American Pipe* nor any other form of tolling may be invoked to avoid the three year statute of repose set forth in Section 13 of the Securities Act of 1933.[348]  The added plaintiffs here cannot avoid the statute of repose on a 'relation back' theory under FED. R. CIV. P. 15(c) because the statute of repose by its terms allows no exceptions.[349]  Indeed, Rule 15 could not properly be construed to permit relation back because such a construction would conflict with the Rules Enabling Act, which provides in pertinent part that the rules prescribed by the Supreme Court (including Rule 15) "shall

---

[346]

Id., 2011 WL 2508254, at *2 (quotations omitted).

[347]

Def. Br. at 2 n.7.

[348]

*Footbridge Ltd. Trust v. Countrywide Financial Corp.*, __ F. Supp.2d __, 2011 WL 907121 (S.D.N.Y. Mar. 16, 2011).  *Accord IndyMac II*, 2011 WL 2508254, at *5-6 (S.D.N.Y. June 21, 2011); *In re Lehman Bros. Secur. Litig.*, ___ F.R.D. ____, 2011 WL 1453790 (S.D.N.Y. Apr. 13, 2011).

[349]

*See* 15 U.S.C. § 77m  ("*In no event* shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title more than three years after the sale." (emphasis added)).

not abridge, enlarge or modify any substantive right."[350]

In light of these principles, several of the claims asserted by the newly added plaintiffs are time-barred. Mohan Ananda and Frank Mandell assert claims in connection with the "100% Principal Protection Notes Linked to a Global Index Basket" offering. That offering, however, occurred on March 30, 2007, and Ananda's and Mandell's purchases therein allegedly occurred on March 23, 2007.[351] Roy Wiegert asserts claims in connection with the "100% Principal Protection Notes Linked to a Global Index Basket" offering. But that offering, and Wiegert's purchases therein, also occurred on March 30, 2007, and March 23, 2007, respectively.[352] Consequently, all of the Securities Act claims respecting these three offerings are barred by the three year statute of repose.

B.    *Statutory standing under Section 12*

UBS argues that all of the Securities Act Section 12 claims against it should be dismissed because plaintiffs have failed sufficiently to allege statutory standing. Their argument is premised solely on the fact that the TAC alleges that plaintiffs "purchased or otherwise acquired" the securities listed in Appendix B to the TAC[353] which, they contend, is insufficient to establish that

---

[350]

28 U.S.C. § 2072(b).

[351]

TAC Appx. A, B.

The Court infers for purposes of the motions that the apparent discrepancies between the alleged purchase dates, which allegedly were trade dates, and the later offering date are reconciled by the purchases having been made on a "when issued" basis.

[352]

*Id.*

[353]

Def. Br., at 2 n.4.

plaintiffs had standing under Section 12.

A plaintiff has standing to bring a Section 12 claim only against a "statutory seller" from which it "purchased" a security.[354]  A "statutory seller" is one who, in a public offering, either transferred title to the purchaser or successfully solicited the transfer for financial gain.[355]  A complaint that alleges that the plaintiff purchased its securities "pursuant and/or traceable to" the Offering Documents is not sufficient.[356]  Allegations that a plaintiff purchased securities "pursuant to" the pertinent offering documents, however, have been construed to permit proof that the plaintiff purchased his or her security "in the offering."[357]

Plaintiffs here have alleged that the Section 12(a)(2) claims are brought on behalf of "all persons and entities who purchased or otherwise acquired the Lehman/UBS Structured Products pursuant to the materially untrue and misleading Structured Note Offering Materials."[358]  They have alleged also the dates and amount of securities that they purchased.[359]  Assuming these factual

---

[354]

     *Akerman*, 810 F.2d at 344 ("Section 12(2) imposes liability on persons who offer or sell securities and only grants standing to 'the person purchasing such security' from them.").

[355]

     *Pinter*, 486 U.S. at 642; *Wilson*, 872 F.2d at 1126; *see also Yung v. Lee*, 432 F.3d 142, 147-48 (2d Cir. 2005).

[356]

     *See In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2005) (collecting cases).

[357]

     *See Tsereteli*, 692 F. Supp.2d at 391;  *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 694 (S.D.N.Y. 2000) (holding claim based on purchase made "pursuant to the Offering" could be brought under § 12 while claim based on purchases made "pursuant or traceable to" offering could not be).

[358]

     TAC ¶ 134

[359]

     *See id.* App. B.

allegations to be true, and drawing all reasonable inferences in plaintiffs' favor, UBS's statutory standing argument must be rejected.[360]

C.      *Existence of actionable material misstatements and omissions in the Offering Materials*

The TAC Securities Act claims against the non-E&Y defendants are based principally on the same categories of alleged misstatements and omissions in the Offering Materials discussed in the Exchange Act section above.  The TAC thus alleges misstatements and omissions sufficiently under the Securities Act to the same extent that it does so under the Exchange Act.  But the TAC relies, in connection with the Securities Act claims, on two additional categories of alleged misstatements:  statements concerning Lehman's valuation of its commercial real estate holdings and in the PPN Offering Materials.

1.      *Valuation of commercial real estate*

The Offering Materials stated that Lehman's "[f]inancial instruments and other inventory positions owned . . . are presented at fair value" and that its "private equity investments are measured at fair value."[361]  They stated also that Lehman adopted SFAS 157 for determining

---

[360]

The claim that plaintiffs lack statutory standing is the only argument UBS offers in support of its motion to dismiss the Section 12 claim that is independent of the Underwriter Defendants' motion to dismiss the Section 11 claims against them.  Consequently, the Section 12 claims against UBS stand or fall to the same extent as the other Section 11 claims do.

[361]

TAC ¶ 93; *see, e.g.*, 2007 10-K at 17, 62; 1Q08 at 22, 71.

"fair value"[362] and defined that term as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, or an 'exit' price."[363]   Plaintiffs allege that these statements were materially false and misleading because Lehman (1) failed to consider certain market information in the assumptions underlying the models it used to value its Archstone and Principal Transaction Group ("PTG") assets and, consequently, (2) assigned values to these assets that did not reflect their "fair value."

The essence of plaintiffs' claim is that SFAS 157 required Lehman to consider certain particular pieces of market-based information in determining the values of its Archstone and PTG assets and that the methods it used failed to do so.[364]   They allege that the models Lehman used to value the Archstone assets assumed (1) a rental growth rate 1.9 to 3.5 percent higher than that projected by third parties, and (2) higher REIT net operating income growth rates than the historical average.   They assert also that the models failed to consider the capitalization rates of other publicly traded REITs.[365]   Finally, they assert that the models used to value the PTG assets  (1) assumed that the real estate collateral would appreciate even as real estate prices were declining, and (2) used an incorrect yield rate that at least one employee allegedly described as based on a "gut feeling."[366]

The allegations that Lehman's valuation models were based on assumptions or inputs

---

362

       *See*, *e.g.*, 2007 10-K at 40; 1Q08 at 12; 2Q08 at 12.

363

       *See*, *e.g.*, 2007 10-K at 95; 1Q08 at 12; 2Q08 at 12.

364

       *See*, *e.g.*, TAC ¶¶ 92-93, 94, 97-98.

365

       *Id.* ¶ 92.

366

       *Id.* ¶¶ 97-99.

different than those used by third parties and the Examiner, or those plaintiffs would have used, is not sufficient to state a claim that Lehman's valuation methods did not comply with SFAS 157's fair value requirement or that the valuation statements based on those models otherwise were misleading. Plaintiffs have not alleged that Lehman failed to undertake the fair value analysis that it said it would undertake for the Archstone and PTC assets. They have alleged only that the methods they used somehow were wrong because they were different than the methods and assumptions that others used in other contexts or at other times.

But SFAS 157 expressly contemplates that different models, based on different assumptions and the assignment of different weight to different inputs, may be used to determine fair value.[367] Lehman's decision to use certain inputs and assumptions rather than others is consistent with SFAS 157. More significantly for these motions, Lehman's determination that certain models, assumptions, and inputs were likely to provide accurate estimations of fair value was a matter of judgment. Such decisions would make Lehman's Offering Materials' statement that it valued assets at fair value in accordance with SFAS 157 false or misleading only if Lehman had not truly believed that the models, assumptions and inputs would produce fair values in accordance with SFAS 157. The TAC is devoid of any such factual allegations and, in fact, expressly disclaims any reliance on intentional wrongdoing in this regard.[368] Consequently, it fails to state a claim on that basis.

---

[367]

See, e.g., SFAS 157 ¶ 18 (describing three different "[v]aluation techniques" that can measure "fair value"); ¶ 22 (noting that "[a]ssessing the significance of a particular input to the fair value measurement in its entirety requires judgment, considering factors specific to the asset or liability."), ¶ A3 ("The judgments applied in different valuation situations will often be different."), ¶ C54 ("Determining the appropriateness of valuation techniques in the circumstances requires judgment.").

[368]

E.g., TAC ¶¶ 23, 120.

Plaintiffs' reliance on *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*[369] and *Automatic Catering, Inc. v. First Multifund For Daily Income, Inc.*[370] for the proposition that misstatements concerning the methodology used to value assets are actionable statements of fact is misplaced.  In those cases, the offering documents described the precise methodology by which the assets' value would be determined.[371]  For example, in *Automatic Catering, Inc.*, the offering documents stated that the general partner would value the securities based on current market values.[372]  The plaintiffs alleged that this statement was false because the company actually valued the securities using an amortized cost method.[373]  There is no such allegation in this pleading.

The TAC's claim that Lehman assigned incorrect values to its commercial real estate assets fails as well.  The only basis for this claim is the allegation that Lehman's fair value methodology violated SFAS 157.  As plaintiffs have failed to allege that Lehman violated SFAS 157, these values are not actionable.

Moreover, the values Lehman assigned to assets like Archstone and PTG were not

---

[369]

479 F. Supp. 2d 349 (S.D.N.Y. 2007), *recons. denied*, No. 03 Civ. 2387 (LAK), 2007 WL 1138866 (S.D.N.Y. Apr. 17, 2007).

[370]

No. 80 Civ. 4117 (RJS), 1981 WL 1664 (S.D.N.Y. Aug. 3, 1981).

[371]

*See Fraternity Fund Ltd.*, 479 F. Supp. 2d at 362 ("[T]he General Partner will price the [securities] based upon the mean between the bid and the asked prices for such securities received from the partnership's brokers and dealers."); *Automatic Catering, Inc.*, 1981 WL 1664, at *7-9 (The net asset value per share . . . is determined by: (a) valuing securities for which market quotations are readily available at the market value and other securities at Fair Value . . . , (b) deducting the Fund's liabilities, (c) dividing the resulting amount by the number of shares outstanding and (d) adjusting to the nearest full cent.")

[372]

*Automatic Catering, Inc.*, 1981 WL 1664, at *7.

[373]

*Id.*

statements of objective fact but instead reflect Lehman's judgment or opinion.[374]   They therefore would be actionable only if plaintiffs had alleged that Lehman did not truly believe those valuations at the time they were issued.[375]   But there are no such allegations in the complaint.[376]   Consequently, the values themselves cannot form the basis of a claim.

2.     *Structured products offering materials and PPNs*

The TAC alleges also that the pricing supplements related to each PPN (the "PPN Offering Materials") were false and misleading for the additional reason that they stated that the PPNs would provide "100% Principal Protection" or "partial principal protection" if the PPNs were held to maturity.[377]   Plaintiffs claim that these statements were false and misleading because (1) the PPNs did not protect investors' principal and were no different than ordinary bonds,[378] and (2)  the PPN Offering Materials failed to disclose that repayment of principal depended on Lehman's solvency.[379]   The claims based on these statements are asserted against Fuld, O'Meara, Callan, the

---

374

      *See Fraternity Fund Ltd.*, 376 F. Supp. 2d at 396 ("[V]aluation of [nonexchange listed securities] was not a matter of looking up closing prices in the *Wall Street Journal*, but involved the exercise of judgment.").

375

      *See Lehman MBS*, 684 F. Supp. 2d at 494-95; *Tsereteli*, 692 F. Supp. 2d at 394.

376

      Indeed, plaintiffs expressly have disclaimed any allegations based on deliberate or intentional conduct in their Securities Act claims.  TAC ¶ 23.  Consequently, they cannot state a claim for violations of the Securities Act based on an allegedly false statement of opinion in the Offering Materials.

377

      *Id.* ¶ 118.

378

      *Id.* ¶ 118(a).

379

      *Id.* ¶118(b)-(c).

Director Defendants and UBS.

In determining whether the PPN Offering Materials were false or misleading, the court must "read [them] as a whole."[380]   The "central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the" securities.[381]   Accordingly, a misleading statement displayed prominently and in numerous places may not be cured by inconspicuous and scattered warnings.[382]

Defendants argue that the PPN Offering Materials disclosed the risk that investors might not receive their principal if Lehman went bankrupt.  The Base Prospectus explained, for example, that the PPNs  would "be [Lehman's] unsecured obligations."[383]   One pricing supplement warned that "an investment in the Notes will be subject to the credit risk of Lehman Brothers Holdings Inc, and the actual and perceived creditworthiness of Lehman Brothers Holdings Inc. may affect the market value of the Notes."[384]   The relevant prospectus supplement stated that Lehman's

---

[380]

*DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2002) (quoting *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990), *cert. denied*, 501 U.S. 1249 (1991).

[381]

*McMahan & Co.*, 900 F.2d at 579.

[382]

*See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198-99 (2d Cir. 1993) (information disclosed to investors "need not be considered part of the total mix reasonably available to them if 'the true' is 'buried.'"); *see also Va. Bankshares, Inc.*, 501 U.S. at 1097 ("[N]ot every mixture with the true will neutralize the deceptive.").

[383]

Chepiga Decl. Ex. 22 ("Base Prospectus") at 8.

[384]

*See, e.g.*, 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index (January 31, 2008) ("Jan. 2008 PS") (Chepiga Decl. Ex. 21), at 6.

"own creditworthiness, . . . may affect the trading market value of, and trading market for, your notes," and warned further that

> "[t]he notes will be solely our obligations, and no other entity will have any obligation, contingent or otherwise, to make any payments in respect of the notes. Because we are a holding company whose primary assets consist of shares of stock or other equity interests in or amounts due from subsidiaries, almost all of our income is derived from those subsidiaries. . . .  Accordingly, we will be dependent on dividends and other distributions or loans from our subsidiaries to generate the funds necessary to meet obligations with respect [to] the notes, including the payment of principal and interest. . . . If these sources are not adequate, we may be unable to make payments of principal or interest in respect of the notes and you could lose all or a part of your investment."[385]

While these statements would have made the nature of these securities clear to a careful and intelligent reader, the principal protection statements were displayed more prominently and frequently than the warnings.  The first line of the each pricing supplement submitted with the defendants' motion states "100% principal protection" in large letters.[386]  The first page lists the "Features" of each investment, which include "100% principal protection if held to maturity" and "[a]t maturity, you will receive a cash payment equal to at least 100% of your principal."[387]  Each mentions 100% principal protection at least four times on the first page.  By contrast, the risk that investors could lose their principal if Lehman went bankrupt is not mentioned on that page at all.

---

[385]

    Lehman Brothers Holdings Inc. Medium-Term Notes, Series I Prospectus Supplement (May 30, 2006) (Chepiga Decl. Ex. 23), at S-4, S-7.

[386]

    Jan 2008 PS, at 1; 100% Principal Protection Absolute Return Barrier Notes Linked to a Global Index Basket Pricing Supplement No. 2 (March 30, 2007) ("Mar. 2007 PS") (Chepiga Decl. Ex. 33), at 1; 100 % Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates Pricing Supplement No. 166 (April 30, 2007) ("Apr. 2007 PS") (Chepiga Decl. Ex. 34), at 1.

[387]

    Jan 2008 PS, at 1; Mar. 2007 PS, at 1; Apr. 2007 PS, at 1.

The rest of each pricing supplement continues this trend, frequently mentioning principal protection, but rarely or obliquely disclosing the risk that Lehman would not repay.

At this stage of the litigation, the Court can not conclude as a matter of law that the repeated and emphasized statements about principal protection were offset sufficiently, as a matter of law, by the inconspicuous and scattered warnings – contained in other SEC filings – about Lehman's solvency.  In consequence, these allegations with respect to the PPNs are sufficient to state a claim.

* * *

Accordingly, the TAC's Securities Act claims against all non-E&Y Securities Act Defendants based on the (1) Repo 105 and net leverage, (2) risk management and (3) concentration of credit risk statements and those against the Insider Defendants, the Director Defendants, and UBS based on the PPN statements rest on legally sufficient allegations of materially false or misleading statements. The claims against E&Y are discussed below.

D.    *Section 11 claims against Callan*

Defendant Callan concededly did not sign the Registration Statement.[388]  She argues that the Section 11 claims against her therefore should be dismissed.  Plaintiffs, however, contend that she is subject to suit under Section 11 because she signed various SEC filings, which the Registration Statement incorporated by reference.  Callan's liability therefore turns on whether signing those filings made her a "person who signed the registration statement" within the meaning

---

[388]    Def. Br. at 31.  The TAC does not allege that she did.  Plaintiffs tacitly admit that she did not.

of Section 11.[389]

Lehman's Registration Statement was filed pursuant to Rule 415 of the Securities Act, which permits delayed or continuous offerings of securities.[390]  A registration statement filed pursuant to Rule 415 must contain the undertakings required by Item 512(a) of Regulation S-K.[391]  Those undertakings require the registrant, *inter alia*, to file a post-effective amendment to the registration statement to include (1) any prospectus required by Securities Act Section 10(a)(3), (2) "any facts or events arising after the effective date of the registration statement which . . . represent a fundamental change in the information set forth in the registration statement," and (3) previously undisclosed material information about the plan of distribution.[392]  The registrant need not file a post-effective amendment, however, if the registration statement is on Form S-3 and the information required to be disclosed is "contained in reports filed with or furnished to the [SEC] by the registrant pursuant to section 13 or section 15(d) of the [Exchange Act] that are incorporated by reference in the registration statement."[393]

Where a registration statement "incorporates by reference any Exchange Act

---

[389]

     15 U.S.C. § 77k(a)(1).

[390]

     17 C.F.R. § 230.415(a); *see also* Chepiga Decl. Ex. 22, at 2 ("Registration Statement") ("[S]ecurities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under Securities Act of 1933").

[391]

     17 C.F.R. § 229.512(a).

[392]

     *Id.* § 229.512(a)(1).   The post-effective amendment is considered a new registration statement "for the purpose of determining any liability under the Securities Act of 1933." *Id.* § 229.512(a)(2).

[393]

     *Id.* § 229.512(a)(1)(B).

document filed subsequent to the effective date of the registration statement," the registrant must make additional undertakings.[394]  These include the undertaking that

> "for purposes of determining any liability under the Securities Act . . . each filing of the registrant's annual report pursuant to section 13(a) or section 15(d) of the [Exchange Act] *that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein*, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof."[395]

The Registration Statement was filed on May 30, 2006, and became effective on that day.[396]  The base prospectus[397] filed with the Registration Statement incorporated by reference Lehman's "future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934," which included the 2007 10-K and the other SEC filings that Callan signed.[398]  Consequently, "for purposes of determining any liability under the Securities Act," each of those filings is "deemed a new registration statement."  Callan therefore became a signer of "new" registration statements by virtue of her having signed those filings.  Her motion to dismiss the Section 11 claim on the ground that she did not sign the Registration Statement therefore is

---

[394]

*Id.* § 229.512(b).

[395]

*Id.*

[396]

Registration Statement at 2; *see also* EDGAR Filing Documents for 0001047469-06-00771, http://www.sec.gov/Archives/edgar/data/806085/000104746906007771/0001047469-06 -007771-index.htm (noting Registration Statement became effective on May 30, 2006).

[397]

The base prospectus is part of the Registration Statement.  Registration Statement at 5 ("This Registration Statement contains . . . a form of prospectus."); *see also* 15 U.S.C. § 77b(8) (defining "registration statement" to "include[] any . . . report, document, or memorandum filed as part of such statement or incorporated therein by reference.").

[398]

Registration Statement at 81 ("We incorporate by reference . . . any future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934").

granted in part, but denied to the extent that the claim is based on statements made in theSEC filings that she signed and that were incorporated by reference in that Statement.[399]

E.      Affirmative defenses of non-E&Y defendants

Fuld, O'Meara, Callan, and the Director and Underwriter Defendants argue that the claims against them should be dismissed because the TAC and the Examiner's Report establish the Securities Act affirmative defenses of due diligence and reliance on an expert.[400]

---

[399]

Both Callan and plaintiffs spent their briefing of this issue discussing SEC Rule 430B, 17 C.F.R. § 229.430B, and the SEC release discussing it.  SEC Rel. 33-8591, 70 Fed. Reg. 44722-01.  Those documents make plain that Rule 430B, which was promulgated in 2005, did not change the liability rules for registration statement signers from those that existed prior to its enactment, i.e., the ones discussed above.  See SEC Rel. 33-8591, at 207 ("[W]e believe that for other persons, including directors, signing officers, and experts, the filing of a form of prospectus shall not result in a later Section 11 liability date than that which applied prior to our new rules.").  Moreover, the rule concerns the effective date and concurrent liability issues surrounding a newly-filed "form of prospectus."  See 17 C.F.R. § 229.430B(f).  The issue here, however, is the liability created by Lehman's 2007 10-K, which Callan signed, not a form of prospectus.

To the extent the rule bears on this issue, it supports the Court's conclusion.  It states that "the date a form of prospectus is deemed part of and included in the registration statement . . . shall not be an effective date established pursuant to paragraph (f)(2) of this section as to . . . [a]ny person signing any report or document incorporated by reference into the registration statement, *except for such a report or document incorporated by reference for purposes of including information required by section 10(a)(3) of the [Securities] Act or pursuant to Item 512(a)(1)(ii) of Regulation S-K (such person except for such reports being not deemed to be a person who signed the registration statement within the meaning of section 11(a) of the Act)*."  This language indicates that those who sign documents, like a 10-K, that are incorporated by reference for the purposes of including information required by Section 10(a)(3) or Item 512(a)(1)(ii) *are* deemed to be persons who signed the registration statement within the meaning of Section 11.

[400]

Def Br. at 10-13; DD Br. at 5-14; *see also* 15 U.S.C. § 77k(b); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

1.      *Availability of the affirmative defenses on a motion to dismiss*

Plaintiffs first argue that the affirmative defenses are not available on a motion to dismiss for failure to state a claim.[401]  This general principle, however, is subject to exceptions, and an "affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."[402]

2.      *Applicability of defenses*

In order to establish the due diligence defense, each defendant has the burden to prove that "after reasonable investigation, [he or she had] reasonable ground to believe and did believe" that the Offering Materials were true and did not contain any material misstatements or omissions.[403]  In order to establish the expert-reliance defense, each defendant has the burden to prove that "he [or she] had no reasonable ground to believe and did not believe" that the statements in the expertized portion of the registration statement were untrue or contained material omissions.[404] The statute defines "reasonableness" for these purposes as "that required of a prudent man in the

---

[401]

  Pl. Br. at 48.

[402]

  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998), *cert. denied*, 525 U.S. 1103 (1999); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1277 (2011) ("When . . . the facts [necessary to assert an affirmative defense] are completely disclosed on the face of the pleadings . . . the recent cases seem to agree that the matter may be disposed of by a motion to dismiss under Rule 12(b).").

[403]

  15 U.S.C. § 77k(b)(3)(A).

[404]

  *Id.* § 77k(b)(3)(c).

management of his [or her] own property."[405]

Fuld, O'Meara, Callan, and the Director and Underwriter Defendants contend that Lehman's public filings and the Examiner's Report[406] conclusively demonstrate that each conducted a "reasonable investigation" and had a "reasonable ground to believe" the Offering Materials were true. Fuld, O'Meara, Callan and the Underwriter Defendants likewise contend that the TAC establishes their due diligence at least with respect to the Repo 105 statements. They point to the allegations that E&Y knew about the Repo 105 transactions, issued an unqualified audit opinion certifying that Lehman's 2007 10-K was prepared in accordance with GAAP and fairly presented Lehman's financial condition in all material respects, and certified that it was "not aware of any material modifications that should be made to . . . the [quarterly reports] for them to be in conformity with GAAP."[407] They argue also that there were no red flags that would have put them on notice that it was not reasonable to rely on E&Y's conclusions.[408]

For reasons discussed previously, neither the Examiner's Report nor the various SEC filings is properly before the Court for the truth of the matters asserted. In any case, neither they nor the TAC would conclusively establish the due diligence defense on behalf of any of these defendants. The questions whether a particular defendant acted with due diligence and nevertheless was unaware of the falsity of any pertinent statement necessarily is relative and requires a

---

[405]

   *Id.* § 77k(c); 17 C.F.R. § 230.176.

[406]

   The Court already has noted that it may consider the Examiner's Report on this motion to dismiss as it was "integral" to the TAC. *See supra*.

[407]

   Def. Br. at 13; TAC ¶ 40.

[408]

   Def. Br. at 13.

104

determination of all relevant circumstances.  Plaintiffs were not required to allege in the TAC all the

circumstances necessary to negate the affirmative defense,[409] but only those necessary to state a

plausible claim for relief.[410]    Accordingly, the Court cannot conclude as a matter of law that the

defendants' investigation was reasonable under the circumstances.  Consequently, the motions to

dismiss on this basis are denied.

F.      *Securities Act claims against E&Y*

The Securities Act claims against E&Y are based on the same statements regarding

GAAS and GAAP compliance as the Exchange Act claims.  As discussed above, the TAC arguably

alleges misstatements – that is, statements in which E&Y falsely represented that it had complied

with GAAS and that Lehman had complied with GAAP – in connection with the 2Q08 review.

Representations made in that report, however, are not actionable under the Securities Act.

Accounting firms like E&Y are subject to Securities Act Section 11 liability only if

the alleged misstatement or omission occurs in a portion of a registration statement, or a report or

valuation used in connection with the registration statement, prepared or certified by it.[411]  The SEC,

---

[409]

  *See In re Global Crossing, Ltd Sec. Litig.* 313 F. Supp.2d at 211 (Securities Act Section 11 "expressly provides that the burden of proof is on defendants to establish this defense . . . and the plaintiffs need not negate such an affirmative defense in their pleading."); 15 U.S.C. § 77k(b).

  The Court notes that the TAC pleads in a conclusory manner that the Securities Act Defendants failed to make a "reasonable investigation or possess reasonable grounds to believe that the statements contained in the Shelf Registration Statement were true."  TAC ¶ 126.

[410]

  *Twombly*, 550 U.S. at 570.

[411]

  15 U.S.C. § 77k(a)(4).

by rule, has provided that "a report on an unaudited interim financial statement . . . by an independent accountant . . . shall not be considered a part of a registration statement prepared or certified by an accountant or a report prepared or certified by an accountant within the meaning of" Section 11.[412]  Accordingly, misstatements or omissions in a "report on unaudited interim financial information" cannot give rise to accountant liability under Section 11(a)(4).  As E&Y made the only otherwise actionable statements in reports on unaudited interim financial information,[413] plaintiffs' Securities Act claims against it fail.

G.      *Section 15 claims*

Defendants move to dismiss the Securities Act Section 15 control person claims against the Insider Defendants on the ground that the TAC fails to assert a primary violation of the Securities Act.[414]  For the reasons stated above, the TAC sufficiently alleges violations of Securities

---

[412]

17 C.F.R. § 230.436(c).

[413]

For purposes of 17 C.F.R. § 230.436(c), a "report on unaudited interim financial information" is a report which consists of: "(1) A statement that the review of interim financial information was made in accordance with established professional standards for such reviews; (2) An identification of the interim financial information reviewed; (3) A description of the procedures for a review of interim financial information; (4) A statement that a review of interim financial information is substantially less in scope than an examination in accordance with generally accepted auditing standards, the objective of which is an expression of opinion regarding the financial statements taken as a whole, and, accordingly, no such opinion is expressed; and (5) A statement about whether the accountant is aware of any material modifications that should be made to the accompanying financial information so that it conforms with generally accepted accounting principles."

[414]

Pl. Br. at 31.

106

Act Sections 11 and 12.  Consequently, the Section 15 claims will stand.[415]

*Conclusion*

The motions to dismiss the TAC [09 MD 2017, docket items 293, 296, 299; 08 Civ. 5523, docket items 224, 227, 230] are granted in part and denied in part as set forth above. Defendants shall settle an order more fully setting forth the rulings made herein, preferably an order agreed as to form by all parties, on seven days' notice.

SO ORDERED.

Dated:          July 27, 2011

_____

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[415] Defendants, in a footnote without any citation to authority, contend also that the "Section 15 claims against Gregory and Lowitt should be dismissed for the additional reason that the TAC does not allege that they violated Section 11." This argument is directly contradicted by the statutory text. 15 U.S.C. § 77*o* ("Every person who . . . controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person."). Section 15 would be completely redundant if it applied only to control persons who themselves violated Section 11 or 12.