**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION | Case No. 09-MD-2017 (LAK) |
| This Document Applies To: | <u>ECF CASE</u> |
| *In re Lehman Brothers Equity/Debt Securities Litigation, 08-CV-5523-LAK* | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
<u>**CLASS REPRESENTATIVES AND CLASS COUNSEL**</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. i

I. PRELIMINARY STATEMENT ................................................................................. 1

II. FACTUAL BACKGROUND ..................................................................................... 4

III. LEGAL ARGUMENT ............................................................................................... 7

    A. Plaintiffs Satisfy The Prerequisites Of Rule 23(a) .......................................... 8

        1. Numerosity Is Established ...................................................................... 8

        2. Commonality Is Established ................................................................... 9

        3. Typicality Is Established ....................................................................... 11

        4. Adequacy Is Established ....................................................................... 12

    B. The Requirements Of Rule 23(b) Are Satisfied ............................................. 14

        1. Common Questions Of Law And Fact Predominate ............................. 14

        2. The Element Of Reliance Poses No Barrier To Class Certification ............................................................................................ 16

        3. Materiality Of Repo 105 And E&Y's Misrepresentation ..................... 20

        4. Superiority Is Established ...................................................................... 24

IV. CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Products v. Windsor,*
    521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)...................................................2, 14

*In re Avon Sec. Litig.,*
    No. 91 Civ. 2287 (LMM), 1998 WL 834366 (S.D.N.Y. Nov. 30, 1998)................................8

*Basic Inc. v. Levinson,*
    485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1998).......................................4, 16, 18, 20

*In re Blech Sec. Litig.,*
    187 F.R.D. 97 (S.D.N.Y. 1999) ...........................................................................................8

*In re Boston Sci. Corp. Sec. Litig.,*
    604 F. Supp. 2d 275 (D. Mass. 2009) ................................................................................19

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989) ..................................................................................17, 18

*Cheney v. Cyberguard Corp.,*
    213 F.R.D. 484 (S.D. Fla. 2003) .......................................................................................19

*Consol. Rail Corp. v. Town of Hyde Park,*
    47 F.3d 473 (2d Cir. 1995)..................................................................................................8

*Cromer Fin. Ltd. v. Berger,*
    205 F.R.D. 113 (S.D.N.Y. 2001) ......................................................................................16

*Damassia v. Duane Reade, Inc.,*
    250 F.R.D. 152 (S.D.N.Y. 2008) .............................................................................9, 10, 12

*Darquea v. Jarden Corp.,*
    No. 06 Civ. 722 (CLB), 2008 WL 622811 (S.D.N.Y. Mar. 6, 2008) ......................................2

*Dura-Bilt Corp. v. Chase Manhattan Corp.,*
    89 F.R.D. 87 (S.D.N.Y. 1981) ..........................................................................................15

*In re DVI, Inc. Sec. Litig.,*
    639 F.3d 623 (3d Cir. 2011)...............................................................................................19

*In re Dynex Capital, Inc. Sec. Litig.,*
    No. 05 Civ. 1897 (HB), 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ......................................12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011) .......................................................3, 16

*Escott v. Barchris Constr. Corp.*,
340 F.2d 731 (2d Cir. 1965) .........................................................................7

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007) .............11

*In re Fed. Nat'l Mortg. Assoc. Sec., Derivative and ERISA Litig.*,
247 F.R.D. 32 (D.D.C. 2008) .......................................................................20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ...............................................................11, 12, 13

*Fogarazzo v. Lehman Bros., Inc.*,
232 F.R.D. 176 (S.D.N.Y. 2005) ...............................................................9, 11

*In re Gaming Lottery Sec. Litig.*,
No. 96 CIV 5567 (RPP), 2001 WL 204219 (S.D.N.Y Mar. 1, 2001) ....................18

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982) ...............................9

*Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
114 F.R.D. 48 (S.D.N.Y. 1987) ...................................................................15

*In re Globalstar Sec. Litig.*,
No. 01 Civ. 1748 (PKC), 2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) .......9, 11, 13

*In re HealthSouth Corp. Sec. Litig.*,
261 F.R.D. 616 (N.D. Ala. 2009) .................................................................18

*In re Indep. Energy Holdings PLC Sec. Litig.*,
210 F.R.D. 476 (S.D.N.Y. 2002) ...............................................................8, 16

*In re Initial Pub. Offering Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004) ...................................................................17

*In re Initial Pub. Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) .......................................................................7, 8

*Katz v. Image Innovations Holdings, Inc.*,
No. 06 Civ. 3707(JGK), 2010 WL 2926196 (S.D.N.Y. July 22, 2010) .............2, 8

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) .................................................................17

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y 2008) ....................................................................................18, 24

*In re Lehman Bros. Sec. and ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ......................................................................15, 21, 22

*Lehocky v. Tidel Techs., Inc.*,
    220 F.R.D. 491 (S.D. Tex. 2004) .............................................................................................19

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ...................................9

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) .....................................................................20, 24

*Maywalt v. Parker and Parsley Petroleum Co.*
    147 F.R.D. 51 (S.D.N.Y. 1993) *aff'd*, 67 F.3d 1072 (2d Cir. 1995) ...................................7, 8

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010) ...............................................................................................17

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    249 F.R.D. 124 (S.D.N.Y. 2008) .............................................................................................24

*In re Monster Worldwide, Inc. Sec. Litig.*,
    251 F.R.D. 132 (S.D.N.Y. 2008) .............................................................................................12

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) ..................................................................................................14

*O'Neil v. Appel*,
    165 F.R.D. 479 (W.D. Mich. 1996) .........................................................................................18

*In re Oxford Health Plans, Inc.*,
    191 F.R.D. 369 (S.D.N.Y. 2000) ...............................................................................................9

*Pa. Ave. Funds v. Inyx Inc.*,
    No. 08 Civ. 6857 (PKC), 2011 WL 2732544 (S.D.N.Y. July 5, 2011) ...................................17

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ................................................................................ passim

*In re Parmalat Sec. Litig.*,
    No. 04 MD 1653(LAK),
    2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) .................................................................. passim

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) .............................................................................................15

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    MDL No. 1005, M-21-67 (MP), 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) ......................7

*Pub. Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*,
    No. 08 Civ. 10841 (JSR), 2011 WL 3652477 (S.D.N.Y. Aug. 22, 2011) .............................10

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)..........................................................................................11

*In re Sadia, S.A. Sec. Litig.*,
    269 F.R.D. 298 (S.D.N.Y. 2010) ..................................................................................17

*In re Salomon Analyst Metromedia*,
    544 F.3d 474 (2d Cir. 2008)..........................................................................................20

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007) ........................................................................19

*In re SLM Corp. Sec. Litig.*,
    No. 08 Civ. 1029 (WHP), 2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ........................ passim

*In re Take Two Interactive Sec. Litig.*,
    No. 06 Civ. 803(RJS), 2010 U.S. Dist. LEXIS 143837 (S.D.N.Y. June 29, 2010)................16

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) .........................................................................7, 9, 11, 16

*In re Vivendi Universal, S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ................................................................................... passim

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) ..................................................................................24

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ..................................................................9

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................................13

**OTHER AUTHORITIES**

7A Charles A. Wright, Arthur A. Miller & Mary Kay Kane, *Federal Practice &*
    *Procedure* § 1778 (3d ed. 2011) ..................................................................................15

Federal Rules of Civil Procedure
    Rule 23 ......................................................................................................... passim

H.R. Conf. Rep. No. 104-369 (1995)..............................................................................14

Securities Act Release No. 6235,
    45 Fed. Reg. 63, 693 (1980) ................................................................................17

## I.    PRELIMINARY STATEMENT

Lead Plaintiffs respectfully submit this memorandum in support of their motion, pursuant to Rules 23(a), (b)(3) and (g) of the Federal Rules of Civil Procedure, seeking:  (1) certification of a class of Lehman Brothers Holdings Inc. ("Lehman" or the "Company") investors, as defined below; (2) appointment of Lead Plaintiff Alameda County Employees' Retirement Association ("ACERA") and additional plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma FF") as Class Representatives; and (3) appointment of Lead Counsel as Class Counsel (the "Motion").[1]

As a result of the proposed settlements with the Individual Defendants and the Underwriter Defendants, the remaining defendants in this class action are Ernst & Young LLP ("E&Y") and UBS Financial Services ("UBS").[2]  Specifically, investors in Lehman common stock and options have claims arising under the Securities Exchange Act of 1934 ("Exchange Act") against E&Y, while investors in certain Lehman structured notes have claims arising under the Securities Act of 1933 ("Securities Act") against UBS.

By this Motion, Lead Plaintiffs seek to certify the following proposed class (the "Class"):

---

[1] Lead Plaintiffs are Alameda County Employees' Retirement Association, Government of Guam Retirement Fund, Northern Ireland Local Government Officers' Superannuation Committee, City of Edinburgh Council as Administering Authority of the Lothian Pension Fund, and Operating Engineers Local 3 Trust Fund.  Lead Counsel are Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") and Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz").

[2] "Individual Defendants" refers to the former Lehman officers and directors that are named as defendants in the Third Amended Class Action Complaint For Violations Of The Federal Securities Law ("TAC"), attached to the Declaration of David R. Stickney ("Stickney Decl.") as Ex. A.  "¶__" refers to paragraphs in the TAC.  The "Underwriter Defendants" refers to the 53 banks that underwrote the Lehman debt and equity offerings, as alleged in the TAC.  ¶16 and Appendix A.

> All persons and entities who purchased or otherwise acquired Lehman common stock, or purchased call options or sold put options referencing Lehman common stock between July 11, 2008 and September 14, 2008, inclusive, and who were damaged thereby. Excluded from the Class are Defendants and their respective officers, affiliates and directors, members of their immediate families and their legal representatives, heirs, successors or assigns of any such excluded party and any entity in which Defendants have or had a controlling interest.

This case is ideally suited for class treatment under Rule 23. Indeed, courts in the Second Circuit make clear that claims "'alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification.'" *In re SLM Corp. Sec. Litig.*, No. 08 Civ. 1029 (WHP), 2012 WL 209095, at *4 (S.D.N.Y. Jan. 24, 2012) ("*SLM*") (Pauley, J.) (quoting *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707(JGK), 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010) (citing *Amchem Products v. Windsor*, 521 U.S. 591, 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997))). Moreover, "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements are to be construed liberally." *SLM*, 2012 WL 209095, at *3 (quoting *Darquea v. Jarden Corp.*, No. 06 Civ. 722 (CLB), 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008)).

As explained below, the Rule 23(a) prerequisites of "numerosity," "commonality," "typicality," and "adequacy" are readily satisfied. First, numerosity cannot be disputed as Lehman had an average of 693.3 million shares of common stock outstanding during the Class Period, with an average daily trading volume of over 87 million shares on the New York Stock Exchange ("NYSE"). *See* Stickney Decl., Ex. B, Expert Report of Professor Gregg A. Jarrell, Ph.D. ("Jarrell Report") dated February 3, 2012 at ¶22. Second, commonality is satisfied by the common questions of fact and law surrounding E&Y's false and misleading statement in Lehman's Form 10-Q for 2Q08. Third, the proposed Class Representatives' claims against E&Y are typical of the claims of the Class because the legal and factual arguments supporting the claims against E&Y are the same for the proposed Class Representatives as they are for the

additional class members.  Finally, the interests of proposed Class Representatives ACERA and Oklahoma FF are directly aligned with the interests of the Class based upon their purchases of Lehman common stock during the Class Period.

The proposed Class Representatives also satisfy Rule 23(b)(3), which requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  As for the reliance element of the Section 10(b) claim, Lead Plaintiffs have established that a presumption of reliance applies pursuant to the fraud-on-the-market theory of reliance.  In connection with this Motion, Lead Plaintiffs submit the expert report of Professor Gregg A. Jarrell, Ph.D., which supports the allegation that Lehman common stock traded in an efficient market during the Class Period.[3]  Indeed, Lehman was one of the largest investment banks in the world and a widely-held stock on the New York Stock Exchange – the paradigm of market efficiency.  Further, the undisclosed and misrepresented information relating to Lehman's use of "Repo 105" transactions to manipulate its net leverage and net leverage ratio was clearly material, as was E&Y's representation that it was "not aware of any material modifications that should be made to [Lehman's] consolidated financial statements . . . for them to be in conformity with [GAAP]."[4]  ¶224.  Accordingly, pursuant to the fraud-on-the-market doctrine, a presumption of reliance applies to the Section 10(b) claims.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185, 180 L. Ed. 2d 24 (2011) ("*Halliburton*") (according to the doctrine, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material

---

[3] *See* Stickney Decl., Ex. B, Jarrell Report.

[4] As in this Court's July 27, 2011 Opinion, Lead Plaintiffs refer to Repo 105 and Repo 108 transactions collectively as "Repo 105."

misrepresentations") (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246, 108 S. Ct. 978, 991-92, 99 L. Ed. 2d 194 (1998)).

For the reasons set forth more fully herein, Lead Plaintiffs' Motion should be granted.

## II.    FACTUAL BACKGROUND

Prior to and during the Class Period, Lehman utilized massive amounts of undisclosed Repo 105 transactions to temporarily reduce Lehman's reported leverage by billions of dollars at the end of reporting periods and in particular, the 2Q08 reporting period, which ended on May 31, 2008.  ¶¶26-39. The Repo 105 transactions served to artificially reduce Lehman's reported "net leverage ratio" – a key financial metric for evaluating the strength of Lehman's balance sheet and its ability to absorb losses from the deteriorating real estate markets.  ¶¶1, 147.  In these transactions, Lehman purported to "sell" as much as $50 billion of its assets to third parties at the end of financial reporting periods, thereby apparently "removing" the assets from Lehman's balance sheet and lowering the Company's net leverage ratio.  ¶31.  Unlike ordinary repurchase agreements in which the transferred securities would have remained on Lehman's balance sheet and a corresponding liability would have been recorded representing Lehman's obligation to repay the borrowed cash, Lehman used the cash obtained through concealed Repo 105 transactions to pay down short-term liabilities, thereby reducing total liabilities and total assets and, thus, artificially reducing the Company's net leverage ratio.  ¶¶31-32.  The "sales" were wholly illusory as Lehman had agreed to repurchase these assets only days after the quarter ended, when the assets would be restored to the Company's balance sheet.  ¶32.

The Repo 105 transactions had no legitimate business purpose.  ¶¶63, 147-49.  Through these transactions, Lehman created a false and misleading picture of the Company's financial strength and ability to withstand losses.  ¶¶154-56.  Specifically, Repo 105 transactions

concealed the truth about Lehman's balance sheet and liquidity because they allowed the Company to avoid taking massive write-downs on assets it otherwise would have had to sell and avoided downgrades from the rating agencies. ¶¶248-49.

Despite the magnitude of Lehman's Repo 105 transactions, they were not disclosed during the class period. Investors never knew that, days after a quarter ended, tens of billions of dollars in assets would reappear on Lehman's balance sheet, increasing net leverage by as much as 15%. As Lehman's Global Financial Controller, Martin Kelly, later explained, "if an analyst or a member of the investing public were to read Lehman's Forms 10-Q and 10-K from cover to cover, taking as much time as she or he needed, 'they would have no transparency into [Lehman's] Repo 105 program.'" ¶148(a).

Moreover, Lehman publicly urged investors to consider net leverage because it was purportedly a "more meaningful, comparative ratio" than gross leverage. ¶26; *see, e.g.*, Stickney Decl., Ex. C, 2Q08 Form 10-Q at 88 ("The relationship of assets to equity is one measure of a company's capital adequacy. Generally, this leverage ratio is computed by dividing assets by stockholders' equity. The Company believes that a more meaningful, comparative ratio for companies in the securities industry is net leverage, which is the result of net assets divided by tangible equity capital."). Even incremental adjustments in the ratio were material as Lehman and E&Y internally acknowledged that movements of as little as 0.1 in the net leverage ratio were material. ¶28; *see* Stickney Decl., Ex. D, Ernst & Young Workpapers, LBHI/LBI Walkthrough Template for Balance Sheet Close Process (Nov. 30, 2007) at 14 ("Materiality is usually defined as any item individually, or in the aggregate, that moves net leverage by 0.1 point or more (typically $1.8 billion). Net leverage is an important ratio analyzed by the rating agencies and included in Lehman's earnings releases.").

As the market became increasingly concerned about Lehman's ability to withstand losses, Lehman dramatically increased its use of Repo 105 transactions – from approximately $32 billion in 2Q07, to $36 billion in 3Q07, to $39 billion in 4Q07, to $49 billion in 1Q08, and then to over $50 billion in 2Q08. ¶38; Stickney Decl. Ex. E, Examiner Report at 888-91.[5] Simultaneously, during this period, Lehman publicly reported a materially reduced net leverage ratio, from 15.4x at the end of 2Q07, to 12.1x at the end of 2Q08. ¶38; Stickney Decl. Ex. C, 2Q08 10-Q at 56, 89; Ex. F, 2007 Form 10-K at 29, 64. Using Repo 105 transactions, Lehman reduced its net leverage ratio by 10% to 15% per quarter and by 1.50x to 1.90x each quarter. ¶38; Stickney Decl. Ex. E, Examiner Report at 888-91. Given that Lehman and E&Y defined materiality as a change in net leverage by 0.1, the reduction in net leverage by 1.50 to 1.90 exceeded Lehman's own materiality threshold by ***fifteen to nineteen times***. ¶¶28-38.

While investors were unaware of the Repo 105 program and the distortion of net leverage, E&Y privately knew that Lehman used Repo 105 transactions to temporarily reduce the reported balance sheet by tens of billions of dollars and the reported net leverage figures by up to 15% at the end of reporting periods. ¶¶226-28. In addition to E&Y's actual knowledge that Repo 105 usage was spiking at quarter's end on a consistent basis, E&Y's direct knowledge is further demonstrated by the account of Matthew Lee ("Lee"), a Lehman Senior Vice President in charge of Lehman's consolidated balance sheets. ¶229. Concerned about the misleading nature of Lehman's financial reporting, just days before E&Y issued its false statement on the evening of July 10, 2008, Lee told two E&Y partners during a face-to-face meeting about management's practice of moving $50 billion in assets off of Lehman's balance sheet near the

---

[5] "Examiner Report" refers to the March 11, 2010 report issued by the bankruptcy court examiner, Anton R. Valukas (the "Examiner"), assigned to Lehman's bankruptcy estate.

end of the 2Q08 quarter with the assets returning to the balance sheet just days after the quarter closed. ¶230. In her handwritten notes from this meeting, E&Y partner Hillary Hansen underscored the importance of the issue by underlining and bolding the $50 billion figure. E&Y, however, did not launch an investigation following Lee's disclosure and made no mention of the Repo 105 issue to the Audit Committee. ¶231. Instead, E&Y issued the false and misleading unqualified review report without disclosure. ¶232.

## III.   LEGAL ARGUMENT

The class action mechanism is well-suited for securities actions. *See Maywalt v. Parker and Parsley Petroleum Co.* 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (explaining that the Second Circuit "has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country") *aff'd*, 67 F.3d 1072 (2d Cir. 1995); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 237 (S.D.N.Y. 2006); *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* MDL No. 1005, M-21-67 (MP), 1995 WL 798907, at *15 (S.D.N.Y. Nov. 20, 1995) (citing *Escott v. Barchris Constr. Corp.*, 340 F.2d 731, 733 (2d Cir. 1965)), *cert. denied sub nom.* To be certified, plaintiffs must satisfy the prerequisites of Rule 23(a), namely, "numerosity," "commonality," "typicality," and "adequacy." *See* Fed. R. Civ. P. 23(a). In addition, plaintiffs must satisfy one of the requirements of Rule 23(b), in this case by demonstrating under Rule 23(b)(3) that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Moreover, the Court should not resolve factual issues that are not relevant to a particular Rule 23 requirement. *See In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (citing *In re Initial Pub. Offering*

*Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)). Finally, the Court must "assure that a class certification motion does not become a pretext for a partial trial of the merits." *Id.*; *see also Katz,* 2010 WL 2926196, at \*2.

**A.    Plaintiffs Satisfy The Prerequisites Of Rule 23(a)**

**1.    Numerosity Is Established**

Rule 23 permits class certification if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[T]he rule does not require impossibility of joinder." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999). "[J]oinder of all members need not be impossible, but only impracticable in the sense that joinder would 'needlessly complicate and hinder efficient resolution of the litigation.'" *In re Avon Sec. Litig.,* No. 91 Civ. 2287 (LMM), 1998 WL 834366, at \*5 (S.D.N.Y. Nov. 30, 1998); *see also In re Indep. Energy Holdings PLC Sec. Litig.,* 210 F.R.D. 476, 479 (S.D.N.Y. 2002); *Maywalt,* 147 F.R.D. at 55; *Blech*, 187 F.R.D. at 103.

In this Circuit, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 482-83 (2d Cir. 1995); *see also In re Parmalat Sec. Litig.*, No. 04 MD 1653(LAK), 2008 WL 3895539, at \*4 (S.D.N.Y. Aug. 21, 2008) (Kaplan, J.). Moreover, "courts in this district have certified plaintiff classes based on the volume of outstanding shares." *Pa. Ave. Funds v. Inyx Inc.*, No. 08 Civ. 6857 (PKC), 2011 WL 2732544, at \*3 (S.D.N.Y. July 5, 2011) ("*Inyx*") (collecting cases). "Precise quantification of the class members is not necessary because a court may make common sense assumptions regarding numerosity." *Vivendi,* 242 F.R.D. at 83 (citations omitted).

Numerosity cannot seriously be disputed. During the Class Period, Lehman had an average of 693.3 million shares of common stock outstanding, with an average daily trading

volume of over 87 million shares on the New York Stock Exchange. *See* Stickney Decl., Ex. B,

Jarrell Report ¶22. Throughout the Class Period, Lehman securities were purchased by investors

in countries worldwide as well as in the over-the-counter market in the United States. While the

exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs

believe that there are hundreds, if not thousands of members in the Class located throughout the

United States and abroad who purchased on the NYSE. ¶18. Accordingly, as in *Veeco*

*Instruments*, 235 F.R.D. at 238, "[t]he large size and geographical diversity of the putative class

makes joinder impracticable."

### 2. Commonality Is Established

"The commonality requirement, particularly in securities fraud litigation, is generally

considered a low hurdle easily surmounted." *In re Marsh & McLennan Cos., Inc. Sec. Litig.,* No.

04 Civ. 8144 (CM), 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009); *see also In re*

*Globalstar Sec. Litig.,* No. 01 Civ. 1748 (PKC), 2004 WL 2754674, at *4 (S.D.N.Y. Dec. 1,

2004).[6] "Commonality requires the plaintiff to demonstrate that the class members 'have

suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d

374 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157, 102 S. Ct. 2364, 2370-71,

72 L. Ed. 2d 740 (1982)). "This requirement 'has been applied permissively in securities fraud

litigation' and generally is satisfied 'where putative class members have been injured by similar

material misrepresentations and omissions.'" *Parmalat*, 2008 WL 3895539, at *4 (citations

omitted); *see also Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. 176, 180 (S.D.N.Y. 2005); *In re*

*Oxford Health Plans, Inc.,* 191 F.R.D. 369, 374 (S.D.N.Y. 2000). "Commonality 'does not mean

---

[6] Rule 23(a)(2) requires a plaintiff to show that "there are questions of law or fact common to the class."

that all issues must be identical as to each member.'" *Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152, 156 (S.D.N.Y. 2008).

The party seeking class certification is merely required to "identify some unifying thread among the members' claims that warrant[s] class treatment." *Id.* at 156; *Vivendi*, 242 F.R.D. at 84. Indeed, "a single common question of law or fact may suffice." *Inyx*, 2011 WL 2732544, at *4. Here, at least five separate questions of law or fact are common to all members of the Class, including (1) whether the federal securities laws were violated by E&Y's misrepresentation as alleged; (2) whether E&Y's report included in Lehman's Form 10-Q for 2Q08 misrepresented material facts concerning the business and financial condition of Lehman; (3) whether the market price of Lehman common stock (and options) was artificially inflated due to the material misrepresentations and failure to disclose material facts by E&Y; (4) whether E&Y knew of the misrepresentations or acted recklessly when issuing its audit review opinion; and (5) the extent to which the members of the Class have sustained damages and the proper measure of damages.

The Section 10(b) claims against E&Y focus on the statement that E&Y was "not aware of any material modifications that should be made to [Lehman's] consolidated financial statements . . . for them to be in conformity with [GAAP]."  ¶224.  Thus, "[c]ommon questions of law and fact include whether certain statements were false and misleading," whether they and the omitted facts were material, and "whether those statements violated the federal securities laws." *Inyx*, 2011 WL 2732544, at *4; *see also Pub. Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, No. 08 Civ. 10841 (JSR), 2011 WL 3652477, at *6 (S.D.N.Y. Aug. 22, 2011) (the "commonality requirement is 'plainly satisfied [where] the alleged misrepresentations . . . relate to all the investors, [as the] existence and materiality of such misrepresentations obviously

present important common issues'" (brackets in original) (citation omitted)); *Fogarazzo*, 232 F.R.D. at 180; *Veeco Instruments*, 235 F.R.D. at 238.

The Section 10(b) claims against E&Y also raise the common issue of whether E&Y's material misrepresentations caused shareholder losses and whether E&Y acted with scienter. *Inyx*, 2011 WL 2732544, at *4 ("whether [material misstatements or omissions] were knowingly and recklessly issued, and ensuing causation issues" present common questions); *Globalstar* 2004 WL 2754674, at *4. Rule 23(a)(2)'s commonality requirement is plainly satisfied here.

### 3. Typicality Is Established

Courts in this District "have emphasized that the typicality requirement is not demanding." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *13 (S.D.N.Y. July 27, 2007). "[T]he typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." *Vivendi*, 242 F.R.D. at 84-85. To establish typicality, plaintiffs must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *see also Parmalat*, 2008 WL 3895539, at *5. "When the same unlawful conduct was directed at or affected both the named plaintiff and the prospective class, typicality is usually met." *Inyx*, 2011 WL 2732544, at *4 (citing *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)); *Vivendi*, 242 F.R.D. at 85 (same). Finally, "[t]ypicality 'does not require that the factual background of each named plaintiffs' claim be identical to that of all class members.'" *EVCI*, 2007 WL 2230177, at *13 (citation omitted).

Here, the proposed Class Representatives' claims are typical of the claims of the Class. Like the other members of the Class, their claims are based on E&Y's statement included in

Lehman's 2Q08 Form 10-Q. The legal and factual arguments the proposed Class Representatives advance regarding E&Y's liability are the same as the arguments that other Class members would advance in support of their claims. Moreover, ACERA and Oklahoma FF are not subject to any unique defenses. *See Parmalat*, 2008 WL 3895539, at *5 (The unique defense rule is "intended to protect plaintiff class – not to shield defendants from a potentially meritorious suit" and "has generally been applied only where a full defense is available against an individual plaintiff's action." (citation omitted)). Accordingly, ACERA and Oklahoma FF satisfy the typicality requirement. *See, e.g.*, *Vivendi*, 242 F.R.D. at 85 ("[P]laintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements . . . . Such allegations [] generally . . . satisfy the typicality requirement."); *see also Inyx*, 2011 WL 2732544, at *4-5; *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2011 WL 781215, at *3 (S.D.N.Y. Mar. 7, 2011) (finding claims to be typical because legal theories and proof would be the same for plaintiffs' claims and claims of class members).

### 4.    <u>Adequacy Is Established</u>

Rule 23(a) requires plaintiffs to establish that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see Parmalat*, 2008 WL 3895539, at *7. "Adequacy 'entails an inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *Flag Telecom*, 574 F.3d at 35. A finding that a proposed class representative satisfies the typicality inquiry constitutes "strong evidence that [its] interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class." *Damassia*, 250 F.R.D. at 158; *see also In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 134 (S.D.N.Y. 2008). Finally,

only a fundamental conflict between the interests of the proposed class representative and the class will defeat a motion for class certification. *See Flag Telecom*, 574 F.3d at 35 ("In order to defeat a motion for [class] certification, however, the conflict 'must be fundamental.'").

Here, based upon their purchases of Lehman common stock during the Class Period, and the significant losses they suffered, ACERA's and Oklahoma FF's interests are directly aligned with the interests of the Class they seek to represent.[7] *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (explaining that "named plaintiffs' interests are directly aligned with those of the absent class members; they are purchasers of WorldCom equity and debt securities who suffered significant losses as a result of the investments"). When ACERA and Oklahoma FF prove their claims, they will also prove the claims of absent Class members, satisfying the adequacy requirement. *See, e.g., Inyx*, 2011 WL 2732544, at *5; *Globalstar*, 2004 WL 2754674, at *4.

ACERA has also demonstrated its commitment to monitor and supervise the prosecution of this action on behalf of the Class. ACERA retained experienced counsel, receives regular status updates, participates in strategic decisions, including the resolution of the action against the previously named defendants, and is actively participating in discovery. Likewise, both ACERA and Oklahoma FF (if appointed as a class representative) is willing to actively participate in this action going forward. *See* Stickney Decl., Ex. H, Certification of Oklahoma FF. Moreover, ACERA (with well over five billion dollars under management) and Oklahoma FF (with over 1.5 billion dollars under management) are large public pension funds and are precisely the type of institutional investors Congress sought to empower when passing the

---

[7] *See* Stickney Decl., Exs. G and H (Certifications setting forth ACERA's and Oklahoma FF's transaction history in Lehman common stock during the Class Period).

Private Securities Litigation Reform Act of 1995. *See* H.R. Conf. Rep. No. 104-369, at 28 (1995). ACERA and Oklahoma FF have a considerable interest in attaining an additional recovery for the Class from E&Y to add to the funds obtained from the previously settling defendants and easily satisfy the adequacy requirement of Rule 23(a)(4).

Finally, proposed Class Counsel are highly qualified and capable of prosecuting this action. *See* Stickney Decl., Exs. I and J (Firm Resumes of Lead Counsel). In sum, the requirements of Rule 23(a) are satisfied.

### B.     The Requirements Of Rule 23(b) Are Satisfied

Rule 23(b)(3) requires that common questions of law and fact predominate over any questions affecting only individual class members, and that the class action mechanism be superior to other available methods for fairly and efficiently adjudicating the dispute. Both requirements are readily met in this case.

### 1.     Common Questions Of Law And Fact Predominate

The predominance requirement "tests whether a proposed class is sufficiently cohesive to warrant adjudication by representation." *SLM,* 2012 WL 209095, at *4 (citation omitted). "Class-wide issues predominate if resolution of some of the legal and factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). The predominance requirement is "readily met" in securities actions. *Amchem Prods.,* 521 U.S. at 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689. Notably, Rule 23(b)(3) does not require that there be an

absence of any individual issues.[8]  Rather, common questions of law or fact predominate if they represent a significant aspect of the case and can be resolved for all class members in a single adjudication.  *See* 7A Charles A. Wright, Arthur A. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1778 (3d ed. 2011).[9]

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."  *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 274 (S.D.N.Y. 2011) (emphasis in original and citation omitted).  Courts routinely hold that these elements present common issues that predominate over individualized issues.  *See, e.g., Parmalat*, 2008 WL 3895539, at *8 ("It is common ground, save for the issue of transaction causation, that the domestic plaintiffs' claims are predicated upon a common nucleus of facts and a common course of conduct such that each element necessary to prove defendants' allegedly fraudulent conduct is common to all class members.").  Indeed, "class actions are generally well-suited to securities fraud cases, in large part because

---

[8] *See, e.g., Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("To be sure, individual issues will likely arise in this as in all class action cases.  But, to allow various secondary issues of plaintiffs' claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.").

[9] "Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 (S.D.N.Y. 1995) (citations omitted); *accord Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 F.R.D. 48, 52 (S.D.N.Y. 1987).

'they avoid the time and expense of requiring all class members to proceed individually.'"

*Indep. Energy Holdings*, 210 F.R.D. at 486.[10]

Given the common nucleus of facts and course of conduct necessary to prove the claim under Section 10(b) and Rule 10b-5 against E&Y, the predominance requirement of Rule 23(b)(3) is plainly satisfied.[11]

### 2.  The Element Of Reliance Poses No Barrier To Class Certification

In opposing class certification in securities fraud cases, defendants attempt to argue that the need to show reliance means that individual issues will predominate and, therefore, class certification should be denied.  Here, however, reliance can be presumed under the "fraud-on-the-market doctrine" set forth in *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).[12]  This presumption eliminates the need for proof of reliance on an individual basis.[13]

---

[10] As the Supreme Court recently held, proof of loss causation is not required at the class certification stage with respect to any of Lead Plaintiffs' claims.  *See Halliburton*, 131 S. Ct. at 2186, 180 L. Ed. 2d 24 (finding that loss causation need not be established at class certification because it has "no logical connection" to requirements of Rule 23).

[11] *See Veeco Instruments*, 235 F.R.D. at 240 ("[Q]uestions of fact regarding the content and implications of defendants' statements and defendants' intent in making these statements are central to the claims of each member of the putative class.  Any individual issues will necessarily be secondary."); *see also Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) (common questions held to predominate where "[t]he proof for the claims of misrepresentation or omission, materiality, and Deloitte's scienter are all based on a common nucleus of facts and a common course of conduct"); Stickney Decl., Ex. K, *In re Take Two Interactive Sec. Litig.*, No. 06 Civ. 803(RJS), 2010 U.S. Dist. LEXIS 143837, at *27 (S.D.N.Y. June 29, 2010) ("In securities fraud class actions in which the fraud is alleged to have been carried out through public communications to a wide variety of market participants, common issues of law and fact will generally predominate over individual issues." (citation omitted)).

[12] *See Halliburton*, 131 S. Ct. at 2185, 180 L. Ed. 2d 24 (noting that plaintiffs are entitled to presumption of reliance upon a showing that "the alleged misrepresentations were publicly known . . . , that the stock traded in an efficient market, and that the relevant transactions took

Under the fraud-on-the-market theory, a presumption of reliance applies where a defendant has made a material misrepresentation or omission and the company's stock traded in an efficient market. *Inyx*, 2011 WL 2732544, at *8; *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 307 (S.D.N.Y. 2010). To determine market efficiency, courts analyze the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See, e.g.*, *Inyx*, 2011 WL 2732544, at *9. While not the exclusive means of analyzing whether a market is sufficiently efficient to warrant application of the fraud-on-the-market doctrine, the *Cammer* factors include: (1) a large weekly trading volume; (2) the existence of a significant number of analysts following the company; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement;[14] and (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *See*, *e.g.*, *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303 (S.D.N.Y. 2005); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 107 n.323 (S.D.N.Y. 2004); *Inyx*, 2011 WL 2732544, at *9.

---

place 'between the time the misrepresentations were made and the time the truth was revealed.'" (citation omitted)).

[13] "The fraud-on-the-market doctrine 'creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value.'" *Parmalat*, 2008 WL 3895539, at *9 (citation omitted).

[14] As courts have recognized, the Securities and Exchange Commission ("SEC") permits the filing of an S-3 Registration Statement only where "the stock is already traded on an open and efficient market, such that further disclosure is unnecessary." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 97 n.17 (D. Conn. 2010) (quoting *Krogman v. Sterritt*, 202 F.R.D. 467, 476 (N.D. Tex. 2001)). Form S-3 is thus "*predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.*" *Cammer*, 711 F. Supp. at 1284 (emphasis in original) (quoting SEC Securities Act Release No. 6235, 45 Fed. Reg. 63, 693 (1980)).

An efficient market is one that is "both open and developed" and that "rapidly reflects new information in price." *Inyx*, 2011 WL 2732544, at \*9 (quoting *In re Gaming Lottery Sec. Litig.*, No. 96 CIV 5567 (RPP), 2001 WL 204219, at \*17 (S.D.N.Y Mar. 1, 2001)). The fact that Lehman common stock traded on the New York Stock Exchange alone establishes market efficiency. *See Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y 2008) ("no argument could be made that the New York Stock Exchange is not an efficient market" (citing *Basic*, 485 U.S. at 249 n.29, 108 S. Ct. 978, 99 L. Ed. 2d 194)).[15] Indeed, in a report submitted herewith, Plaintiffs' expert, Professor Jarrell, analyzed each of the *Cammer* factors and determined that not only do all the *Cammer* factors collectively lead to the conclusion of efficiency for Lehman common stock during the Class Period, but that *every* single *Cammer* factor supports such a finding. *See* Stickney Decl., Ex. B, Jarrell Report, Appendix A. In his report, Professor Jarrell notes:

- On average, there were approximately 693.3 million Lehman shares issued and outstanding during the Class Period. *See* Jarrell Report ¶22.

- Lehman common stock was heavily traded, with an average of 54.2% of all outstanding shares trading on a weekly basis. *See* Jarrell Report ¶22.[16]

- Lehman common stock was listed on the NYSE and was assigned to a specialist who was required to provide liquidity for the security. *See* Jarrell Report. ¶29.[17]

---

[15] *See also In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 634 (N.D. Ala. 2009) (stating that when a stock trades on the New York Stock Exchange, "a presumption is created that the market for that stock is developed and efficient"); *O'Neil v. Appel*, 165 F.R.D. 479, 504 (W.D. Mich. 1996) ("The market system upon which a particular stock trades provides some insight as to the likelihood that the market for that stock is efficient.").

[16] *See Cammer*, 711 F. Supp. at 1293 ("Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one.").

- Lehman common stock was widely followed by at least 19 securities analysts, and was the subject of over 150 analyst reports during the Class Period. *See* Jarrell Report ¶24.[18]

- Lehman was eligible to file a Form S-3 with the SEC during the Class Period. *See* Jarrell Report ¶31.

- There was a clear cause and effect relationship between the new information regarding Lehman and its stock price. *See* Jarrell Report ¶¶32-104.[19]

- The high percentage (79.9%) of institutional ownership in Lehman's common stock, Lehman's large market capitalization (between $144 million and $14.7 billion), its narrow average bid-ask spread (0.31%), the significant presence of short sellers (between 10.1% and 31.6% of all common shares outstanding), and the put-call parity related to Lehman's options further supported a finding of market efficiency. *See* Jarrell Report ¶¶105-21.[20]

Accordingly, Lehman common stock traded in an efficient market throughout the Class Period.[21]

---

[17] *See In re Boston Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 283 (D. Mass. 2009) (finding presence of market maker – in form of NYSE specialist – indicative of market efficiency).

[18] "The number of securities analysts following and reporting on a company's stock during the class period is a persuasive factor as the existence of a significant number of analysts implies that company reports are closely reviewed by investment professionals, who, in turn, make buy/sell recommendations to client investors." *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003).

[19] Professor Jarrell found that new information "was generally impounded into the stock price within one day for Lehman common stock, and never more than two days." *See* Stickney Decl., Ex. B, Jarrell Report ¶38. This conclusion weighs in favor of a finding of market efficiency. *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) (affirming district court finding of efficiency where most information was absorbed into company's share price within one day, even though some information took two days to impact share price).

[20] *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 508 (S.D. Tex. 2004) ("there is a general understanding that a high level of institutional interest in a security serves to increase the efficiency of the market"); *Inyx*, 2011 WL 2732544, at *9 (finding efficiency where company had market capitalization of approximately $22.4 million during class period).

[21] Moreover, in seeking to avail themselves of the fraud-on-the-market presumption, purchasers of Lehman call options or sellers of Lehman put options during the Class Period are entitled to rely on the fraud-on-the-market presumption, and the efficiency of the market for Lehman options is established by the efficiency of the market for Lehman common stock. *See In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1330 (N.D. Ga. 2007) (holding where

### 3. Materiality Of Repo 105 And E&Y's Misrepresentation

Information is material where there is a substantial likelihood that it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic,* 485 U.S. at 231-32, 108 S. Ct. at 983, 99 L. Ed. 2d 194 (citation omitted). As Judge Pauley recently explained in *SLM,* courts are required to take a "common-sense and holistic approach" to assessing materiality at the class certification stage, and must evaluate "all the relevant circumstances in a particular case." *SLM,* 2012 WL 209095, at *5 (citing *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1317, 179 L. Ed. 2d 398 (2011)). Importantly, in establishing materiality under *Basic*'s "total mix" standard, the Second Circuit has repeatedly stated that "plaintiffs do not bear the burden of showing an impact on price." *In re Salomon Analyst Metromedia,* 544 F.3d 474, 483 (2d Cir. 2008); *see also SLM,* 2012 WL 209095, at *4-5 (rejecting defendants' contention that plaintiffs were required to prove that misrepresentations "had a measurable effect on the stock price" because "[a] legal assessment of materiality . . . is not determined by a single factor such as price impact").[22]

Here, the materiality of E&Y's misrepresentation and the omitted facts related to Lehman's use of Repo 105 transactions to artificially reduce its net leverage ratio at quarter-end

---

plaintiffs "have adduced sufficient evidence demonstrating that the market for SA stock during the class period was efficient" options purchasers are "entitled to rely on the fraud on the market theory"); *In re Fed. Nat'l Mortg. Assoc. Sec., Derivative and ERISA Litig.,* 247 F.R.D. 32, 41-42 (D.D.C. 2008) (same). Additionally, after (1) analyzing put-call parity and (2) comparing price movements in Lehman common stock to fluctuations in the price of call and put options referencing Lehman common stock, Professor Jarrell concluded that the market for Lehman call and put options was efficient during the Class Period. *See* Stickney Decl., Ex. B, Jarrell Report ¶ 118.

[22] As the Second Circuit reasoned in *Salomon,* it would be illogical for courts to require proof of price impact because "[t]he point of *Basic* is that an effect on market price is *presumed* based on the materiality of the information and a well-developed market's ability to readily incorporate that information into the price of securities." *Salomon,* 544 F.3d at 483 (emphasis in original).

is established by a collection of facts and from an array of sources, including, *inter alia*, (1) Lehman's public filings; (2) E&Y's audit workpapers and internal documents; (3) internal Lehman documents; and (4) statements made by credit rating agencies, government supervisors and Lehman's board of directors to the Examiner.

In its Order partially denying E&Y's motion to dismiss in this action, the Court held that Lead Plaintiffs sufficiently pled that E&Y had made a material misrepresentation by "profess[ing] ignorance of facts warranting material modifications to Lehman's balance sheet when in truth it had received information concerning Lehman's use of Repo 105s to move $50 billion of inventory off that balance sheet." *Lehman*, 799 F. Supp. 2d at 304. Lehman's reported net leverage ratio was, by Lehman's own admission in its public filings, "a significant financial metric for 'securities analysts, credit agencies and investors' during the Class Period." *Id.* at 281. *See SLM*, 2012 WL 209095, at *4-6 (finding materiality where company touted significance of its private education loan business, which was the subject of defendants' misrepresentations).

The Court further relied on Lehman's own internal accounting policy regarding net leverage, which stated that materiality "is usually defined as any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion)." Stickney Decl., Ex. D, Ernst & Young Workpapers, LBHI/LBI Walkthrough Template for Balance Sheet Close Process (Nov. 30, 2007) at 14 ("Materiality is usually defined as any item individually, or in the aggregate, that moves net leverage by 0.1 point or more (typically $1.8 billion). Net leverage is an important ratio analyzed by the rating agencies and included in Lehman's earnings releases."); *see also Lehman*, 799 F. Supp. at 280-81. This policy – of which E&Y was aware during the Class Period by virtue of its inclusion in E&Y's audit workpapers – meant that any item or transaction that increased or decreased net leverage by 0.1x was, by Lehman's own definition,

material. By accounting for over $50 billion in Repo 105 transactions as sales during the second quarter of 2008, Lehman artificially reduced its reported net leverage ratio from 13.9x to 12.1x. ¶¶37-38. E&Y was thus aware that at the end of the second quarter, Lehman's usage artificially reduced its reported net leverage ratio by an amount that was *18 times* its own threshold for materiality. *Lehman*, 799 F. Supp. 2d at 281 (finding fact that "Repo 105 transactions resulted in net leverage differences more than fifteen times the difference that Lehman itself considered material" relevant to analysis of materiality).

Statements from the three leading credit rating agencies – Fitch, Moody's and S&P – support a finding that the Repo 105 program and E&Y's misrepresentation were material. Analysts from each rating agency informed the Examiner that they were unaware of Lehman's use of Repo 105 transactions to artificially reduce its reported net leverage ratio, and would have considered such information important to their analyses of Lehman's liquidity and capital position. *See* Stickney Decl. Ex. E, Examiner Report at 906 (Fitch analyst stating that Repo 105 transactions "would be 'material' in Fitch's view" and "'sounded like fraud'"); *id.* at 907-08 (S&P analyst stating that, in analyzing Lehman's net leverage, she would have wanted to know about its use of Repo 105 transactions to move $50 billion in assets off its balance sheet); *id.* at 908-09 (Moody's analyst stating that information regarding Repo 105 would have been important to Moody's and would have spawned further investigation to ensure that these transactions were "captured by some risk measure").[23]

---

[23] Internal Lehman documents further support this conclusion. *See, e.g.*, Stickney Decl. Ex. E, Examiner Report at 909 (June 2008 e-mail from Dominic Gibb of Lehman's European and Middle East finance team to Martin Kelly stating that because Lehman's risk metrics failed to account assets "sold" through Repo 105 transactions, it was "understating what we have at risk *by a material amount* especially at quarter ends" (emphasis added)); Stickney Decl. Ex. L, (Gibb's e-mail). Additionally, the intense focus by rating agencies, analysts and other market participants on Lehman's leverage ratios weighs in favor of a finding of materiality. *See* ¶152;

Similar statements were made to the Examiner by government officials and the members of Lehman's own board of directors, who were likewise unaware of Lehman's Repo 105 program. *See, e.g.,* Stickney Decl. Ex. E, Examiner Report at 909-10 (Treasury Secretary Timothy Geithner stating that Lehman's Repo 105 program "would have been a huge issue for the New York Fed[eral Reserve]"); Stickney Decl. Ex. E, Examiner Report at 910 (New York Federal Reserve Examining Officer stating that knowledge of Repo 105 practice "would have been 'very important' to him"); *id.* at 946 (numerous members of Lehman's board of directors stating that they would have wanted to know about Lehman's Repo 105 transactions). And, statements to the Examiner by numerous senior Lehman personnel confirm that the net leverage ratio and the reduction of net assets beginning in late 2007 were material. For example,

> Anuraj Bismal, a former Senior Vice President in Lehman's Balance Sheet Group, said that Lehman's meeting of its leverage ratio target was the most critical piece ("a very hot topic") for senior management by the end of 2007. Bismal said that balance sheet targets and leverage ratio targets were "absolutely about how rating agencies would view Lehman, and also creditors and the investing public."

Stickney Decl. Ex. E, Examiner Report at 808-809.

Moreover, numerous quantitative metrics support a finding of materiality. *See SLM*, 2012 WL 209095, at *7 (noting that courts should assess both qualitative and quantitative factors bearing on materiality). As set forth in the TAC, the volume of Repo 105 transactions outstanding at the end of the second quarter of 2008 amounted to more than 10% of Lehman's short-term liabilities, and over 8% of Lehman's total liabilities. ¶39. By that time, Lehman's Repo 105 usage also amounted to 1.6x the Company's total tangible common equity. *See* Stickney Decl. Ex. E, Examiner Report at 897. Moreover, but for Repo 105 transactions,

*SLM*, 2012 WL 209095, at *4-6 (considering analyst focus on statements related to Sallie Mae's private education loan business in assessing materiality).

Lehman would have been required to sell over $50 billion in assets in order to *actually* reduce its net leverage ratio to 12.1x by the end of the second quarter. Such sales would have been equivalent to nearly (1) 70% of Lehman's mortgage and asset-backed securities; (2) 23.3% of Lehman's total risk-weighted assets; (3) 18.7% of Lehman's total financial instruments and other inventory positions; or (4) 7.9% of Lehman's total assets as of the end of the second quarter. *See* Stickney Decl., Ex. C, Lehman's July 10, 2008 Form 10-Q at 24, 48 and 103.

Viewed holistically, as they must be, these factors more than sufficiently establish that E&Y's misrepresentation related to Lehman's financial statements and the use of Repo 105 transactions – and the impact of such transactions on Lehman's reported net leverage ratio – was material. *SLM*, 2012 WL 209095, at *6 (noting that courts must assess materiality holistically) (citing *Matrixx*, 131 S. Ct. at 1317, 179 L. Ed. 2d 398). Having established each required element of the fraud-on-the-market doctrine, the proposed Class Representatives and all Class members are entitled to a presumption of reliance. Accordingly, individual issues do not predominate, and Lead Plaintiffs have satisfied the first prong of Rule 23(b)(3).

### 4. Superiority Is Established

Rule 23(b)(3) also requires that a class action also be "superior to other available methods for fairly and efficiently adjudicating the controversy." As a general matter, "securities suits such as this easily satisfy the superiority requirement." *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 120 (S.D.N.Y. 2008) (citation omitted). As a court in this District explained:

> Most violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible. Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor an adjudication of their claims. Moreover, although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf.

*Lapin*, 254 F.R.D. at 187 (ellipses in original) (quoting *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. 2008)).

Here, the proposed Class consists of a large number of investors who purchased Lehman common stock and call options (or sold put options) during the Class Period, many of whose individual damages are small enough to render individual litigation prohibitively expensive, and who would lack a means of redress without the availability of a class action. Permitting this matter to proceed as a class action thus provides these investors with the ability to seek redress for their damages. This action presents no material case management issues. Finally, allowing all claims to proceed in a single forum will preserve judicial time and resources. As such, Lead Plaintiffs have met the superiority requirement of Rule 23(b)(3).

## IV.    <u>CONCLUSION</u>

For all the reasons stated herein, Lead Plaintiffs respectfully submit that the Court should certify the Class, appoint ACERA and Oklahoma FF as Class Representatives and appoint Lead Counsel as Class Counsel.

Dated: February 3, 2012

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP


  */s/ David R. Stickney*
      DAVID R. STICKNEY

DAVID R. STICKNEY
BRETT M. MIDDLETON
JON F. WORM
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:  (858) 793-0323
   *-and-*
MAX W. BERGER
STEVEN B. SINGER
1285 Avenue of the Americas, 38th Floor
New York, NY 10019

Tel:    (212) 554-1400
Fax:   (212) 554-1444

*Co-Lead Counsel for Lead Plaintiffs*


KESSLER TOPAZ MELTZER & CHECK, LLP

_/s/ David Kessler_
      DAVID KESSLER

DAVID KESSLER
JOHN A. KEHOE
KIMBERLY JUSTICE
JOHN GROSS
MICHELLE NEWCOMER
RICHARD A. RUSSO, JR.
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:   (610) 667-7056

*Co-Lead Counsel for Lead Plaintiffs*