UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
In re:

LEHMAN BROTHERS SECURITIES AND
ERISA LITIGATION

This document applies to:                                    09 MD 2017 (LAK)

*In re Lehman Brothers Equity/Debt Sec. Litig.*
08 Civ. 5523 (LAK)
-----------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF
THE STRUCTURED PRODUCT PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION AND APPOINTMENT
OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND......................................................................................2

    A.    UBS's Sale of the Structured Products    2

    B.    False and Misleading Statements About "Principal Protection"    3

    C.    False and Misleading Statements About Lehman    6

THE PROPOSED CLASS REPRESENTATIVES AND CLASS ..................................................8

CLASS CERTIFICATION SHOULD BE GRANTED ........................................................9

    A.    The Proposed Class Satisfies the Requirements of Rule 23(a)......................10

        1.    Joinder of All Class Members Is Impracticable.........................................10

        2.    There Are Questions of Law and Fact Common to All Class Members ...................................................................10

        3.    Plaintiffs' Claims Are Typical of the Class ...............................................12

        4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class...................................................................13

    B.    The Class Satisfies Rule 23(b)(3).......................................15

        1.    Issues Common to the Class Predominate Over Any Individualized Issues..................................................................15

        2.    A Class Action Is the Superior Method for Trying this Case ...................20

    C.    The Court Should Appoint Girard Gibbs as Class Counsel Under Rule 23(g)    22

CONCLUSION.................................................................................23

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                **Page**

*Amchem Products v. Windsor*
    521 U.S. 591, 117 S. Ct. 2231 (1997) ................................................................ 14

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
    222 F.3d 52 (2d Cir. 2000) ................................................................................. 13

*Basic Inc. v. Levinson*
    485 U.S. 224, 108 S. Ct. 978 (1988) .................................................................. 18

*Brown v. Charles Schwab & Co., Inc.*
    2009 WL 4809426 (D.S.C. Dec. 9, 2009) ....................................................... 21

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*
    504 F.3d 229 (2d Cir. 2007) ............................................................................. 10

*Consolidated Rail Corp. v. Town of Hyde Park*
    47 F.3d 473 (2d Cir. 1995) ............................................................................... 10

*Damassia v. Duane Reade, Inc.*
    250 F.R.D. 152 (S.D.N.Y. 2008) ...................................................................... 14

*Dura-Bilt Corp. v. Chase Manhattan Corp.*
    89 F.R.D. 87 (S.D.N.Y.1981) ................................................................. 16, 18, 19

*Espinoza v. 953 Associates LLC*
    No. 10 Civ. 5517(SAS), 2011 WL 5574895 (S.D.N.Y. Nov. 16, 2011) ......... 19

*Fogarazzo v. Lehman Brothers, Inc.*
    263 F.R.D. 90 (S.D.N.Y. 2009) ....................................................................... 21

*Herman & McLean v. Huddleston*
    459 U.S. 375, 103 S. Ct. 683 (1983) ................................................................ 16

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
    903 F.2d 176 (2d Cir. 1990)………………………………………………...13

*In re Alstom SA Securities Litig.*
    253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................................ 9

*In re Blech Securities Litig.*
    187 F.R.D. 97 (S.D.N.Y. 1999) ....................................................................... 20

*In re Currency Conversion Fee Antitrust Litig.*
  264 F.R.D. 100 (S.D.N.Y. 2010) ................................................................. 21

*In re Deutsche Telecom AG Securities Litig.*
  229 F. Supp. 2d 277 (S.D.N.Y. 2002) ...................................................... 10, 17

*In re Dynex Capital, Inc. Sec. Litig.*
  No. 05 Civ. 1897(HB), 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ............................... 12

*In re Flag Telecom Securities Litig.*
  245 F.R.D. 147, 161 (S.D.N.Y. 2007)……………………………………………………...14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
  574 F.3d 29 (2d Cir. 2009)........................................................... 12, 14, 15, 21

*In re IPO Securities Litig.*
  471 F.3d 24 (2d Cir. 2006)...................................................................... 9, 19

*In re J.P. Morgan Chase Cash Balance Litig.*
  242 F.R.D. 265 (S.D.N.Y. 2007) ............................................................... 11, 12

*In re Lehman Brothers Sec. & ERISA Litig.*
  799 F. Supp. 2d 258 (S.D.N.Y. 2011) ...................................................... 6, 7, 8, 18

*In re Morgan Stanley Info. Fund Sec. Litig.*
  592 F.3d 347 (2d Cir. 2010)....................................................................... 17

*In re Nassau County Strip Search Cases*
  461 F.3d 219 (2d Cir. 2006)....................................................................... 22

*In re Nigeria Charter Flights Contract Litig.*
  233 F.R.D. 297 (E.D.N.Y. 2006) .................................................................... 9

*In re NTL, Inc. Securities Litig.*
  02 Civ. 3013 (LAK) (AJP), 2006 WL 330113 (S.D.N.Y. Feb. 14, 2006).................... 9, 11

*In re NTL, Inc. Securities Litig.*
  02 Civ. 3013 (LAK), 2006 WL 568225 (S.D.N.Y. Mar. 9, 2006) ............................. 10

*In re NYSE Specialists Securities Litig.*
  260 F.R.D. 55 (S.D.N.Y. 2009) ......................................................... 9, 14, 20, 21

*In re Parmalat Securities Litig.*
  Dkt. No. 04 MD 1653(LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)...... 11, 13, 15

*In re Sadia, S.A. Securities Litig.*
    269 F.R.D. 298 (S.D.N.Y. 2010) .................................................................................. 9

*In re Salomon Analyst Metromedia Litig.*
    544 F.3d 474 (2d Cir. 2008).................................................................................. 9, 15

*In re SLM Corp. Securities Litig.*
    No. 08 Civ. 1029 (WHP), 2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) .......................... 18

*In re Veeco Instruments, Inc. Securities Litig.*
    235 F.R.D. 220 (S.D.N.Y. 2006) .................................................................................. 9

*In re Visa Check/MasterMoney Antitrust Litig.*
    280 F.3d 124 (2d Cir. 2001)................................................................................ 16, 21

*In re Vivendi Universal, S.A. Sec. Litig.*
    242 F.R.D. 76 (S.D.N.Y. May 21, 2007) ...................................................................... 13

*In re WorldCom, Inc. Securities Litig.*
    219 F.R.D. 267 (S.D.N.Y. 2003) .......................................................................... passim

*In re WorldCom, Inc. Securities Litig.*
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)............................................................................ 6

*In re WRT Energy Securities Litig.*
    No. 96 Civ. 3610(JFK), 2006 WL 2020947 (S.D.N.Y. July 13, 2006) .......................... 12

*Marisol v. Giuliani*
    126 F.3d 372 (2d Cir. 1997)...................................................................................... 10

*Matrixx Initiatives, Inc. v. Siracusano*
    131 S. Ct. 1309 (2011)............................................................................................ 18

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*
    No. 08 Civ. 5653, 2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011) ................. 10, 12, 16, 21

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*
    272 F.R.D. 160, 165 (S.D.N.Y. 2011)……………………………………………13, 19

*Public Employees Retirement System of Miss. v. Goldman Sachs Group, Inc.*
    09 CV 1110 (HB), Docket No. 122 at p.11 (S.D.N.Y. Feb. 2, 2012).............................. 20

*Public Employees' Retirement System of Miss. v. Merrill Lynch & Co., Inc.*
    277 F.R.D. 97 (S.D.N.Y. 2011) .............................................................................. passim

*Robidoux v. Celani*
    987 F.2d 931 (2d Cir. 1993)...................................................................................... 10, 12

*Seijas v. Republic of Argentina*
    606 F.3d 53 (2d Cir. 2010)........................................................................................ 19

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*
    546 F.3d 196 (2d Cir. 2008)...................................................................................... 9

*TSC Industries, Inc. v. Northway, Inc.*
    426 U.S. 438, 98 S. Ct. 2126 (1976).......................................................................... 18

*Wagner v. Barrick Gold Corp.*
    251 F.R.D. 112 (S.D.N.Y. 2008) ............................................................................... 14

*Wal-Mart Stores, Inc. v. Dukes*
    131 S. Ct. 2541 (2011)............................................................................................. 11, 12

**Statutes**
15 U.S.C. § 77k(a)(1)...................................................................................................... 16

15 U.S.C. § 77k(e) ......................................................................................................... 19

15 U.S.C. § 77l(a)(2)....................................................................................................... 17

**Rules**
Fed. R. Civ. P. 23(b)(3)................................................................................................... 20

Fed. R. Civ. P. 23(g) ...................................................................................................... 22

**Other Authorities**
The Regulation of Securities Offerings, Securities Act Release No. 7606A
    63 Fed.Reg. 67174, 1998 WL 833389 (Dec. 4, 1998)………………………………...…..6

**PRELIMINARY STATEMENT**

The Structured Product Plaintiffs move to certify a class consisting of all persons who bought or otherwise acquired the Lehman Brothers-issued structured products sold by UBS Financial Services, Inc. that are identified in Appendix A (the "Structured Products").[1]  Plaintiffs allege that UBS, as underwriter and seller of the Structured Products, is liable under sections 11 and 12(a)(2) of the Securities Act of 1933 for the materially false and misleading statements and omissions in the offering documents about Lehman's financial condition and the "principal protection" feature of their notes.  Class certification is appropriate because Plaintiffs' claims focus on UBS's conduct and will be proven with evidence common to all of the proposed class members.

The proposed class satisfies the numerosity, commonality, typicality and adequacy requirements of Rule 23(a).  UBS sold $673 million of the Structured Products to more than 15,000 investors, making joinder of all class members impracticable.  Plaintiffs' claims are typical of class members' claims because they all purchased Structured Products from UBS and were misled by the same statements and omissions.  Plaintiffs and their counsel have demonstrated their adequacy to fairly and vigorously represent the interests of the class.

Plaintiffs also share common issues with the class, and those issues predominate over any individual issues.  The central elements of both Securities Act claims—whether the offering documents contained false or misleading statements or omissions and whether those statements and omissions were material—are capable of classwide resolution.  Plaintiffs allege that the offering documents contained false and misleading statements about Lehman's financial

---

[1] This list includes the Return Optimization Securities with Partial Protection Linked to the S&P 500® Index that Joseph Humble purchased, which will be included if the Court grants his motion to intervene.  The motion is currently being briefed by the parties.  (Dkt. Nos. 669-71).

1

condition and the "principal protection" offered by some of the Structured Products.  UBS vehemently denies liability.  Because the sufficiency of the disclosures and the materiality of the statements and omissions are both determined by reference to an objective standard, they can and should be decided on a class basis.  Each class member's claim will stand or fall based on the outcome of these issues.  Because certification is also the superior procedure for adjudicating the claims, plaintiffs request that the Court grant their motion for class certification.

## FACTUAL BACKGROUND

### A.    UBS's Sale of the Structured Products

Structured products are investment vehicles that combine a fixed income security with a derivative that is often an option linked to the performance of an extrinsic benchmark, such as a single security, a basket of securities, an index, a commodity, a debt issuance, a foreign currency, or the difference between currency swap rates.  ¶ 113.[2]  Traditionally, the fixed income component was a U.S. Treasury security or other highly rated debt instrument.  *Id.*

Unlike traditional structured products, the fixed income security for UBS's structured products was a note issued by an investment bank.  UBS conducted an auction each month for investment banks to compete to be selected to issue one or more of UBS's structured products. ¶ 114.  Lehman was a major issuer, and over a span of about 18 months issued more than $1.2 billion of UBS's structured products.  ¶ 115.

UBS sold the Structured Products at issue in this case from April 30, 2007 to June 30, 2008.  They were all issued by Lehman and underwritten and sold by UBS.  They were also issued pursuant to a common set of offering documents, starting with a May 2006 shelf registration statement (the Base Prospectus) and a May 2006 Medium-Term Notes, Series I

---

[2] Citations to "¶ __" are to the Third Amended Class Action Complaint, a copy of which is attached as Exhibit 2 to the Girard Declaration.

(MTN) prospectus.  *See* Girard Decl., Exs. 9; 10.  These two prospectuses incorporated by

reference Lehman's SEC filings, including Form 10-Ks, 10-Qs, and 8-Ks.  They also

incorporated subsequent product supplements that provide more information about the derivative

aspect of the notes.  ¶ 122.

UBS did not consistently provide these documents to investors.  Instead, UBS typically

gave investors a pricing supplement or a free-writing prospectus[3] that was around 10 pages long.

Besides the information about the derivative, these documents were fairly uniform.  They

contained the "Final Terms" of the offering, listed its "Features," provided information about

"Investor Suitability" and identified "Key Risks."  *See* Girard Decl., Ex. 3.

### B.       False and Misleading Statements About "Principal Protection"

Twenty-eight of the 32 Structured Products featured full or partial "principal protection"

(the "PPN" offerings).   Each of these offerings included the term "100% Principal Protection" or

"Partial Protection" in the name of the security, such as "Performance Securities with Partial

Protection Linked to a Global Index Basket" and "100% Principal Protection Callable Spread

Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap

Rates."  *See* Girard Decl., Exs. 3A at 1; 3B at 21.

The pricing supplements for PPNs with full principal protection featured the term

"principal protection" or "100% principal protection" three or more times on the first page.  They

all offered "100% Principal Protection if the Notes are held to maturity," and included one or

more of the following statements:

- At maturity, you will receive a cash payment equal to at least 100% of your
  principal.

---

[3] Because the pricing supplements and free-writing prospectuses for each offering are virtually
identical, the references to pricing supplements in this brief will include the free-writing
prospectuses.

- You will receive at least the minimum payment of 100% of the principal amount of your Notes if you hold your Notes to maturity.

- Although the Notes are principal-protected if held to maturity, selling this or any other fixed income security prior to maturity may result in a dollar price less than 100% of the applicable principal amount of Notes sold.

*See id.*, Exs. 3A at 1, 6,11, 16; 3B at 21, 25, 30, 36; 3C at 42, 45, 49, 57; 7 at 5; *see also* ¶ 118.

The pricing supplements for PPNs with partial principal protection featured the term "partial protection" four or more times on the first page. They all included one or more of the following statements, with minor variations:

- The partial principal protection feature applies only at maturity.

- … partial principal protection when the Notes are held to maturity

- At maturity of the Notes, investors will receive a cash payment equal to at least the applicable Protection Percentage multiplied by the principal amount.

Girard Decl., Exs. 3D at 61, 62, 73, 76; 7 at 5-6; *see also* ¶ 118.

The pricing supplements did not disclose that the notes were unsecured debts of the issuer and the principal protection was contingent on Lehman's solvency. Instead, the only circumstance they identified in which an investor would receive less than his principal was if he failed to hold the note to maturity. *See, e.g.,* Girard Decl., Ex. 3A at 1 ("Principal protection only applies if the Notes are held to maturity."); 3D at 66 ("Partial principal protection only applies if you hold the Notes to maturity.").

UBS has pointed to three statements in the pricing supplements that it contends constitute a sufficient disclosure to offset the repeated representations about principal protection. The first statement appears in all of the pricing supplements and states only what the notes are not: "The Notes are not deposit liabilities of Lehman Brothers Holdings, Inc. and are not FDIC-insured." The second statement appears in 20 of the pricing supplements. Starting in August 2007, most of

the pricing supplements included a footnote that references "the creditworthiness of the issuer" (reproduced in approximately the same size font):

> Lehman Brothers Holdings Inc. is rated A+ by Standard & Poor's, A1 by Moody's and AA- by Fitch. A credit rating reflects the creditworthiness of Lehman Brothers Holdings Inc. and is not a recommendation to buy, sell or hold securities, and it may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating. The creditworthiness of the issuer does not affect or enhance the likely performance of the investment other than the ability of the issuer to meet its obligations.

Girard Decl., Exs. 3B at 23, 34; 3C at 44, 53; 3D at 64, 79; 3E at 93, 103-04; 4.  The third statement appears in 21 of the pricing supplements and also references Lehman's creditworthiness.  Starting in October 2007, some of the pricing supplements included a statement at or near the end of a long list of "Key Risks" that said, with minor variations, "Credit of Issuer—An investment in the Notes will be subject to the credit of Lehman Brothers Holdings Inc., and the actual and perceived creditworthiness of Lehman Brothers Holdings Inc. may affect the market value of the notes."  *Id.*, Exs. 3D at 66, 82; 3E at 99, 108; 4.

Because the pricing supplements lacked any clear statement that principal protection was dependent on Lehman's ability to repay the principal, the representations of "100% principal protection" or "partial principal protection" indicated that the notes benefitted from structural features that ensured repayment of the principal at maturity.  After Lehman's bankruptcy, in response to questions from UBS financial advisors and their clients who had purchased Lehman-issued structured products, UBS issued a 3-page "Structured Products Lehman Q&A."  In this September 23, 2008 document, UBS disclosed to investors that they had no interest in any instruments used by Lehman to hedge its obligations under the PPNs, that the PPNs were not supported by any security interest or collateral, that investors would not receive principal protection, and that the PPNs were, "[s]imilar to traditional bonds," a defaulted obligation of the issuer.  *Id.*, Ex. 8.  None of these disclosures appeared in the pricing supplements.

### C.      False and Misleading Statements About Lehman

As underwriter and seller of the Structured Products, UBS had an obligation under the

Securities Act to conduct a reasonable investigation and ensure that the information in the

offering documents was accurate and complete.[4]  Plaintiffs contend UBS failed to do so and

statements in the offering documents were false and misleading because they omitted or

misstated material information about (1) Lehman's use of Repo 105 transactions to temporarily

reduce its net leverage ratio at the end of quarterly reporting periods; (2) Lehman's routine

disregard of its risk limits, its use of stress testing to evaluate risks associated with its real estate

portfolio, and the number of days on which Lehman exceeded its Value-at-Risk limits; and

(3) Lehman's significant concentrations of credit risk in violation of SFAS 107.  *See* Ex. 5.

**Repo 105.**  The false and misleading representations about Lehman's net leverage ratio

appeared in the offering documents throughout the time UBS sold the Structured Products.

Lehman's use of Repo 105 transactions to present a false and misleading picture of its financial

condition started before the first of the Structured Product offerings on April 30, 2007.  In the

Repo 105 transactions, Lehman transferred assets to other parties (including UBS) in exchange

for cash, and agreed to repurchase the assets for the same amount of cash, plus an additional

charge, at a future date.  *See In re Lehman Brothers Sec. & ERISA Litig.*, 799 F. Supp. 2d 258,

268 (S.D.N.Y. 2011).  By treating the transferred assets as sales and removing them from its

balance sheets, Lehman artificially lowered its net leverage ratio and represented the company to

---

[4] *See, e.g., In re WorldCom, Inc. Securities Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004)
("[I]n enacting Section 11, 'Congress recognized that underwriters occupied a unique position
that enabled them to discover and compel disclosure of essential facts about the offering.
Congress believed that subjecting underwriters to the liability provisions would provide the
necessary incentive to ensure their careful investigation of the offering.'") (quoting The
Regulation of Securities Offerings, Securities Act Release No. 7606A, 63 Fed.Reg. 67174,
67230 (Dec. 4, 1998), 1998 WL 833389).

be "in a stronger financial position than it actually was." *Id.* at 269. Lehman reported a net leverage ratio of 15.4 in its April 9, 2007 Form 10-Q for the quarter ended February 28, 2007 (which was incorporated into the offering documents). If Lehman had included the $22 billion in Repo 105 assets that were temporarily removed from its financial statements, Lehman's net leverage ratio would have increased by 10% to 16.4. ¶ 117(a), (b) & (e). Lehman's omissions about Repo 105 and misleading representations concerning its net leverage ratio and the amount of securities sold under agreements to repurchase continued through June 30, 2008, the date of the last Structured Product offering. ¶¶ 26-61, 66-69; *see also Lehman*, 799 F. Supp. 2d at 279-83.

**Risk limits and stress tests.** The false and misleading statements about Lehman's risk management practices also appeared in the offering documents throughout the time UBS was selling the Structured Products. Lehman represented that its management was overseeing compliance with its risk policies and limits, when in fact it routinely overruled or disregarded those policies and limits. ¶¶ 74-78, 117(c); *see also Lehman*, 799 F. Supp. 2d at 284-85. Lehman represented that it used "stress tests" to evaluate its real estate portfolio but excluded some of its most risky investments from the tests. ¶¶ 79-80; *see also Lehman*, 799 F. Supp. 2d at 285-86. And Lehman failed to disclose that it frequently exceeded its Value-at-Risk limits, instead stating that it had not exceeded the limit in the reporting period, or had exceeded it on only a few trading days. ¶ 83; *see also Lehman*, 799 F. Supp. 2d at 286-87.

**Concentrations of credit risk.** Lehman's 2007 10-K, filed on January 29, 2008, failed to disclose significant concentrations of credit risk in its commercial real estate portfolio, despite a November 2007 presentation by the Global Real Estate Group to Lehman's Executive Committee that addressed the over-concentration of its global real estate portfolio and

recommended reductions.  These misleading statements and nondisclosures appeared in the

offering documents for the 13 Structured Products that were sold on or after the 2007 10-K was

filed and before Lehman filed its first quarter 2008 10-Q on April 9, 2008.  ¶¶ 104-05, 107; *see*

*also Lehman*, 799 F. Supp. 2d at 290-92.  On February 20, 2008, a Lehman employee wrote an

email about concerns with the company's residential and commercial mortgage-backed securities

exposure.  Reports filed after that date did not disclose that Lehman's Alt-A assets represented a

significant concentration of credit risk.  ¶ 106; *see also Lehman*, 799 F. Supp. 2d at 291.

### THE PROPOSED CLASS REPRESENTATIVES AND CLASS

Plaintiffs are retail investors who were attracted to the potential for enhanced returns the

Structured Products offered, and the "principal protection" feature.  They include a retired high

school teacher, an oil and gas exploration specialist, a retired boiler technician who worked for

the Air Force and Department of Defense for more than 30 years, real estate developers, two

attorneys, one of whom was a member of the team that invented GPS, a retired engineer, and a

widow who serves as trustee of her late husband's pension plan.  *See* Girard Decl., Ex. 11.  Many

of them purchased Structured Products with money set aside for retirement.  All of the proposed

class representatives share the common experience of having purchased a product from UBS that

did not turn out to be what they expected it to be, and claim to have purchased that product

pursuant to materially false or misleading offering documents.

Plaintiffs seek to represent a class of all persons who purchased or otherwise acquired the

Structured Products that are identified in Appendix A, and were damaged.  UBS has deposed

nearly all of the plaintiffs, with just a few remaining to be deposed shortly after this motion is

filed.  They have all testified that they understand their duties as class representatives and are

prepared to litigate this case on behalf of the class members.

## CLASS CERTIFICATION SHOULD BE GRANTED

Class certification should be granted because the proposed class satisfies the four

prerequisites of Rule 23(a) (numerosity, commonality, typicality and adequacy) and the

requirements of Rule 23(b)(3) (predominance and superiority).  *See In re Salomon Analyst*

*Metromedia Litig.*, 544 F.3d 474, 478 (2d Cir. 2008).  Plaintiffs must satisfy the requirements of

Rule 23 by a preponderance of the evidence.  *See Teamsters Local 445 Freight Div. Pension*

*Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).  While a plaintiff moving for class

certification must provide enough evidence to support a determination that each element of Rule

23 is met and the court must "assess all of the relevant evidence admitted at the class

certification stage," the court "should not assess any aspect of the merits unrelated to a Rule 23

requirement." *In re Sadia, S.A. Securities Litig.*, 269 F.R.D. 298, 306-07 (S.D.N.Y. 2010)

(quoting *Bombardier*, 546 F.3d at 202 and *In re IPO Securities Litig.*, 471 F.3d 24, 41 (2d Cir.

2006)).

This Court has substantial discretion in deciding this motion.  "[T]he district court is

often in the best position to assess the propriety of the class and has the ability … to alter or

modify the class, create subclasses, and decertify the class whenever warranted." *In re Alstom*

*SA Securities Litig.*, 253 F.R.D. 266, 274 (S.D.N.Y. 2008) (quoting *In re Nigeria Charter Flights*

*Contract Litig.*, 233 F.R.D. 297, 301 (E.D.N.Y. 2006)).  But "[c]ourts have long recognized that

[c]lass actions are a particularly appropriate and desirable means to resolve claims based on the

securities laws." *In re NYSE Specialists Securities Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009)

(quoting *In re Veeco Instruments, Inc. Securities Litig.*, 235 F.R.D. 220, 240 (S.D.N.Y. 2006)).

"The Second Circuit requires a liberal, rather than restrictive, interpretation of Rule 23 of the

Federal Rules of Civil Procedure, particularly in securities cases." *In re NTL, Inc. Securities*

9

*Litig.*, 02 Civ. 3013 (LAK) (AJP), 2006 WL 330113, at \*4 (S.D.N.Y. Feb. 14, 2006)), *adopted by* 2006 WL 568225 (S.D.N.Y. Mar. 9, 2006); *see also In re Deutsche Telecom AG Securities Litig.*, 229 F. Supp. 2d 277, 282 (S.D.N.Y. 2002) ("Courts have recognized that class actions are generally appropriate when plaintiffs seek redress for violations of the securities laws.").

### A.    The Proposed Class Satisfies the Requirements of Rule 23(a)

#### 1.    Joinder of All Class Members Is Impracticable

Class certification is appropriate when the class members are so numerous and dispersed that joinder of all members would be impracticable. *See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). "'Impracticable does not mean impossible,'—it simply suggests inconvenience or difficulty." *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, No. 08 Civ. 5653, 2011 WL 3874821, at \*1 (S.D.N.Y. Aug. 16, 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)).  Numerosity is presumed when a class consists of 40 or more members.  *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

UBS concedes that more than forty investors (or "unique customer accounts") purchased each of the Structured Product offerings, and reported that there are a total of more than 15,000 unique customer accounts for the offerings, with more than $600 million of principal outstanding.  Girard Decl., Exs. 6 at 4-6; 7 at 7.  The proposed class easily satisfies the numerosity requirement.

#### 2.    There Are Questions of Law and Fact Common to All Class Members

The commonality requirement "is met if plaintiffs' grievances share a common question of law or fact."  *DLJ Mortgage*, 2011 WL 3874821, at \*2 (quoting *Marisol v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).  It may be satisfied by a single common question of law or fact.  *Id.*

10

(quoting *In re J.P. Morgan Chase Cash Balance Litig.,* 242 F.R.D. 265, 272 (S.D.N.Y. 2007)).

A plaintiff meets this requirement by showing a "common contention" that is "capable of

classwide resolution" such that "determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*,

131 S. Ct. 2541, 2551 (2011).

      At the core of both section 11 and section 12(a)(2) is the question of whether the offering

documents contained false or misleading statements of material fact.  Plaintiffs contend that they

do.  UBS contends that they do not.  Determination of this issue on a classwide basis will

therefore resolve the central issue that is common to all class members' claims.  "[C]ourts in this

circuit have held that the Rule 23 commonality requirement 'is plainly satisfied [where] the

alleged misrepresentations in the prospectus relate to all the investors, [as the] existence and

materiality of such misrepresentations obviously present important common issues." *Public

Employees' Retirement System of Miss. v. Merrill Lynch  & Co., Inc.*, 277 F.R.D. 97, 105

(S.D.N.Y. 2011); *see also id.* at 105-06 ("[I]n this case the common questions include, most

prominently, whether Defendants made materially false and misleading statements in the

Offering Documents in any or all of the ways alleged in the Amended Complaint.").

      There are additional issues of law and fact that are common to all class members,

including whether the misstatements and omissions were material and whether the members of

the class have sustained damages.  *See In re Parmalat Securities Litig.*, Dkt. No. 04 MD

1653(LAK), 2008 WL 3895539, at \*5 (S.D.N.Y. Aug. 21, 2008); *NTL*, 2006 WL 330133, at \*6-

7.  Many of UBS's defenses, including any negative causation or due diligence defenses, are also

subject to common proof.  *See In re WorldCom, Inc. Securities Litig.*, 219 F.R.D. 267, 289, 291,

293 n.30 (S.D.N.Y. 2003) (for section 11 and 12(a)(2) claims, the defendants' "most readily

available defenses to liability also present issues of law and fact that are common to the class").

Because the resolution of the common questions will "generate common *answers* apt to drive the

resolution of the litigation," the commonality requirement is satisfied.  *Dukes*, 131 S. Ct. at 2551

(internal citations omitted).

### 3. Plaintiffs' Claims Are Typical of the Class

The typicality requirement "is not demanding."  *In re Dynex Capital, Inc. Sec. Litig.*, No.

05 Civ. 1897(HB), 2011 WL 781215, at *3 (S.D.N.Y. Mar. 7, 2011).  It is satisfied if "each class

member's claim arises from the same course of events, and each class member makes similar

legal arguments to prove the defendant's liability."  *In re Flag Telecom Holdings, Ltd. Sec.*

*Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux*, 987 F.2d at 936).  "The purpose of the

typicality requirement is to ensure that maintenance of a class action is economical and that the

named plaintiff's claims and the class claims are so interrelated that the interests of the class

members will be fairly and adequately protected in their absence."  *DLJ Mortgage*, 2011 WL

3874821, at *2 (quoting *In re J.P. Morgan,* 242 F.R.D. at 273).  The focus is on the defendant's

conduct, not the plaintiffs' actions.  *Id.*

Plaintiffs and all class members purchased Lehman-issued Structured Products from

UBS.  Plaintiffs' legal theories and evidence are substantially the same for every member of the

class.  Since plaintiffs and class members share the same claims against UBS, plaintiffs' claims

are typical of the class.  *Id.*, at *4 ("All of the potential class members were allegedly damaged

by the same actions by Defendants, and all will make similar legal arguments to support their

claims."); *see also In re WRT Energy Securities Litig.,* No. 96 Civ. 3610(JFK), 2006 WL

2020947, at *3 (S.D.N.Y. July 13, 2006) ("The proper inquiry is whether other members of the

class have the same or similar injury, whether the action is based on conduct not special or

unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.") (citation omitted); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 85 (S.D.N.Y. May 21, 2007) ("Central to all the proposed class representatives claims is defendants' alleged course of conduct throughout the class period. In prosecuting their case, plaintiffs will necessarily seek to develop facts relating to the alleged accounting irregularities and the dissemination of allegedly false or misleading statements underlying their claims. Such allegations are generally considered sufficient to satisfy the typicality requirement.").

The fact that plaintiffs invested in different offerings does not impact typicality because "there is one [plaintiff] for each offering and that is sufficient to establish typicality." *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 165 (S.D.N.Y. 2011); *see also Public Employees v. Merrill Lynch*, 277 F.R.D. at 107 (finding typicality where there was a plaintiff for each offering included in the class). The class representative's claim does not have to be identical to the claims of all class members, and "it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification." *In re Parmalat*, 2008 WL 3895539, at *5 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000)). A plaintiff is atypical only if he is "subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990); *see also In re Parmalat*, 2008 WL 3895539, at *5 ("The unique defense rule … is 'intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit.'") (citation omitted).

### 4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

"Adequacy entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the

interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom,* 574 F.3d at 35 (citation omitted). "The focus is on uncovering conflicts of interest between named parties and the class they seek to represent. In order to defeat a motion for certification, however, the conflict must be fundamental." *Id.* (citation omitted). This inquiry considers "whether the proposed class representatives possess 'the same interest and suffer the same injury as the class members.'" *In re NYSE Specialists*, 260 F.R.D. at 73 (quoting *Amchem Products v. Windsor*, 521 U.S. 591, 625-26, 117 S. Ct. 2231, 2251 (1997)); *see also In re WorldCom*, 219 F.R.D. at 282 ("The named plaintiffs' interests are directly aligned with those of the absent class members: they are purchasers of WorldCom equity and debt securities who suffered significant losses as a result of the investments."). It also considers whether the class representatives are involved in the litigation and understand their duty to represent the interests of others. *See Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118 (S.D.N.Y. 2008) ("It is sufficient if the class representatives are 'aware of the basic facts underlying the lawsuit and ... not ... likely to abdicate his obligations to fellow class members.'") (quoting *In re Flag Telecom Securities Litig.*, 245 F.R.D. 147, 161 (S.D.N.Y. 2007)) (alteration in original).

Because plaintiffs' claims are typical of all class members' claims, plaintiffs have no conflict of interest with the class members. "A finding that a proposed class representative satisfies the typicality requirement constitutes 'strong evidence that [its] interests are not antagonistic to the class; the same strategies that will vindicate plaintiff['s] claims will vindicate those of the class." *Public Employees v. Merrill Lynch*, 277 F.R.D. at 109 (quoting *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008)). Plaintiffs have demonstrated their adequacy by producing documents and appearing for depositions. They have been involved in

14

the case, are knowledgeable about their claims, and are willing and able to protect the interests of

class members.  *See* Girard Decl., Ex. 11.  In addition, plaintiffs are represented by counsel who

are "qualified, experienced and able to conduct the litigation."  *In re Flag Telecom*, 574 F.3d at

35.  Plaintiffs' counsel have substantial experience in complex litigation and class actions, and

have the resources necessary to prosecute this case through trial and any appeals.  *See* Girard

Decl., ¶¶ 2, 3 & Ex. 1.  Plaintiffs and their counsel have demonstrated their commitment to

prosecuting this case on behalf of all class members and satisfy the adequacy requirement.[5]

**B.      The Class Satisfies Rule 23(b)(3)**

In addition to the Rule 23(a) prerequisites, the class satisfies the requirements of Rule

23(b)(3) that "questions of law or fact common to the members predominate over any questions

affecting only individual members" and "a class action is superior to other available methods for

the fair and efficient adjudication of the controversy."

**1.      Issues Common to the Class Predominate Over Any Individualized Issues**

The predominance requirement "tests whether a proposed class is 'sufficiently cohesive

to warrant adjudication by representation.'"  *In re Salomon Analyst*, 544 F.3d at 480 (citation

omitted).  Courts consider whether "the issues in the class action that are subject to generalized

proof, and thus applicable to the class as a whole … predominate over those issues that are

subject only to individualized proof."  *In re Parmalat*, 2008 WL 3895539, at *7 (quoting *In re*

---

[5] In its January 9, 2009 Pretrial Order No. 1, the Court reaffirmed its appointment of lead plaintiffs and lead counsel for the equity/debt securities action and established an executive committee consisting of lead counsel in the equity/debt securities, mortgage-backed securities, and ERISA litigation, and Daniel Girard of Girard Gibbs as counsel for the Structured Products plaintiffs.  Lead plaintiffs for the equity/debt action have resolved their claims against all defendants except their Exchange Act claims against Ernst & Young.  For so long as that litigation continues, the Structured Product plaintiffs will continue to look to lead plaintiffs to direct the overall litigation and to coordinate discovery to avoid duplication of effort.

*Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001)).  Plaintiffs do not

have to show that there are no individual issues, since "individual issues will likely arise in this

as in all class action cases."  *DLJ Mortgage*, 2011 WL 3874821, at *5.  "But, to allow various

secondary issues of plaintiffs' claim to preclude certification of a class would render the rule an

impotent tool for private enforcement of the securities laws."  *Id.* (quoting *Dura-Bilt Corp. v.*

*Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981)).

      Plaintiffs will prove the elements of their claims using evidence common to all class

members.  Under section 11, "a plaintiff … need only show a material misstatement or omission

to establish his *prima facie* case."  *Herman & McLean v. Huddleston*, 459 U.S. 375, 382, 103 S.

Ct. 683, 687 (1983).  The claim "places a relatively minimal burden on a plaintiff" and "is

designed to assure compliance with the disclosure provisions of the Act by imposing a stringent

standard of liability on the parties who play a direct role in a registered offering."  *Id.*  Plaintiffs

must prove that (1) they purchased registered securities; (2) the defendant is a party held liable

under section 11 (in this case, as an underwriter); and (3) the registration statement "contained an

untrue statement of a material fact or omitted to state a material fact required to be stated therein

or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a)(1); *see also*

*Public Employees v. Merrill Lynch*, 277 F.R.D. at 111.

      Like the section 11 claim, "Section 12(a)(2) imposes liability without requiring 'proof of

either fraud or reliance.'"  *In re WorldCom*, 219 F.R.D. at 290 ("Reliance by the buyer need not

be shown, for § 12(2) is a broad anti-fraud measure and imposes liability whether or not the

purchaser actually relied on the misstatement.") (citation omitted).  Plaintiffs must prove

that (1) the defendant is a "statutory seller"; (2) a sale made by means of a prospectus; and

(3) the prospectus or oral communication "contained an untrue statement of a material fact or

omitted to state a material fact required to be stated therein or necessary to make the statements

therein not misleading."  15 U.S.C. § 77l(a)(2); *see also Public Employees v. Merrill Lynch*, 277

F.R.D. at 111.

Both claims focus on UBS's conduct, not the plaintiffs' conduct.  The primary disputes

are therefore common to all class members:  Was there a false or misleading statement in the

registration statement or prospectus?  If so, was it material?  *See In re Morgan Stanley Info.*

*Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) ("In many cases—including this one—two

issues are central to claims under sections 11 and 12(a)(2): (1) the existence of either a

misstatement or an unlawful omission; and (2) materiality.").  The statements and omissions

about Lehman that plaintiffs allege violate the securities laws are in SEC filings that are

incorporated by reference into the offering documents, in Forms 10-K, 10-Qs and 8-Ks.  *See*

Girard Decl., Ex. 5.  Proof of the falsity or misleading nature of the statements and omissions

will be the same for all class members.  *See* Girard Decl., Ex. 5.  *See also Public Employees v.*

*Merrill Lynch*, 277 F.R.D. at 114 (finding predominance where, among other things, the

prospectuses and supplements "contain substantially similar, boilerplate language across the

Offerings."); *In re Deutsche Telekom*, 229 F. Supp. 2d at 282 (finding predominance where there

were "many questions of law and fact common to [the plaintiffs] and the class—particularly the

question whether the allegedly fraudulent statements and omissions concerning Deutsche

Telekom violated the securities laws.").

Whether the statements about "principal protection" were false and misleading is another

common issue.  Twenty-eight of the 32 offerings purported to feature full or partial principal

protection, and the statements in the pricing supplements about this feature are nearly identical.

*See* Girard Decl., Exs. 3; 4.  An issue common to all of these offerings is whether "the repeated

17

and emphasized statements about principal protection were offset sufficiently … by the inconspicuous and scattered warnings—contained in other SEC filings—about Lehman's solvency," a determination the Court declined to make as a matter of law.  *In re Lehman*, 799 F. Supp. 2d at 315.  There are some minor differences among the pricing supplements, but "[w]hile an analysis of the alleged falsity of the statements in the Offering Documents will of course entail some individualized inquiry, the common issues here overwhelm the individual ones." *Public Employees v. Merrill Lynch*, 277 F.R.D. at 114 ("Although the Supplements contain some statements that are unique to the particular offering, it is the substantially similar statements common to each Prospectus and Supplement that are the clear focus of the Amended Complaint.").

The issue of materiality is also the same for all class members.  The "materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978 (1988)); *see also In re SLM Corp. Securities Litig.*, No. 08 Civ. 1029 (WHP), 2012 WL 209095, at *6 (S.D.N.Y. Jan. 24, 2012) ("Courts evaluate materiality holistically.").  "Because materiality is determined by an objective rather than a subjective standard, the question of materiality, 'rather than being an individual issue, is in fact a common issue.'"  *Public Employees v. Merrill Lynch,* 277 F.R.D. at 114 (quoting *Dura-Bilt*, 89 F.R.D. at 94).  "This is true even if, as seems doubtful, a misstatement that is material at the time of one offering is no longer material at the time of another offering, for this would still need to be determined by common evidence as to the objective state of affairs at a given time."  *Id.*; *see also TSC Industries, Inc. v. Northway, Inc.*,

426 U.S. 438, 445, 98 S. Ct. 2126, 2130 (1976) ("The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to an investor.").

The only potentially individual issue is the amount of damages the class members are entitled to receive. But section 11(e) provides a statutory measure of damages that is applicable to the entire class. *See* 15 U.S.C. § 77k(e). And it is "well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).

UBS may argue that its defenses raise individual issues that will predominate over common ones at trial, but "[c]ourts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions." *Public Employees v. Merrill Lynch*, 277 F.R.D. at 117 (quoting *Dura-Bilt,* 89 F.R.D. at 93); *see also Espinoza v. 953 Associates LLC*, No. 10 Civ. 5517(SAS), 2011 WL 5574895, at *7 (S.D.N.Y. Nov. 16, 2011) ("The focus of the predominance inquiry is on defendants' liability, not damages."). UBS's two "most readily available defenses to liability"—due diligence and negative causation—are common to all class members. *See In re WorldCom*, 219 F.R.D. at 288, 293 n.30. And this is not a case in which some of the class members are sophisticated investment managers or engaged in the allegedly wrongful conduct themselves, raising individualized issues of knowledge. *See In re IPO*, 471 F.3d at 43-44 (plaintiffs asserted that some of the class members had knowledge of the scheme and thousands of the class members actually participated in it); *Residential Capital*, 272 F.R.D. at 169 (the class included sophisticated investors with "significant experience in asset-backed securities markets," like JPMorgan, which was a

defendant in a similar lawsuit); *see also Public Employees Retirement System of Miss. v. Goldman Sachs Group, Inc.*, 09 CV 1110 (HB), Docket No. 122 at p.11 (S.D.N.Y. Feb. 2, 2012) ("[I]n those cases where common issues failed to predominate because of individual investor knowledge, certain putative class members either participated in or had knowledge of the alleged conduct.") (attached to Girard Declaration as Exhibit 12).

### 2.    A Class Action Is the Superior Method for Trying this Case

Four factors govern the superiority analysis: "(a) class members' interest in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).  Applying these factors, "securities cases 'easily satisfy the superiority requirement.'"  *In re NYSE Specialists*, 260 F.R.D. at 80 (quoting *In re Blech Securities Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999)).

The proposed class consists of more than 15,000 geographically diverse Structured Product investors.  "As a class, they have a joint interest in litigating the many common questions on which they bear the burden and in responding to the various class-wide defenses that they may face."  *In re WorldCom*, 219 F.R.D. at 304.  Here, the only alternative to participation in this class action is FINRA arbitration.  But the arbitration provision in UBS's customer agreement precludes investors from arbitrating claims as a class action, and would instead require each investor to prove UBS's liability individually, in thousands of separate arbitrations.  Some investors have already commenced individual arbitrations—approximately 3% of the class according to UBS—but the remaining 97% will benefit from class-wide treatment of their claims.  *See* Girard Decl., Ex. 6 at 7.  *See also, e.g., Brown v. Charles Schwab*

*& Co., Inc.*, 2009 WL 4809426, at *9 (D.S.C. Dec. 9, 2009) ("While arbitration may be an alternative adjudicative method in this case, it would not be superior. … When compared to multiple arbitrations across the country, a class action is the superior method of adjudication.").

Concentrating the litigation in this forum is beneficial given the significant amount of time the parties and this Court have devoted to litigating this case. *See, e.g., Fogarazzo v. Lehman Brothers, Inc.*, 263 F.R.D. 90, 110 (S.D.N.Y. 2009) ("Class counsel and class representatives have already spent a significant amount of time litigating this case. This Court has also become familiar with the claims in this case, further making it desirable to continue this litigation here.").  It will also ensure an efficient resolution of the claims without the risk of inconsistent rulings.  *See In re NYSE Specialists*, 260 F.R.D. at 80 ("Class certification will also promote economy and uniformity of decisions by concentrating these consolidated litigations in a single forum.").  And "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule."  *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117 (S.D.N.Y. 2010) (quoting *In re Visa Check*, 280 F.3d at 140); *see also DLJ Mortgage,* 2011 WL 3874821, at *9 ("[A]s securities actions such as this are commonly brought as class actions, there does not seem to be any particular difficulty in administering such an action.").

Even if the Court determines that some issues, like the amount of damages, require individualized consideration, it can and should certify the overarching common issues of falsity and materiality.  If problems arise, the Court may "utilize the available case management tools to see that all members of the class are protected, including but not limited to the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(C), to certify subclasses pursuant to Rule 23(c)(5), and the authority under Rule 23(d) to issue orders ensuring 'the fair and

21

efficient conduct of the action.'"  *In re Flag Telecom*, 574 F.3d at 37 (quoting Rule 23(d)

advisory committee's note).  The Court has the option of bifurcating liability and damages before

the same jury or different juries or appointing a special master or magistrate judge to preside

over individual proceedings.  *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 231

(2d Cir. 2006).

Because class treatment of plaintiffs' claims is superior to the alternatives, and all other

requirements of Rule 23 are satisfied, plaintiffs request that the Court grant this motion for class

certification.

### C.   The Court Should Appoint Girard Gibbs as Class Counsel Under Rule 23(g)

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel."

Plaintiffs request that the Court appoint Girard Gibbs as class counsel for the Structured Products

class.  In appointing class counsel, the Court must consider: "(i) the work counsel has done in

identifying or investigating potential claims in the action; (ii) counsel's experience in handling

class actions, other complex litigation, and the types of claims asserted in the action; (iii)

counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to

representing the class.  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Girard Gibbs is well qualified to prosecute this case on behalf of plaintiffs and the other

members of the class.  The firm's attorneys have extensive experience in the prosecution and

successful resolution of securities cases, class actions and other complex litigation.  *See* Girard

Decl., Ex. 1.  Since the Court appointed Girard Gibbs to the Executive Committee as counsel for

the Structured Product plaintiffs on January 9, 2009, the firm has demonstrated its ability to

prosecute these claims.  Among other things, Girard Gibbs has investigated the claims,

participated in drafting an amended complaint and opposing defendants' motions to dismiss, and

engaged in discovery.  Discovery has included production of all of the plaintiffs' relevant

documents, defending and assisted in the defense of seventeen depositions of the plaintiffs across

the country, propounding documents, requests for admission and interrogatories on UBS, and

review of thousands of pages of documents that UBS produced.  *Id.*, ¶¶ 2, 3.  The firm will

continue to devote necessary resources to this case and to vigorously litigate on behalf of the

class.

**CONCLUSION**

Because the proposed class satisfies all of the requirements of Rule 23(1) and 23(b)(3),

plaintiffs request that the Court issue an order (1) certifying a class of all persons or entities who

bought or otherwise acquired the Lehman-issued structured products sold by UBS that are

identified in Appendix A; (2) appointing plaintiffs as class representatives; and (3) appointing

Girard Gibbs as class counsel.


Dated: February 3, 2012                             Respectfully submitted,

                                                    **GIRARD GIBBS LLP**

                                                    By:   */s/ Daniel C. Girard*
                                                          Daniel C. Girard

                                                    Jonathan K. Levine
                                                    Amanda M. Steiner
                                                    Dena Connolly Sharp
                                                    601 California Street, Floor 14
                                                    San Francisco, CA 94108
                                                    Tel: (415) 981-4800
                                                    Fax: (415) 981-4846

                                                    *Counsel for Plaintiffs Mohan Ananda, Richard
                                                    Barrett, Neel Duncan, Nick Fotinos, Stephen Gott,
                                                    Karin Kano, Barbara Moskowitz, Ronald Profili,
                                                    Lawrence Rose, Joe Rottman, Grace Wang and
                                                    Miriam Wolf and proposed intervenor Joseph
                                                    Humble*

**ZWERLING, SCHACHTER**
    **& ZWERLING, LLP**
Susan Salvetti
Justin M. Tarshis
41 Madison Avenue
New York, New York 10010
Telephone: (212) 223-3900
Facsimile: (212) 371-5969

*Counsel for Plaintiffs Ed Davis, Rick Fleischman, J. Harry Pickle, Trustee Gastroenterology Associates, Ltd. Profit Sharing Plan FBO Charles M. Brooks M.D., Arthur Simons, Juan Tolosa*

**LAW OFFICES OF JAMES V. BASHIAN, P.C.**
James V. Bashian
500 Fifth Avenue, Suite 2700
New York, New York 10110
Telephone: (212) 921-4110
Facsimile: (212) 921-4229

*Counsel for Plaintiff David Kotz*

**BONNETT FAIRBOURN FRIEDMAN**
    **& BALINT, P.C.**
Andrew Friedman
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100
Facsimile: (602) 274 1199

**TIFFANY & BOSCO P.A.**
Richard G. Himelrick
2525 East Camelback Road
Phoenix, Arizona 85016
Telephone: (602) 255-6000
Facsimile: (602) 255-0103

*Counsel for Plaintiff Shea-Edwards Limited Partnership*

24

**Appendix A**
**Structured Product Offerings Included in the Proposed Class**

1   100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517PX63)

2   Performance Securities with Partial Protection Linked to a Global Index Basket (52520W515)

3   100% Principal Protection Notes Linked to a Currency Basket (52520W440)

4   100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517P2P5)

5   100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517P3H2)

6   100% Principal Protection Notes Linked to an International Index Basket (52522L186)

7   100% Principal Protection Notes Linked to a Global Index Basket (52522L889)

8   Performance Securities with Partial Protection Linked to a Global Index Basket (52522L244)

9   100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517P5K3)

10  Medium-Term Notes, Series I, 100% Principal Protection Notes Linked to an Asian Currency Basket (52520W341)

11  100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index (52522L293)

12  Return Optimization Securities Linked to an Index (52522L319)

13  Return Optimization Securities Linked to an Index (52522L335)

14  100% Principal Protection Notes Linked to an Asian Currency Basket (52520W333)

15  Return Optimization Securities with Partial Protection Linked to the S&P 500® Index (52522L459)

16  Return Optimization Securities with Partial Protection Linked to the S&P 500® Index (52522L491)[6]

---

[6] This offering will be included if the Court grants Joseph Humble's motion to intervene, which is currently being briefed by the parties.  (Dkt. No. 669-71).

25

17   100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (52517P4N8)

18   100% Principal Protection Notes Linked to an Asian Currency Basket (52520W325)

19   100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500® Index (52522L525)

20   Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500® Financials Index (52522L657)

21   100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates (5252M0CZ8)

22   100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000® Index (52522L566)

23   100% Principal Protection Notes Linked to an Asian Currency Basket (52523J412)

24   Return Optimization Securities with Partial Protection Notes Linked to the S&P 500® Index (52522L806)

25   Return Optimization Securities with Partial Protection Notes Linked to the MSCI EM Index (52522L814)

26   Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR® Fund (52522L871)

27   100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000® Index (52522L798)

28   Return Optimization Securities with Partial Protection Linked to a Basket of Global Indices (52523J172)

29   Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index (52523J206)

30   Return Optimization Securities with Partial Protection Linked to the S&P 500® Financials Index (52523J230)

31   100% Principal Protection Absolute Return Barrier Notes (52523J248)

32   100% Principal Protection Absolute Return Barrier Notes (52523J255)