C4CTLEHC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE:  LEHMAN BROTHERS
                                        08-CV-5523 (LAK)
4    ------------------------------x
                                        New York, N.Y.
5                                       April 12, 2012
                                        4:00 p.m.
6
     Before:
7
                        HON. LEWIS A. KAPLAN,
8
                                        District Judge
9
                        APPEARANCES
10
     BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
11        Attorneys for Lead Plaintiffs
     BY:  MAX W. BERGER, ESQ.
12        DAVID R. STICKNEY, ESQ.

13   BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP
          Attorneys for Lead Plaintiffs
14   BY:  DAVID KESSLER, ESQ.
          JOHN A. KEHOE, ESQ.
15
     GIRARD GIBBS LLP
16        Attorneys for Structured Product Plaintiffs
     BY:  DENA CONNOLLY SHARP, ESQ.
17
     CLEARY GOTTLIEB STEEN & HAMILTON LLP
18        Attorneys for Underwriter Defendants
     BY:  MITCHELL A. LOWENTHAL, ESQ.
19        VICTOR L. HOU, ESQ.

20   ALLEN & OVERY LLP
          Attorneys for Defendant Fuld
21   BY:  PATRICIA HYNES, ESQ.

22   DECHERT LLP
          Attorneys for Director Defendants
23   BY:  ADAM J. WASSERMAN, ESQ.

24

25
```

C4CTLEHC

```
1              (In open court)

2              DEPUTY CLERK:  In re:  Lehman Brothers.

3              Counsel for plaintiffs, are you ready?

4              MR. BERGER:  We are, your Honor.

5              DEPUTY CLERK:  And you are?

6              MR. BERGER:  Max Berger, Bernstein, Litowitz, Berger &

7    Grossman, co-lead counsel for the class.  Good afternoon.

8              THE COURT:  Good afternoon.

9              MR. STICKNEY:  Good afternoon, your Honor, David

10   Stickney, Bernstein Litowitz, for the class.

11             THE COURT:  Good afternoon.

12             MR. KESSLER :  Good afternoon, your Honor, David

13   Kessler, Kessler, Topaz, Meltzer & Check for lead plaintiffs.

14             THE COURT:  Good afternoon.

15             MR. KEHOE:  Good afternoon, your Honor, John Kehoe

16   from Kessler, Topaz, Meltzer & Check for lead plaintiffs.

17             DEPUTY CLERK:  Counsel for Structured Product

18   plaintiffs, please.

19             MS. SHARP:  Good afternoon, your Honor, Dena Sharp,

20   Girard Gibbs, for the Structured Product plaintiffs.

21             DEPUTY CLERK:  Counsel for director defendants.

22             MR. WASSERMAN:  Good afternoon, your Honor, Adam

23   Wasserman from Dechert for the Director defendants.

24             DEPUTY CLERK:  Counsel for the underwriter defendants.

25             MR. LOWENTHAL:  Mitchell Lowenthal, Cleary Gottlieb,
```

1    for the larger group of underwriters.  There's a second group

2    as well.

3           THE COURT:  OK.  All right.  Well, I propose to take

4    up the underwriters settlement first, the D and O settlement

5    second, then attorneys' fees.  So I'll hear I guess plaintiffs

6    on the underwriters settlement briefly.  I'm familiar with the

7    papers.

8           MR. BERGER:  Good afternoon, your Honor.

9           So if I may, your Honor, I also serve, in addition to

10   being co-lead counsel for the class, as chairman of the

11   executive committee.  I have done so from December '09 to date.

12   We polled the courtroom and there's no objectors or class

13   members who wish to be heard in the courtroom, your Honor.

14          And so let me begin by saying that after four years of

15   hard-fought litigation, I'm delighted to present for final

16   approval these two separate settlements totaling approximately

17   $516 million.  The money has already been deposited and is

18   earning whatever interest it could earn on treasury bills these

19   days.  The case is continuing against Ernst & Young, Lehman's

20   auditor, and UBS Financial Services, the underwriter of Lehman

21   structured notes.

22          We're very proud of the results achieved here, and

23   certainly hope the Court agrees.  We, lead plaintiffs, believe

24   the settlements are excellent results for the class.  The Court

25   certified the settlement class and approved the notice program

C4CTLEHC

 1   leading up to the settlements on December 15, 2011.  Since

 2   then, over 900,000 notices have been mailed to class members.

 3   Summary notices have also been published in the Wall Street

 4   Journal and Investors Business Daily.

 5           THE COURT:  There's some issues about late notice,

 6   aren't there?

 7           MR. BERGER:  Yes, your Honor, there were I think four

 8   class members who said they were late noticed, but we

 9   unfortunately have no control over what the nominees do with

10   with respect to sending out the notices.  They are instructed

11   in the class notice to send out these notices promptly to their

12   beneficial owners.  We don't have those records, your Honor,

13   because a lot of the stock was held of record by brokerage

14   firms, but we account for that fact by publishing as well as

15   mailing notice.

16           THE COURT:  What's your proposal about what to do with

17   the four who claim late notice?

18           MR. BERGER:  There's nothing much.  They knew enough,

19   your Honor, to know that the hearing was today, and if they

20   wanted to be heard with respect to anything, I believe had

21   enough time to speak.  There's nothing much we could do about

22   it.  They have until I think it's late May to file their proofs

23   of claim, so they're not prejudiced in any way in terms of

24   their receiving the notices late by their brokerage firms who

25   had forwarded them on to them.  There was published notice in

C4CTLEHC

1   two publications as well as, your Honor, very wide

2   dissemination of the news media of our settlement.

3          THE COURT:  Your point about the claim cut-off date

4   answers my concern.

5          MR. BERGER:  OK.  So class members comprising -- I'm

6   going to get to the underwriter settlement in one moment, I

7   just wanted to give a predicate for that.  Class members

8   comprising a majority of the class are some of the largest and

9   most sophisticated institutional investors in the world, many

10  routinely object to settlements and fee requests.  We're very

11  pleased to report no one institutional investor had objected to

12  either settlement or either plan of allocation or either fee

13  request.  For that matter, only 13 institutional investors have

14  chosen to opt out of the case, which is also very rare.  It's

15  also virtually unprecedented not one class member at all,

16  individual or institutional, objected to the class settlement,

17  plan of allocation, or fee request.

18          There's only seven individual shareholders who

19  objected to aspects of the D and O settlement and plan of

20  allocation, and four individuals objected to the fee requested

21  with respect to the directors and officers settlement.  We

22  believe that they're wholly without merit, but obviously we're

23  prepared to answer any questions your Honor has.  Mr. Andrews,

24  who submitted a 95-page fairly rambling objection, has now also

25  submitted a surreply and request for fees which we oppose.

C4CTLEHC

 1              THE COURT:  He needs to build up his lodestar.

 2              MR. BERGER:  Your Honor, I don't know if we sent it to

 3      your Honor yesterday, because we just received it.  I don't

 4      know whether you received it, if you didn't --

 5              THE COURT:  I have been through it.  Thank you.

 6              MR. BERGER:  So we respectfully submit that the

 7      paucity of objections, because these are outstanding

 8      settlements which were achieved through tremendous effort, and

 9      the plans of allocation and fee requests are well within the

10      established guidelines for approval in this circuit -- and it

11      bears noting, and the decision is up to your Honor in any

12      event, but the reaction of the class has been described by the

13      Second Circuit in the *Wal-Mart* case as the most significant

14      Grinnell factor for the Court to weigh in considering approval.

15              So let me say with respect to the underwriter

16      settlement, our papers in support of the settlement plan of

17      allocation are quite detailed.  In light of this, I'll just

18      briefly summarize for your Honor.  The overarching factor with

19      respect to the settlements, both the officer and directors

20      settlement --

21              THE COURT:  Let's stick to the underwriters

22      settlement.

23              MR. BERGER:  The underwriters settlement, the case was

24      fraught with risk, particularly after Lehman filed for the

25      largest bankruptcy in history.  Three months after the case

C4CTLEHC

1   began, Lehman was no longer a viable defendant.

2          To begin with, it's one of the largest securities

3   class action settlements ever achieved without a parallel

4   government proceeding of any kind, civil or criminal, and one

5   of the largest to come out of the recent financial crisis.

6          THE COURT:  In fact, all you have was a 2200-page,

7   nine volume report by the bankruptcy examiner which was a road

8   map to the case and large portions of which wound up in the

9   third amended complaint.  Right?

10          MR. BERGER:  Your Honor, with all due respect, we view

11   the Valukas report with respect to the underwriters as being a

12   wash, because on the one hand, yes, the work that was done

13   there did provide us with information that was unavailable to

14   us before, particularly with respect to a Repo modified --

15          THE COURT:  And also with respect to risk management.

16          MR. BERGER:  And risk management and that leverage.

17   There were other points in that report that were either in our

18   original complaint, our second amended complaint, and also that

19   we were working on through the hundreds of witnesses that we

20   interviewed as part of our proceeding.  We were not relying at

21   all on the Valukas report, but it would not be fair to say that

22   it didn't provide us with a lot of additional information that

23   was not available to us.

24          But specifically with respect to the underwriters, I

25   say it's a wash because the while the Valukas report provided

C4CTLEHC

1    us with information that we could use to assert why the

2    registration statements that these underwriters were involved

3    in were materially false and misleading, on the other hand, the

4    underwriters took cover for their due diligence defense by the

5    focus of Valukas on the role that Ernst & Young played with

6    respect to signing off on all of those transactions.

7            THE COURT:  You were in imminent danger of being

8    dismissed before you amended the complaint in light of the

9    Valukas report.

10           MR. BERGER:  Well, it was sub judice with your Honor.

11   I didn't know what your disposition was going to be, so I'm

12   certainly -- I'm going to send a thank you note to Mr. Valukas

13   as soon as I leave the courtroom.  But what I will say is that

14   the underwriters specifically took real comfort in that report

15   in the sense that there was such a tremendous focus on really

16   Ernst & Young's signing off with clean audit opinions and clean

17   opinions that even the quarterly reports that they opined on

18   with respect to Lehman Brothers handling of these financial

19   transactions.  So they're entitled to rely upon the expertized

20   portions of the registration statement, and that's what they

21   said.  So I say it's a wash, and now I see that it was just

22   more than that from your perspective, your Honor.

23           THE COURT:  Well, I never ultimately had to decide,

24   but you had problems.

25           MR. BERGER:  Right.  Well, I respectfully submit,

C4CTLEHC

though, that with it all, even with the help -- and I

acknowledge the fact that it was a help, the report was a help

to us, it took quite a feat to pry $426 million from the

underwriters.  That is an extraordinarily large sum to achieve

from what are in essence junior underwriters in this offering.

Lehman was the principal underwriter in most of these

offerings.  So with Lehman in bankruptcy and unavailable to

contribute to any settlement, we couldn't prosecute a case

against them, obviously.  The fact that we were able to achieve

that result I respectfully submit was significant.

         And the return to the class of a percentage of their

reasonably recoverable damages I also submit was excellent.

The cornerstone, the major economic consulting firms, their

2011 review of cases with an underwriter defendant found that

the total average recovery from all defendants was

approximately 5.4 percent.  That's from all of them.  Here

we've achieved multiples of that just from the junior

underwriters, and we still have remaining defendants in the

case, and we didn't have an issuer.

         So thus, we recovered 13 percent of the theoretical

maximum allowable statutory damages of $3.3 billion, and a very

significantly larger percentage of reasonably recoverable

damages if we consider, as the Securities Act allows, negative

causation, which the underwriter defendants argue would

virtually eliminate our damages completely.  That's what we

C4CTLEHC

1     were facing with respect to all of the defendants, that it was

2     the economic tsunami in 2008 that took us by surprise, that's

3     what caused all these stocks to go down, you had no damages, it

4     had nothing to do with any wrongdoing on our part.  So all

5     defendants argued, including the underwriters, that our class's

6     losses were directly attributable to that financial meltdown

7     and not wrongdoing at Lehman.  That was a real and threatening

8     arguments throughout the litigation.

9          The argument was properly troubling because they said

10    that the disclosure of the use of Repo 105 transactions at

11    Lehman was not revealed until after Lehman filed for

12    bankruptcy, so the revelation could not have been responsible

13    for the losses incurred by class members.  They argue that they

14    justifiably relied on Lehman's audited financial statements as

15    part of their due diligence, and that in addition there were no

16    material misstatements or omissions in the registration

17    statements because Lehman signed off under GAAP for all of

18    them.

19         So the issues regarding underwriter liability were

20    quite complex for us.  There was 60 different underwriters,

21    twelve securities offerings at issue.  The issuer, Lehman, as I

22    say, was in bankruptcy.  The case hinged on disputed accounting

23    principals and auditing standards and the adequacy of the

24    underwriters' due diligence.  We conducted an extensive

25    investigation, reviewed millions of pages of documents, as I

C4CTLEHC

1     say, we interviewed hundreds of witnesses and consulted with a

2     number of experts to prosecute the case and determine the

3     reasonableness of the settlement.

4              Moreover, the negotiations leading up to the

5     settlement were protracted.  They spanned well over a year.

6     They were quite difficult because the underwriter defendants at

7     all times contended that we couldn't credibly prove our

8     damages.  The settlements required the approval of each and

9     every one of the 60 underwriters, as well as all of the class

10    plaintiffs and the five lead plaintiffs.  And the discussions

11    were overseen by a very senior securities mediator, retired

12    Judge Daniel Weinstein, so he helped facilitate that process

13    greatly.

14             But nevertheless, as I say, this was on again, off

15    again, for over a year.  And so we believe that, considering

16    the percentage of reasonably recoverable damages obtained, the

17    size of the settlement, the complexity of the case, the risks

18    involved, we respectfully submit that your Honor should approve

19    this settlement.

20             THE COURT:  Just a couple of factual questions.

21             MR. BERGER:  Sure.

22             THE COURT:  The mountain of paper in my chambers is

23    gigantic.

24             MR. BERGER:  I will try and sift through.

25             THE COURT:  Just confirm for me, if you can do so, or

C4CTLEHC

1    correct my understanding that there is no proposal to allocate

2    anything to lead plaintiffs or any other plaintiffs apart from

3    whatever their share based on their purchases and sales is.

4           MR. BERGER:  That is correct, your Honor.

5           THE COURT:  OK.  Have the problems or controversies

6    relating to the proposed bar order been worked out?

7           MR. BERGER:  Yes, your Honor.

8           THE COURT:  And where are we on the complaint about

9    the $50 minimum payment?

10          MR. BERGER:  Your Honor, it's -- what we would like to

11   do with that, your Honor, and I don't want to blow that off,

12   the proofs of claim are due in May sometime.  We will process

13   them and go through basically an allocation.  There are a large

14   number of claimants.  I think it's less relevant, frankly, for

15   the underwriter settlement, and the objector is not objecting

16   with respect to the underwriter settlements, only the D and O

17   settlement.

18          However, we would -- when we visit that, that minimum,

19   at the time where -- before we distribute and present it to

20   your Honor, so if it appears that that number is too high,

21   we'll be more than happy to reduce that number.  What we're

22   trying to avoid, frankly, is people getting checks for de

23   minimis amounts and spending so much money on the

24   administration of the settlement that it doesn't make it

25   worthwhile.

C4CTLEHC

1          THE COURT:  I think I once got a class action

2     settlement for about a buck.

3          MR. BERGER:  And I'm sure you were not happy about it,

4     your Honor.

5          THE COURT:  Cost 50 cents to deposit it.

6          MR. BERGER:  That's what we're trying to avoid.

7          THE COURT:  So as a technical matter, what you got to

8     do, I suppose, is some kind of carve out in the approval of the

9     plan of allocation to permit a later determination on that; is

10    that right?

11         MR. BERGER:  No, I don't think that we need to change

12    anything.  In other words, what we would do is before we have

13    any distribution we would come to your Honor and say we are

14    ready to distribute, we believe that we should --

15         THE COURT:  But isn't the $50 provision in the plan of

16    allocation?  Where does it come from?

17         MR. BERGER:  I think it's just in -- it is in the plan

18    specifically, in the plan of allocation, yes, your Honor.

19    There is a reservation for adjustment.

20         MR. STICKNEY:  There is.

21         THE COURT:  So you're asking me to approve it

22    essentially on faith, that if everybody sees fit to do it, you

23    will come back to me and ask me to change it.

24         MR. BERGER:  Your Honor, we have no problem at all

25    rather than just approving the plan of allocation as submitted

C4CTLEHC

1    to your Honor, subject to reviewing the minimum allocations to

2    class members before distribution, that's not a problem at all

3    from our perspective.

4              THE COURT:  OK.  Anything else, Mr. Berger?

5              MR. BERGER:  That's it for the underwriter settlement,

6    your Honor.

7              THE COURT:  I was told there are no objectors on the

8    underwriters settlement present who you want to be heard.  Is

9    that correct?

10             Nobody is.

11             MR. BERGER:  There were none filed, your Honor.

12             THE COURT:  So it's my intention to approve the

13   underwriter settlement, which I think is a reasonably good

14   result in the circumstances.  You'll have to do something with

15   the paperwork to deal with the $50, but you'll get that to me.

16             MR. BERGER:  OK, your Honor.

17             THE COURT:  And with a red line so I know what you

18   have done.

19             MR. BERGER:  Sure.

20             THE COURT:  So we can move on then to the D and O

21   settlement.

22             MR. LOWENTHAL:  Your Honor, before we do that, I

23   wanted to say we'll submit something to the Court, because if

24   the Court does give final approval for the underwriter

25   settlement, that will moot some of the motions to dismiss that

C4CTLEHC

1   are on this docket.

2           THE COURT:  Bless you.

3           MR. LOWENTHAL:  I assumed that you would want to know

4   that, and once the order is entered we'll submit a letter

5   identifying what you no longer have to address.

6           THE COURT:  Wonderful.  And my law clerks are

7   ecstatic.

8           MR. LOWENTHAL:  It was sent for their benefit.

9           THE COURT:  I understand.

10          MR. BERGER:  Your Honor, the director and officers

11  settlement consists of $90 million in cash.  This settlement

12  was arrived at on the basis of plaintiffs' evaluation of the

13  merits of officer defendants' ability to pay.  It's one of the

14  largest director and officer securities class action

15  settlements ever.  Obtaining this settlement was also,

16  respectfully, fraught with risk and uncertainty.

17          At the outset, lead plaintiffs believed that damages,

18  if plaintiffs were successful at trial, would be tens of

19  billions of dollars, far exceeding these defendants' ability to

20  fund any judgment, particularly Lehman's former officers who

21  had a significant part of their net worth tied to their

22  ownership of now worthless Lehman stock.

23          THE COURT:  What steps were taken to assess the

24  ability to pay of the non-officer directors?

25          MR. BERGER:  None, your Honor.  The evaluation with

C4CTLEHC

```
1    respect to the director defendants who were defendants only on
2    the Securities Act or Section 11 claims we believe was based
3    purely on our review of the merits of that claim.  And what we
4    did was we weighed the amount of the settlement that we could
5    achieve here, because obviously we couldn't settle piecemeal,
6    we had to settle with all the directors and officers or none at
7    all.  And the insurance policy was a wasting asset.  We viewed
8    the principal claim -- and I will get to the Valukas report in
9    a moment -- we reviewed the principal claim we had as being
10   against the former officers of Lehman Brothers.  The directors
11   were statutory defendants with respect to the offerings.

12           What the Valukas report did, while it may have helped
13   in our assertion of claims, it certainly hurt with respect to
14   any claims that we could assert against the director
15   defendants.  For that matter, it made it very clear that there
16   was no colorable claim, or he found no colorable claim with
17   respect to the directors.

18           And so the combination of that, plus their reliance or
19   ability to rely on Ernst & Young and Ernst & Young's issuing
20   clean audit opinions which were contained in the registration
21   statements, as well as issues such as a negative causation, no
22   material misstatements, so on and so forth, the issues that I
23   mentioned with respect to the underwriter settlement --

24           THE COURT:  There, at least on the face it, seems
25   quite a high likelihood of prevailing on the issue of
```

C4CTLEHC

1    misstatements.

2              MR. BERGER:  Well, the issuer is absolutely liable if

3    they were materially false and misleading statements.  The

4    directors, however, had a defense, and the defense --

5              THE COURT:  A due diligence defense.

6              MR. BERGER:  Yes.  And we believe that the Valukas

7    report, which pretty thoroughly looked at this, pretty much

8    helped to exonerate them.  Not that we wouldn't have tried our

9    level best to prevail in the case against them, your Honor, but

10   we viewed the recovery that we could obtain in that settlement

11   of $90 million, which we consider to be a significant amount of

12   money, as trumping the risk that we would run by continuing to

13   prosecute the case, continuing to incur costs.  Don't forget,

14   if we continue to prosecute this case against the officers and

15   directors, there would have been tens of million of dollars

16   more in terms of attorney time, expenses and other things, all

17   more or less coming out of the insurance.

18             THE COURT:  I understand.  I take it what you're

19   implying and what I imagine is the case, but what I would like

20   to know is that the insurance carrier's position was it was a

21   package deal or no deal.

22             MR. BERGER:  Absolutely, your Honor.

23             THE COURT:  I would like to have some documentation of

24   that.

25             MR. BERGER:  I'm sorry?

C4CTLEHC

1          THE COURT:  I would like to have some documentation of

2     that.

3          MR. BERGER:  Well, the mediation -- the only thing I

4     could say is that this was pretty much done under the umbrella

5     of a mediation, and all of the individual defendants were

6     covered by this insurance policy.  And certainly those that

7     were settling would have been happy to settle no matter what

8     the coverage was, but those that were not settling would

9     certainly --

10          THE COURT:  I understand that, but I want to know what

11     the carrier's position was.

12          MR. BERGER:  Well, I can't -- I didn't speak to them

13     directly, your Honor.  This is what we were told, and we assume

14     that was the case, that that would --

15          THE COURT:  If the carrier was prepared to settle on

16     behalf of the officers, just to pick a number, for $50 million,

17     then maybe the deal isn't such a good deal.  Or to put it the

18     other way around, if they were prepared to settle with the

19     directors, the non-officers, for $5 million, maybe the deal

20     wasn't so good a deal.  I don't know.

21          MR. BERGER:  Well, at all times throughout the

22     mediation process -- and this process lasted approximately a

23     year, your Honor, we had a number of sit-down, extensive

24     mediation sections that was done telephonically back and forth.

25     There were many bumps in the road.  But it literally took over

C4CTLEHC

1    a year, and throughout that entire period of time it was made

2    very clear to us that if we were going to settle with the

3    officers and directors, it had to be an all-or-nothing

4    settlement.

5          THE COURT:  Who was it that made that clear to you?

6          MR. BERGER:  Counsel for the defendants, the

7    individual defendants, as well as the mediator.

8          I mean I think if we have -- is there anybody who

9    could --

10          THE COURT:  I would like to have some documentation,

11   please.

12          MS. HYNES:  Your Honor, Patricia Hynes, Allen & Overy,

13   representing Mr. Fuld.

14          We really were relying upon the good offices of the

15   mediator who was dealing directly with the insurance carriers

16   and with all of the parties who were involved in this, and it

17   was always presented to us -- and Mr. Berger is correct, that

18   at least from our side, it was always the officers and

19   directors and that the mediator was reporting to us that he was

20   having very intense conversations with the insurance carriers

21   as to what they were prepared to do.  We still have cases out

22   there that haven't been settled, so the fact of whether this is

23   a good result, it is a good result because --

24          THE COURT:  It certainly is for your client.

25          MS. HYNES:  Well, my client is still out there exposed

C4CTLEHC

1    with the insurance gone, so it's a good result for this case,

2    but it's not -- it didn't deal with all of the risks is what

3    I'm saying.

4            But our negotiations were not directly -- and I can

5    say this for all the defendants -- was through the mediator.

6            THE COURT:  I have that point.

7            MR. BERGER:  Your Honor, I may also point out that I

8    think that again the class that -- there were 630 million

9    shares of Lehman stock outstanding, and probably every large

10   institution in America or the world owned Lehman stock and got

11   burned by this bankruptcy.  And we found it quite heartening

12   that not one chose to object to the settlement.  Not that that

13   takes anything away from your Honor's responsibility, but I

14   just respectfully submit it's a factor to consider.

15           THE COURT:  I was also confused in reading the papers

16   as to how much insurance coverage there was and is.

17           MR. BERGER:  Your Honor, there was $250 million of

18   insurance at the start.

19           THE COURT:  For each policy here?

20           MR. BERGER:  For the policy implicated in our case.

21           THE COURT:  And what was that?

22           MR. BERGER:  The claims-made policy, I think it was

23   2007/2008.

24           THE COURT:  Well, Lehman went down in September of

25   2008, right?

C4CTLEHC

1          MR. BERGER:  Yes, your Honor.

2          THE COURT:  And the class period starts when?

3          MR. BERGER:  The class period starts July '08 -- I

4    mean June '07, sorry.

5          THE COURT:  All right.  Potentially we have two policy

6    years here, depending on what the terms of the policies were.

7          MR. BERGER:  There was only one policy year that we

8    vetted that -- believe me, your Honor, if we could have gotten

9    more insurance, we would have been delighted to get it.

10         THE COURT:  You know, I have an obligation to know

11   what the facts are.

12         MR. BERGER:  I'm going to try to -- to the extent I

13   can, your Honor, I will provide them to you, and if not, we

14   certainly would submit anything your Honor requires.

15         However, these are claims-made policies, so when a

16   claim is asserted, basically everything relates back to that

17   claim.  So the claims that were asserted in our case, there was

18   never any question in our mind, and we fully vetted this,

19   because we examined the policies, we had all the policies, we

20   had the policies for the succeeding year, there was never any

21   question in our mind that the coverage for our case, the class

22   action case, was the 2007/2008 year which had 250 million of

23   coverage.

24         But at the time we settled the case -- this is what is

25   important, your Honor, at the time we settled the case, there

C4CTLEHC

1    were -- at least we believe based upon the submissions --

2    Lehman was in bankruptcy, so there were submissions to the

3    bankruptcy court to obtain coverage or payments from various

4    layers of the policies.  And at the time our case was settled,

5    we believe that there were approximately $100 million already

6    paid out for other settlements, arbitration awards, attorneys'

7    fees, expenses.  There were many, many law firms representing

8    the defendants in this case all over the country.

9            And so there were -- when we settled our case, there

10   were so many other litigations out there that were large,

11   including mortgage-backed securities litigation, and so it

12   was -- respectfully, we believe it took a good deal of skill on

13   our part to get the lion's share of the remaining insurance and

14   at the same time, when we got that insurance, have this vetting

15   process that we used Judge Martin for.

16           THE COURT:  Well, we'll come to that in a minute, but

17   I would really like some documentation about the policy.  I

18   mean you're telling me now I think for the first time that it

19   was a claims-made policy.  That's news.  I don't know the term

20   of the policy, what the dates covered are.  I would like to

21   know these things.

22           MR. BERGER:  Sure, your Honor.  We'll submit that to

23   you.

24           THE COURT:  Please.

25           MR. BERGER:  OK.  Well, in any event, your Honor, we

C4CTLEHC

1   believe that we settled the case at a very propitious time

2   because shortly thereafter there was, we understand, very

3   little left of the policies.

4         We, because I think the effort on the part of

5   plaintiffs' counsel in the case is relevant for your

6   consideration, you should know that we rejected a number of

7   prior offers to settle and would not settle the case for the

8   sums that were offered.  And it was only until we got the

9   number that we thought was appropriate under the circumstances,

10  despite the other litigation outstanding, and until the officer

11  defendants had agreed to be subject to this vetting process by

12  Judge Martin, that we agreed to the settlement.

13        Now of course, the settlement was contingent upon his

14  findings.  So we weighed that obviously against having to

15  prosecute the case for years, having certain -- being certain

16  that the insurance would be dissipated and gone at the time we

17  got to trial, have to rely upon getting a favorable judgment

18  against the officers and/or directors, and then go through

19  appeals, and years from now have to go back, and, if we

20  continued to be successful, try to satisfy that judgment out of

21  their personal assets.

22        THE COURT:  What's the justification for looking only

23  at the net liquid assets of the officer defendants?

24        MR. BERGER:  Well, your Honor, we first of all, let me

25  just say that it is rare, if not almost unprecedented, that

C4CTLEHC

```
1   where there is significant insurance coverage that individual

2   defendants contribute to these settlements when there is

3   insurance coverage.  This is a lot of money, this is $90

4   million.  And for us --

5           THE COURT:  This is one of the biggest financial

6   services disasters in the history of the world.

7           MR. BERGER:  That's why, your Honor --

8           THE COURT:  Very substantial risks of liability on the

9   part of the officers.

10          MR. BERGER:  Although I'm mindful of the fact that

11  your Honor told me earlier that you were about to dismiss our

12  case.

13          THE COURT:  Well, you understand the significance of

14  Valukas and so do I.

15          MR. BERGER:  Yes, but your Honor, let me directly

16  answer your question.  This was a balancing, it is not

17  perfection, this is a balancing act for us.  We had $90 million

18  on the one hand, on the other hand we wanted to make sure that

19  after we arrived at a settlement and it was finally approved,

20  one of the officers was not going to stand up, OK, and disclose

21  a 250 or $300 million bank account, whether it's domestic or

22  foreign, and have walked away from this case with just

23  insurance coverage.  That's what we were looking for.

24          When it came to negotiating this, obviously there was

25  extraordinary resistance by the individual defendants.  We're
```

1    asking them to open their kimonos and disclose this information

2    to us.  We're also racing against time, because other cases and

3    arbitrations were going trial that could have wiped out this

4    insurance policy, so we're racing against time.

5         We had to face a decision, do we have to get

6    appraisers to appraise jewelry, cars, rugs, summer homes, and

7    things like that today which would be a completely different

8    value three, four, five years from now when we actually could

9    satisfy a judgment, if we were lucky enough to get a judgment,

10   do we do that, or do we basically take a look at what is

11   readily -- what they have that is either cash or cash

12   equivalent.  That's what we looked at.  Because what would have

13   happened, your Honor, is if we hired an appraiser, it would

14   take months, and at tremendous cost, I might add, to appraise a

15   piece of art, a rug.

16        THE COURT:  Why wasn't it a lot simpler than that?

17   You could look, for example, at the real estate.  There is

18   historical information about what was paid, there is tax

19   assessment data which is theoretically current year to year,

20   although I realize that's imperfect in a lot of places.  And a

21   particular officer could have been confronted with the cost of

22   defending those assets through more litigation against a

23   diminishing cash horde -- whatever it might be, 10 million, 50

24   million, I have no idea, because that information hasn't been

25   put before me -- and maybe, given that choice, the particular

C4CTLEHC

1    officer says well, I don't like it, but I'm prepared to kick

2    some of my cash in to buy off that exposure.  Now that seems

3    like a perfectly practical away to approach it.

4            MR. BERGER:  Your Honor, we have done that before.  We

5    have done that in situations with respect to officers.  We have

6    done that also with respect to directors.  I think your Honor

7    knows, I mean our firm is not shy about doing that.  However,

8    we looked at this sum as being -- our measurement was was it

9    reasonable for us to expect that let's say a number of years

10   down the road after trying the case, incurring another 10, $20

11   million of time and expense, of lawyer time and expenses in the

12   case, when there is no insurance left, was it more or less

13   likely that we would be able to get the same amount of money

14   years down the road.

15           THE COURT:  But look at it from another possible point

16   of view, take an officer A, we'll just call him A, and officer

17   A is sitting there with $50 million in cash, and $300 million

18   of non-cash assets.  Now confronted with the risk of kicking --

19   of proceeding further, not being able to settle unless he

20   kicked in 5 or $10 million, and having to fight for a long

21   period of time to protect not only the cash but the non-cash

22   assets, it might be a perfectly reasonable judgment for that

23   individual to kick in the $5 million.

24           MR. BERGER:  And while that individual was making that

25   judgment, your Honor, another arbitration would have gone

C4CTLEHC

1   forward and judgment would have been reached and then the money

2   would not have been left.

3           THE COURT:  Possibly, possibly not.

4           MR. BERGER:  But this is the judgment that we had to

5   make as to whether that made sense or not.  When we took a

6   look -- when we considered -- for example, your Honor mentioned

7   real estate, we said one of the causes of Lehman's downfall and

8   all of the other financial firms' downfalls was this housing

9   tsunami.  So values went down dramatically.  Who knew what they

10  would be four years from now.  We had no idea.  Valuation is

11  problematic.

12          You have to -- the mediator, Judge Weinstein, said --

13  Judge Martin went to Judge Weinstein basically to ask him what

14  was meant by cash equivalent assets or assets that could be

15  readily converted to cash.  And Judge Weinstein said that it

16  was everybody's intent not to get into a situation where

17  everybody was disputing the value of non-cash assets.  So what

18  we were referring to was stock, bonds, whatever those bonds

19  were, and of also cash, but in the meantime he got net worth

20  statements consisting of all of their assets and all of their

21  liabilities.

22          Also, we did our own investigation and really

23  concluded that there was a substantial amount of these

24  officers' net worth tied up in Lehman's stock that was now

25  worthless, and our judgment was Judge Martin concluded that if

C4CTLEHC

1    you just took a look at those assets, they were substantially

2    less than what he was charged with finding, substantially less.

3          THE COURT:  And what he was charged with finding?

4    What does that mean?

5          MR. BERGER:  He was charged with finding whether the

6    liquid -- or let me give you the words, includes non-liquid

7    assets easily converted to cash, whether the liquid assets or

8    non-liquid assets easily converted to cash, whether those

9    exceeded $100 million.

10         THE COURT:  That was the question that was put to

11   Judge Martin?

12         MR. BERGER:  Sorry?

13         THE COURT:  Was that the question put to Judge Martin?

14         MR. BERGER:  Yes.

15         THE COURT:  Now there's reference in your papers to an

16   agreement about the scope of his review.  Is that in the papers

17   before me, the agreement itself?

18         MR. BERGER:  Yeah, I believe in the affidavit, the

19   joint affidavit that was submitted by Mr. Stickney and

20   Mr. Kessler.

21         THE COURT:  Could you help me find it?  Because I have

22   been unsuccessful so far.

23         MR. BERGER:  The retention agreement is not included,

24   your Honor.

25         THE COURT:  That's what I thought.  I would like to

C4CTLEHC

1    have it.

2              MR. BERGER:  But what he got from them is included.

3              THE COURT:  Meaning what, meaning the net worth

4    statements?

5              MR. BERGER:  The net worth statements and all the

6    other records that he got from them, tax returns.

7              THE COURT:  And they're in the papers before me?

8              MR. BERGER:  Yes, your Honor, page -- not the

9    actual -- they were confidentially submitted to Judge Martin,

10   that was -- the whole point of this review, your Honor, was to

11   hire, this is not -- we did this so that we could make certain,

12   your Honor, that somebody who is a respected neutral could

13   confidentially see this.

14             THE COURT:  But correct me if I'm wrong, I understand

15   from the papers and from what you just said -- and I really

16   need to be corrected if I'm wrong is this -- you retained Judge

17   Martin to answer this question:  Is the net liquid assets of

18   these five people as a group greater than, less than, or equal

19   to $100 million?  Right?

20             MR. BERGER:  That's correct.

21             THE COURT:  It was a yes or no question, basically.

22             MR. BERGER:  Yes.

23             THE COURT:  True?

24             MR. BERGER:  Yes.

25             THE COURT:  And he looked at various papers that were

C4CTLEHC

1    submitted to him --

2              MR. BERGER:  No, that he asked for.

3              THE COURT:  Well, I presume he didn't look at the ones

4    that he asked for that were not submitted to him.

5              MR. BERGER:  What I mean is he hired a forensic

6    accounting firm -- this is important, this was not a cover up,

7    he hired a forensic --

8              THE COURT:  Believe me, I have known Judge Martin my

9    entire professional life, the suggestion that I might be

10   implying a cover up is ridiculous.

11             MR. BERGER:  That's why we hired him.

12             THE COURT:  He's one of the most distinguished

13   colleagues I ever had the pleasure of serving with.  That's not

14   the point.  The point is that in respect of the ability to pay

15   of the officers and the reasonableness of the judgment, to let

16   them off the hook without paying a nickel beyond the insurance,

17   I'm being asked to buy a pig and a poke.  And to the extent I'm

18   being asked to rely on Judge Martin, and I have no hesitation

19   about doing so for the question he was asked to answer.  I'm

20   simply being asked to accept, and do I accept that based on the

21   data submitted to him, the net liquid assets of these five

22   people in the aggregate were under $100 million.

23             MR. BERGER:  He said "substantially."

24             THE COURT:  What does that mean?  $94 million?  $4

25   million?  I don't know.  I assume somewhere in between.  I know

C4CTLEHC

1    nothing about their assets that were not within whatever

2    definition of liquid assets was used.  I'm sure it was a

3    reasonable definition, but nevertheless, I know nothing about

4    it.  I don't have any of the data he looked at.  I don't have

5    any of the tax returns.  I don't have whatever reports were

6    prepared by the forensic accountant.  I'm at sea here.

7              MR. BERGER:  May I respond, your Honor?

8              THE COURT:  Yes.

9              MR. BERGER:  Well, we begin with the following

10   premise, your Honor, that we could have done what would have

11   been done in virtually every case I could think of involving

12   insurance settlements and a fraud, and in this particular case

13   it was an open question as to whether -- as I say, there's no

14   governmental proceedings of any kind that have been brought

15   against the officers or directors or underwriters or any of the

16   settling defendants.

17             And so in this particular -- and who it all times

18   maintained they do nothing wrong, it is very common -- and that

19   is the reason why these D and O policies are taken out -- it is

20   very common for insurance to pay the settlement amounts for

21   officers and directors.  If there was no insurance, that would

22   be one thing.  $90 million may be a drop in the bucket for what

23   was lost here, but it is objectively a lot of money, and it is

24   a large portion of the remaining insurance.

25             We had to take a look and say should the class be

C4CTLEHC

1    paying for a long-term prosecution of this case, or should we

2    resolve the case at this number.  We decided we would resolve

3    the case at this number provided that on a confidential

4    basis -- the confidentiality wasn't our choice, it was the

5    individual defendants' choice -- on a confidential basis, we

6    pick, the plaintiffs, pick the respected neutral.  That

7    respected neutral is charged with a responsibility of hiring a

8    forensic accountant, getting sworn statements from these

9    officers, reviewing their tax returns, reviewing their bank

10   accounts, reviewing their brokerage accounts, getting lists of

11   assets other than cash or a functionally equivalent asset, and

12   then rendering an opinion to whether, on the basis of his

13   review, that their assets were less than $100 millions.  He

14   says substantially less.

15           That is much more, going much further than I

16   respectfully submit almost anyone would go to with respect to a

17   settlement like this.  And we did it because we were conscious

18   of the fact that there would be a potential public hue and cry

19   about the officers of Lehman Brothers getting off the hook

20   without paying any money.

21           But you know what?  I mean not one, not one

22   shareholder out of 630 million shares had said that the number

23   we settled for for the officers and directors was inadequate,

24   not one.

25           THE COURT:  Well, I think Mr. Andrews had a few things

C4CTLEHC

1      to say about it.

2                  MR. BERGER:  But he didn't say that, your Honor, what

3      he said is we should have included -- well --

4                  THE COURT:  He talks about somebody's $28 million

5      house.

6                  MR. BERGER:  He tried to extort a fee from us.  And he

7      didn't have that house.  It's not true.  These numbers are

8      coming out of thin air.  How do you respond to somebody like

9      him?

10                 THE COURT:  Well, you know, I read his papers, too,

11     and I know that Mr. Fuld doesn't have five airplanes and a

12     helicopter.  I know that Mr. Andrews says he does because there

13     was once an article somewhere that said that Lehman had that

14     aircraft, which is rather different.  Even I could figure that

15     out.  So I certainly am capable of figuring out that it is

16     possible that what the man is talking about in terms of houses

17     and the like may be wildly inaccurate, there might even be a

18     probability that it's so, but I don't know because I don't have

19     a record.

20                 MR. BERGER:  But your Honor, it's not -- we can't --

21     that is not a record we could get you because basically the

22     condition of the settlement was that -- and this is why we

23     hired John Martin, we hired John Martin because we knew that

24     nobody --

25                 THE COURT:  Let's get clear, I assume for purposes of

C4CTLEHC

1    these deliberations that Judge Martin rendered to you an

2    opinion based on what he looked at that the net liquid assets

3    or whatever the magic term is was substantially under $100

4    million.  I am still left with the question that neither you

5    nor I have the slightest idea of what assets these people have

6    that are not within that definition.  None at all.  I have been

7    provided with no documentation at all about it, and I am being

8    asked to accept on faith that your judgment that you should

9    settle this case without a payment from these people was a

10   reasonable one even in circumstances where you don't know the

11   facts either, I have a little problem.

12           MR. BERGER:  But your Honor, all I'm saying is two

13   things, one, not just that he -- what he asked for, he asked

14   for and received everything, including sworn statements.

15           THE COURT:  But you did not ask him -- Mr. Berger,

16   please.  You did not ask him to render -- unless I'm mistaken,

17   but I thought I heard you -- to render any opinion whatsoever

18   with respect to the value of assets that did not fall within

19   the definition that he was asked to opine on.  Is that right?

20           MR. BERGER:  Yes.  And we would not have a deal, and

21   the money would be gone, we would have --

22           THE COURT:  Maybe it would and maybe it wouldn't.  And

23   maybe what you would have is the $90 million from the insurance

24   company and another 25 or $30 million from the individuals --

25           MR. BERGER:  But --

C4CTLEHC

1          THE COURT:  -- who certainly --

2          MR. BERGER:  I understand.

3          THE COURT:  -- who certainly don't want to go to trial

4     in this case.

5          MR. BERGER:  I understand what you're saying, but

6     we're facing a situation where these officers have a --

7     principally the officers, in some cases the directors have

8     litigation against them all over the place, all over the place.

9     Certainly somebody else can perhaps get their money or

10    whatever.  I knew -- I know they were not writing checks to us

11    if they had checks to write because there were 10, 20, 30 other

12    cases out there that were unresolved.

13          And basically, my attitude was can I responsibly ask

14    your Honor to approve this settlement as being a fair,

15    reasonable and adequate settlement under the circumstances of

16    this case.  And I feel comfortable that I can because of the

17    entire landscape that was out there.  All this other

18    litigation, the wasting asset of the insurance, every day that

19    went by, every time we had a mediation and there was 75 lawyers

20    involved in the case, or we basically went on with discovery,

21    we were just starting with our intense discovery in the case,

22    it would have basically eaten through this policy in a matter

23    of months.

24          THE COURT:  Did anybody look at the question of what

25    interfamily transfers were made in past three or four years by

C4CTLEHC

1   these people?

2           MR. BERGER:  Yes, he did.  I think what is said in his

3   papers was he asked for all of their bank accounts in 2008 and

4   also currently, and their tax returns for each of those years.

5   And I'm not sure exactly how he put it, I don't want to

6   misrepresent anything to the Court, but that was one of the

7   things he was looking at, I believe.

8           THE COURT:  Bank accounts.

9           MR. BERGER:  He had bank accounts, tax returns,

10  records of all of their assets that he got from all of them,

11  and he got sworn statements from them, I suppose subject to

12  penalty of perjury because he asked for affidavits from every

13  one of the officers.

14          THE COURT:  Affidavits to what effect?

15          MR. BERGER:  Affidavits that what he was being

16  presented with was a complete and accurate -- was a complete

17  and accurate production of all of their assets, liabilities,

18  net worth statements, everything that he asked for.

19          THE COURT:  And these were net worth statements as of

20  one date or as of more than one date?

21          MR. BERGER:  No, I believe he asked for them -- let me

22  pull out -- I could hand this up to your Honor, if you would

23  like it.

24          THE COURT:  Is this the affidavit you submitted?

25          MR. BERGER:  This is paragraph 70, let's see.  Would

C4CTLEHC

1    your Honor like to -- paragraph 70 of the affidavit.

2         THE COURT:  I have that.

3         And this was all directed to the liquid net worth

4    assessment?

5         MR. BERGER:  No -- well, yeah, that assessment, but

6    your Honor asked the question about transfers, which would have

7    presumably been able to be discerned.

8         THE COURT:  Presumably.  So if somebody owned real

9    estate with enormously valuable mineral rights and it was

10   transferred in 2007 to the spouse, would that have been on

11   these statements?

12        MR. BERGER:  Well, if it was transferred -- well,

13   let's see, all current bank and brokerage account statements

14   that existed between May 2008 and the present and have been

15   closed in the interim.  That was one of the things he asked

16   for.  There's a whole laundry list of things that he asked for.

17   But your Honor, how would we be able to get four years from now

18   assets transferred from one spouse to another?

19        THE COURT:  Talk to Mr. Pickard.

20        MR. BERGER:  Well, he has a slightly different

21   situation.

22        THE COURT:  The methodology is well known.

23        MR. BERGER:  I mean the documentation that Judge

24   Martin sought and received here was very extensive.

25        THE COURT:  But apparently not extensive enough --

C4CTLEHC

1    although I don't know and I'm not sure that you do -- to have

2    captured the transaction I just hypothesized.  Right?

3         MR. BERGER:  But I believe, your Honor, that we would

4    never be entitled to that information because the only time we

5    would be entitled to it -- the only time we may be entitled to

6    to that is after we get a judgment against these officers --

7         THE COURT:  You aren't, quote, entitled, closed quote,

8    to any of the information that was turned over, not one scrap

9    of it, not the tax returns, not the bank statements, not the

10   brokerage statements.  They were provided because these people

11   wanted out of the lawsuit, and it was designed to create some

12   sort of a record from which you could say to me:  I couldn't

13   get any more money.

14        But I'm pointing out to you that I have very severe

15   questions about whether it would be appropriate for me to draw

16   that conclusion given the paucity of the information in front

17   of me.  And you said a moment ago that you knew there would be

18   a hue and cry about the officers of Lehman getting out of this

19   case scot-free, which is what is being proposed, and I'm

20   telling you, as sure as God made little green apples, that if

21   officer B had $100 million in real estate and other non-liquid

22   assets that were transferred to the wife after the start of the

23   class period -- or to the husband, as the case may be -- for

24   one dollar and other good and valuable consideration, and that

25   comes out, hue and cry isn't going to describe what will

C4CTLEHC

 1  happen.  And I have an obligation, I think, to have some

 2  reasonable assurance that that's not going to happen, or if it

 3  may happen, that there is a really super duper reason for why

 4  we all get blindsided.

 5       MR. BERGER:  Your Honor, just two points.  First, the

 6  statements that Judge Martin requested beginning in May 2008

 7  were before the actual first complaint was filed in the case.

 8  Second, I refer to the hue and cry because we wanted to be

 9  prepared, and I wanted to -- we, the plaintiffs' lawyers in the

10  case and the lead plaintiffs wanted to be in a position where

11  we could responsibly represent to your Honor that we do not

12  believe that -- that we believe that this is a fair,

13  reasonable, and adequate settlement.

14       The fact of the matter is this settlement was very

15  well publicized.  Notice went out to 900,000 shareholders, and

16  it specifies what the settlement is.  Our papers clearly

17  describe the fact that there was a neutral person bought in to

18  take a look at the liquid assets of the officers.  With the

19  exception of Mr. Andrews, not one shareholder, institutional or

20  otherwise, many of whom were wiped out of their investments at

21  Lehman, has come forward to complain about the settlement.  Not

22  one.

23       THE COURT:  Well, if Rule 23 said that no class

24  settlement shall be consummated without approval of the

25  majority in interest of those in the class, it would be all

C4CTLEHC

1    over.  But that isn't what it says.

2              MR. BERGER:  But your Honor --

3              THE COURT:  It's relevant, of course.

4              MR. BERGER:  The cases I think clearly hold that the

5    reaction of the class, as I had referred to before, the

6    reaction of the class to the settlement, the proposed

7    settlement, is -- and the Second Circuit said this -- is the

8    single most important factor under Grinnell for the Court to

9    consider in approving the settlement.

10             THE COURT:  I certainly understand that.  Thank you.

11             Look, let's draw a line under this part of the

12   discussion.  You certainly see my concern.  I have reservations

13   about whether I'm prepared to approve the director and officer

14   settlement on the record before me.  You know my concerns.  I

15   have voiced my questions.

16             There are in existence at least a number of documents

17   that are relevant to those concerns, they include what exactly

18   the scope of the work that Judge Martin was working under said,

19   they include the scope of work between him and his forensic

20   accountant, they include whoever reports were rendered by the

21   forensic accountant, they include the net worth questionnaires

22   and whatever other documents the directors and officers

23   submitted, they include whatever the affidavits were that were

24   submitted, they include -- well, that's what I know exists.

25             Then you talked about viewing all of this in the

C4CTLEHC

1    context in which these discussions were taking place.  It

2    certainly is within your ability to provide a declaration or

3    affidavit putting before me how you approached all this and why

4    the judgments were made, given the information you had, in

5    considerably greater detail than is before me.  And you know, I

6    just had occasion, I think, to appoint your firm lead counsel

7    in the BNY Mellon case, and on that occasion I expressed the

8    enormously high regard I have to your firm, and I have it for

9    you, sir.

10            MR. BERGER:  Thank you, your Honor.

11            THE COURT:  And I know that the creativity that your

12   firm is known for and the ability of the counsel representing

13   the directors and officers who would very much like to have

14   this settlement approved is such that you are all very much

15   able to put a record before me that might well lead me to the

16   conclusion you would like me to reach.  And I'm not saying that

17   I can't reach it on this record, but I'm saying there's doubt.

18            And you tell me how much time you want.

19            MR. BERGER:  Your Honor, we would like to do it,

20   obviously, as soon as possible, but if I may, just before the

21   time just that -- I know it's late, I don't mean to belabor it,

22   but there's a very important point here regarding the issue of

23   confidentiality and what records there are.

24            Judge Martin and his forensic accountant, as part of

25   the ground rules for this review, are maintaining the

C4CTLEHC

 1    confidentiality of those documents.  I believe they were

 2    actually even -- I'm not sure, but they could have actually had

 3    to have been returned to the individuals.

 4         Now why?  I understand somebody could take a look at

 5    that and say:  Well, I smell a rat.  But I can assure you, your

 6    Honor, there is no rat here.  And the reason why they had to

 7    maintain the confidentiality was twofold.  One, this settlement

 8    wasn't final until we basically got this report from Judge

 9    Martin, so we couldn't see these documents and then proceed

10    with a settlement against them when those documents are more

11    confidential than being in somebody's underwear drawer.

12         THE COURT:  Look, I can't count the number of cases I

13    have had with your firm in the last 18 years, and I'm

14    reasonably confident that in not one of them have you failed to

15    submit some kind of confidentiality order on day one or near

16    it.

17         Now these things don't necessarily have to be

18    submitted to you to the extent that they're personal to these

19    five individuals, there are ways to deal with this.  This Court

20    is used to dealing with materials of the highest levels of

21    security classification in national defense matters, sometimes

22    without one side or the other seeing them.  There are all sorts

23    of ways to deal with this problem.

24         MR. BERGER:  OK.  Two weeks, your Honor?

25         THE COURT:  That's fine with me.

C4CTLEHC

1            MR. BERGER:  If I could just conclude, I just want

2      to -- we're focusing principally on this financial review, but

3      at the outset of the presentation of the officer and director

4      settlement, what I said was it was based upon a twofold

5      analysis, one was ability to pay and the other was the merits.

6      And I just want to quickly comment, because Mr. Andrews called

7      the case against the officers and directors a slam dunk, and

8      all I want to say about that is -- and here's again where the

9      examiner's report comes in, is the examiner virtually

10     exonerated the directors for any liability, and with respect to

11     the officers, despite the 2200 pages, never found a reason to

12     argue or even imply that there was a fraud claim against them.

13     Yes, he found that they may have breached -- or certain of them

14     may have breached their fiduciary duty to Lehman Brothers, but

15     that wasn't sufficient for our 10(b) claim or our Section 11

16     claim because the officers also were relying upon the

17     examiner's conclusion with respect to the Ernst & Young report

18     and the expertized portions of the registration statements.

19            So I respectfully submit that the case was far from a

20     slam dunk, was very problematic against the officers and

21     directors, and perhaps that's why the government -- no

22     governmental agency has chosen to prosecute them for any

23     wrongdoing despite the notoriety and the impact the Lehman

24     bankruptcy had on the United States and the world economy.  Of

25     course, they also made the arguments that there was no

C4CTLEHC

1   materially false or misleading statements in the registration

2   statements.

3            THE COURT:  But you saw how persuasive that was for

4   me.

5            MR. BERGER:  And also negative causation was again a

6   principal argument that there is likely underwriters.

7            So I -- needless to say, your Honor, I think you could

8   gather from the back and forth here, the negotiations with

9   respect to the officers and directors was also very protracted.

10  It took well over a year, I think it could have been a year and

11  a half of back and forth with and without the mediators in

12  order for us to reach a resolution, and that resolution was

13  supported and recommended by Judge Weinstein.

14           If the Court has any other questions --

15           THE COURT:  I think the 8th Amendment might preclude

16  any further questions to you.

17           Look, you got a nice result in the underwriter case.

18  I don't take anything away from you, a lot of skill, a lot of

19  effort, no question about it.  I do have this reservation about

20  the director settlement.  Please don't take the fact that I

21  pressed you as personal or hostile or anything, I just have a

22  job to do, and I'm doing it the best I can.  Now -- and you

23  know because I keep appointing your firm over and over again,

24  there's no lack of regard for what you do.

25           OK, now --

C4CTLEHC

| 1 | MR. BERGER:  I appreciate that, your Honor.  We will |

1          MR. BERGER:  I appreciate that, your Honor.  We will

2     get you something.

3          THE COURT:  I look forward to it.

4          All right.  I think in many ways the conversation we

5     have been having addresses indirectly the fee issue.

6          MR. BERGER:  May I just do the plans of allocation?

7     Do you have any questions regarding that, your Honor?

8          THE COURT:  Not at the moment, your Honor.

9          If you want to address fees --

10          MR. BERGER:  I'm fine, your Honor.

11          THE COURT:  All right.  Anybody else wish to be heard

12     on this?

13          Ms. Hynes, you're looking pensive, but you don't want

14     to say anything?

15          MS. HYNES:  Thank you for the opportunity.

16          THE COURT:  I didn't mean to leave anybody out.

17          I think we're done unless anybody else has anything

18     else to say.

19          MR. BERGER:  I was going to address the fee issue.

20          THE COURT:  No, I thought you just declined the

21     opportunity, but go ahead.

22          MR. BERGER:  Thank you, your Honor.  I should be more

23     on my toes.

24          THE COURT:  Let me be up front with you, my gut

25     reaction to it is that it's too high.  That's my gut reaction.

C4CTLEHC

1   And my gut -- and it's more than a gut reaction, it's a

2   reaction informed by all of this stuff -- is that something way

3   closer to the lodestar but at or above the lodestar is more

4   likely appropriate than what you asked for.  But I'm happy to

5   hear what you have to say.

6          MR. BERGER:  OK.  Well, your Honor, we believe that

7   under the circumstances the settlements that we are presenting

8   to you -- let me step back for a minute.

9          We are very mindful of your Honor's focus on, number

10  one, reviewing fee applications on a lodestar multiplier basis.

11  We are very mindful of your Honor's focus on handling these

12  cases efficiently and with a minimum of duplication.  Your

13  Honor set out at the beginning of this litigation by issuing

14  pretrial order number one, which appointed our firm, first Sean

15  Coffey and now me as chair -- actually the committee selected

16  us as chair, but an executive committee to monitor the time

17  that was spent in the litigation, to give the assignments, to

18  basically avoid -- specifically avoid duplication, to handle

19  the case efficiently.

20         And that's what we did.  We believe we faithfully

21  discharged your Honor's responsibilities that you imposed on

22  us, and achieved -- putting aside the officer and director

23  settlement, which we think under the circumstances is an

24  excellent settlement, but certainly the underwriter settlement

25  is without question under the circumstances an extraordinary

C4CTLEHC

1    settlement, as witnessed by the fact that, again, no class

2    member has chosen to object to not just the settlement but also

3    the fee, which I respectfully ask your Honor to take into

4    consideration.

5         Now we presented -- in every one of these cases we

6    start with a certain presumption, one that the cases bear an

7    enormous amount of risk.  And I know that people are skeptical

8    about that and can say whatever they want to your Honor.  Just

9    two weeks ago before, Judge Hellerstein, a case that we have

10   been working on for six years, summary judgment against us.

11   Omnicom, Judge Pauley, summary judgment against us, and on and

12   on.  Of course, we win a lot of cases and we settle a lot of

13   cases, but the risk is tremendous in these cases.

14        And the risk here, particularly considering the Lehman

15   bankruptcy taking place, the principal source of any recovery

16   being gone and having a recovery against essentially junior

17   underwriters in the litigation as the only deep pockets, was

18   tremendous.  Not withstanding that, we put every effort we

19   could it in, managed the litigation, supervised the litigation

20   in accordance with the dictates of your Honor.  We staffed

21   document reviews with lower-earning attorneys.  I will point

22   out the fact that your Honor says lodestar.  OK, well, contrast

23   our lodestar with the examiner based in Chicago whose fee

24   application to the bankruptcy court shows 111,000 hours over 15

25   months, not four years, 15 months for a lodestar of $53 million

C4CTLEHC

1    at an average rate of $472 an hour.  No risk.  What Jenner &

2    Block knew and what Mr. Valukas knew was, sure as night follows

3    day, they were going to be paid their $53 million.

4            Over four years we incurred $37 million worth of time

5    in this case.  We put aside a lot of other things to focus our

6    attention on this case.  It was very high visibility.  It was a

7    very important case.  We viewed our fiduciary responsibilities

8    to the class seriously.  And when we take on a case like this,

9    we have, I respectfully submit, a right to say OK, well,

10   listen, what are we looking at at the end of the day if we do

11   our job properly.  So we see a chart of 83 cases, all 83, we

12   didn't pick and choose them, settlements between $100 million

13   and a billion dollars.  And what do they show?  The average on

14   those cases shows a -- I don't want to upset you with a

15   percentage, but shows a percentage --

16           THE COURT:  I'm made of sterner stuff.

17           MR. BERGER:  -- on average of 18.6 percent.

18           THE COURT:  Even if you use scientific notation I will

19   be all right.

20           MR. BERGER:  It shows an average multiplier of

21   2.67 percent.  I have the chart.  We added that to the chart, I

22   could submit it to your Honor.  But that's -- if you take a

23   look at just the settlements between 4 and $600 million, so

24   we're not trying to do anything underhanded here, the

25   multiplier is well over two and a half percent on average for

C4CTLEHC

```
1    all of those cases.  So that's what our going-in assumption is.

2           Four years we have not been paid.  Four years we

3    advanced expenses in this case and handled the case

4    efficiently, discharged our responsibilities.  We presented to

5    your Honor, which I'm sure is more than most litigants maybe

6    who don't know your Honor would present, we divided our time in

7    categories and tranches for you so you could see what we worked

8    on.  Our lodestar multiplier, for example, the Lucas's was $472

9    an hour on average, ours was 411.  For document reviews, in the

10   last tranche, $385 an hour because we used staff attorneys for

11   that.  In addition, for example, his hourly rates run up to

12   $1,183 an hour for partners when ours are substantially less

13   than that, associates are substantially less than that.

14          THE COURT:  Don't let that get around or the whole

15   federal bench will be back in practice.

16          MR. BERGER:  Things have changed, your Honor.

17          THE COURT:  Tell me about it.

18          MR. BERGER:  So what I'm suggesting -- I'm just

19   completely avoiding my outline here because I just -- we just

20   take on this responsibility.  This was, from day one, an

21   extraordinarily difficult case.  If you would have been in the

22   negotiations for the underwriters and the officers and

23   directors and basically supervising all the lawyers in the case

24   and putting this together, I respectfully suggest that you

25   would look at the time very differently.
```

C4CTLEHC

1          And what I'm saying is there's a public policy

2     consideration involved here as well, and that is that we and

3     our clients, the lead plaintiffs in this case, the

4     institutional lead plaintiffs -- who, by the way, our papers

5     said 17 and a half percent, we're applying for 16 percent,

6     which amounts to only the 2.18 times multiplier, that's it.

7     The Second Circuit in the *Wal-Mart* case said multipliers of 3

8     to 4.5 in cases like this are common.  The Second Circuit said

9     that.  And I think it's borne out by the statistics,

10    multipliers in cases like that of 3 to 4.5 are common.

11         THE COURT:  If the average is 2.7 and they're common

12    at 4.5, I think they're also arithmetically common at one,

13    right?

14         MR. BERGER:  Your Honor, I don't think so.  First of

15    all, if we were going to be compensated for our lodestar, I

16    appreciate your Honor's respect for me and our firm, but the

17    truth of the matter is if we were going to be compensated for

18    our work on our lodestar basis, we would be sending out bills

19    to clients and billing them and getting paid on a regular

20    basis.  Because the only reason why we do this is because we're

21    willing to take the risk so that if we are successful, we get a

22    reasonable multiplier, and if we are not, we lose; the class

23    loses, we lose.

24         So what I'm saying is take this as a perfect example,

25    the public -- one of the factors that the Court is directed to

C4CTLEHC

1    consider by the Second Circuit in *Goldberger* is the public

2    policy considerations here.  No governmental proceeding stepped

3    forward despite this Lehman bankruptcy, despite all the

4    brouhaha, the Congressional hearings, the testimony, nothing.

5    Of course, the New York AG has a case against Ernst & Young,

6    but that's not what we're discussing here.  This is a perfect

7    example of the plaintiffs' securities bar and lead

8    institutional plaintiffs coming into a situation, taking

9    control of it, prosecuting it, and getting a very substantial

10   recovery; maybe not considering the damages for the officer and

11   director settlement, but certainly in the underwriter

12   settlement for investors who otherwise would have absolutely no

13   recourse.  We got it for them, and we worked hard to get it,

14   and would hope that your Honor would understand that when you

15   are considering our fee request.

16        THE COURT:  OK.  Thank you, I appreciate that.  That's

17   helpful.  Anybody else?

18        OK.  Thank you all.  It was very helpful, and I will

19   look forward to seeing whatever you give me later on.

20        MR. BERGER:  Thank you, your Honor.

21        THE COURT:  Have a good evening, everyone.

22                           o0o

23

24

25