**Responsive to Dkt. No. 1010 in No. 09-md-02017-LAK**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION

This Document Applies To:

In re Lehman Brothers Equity/Debt Securities Litigation, 08 Civ. 5523 (LAK).

Civil Action No. 09 MD 2017 (LAK)

**UBS FINANCIAL SERVICES INC.'S MEMORANDUM OF LAW IN OPPOSITION TO THE STRUCTURED PRODUCT PLAINTIFFS' MOTION FOR RECONSIDERATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 54(b)**

GIBSON, DUNN & CRUTCHER LLP
JONATHAN C. DICKEY
MARSHALL R. KING
OLIVER M. OLANOFF
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

Attorneys for Defendant UBS Financial Services Inc.

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 3

A. The Court Should Deny Plaintiffs' Motion for Reconsideration. ..... 3

1. *NECA* Does Not Confer Unfettered Standing to Assert Diverse Class Claims Simply Because the Claims May Raise Some Similar Concerns. ..... 4

2. Plaintiffs Have Failed To Show that the Claims Regarding the 53 Unpurchased Notes Satisfy the "Same Set of Concerns" Standard. ..... 7

3. The Claims Regarding the Unpurchased Notes Do Not Present the "Same Set of Concerns" as the Claims Regarding the Purchased Notes. ..... 8

B. Plaintiffs Disregard the Impact of the Relief they Seek on Class Certification. ..... 13

III. CONCLUSION ..... 15

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Bergerson v. N.Y. Office of Mental Health, Cent. N.Y. Psyc. Ctr.*,
652 F.3d 277 (2d Cir. 2011) .......... 3

*Blum v. Yaretsky*,
457 U.S. 991, 102 S. Ct. 2777 (1982) .......... 6

*Cobalt Multifamily Investors I, LLC v. Shapiro*,
No. 06 Civ. 6468, 2009 WL 4408207 (S.D.N.Y. Dec. 1, 2009) .......... 3

*Gratz v. Bollinger*,
539 U.S. 244, 123 S. Ct. 2411 (2003) .......... 2, 4, 5, 6

*Green v. Beer*,
No. 06 Civ. 4156, 2009 WL 3401256 (S.D.N.Y. Oct. 22, 2009) .......... 4

*Hopkinson v. Estate of Siegal*,
No. 10 Civ. 1743, 2011 WL 2935876 (S.D.N.Y. July 12, 2011) .......... 3

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011) .......... 1, 8, 9

*Lewis v. Casey*,
518 U.S. 343, 116 S.Ct. 2174 (1996) .......... 6

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
No. 11-2762 CV, 2012 WL 3854431 (2d Cir. Sept. 6, 2012) .......... passim

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
632 F.3d 762 (1st Cir. 2011) .......... 2, 6

*Prescia v. U.S. Life Ins. Co. in City of N.Y.*,
No. 10 CV 2518, 2011 WL 70569 (S.D.N.Y. Jan. 6, 2011) .......... 3

*Pretter v. Metro North Commuter R.R. Co.*,
No. 00 Civ. 4366, 2002 WL 31163876 (S.D.N.Y. Sept. 30, 2002) .......... 3

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*,
No. 08-CV-7069, 2012 WL 4049958 (S.D.N.Y. Sept. 11, 2012) .......... 3

Defendant UBS Financial Services Inc. ("UBSFS") respectfully submits this memorandum of law in opposition to the motion of the Structured Product Plaintiffs ("Plaintiffs") for reconsideration of the Court's July 27, 2011 order granting in part and denying in part the defendants' motion to dismiss. *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011) ("*Lehman*"). For the reasons set forth below, Plaintiffs' motion should be denied.

## I. INTRODUCTION

Through their motion for reconsideration, Plaintiffs seek to revive class claims for alleged misstatements in the offering documents for 53 Lehman structured notes that they did not purchase. *See Lehman*, 799 F. Supp. 2d at 273-74.[1] As the sole support for their motion, Plaintiffs rely on *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* ("*NECA*"), which held that named plaintiffs might have standing to bring class claims relating to securities they did not purchase if those claims present the "same set of concerns as plaintiffs' claims" relating to securities that they did purchase. No. 11-2762 CV, 2012 WL 3854431, at *1 (2d Cir. Sept. 6, 2012). Plaintiffs' motion for reconsideration should be denied because Plaintiffs did not and cannot show that the claims on the 53 structured notes they did not purchase (the "Unpurchased Notes") raise the same set of concerns as the claims on the 31 structured notes they did buy (the "Purchased Notes").

The Unpurchased Notes were offered at various times over the course of a highly tumultuous 16-month period in the history of the global economy and Lehman Brothers

[1] Plaintiffs ask the Court to reconsider its decision to dismiss the claims relating to 54 offerings identified in Appendix B ("App'x B") to the Third Amended Complaint ("TAC"). As UBSFS has explained on several previous occasions, the security identified by CUSIP 52522L368, which is included among the 54 offerings in Appendix B to the TAC, was called prior to Lehman's bankruptcy, rendering any of Plaintiffs' claims with respect to that offering indisputably meritless. *See* Declaration of Oliver Olanoff, dated October 9, 2012 ("Olanoff Decl."), Ex. 1.

Holdings Inc. ("Lehman"), pursuant to different offering documents that allegedly contained a diverse and ever-changing array of supposed misstatements. As a result, the 53 Unpurchased Notes do not present the same set of alleged misstatements, offering document disclosures, and other relevant circumstances as the 31 Purchased Notes – and Plaintiffs make no showing whatsoever to the contrary. The claims regarding the Unpurchased Notes, therefore, do not present the "same set of concerns" as the claims regarding the Purchased Notes. Indeed, in class certification proceedings, Plaintiffs tacitly admitted that the claims related to each Lehman structured note raise materially different concerns when they proposed that the Court certify a subclass for each of the 31 Purchased Notes. *See* Doc. 911 at 2-3.

Extending *NECA* to permit "class standing" in this case would render *NECA*'s standard infinitely elastic. *NECA*, which addressed allegations of "nearly identical misrepresentations" in offering documents for "*all* of" the securities at issue, 2012 WL 3854431, at *12, did not confer standing to litigate class claims regarding unpurchased securities in a case like this one, where by virtue of the incorporation of different SEC filings in a rapidly changing environment, there are hundreds of alleged misrepresentations and corrective disclosures that vary over time and by offering. Accordingly, *NECA* does not justify reconsideration of the Court's July 2011 ruling, and Plaintiffs' motion should be denied.[2]

[2] In addition, *NECA* was decided incorrectly. Although *NECA* acknowledges that "constitutional litigation seeking injunctive relief does not map all that neatly onto statutorily based securities litigation seeking monetary damages," 2012 WL 3854431, at *12, it grounds its analysis in an overextension of the Supreme Court's ruling in *Gratz v. Bollinger*, 539 U.S. 244, 123 S. Ct. 2411 (2003) – a case involving alleged civil rights violations. Prior to the Second Circuit's ruling in *NECA*, the First Circuit considered and rejected the application of *Gratz* in the same securities context, determining that plaintiffs did not have standing to bring suit in connection with securities they did not purchase. *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 770, 771 (1st Cir. 2011).

## II. ARGUMENT

### A. The Court Should Deny Plaintiffs' Motion for Reconsideration.

Motions for reconsideration are disfavored. *Pretter v. Metro North Commuter R.R. Co.*, No. 00 Civ. 4366, 2002 WL 31163876, at *1 (S.D.N.Y. Sept. 30, 2002) (JSR). Indeed, reconsideration "is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Cobalt Multifamily Investors I, LLC v. Shapiro*, No. 06 Civ. 6468, 2009 WL 4408207, at *1 (S.D.N.Y. Dec. 1, 2009) (KMW) (internal quotation marks omitted) (citation omitted). It is "normally inappropriate" to grant a motion for reconsideration, and "as a rule courts should be loathe to do so in the absence of extraordinary circumstances" because "there is a strong presumption against amendments of prior orders." *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, No. 08-CV-7069, 2012 WL 4049958, at *34 (S.D.N.Y. Sept. 11, 2012) (KMK) (internal quotation marks omitted) (*citing Bergerson v. N.Y. Office of Mental Health, Cent. N.Y. Psyc. Ctr.*, 652 F.3d 277, 288 (2d Cir. 2011)). Moreover, reconsideration is not appropriate where a party seeks a "rehearing on the merits with regards to issues already decided." *Hopkinson v. Estate of Siegal*, No. 10 Civ. 1743, 2011 WL 2935876, at *1 (S.D.N.Y. July 12, 2011) (LBS) (citation omitted).

The only grounds for granting a motion for reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *Prescia v. U.S. Life Ins. Co. in City of N.Y.*, No. 10 CV 2518, 2011 WL 70569, at *1 (S.D.N.Y. Jan. 6, 2011) (KMW) (internal quotation marks omitted) (citation omitted). However, if there is only a clarification of controlling law, or simply an application of existing law to a specific set of facts, the court must consider whether there are "cogent or compelling reasons" to justify granting the motion, because it is not enough "that a party could

now make a more persuasive argument under more recent case law." *Green v. Beer*, No. 06 Civ. 4156, 2009 WL 3401256, at *2 (S.D.N.Y. Oct. 22, 2009) (KMW) (citations omitted) (denying motion for reconsideration even though party claimed that intervening decision "substantially change[d]" the law). Here, the Second Circuit did not purport to declare a change of controlling law in *NECA*.[3] Accordingly, Plaintiffs must demonstrate a "clear conviction of error with respect to a point of law on which . . . [the] previous decision was predicated" in order to justify reconsideration. *Id.*

**1. *NECA* Does Not Confer Unfettered Standing to Assert Diverse Class Claims Simply Because the Claims May Raise Some Similar Concerns.**

*NECA* does not render this Court's original standing ruling in this case "a clear . . . error with respect to a point of law." *Green*, 2009 WL 3401256, at *2 (citation omitted). In *NECA*, the Second Circuit held that a plaintiff can bring suit on behalf of purchasers of other securities if the unnamed purchasers' claims "implicate 'the *same* set of concerns' as plaintiff's claims." 2012 WL 3854431, at *1 (emphasis added). In determining that the *NECA* plaintiffs had standing to assert class claims regarding some, *but not all*, of the mortgage-backed certificates at issue, the *NECA* Court articulated several important limits on the "same set of concerns" standard. *See id.* at *7-12. First, the Court observed that "the same three defendants are alleged to have inserted *nearly identical misrepresentations* into the Offering Documents associated with *all* of the Certificates, whose purchasers plaintiff seeks to represent." *Id.* at *12 (first emphasis added). The *NECA* Court also rejected the notion that all securities issued pursuant to a common shelf registration statement containing alleged misstatements present the "same set of concerns." *Id.* at *13. Instead, the Court required an analysis of "the nature and content of the specific

[3] As discussed more fully below, the *NECA* Court grounded its legal analysis in the Supreme Court's decision in *Gratz*, 539 U.S. 244, 123 S. Ct. 2411, which predated this Court's ruling on Plaintiffs' standing. While the Second Circuit applied the principles it gleaned from *Gratz* to the facts of the case before it, the *NECA* Court did not purport to be changing controlling law.

misrepresentations alleged" in order to determine whether they were equally relevant to the "distinct sets of plaintiffs" for each certificate. *Id.* at *12. Examining the specific facts relating to each alleged misstatement, the *NECA* Court ultimately determined that the named plaintiffs lacked standing to bring suit over some certificates that they did not purchase because "to the extent the representations in the Offering Documents were misleading with respect to one Certificate, they were not necessarily misleading with respect to others," and the alleged injuries had "the potential to be very different—and could turn on very different proof." *Id.* at *13.

Further insight on the contours of the "same set of concerns" standard comes from the Supreme Court authorities on which the *NECA* Court relied in adopting that standard. The Second Circuit placed great weight on *Gratz v. Bollinger,* where the Supreme Court held that a plaintiff had standing to seek injunctive relief on behalf of both freshman applicants and transfer students at the University of Michigan because "the same set of concerns is implicated by the University's use of race in evaluating all undergraduate admissions applications." 539 U.S. 244, 267, 123 S. Ct. 2411, 2426 (2003). In reaching that conclusion, the Court emphasized that "[t]he criteria used to determine whether a transfer applicant will contribute to the University's stated goal of diversity are *identical* to that used to evaluate freshman applicants." *Id.* at 265. In fact, the Supreme Court noted that the "*only* difference between the University's use of race in considering freshman and transfer applicants is that all underrepresented minority freshman applicants receive 20 points and 'virtually' all who are minimally qualified are admitted, while 'generally' all minimally qualified minority transfer applications are admitted outright." *Id.* at 266. The Court also relied on the simplicity of the parties' claims and defenses, noting that the "sole rationale" the University provided for its race-based preferences in undergraduate

admissions was its interest in a diverse student body and that the petitioner's only argument was that the University's rationale was not a compelling state interest. *Id.* at 267.

The Second Circuit also recognized that other Supreme Court decisions constrained the reach of *Gratz*. In *Blum v. Yaretsky*, the Supreme Court ruled that nursing home residents transferred to a *lower* level of care without adequate notice could not assert class claims for transfers to a *higher* level of care because "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, *although similar*, to which he has not been subject." 457 U.S. 991, 999, 102 S. Ct. 2777, 2783 (1982) (emphasis added). Under *Blum*, merely *similar* claims and facts do not confer standing, and any reading of *NECA* to that effect would be clear error. Likewise in *Lewis v. Casey*, the Supreme Court found that prisoner plaintiffs who faced certain literacy-based court access obstacles lacked standing to bring claims for a wide variety of alleged prison inadequacies that they did not experience because "standing is not dispensed in gross." 518 U.S. 343, 358, 116 S.Ct. 2174, 2183, n.6 (1996) ("If the right to complain of one administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course not the law."); *accord Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 770 (1st Cir. 2011) (standing to assert class claims related to unpurchased securities might be possible, but only where "the establishment of the named plaintiffs' claims necessarily establishes those of other class members") (cited in *NECA*, 2012 WL 3854431, at *14, with approval).

**2. Plaintiffs Have Failed To Show that the Claims Regarding the 53 Unpurchased Notes Satisfy the "Same Set of Concerns" Standard.**

Despite the guidance from *NECA* on how to judge whether claims raise the "same set of concerns," Plaintiffs have not even *attempted* to demonstrate how, on an offering-by-offering basis, the claims regarding the 53 Unpurchased Notes satisfy the *NECA* standard. Plaintiffs fail to put forward any analysis of whether the misstatements currently at issue in this case are *identical* to those in offering documents for the Unpurchased Notes. Nor do they analyze the "nature and content" of the "specific" misstatements alleged in order to determine whether those misstatements "implicate[] the same set of concerns for distinct sets of plaintiffs." *NECA*, 2012 WL 3854431, at *12. And they offer nothing to establish that proving their claims regarding the 31 Purchased Notes will necessarily prove the claims regarding the 53 Unpurchased Notes.

Instead, Plaintiffs say they have standing to bring class claims with respect to the 53 Unpurchased Notes based on a sweeping—*and demonstrably false*—assertion that "[t]he misrepresentations and omissions infect 'every offering in like manner' because the notes are all backed by Lehman." *See* Pl. Mot. at 6. But that assertion, even if true, would not satisfy the "class standing" standard adopted by *NECA*. The mere fact that Lehman backed the Purchased and Unpurchased Notes does not begin to show that the diverse claims with respect to each group of notes raise the "*same* set of concerns," such that proof of liability on the claims regarding the Purchased Notes would necessarily establish liability on the claims regarding the Unpurchased Notes – as this Court's July 27, 2011 ruling on defendants' motion to dismiss held, and as Plaintiffs' own modified sub-classing proposal concedes. By itself, Plaintiffs' utter failure to carry their burden under *NECA* warrants denying the motion for reconsideration.

**3. The Claims Regarding the Unpurchased Notes Do Not Present the "Same Set of Concerns" as the Claims Regarding the Purchased Notes.**

The diverse misstatement claims here are nothing like the "nearly identical" misstatement claims regarding adherence to mortgage origination guidelines that the *NECA* Court found to present the "same set of concerns" across different securities. 2012 WL 3854431, at *12-13. Nor is there any merit in Plaintiffs' effort to analogize this case to *dicta* from *NECA* approving "class standing" for "a series of corporate debt offerings, issued over the course of a year, all of which contained an *identical* misrepresentation about the issuing company's insolvency." *Id.* at *12 (emphasis added); *see* Pl. Mot. at 5-6. Here, the misstatements regarding the 53 Unpurchased Notes are far from "identical" or even "nearly identical" to the misstatements regarding the 31 Purchased Notes. Plaintiffs assert a host of different misstatements that vary by offering because: (i) Plaintiffs pleaded some of their claims only for certain offerings, (ii) this Court's July 27, 2011 ruling limits some of the claims to specific offerings, (iii) each offering had different offering documents, disclosures, and incorporated SEC filings, and (iv) Lehman's financial condition and the prevailing market conditions constantly changed over the pertinent 16-month period as the credit crisis deepened. *See Lehman*, 799 F. Supp. 2d at 279-82, 284-86, 292 (identifying which alleged misrepresentations remain in the case and for which offerings they apply); TAC ¶¶ 26-119. Analysis of just the major points of variation in Plaintiffs' claims shows that each note has its own matrix of alleged misstatements, disclosures, and other relevant factors that prevent the claims regarding the Unpurchased Notes from raising the "same set of concerns" as the claims regarding the Purchased Notes.

*Alt-A Mortgage Assets.* In its ruling on the motion to dismiss, the Court found that Lehman's purported misstatements relating to its Alt-A mortgage assets are only actionable for securities whose offering documents incorporated Lehman SEC reports from February 20, 2008

onward. *Lehman*, 799 F. Supp. 2d at 292. Of the 53 Unpurchased Notes that Plaintiffs seek to reintroduce into this litigation, 16 are subject to Alt-A claims and 37 are not. *See* TAC, App'x B. As a result—before even considering other claims or any disclosures—the 16 Unpurchased Notes subject to an Alt-A claim do not present the same set of concerns as the 22 Purchased Notes *not* subject to an Alt-A claim, while the 37 Unpurchased Notes not subject to an Alt-A claim do not present the same set of concerns as the 9 Purchased Notes that *are* subject to an Alt-A claim. *See id.*

*Commercial Real Estate.* The Court held that Lehman's purported misrepresentations relating to concentration of credit risk in commercial real estate are only actionable for offerings that incorporated Lehman's 2007 10-K, and that pre-dated Lehman's Form 10-Q for the first quarter of 2008. *Lehman*, 799 F. Supp. 2d at 292. Of the 53 Unpurchased Notes, 18 are subject to commercial real estate claims and 35 are not. *See* TAC, App'x B. That means, without reference to other variations among the notes, the 18 Unpurchased Notes subject to commercial real estate claims do not present the same set of concerns as the 20 Purchased Notes *not* subject to commercial real estate claims. And the 35 Unpurchased Notes not subject to commercial real estate claims do not present the same concerns as the 11 Purchased Notes that *are* subject to commercial real estate claims. Combining the Alt-A variation with the commercial real estate variation, of course, eliminates even more of the potential matches between individual Unpurchased Notes and individual Purchased Notes

*Value At Risk Limits.* Plaintiffs allege that Lehman exceeded its VaR limits only during certain portions of the class period between mid-August 2007 and September 15, 2008. TAC ¶ 83. Accordingly, at a minimum, statements about Lehman's adherence to risk policies were not misleading before Lehman made an SEC filing covering mid-August 2007, rendering the

VaR-related claims irrelevant to at least 12 Unpurchased Notes. *See* TAC, App'x B. Relatedly, the 44 alleged breaches of Lehman's firm-wide VaR limits occurred at various times during the period that Lehman structured notes were offered. Many of those VaR breaches will be completely irrelevant to claims regarding some of the Lehman structured notes, depending on the offering date for the note. As a result, Unpurchased Notes will rarely, if ever, present the same set of concerns regarding VaR limits as Purchased Notes issued in a materially different time period, adding further note-specific diversity to Plaintiffs' claims.

*Repo 105.* The TAC does not even attempt to claim that Lehman misstated its use of Repo 105 transactions prior to the second quarter of 2007. *See* TAC ¶ 37 (alleging Repo 105 usage beginning with Lehman's second quarter 2007 Form 10-Q, which Lehman filed on July 10, 2007). Thus, 8 of the 53 Unpurchased Notes are not subject to Repo 105 claims. Those 8 notes therefore do not present the same set of concerns as the 27 Purchased Notes that are subject to Repo 105 claims. *See* TAC, App'x B. In addition, the TAC asserts that Lehman's purported use of Repo 105 changed significantly during the class period, increasing by more than $21 billion, or 93%, between the second quarter of 2007 and the second quarter of 2008. TAC ¶ 37. The significant variation in Lehman's alleged use of Repo 105 transactions, and the TAC's failure to allege *identical* Repo 105 misrepresentations throughout the class period, underscores that the set of concerns presented by the claims relating to any particular structured note are highly specific to the offering date.

*Incorporated SEC Filings.* Many of the claims asserted by plaintiffs arise from alleged misstatements in Lehman SEC filings incorporated by reference into the offering documents for the Lehman structured notes. But over time, different structured notes incorporated different sets of Lehman SEC filings. *See* TAC, App'x B. As a result, Unpurchased Notes issued in one

month often incorporate different SEC filings, and thus raise a different set of concerns, than Purchased Notes issued in a different month. Indeed, several of the Unpurchased Notes incorporate by reference a unique set of SEC filings. The two Unpurchased Notes issued in March 2007 (CUSIPs 52520W556 and 52520W564) and the three Unpurchased Notes issued in December 2007 (CUSIPs 52522L483, 52522L491 and 52522L533) incorporate sets of Lehman SEC filings that do not match the set of SEC filings incorporated by *any* Purchased Note. *See* TAC, App'x B. It cannot be the case that claims that turn on one set of incorporated Lehman SEC filings raise the same set of concerns as claims that turn on a different set of Lehman SEC filings.

*Principal Protection.* One of Plaintiffs' claims is that some Lehman structured notes purported to provide principal protection but allegedly misstated the fact that any principal protection was subject to Lehman's creditworthiness and ability to repay the principal. TAC ¶¶ 118-119. Among the 53 Unpurchased Notes, 19 provided "100% principal protection," 21 provided "partial principal protection," 5 provided "contingent" principal protection, and 8 provided no principal protection. *See* TAC, App'x B. Notes with different levels of principal protection raise different sets of concerns, particularly since Plaintiffs do not assert their principal protection claims with respect to structured notes with contingent or no principal protection. *Id.* ¶ 118 & App'x B. The variation in principal protection further multiplies the note-specific diversity of the Lehman structured notes and the difficulty of matching Unpurchased Notes to Purchased Notes raising the same set of concerns.

*Credit Risk Disclosures.* Note-specific offering documents contain different disclosures explaining that any principal protection was subject to Lehman's creditworthiness. Among the 53 Unpurchased Notes, 39 contained a footnote stating that "The creditworthiness of the issuer

does not affect or enhance the likely performance of the investment other than the ability of the issuer to meet its obligations." *See, e.g.*, Olanoff Decl. Ex. 2. A partially overlapping group of 42 Unpurchased Notes contained a "Risk Factor" stating: "**Credit of Lehman Brothers Holdings Inc.** — An investment in the Notes is subject to the creditworthiness of Lehman Brothers Holdings Inc. as issuer of the Notes, and the actual and perceived creditworthiness of Lehman Brothers Holdings Inc. may affect the market value of the Notes." *See, e.g.,* Olanoff Decl. Ex. 5.[4] 35 Unpurchased Notes contained both disclosures, and 7 contained neither disclosure. As a result of that variation in disclosure—which the Purchased Notes also exhibit—Unpurchased Notes with one kind of disclosure (or non-disclosure) will raise a different set of concerns than all of the Purchased Notes with a different kind of disclosure (or non-disclosure). The resulting disparity between Unpurchased and Purchased Notes further limits the possibility that an Unpurchased Note will present the same set of concerns as a Purchased Note.

When all of the different sources of variation in the Lehman structured notes are put together, it becomes difficult to find any Unpurchased Notes that raise the same set of concerns as Purchased Notes. Indeed, even a cursory review reveals many Unpurchased Notes that simply cannot be matched to a Purchased Note. A few examples make the point:

- An Unpurchased Note issued on June 22, 2007 (CUSIP 52522L202)—which provided 100% principal protection, had offering documents that included the creditworthiness footnote disclosure, had offering documents that incorporated Lehman SEC filings between February 13, 2007 and June 12, 2007, and is not subject to the Repo 105, VaR, commercial real estate, or Alt-A claims—has no match among the Purchased Notes. *See* App'x B.; Olanoff Decl., Ex. 2.

- No Purchased Note has the same characteristics as three Unpurchased Notes issued in June 2008 (CUSIPs 5250W283, 525M0FU6, and 525M0CD7), which provided 100% principal protection, had offering documents that included a creditworthiness risk factor disclosure (but not a creditworthiness footnote disclosure), had offering documents that

[4] In certain instances, the structured note offering documents contain a slight variation on this disclosure.

incorporated Lehman SEC filings between February 13, 2007 and June 9, 2008, and are not subject to the commercial real estate claims. *See* App'x B.; Olanoff Decl., Exs. 3-5.

- Three Unpurchased Notes issued on August 31, 2007 (CUSIPs 52522L129, 52522L137, and 52522L145) are unique among the Lehman structured notes because they provided contingent principal protection, had offering documents that included a creditworthiness footnote disclosure and the creditworthiness risk factor disclosure, had offering documents that incorporated Lehman SEC filings between February 13, 2007 and July 10, 2007, and are not subject to the principal protection, VaR, commercial real estate, and Alt-A claims. *See* App'x B.; Olanoff Decl., Ex. 6.

- Two Unpurchased Notes issued in September 2007 (CUSIPs 52522L251 and 52522L236) are the only Lehman structured notes that had offering documents that included a creditworthiness footnote disclosure, had offering documents that incorporated Lehman SEC filings between February 13, 2007 and September 18, 2007, and are not subject to the principal protection, commercial real estate, and Alt-A claims. *See* App'x B.; Olanoff Decl., Exs. 7-8.

- No Purchased Note matches two Unpurchased Notes issued on February 29, 2008 (CUSIPs 52522L632 and 52522L772) that provided no principal protection, had offering documents that included a creditworthiness footnote disclosure and a creditworthiness risk factor disclosure, had offering documents that incorporated Lehman SEC filings between February 13, 2007 and January 29, 2008, and are not subject to the principal protection and Alt-A claims. *See* App'x B.; Olanoff Decl., Exs. 9-10.

These are only some examples of the divergence among the Purchased Notes and the Unpurchased Notes – yet they show how the tremendous variation among the Lehman structured notes prevents the claims regarding Unpurchased Notes from raising the same set of concerns as the claims regarding Purchased Notes. And Plaintiffs do not offer any note-by-note analysis that tries to match Unpurchased Note claims to Purchased Note claims. Accordingly, Plaintiffs' reconsideration motion should be denied.

**B. Plaintiffs Disregard the Impact of the Relief They Seek on Class Certification.**

Plaintiffs assert that if the Court is inclined to grant their motion, significant additional briefing or discovery on the pending class certification will be unnecessary. Pl. Mot. at 7. They make this statement in a vacuum without offering even a single word describing how they would define this new class, which would more than double the number of offerings at issue and add

significant additional problems to an already unmanageable class certification proposal. If Plaintiffs wish to certify a different class from what they have already proposed, they should withdraw their pending motion and begin the class certification process anew. They should not be permitted to file an on-the-fly amendment to their currently pending motion.

## III. CONCLUSION

For the foregoing reasons, UBSFS respectfully requests that the Court deny Plaintiffs' Motion for Reconsideration and uphold its dismissal order dated July 27, 2011.

Dated: New York, New York
October 9, 2012

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Jonathan C. Dickey

Jonathan C. Dickey
jdickey@gibsondunn.com
Marshall R. King
mking@gibsondunn.com
Oliver M. Olanoff
oolanoff@gibsondunn.com

200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

GIBSON, DUNN & CRUTCHER LLP
Mark A. Perry
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant UBS Financial Services Inc.*