Last year, BDO Seidman LLP agreed to pay $50 million in a deferred prosecution deal. In 2010, Deutsche Bank AG reached a $553.6 million non-prosecution agreement with the U.S. KPMG LLP settled a tax shelter investigation for $456 million in 2005.

Donna Guerin, a former partner with the law firm Jenkens & Gilchrist, pleaded guilty in September to one count of conspiracy and one count of tax evasion for her part in what prosecutors have called the biggest tax-fraud prosecution in history.

Prosecutors claimed Guerin helped run a 10-year tax shelter scheme that cost the U.S. $92 million in lost taxes. She was sentenced yesterday to eight years in prison and ordered to pay $190 million in restitution by U.S. District Judge William Pauley in Manhattan.

http://www.bloomberg.com/news/2013-03-01/ernst-young-to-pay-123-million-to-end-tax-fraud-probe.html

1.  *OPINION OF THE COMMISSION 102(e) PROCEEDING Grounds for Remedial Action Improper Professional Conduct Certified public accountant acting as audit manager engaged in improper professional conduct in the audit of the financial statements of a private company and a related fund. Held, it is in the public interest to deny the accountant the privilege of appearing or practicing before the Commission for six months.*
    *http://www.sec.gov/litigation/opinions/2012/34-68431.pdf*

2.  *Office of the Chief Accountant:*
    *Regarding the Initial Decision*
    *In the Matter of Ernst & Young LLP, April 16, 2004*
    *http://www.sec.gov/info/accountants/staffletters/eandy04272004.htm*

3.  *US Attorney's Office and FBI Announce Guilty Plea of Former Ernst & Young Auditor to Obstruction Charges and SEC Charges Former Ernst & Young Employees for Alleged Role in Destruction of Audit Working Papers*
    *http://www.sec.gov/news/press/2003-123.htm*

4.   SECURITIES EXCHANGE ACT OF 1934
Release No. 55523 / March 26, 2007
ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 2580 / March 26, 2007
ADMINISTRATIVE
PROCEEDING
File No. 3-12600
Vs.
Ernest and Young
http://www.sec.gov/litigation/admin/2007/34-55523.pdf

5.   *SEC Institutes Proceedings Against Ernst & Young to Resolve Auditor Independence Allegations*

*Division of Enforcement and Office of Chief Accountant Charge Firm with Violations Stemming from Joint Business Relationships with Audit Client*

On May 20, 2002, the Commission instituted public administrative proceedings against Ernst & Young LLP ("E&Y") in an auditor independence case arising from E&Y's joint business relationships with one of its audit clients. As reflected in the order instituting the proceedings, the Commission's Division of Enforcement (the "Division") and Office of Chief Accountant ("OCA") have alleged that E&Y violated the auditor independence requirements imposed by the Commission's rules and by generally accepted auditing standards in connection with E&Y's audits of the financial statements of PeopleSoft Inc. from 1994 through 2000, which occurred during the same period as the joint business relationships. According to the allegations made by the Division and OCA, E&Y violated Rule 2-02(b) of Commission Regulation S-X and caused PeopleSoft to file reports with the Commission throughout the relevant period that failed to include independently audited financial statements as required. The Division and OCA are seeking an order

*requiring E&Y to cease and desist from committing or causing such violations,*

*requiring E&Y to disgorge the audit fees it was paid for the audits in question, and*

*sanctioning E&Y pursuant to Commission Rule 102(e) for engaging in improper*

*professional conduct. **http://www.sec.gov/litigation/admin/34-45964.htm***


6.   *UNITED STATES OF AMERICA*
     *Before the*
     *SECURITIES AND EXCHANGE COMMISSION*


*SECURITIES EXCHANGE ACT OF 1934*
*Release No. 46130 / June 27, 2002*

*ACCOUNTING AND AUDITING ENFORCEMENT*
*Release No. 1584 / June 27, 2002*

*ADMINISTRATIVE PROCEEDING*
*File No. 3-10815*


| | |
|---|---|
| *In the Matter of* | *ORDER INSTITUTING PUBLIC* |
| | : *ADMINISTRATIVE PROCEEDINGS* |
| *MORET ERNST & YOUNG* | : *AND ORDER PURSUANT TO RULE* |
| *ACCOUNTANTS, n/k/a* | : *102(e) OF THE COMMISSION'S* |
| *ERNST & YOUNG ACCOUNTANTS,* | : *RULES OF PRACTICE* |
| | : |
| *Respondent.* | : |
| | : |
| | : *http://www.sec.gov/litigation/admin/34-* |
| | *46130.htm* |


*SEC Charges Ernst & Young and Six Partners for Roles in Accounting Violations*
*at Bally Total Fitness*

7. From "Accounting Web"
   http://www.uic.edu/classes/actg/actg593/Readings/Sarbanes-Oxley/Has-Sox-Been-Successful.pdf
   Has SOX Been Successful?

Posted by Terri Eyden on Sep 5 2012

Part of the article: Summary of PACOB news release:

In an unrelated case of audit failure, on February 8, 2012, the PCAOB announced the censure of E&Y and imposed a $2 million penalty for faulty audits of Medici Pharmaceutical Corporation for 2005, 2006, and 2007 financial statements, its largest civil money settlement to date. It also assessed censure sanctions on four E&Y partners for varying time periods. The respondents neither admitted nor denied the PCAOB findings and didn't consent to make the case public.

An analysis of firm performance reported in PCAOB firm inspections appearing in "Between the Numbers" showed a 20 percent rate of audit failure at E&Y for 2010, more than double the rate in the 2009 inspections.

Actual PACOB release

http://pcaobus.org/News/Releases/Pages/02082012_DisciplinaryOrderEY.aspx

8. **PCAOB Announces Settled Disciplinary Orders
   Against Former Ernst & Young Partner and Senior Manager
   For Providing Misleading Documents to PCAOB Inspectors
   And Altering Working Papers**
   Washington, D.C., Aug. 1, 2011

**Equitable Life (2004)**

In April 2004, Equitable Life, a UK life assurance company, sued EY after nearly

*collapsing but abandoned the case in September 2005. EY described the case as "a*

*scandalous waste of time, money and resources for all concerned."[39]*

**Bally Total Fitness (2008)**

*Following allegations by the* <u>*Securities and Exchange Commission*</u> *that EY had*

*committed accounting fraud in its work auditing the books of* <u>*Bally Total Fitness*</u>*, EY*

*reached two settlements in 2008, including a fine of $8.5million.[40]*

**Anglo Irish Bank (2009)**

*In 2009, in the* <u>*Anglo Irish Bank hidden loans controversy*</u>*, EY was criticised by*

*politicians[41] and the shareholders of Anglo Irish Bank for failing to detect large*

*loans to* <u>*Sean FitzPatrick*</u>*, its Chairman, during its audits. The Irish Government had*

*to subsequently take full ownership of the Bank at a cost of €28 billion.[42][43] The*

*Irish Chartered Accountants Regulatory Board appointed John Purcell to*

*investigate.[44] EY said it "fundamentally disagrees with the decision to initiate a*

*formal disciplinary process" and that "there has been no adverse finding made*

*against EY in respect of the audit of Anglo Irish Bank."[45]*

**Sons of Gwalia (2009)**

*In 2009, EY, the former auditors of* <u>*Sons of Gwalia*</u>*, agreed to a $125m settlement*

*over their role in the gold miner's collapse in 2004.* <u>*Ferrier Hodgson*</u>*, the company's*

*administrator, had claimed EY was negligent over the accounting of gold and dollar*

*hedging contracts. However, EY said that the proposed settlement was not an*

*admission of any liability.[46]*

**Akai Holdings (2009)**

*In 2009, EY reached a legal settlement where they agreed to pay US$200m to the liquidators of Akai Holdings. It was alleged that EY falsified court documents to avoid negligence charges which led to police raiding the Hong Kong office.[47]*

**Lehman Brothers (2010)**

*The <u>Valukas Report</u> issued in 2010[48] charged that <u>Lehman Brothers</u> engaged in a practice known as repo 105 and that EY, Lehman's auditor, was aware of it. New York prosecutors announced in 2010[49] that they have sued the firm. EY said that its last audit of Lehman Brothers was for the fiscal year ending 30 November 2007 and that, Lehman's financial statements were fairly presented in accordance with Generally Accepted Accounting Principles.[50][51][52]*

*http://en.wikipedia.org/wiki/Ernst_%26_Young*

*The objector has proven the point that a clear pattern exists and the Lehman case was not the exception but the rule as to how defendant really operates and that defendant actions are worth more than $99 million. Defendant's actions constitute a serial fraudster designation and were not an oversight but a cold calculating enabling fraud done because of the $160 million in fees paid to it by Lehman over a multi year period and not wanting to rock the boat. .*

*The article below describes E&Y's bad conduct above which shows that the $99 million offer should be rejected.* Among other things, The Examiner' Report detailed the company's use of a device known as Repo 105 to manage its balance sheet. The bankruptcy examiner found that the company's auditors were aware of but did not question the company's use of Repo 105. His report also concluded that there were "colorable claims" against E&Y on the grounds that it "did not meet professional standards" for its "failure to question and challenge improper or inadequate disclosure."The paragraph above is broken down in finer detail below. *She is well qualified to write about this case and for the Court to consider this information in its consideration of this settlement. In fact the Court is even mentioned in the article.*

Francine McKenna (@retheauditors on Twitter) is a CPA, writer, speaker and subject matter expert with more than twenty-five years of experience in consulting and professional services including tenure at two Big 4 firms, both in the US and abroad. She is a two-time Gerald Loeb Award finalist and a frequently quoted freelance journalist.

**$99 Million Buys EY Ticket Out Of Private Lehman Litigation,**

**10-21-2013 | 03:06 PM**

* Author Francine McKenna

Last defendant standing. Not an enviable place for EY in the case, *In re Lehman Brothers Securities and ERISA Litigation.*

Everyone else had folded their tent, paid the price to cross this dog off the list. Lehman underwriters agreed in 2011 to a $426.2 million settlement. UBS, one of the underwriters, held

out and settled last August for another $120 million. Even before the UBS and EY settlements, Bernstein Litowitz Berger & Grossmann, attorneys for the plaintiffs, claimed the combined recovery of $516,218,000 is the third largest recovery to date in a case arising from the financial crisis.

The $99 million E&Y is to pay is more than Lehman's officers and directors, who settled for $90 million. That's a big deal considering the executives typically say, "The auditors said it was ok," and the auditors say, "Management duped us." But it's not that much considering that EY agreed to pay C$117 million ($117.6 million) last December to settle claims in a Canadian class action suit against bankrupt Sino-Forest Corp, a Chinese reverse merger fraud. That settlement is the largest by an auditor in Canadian history, according to the law firms.

(The objector states that this Court should note that the Sino-Forest fraud cost shareholders $3.2 billion in damages far less than defendant did in this case.

http://www.bloomberg.com/news/2012-05-22/sino-forest-disclosure-grossly-misleading-osc-says.html.

And it's not as much as some thought EY would pay for Lehman. In fact, many thought Lehman would finish off EY for good.

John Carney, now of CNBC, writing for Business Insider at the time

> The Examiner concludes that sufficient evidence exists to support colorable claims
> against Ernst & Young LLP ("Ernst & Young") for professional malpractice arising from
> Ernst & Young's failure to follow professional standards of care with respect to

communications with Lehman's Audit Committee, investigation of a whistleblower claim, and audits and reviews of Lehman's public filings.

(Those claims are explained several pages down in the second article.)

That may not sound like a mortal threat against Ernst & Young. But the damages here could be enormous. A successful lawsuit against E&Y could result in a court finding that the failure to properly advise the audit committee prevented Lehman from taking genuine steps to substantially reduce its leverage, which may have saved the firm from bankruptcy. Which is to say, E&Y could find itself blamed for all the losses to Lehman shareholders. That would be a stretch--such a claim would be speculative--but it still should be scaring the heck out of the partners.

When the bankruptcy examiner's report on Enron came out, the language about Arthur Andersen was quite mild. It merely noted there was "sufficient evidence from which a fact-finder could conclude that Andersen: (1) committed professional negligence in the rendering of accounting services to Enron…" It went on to note that Andersen likely had a strong defense against liability since so many Enron executives were implicated.

"Enron brought down Arthur Andersen," Felix Salmon notes. "Will Lehman do the same for E&Y?"

In July of 2011, New York Federal Court Judge Lewis Kaplan decided to allow substantially all of the allegations against Lehman executives and at least one of the allegations against Ernst & Young to move forward to discovery and trial. One month later Lehman Brothers executives,

including its former chief executive Richard S. Fuld Jr., agreed to pay $90 million to settle.
Insurance proceeds paid for their settlement.

What was the remaining allegation against Ernst & Young? That the auditor had reason to know
Lehman's 2Q 2008 financial statements could be materially misstated because of the extensive
use of Repo 105 transactions. (By the way $50 billion is material to reported results for any filing
made by Lehman.)

How could EY know this? Here's what the Lehman Bankruptcy Examiner, Anton Valukas's
Report says: 945

(The first sentence below was part of the beginning of the paragraph but for some reason
was left out by the author. The pages are 945-947 of the Examiners report.)

Without exception former Lehman directors were unaware of Lehman's Repo 105 program and
transactions. 3642 *Lehman's own Corporate Audit group led by Beth Rudofker, together with*
*Ernst & Young, investigated allegations about balance sheet substantiation problems made in a*
*May 16, 2008 "whistleblower" letter sent to senior management by Matthew Lee. On June 12,*
*2008, during the investigation, Lee informed Ernst & Young about Lehman's use of $50 billion*
*of Repo 105 transactions in the second quarter of 2008. At a June 13, 2008 meeting, Ernst &*
*Young failed to disclose that allegation to the Board's Audit Committee. (Bankruptcy Examiner's*
*Report V3 page 945)*

*(More follow through from above taken from pages 945-946 of the Examiners Report that was*
*not included in the article.)*

Former Lehman director Cruikshank recalled that he made very clear he wanted a full and through investigation into each allegation made by Lee, whether the allegation was contained in Lee's May 16, 2008 letter or raised by Lee in the course of the investigation, 3646 Another Lehman director, Berlind similarly stated that the Audit Committee explicitly instructed Lehman's Corporate audit group and Ernst & Young to keep the Audit Committee informed of all of Lee's allegations. 3647 Berlind also said he wanted to know about Lehman's Repo 105 program and that if he had known about Lehman's Repo 105 transactions he would have asked Lehman's auditors to test the transactions to ensure they were appropriate. 3647

(This objector says that obviously those transactions would not have passed the legal and ethical test at the time or today but given a blessing by defendant for Lehman to use in their scheme.)

Here is more detail from the Auditor's report that this objector is including that shows more detail about what the defendant E&Y knew and how they have attempted to blame it all on a misunderstanding.  Counsel seems to have forgotten about this evidence when negotiating this $99 million to low ball offer which is clearly not enough.

**Evidence from the Examiner's Report that $99 million doesn't cut it**

On May 16, 2008, Matthew Lee, then Senior Vice President in the Finance Division responsible for Lehman's Global Balance Sheet and Legal Entity Accounting, sent a letter to certain members of Lehman's senior management identifying possible violations of Lehman's Ethics Code related to accounting/balance sheet issues. **Lehman involved Ernst & Young in its investigation of the concerns raised in Lee's May 16, 2008 letter.**

Subsequently, less than a month later, on June 12, 2008, to  Ernst & Young – Schlich (Partner) and Hillary Hansen – (Partner, and co-head of the Lehman account), interviewed Lee. **Hansen's notes of the interview reveal that Lee made certain statements to Ernst & Young about Lehman's Repo 105 practice, including, most notably, the volume of Repo 105 activity that Lehman engaged in the quarter ending (May 31, 2008).** Hansen's notes specifically recount Lee's allegation that Lehman moved $50 billion of inventory off its balance sheet at quarter's end through Repo 105 transactions and that these assets returned to the balance sheet approximately a week later. (Objector states they had been doing this for years before hand.)

**Hansen's notes indicate that Lehman's "Rates [and] Liquid Markets" businesses engaged in "Repo 105/Repo 108 [to] reduce[] assets by 50B [by] moving off B/S [i.e., balance sheet] in Europe & back in 5 days later."** Hillary Hansen, Ernst & Young, Handwritten Notes (June 12, 2008), at p. 1 [EY?LE?LBHIKEYPERS 5826869]. This is consistent with the Examiner's conclusions that at quarter ending in second quarter 2008, Lehman reduced its balance sheet by slightly more than $50 billion through Repo 105 transactions. (The partner's notes are the smoking gun against E&Y in this case and worth more than $99 million.)

When interviewed by the Examiner, **Schlich did not recall Lee saying anything about Repo 105 transactions during that interview, although he did not dispute the authenticity of Hansen's notes from the Lee interview.** In spite of Hansen's notes, Schlich maintained that Ernst & Young did not know that Lehman engaged in the following Repo 105 activity during the listed time periods: $49.1 billion at first quarter 2008 (Feb. 29, 2008); and $50.38 billion at second quarter 2008 (May 31, 2008). (Mr. Schlich should be charged with perjury and

obstruction if he were put under oath by The Examiner in this objector's opinion. I wonder what a jury would say upon hearing all this?)

During the Examiner's interview of Hansen, Hansen recalled that while Ernst & Young questioned Lee about his May 16, 2008 letter, Lee "rattled off" a list of additional issues and concerns he held, one of which was Lehman's use of Repo 105 transactions. Ernst & Young had no further conversations with Lee about Repo 105 transactions. Prior to her interview of Lee in June 2008, Hansen had heard the term Repo 105 "thrown around" **but she did not know its meaning;** according to Hansen, Schlich described Repo 105 transactions to her shortly after they met with Lee. (Objector states that maybe if Ms. Hansen had been at the office five days a week instead of home playing with the kids she might know the answer, (which she probably does but is playing the dumb blonde,) the bankruptcy might not have occurred and stakeholders would not be out billions of dollars, just a thought.)

From the internet:

**Meet Ms. Hillary Hansen.**

The weakest link is surely E&Y partner, and co-head of the Lehman account, Hillary Hansen. For all of you who would like to get a glimpse of this presumably tireless workhorse which was supposed to be working 24/7 figuring out what the h*** was going on with Lehman's books, you may be in for a disappointment. In a TV presentation on the topic of "Women's Networks Help Level the Playing Field" from January, 2009, we get a glimpse into Ms. Hansen's busy lifestyle "I am a woman raising three small children, I commute from far away, I work home two days,

usually I am not in on Fridays (laughter), I telecommute and often times I get asked how I fit it

all together." Hansen discloses at the end of the interview that "We audit Lehman Brothers,

**UNFORTUNATELY."** It appears she 'laughsa bit. Once again prophetic.

The link showing Hansen's no big deal comments and a chip on the shoulder attitude is below. It

should be seen to be believed. It's all a joke to these clowns because it's not their money! This is

an example of what Lehman paid $160 million in fees for over a seven year period? No wonder

the books were cooked. $99 million for this partner's and her 50 member auditing team's "work"

and the damages caused in this case is despicable. Imagine this piece of work in front of a jury!

To view this mid six figure partner in all her glory start watching at the 13:33 mark to 17:20

mark.

http://fora.tv/2009/01/26/Womens_Networks_Help_Level_the_Playing_Field

Objector is considering sending a copy of this objection to the SEC and PACOB to have both

partners actions reviewed for possible violations and sanctions of the standards cited above

depending on how this all turns out.

Here is a several page summary of evidence of the applicable bullet points and the Examiner's

conclusions that ties in defendant E&Y bad faith malpractice conduct to this fscheme, and puts it

on the hook for billions of damages it caused as a result, not just $99 million. Counsels seem to

have forgotten all of this in their rush to settle.

**Statement by Anton R. Valukas Examiner, Lehman Brothers Bankruptcy before the**

**Committee on Financial Services United States House of Representatives regarding "Public**

**Policy Issues Raised by the Report of the Lehman Bankruptcy Examiner" April 20, 2010**

Page 13

Bullet four: The appropriateness of a accounting practices such as Repo 105. I devote 320 pages of my Report (pages 732-1127, objectors note) to Lehman's Repo 105 practices, detailing Lehman's use of an accounting technicality to temporarily remove significant amounts of assets off balance sheet for no apparent reason other than to artificially and deceptively reduce Lehman's reported net leverage and, therefore, the market perception of Lehman's viability.

I express no view on whether, as a technical matter of GAAP accounting, it is permissible to treat transactions as sales which are by all other measures financings. But I have a definite view that it is not appropriate to engage in significant amounts of such transactions without disclosure.


Page 14

Lehman did not disclose that it used $50 billion of these transactions. To the contrary, it affirmatively and erroneously stated in its public filings that it used repo transactions solely as financings. The effect of these transactions was to reduce its net leverage by nearly two full points – when Lehman itself defined a material transaction as one which affected net leverage by one tenth of one point. The failure to disclose the facts was not appropriate.

(This is the reverse engineering that The Examiner wrote about on the top of page 739 but defendant E&Y ignored this fact for the last 120 days of Lehman's life after the whistleblower letter was given to them to investigate. E&Y, you will need a tractor trailer truck full of cash to settle this not the compact car you are now using.)


Bullet five: The quality of Lehman's Management Discussion and And Analysis Disclosures.

I found that there are colorable claims that the Management Discussion and Analysis ("MD&A") sections of Lehman's Form 10-K for 2007 and Form 10-Q filings in 2008 were misleading. Lehman emphasized to the investing public that it had worked to lower its net leverage ratio, and stated in its MD&A that net leverage is "more meaningful" than a simple leverage ratio. But Lehman did not disclose that it had only temporarily reduced its net leverage ratio through Repo 105 transactions. Consequently, Lehman's statement that the net leverage ratio was a "more meaningful" measurement of leverage was rendered misleading because that ratio – as reported by Lehman – was not an accurate indicator of Lehman's actual leverage, and in fact, understated Lehman's leverage significantly. In light of the market's focus on the leverage of investment banks in late 2007 and 2008, I found that sufficient evidence exists for a judge or jury to find that Lehman's reported net leverage ratio was materially misleading during that period.

An MD&A should include an "analysis " of known material trends, events, demands, commitments, and uncertainties – not simply a restatement of financial statement information. For example, an MD&A should provide information about the quality of, and potential realabbility y of, a company's earnings and cash flow so that investors can ascertain the likelihood that past performance is indicative of future performance. Regulation S-K requires a registrant to discuss known trends involving its capital resources, specifically including off-balance sheet financing arrangements . The same regulation specifies that a registrant should discuss, among other things, the "nature  and business purpose to the registrant of such off-balance sheet arrangements" an d "[t]he importance to the registrant of such off- balance sheet arrangements in respect of its liquidity, capital resources, market risk support, credit risk support

or other benefits." My report details statements, in both interviews and in contemporaneous e-

mails, by senior

Page 15

Lehman employees that the Repo 105 transactions had no business purpose at all, but did have a

marked effect on Lehman's reported net leverage ratio. SEC guidance also states that an MD&A

should describe "unusual events and transactions" to help identify apparent trends. (Objector

says how about disclosing the receipt of the whistleblower letter?) Lehman did not disclose the

unusual nature of the Repo 105 transactions or the trend of the temporary reduction of Lehman's

reported net leverage ratio at the end of reporting periods. Lehman's obligation to repurchase

$50 billion of Repo 105 transactions should have been disclosed in its MD&A. That obligation

was a known event that was reasonably likely to occur and would have had a material effect on

the company's financial condition or results of operations. In addition, in the Liquidity and

Capital Resources section of Lehman's MD&A's, Lehman should have included a discussion of

the timing and/or amounts of the cash flow created by the repayment of the Repo 105 cash

borrowing in the first seven to ten days after the end of the reporting period.

The following is more evidence of wrongdoing and guilt of E&Y and is from page 174 of

Valukulas Report that counsel forgot about when negotiating the $99 million bogus settlement.

Yes its N.Y. state law but federal law and good faith conduct also parallel federal law, rules,

regulations and standards.

195.

O. Auditor Malpractice: To state a claim of auditor malpractice under New York law, a client

must allege (1) "a departure from accepted standards of practice," and (2) "that the departure

was the proximate cause of an injury." See VTech Holdings, Ltd. v. Pricewaterhouse Coopers,

LLP 348 F. Supp. 2d 255, 262 (S.D.N.Y. 2004); Hous. Works, Inc. v. Turner, 179 F. Supp.

2d 177, 215 (S.D.N.Y. 2001). The plaintiff must also allege that the plaintiff was in privity

with the accountant or had "'a bond so close as to approach that of privity.'" VTech Holdings

, 348 F. Supp. 2d at 262 (quoting Parrott v. Coopers & Lybrand, L.L.P. 741 N.E.2d 506, 508

(N.Y App. Div. 2000)).

In determining whether an auditor has deviated from accepted standards, courts and tribunals

routinely look to the recognized and accepted professional standards for accountants and

auditors, generally measured by Generally Accepted Accounting Principles ("GAAP")

and Generally Accepted Auditing Standards ("GAAS"). See , e.g. ,Cumis Ins. Soc'y v. Tooke

739 N.Y.S.2d 489, 493 (App. Div. 2002)

Below is from Page 175 of the Valuaukas Report

Auditors can be liable for violating professional standards in connection with the preparation

Of interim financial reports. William Iselin & Co. v. Landau , 522 N.E.2d 21, 23 (N.Y. 1988)

(regardless of whether the activity is characterized as an "audit" or a "review," accountant owes

client a duty to exercise due care in the performance of professional accounting services); Collins

v. Esserman & Pelter , 681 N.Y.S.2d 399, 401 (App. Div. 1998) ("Even with respect

to a review . . . the accountant is obligated to exercise due care in the performance of the

engagement."); see also In re Kantor, Geisler & Oppenheimer, P.A. , PCAOB Release

No. 105 - 2007 - 009 (Dec. 14, 2007) (accounting firm violated Section 10A(b) of the Exchange

Act and PCAOB standards in quarterly review when, upon learning information indicating that

an illegal act may have occurred, the firm failed to address appropriately the threshold question

of whether it was likely that an illegal act had occurred). Auditors also may face liability if they

fail to disclose suspicious information to corporate audit committees. Silverman v. KPMG LLP

(In re Allou Distribs., Inc.), 395 B.R. 246, 272 - 73 (Bankr. E.D.N.Y. 2008) (plaintiff sufficiently

pled that auditing firm committed malpractice by failing to report suspicious circumstances and

material discrepancies to the audit committee); In re Springer Exchange Act Release No. 44858,

75 S.E.C. Docket 2095 (Sept. 27, 2001) (accountant who violated Section 10A of the Securities

Exchange Act engaged in professional misconduct by failing to notify client'

Page 176 of Valukus Report

audit committee that he had detected information indicating that the client had reported $1.3

million in false revenues in its quarterly report). Under New York law, clients generally may

recover

fees paid to negligent auditors. Stanley L. Bloch, Inc. v. Klein , 258 N.Y.S.2d 501, 508 (Sup. Ct.

1965)

(measure of damages for professional negligence of accountant in issuing balance sheet

containing substantial errors was accounting and auditing fees paid to accountant for year of

service immediately prior to issuance of balance sheet and accounting and auditing fees

necessitated by review thereof). In addition to fees, other jurisdictions have recognized that a

plaintiff is entitled to "actual out - of pocket costs" that "flow as a natural and continuous

consequence" from or are otherwise "proximately caused" by the defendant's breach of its legal

duties. Crowley v. Chait, Civ.  No. 85 - 2441 (HAA), 2004 WL 5434953, at *12 (D.N.J. Aug. 25,

2004); Baker Hughes Oilfield Operation, Inc. v. Seabulk Tankers, Inc., No. Civ. A. 03 - 1230,

2004 WL 1290576, at *2 (E.D. La. June 8, 2004); Keywell Corp. v. Piper & Marbury L.L.P.,

No. 96 - CV - 0660E (SC), 1999 WL 66700, at *5 (W.D.N.Y. Feb. 11, 1999). Among the

expenses that may be considered to flow from a breach of a legal duty are those incurred to

repair harm to the plaintiff caused by the defendant's breach. See , e.g. , World Radio

Labs., Inc. v. Coopers & Lybrand, 557 N.W.2d 1, 15 (Neb. 1996) (client was entitled to recover

damages For accounting fees paid to second auditing firm as a result of defendant auditing firm's

negligence). (Objector says like the cost of the Examiners Report).

Page 177 of Valuakus Report

Some jurisdictions permit a bankrupt client to seek damages based on allegations that its

auditor's negligence proximately caused its bankruptcy. See , e.g. , Bd. Of Trs. Of Cmty.

Coll. Dist. No. 508 v. Coopers & Lybrand LLP , 775 N.E.2d 55, 63 (Ill. App. 2002) (under

Illinois law, auditor's failure to detect treasurer's violation of investment policy during

audits could be the proximate cause of damages caused by investments made after the

audit, where members of the board testified that they would have ended those investment

practices had auditor detected them), rev'd on other grounds , 803 N.E.2d 460 (Ill. 2003);

see also Plan Comm. v. PricewaterhouseCoopers, LLP , 335 B.R. 234, 249 - 51 (D.D.C.

2005) (creditors committee adequately alleged damages against debtor's auditing firm under

District of Columbia law, where committee asserted that malpractice proximately caused

debtor's insolvency and bankruptcy and specifically alleged that the board would have taken

Actions to avoid insolvency if it had been "timely alerted by appropriately audited financial

Statements to the fact that [company] was performing significantly worse than was presented

In the negligently audited financial statements"), dismissed on other grounds , No. 02 - 01487

(TFH), 2007 WL 1191917 (D.D.C. Apr. 20, 2007)

Page 948

948 i) Ernst & Young's Knowledge of Lehman's Repo 105 Program During several Rule 30(b)(6) - type 3654 interview sessions, the Examiner interviewed members of Ernst & Young's Lehman audit team regarding Ernst & Young's knowledge of and involvement in Lehman's Repo 105 program. (1) Ernst & Young's Comfort with Lehman's Repo 105 Accounting Policy The Examiner interviewed Ernst & Young's lead partner on the Lehman audit team, William Schlich, regarding Lehman's Repo 105 program. According to Schlich, Ernst & Young had been aware of Lehman's Repo 105 policy and transactions for many years.3655 Consistent with the statements of Lehman's John Feraca (Secured Funding Desk),Schlich stated that Lehman introduced its Repo105 Accounting Policy on the heels of the FASB's promulgation of SFAS140.3656

The key contacts list below was added by the objector to show just how high up the knowledge of this scheme went. Regarding Schlich, the chart shows his title, he is not some flunky. He is in charge of 16,000 employees, a poor role model if you ask this objector. Who knew what when counsel, the class would like to know before settlement approval.

Key contacts

| Carmine DiSibio | Kurt Neidhardt | Susan Cote | Ed Pisani | Joanne Dunbar |
|---|---|---|---|---|

| Arthur Tully | Bill Schlich | Chris Scudellari | Susan Frieden |
|---|---|---|---|



*Quality In Everything We Do*

During that time, Ernst&Young discussed the Repo 105 Accounting Policy (including Lehman's

Structure for Repo 105 transactions) and Ernst&Young's audit team had a number of additional

conversations with Lehman about Repo105 over the years.3657

However, according to Schlich ,Ernst Young

Page 949

had no role in the drafting or preparation of Lehman's Repo 105 Accounting Policy.

3658  Schlich stated definitively that Ernst & Young had no advisory role with respect to

Lehman's use of Repo 105 transactions and that Ernst & Young did not "approve" the

Accounting Policy. 3659  Rather, according to Schlich, Ernst & Young "bec[a]me comfortable

with the Policy for purposes of auditing financial statements." 3660 Following "consultation

and dialogue" about the proper interpretation and application of SFAS 140, Ernst

& Young "clearly. . .concurred with Lehman's approach" to SFAS 140 and subsequent

literature by FASB on the issue of "control" of assets involved in a repo transactions.

3661 Ernst & Young's view, however, was not based upon an analysis of whether actual Repo

105 transactions complied with SFAS 140. 3662 Rather, Ernst & Young's review of Lehman's

Repo 105 Accounting Policy was purely "theoretical." 3663

In other words, Ernst & Young solely assessed Lehman's understanding of the requirements of

SFAS 140 in the abstract and as reflected in its Accounting Policy; Ernst & Young did not opine

on the propriety of the transactions as

Page 950

a balance sheet management tool. 3664  Ernst & Young did not review the Linklaters letter,

referenced in the Accounting Policy Manual. 3665

*Below is one last brilliant article that took a while to find. It includes a couple of additional gems of evidence out of the Examiners Report that presents additional damning evidence in a clear concise, readable manner, all backed up by the Examiner's Report, files located in this building and in all counsels files. After reading and understanding the articles and analysis, and understanding that defendant telling only half the truth to stakeholders representatives (the audit committee) is a well known method of deception, rejection is the hands down winner. The Mount Everest high evidence against E&Y unquestionably demands more than a token $99 million in damages, period, no legal pleading or explanation can change that*

*The author's information is below. She is well qualified to write about this case and for the Court to consider this information in its consideration of this proposed ill conceived settlement.*

Francine McKenna (@retheauditors on Twitter) is a CPA, writer, speaker and subject matter expert with more than twenty-five years of experience in consulting and professional services including tenure at two Big 4 firms, both in the US and abroad. She is a two-time Gerald Loeb Award finalist and a frequently quoted freelance journalist. For more info, click the "About" link at the bottom of this page.

re: The Auditors

**Liberté, Egalité, Fraternité: Big Lehman Brothers Troubles For Ernst & Young**

By Francine • Mar 15th, 2010 • Category: Latest, Pure Content, The Case Against The Auditors

I'm not going to repeat Anton Valukas' superb Bankruptcy Examiner Report, public on March 11, in detail here. I'll offer my opinion and analysis on the "colorable claims," Ernst & Young's (EY) potential defenses, and any details or issues I believe may not have been covered or any questions left unanswered in other reporting.

EY's relationship with Lehman continued until the bitter end. So it comes as no surprise to me that EY had a hard time acting independently with their "sticky" client. Lehman Bankruptcy Examiner Anton Valukas, Chairman of Chicago law firm Jenner & Block, sums it up nicely:

The Examiner concludes that sufficient evidence exists to support colorable claims against Ernst & Young LLP for professional malpractice arising from Ernst & Young's failure to follow professional standards of care with respect to communications with Lehman's Audit Committee, investigation of a whistleblower claim, and audits and reviews of Lehman's public filings. (Bankruptcy Examiner's Report V3, Pg 1027)

Ernst & Young, the audit firm, had a long and lucrative relationship with Richard Fuld and Lehman Brothers. Lehman Brothers has paid EY more than $160 million in audit and other fees since fiscal year 2001. Although this isn't nearly as much as Goldman Sachs and AIG pay PwC – almost $230 million a year combined in 2008 – it was still a huge amount and represented a significant client relationship for Ernst & Young.

For my first installment in this series, let's take each "colorable claim" individually and give them a Red (toast) , Yellow  (may be vulnerable), or Green (not likely to be too damaging) rating.

**Ernst & Young failed to follow professional standards of care with respect to communications with Lehman's Audit Committee.**

**Ernst & Young failed to follow professional standards of care with respect to an investigation of a whistleblower claim**

*Lehman's own Corporate Audit group led by Beth Rudofker, together with Ernst & Young, investigated allegations about balance sheet substantiation problems made in a May 16, 2008 "whistleblower" letter sent to senior management by Matthew Lee. On June 12 2008, during the investigation, Lee informed Ernst & Young about Lehman's use of $50 billion of Repo 105 transactions in the second quarter of 2008. At a June 13, 2008 meeting, Ernst & Young failed to disclose that allegation to the Board's Audit Committee. (Bankruptcy Examiner's Report V3 page 945)*

As the lawyers would say, the *optics* are bad here. The Audit Committee asks EY to support Lehman's internal auditor in investigating a "whistleblower's" allegations of balance sheet improprieties.  The auditors interview the "whistleblower" and then don't say anything at any of the Audit Committee meetings. Turns out what Mr. Lee, the "whistleblower", was alleging is what the examiner believes is the fundamental problem and grounds for "colorable claims" against top officers and EY.

The word "whistleblower" is tainted with tons of emotion post-Enron. We now look at those called "whistleblowers" and see heroes. But let's look at what I think may have actually happened. Lehman's Internal Audit department "naturally" asked their trusted, all-things-to-all

people advisor, EY, to help with the investigation of the "whistleblower's" claims. The Internal Audit Department, not EY, was in charge of the investigation.

That was their first mistake. If I've said it once, I've said it a thousand times: The external auditor should not be conducting or assisting with internal investigations of potential fraud or illegal acts by top executives. I wrote about it at Siemens, subject of the largest ever FCPA settlement in history. KPMG, their auditor, got sued.

The external auditor should stay the hell away from internal investigations because they may get caught up in something they would rather not know. They may want to claim plausible deniability. And a company should not engage the external auditor to support internal investigations especially involving fraud or illegal acts by top management. Do they do it to be cheap or to keep dirty laundry inside? The external auditor is too often part of the problem, an enabler, instead of part of the solution.

If Lehman had hired another firm – a law firm or anyone except their external auditor – to perform the investigation, the investigation would have been covered end to end in privilege, the external auditor may or may not (in this case EY would have been better not to) have been included in the "circle of privilege," and the investigation would have been completed professionally.

However, by supporting this investigation, EY was essentially doing internal audit work; a prohibited service under Sarbanes-Oxley for independence reasons. It's shocking to me that the EY audit partners did not at least turn over the investigation to EY's Forensic Accounting and Investigations Practice in order to provide some semblance of independence and professionalism.

Even though EY may have been an unwilling party to knowledge of an ugly situation right before an audit committee meeting, they got stuck. They had an obligation under AU 380, as the external auditor - not as an investigator – to inform the Audit Committee. They could have been on the other side being informed – or not – instead of being the one supposed to be doing the informing.

AU 380, the rules for auditor communication with the Audit Committee, are very clear. But they relate to the *auditors' role as an auditor* not the role of an auditor who is lent as muscle to an internal investigation. By playing the "trusted advisor" they screwed themselves.

Stoplight? Yellow. Looks bad, but EY may be able to talk their way out of this one once it gets to court. They need to explain how they were still looking into the issue, doing their "auditor" work and make sure their full but limited role and responsibilities for the process are explained. If they lose on this chalk it up to another case of audit partners wanting to be supermen to their clients, the corporation's executives, rather than looking out for their own best interests. Unfortunately in this situation, the shareholders were probably going to lose either way.

**Ernst & Young failed to follow professional standards of care with respect to audits and reviews of Lehman's public filings.**

*"The Examiner finds that sufficient evidence exists to support the finding of colorable claims against Richard Fuld, Christopher O'Meara, Erin Callan, and Ian Lowitt in connection with their actions in causing or allowing Lehman to file periodic reports that did not disclose Lehman's use of Repo 105 transactions and against Ernst & Young for its failure to meet professional standards in connection with that lack of disclosure…While there were credible facts and arguments presented by each that may form the basis for a successful defense, the*

*Examiner concluded that these possible defenses do not change the now final conclusion that there is sufficient evidence to support a finding that claims of breach of fiduciary duty exist against Fuld, O'Meara [CFO 2004-2007], Callan [CFO 12/07 to 6/2008], and Lowitt [CFO 6/2008 to Chapter 11 9/08] and a colorable claim of professional malpractice exists against Ernst & Young." (Bankruptcy Examiner's Report V3, pages 999-991)*

This one is about mandated disclosure and, unfortunately for EY and these Lehman executives, it looks like a *prima facie* case of securities laws violation for the executives and malpractice for EY.

Color this stoplight Red for "EY is burnt toast."

EY's only hope is, perhaps, an *"in pari delicto"* defense. The Lehman executives will surely be subject to civil and criminal fraud charges. In that case, given the challenges for a Bankruptcy Trustee who, strictly speaking, stands in the shoes of felons whose actions may be imputed to Lehman, the corporation, EY may be able to try what PwC and Grant Thornton/PwC/EY have tried in the AIG and Refco cases coming before the New York Court of Appeals. But if those questions are resolved in favor of the plaintiffs, EY will not be able to count on Fuld, O'Meara, Callan and Lowitt to shield them from accountability.

Why did this happen? Well, any obfuscation, if intentional, was meant to fool investors, ratings agencies, short sellers, counterparties and anyone else whose confidence the Lehman executives required. They wanted to *appear to be* in better financial shape than they really were – for as long as possible.

They may have been prolonging the inevitable, but at some point they knew the inevitable would occur. Liquidity crises are rarely sudden. But they are often suddenly acknowledged. In Lehman's case, the Bear Stearns failure was probably the bell that tolled hollow, loud and clear.

So why did EY "fail to meet professional standards" in connection with that lack of disclosure? Brad Hintz, Lehman's CFO in the late 1990's told Bloomberg on March 12, "over ten years, a lot of venial sins add up…" I'm assuming Hintz means the mortal sin of accounting manipulation. I think, over the last ten years, EY may have ignored a lot of venial sins until "the drug we're on," as Lehman's McDade calls the now notorious Repo 105 transactions, added up to the mortal sin of accounting manipulation that was hidden from investors by lack of disclosure.

Brad Hintz told me that the average CFO tenure post-Lehman IPO 1994 was 540 days. The Examiners's Report refers to three CFOs during the period under examination alone. I've already told you what was wrong with the last two, Callan and Lowitt.  You can sense their boredom and disdain for accounting details when you read their testimony.

The Examiner spent a lot of time trying to ascertain if, when and to what extent EY knew of and had been instrumental in designing and approving the Repo 105 transactions. The evidence he gathered says EY was very involved and very knowledgeable, up to and until the "whistleblower's" report of the abuses of the Repo 105 accounting treatment at 2007-2008 quarter ends. But the spin that lead partner William Schlich puts on the Repo 105 treatment is different. EY defends the transactions as proper GAAP.

*"According to Schlich, Ernst & Young had been aware of Lehman's Repo 105 policy and transactions for many years…Schlich stated that Lehman introduced its Repo 105 Accounting*

Policy on the heels of the FASB's promulgation of SFAS 140. During that time, Ernst & Young "discussed" the Repo 105 Accounting Policy (including Lehman's structure for Repo 105 transactions) and Ernst & Young's team had a number of additional conversations with Lehman about Repo 105 over the years. However, according to Schlich, Ernst & Young had no role in the drafting or preparation of Lehman's Repo 105 Accounting Policy. Schlich stated definitively that Ernst & Young had no advisory role with respect to Lehman's use of Repo 105 transactions and that Ernst & Young did not "approve" the Accounting Policy.

Rather, according to Schlich, Ernst & Young "bec[a]me comfortable with the Policy for purposes of auditing financial statements." Following "consultation and dialogue" about the proper interpretation and application of SFAS 140, Ernst & Young "clearly ...concurred with Lehman's approach" to SFAS 140...not based upon an analysis of whether actual Repo 105 transactions complied with SFAS 140. Rather, Ernst & Young's review of Lehman's Repo 105 Accounting Policy was purely "theoretical." In other words, Ernst & Young solely assessed Lehman's understanding of the requirements of SFAS 140 in the abstract and as reflected in its Accounting Policy; Ernst & Young did not opine on the propriety of the transactions as a balance sheet management tool." (Bankruptcy Examiner's Report <u>v3, pages 948-950</u>)

Lehman initiated its Repo 105 program sometime in 2001, soon after SFAS 140 took effect in September 2000 Lehman's outside auditors and lawyers participated in the firm's review of SFAS 140. Indeed, Lehman vetted the concept of a SFAS 140 repo transaction with its outside auditor, before the firm formalized a Repo 105 accounting policy and approved Repo 105 transactions for use by firm personnel. (Bankruptcy Examiner's Report <u>V3, page 765</u>)

That kind of comfort and confidence in your client and their technical competence comes from a long, lucrative relationship. But it must have been more than that. It could not have possibly come from confidence in the Lehman CFO suite, given its revolving door and the lack of accounting interest and aptitude in later years.

Ernst and Young's confidence in Lehman's CFO leadership was rooted in *fraternity*. Both Christopher O'Meara and David Goldfarb, his predecessor who was CFO from 2000 to 2004, are Ernst and Young alumni. Prior to joining Lehman Brothers in 1994, Mr. O'Meara worked as a senior manager in Ernst & Young's Financial Services practice. Prior to joining Lehman Brothers in 1993, Mr. Goldfarb served as the Senior Partner of the Ernst & Young's Financial Services practice, where he worked from 1979 to 1993.

http://retheauditors.com/2010/03/15/liberte-egalite-fraternite-lehman-brothers-troubles-for-ernst-young-threaten-the-big-4-fraternity/

Bottom of page 961 of Valukas Report

961

Ernst& Young did not follow - up on either Lee's allegations regarding Lehman's Repo 105 activity or Reilly's claim that he had no knowledge of Lehman's alleged $50 billion Repo 105 Usage figure. 3720 Ernst & Young signed a Report of Independent Registered Public Accounting

Firm for Lehman's second quarter 2008 Form10 - Q on July 10, 2008, less than four weeks After Schlich and Hansen interviewed Lee.

37

*Below are Lehman's stock prices from January 2008 to the date of bankruptcy in reverse.*

**Historical Prices Lehman Brothers Holdings Inc.**

http://www.nasdaq.com/symbol/lehlq/historical

| Date | Open | Closing Price | Daily High | Daily Low | Volume (Pcs.) |
|------|------|---------------|------------|-----------|---------------|
| 9/16/2008 | 0.18 | 0.15 | 0.24 | 0.15 | 419,226 |
| 9/15/2008 | 0.50 | 0.16 | 0.53 | 0.14 | 138,025 |
| 9/12/2008 | 3.01 | 2.55 | 3.83 | 2.44 | 49,890 |
| 9/11/2008 | 5.10 | 3.32 | 5.30 | 2.93 | 20,934 |
| 9/10/2008 | 7.20 | 5.75 | 7.60 | 5.15 | 18,775 |
| 9/9/2008 | 10.06 | 6.35 | 10.06 | 6.35 | 4,733 |
| 9/8/2008 | 11.98 | 10.07 | 12.15 | 9.36 | 3,326 |
| 9/5/2008 | 10.59 | 11.21 | 11.21 | 10.50 | 585 |
| 9/4/2008 | 11.72 | 10.59 | 11.72 | 10.59 | 85 |
| 9/3/2008 | 10.80 | 11.12 | 11.40 | 10.80 | 2,400 |
| 9/2/2008 | 11.28 | 10.84 | 11.92 | 10.84 | 4,150 |
| 9/1/2008 | 10.85 | 10.95 | 10.95 | 10.70 | 1,000 |
| 8/29/2008 | 10.70 | 11.07 | 11.07 | 10.56 | 3,070 |
| 8/28/2008 | 10.03 | 10.42 | 10.42 | 10.03 | 2,500 |
| 8/27/2008 | 9.50 | 10.03 | 10.03 | 9.50 | |
| 8/26/2008 | 9.23 | 9.37 | 9.46 | 9.23 | 1,260 |
| 8/25/2008 | 9.67 | 9.33 | 9.75 | 9.33 | 1,315 |
| 8/22/2008 | 9.09 | 10.37 | 10.70 | 9.09 | 1,252 |
| 8/21/2008 | 9.22 | 9.09 | 9.22 | 9.09 | |
| 8/20/2008 | 8.96 | 8.82 | 8.96 | 8.82 | |
| 8/19/2008 | 10.23 | 10.23 | 10.23 | 10.23 | |
| 8/18/2008 | 10.88 | 10.42 | 10.88 | 10.42 | 140 |
| 8/15/2008 | 11.40 | 11.13 | 11.40 | 11.13 | |
| 8/14/2008 | 10.45 | 10.92 | 10.92 | 10.45 | |
| 8/13/2008 | 10.94 | 10.44 | 11.03 | 10.44 | |
| 8/12/2008 | 12.30 | 11.33 | 12.50 | 11.33 | 1,150 |
| 8/11/2008 | 12.55 | 12.83 | 12.83 | 12.55 | 2,500 |
| 8/8/2008 | 11.76 | 12.55 | 12.55 | 11.76 | |
| 8/7/2008 | 13.24 | 12.15 | 13.24 | 12.15 | 200 |
| 8/6/2008 | 12.97 | 13.30 | 13.30 | 12.97 | 300 |

| | | | | |
|---|---|---|---|---|
| 8/5/2008 | 11.63 | 12.30 | 12.30 | 11.63 | |
| 8/4/2008 | 11.88 | 11.70 | 11.88 | 11.45 | 200 |
| 8/1/2008 | 11.07 | 11.30 | 11.30 | 11.07 | |
| 7/31/2008 | 11.45 | 10.90 | 11.45 | 10.90 | |
| 7/30/2008 | 10.75 | 11.20 | 11.20 | 10.75 | 1,000 |
| 7/29/2008 | 9.65 | 10.22 | 10.22 | 9.65 | 1,000 |
| 7/28/2008 | 10.93 | 10.19 | 10.93 | 10.19 | 80 |
| 7/25/2008 | 11.75 | 11.04 | 12.00 | 11.04 | 500 |
| 7/24/2008 | 13.55 | 12.32 | 13.55 | 12.32 | 360 |
| 7/23/2008 | 12.71 | 13.55 | 13.55 | 12.71 | 400 |
| 7/22/2008 | 11.15 | 12.09 | 12.09 | 11.15 | |
| 7/21/2008 | 12.27 | 11.76 | 13.04 | 11.76 | 2,145 |
| 7/18/2008 | 11.30 | 12.27 | 12.44 | 11.30 | 2,200 |
| 7/17/2008 | 10.15 | 11.61 | 11.61 | 10.15 | 640 |
| 7/16/2008 | 8.45 | 8.63 | 8.63 | 8.45 | 110 |
| 7/15/2008 | 7.94 | 8.76 | 8.76 | 7.94 | 950 |
| 7/14/2008 | 9.48 | 8.83 | 10.40 | 8.82 | 2,030 |
| 7/11/2008 | 11.20 | 8.74 | 11.20 | 8.73 | 1,433 |
| 7/10/2008 | 12.64 | 10.80 | 12.75 | 10.80 | 740 |
| 7/9/2008 | 14.09 | 13.49 | 14.09 | 13.49 | |
| 7/8/2008 | 13.26 | 13.05 | 13.26 | 13.05 | 200 |
| 7/7/2008 | 14.58 | 13.26 | 14.58 | 13.26 | |
| 7/4/2008 | 14.59 | 14.58 | 14.59 | 14.58 | |
| 7/3/2008 | 14.19 | 14.59 | 14.59 | 14.19 | |
| 7/2/2008 | 13.34 | 14.34 | 14.34 | 13.34 | 75 |
| 7/1/2008 | 13.00 | 13.41 | 13.41 | 12.39 | 310 |
| 6/30/2008 | 14.00 | 12.96 | 14.00 | 12.96 | |
| 6/27/2008 | 14.47 | 13.84 | 14.47 | 13.84 | |
| 6/26/2008 | 15.80 | 14.68 | 15.80 | 14.68 | |
| 6/25/2008 | 15.60 | 15.98 | 15.98 | 15.60 | |
| 6/24/2008 | 14.79 | 15.42 | 15.42 | 14.79 | |
| 6/23/2008 | 15.41 | 15.07 | 15.41 | 15.07 | |
| 6/20/2008 | 15.75 | 15.05 | 15.75 | 15.05 | |
| 6/19/2008 | 15.79 | 15.39 | 15.79 | 15.39 | |
| 6/18/2008 | 16.36 | 15.53 | 16.36 | 15.53 | |
| 6/17/2008 | 17.62 | 16.62 | 18.00 | 16.62 | 100 |
| 6/16/2008 | 16.66 | 17.62 | 18.00 | 16.66 | 200 |
| 6/13/2008 | 15.00 | 16.52 | 16.52 | 15.00 | 1,070 |

| | | | | |
|---|---|---|---|---|
| 6/12/2008 | 15.53 | 14.97 | 15.85 | 14.97 | 1,730 |
| 6/11/2008 | 17.65 | 16.22 | 17.90 | 16.22 | 930 |
| 6/10/2008 | 18.75 | 17.65 | 18.75 | 17.65 | 120 |
| 6/9/2008 | 20.70 | 17.95 | 20.70 | 17.95 | 70   559 million shares outstanding |
| 6/6/2008 | 21.50 | 21.16 | 21.95 | 21.16 | 400 |
| 6/5/2008 | 20.51 | 21.27 | 21.27 | 20.10 | 290 |
| 6/4/2008 | 20.09 | 20.51 | 20.93 | 18.88 | 1,080 |
| 6/3/2008 | 21.90 | 19.75 | 21.90 | 19.75 | 200 |
| 6/2/2008 | 23.64 | 22.11 | 23.64 | 22.11 | |
| 5/30/2008 | 24.49 | 23.64 | 24.65 | 23.64 | 1,200 |
| 5/29/2008 | 23.26 | 24.57 | 24.57 | 23.26 | |
| 5/28/2008 | 23.33 | 22.66 | 23.33 | 22.65 | |
| 5/27/2008 | 22.91 | 23.33 | 23.33 | 22.65 | 343 |
| 5/26/2008 | 22.98 | 22.91 | 22.98 | 22.91 | |
| 5/23/2008 | 24.19 | 22.98 | 24.19 | 22.87 | 470 |
| 5/22/2008 | 25.33 | 24.19 | 25.33 | 24.19 | |
| 5/21/2008 | 26.61 | 25.38 | 26.61 | 25.38 | |
| 5/20/2008 | 27.84 | 26.61 | 27.84 | 26.61 | |
| 5/19/2008 | 28.06 | 27.99 | 28.06 | 27.99 | |
| 5/16/2008 | 28.55 | 28.06 | 28.55 | 28.06 | |
| 5/15/2008 | 27.54 | 28.36 | 28.36 | 27.54 | |
| 5/14/2008 | 27.83 | 27.99 | 27.99 | 27.83 | |
| 5/13/2008 | 28.48 | 27.83 | 28.48 | 27.83 | |
| 5/12/2008 | 28.08 | 28.45 | 28.45 | 28.08 | |
| 5/9/2008 | 28.03 | 28.08 | 28.08 | 28.03 | |
| 5/8/2008 | 28.73 | 28.03 | 28.73 | 28.03 | |
| 5/7/2008 | 29.60 | 29.42 | 29.60 | 29.42 | |
| 5/6/2008 | 29.65 | 29.11 | 29.65 | 29.11 | 100 |
| 5/5/2008 | 30.54 | 29.65 | 30.54 | 29.65 | |
| 5/2/2008 | 30.05 | 30.54 | 30.54 | 30.05 | |
| 4/30/2008 | 30.09 | 29.69 | 30.09 | 29.69 | |
| 4/29/2008 | 30.71 | 30.09 | 30.71 | 30.09 | |
| 4/28/2008 | 30.03 | 30.73 | 30.73 | 30.03 | |
| 4/25/2008 | 29.79 | 30.03 | 30.03 | 29.79 | |
| 4/24/2008 | 27.65 | 30.18 | 30.18 | 27.65 | |
| 4/23/2008 | 27.96 | 27.65 | 27.96 | 27.65 | |
| 4/22/2008 | 28.23 | 27.96 | 28.23 | 27.96 | |

| | | | | |
|---|---|---|---|---|
| 4/21/2008 | 28.94 | 28.14 | 28.94 | 28.14 | |
| 4/18/2008 | 27.25 | 29.61 | 29.61 | 27.25 | |
| 4/17/2008 | 26.02 | 26.97 | 26.97 | 26.02 | |
| 4/16/2008 | 25.02 | 25.69 | 25.69 | 25.02 | 200 |
| 4/15/2008 | 24.93 | 25.02 | 25.02 | 24.93 | |
| 4/14/2008 | 25.18 | 24.93 | 25.18 | 24.93 | |
| 4/11/2008 | 25.66 | 25.18 | 25.70 | 25.18 | 43 |
| 4/10/2008 | 25.85 | 25.66 | 25.85 | 25.66 | |
| 4/9/2008 | 27.96 | 26.09 | 27.96 | 26.09 | |
| 4/8/2008 | 28.42 | 27.96 | 28.42 | 27.96 | |
| 4/7/2008 | 28.18 | 28.42 | 28.42 | 28.18 | |
| 4/4/2008 | 27.91 | 28.18 | 28.18 | 27.91 | |
| 4/3/2008 | 28.09 | 28.37 | 28.58 | 28.09 | 95 |
| 4/2/2008 | 28.00 | 28.44 | 28.99 | 28.00 | 100 |
| 4/1/2008 | 23.50 | 27.70 | 27.70 | 23.50 | 600 |
| 3/31/2008 | 24.11 | 24.77 | 24.77 | 24.11 | |
| 3/28/2008 | 25.00 | 24.11 | 25.00 | 24.11 | |
| 3/27/2008 | 27.01 | 24.66 | 27.01 | 24.66 | |
| 3/26/2008 | 29.11 | 27.01 | 29.11 | 27.01 | |
| 3/25/2008 | 29.63 | 29.11 | 29.63 | 29.11 | |
| 3/20/2008 | 27.11 | 27.11 | 27.11 | 27.11 | |
| 3/19/2008 | 29.10 | 27.11 | 29.61 | 27.11 | 160 |
| 3/18/2008 | 19.40 | 28.71 | 28.71 | 19.40 | 3,266 |
| 3/17/2008 | 20.50 | 17.73 | 21.19 | 13.11 | 4,525 |
| 3/14/2008 | 29.80 | 25.68 | 29.80 | 25.45 | 75 |
| 3/13/2008 | 29.25 | 29.68 | 29.68 | 29.25 | |
| 3/12/2008 | 29.77 | 29.82 | 29.82 | 29.77 | |
| 3/11/2008 | 28.13 | 29.47 | 29.47 | 28.13 | |
| 3/10/2008 | 29.90 | 28.13 | 29.90 | 28.13 | |
| 3/7/2008 | 29.90 | 29.90 | 29.90 | 29.90 | |
| 3/6/2008 | 31.52 | 29.90 | 31.52 | 29.90 | |
| 3/5/2008 | 31.44 | 31.52 | 31.52 | 31.44 | |
| 3/4/2008 | 32.31 | 31.07 | 32.31 | 31.07 | |
| 3/3/2008 | 33.92 | 32.31 | 33.92 | 32.31 | |
| 2/29/2008 | 36.34 | 33.94 | 36.34 | 33.94 | 155 |
| 2/28/2008 | 37.75 | 36.38 | 37.75 | 36.38 | |
| 2/27/2008 | 38.26 | 37.75 | 38.26 | 37.75 | |
| 2/26/2008 | 37.05 | 38.38 | 38.38 | 37.05 | |

| Date | | | | |
|---|---|---|---|---|
| 2/25/2008 | 36.13 | 36.20 | 36.20 | 36.13 | |
| 2/22/2008 | 36.59 | 35.49 | 36.92 | 35.49 | 14 |
| 2/21/2008 | 37.86 | 36.59 | 37.86 | 36.59 | |
| 2/20/2008 | 36.50 | 37.86 | 37.86 | 36.50 | |
| 2/19/2008 | 37.46 | 36.50 | 37.46 | 36.50 | |
| 2/18/2008 | 36.91 | 37.46 | 37.46 | 36.91 | |
| 2/15/2008 | 37.42 | 36.91 | 37.42 | 36.91 | |
| 2/14/2008 | 37.93 | 37.42 | 37.93 | 37.42 | |
| 2/13/2008 | 39.17 | 37.93 | 39.17 | 37.93 | |
| 2/12/2008 | 40.45 | 39.36 | 40.45 | 39.36 | |
| 2/11/2008 | 41.00 | 40.71 | 41.00 | 40.71 | |
| 2/8/2008 | 42.16 | 40.58 | 42.16 | 40.58 | |
| 2/7/2008 | 39.66 | 42.16 | 42.16 | 39.66 | |
| 2/6/2008 | 41.19 | 39.66 | 41.19 | 39.66 | |
| 2/5/2008 | 42.74 | 41.19 | 42.74 | 41.19 | |
| 2/4/2008 | 43.98 | 42.74 | 43.98 | 42.74 | |
| 2/1/2008 | 43.08 | 43.83 | 43.83 | 43.08 | |
| 1/31/2008 | 42.67 | 43.08 | 43.08 | 40.55 | 510 |
| 1/30/2008 | 43.10 | 42.97 | 43.10 | 42.97 | |
| 1/29/2008 | 40.51 | 41.84 | 41.84 | 40.51 | |
| 1/28/2008 | 39.45 | 40.14 | 40.14 | 39.45 | |
| 1/25/2008 | 40.55 | 39.45 | 40.55 | 39.45 | 50 |
| 1/24/2008 | 40.00 | 40.55 | 40.55 | 40.00 | 100 |
| 1/23/2008 | 37.07 | 37.59 | 37.59 | 37.07 | 100 |
| 1/22/2008 | 36.00 | 36.89 | 36.89 | 36.00 | 345 |
| 1/21/2008 | 36.23 | 36.89 | 36.89 | 36.00 | 28 |
| 1/18/2008 | 37.61 | 36.23 | 37.61 | 36.23 | 80 |
| 1/17/2008 | 39.93 | 37.61 | 39.93 | 37.61 | |
| 1/16/2008 | 37.75 | 39.93 | 39.93 | 37.75 | 100 |
| 1/15/2008 | 39.45 | 37.73 | 39.45 | 37.73 | |
| 1/14/2008 | 39.49 | 39.45 | 39.49 | 39.45 | |
| 1/11/2008 | 38.57 | 39.49 | 39.49 | 38.57 | |
| 1/10/2008 | 36.98 | 37.58 | 37.58 | 36.98 | 70 |
| 1/9/2008 | 38.26 | 36.22 | 38.26 | 36.22 | |
| 1/8/2008 | 39.32 | 38.94 | 39.32 | 38.94 | |
| 1/7/2008 | 39.54 | 39.32 | 39.54 | 39.32 | |
| 1/4/2008 | 41.67 | 39.54 | 41.67 | 39.54 | |
| 1/3/2008 | 42.80 | 41.67 | 42.80 | 41.67 | |

1/2/2008        44.15            42.89          44.15            42.89

*The following snippet continues on page 23 #51-53 from the State of New York's complaint*

*against the defendant explains the additional chain of events involving the whistleblower from*

*E&Y and defendant intentionally and calculating deceiving the Lehman directors by remaining*

*silent which as we all know is a well known method of deception that have not been fully*

*described above. Defendant is just as responsible for damages as the Lehman Officers are but*

*fortunately for the class E&Y is not bankrupt and can afford more, much more.*

VIII. E&Y Failed To Disclose Whistleblower Allegations Regarding Repo 105

51

In May 2008, E&Y was given a copy of a letter to senior financial executives at

Lehman from Matthew Lee, a Senior Vice President in Lehman's Finance Division responsible

for Lehman's Global Balance Sheet and Legal Entity Accounting, which raised serious questions

concerning Lehman's financial statements. E&Y was directed by Lehman's Audit Committee to

meet with Lee and to report back the results of its investigation of Lee's allegations. (Defendant

waited a month to even interview the whistleblower! Guess they were circling the wagons and

delaying for as long as possible hoping something else would occur and get them off the hook.)

52.

On June 12, 2008, Schlich, and another E&Y partner, Hillary Hansen, interviewed

Lee. As demonstrated by contemporaneous notes made by Hansen, and Lee's own testimony,

Lee told Schlich and Hansen of E&Y that (as E&Y already knew), Lehman was removing $50

billion in fixed income securities from its balance sheet each quarter by purporting to "sell them"

to European counterparties for a short time. Hansen's notes thus state that Lee told them: "Repo

105/Repo 108 reduced assets to 50B – moving off b/

s in Europe & back in 5 days later off balance sheet..."

53.

Immediately following the meeting with Lee, Hansen raised concerns about the Repo 105

transactions with Schlich, who casually dismissed the concerns by telling Hansen that the Repo

105 transactions were being properly recorded as sales. Schlich and Hansen then met with

Lehman's Global Product Controller, Gerard Reilly, to review Lee's allegations. In a brief

meeting, they FAILED (objectors CAPS) to even mention Repo 105. Further, at a meeting of

Lehman's Audit Committee on June 13, 2008, Schlich failed to mention the Repo 105 concerns

that Lee had conveyed – even though E&Y had been specifically instructed to inform Lehman's

Audit Committee of all concerns raised by Lee

Again slam dunk evidence that defendant intentionally kept the audit Committee in the dark and

is liable for much more than $99 million in damages at trial.

**Summary Judgment Standard:**

Courts apply a different procedural mechanism –summary judgment –

To assess the sufficiency of allegations in light of a more developed factual record. Federal Rule

Of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings,

depositions, the discovery and disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law." Page 12 Volume 6 of the Examiner's Report

Objector states there is no issue for trial here, just the damage amount!

**Summary Judgment should be filed for in a motion**

Based on all the evidence and violations above why hasn't counsel filed for summary judgment rather than a bogus settlement offer as defined below when it appears that's what should be occurring.

This current offer is the equivalent of being hit by a drunk driver at a stop light, (you were wearing your seat belt) incurring $100,000.00+ in ongoing medical bills and the insurance company for the defendant offers the same 1.6% of the total damages or just $1,600.00 to settle based on the minimum $6.6 billion in damages estimate. Who would take that offer? No one would and neither should the class. Defendant has the means, motive and opportunity to pay more based on the malpractice fraud they engaged in and covered up by remaining silent. Their first trial balloon offer is not good enough. The defendant should be begging to settle, not the other way around.

**Objector Fee Award**

This objector may eventually apply for an objector award under N.Y law which applies if the approval is granted to a proposed settlement only if the settlement amount is raised or the attorney fee and/or expenses are reduced with any monies flowing back into the fund for distribution to the class victims.

**Suggested attorney fee**

If the Court does approve the settlement, the fee request should be reduced to 12% to reflect the fact that the Examiner provided all the evidence in this case, counsel just reread it and put its

own spin on it and then billed the class a second time for reviewing the same evidence! In fact

reading the Court's opinion dated July 07, 2011 it's obvious to this objector that the TAC was

not done properly and therefore negligent in certain aspects as the Court wrote about. That's

another reason to lower the undeserved fee request to 10%. The settlement amount is largely

illusory compared to the total maximum damages defendants face on the court steps the day of

the trial. We should proceed on.

CONCLUSION

The ultimate question to be resolved is this:

Has Plaintiff's Counsel proved that the $99 million is fair, reasonable and adequate based on the

evidence and the $6.6 billion to $30 billion in damages caused by E&Y's actions, inactions and

cover-up of this accounting manipulation scheme?  Objector says no they have not. This objector

and many others certainly would not have purchased ANY shares during the class period had

they known the whole truth, not half the truth which is a well known method of deception.

Instead E&Y got into a self-induced coma, a silent cover up mode and the class suffered billions

in losses as a result which defendant is now responsible for.

**Deny motion to certify**

Wherefore, this objector respectfully requests that the Court withdraw its conditional approval of

the proposed settlement and enter orders requiring further proceedings so as to affect substantial

justice in this cause between the parties and the absent class members. The Court should rule that

the class cannot be certified pursuant to Rule 23(a)(4),  23(e) and sustain these objections

because the proposed settlement at this time  is unfair, unreasonable, inadequate and not in the