public interest because the offer is immensely underfunded compared to the size of shareholder losses which all the evidence backs up and is irrefutable. The overwhelming amount of gigantic evidence available in the Plaintiff's and Court's files, in the Examiners report and this objection easily prove that this proposed settlement is a slam dunk for huge liability and money damages, so modification or outright rejection is required. To approve this settlement based on the damages incurred by the defendant's deliberate actions and damages caused, along with all the evidence would be, in this objector's opinion, **a mistake of law and clearly erroneous factual finding.**

Objector incorporates the two thousand two hundred page $50,000,000.00 Examiner's Report into this objection. A copy has not been attached due to its size but can be found at jenner.com.

Objector requests directly through Plaintiffs Counsel and to the Court directly in this objection that per Federal Rule Of Civil Procedure 56(c) a summary judgment motion/ruling be made/ordered/filed/suggested starting today through the next thirty days.  A collectible Tyco size settlement or verdict awaits the class.

Objector incorporates any other objections received in this matter into this objection that are not inconsistent with his own and reserves the right to amend and expand on those objections especially since counsel chose not to include three objections in its filing papers and chose not to post them on the website for the class and objector to comment on until March 18, 2014.

Unless this objector has missed or is unaware of something, this proposed settlement may now be the equivalent of what happened when Dorothy in the "Wizard of Oz" threw a bucket of water on the "Wicked Witch of the West".

Thank you for your attention and consideration.

Case No. 08-cv-5523-lak, 09-MD-2017(LAK

Dated: March 20, 2014

Chris Andrews, Pro Se
P.O. Box 530394
Livonia, MI 48152-0394
E-mail caaloa@gmail.com
Phone 1-248-535-3810

Chris Andrews
I certify that the above information is true and accurate to the best of my knowledge.

I hereby certify that on this day I mailed the foregoing to the Clerk of the Court, and served true

and correct copies upon class counsel and defendants' counsel via US Post Office Priority Mail

(two- three day delivery) at the addresses below, per the instructions of the Settlement Notice to:

Clerk of the Court United States District Court for the Southern District of New York, Clerk of

the Court 500 Pearl Street, New York, New York 10007

Bernstein Litowitz Berger & Grossmann LLP attention David Stickey, 12481 High Bluff Drive,

Suite 300, San Diego CA 92130-3582

Kessler Topaz Meltzer & Check, LLP, Attention David Kessler 280 King of Prussia Road,

Radnor, PA 19087

Latham & Watkins, Attention Miles Ruthberg 885 Third Avenue, New York, N.Y. 10022



Chris Andrews

*I certify that the above information is true and accurate to the best of my knowledge.*

Case No. 08-cv-5523-lak,09-MD-2017(LAK)



# AMERITRADE
Apex

0-669-3900
) AMERITRADE
VISION OF TD AMERITRADE INC
D BOX 2209
MAHA, NE 68103-2209

**Statement Reporting Period:**
09/01/08 - 09/30/08

**Statement for Account #**

CHRIS ANDREWS
23610 HAZEN DRIVE
SOUTHFIELD, MI 48034-2507

**Announcements:**
EFFECTIVE 11/28/2008, NO-TRANS-
ACTION-FEE FUNDS (EXCEPT PROFUNDS &
RYDEX MUTUAL FUNDS) HELD 180 DAYS
OR LESS ARE SUBJECT TO A $49.99
SHORT-TERM REDEMPTION FEE, PLUS ANY
FEES DESCRIBED IN THE PROSPECTUS.

**Investment**

Cash
MMDA
Money Market
Short Balance
Stocks
Short Stocks
Fixed Income
Options
Short Options
Mutual Funds
Other

**Total**

**Cash Activity Summary**

Opening Balance
Securities Purchased
Securities Sold
Funds Deposited
Funds Disbursed
Income
Expense
Other

**Closing Balance**

**Statement for Account #** ▓▓▓▓
09/01/08 - 09/30/08

## Account Activity

| Trade Date | Settle Date | Acct Type | Transaction/ Cash Activity* | Description | Symbol/ CUSIP | Quantity | Price | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 09/12/08 | 09/17/08 | Margin | Buy - Securities Purchased | WASHINGTON MUTUAL COM | | | | | |
| 09/12/08 | 09/17/08 | Margin | Sell - Securities Sold | WASHINGTON MUTUAL COM | WAMU | 1,000 | 2.81 | 2,800.03 | 2,418.08 |
| 09/12/08 | 09/17/08 | Margin | Buy - Securities Purchased | LEHMAN BROS HLDGS INC COM | LEHMQ | 200 | 3.67 | (743.95) | 1,674.13 |

Case 1:09-md-02017-LAK   Document 874-6   Filed 04/05/12   Page 65 of 96

**Statement for Account #** ▮▮▮▮▮▮
09/01/08 - 09/30/08

## Account Activity

| Trade Date | Settle Date | Acct Type | Transaction/ Cash Activity* | Description | Symbol/ CUSIP | Quantity | Price | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 09/15/08 | 09/18/08 | Margin | Sell - Securities Sold | LEHMAN BROS HLDGS INC COM | LEHMQ | 200- | 0.321 | 54.24 | 594.31 |



# Global Code
# of Conduct





EY

Building a better
working world

**The Global Code of Conduct
draws on our shared values.**

*Who we are*

## Our values

People who demonstrate
integrity, respect and teaming.

People with energy, enthusiasm
and the courage to lead.

People who build relationships
based on doing the right thing.

**To the people of EY**

EY is committed to doing its part in building a better
working world.

Our Global Code of Conduct and our values underpin this
purpose.  They represent our commitment to all our
stakeholders that we understand the confidence that they
place in us to deliver quality and excellence in everything we do.

Every day each one of us could be faced with challenging and
difficult choices; it's simply a part of living and working in a
demanding, complex and increasingly globalized business
environment.  But it's the integrity and professionalism that
we bring to these challenges that defines our reputation.

We are each accountable for our own decisions.  And we
are accountable to all our EY colleagues across the world.
The Code provides a clear set of standards for our business
conduct.  It presents each of us with an ethical and
behavioral framework to guide our response to the
challenging and sometimes difficult choices we face.
It also reflects our values.

Whenever we encounter an ethical issue, each of us has the
responsibility to respond in a manner that reflects our values
in action.  While most issues can be resolved locally, you will
find information within this Code about additional support
and resources available globally.

It's essential that everyone at EY fully complies with the
Code.  By doing so, we send a clear message to those we
work with about the strength of our commitment to ethical
behavior and quality.

In this way we protect and enhance the reputation of EY,
and play a key role in building a better working world for our
people, for our clients and for our communities.


Sincerely,

**Mark A. Weinberger**
Global Chairman and CEO

Global Code of Conduct   3

## EY Global Code of Conduct

The EY Global Code of Conduct provides the ethical
framework on which we base our decisions – as individuals
and as members of our global organization.  The Code is
anchored in our values and beliefs, and underpins all that
we do.

Our Global Code of Conduct is organized into five categories
containing guiding principles that should be used by
everyone within EY to guide our behavior across all areas of
our activity:

1.  Working with one another

2.  Working with clients and others

3.  Acting with professional integrity

4.  Maintaining our objectivity and
    independence

5.  Respecting intellectual capital

We expect everyone who works at EY to behave in
accordance with the principles contained in the Global
Code of Conduct.  If you do not understand the principles
contained within the Code, or are not sure how to apply
them, you should consult with an appropriately qualified
colleague to get your questions answered.

## Our commitment

The Global Code of Conduct applies to everyone at EY, regardless of their individual role, position or practice.

- We promote and support the Global Code of Conduct in our day-to-day business activities, through both personal leadership and business practice.

- Each of us is expected to behave according to the principles contained in the Global Code of Conduct. We encourage consultation and the seeking of advice, as appropriate, from the resources available to assist in application of the Code.

- We understand that deviations from or violations of the Global Code of Conduct are unacceptable and that we should feel able to raise them, without fear of retaliation, with an appropriate colleague or to the relevant ethics hotline. **EY does not permit discrimination or retaliation of any kind for good faith reports of illegal or unethical behavior.**

- We acknowledge that breaches of the Global Code of Conduct may result in our practices taking disciplinary action, up to and including termination of employment.

- We affirm in writing our understanding of the principles contained in the Global Code of Conduct and our commitment to abide by them.

## 1. Working with one another

- We build relationships with each other based on a shared trust and confidence that each of us has a personal and professional commitment to do the right thing.

- We are committed to communicating openly and honestly

- We are committed to working in diverse teams and are personally accountable to other team members for the contribution we make.

- We rely upon each other to deliver quality service to our clients and for our individual development.

- We nurture integrity, respect and teaming.

- We consult with each other and value the perspectives of those who are different from us, as well as those who challenge our own point of view.

- We embrace multicultural experience and diversity as strengths of our global organization.  As such, we respect one another and strive for an inclusive environment free from discrimination, intimidation and harassment.

- We encourage and support the professional development of our colleagues and promote individual achievement and continuous learning.

- We expect and deliver feedback regularly, candidly and constructively, and positively recognize success.

## 2. Working with clients and others

No client or external relationship is more important than the ethics, integrity and reputation of EY.

*Working with clients ...*

- We commit ourselves, as professionals, to uphold the trust placed in us by others.

- We are committed to delivering quality services that reflect our professional capabilities and are appropriate to the specific issues and needs of our clients.

- We are robust and courageous in our challenge to clients and are not afraid to deliver unwelcome information to them.

- We support our people and will withdraw from working for any clients that put our people under undue pressure or threaten them in exercising their professional duties.

*Working with regulators ...*

- We uphold the professional standards and rules applicable to us, and our member firms actively work with the regulators who oversee our professional conduct to ensure that these rules and standards meet the continuously changing needs of the market.

*Working with others ...*

- We reject unethical or illegal business practices in all circumstances.

- We avoid working with clients and others whose standards are incompatible with our Global Code of Conduct.

- We coordinate, as appropriate, with other members of our profession in matters of public interest.

- We recognize our responsibility as an organization in playing an active and positive role in supporting a successful and sustainable society.

### 3. Acting with professional integrity

*Our professional integrity ...*

▸ We comply with laws, regulations and standards that apply to us in our professional conduct.

▸ We uphold the EY name. We do not misrepresent the position that EY takes in professional and other matters.

▸ We promote a culture of consultation. We address questions of ethics and consult appropriately to help resolve them. We do not hide from or ignore issues.

▸ We provide ethics hotlines to deal with sensitive ethical issues.

▸ We understand and comply with EY policies and procedures.

*Our competitive approach ...*

▸ We recognize that our competitive advantage is achieved through the excellence of our professional advice and the quality of our service delivery.

▸ We compete energetically and vigorously, and recognize the need to be honest in our competitive behavior.

▸ We do not offer personal inducement to secure work.

*Documenting our work ...*

▸ We properly document our client engagements and business operations in accordance with EY policies and relevant legal and professional requirements.

▸ We never destroy or alter documents, or recommend their destruction or alteration, for any illegal or improper reason.

*Our fees ...*

▸ We charge appropriate fees for our services in accordance with our engagement terms and our professional rules.

*Time and expenses .*

▸ We require actual hours worked and expenses incurred to be reported.

▸ We incur expenses in accordance with EY policies or, where agreed, our clients' expense policies.

## 4. Maintaining our objectivity and independence

*Our objectivity ...*

‣ We maintain and affirm our objectivity and independence, recognizing that these are critical to our professional responsibilities.

‣ We employ professional skepticism.

‣ We reject inappropriate pressure from clients or others.

‣ We are alert for personal and professional conflicts of interest and take immediate and appropriate steps to resolve or manage any that may arise.

‣ We do not accept payments or items of value if this could reasonably be viewed as influencing our conclusions or advice.

*Our independence ..*

‣ We comply with EY's independence rules, including the restrictions applicable to our families.  We understand that these may sometimes be more rigorous than applicable professional and legal requirements.

‣ We avoid relationships that impair – or may appear to impair – our objectivity and independence.

‣ We continuously monitor our independence.

## 5. Respecting intellectual capital

▸ We respect and protect confidential information obtained from, or relating to, our clients or third parties, as well as personal information about our people, in accordance with local law and professional standards.

▸ We take proactive measures to safeguard our documents, computers and other data devices that contain personal or confidential information.

▸ We do not use confidential information for personal gain.

▸ We obtain, develop and protect intellectual property in an appropriate manner. We respect the restrictions on its use and reproduction.

▸ We use and share internal and external knowledge in accordance with EY policies and our legal and professional obligations.

▸ We acknowledge that each of us is responsible for keeping our professional knowledge up to date and for sharing best practices.

## Where to find support

In developing this Global Code of Conduct, the leadership of EY recognizes that no code can cover every eventuality – and that from time to time we may require the advice and support of others in addressing some of the situations that arise during the normal course of daily business life.

We have long promoted a consultative culture at EY.  In addition to established internal relationships, we have created a support network that is available for consultation and advice, to help each of us live up to our commitments under the Code.

*Here are some of the places where you can go for advice and guidance:*

‣ Risk Management and Quality Leaders, who have been appointed at the Global, Service Line, Area and local level

‣ The Talent team at all levels within the global organization

‣ The Office of the General Counsel or Legal Counsel in your Area or locally

‣ Professional Practice Directors

‣ Global, Area, and local policies and procedures, including online resources and databases

‣ Ethics hotlines and ethics oversight teams

**Putting it into action**

This Global Code of Conduct gives everyone at EY an ethical framework to help make the right decisions. The principles contained in the Code provide us with a clear set of standards, grounded in our values, on which to base our behavior across all areas of our professional activity.

How do we put the Code into action? How can each of us make sure that we are living up to our commitments under the Code?

If you are unsure of the right course of action, or are faced with a difficult issue, asking yourself the following questions may help you determine the appropriate way to act.

1. Have I consulted appropriately with colleagues?

2. Are my actions legal and in compliance with the standards of our profession?

3. Am I compromising my integrity or the integrity of EY or our clients?

4. Am I upholding the values of EY?

5. Am I treating others the way I expect others to treat me?

6. Is my choice of action the most ethical among the possible alternatives?  Do I feel good about my choice?

7. If I document my decision, would a reviewer agree with the action I have taken?

8. Would my actions damage the reputation of EY?

**Notes**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



EY | Assurance | Tax | Transactions | Advisory

**About EY**

EY is a global leader in assurance, tax, transaction and advisory services. The insights and quality services we deliver help build trust and confidence in the capital markets and in economies the world over. We develop outstanding leaders who team to deliver on our promises to all of our stakeholders. In so doing, we play a critical role in building a better working world for our people, for our clients and for our communities.

EY refers to the global organization, and may refer to one or more, of the member firms of Ernst & Young Global Limited, each of which is a separate legal entity. Ernst & Young Global Limited, a UK company limited by guarantee, does not provide services to clients. For more information about our organization, please visit ey.com.

© 2013 EYGM Limited.
All Rights Reserved.

EYG no. DU0016

This material has been prepared for general informational purposes only and is not intended to be relied upon as accounting, tax, or other professional advice. Please refer to your advisors for specific advice.





NERA
ECONOMIC CONSULTING

21 January 2014



# Recent Trends in Securities Class Action Litigation: 2013 Full-Year Review
Large settlements get larger; small settlements get smaller

By Dr. Renzo Comolli and Svetlana Starykh

Insight in Economics™



**2013 Highlights in Filings**

- 10% increase in the number of federal securities class actions filed
- Filings in the 9th Circuit back to historical level, after the 2012 trough
- Filings in the 5th Circuit alleging violation of Rule 10b-5 roughly doubled

**2013 Highlight in Dismissals and Settlements**

- Number of settlements remained close to record low level
- 9 settlements above $100 million drove average settlement up, but smaller cases settled for less

# Recent Trends in Securities Class Action Litigation: 2013 Full-Year Review

**Large settlements get larger; small settlements get smaller**

By Dr. Renzo Comolli and Svetlana Starykh[1]

21 January 2014

## Introduction and Summary

Legal developments have dominated the news about federal securities class actions in 2013. Last February, the Supreme Court decision in *Amgen* resolved certain questions about materiality but focused the debate on *Basic* and the presumption of reliance, which are now back to the Supreme Court after *certiorari* was granted for the second time in *Halliburton*.

Against this legal backdrop, 2013 saw a small increase in the number of complaints filed for securities class actions in general and for class actions alleging violation of Rule 10b-5 in particular. Filings in the 5th Circuit doubled, while filings in the 9th Circuit bounced back after having dipped in 2012.

Settlement activity continued to proceed at a very slow pace after the 2012 record low. But the 2013 settlements include some large ones. Nine settlements passed the $100 million mark, driving average settlement amounts to record highs never seen before. On the other hand, the median settlement dropped substantially compared to 2012. In summary, 2013 was a year in which large settlements got larger and small settlements got smaller.

## Trends in Filings[2]

### Number of Cases Filed

In 2013, 234 securities class action were filed in federal court. That level represents a 10% increase over 2012, and a slight increase compared to the average number of filings in the period 2008-2012. See Figure 1.

Figure 1. **Federal Filings**
January 1996 – December 2013



Over the 1996-2013 period, the number of publicly listed companies in the US decreased substantially. In 2013, 4,972 companies were listed in the US, 43% fewer than in 1996. Combined with the filing data, the implication of this decline is that an average company listed in the US was 83% more likely to be the target of a securities class action in 2013 than in the first five years after the passage of the PSLRA. See Figure 2.

Figure 2. **Federal Filings and Number of Companies Listed in United States**
January 1996 – December 2013



Note: Number of companies listed in US is from Meridian Securities Markets; 1996-2012 values are year-end; 2013 is as of October.

## Filings by Type

The number of merger objection cases filed in federal court continued diminishing compared to its peak in 2010. In 2013, 50 such cases were filed; this figure includes merger objections alleging breach of fiduciary duty but not a violation of a securities law. In spite of their diminishing number, merger objections represented the largest distinct group of filings among those depicted here. Many more merger objection cases have been filed at state level: we don't include state cases in our counts.

There were hardly any new filings related to the credit crisis in 2013, which was also the case in 2012.[3] Filings related to Ponzi schemes were also very few: just four. See Figure 3.

Figure 3. **Federal Filings**
January 2005 – December 2013



A different way of classifying filings is based on whether they allege violations of Rule 10b-5, Section 11, and/or Section 12. These filings are often regarded as "standard" securities class actions and are depicted in Figure 4. In 2013, 165 "standard" cases were filed, a 15% increase over 2012 and more than any year in the 2009-2012 period. This figure, however, is still much lower than the 218 "standard" cases filed in 2008 during the filing peak associated with the credit crisis.

Figure 4.  **Federal Filings Alleging Violation of Any of: Rule 10b-5, Section 11, Section 12**
January 2000 – December 2013



Note: Excludes IPO laddering cases.

The Supreme Court's second grant of *certiorari* in *Halliburton* is commanding attention because of the possible impact it might have on securities class action litigation. The Supreme Court recently issued two other decisions about securities class actions alleging violation of Rule 10b-5: the first *Halliburton* decision and the *Amgen* decision. Figure 5 shows the number of 10b-5 class action monthly filings in the periods surrounding these decisions. Figures 6 and 7 are equivalent figures for the 2nd and the 5th Circuit, respectively. In the figure about the 2nd Circuit, we add the 2nd Circuit decision in *Solomon*; while in the chart about the 5th Circuit, we add the 5th Circuit decision *Oscar v Allegiance*.[4] In the 5th Circuit, 13 10b-5 class actions were filed in 2013 (all of them after the *Amgen* decision) compared to 6 filed in 2012 and 5 filed in 2011. Of course, we are not suggesting how much, if any, of the change in the filing activity is due to these decisions as, in these years, the litigation environment was influenced by many other factors but we do note a 48% increase in average monthly filings from the period *Amgen certiorari − Amgen* decision to the period *Amgen* decision − *Halliburton* second writ.

**Figure 5. Monthly 10b-5 Filings − All Circuits**
January 2007 − December 2013





**Figure 6. Monthly 10b-5 Filings – Fifth Circuit**
January 2007 – December 2013



**Figure 7. Monthly 10b-5 Filings – Second Circuit**
January 2007 – December 2013

In addition to the number of filings, we also analyze the size of the cases that they represent using a measure we label "investor losses." Aggregate investor losses as shown in Figure 8 are simply the sum of total investor losses across all cases for which investor losses can be computed.

In 2013 aggregate investor losses were noticeably smaller than in any other year since 2005. The reduction was driven by the scarcity of filings associated with investor losses larger than $10 billion; only one such case was filed in 2013. Cases associated with investor losses in that range are very few in a given year, but because of their size, even just a couple of them can have a sizeable impact on the aggregate.

Figure 8. **Aggregate Investor Losses ($Billion) for Federal Filings with Alleged Violations of Rule 10b-5, Section 11, or Section 12**
January 2005 – December 2013



NERA's investor losses variable is a proxy for the aggregate amount that investors lost from buying the defendant's stock rather than investing in the broader market during the alleged class period. Note that the investor losses variable is not a measure of damages, since any stock that underperforms the S&P 500 would have "investor losses" over the period of underperformance; rather, it is a rough proxy for the relative size of investors' potential claims. Historically, "investor losses" have been a powerful predictor of settlement size. Investor losses can explain more than half of the variance in the settlement values in our database.

We do not compute investor losses for all cases included in this publication. For instance, class actions in which only bonds and not common stock are alleged to have been damaged are not included. The largest excluded groups are the IPO laddering cases and the merger objection cases. NERA reports on securities class actions published before 2012 did not include investor losses for cases with only Section 11 allegations, but such cases are included here. The calculation for these cases is somewhat different than for cases with 10b-5 claims.

Technically, the investor losses variable explains more than half of the variance in the logarithm of settlement size. Investor losses over the class period are measured relative to the S&P 500, using a proportional decay trading model to estimate the number of affected shares of common stock. We measure investor losses only if the proposed class period is at least two days.

## Filings by Issuers' Country of Domicile[5]

In 2011, a record number of cases were filed against foreign issuers, with a total of 62. More than half of those cases reflected a surge of filings against companies domiciled or with principal executive offices in China. Filings against Chinese companies dropped significantly in 2012 and remained constant in 2013, with only 16 suits filed. See Figure 6. The total number of filings against all foreign-domiciled companies followed a similar pattern. See Figure 9.

Figure 10 shows that in 2011 foreign-domiciled companies were disproportionally targeted by securities class actions. That is, securities class actions against foreign-domiciled companies represented a larger proportion of total securities class actions compared with the proportion that listings of foreign-domiciled companies represented of total listed companies. In 2012 and 2013 foreign-domiciled companies have not been disproportionally targeted.

Figure 9.  **Filings by Foreign Company Domicile and Year**
January 2008 – December 2013



Note: Companies with principal executive offices in China are included in the totals for China.

Figure 10.  **Foreign-Domiciled Companies: Share of Filings and Share of All Companies Listed in United States**
January 2008 – December 2013



Note: Companies with principal executive offices in China are included in the counts of foreign companies.

## Filings by Circuit

Historically, filings have been concentrated in two US circuits, and 2013 was no exception: the 2nd and the 9th Circuits, which respectively include New York and California, together accounted for 53% of the 2013 filings. Filings in the 9th Circuit rebounded markedly from the low in 2012: 59 cases were filed there in 2013, a 64% increase from the previous year and close to the 2009-2011 average. The 2nd Circuit exhibited a comparatively smaller increase: 66 cases were filed there in 2013, an increase of 18% compared to the previous year. See Figure 11.

In the 5th Circuit, more than twice as many securities class actions were filed in 2013 as in 2012. With 25 cases filed, the 5th Circuit, which includes Texas, still represented only 11% of the US cases. However, the 2013 level was exceptional for the 5th Circuit: it was the highest level since 2000. This increase is related to the increase in 10b-5 class action filings discussed in Figure 6.

**Figure 11. Federal Filings by Circuit and Year**
January 2009 – December 2013



## Filings by Sector

The electronic technology and services, health technology and services, and finance sectors taken together continued to account for more than half of the primary defendants. In 2013, these sectors represented, respectively, 19%, 18%, and 15% of the filings' targets. See Figure 12. In 2008, due to the credit crisis, filings against primary defendants in the financial sector accounted for 49% of filings (not shown). From that 2008 peak, the share of filings accounted for by the financial sector declined to 14% in 2012, with a barely perceptible rebound in 2013 to 15%.

Figure 12. **Percentage of Filings by Sector and Year**
January 2009 – December 2013



Note: This analysis is based on the FactSet Research Systems, Inc. economic sector classification. Some of the FactSet economic sectors are combined for presentation.

Companies in the financial sector are often also targeted as codefendants.

Figure 13 shows that 9% of filings in 2013 involved a financial institution as a codefendant, but not a primary defendant. The overall pattern of filings against financial institutions as a share of total filings is similar whether financial codefendants are included in the calculation or not: the share peaked with the credit crisis and has been declining since, with a barely perceptible rebound in 2013 to 24%.[6]

Figure 13.  **Federal Cases in which Financial Institutions Are Named Defendants**
January 2005 – December 2013



Note: Analysis presented in this chart uses codefendant data we code at the filing stage.

### *Accounting codefendants*

Only 2.1% of federal securities class actions filed in 2013 included an accounting codefendant in the initial filing. This level represented a slight uptick from the previous year but it was still a much lower level than the one experienced in the 2005-2009 period, when on average 7.7% of cases named accounting codefendants. See Figure 14.[7]

As noted in prior publications, this trend might be the result of changes in the legal environment. The Supreme Court's *Janus* decision in 2011 restricted the ability of plaintiffs to sue parties not directly responsible for misstatements, and, as a result, auditors may only be liable for statements made in their audit opinion. This decision, along with the Court's *Stoneridge* decision in 2008 that limited scheme liability, may have made accounting firms unappealing targets for securities class action litigation

Figure 14. **Percentage of Federal Filings in which an Accounting Firm is a Codefendant**
January 2005 – December 2013



Note: Analysis presented in this chart uses codefendant data at the filing stage.

## Allegations

Allegations involving misleading earnings guidance were up sharply in 2013, representing 41% of complaints, compared to 29% in 2012. More than a quarter of filings included accounting allegations – more than in the previous year, but less than the 44% observed in 2009.[8] See Figure 15. The decline in accounting allegations may be related to the reduction in cases with accounting codefendants.

Figure 15. **Allegations in Federal Filings**
January 2009 – December 2013



The percentage of class actions with Rule 10b-5 allegations that also alleged insider sales had been on a sharply decreasing trend between 2005 and 2011, dropping from 48.6% to 17.4%. This trend started to reverse in 2012, and in 2013 insider sales allegations were included in a quarter of all 10b-5 class actions. See Figure 16.

Figure 16. **Percentage of Rule 10b-5 Filings Alleging Insider Sales**
By Filing Year; January 2005 – December 2013



## Time to File

Half of the class actions filed in 2013 were filed within 16 days from the end of the alleged class period, a marked acceleration compared to the 40 days it took to file half of the class actions in 2012. This acceleration, though, did not involve all filings: the mean time to file increased to 139 days from 115. In other words, fast class actions got faster and slow class actions got slower. See Figure 17.

**Figure 17. Time to File from End of Alleged Class Period to File Date for Rule 10b-5 Cases**
January 2009 – December 2013





Note: This analysis excludes cases where alleged class period could not be unambiguously determined.